UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARMAND SKRINE,<br><br>         Petitioner,<br><br>-against-<br><br>CHRISTOPHER COLLINS,<br><br>         Respondent. | **DECARATION IN OPPOSITION TO THE PETITION FOR A WRIT OF HABEAS CORPUS**<br><br>23-CV-04575-DG |

**THOMAS B. LITSKY**, an attorney duly admitted to practice in the State of New York and before this Court, declares under penalty of perjury, pursuant to 28 § 1746, that:

1. I am an Assistant District Attorney, of counsel to Michael E. McMahon, District Attorney of Richmond County. I submit this declaration in opposition to the petition for a writ of habeas corpus.

2. This declaration is based upon information and belief, the source of which is my review of files maintained by the Richmond County District Attorney's Office.

3. The underlying petition concerns a judgment of the Supreme Court of the State of New York, Richmond County (Collini, J., on suppression motion; Rooney, J., at trial and sentence), rendered July 29, 2014. By that judgment, petitioner was convicted, following a jury trial, of Murder in the Second Degree [P. L. § 125.25(1)] and Criminal Possession of a Weapon in the Second Degree

0

[P. L. § 265.03(3)]. He was sentenced to concurrent indeterminate and determinate terms of imprisonment of 25 years to life and ten years, the later to be followed by two and a half years of post-release supervision. Petitioner is presently serving his sentence.

4. On December 8, 2011, inside a residential apartment complex at 195 Steuben Street in Staten Island, petitioner used an assault rifle with a defaced serial number to shoot a friend to death. The gun was recovered from an abandoned duffel bag containing counterfeit currency and petitioner's personal items; petitioner himself, meanwhile, was spotted on a street just blocks from the bag, and minutes after the shooting.

5. Petitioner was arrested and charged with Murder in the Second Degree [P. L. § 125.25(1)], Criminal Possession of a Weapon in the Second Degree [P. L. § 265.03], Criminal Possession of a Weapon in the Third Degree (assault weapon) [P. L. § 265.02(7)], Criminal Possession of a Weapon in the Third Degree (defaced weapon) [P. L. § 265.02(3)], and Criminal Possession of a Forged Instrument in the First Degree (two counts) [P. L. § 170.30].

## THE EVIDENCE AT THE SUPPRESSION HEARING

### The People's Case

6. At around 11:50 a.m. on December 8, 2011, Police Officer JEFFREY ANDERSON and a partner, both in uniform, traveled to Staten Island

in a marked police car (Anderson 22). They were responding to a radio report of a male shot at 195 Steuben Street (Anderson 22).

7. Officer Anderson drove across the Verrazzano Bridge, then exited onto a service road in the direction of Steuben Street (Anderson 23). Finally within walking distance of 195 Steuben Street, and only five minutes after the radio report, Anderson noticed petitioner walking along the service road. He was wearing black jeans; a black jacket; black, muddy sneakers; and a blue Yankees hat (Anderson 26). As Anderson's car passed, petitioner made eye contact with him, and then increased his speed (Anderson 26, 34).

8. Officer Anderson backed up and pulled over (Anderson 27). He asked petitioner where he was going. Petitioner did not respond. He kept his hands in his pockets, and Anderson noticed he was sweating despite the December cold (Anderson 27-28). Anderson and his partner asked to see petitioner's ID; petitioner refused. Anderson's partner then placed petitioner in handcuffs, and Anderson frisked him (Anderson 28).

9. The frisk recovered $900 cash, a quantity of counterfeit currency, a passport, and a birth certificate (Anderson 30-31). A check of petitioner's name revealed an open "I-card" for his arrest (Anderson 30). Petitioner was then arrested.

10. Following petitioner's arrest, Detective EDWARD PATTERSON

interviewed him at the precinct stationhouse (Patterson 48).

11. At around 4:00 p.m., Detective DANIEL GUARIANO observed the recovery of a black and gray duffel bag from a pile of leaves in a wooded area near 195 Steuben Street (Guariano 6-8). Inside the bag was a semiautomatic weapon (Guariano 9; People's Ex. 1 [photograph]).

12. On January 6, 2012, Detective Patterson conducted a photo array. It produced a positive identification (Patterson 48). The witness identified petitioner as a man that he "met at David's after Thanksgiving" (Patterson 61, 63).

**The Court's Decision**

13. In a Decision and Order issued July 17, 2013, the court (Collini, J.) determined that the circumstances of petitioner's police encounter on the service road permitted no more than a "Level One" request for information under People v. DeBour, 40 N.Y.2d 210 (1976). Thus, the officers' detention and frisk of petitioner required that "the … physical evidence from petitioner's person (i.e., the counterfeit currency and identification cards) must be suppressed" along with the ensuing statement to police (Decision and Order at 4-5).

14. The court denied the suppression motion in all other respects.

**The Trial**

15. In March 2014, the parties proceeded to trial on the second-degree murder, criminal possession of a weapon, and first-degree criminal possession of a

3

forged instrument counts.

**The Evidence at Trial**

    **The People's Case**

16.    David Williams lived with his fiancée, JACLYN NICOLE HUNT, and their daughter at 195 Steuben Street, Apartment 7L, Staten Island (Hunt 240). He was an Access-A-Ride employee; she was a preschool teacher (Hunt 240, 241). They had known each other for thirteen years (Hunt 240).

17.    Williams had known petitioner for a while, too (Hunt 243). They had been college roommates, and they kept in touch after graduation, spending time together at Williams's apartment and elsewhere (Hunt 243, 245). Williams was 5'11" and skinny; petitioner, who had played college basketball, was taller and much heavier (Patterson 233; Hunt 241, 245; DeRoux 361-62).

18.    On Thanksgiving 2011, Hunt noticed petitioner was carrying a heavy duffel bag. Petitioner was known to carry a similar duffel Hunt identified a photo of that duffel bag (Hunt 246, People's Ex. 124 [photograph]).

19.    On the morning December 8, 2011, Williams dropped Hunt off at work and their daughter off at school (Hunt 247). That same morning, as depicted in surveillance videos downloaded by Department of Transportation employees JAMES VITALE and MICHAEL CASIANO, petitioner traveled by ferry from Manhattan to Staten Island during the 9:00 hour (Casiano 162; Vitale 215;

4

People's Ex. 168, 170 [videos]). Petitioner was also in a dark jacket, gray hooded sweatshirt, and baseball cap; and he was carrying a large, gray and black bag (Patterson 225; People's Ex. 171 [photographs]). Upon his arrival in Staten Island, petitioner walked toward a bus terminal (Patterson 227; People's Ex. 171).

20. Later that morning, building custodian JEAN LOISEAU noticed a person standing in front of the lobby elevator of 195 Steuben Street (Loiseau 112, 123). The man, who was taller than 6'4", was covered from head to toe – a long coat, a full-face mask, gloves, and so on – to the point where Loiseau could not even discern his race (Loiseau 113, 114). He was carrying a black "sports bag" (Loiseau 113, 115).

21. At one point that morning, JANET SMITH, who lived in Apartment 7M, next door, heard male voices coming from Apartment 7L (Smith 164,166). The tone was initially conversational (Smith 167). But later, as Smith walked in the hallway toward the stairwell, she heard "shuffling" and "heavy things being moved around" inside the apartment – and finally a loud shot (Smith 168).

22. Before Smith could leave the hallway, the door to Apartment 7L opened (Smith 169). Williams emerged, his hands on his stomach (Smith 169). He said, "Help me; oh god, help me," and fell to the floor (Smith 170). The door shut behind him (Smith 170).

23. Smith ran down the stairs, on her way to a neighbor's apartment

5

from which she could call the police (Smith 171, 175). As she ran, she heard "another bang, a lot of bang" (Smith 170-171).

24. Moments later, at around 11:50 a.m., Police Officer JEFFREY ANDERSON, driving in Brooklyn toward the Verrazzano Bridge, heard a radio report of a male shot at 195 Steuben Street (Anderson 186). He drove into Staten Island, then left the Staten Island Expressway onto a service road two blocks south of 195 Steuben Street (People's Ex. 169 [maps]). Between the apartment building and the service road were a single residential block, and a wooded area about one block long (People's Ex. 169 [maps]).

25. Petitioner was walking on the service road; it had no sidewalk (Anderson 189). He was wearing a Yankees cap, a dark jacket, and black jeans (Anderson 191, 192, 193). His shoes were muddy, and his face was sweaty (Anderson 191, 192). As he crossed the side of Officer Anderson's car, he made eye contact with Anderson and picked up speed (Anderson 191-92). Anderson stopped him (Anderson 193-94).

26. Meanwhile, at about 12 noon, first responders arrived at Apartment 7L (Diniso 105; Aguilo 131). Police Officer VINCENT AGUILO and Detective EDWARD PATTERSON, each responding to a report of shots fired, were among those on the scene.

27. They encountered Williams lying prone, facedown, in a pool of

6

blood on the hallway floor (Aguilo 132; Patterson 221; People's Ex. 4, 12 [photographs]). Skull fragments and brain matter were visible "a good distance down the hallway" (Steneck 32; Patterson 221; People's Ex. 3, 6 [photographs]). JESSICA DINISO, an emergency medical technician, concluded immediately that Williams had succumbed to a gunshot wound to his head (Diniso 106).

28. Officer Aguilo, who had been informed that a child might be in the home, opened the apartment door (Aguilo 133). He found that the living area was disheveled, with a drum set and sofa pulled apart and various objects thrown or fallen to the floor (Aguilo 134; Patterson 221; Hunt 250). Chairs and tables were turned over (Patterson 221). A shell casing sat on the floor near the doorway (Aguilo 134). Aguilo secured the crime scene.

29. At around 3 p.m., Detective ROBIN STENECK and other members of the Crime Scene Unit arrived at Apartment 7L (Steneck 25, 36). Apart from the physical evidence already described by Aguilo and Patterson, Steneck observed wounds to Williams's arm and upper torso, and blood spatter on the wall of the hallway (Steneck 35, 42; People's Ex. 23, 25, 33-37 [photographs]).

30. Detective Steneck also found signs of fired bullets. In the hallway in front of Apartment 7H was a deformed bullet on the floor and a bullet-impact mark on the wall, 4'6" up from the ground (Steneck 35, 54-55, 57). Inside the apartment were a deformed bullet on the floor near the front door and a bullet-

7

impact mark on the door, 4'1" up from the ground (Steneck 51-52, 56, 57).

31. Fingerprints were also recovered from the hallway outside Apartment 7L. But the only examinable print ultimately belonged to a non-suspect resident who was 5'7" tall and weighed 170 pounds (Patterson 222-23).

32. In the wooded area between 195 Steuben Street and the Staten Island Expressway service road, Police Officer ANTHONY JACOBS, of the NYPD's K-9 unit, conducted a search with the help of a German shepherd named Storm (Jacobs 197, 200). The dog located a black and gray duffel bag hidden under some leaves (Jacobs 201, 204-05), a bag Williams's fiancée remembered petitioner having carried around (Hunt 246).

33. Detective Steneck recovered the duffel bag, and processed it in her truck (Steneck 65).

34. It contained a long brown or black coat, a gray hooded sweatshirt, a hand towel, a spade, an umbrella, a rope, a single black glove, a black mask with eye holes, a CD player, a Gatorade bottle, and a sock containing paper currency.

35. Finally, it contained both a rifle, loaded with a magazine and a live cartridge in the chamber, and a discharged shell casing (Steneck 69; Jacobs 205).

36. Detective Steneck processed the items in her police truck (Steneck 65). The detective marked her initials and different identification numbers on items that she found in the duffel bag. She marked "RS 23" on duffel bag, "RS12"

8

on one loose mask, and "RS7" on the brown coat, size 46 XL (Steneck 66-69; Peo.124 [photo of duffel]; Peo. Exh. 115 [photo of "RS12" mask] Peo. Exh. 107 [photo of coat]).[1]

37. Those items were sent to the police lab, and then to the Office of the Chief Medical Examiner ("OCME"). On April 27, 2011, OCME sent those items to the NYPD Property Clerk at Pierson Place warehouse in Long Island City Queens. On May 11, 2012, the NYPD Property Clerk sent the items from Pierson Place to its Kingsland Avenue warehouse located at 520 Kingsland Avenue in Brooklyn. Those items were destroyed in Hurricane Sandy (Sgt. John TRZCINSKI 145-148).

38. OCME examined items submitted to it, including a mask that was loose inside the bag (People's Ex. 177C, marked "2" by OCME and "RS12" by Steneck) and a mask that was packaged within the pocket of a long coat (People's Ex. 177B, marked "1B" by OCME and unmarked by Steneck). Matching DNA profiles were generated from both masks.

39. IRENE WONG, a criminalist in OCME's forensic-biology department, supervised the generation of a profile based on DNA recovered from two black masks within the duffel bag, including one within the duffel bag's long

---

[1] Detective Steneck offered no testimony whether she looked into the pockets or removed anything from coat pockets when she processed evidence in her truck (T. 374).

9

brown jacket (Wong 329, 331). That profile was then compared to an exemplar profile generated from DNA within the mouth of petitioner (Wong 337).

40. The mask marked "RS12" by Steneck, and labeled "Mask 2" by OCME, had 180.44 picograms of DNA per mircrolitre, and when tested, resulted in a finding of 19 out of 30 possible alleles. The 1B Mask had 505.232 picograms of DNA per microliter, and when tested, resulted in a finding of 30 out of 30 possible alleles (People's Exhibit 175B at p 70).

41. Wong reached two conclusions: first, that the DNA from both black masks derived from a single source (Wong 341); and that "Armand Skrine is the donor to those two mask samples" (Wong 343).

42. Williams's autopsy was conducted by Dr. STEPHEN DEROUX, of the Office of the Chief Medical Examiner ("OCME"). Dr. DeRoux observed entry and exit gunshot wounds to Williams's head, and a second pair of entry and exit gunshot wounds to his torso (DeRoux 363). The torso wounds suggested that a bullet had traveled through Williams's heart and lungs, entering his body while his arms were at his side (DeRoux 363, 371). Either injury would have caused Williams's death, but the head injury would have killed him instantly (DeRoux 366, 369).

43. Dr. DeRoux also noticed fresh abrasions to Williams's head, chest, leg, and shoulder (DeRoux 363, 372).

44. Detective JAMES CLONTZ, of the NYPD's forensic-investigation division, examined the rifle recovered from the duffle bag. It was an operable, semi-automatic weapon based on the AK-47 Kalashnikov rifle, and it contained an ejection port designed to catch errant shell casings (Clontz 282, 283, 286, 290-91). Its serial number had been defaced (Clontz 297). Two rounds were missing from the magazine (Clontz 287).

45. Detective Clontz also determined that the bullets recovered from 195 Steuben Street matched the duffel bag's unused cartridges in appearance and caliber class, and that they were an appropriate shape and size to have been fired from the rifle (Clontz 304-05, 306). He could not conclusively state whether they had actually been fired from the rifle (Clontz 306).

46. After examining the discharged shell casings, however, Clontz was more confident: he determined that the casings had been fired from the same firearm (Clontz 309-10).

47. The paper currency from the duffel bag was also examined. They were stacks of U.S. ten-dollar bills divided into multiple sets, and the bills in each set had the same serial number (Steneck 75). Criminalist PATRICIA ZIPPO determined that they were counterfeit (Zippo 271).

**The Defense Case**

48. Petitioner did not call any witnesses.

11

**The Verdict and Sentence**

49.    The jury convicted petitioner of Murder in the Second Degree [P. L. § 125.25(1)] and Criminal Possession of a Weapon in the Second Degree [P. L. § 265.03(3)]. On July 29, 2014, he was sentenced to state concurrent indeterminate and determinate terms of imprisonment of 25 years to life and ten years, the later to be followed by two and a half years of post-release supervision.

**The Direct Appeal**

50.    On direct appeal, petitioner claimed, in relevant part, that counsel was ineffective because she did not to inadmissible evidence, was unprepared, gave, have no opening statement and an incoherent summation.

51.    The Appellate Division found that "the evidence, the law, and the circumstances of this case, viewed in the totality and as of the time of the representation, reveal that counsel provided the petitioner with meaningful representation." People v. Skrine, 201 A.D.3d 744, 745 (2d Dept. 2022). The court further found that counsel was not ineffective for failing to assert a Confrontation Clause challenge to the testimony of the OCME criminalist because that alleged error involved an issue which was not "so clear-cut and dispositive" at the time of the petitioner's trial that "no reasonable defense counsel would have failed to assert it." Id. (citing People v. Rodriguez, 31 N.Y.3d 1067, 1068 (2018)). The court also found that counsel's failure to object to improper testimony and

evidence regarding the clothing worn by the petitioner at time of his arrest "was not 'sufficiently egregious and prejudicial as to compromise petitioner's right to a fair trial.'" Id. (citing People v. Caban, 5 N.Y.3d 143, 152 (2005).

52.     On March 24, 2022, the New York Court of Appeals, denied leave to appeal. People v.Skrine, 38 N.Y.3d 954 (2022).

**The Petition Before this Court**

53.     In a counseled petition, filed June 20, 2023, petitioner asserts that defense counsel's combined failure to object to evidence connecting him to the crime and alleged lack of preparation deprived him of his constitutional right to the effective assistance of counsel.

54.     Respondent is filing the State Court Record separately.

WHEREFORE, for the reasons that will be set forth in Respondent's Memorandum of Law, the petition should be dismissed without a hearing.

                                          /s Thomas B. Litsky
                                          _____
                                          THOMAS B. LIITSKY (TL-8976)
                                          Assistant District Attorney

Dated: Staten Island, New York
      December 1, 2023