UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ARMAND SKRINE,

                                    Petitioner,

              -against-

CHRISTOPHER COLLINS,

                                    Respondent.

No. 23-cv-04575-DG

## STATE COURT RECORD

MICHAEL E. McMAHON
District Attorney Richmond County
Attorney for Respondent
130 Stuyvesant Place
Staten Island, New York 10301
Thomas.Litsky@rcda.nyc.gov
(phone) 718-556-7120
Thomas.Litsky@rcda.nyc.gov

THOMAS B. LITSKY
Assistant District Attorney
   Of Counsel

Dated: December 1, 2023

# TABLE OF CONTENTS

Supreme Court, Richmond County, Decision and Order
on Defendant's Motions to Suppress, dated July 17, 2013 .................................... 1-7

Defendant's Appellate Division, Second Department, Brief  ............................. 8-79

The People's Appellate Division, Second Department, Brief ......................... 80-126

Defendant's Appellate Division, Second Department, Reply Brief ............. 127-147

Decision & Order of the Appellate Division, Second Department,
        dated January 12, 2023  ....................................................................... 148-149

Defendant's Initial Letter Seeking Leave to Appeal to the  New York
        Court of Appeals .................................................................................... 150-151

Defendant's Supplemental Letter Seeking Leave to Appeal ......................... 152-156

The People's Letter in Opposition ................................................................ 157-160

Order of the Court of Appeals Denying Leave to Appeal,
        dated March 24, 2022, ................................................................................161

Pretrial Hearing Transcript ......................................................................... 162-228

Voir Dire Transcript ..................................................................................... 229-469

Trial Transcript ........................................................................................... 470-1041

Sentencing Transcript ............................................................................... 1042-1059

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND: CRIMINAL TERM - PART 12

HON. ROBERT J. COLLINI, J.S.C.

THE PEOPLE OF THE STATE OF NEW YORK,

**DECISION AND ORDER
ON DEFENDANT'S
MOTIONS TO SUPPRESS**

-against-

July 17, 2013

ARMAND SKRINE,

Indictment No.: 454/2011

Defendant.

A *Dunaway/Huntley/Mapp/Wade* hearing having been conducted before this Court on June 14, 2013, and upon due consideration of the arguments of counsel[1], it is decided as follows:

DETECTIVE DANIEL GUARIANO of the 120th Squad, POLICE OFFICER JEFFREY ANDERSON of the 120th Precinct and DETECTIVE EDWARD T. PATTERSON of the 120th Squad testified on the People's behalf. Defendant did not produce any witnesses.


FINDINGS OF FACT


The Court, having heard the testimony of the witnesses and having observed their demeanor, finds each witness credible in all respects.

On December 8, 2011 at approximately 11:55 a.m., P.O. Anderson received a radio

---

[1] Memoranda of counsel: People, dated July 15, 2013; defense, dated July 10, 2013.

000002

run of a male shot only about a few minutes earlier at 195 Steuben Street in Staten Island, New York. P.O. Anderson and his partner were in uniform, riding in a marked police vehicle when they drove from the Verrazano Bridge onto the north service road. (People's 3 in evidence is a recording of the radio trasmissions.)

As they drove along the service road and neared a wooded area, P.O. Anderson observed defendant. This occurred approximately five minutes after receiving the radio run.

Defendant was walking alone and no other pedestrians were in the area. He was not disheveled in appearance. He appeared nervous and made eye contact with P.O. Anderson as he was driving past. He then began to walk faster.

P.O. Anderson then stopped his vehicle, backed up and both officers exited. Defendant appeared sweaty[2] and fidgety. He refused the officers' request for identification. P.O. Anderson had his gun out, but at his side, while, at this point, his partner proceeded to handcuff defendant for safety. Defendant had no blood on him.

Mud was observed on defendant's black sneakers. There was mud along a path in the woods, which leads to 195 Steuben Street. It is an approximate five-minute walk between that location and where defendant was stopped by police.

A wallet was recovered from defendant's person with his driver's license along with counterfeit United States currency.

Other police officers arrived and a name check was conducted, which revealed that defendant had an active "I-card" for his arrest for assault in Queens.

The radio run reveals that no description of a suspect was broadcasted over the radio. Even P.O. Anderson could be heard requesting a description and the police dispatcher made several attempts to telephone the 911 caller who reported the shooting, all of which were to no avail.

Thus, at the time defendant was stopped, there was no description of any suspect, not even whether it was a male or female.

Shortly thereafter it was confirmed that the shooting was, in fact, a homicide. Det. Guariano was assigned to assist in the investigation.

Later that day at approximately 4:00 p.m. while with the K-9 unit, Det. Guariano

---

[2] The temperature was approximately 40-45 degrees.

000003

discovered a black and grey duffel bag in the heavily wooded area between 195 Steuben Street and the service road where defendant was stopped. At that time, he was unaware that anyone had been arrested in connection with the case.

Inside the bag was a semiautomatic weapon with gray masking tape affixed to it (People's 1 in evidence is a photo of the bag; People's 2 in evidence is a photo of the wooded area where the bag was found).

At approximately 2:00 p.m. on December 8, 2011, defendant was present inside the interview room at the 120th Squad with Det. Patterson and Det. Hoti. Prior to the administration of *Miranda* warnings, both detectives were discussing the counterfeit money in defendant's presence when defendant said, "I picked that money up."

Det. Patterson subsequently tried to read *Miranda* to defendant eight times over the course of eight to ten hours. Defendant was completely unresponsive.

A photo array was conducted by Det. Patterson on January 6, 2012 at 1:45 p.m. (People's 4 in evidence). The Photo Manager System created the array after Det. Patterson entered defendant's NYSID as the subject of the array. The computer generated photos of individuals similar in appearance to defendant and the program selected defendant's position in the array as number one.

Instructions on viewing the array (People's 5 in evidence) were read to the witness who viewed the array. The witness selected defendant's photo.

## CONCLUSIONS OF LAW

### *Physical Evidence Recovered From Defendant's Person and Defendant's Statement to Police*

In *People v. DuBour,* 40 NY2d 210 (1976), the Court of Appeals provided a "graduated four-level test for evaluating street encounters initiated by the police," which was reaffirmed by the Court in *People v. Moore,* 6 NY3d 496 (2006). Under this test, "level one

000004

permits a police officer to request information from an individual and merely requires that the request be supported by an objective, credible reason, not necessarily indicative of criminality; level two, the common-law right of inquiry, permits a somewhat greater intrusion and requires a founded suspicion that criminal activity is afoot; level three authorizes an officer to forcibly stop and detain an individual, and requires a reasonable suspicion that the particular individual was involved in a felony or a misdemeanor; level four requires probable cause to believe that the person to be arrest has committed a crime." *People v DuBour*, 40 NY2d at 223; *People v. Kennebrew*, 106 AD3d 1107, 1108-1109 (2d Dept 2013).

"To elevate the right to a level three to forcibly stop and detain, the police must obtain additional information or make additional observations of suspicious conduct sufficient to provide reasonable suspicion of criminal behavior." *People v. Moore*, 6 NY3d at 500-501.

Here, when they initially confronted defendant, the police had, at most, a level one request for information under *DuBour*. The police, however, immediately proceeded from a level one to a level three by forcibly detaining and handcuffing defendant and recovering his wallet. This includes the counterfeit bills and forms of identification recovered from defendant's wallet and those otherwise on his person.

There was simply no basis[3] for any inquiry beyond that of a level one. Nervousness, on defendant's part, is not a permissible indicator of criminality. *People v. Garcia*, 20 NY3d 317, 324 (2012); *People v. Milaski*, 62 NY2d 147 (1984). There was no blood visible on defendant nor any other evidence indicative of defendant having been in a shooting or even a physical altercation.

A higher level inquiry may have been permissible if even a general description of a suspect was broadcasted over the radio based on the geographic and temporal proximity to the scene of the homicide, even without the observation of mud on defendant's sneakers.

---

[3] While the Court must abide by binding authority from the New York State Court of Appeals and the United States Supreme Court, as applicable here, it should be emphasized that the police officers believed that they were taking appropriate and justifiable actions relative to this defendant. In fact, these officers should be commended for their efforts, including to repeatedly request a description of the suspect and for having superlative instinct and perception. Their actions were neither overzealous nor borne out of any malicious intent.

000005

Here[4], the police knew not whether there were multiple suspects nor if the suspect(s) was (were) male or female.

Based on the foregoing, the recovery of physical evidence from defendant's person (i.e., the counterfeit currency and identification cards) must be suppressed.

Similarly, defendant's statement to the police at 120th Precinct is suppressed as a fruit of the unjustified detention of defendant along the service road. It is further suppressed as: (1) defendant was clearly in custody for *Miranda* purposes; (2) *Miranda* was not read to defendant when he made the statements; and (3) his statement was not spontaneously uttered based on the fact that the two detectives were conversing about the counterfeit currency in front of defendant immediately prior to defendant making his statement about that currency[5].

### Recovery of Defendant's Duffel Bag

Defendant's motion to suppress physical evidence as to the duffel bag and its contents is DENIED in all respects.

First, defendant has not demonstrated standing nor a legitimate expectation of privacy to challenge the search and recovery of the bag that he left in the woods. *People v. Scully*,

---

[4] One conceivable scenario where geographic and temporal proximity alone <u>might</u> permit a higher level inquiry would be where, among other facts, if an officer was outside of a building, heard a gunshot clearly emanate from inside that building and then stopped an individual who exited that building. Here, the officers were not "ear-witnesses" and defendant was a several-minute walk from the location. Further, defendant was walking along a street during midday, not late in the evening nor in the early morning hours. Without even the most general or vaguest of descriptions of a suspect, any inquiry beyond that of a "level one" under *DuBour* was constitutionally impermissible.

[5] "[F]ully sensitive to defendant's rights, yet using an objective standard, the Trial Judge must determine whether defendant's statement can be said to have been triggered by police conduct which should reasonably have been anticipated to evoke a declaration from defendant." *People v. Lynes*, 49 NY2d 286, 295 (1980). *See also, People v. Damiano*, 87 NY2d 477, 486-487 (1996).

Page 5 of 7

000006

14 NY3d 861 (2010); *People v. Burton*, 6 NY3d 584 (2006).

Second, even if defendant had standing, he voluntarily abandoned his bag in the woods. Neither was defendant under police pursuit at the time he abandoned his bag. *See, e.g., People v. Hills*, 295 AD2d 365 (2d Dept 2002).

### *Photo Array*

"The test for determining whether a pretrial identification was so unfair as to be violative of due process is whether 'the confrontation . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law.' In the case of a photo array, '[t]he general rule is that [it] is deemed to be suggestive when some characteristic of one picture draws the viewer's attention to that picture, indicating that the police have made a particular selection.'" *People v. Killimayer*, 40 AD3d 1118 (2d Dept 2007), *lv. denied*, 9 NY3d 866 (2007) (internal citations omitted).

"Contrary to the defendant's contentions, the photo array was not unduly suggestive, as the individuals in the photo array were sufficiently similar in appearance to the defendant." *People v. Mitchell*, 47 AD3d 951 (2d Dept 2008), *lv. denied*, 10 NY3d 867 (2008).

Finally, the photo array, which was conducted almost one whole month following defendant's arrest, was clearly attenuated from any unlawful stop.

* * *

Page 6 of 7

000007

Accordingly, defendant's motions to suppress are granted in part, and are denied in part, as set forth above.

This constitutes the decision, opinion and order of the Court.

_____
J. S. C.

Dated: July 17, 2013
Staten Island, New York

HON. ROBERT J. COLLINI

*To be argued by*
**NATALIE REA**
(10 Minutes)

# NEW YORK SUPREME COURT

## APPELLATE DIVISION -- SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

  Respondent,

-against-

ARMAND SKRINE,

  Defendant-Appellant.

**TO BE HEARD ON THE ORIGINAL RECORD**

**Richmond County**

**Ind. No. 454/11**

**AD No. 2014-07390**

## BRIEF FOR DEFENDANT-APPELLANT

**JANET E. SABEL**
Attorney for Defendant-Appellant
THE LEGAL AID SOCIETY
Criminal Appeals Bureau
199 Water Street, 5th Floor
New York, New York 10038
NRea@legal-aid.org
(212) 577-3300

**NATALIE REA**
  *Of Counsel*

000009

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

PRELIMINARY STATEMENT .................................................................1

QUESTIONS PRESENTED .......................................................................2

SUMMARY OF ARGUMENT ...................................................................2

STATEMENT OF FACTS ..........................................................................4

    The Charges .........................................................................................4

    Pretrial Proceedings ............................................................................5

    The Trial ...............................................................................................7

        The Crime Scene .............................................................................8

        The Investigation ..........................................................................11

        Physical Evidence .........................................................................11

- Evidence recovered from the 7th floor ...............................12
- Evidence recovered from the duffel bag............................13
- Evidence recovered at the precinct ....................................15

    Identification Testimony ...................................................................17

    The Defense .......................................................................................24

    Motions and Summations .................................................................24

    Charge, deliberations and verdict....................................................27

    Post-Verdict Motion and Sentence ..................................................30

    The Sentence .....................................................................................31

i

000010

ARGUMENT

POINT I

Where The People's Case Was Based Entirely On The Inadmissible Hearsay Testimony Of An OCME Analyst Who Did Not Construct The DNA Profile; An Inadmissible, Never-Authenticated Mask With The Only Full DNA Profile; And The Improper, Repeated Use Of Appellant's Suppressed Clothing, Counsel's Failure To Object To Any Of This Inadmissible Evidence Deprived Appellant Of The Effective Assistance Of Counsel, Mandating Reversal. U.S. Const., Amends. VI, XIV; N.Y. Const., Art. I, §6. ...............35

I.    Counsel's performance fell far below reasonable objective standard. ...................................................................37

A.  Counsel did not object to the People's critical but inadmissible evidence .........................................................38

1) Wong's DNA testimony was inadmissible hearsay…38

2) The second mask with the only complete DNA profile was never authenticated and inadmissible……..41

3) Appellant's suppressed clothing was introduced into evidence without objection ………………………46

B.   Counsel's indecision evinced her lack of preparation .............49

C.   Counsel gave no opening and an incoherent summation .........51

II.   The jury deliberated for four days and, but for counsel's incompetence, the outcome would have been different ………53

ii

000011

POINT II

Given Appellant's Difficult Background, History of Mental Illness, Insignificant Criminal Record, and Expressed Remorse, The Maximum Sentence of 25 Years to Life Was Excessive and Should Be Reduced. U.S. Const., Amend. XIV; N.Y. Const. Art. I, §5......................................56

CONCLUSION.............................................................60

PRINTING SPECIFICATIONS STATEMENT ...........................................1A

ADDENDUM

STATEMENT PURSUANT TO 5531.............................................2A

000012

## TABLE OF AUTHORITIES

Page(s)

FEDERAL CASES

Bullcoming v. New Mexico, 564 U.S. 647 (2011)........................................38

Crawford v. Washington, 541 U.S. 36 (2004)........................................36, 38

Henry v. Poole, 409 F.3d 48 (2d Cir. 2005)........................................52

Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009) ..............................38

Strickland v. Washington, 466 U.S. 668 (1984) ........................................35


STATE CASES

People v. Benevento, 91 N.Y.2d 708 (1998)..................................................36

People v. Bennett, 29 N.Y.2d 462 (1972) ...........................................37, 55

People v. Carillo, 186 A.D.3d 849 (2d Dept. 2020)....................................60

People v. Childs, 29 A.D.3d 709 (2d Dept. 2006) .......................................42

People v. Clarke, 66 A.D.3d 694 (2d Dept. 2009) ...............................52, 55

People v. Connelly, 35 N.Y.2d 171 (1974) ...............................................44

People v. Cortez, 296 A.D.2d 465 (2d Dept. 2002) ........................37, 45, 51

People v. Delgado. 80 N.Y. 2d 780 (1992) ...................................................56

People v. Droz, 39 N.Y.2d 457 (1976).........................................................36

People v. Duren, 130 A.D.3d 842 (2d Dept. 2015)......................................50

People v. Egan, 6 A.D.3d 1203 (4th Dept. 2004)........................................41

People v. Farrar, 52 N.Y.2d 302 (1981).....................................................57

iv

People v. Farrell, 169 A.D.3d 919 (2d Dept. 2019) .....................................59

People v. Forkey, 72 A.D.3d 1209 (3rd Dept. 2010) ...................................59

People v. Goldstein, 6 N.Y. 3d 119 (2005) .................................................38

People v. Hayes, 60 A.D.3d 1097 (3rd Dept. 2009).....................................59

People v. Haynes, 14 A.D. 3d 789 (3rd Dept. 2005)....................................59

People v. Jeffries, 160 A.D.2d 406 (1st Dept. 1990) ...................................57

People v. John, 27 N.Y.3d 294 (2016) .............................................38, 39, 40

People v. Julian, 41 N.Y.2d 340 (1977) .......................................................41

People v. King, __ A.D. 3d __, 2021WL1202112 (2d Dept. 2021).............40

People v. Lawson, 114 A.D.3d 962 (2d Dept. 2014) ...............................7, 50

People v. Long, 81 A.D.2d 521 (2d Dept. 1981) .........................................52

People v. McGee, 49 N. Y.2d 48 (1979) ......................................................41

People v. Merrill, 187 A.D.3d 1058 (2d Dept. 2020)...................................58

People v. Oathout, 21 N.Y.3d 127 (2013).......................................37, 41, 45

People v. Price, 29 N.Y. 3d 472 (2017).......................................................41

People v. Reyes, 89 A.D.3d 401 (1st Dept. 2011) .......................................58

People v. Rodriguez, 94 A.D.2d 805 (2d Dept. 1983) .................................45

People v. Sarkodie, 172 A.D.3d 909 (2d Dept. 2019)..................................60

People v. Strawbridge, 299 A.D.2d 584 (3d Dept. 2002) ............................58

People v. Thompson, 60 N.Y.2d 513 (1983)..................................................56

People v. Turner, 5 N.Y.3d 476 (2005)..................................................36, 40

People v. Watt, 189 A.D.3d 637 (1st Dept. 2020) .......................................58

People v. Wilson, 34 A.D.2d 546 (2d Dept. 1987) .......................................49

000014

## STATUTES

C.P.L. § 330.30 ...................................................................................24, 30

C.P.L. § 470.15(6)(b).................................................................................56

C.P.L § 730.30 ...........................................................................................5

P.L. § 125.25(1) ........................................................................................1

P.L. § 221.10 ............................................................................................58

P.L. § 265.01 ............................................................................................58

P.L. § 265.03(3) ........................................................................................1

## CONSTITUTIONAL PROVISIONS

N.Y. Const., Art. I, §5. ........................................................................2, 56

N.Y. Const., Art. I, §6. ........................................................................2, 35

U.S. Const., Amend. VI...............................................................2, 35, 36, 38

U.S. Const., Amend. XIV .......................................................2, 35, 36, 38, 56

000015

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:  SECOND DEPARTMENT
---------------------------------------------------------- X

THE PEOPLE OF THE STATE OF NEW YORK,          :
                                                                                :
                                        Respondent,          :
                                                                                :
                            against                                        :
                                                                                :
ARMAND SKRINE,                                                  :
                                                                                :
                                        Defendant-Appellant.          :
                                                                                :
---------------------------------------------------------- X

PRELIMINARY STATEMENT

This is an appeal from a judgment, rendered July 29, 2014, convicting appellant after a jury trial of second-degree murder and criminal possession of a weapon in the second degree (P.L. §§125.25(1) and 265.03(3)), and sentencing him to an indeterminate term of imprisonment of  25 years to life, concurrent to a determinate term of 10 years followed by 2 ½ years of post-release supervision, respectively (Collini, J., at hearing and Rooney, J., at trial and sentence).

Notice of appeal of the judgment was timely filed, and on May 8, 2018, this Court granted appellant leave to appeal and proceed as a poor person on the original record and typewritten briefs and assigned Seymour W. James, Jr., succeeded by Janet E. Sabel, as counsel on appeal.  Appellant is currently incarcerated, pursuant to the judgment herein appealed.

1

000016

## QUESTIONS PRESENTED

1.      Whether where the People's case was based entirely on the inadmissible hearsay testimony of an OCME analyst who did not construct the DNA profile; an inadmissible, never-authenticated mask with the only full DNA profile; and the improper, repeated use of appellant's suppressed clothing, counsel's failure to object to any of this inadmissible evidence deprived appellant of the effective assistance of counsel, mandating reversal.

2.      Whether given appellant's difficult background, history of mental illness, insignificant prior criminal record, and expressed remorse, the maximum sentence of 25 years to life was excessive and should be reduced.

## SUMMARY OF ARGUMENT

On December 8, 2011, in the lobby of 195 Steuben Street on Staten Island, the janitor saw a tall person, 6'5" or more, dressed all in black, with a black full-face ski mask and carrying a gym bag.  Five to ten minutes later, David Williams was fatally shot in the seventh-floor hallway, in front of his apartment. Appellant, who was Williams' friend and former college roommate, and who stands somewhere between 6'5" and 6'7", was arrested in the vicinity shortly thereafter. Later that afternoon, a duffel bag containing items of clothing, including a full-face black ski mask and the murder weapon

2

000017

was recovered in a wooded area near the building.  Appellant was charged with the murder.

Before trial, the court suppressed everything recovered from appellant at the time of arrest, including his clothing.  At trial, the People's case against appellant was based on a full DNA profile of appellant recovered from a small mask, a partial DNA profile from a full-face mask, and the comparable extra-large size of the clothing worn by appellant at the time of arrest and recovered from the duffel bag in the woods.  All that evidence was inadmissible and should never have been presented to the jury.  It was and counsel never objected.

The only DNA testimony came from Irene Wong, a criminalist at the OCME who had only reviewed reports by others and therefore, her testimony was inadmissible hearsay. The key OCME criminalists with initials BMA or FR who edited and constructed appellant's DNA profile never testified.  Nor did DMW or SNP and KLB, the OCME criminalists who edited and constructed the DNA profiles from the two masks.  Counsel did not object. The smaller black mask with the only full DNA profile was never authenticated.  Unlike all the other evidence recovered that was meticulously marked, vouchered and photographed, this second smaller mask was not. The People never established a foundation for its introduction.  Counsel never

3

000018

objected.  Finally, appellant's clothing had been suppressed.  The size extra-large of his clothing should never have been introduced into evidence and compared to the extra-large size clothing from the duffel bag.  Counsel never objected.  Counsel's incompetence permeated the trial through less critical blunders ending with an incoherent summation pointing the finger at a neighbor one foot shorter than the suspect.

After four days of deliberations, the jury convicted appellant.  But for counsel's incompetence, the outcome would have been different.  Appellant was deprived of his right to the effective assistance of counsel, warranting reversal.  At the very least, the maximum permissible sentence of 25 years to life was excessive in light of appellant's mental illness, insignificant record, and his expression of remorse before and after trial.

<u>STATEMENT OF FACTS</u>

<u>The Charges</u>

On December 9, 2011, appellant, 34, was charged with second-degree murder, criminal possession of a semi-automatic weapon, and two counts of criminal possession of a forged instrument (<u>i.e.</u> counterfeit money in his wallet and in the duffel bag).[1]  He was found fit to proceed in April 2013 (2013

---

[1]       For different reasons, the last two counts would not be submitted to the jury.

4

000019

Report following a C.P.L §730.30 Fitness to Proceed Examination; Court Sheet). Appellant's counsel had to be relieved for health reasons and new trial counsel, Maria Guastella, Esq., was assigned.

Pretrial Proceedings

Counsel successfully moved to suppress, inter alia, all evidence recovered from appellant's person and from the duffel bag found in the vicinity of the crime (H: 3; Decision and Order ("Decision") dated 7/17/13) at 4-5 (Collini, J.)).[2] While appellant is not challenging the ruling, a summary of the relevant hearing testimony is included.

At the hearing, Detective Jeffrey Anderson testified that around 11:50 a.m. on December 8, 2011, he and his partner were both in uniform, in a marked police car, when they received a radio run of "a male shot at 195 Steuben Street" in Staten Island; there was no description of a perpetrator (H: 22-23; 37; Decision at 1-2). Five minutes after receiving the radio run and not far from 195 Steuben Street, Anderson saw a man "on the highway walking toward the police car" (H: 23). The man, later identified as appellant, was

---

[2]      References to pages of the pretrial hearing minutes are preceded by "H; references to pages of the transcript of voire dire conducted on 2/24 and 2/26/14 are preceded by "VD"; references to pages of the trial transcript are preceded by the name of the witness who so testified, unless the identity is obvious, or they refer to pages of colloquy; and pages of the sentencing minutes are preceded by "S."

5

wearing black jeans, a short black jacket, muddy sneakers, and a blue Yankee cap (H: 27, 43).  According to Anderson, they made eye contact; appellant "looked nervous," and started to walk faster (H: 26, 34; Decision at 2).  The officers stopped, backed up, and got out of their car, guns out of their holster (H: 27; 42).

Asked where he was going, appellant said he was "going to the S53 Bus" (H: 27).  Anderson asked him for identification; appellant did not answer (H: 28).  At that point, Anderson's partner handcuffed him and patted him down (H: 28).  From his back pocket, they removed a passport, birth certificate and wallet, the latter containing a driver license, legitimate and counterfeit bills (H: 28-29, 30).  The officers ran the license, found an open I-card for an assault in Queens, and transported appellant to the precinct, where he was formally arrested and searched (Decision at 2).  At 4:00 p.m. that afternoon, a large black and gray duffel bag was found by the K-9 unit under leaves in a wooded area in "close proximity" to 195 Steuben Street (Decision at 2-3).  In the bag, the officer saw an assault rifle and a small black shovel (H: 18).

The hearing court found that the officers had had "at most a level one request for information" when they confronted appellant and unlawfully proceeded to a level three (Decision at 4).  The court suppressed all the

6

000021

"physical evidence [recovered] from defendant's person (i.e., the counterfeit currency and identification cards)," as well as a statement appellant allegedly made about the counterfeit money (Decision at 3-5). [3]

Before trial, the People informed the court that it planned to introduce into evidence 160 photos, which would be sent to the court.  The prosecutor argued that the photographs were relevant to intent and to counter a justification defense, should it be raised (VD 238-39). The court had not seen the photos but referred the parties to People v. Lawson, 114 A.D.3d 962, 963 (2d Dept. 2014), issued the day before (VD 239).[4]

The Trial

Before opening statements, counsel informed the court that she was not sure what defense she would be presenting and moved to postpone her

---

[3]     Detective Edward Patterson and his partner met appellant in the squad room at the precinct (H: 49).  As they entered the room, they were talking about the counterfeit money when appellant said: "I picked that money up" (H: 50, 51, 65).  Patterson read appellant his Miranda warnings eight times; appellant was unresponsive (H: 51, 65). The court suppressed the statement (Decision at 3-4).

[4]     In Lawson, this Court held that Judge Rooney, the presiding judge in this case, had not abused his discretion in allowing into evidence two crime scene photographs and 14 autopsy photographs of the victim where the photographs were not overly gruesome and were relevant to a "material issue at trial, and elucidated the testimony of the medical examiner regarding the cause of death."

000022

opening statement until the People had rested (2).  The court said that it had never granted such a motion, but it would decide when the time came (2).

In her opening statement, the prosecutor told the jury that appellant and the deceased, David Williams, had been college roommates and had remained friends (15).  The evidence would show that on December 8, 2011, a tall man carrying a gray and black duffel bag took the ferry to Staten Island (17).  A tall man wearing a dark face mask and carrying a duffel bag was seen in the victim's building at 195 Steuben Avenue by the janitor (17).  Shortly thereafter, two shots were fired (17).  Appellant was stopped walking on a service road 10 minutes later (17). In the afternoon, a dark duffel bag was recovered in the wooded area in the vicinity of 195 Steuben Avenue.  In the bag, was the murder weapon, a black mask with appellant's DNA, clothing and other items (18).  At the end of the case, she would be asking the jury to convict appellant on all counts (20).

Defense counsel did not make an opening statement (19).

The Crime Scene

David Williams, his fiancée, Jaclyn Nicole Hunt, and their 5-year-old daughter lived at 195 Steuben Street, in Apartment 7L (Hunt 239-40).  Williams and appellant had been roommates in college (Hunt 243-44).  They

000023

had stayed in touch, went out together, and appellant visited them, occasionally using their shower (Hunt 244-45, 259).  Appellant had been there the week before carrying a gym bag (Hunt 245-46, 259).  Hunt described appellant as tall, over 6'5" "probably about 6'9" (Hunt 243).   On cross-examination, Hunt described another friend, Lonney Walker, as a "big guy, possibly 6'6" and 220 lbs. (Hunt 264).

Early on December 8, 2011, Williams drove Hunt to the preschool where she taught and their daughter to kindergarten (Hunt 247).  Sometime before noon, Jean Loiseau, the janitor at 195 Steuben Street, left his tool shop in the basement and walked through the lobby on the way to his second building (Loiseau 111-12, 116).  In the lobby, he saw a very tall person by the elevator (Loiseau 113).  He could not tell whether the person was a man or a woman, black or white (Loiseau 113).  Loiseau is 6'4" and the person he saw was taller than him (Loiseau 114).  The person was wearing a long black coat, black gloves, a full face black mask, and was carrying a gym bag (Loiseau 114-15).  Loiseau described the face mask as covering the person's head and face except for the eyes (Loiseau 114; People's Exh. 115, 116).

That morning, around 11:00, Janet Smith who lived in apartment 7M, next to Williams and Hunt, was home cleaning her stove when she realized

9

000024

that the pilot light was off (Smith 164-65, 166).  Because she did not have a match, she stepped out of her apartment, planning to ask Williams (Smith 166).  From the hallway, however, she heard men talking in his apartment and decided to go down the stairs to a friend on the fourth floor (Smith 165-67).  She borrowed a lighter, went back to her apartment, lit the stove pilot, and left to return the lighter (Smith 167).

In the hallway, this time, she heard furniture moved around and loud noise coming from Apartment 7L (Smith 168).  As she headed toward the stairs, she heard what sounded like a shot; the door to 7L opened (Smith 169).  She turned around and saw Williams, wearing a white T-shirt, come out of his apartment with his hands on his stomach (Smith 169, 183).  He managed to walk almost to her door and said: "help me," "Oh, God help me" and then fell (Smith 170).  At that moment, the door to 7L shut (Smith 170).  Smith was maybe two steps down the stairs, when she heard "another bang;" she kept running and told her friend on the fourth floor "call the cops, my neighbor was shot" (Smith 171).[5]

---

[5]    Dr. Stephen de Roux, a forensic pathologist from the Office of the Chief Medical Examiner ("OCME"), later performed the autopsy and found that Williams had been shot twice (Roux 363).  One shot went through the victim's right arm then entered his chest, heart and lung and exited through his left side (Roux 363). That shot could have left the victim conscious for 10 to 15 seconds (Roux 369). The other shot entered the left side of

000025

The Investigation

When officers arrived at the scene, Williams was unresponsive, lying face down in the hallway in front of apartment 7L, skull fragments, and blood down the hall (Officer Vincent Aguillo 30-32; Detective Edward Patterson 220-22). A radio-run was sent out and five to ten minutes after receiving it, Detective Anderson stopped appellant as he walked on Narrows Road North (186, 191, 194). Anderson described appellant as about 6'5", wearing a NY Yankees cap, black jacket, black jeans, and black muddy shoes (191-93).

Physical Evidence

Around 4:00 p.m. that day, the K-9 unit found a duffel bag under a pile of leaves in the wooded area by 195 Steuben Street (Officer Anthony Jacobs 201-02). Detective Robin Streneck of the Crime Scene Unit vouchered and photographed the physical evidence recovered from the 7th floor hallway, from the duffel bag in the wooded area, and from appellant at the time of arrest (Streneck 25-88). She took between 100 to 160 photographs (Streneck 29-63; (Trial Exh. 1-106).[6] Because the evidence, with the exception of the murder

---

the head behind the ear and exited the top of the head (Roux 369). He could not say which shot had been fired first (Roux 369-70).

[6]     Electronic copies of the People's trial exhibits are submitted to the Court in a "pdf" document entitled "Trial Exh." and references to these exhibits will appear as follows: (Trial Exh. [exhibit number when necessary] at [pdf page]).

000026

weapon and ballistic evidence, held by the property clerk at the police warehouse was contaminated during Hurricane Sandy, the People relied on the photographs of the evidence at trial ((Trial Exh. 1-160; Sergeant <u>John Trzcinski</u>, property clerk division, 148-49).

- Evidence recovered from the 7th Floor

Detective Streneck took dozens of photographs of the 7th floor hallway depicting blood splatter, skull fragments, as well as the interior of apartment 7L, all of which were introduced into evidence (Trial Exh. at 35-59; 188-277). She also recovered pieces of evidence that she marked and photographed. The first piece of evidence collected was a deformed bullet found in the middle of the hallway (Streneck 36-37; Trial Exh. 13 at 135). It was marked RS1, RS for her initials and "1" because it was the first piece of evidence recovered (Streneck 37). On the photograph, the deformed bullet is set next to a blue NYPD ruler for scale showing the number RS1, the date and case number 11/1073 (Streneck 38, 52; Trial Exh. at 135).[7] The second piece of evidence collected was a shell casing; it was photographed next to a blue NYPD scale

_____

[7]      A second deformed bullet was recovered at the scene (Streneck 51-52; Trial Exh 71). Dr. <u>James</u> <u>Clontz</u>, the ballistics expert, analyzed the two bullets to see if they came from the weapon, but the results were "inconclusive" (306-07).

000027

marked RS2 with the date and case number (Streneck 40; Trial Exh. 17 at 187).

A "possible latent print" on the west wall south of the stairwell was marked RS6 and photographed (Streneck 57-58; Trial Exh. 82-86 at 119, 121, 169-71).  It was subsequently analyzed and found to belong to Samuel Nelson, who lived on the same floor in apartment 7-O and was a friend of the deceased (Patterson 22; Hunt 262-63).  Detective Patterson testified that Nelson was never a suspect because he was 5'7" and 170 pounds (222-23).

- Evidence recovered from the duffel bag

After processing the evidence inside the building, Streneck responded to the wooded area nearby, where a duffel bag had been found (Streneck 61-64; Trial Exh. 90-103).  By then, it was approximately 11:00 p.m. (Streneck 62).  From the duffel bag, marked RS23 (Trial Exh. 106, 124 at 83, 85), she recovered numerous items, including: one full-face black mask with eye holes, marked RS12 (Trial Exh. 115 at 73); a long black jacket/coat, size 46XL, marked RS7 (Trial Exh. 107, 108 at 81, 140; Streneck 66); a gray hooded zip sweatshirt, size 3XL, marked RS8 (Trial Exh.110 at 99, 105; Streneck 67); two pink towels, marked RS9 and RS10 (Trial Exh. 111 at 79, 107); a black hooded sweatshirt, size 3XL, marked RS11 (Trial Exh. 113, 114

at 101); a loaded rifle, marked RS126 (Trial Exh. 126 at 85, 87, 147; Streneck

69-70); a black sock, marked RS13, with US currency emerging slightly from

the sock's opening, ((Trial Exh. 116 at 7); counterfeit currency removed from

the sock was gathered by serial numbers,  marked together RS13A, RS13AB;

and RS13AC (Trial Exh. 141, 143; 144, 146 at 9-31; Streneck 74-75); and a

rifle, marked RS127 (Trial Exh. 30), with live ammunition in the chamber,

and a discharged shell casing in a plastic bag attached with duct tape to the

weapon (Streneck 70-72).[8] All these items were photographed with the blue

NYPD scale marked with the RS number of the items, the date, and case

number (Trial Exh.  153-57, 159).   The coat, marked RS7, was photographed

twice, from the outside and from the inside (Trial Exh. 107, 108 at 81, 140;

Streneck 66).

The ballistics expert described the rifle as an operable defaced semi-

automatic – AK 47-type - weapon with a detachable magazine (Clontz 278,

---

[8]      Other items recovered from the duffel bag included a black spade with a yellow handle (Trial Exh. 117 at 93), two umbrellas (Trial Exh. 118, 119 at 89, 149), a nine-foot white rope (Trial Exh 120 at 115); a black glove (Trial Exh. 121 at 117); a CD player (Trial Exh. 122 at 115); 2 latex gloves (Trial Exh. 123 at 97; Gatorade (Trial Exh 125 at 111). Shown the photographs, Hunt, the victim's partner, testified that the following items recovered from the duffel bag did not belong to Williams: the long black coat, the black mask [RS12], the gray hoodie, the black hoodie, the counterfeit money, the shovel, the rope, the white glove, the CD player or the weapon (Hunt 251-256).

000029

284, 288-91, 297).  Tests showed that the two recovered shell casings were fired by the same weapon (Clontz 307-08, 310).

- Evidence recovered at the precinct

Detective Streneck introduced photos of appellant taken at the precinct (Streneck 72-73; Trial Exh. 132 to 135 at 61-72).  Without objection, she testified about pictures of him dressed in his suppressed arrest clothes, standing in front of a wall of wanted posters (Streneck 72-73; Trial Exh 132 at 71 (frontal view); Trial Exh. 133 at 61 (left side); Trial Exh. 134 at 63 (back side); Trial Exh. 135 at 65 (right side).  Without objection, she testified about the photos of appellant's clothing at the time of arrest (Streneck 76-77; Trial Exh. 153 at 141 (short black jacket marked RS28); Trial Exh.  154 at 91 (2 black sneakers marked RS29); Trial Exh. 55 at 143 (one pair of jeans marked RS30); Trial Exh. 156 at 103 (black shorts marked RS31); Trial Exh. 157 at 75 (gray sleeveless T-shirt marked RS32); Trial Exh. 59 at 101 (long sleeve black shirt marked RS11).  All these items had been photographed with the blue NYPD scale, the RS number, the date, and case number (Trial Exh. 153-57, 159).

Without objection, Streneck testified that the short black jacket appellant had been wearing at the time of arrest, marked RS28, was a size

15

000030

4XL, the shoes, a size 13, the jeans, W38, the gray sleeveless T-shirt, XXL, and the black long-sleeve shirt, a 6XL (Streneck 77-78).  Without objection, the People introduced into evidence two non-counterfeit bills – one $100 bill and one $20 bill – removed from appellant's wallet (Streneck 78; Trial Exh. 160 at 9).

The next day, counsel lodged a belated objection to the introduction of the two legitimate $100 and $20 bills (95-96).  Counsel explained that she had learned from the DD5s that Nicole Hunt had withdrawn $120 the morning of the offense, and counsel believed the prosecution was going to use the bills to link appellant to the incident (96).  Counsel argued that this would improperly force appellant to provide an explanation (96).  The court reminded the parties that all "physical evidence from the defendant's person" had been suppressed (96, 98).  The prosecutor noted that these were legitimate bills, that tests had shown that there was no blood on the bills, and that the People would not be using the evidence (98-99). Counsel withdrew her objection (99-100).  The court told counsel that if she changed her mind, it would strike the testimony (100).

000031

Identification Testimony

No witness identified appellant as the perpetrator.  Loiseau, the janitor at 195 Steuben, was shown a picture of the long coat marked RS7, recovered from the duffel bag, and was asked if it looked like the one worn by the person he had seen in the lobby on December 8, 2011; he said: "[i]t look [sic] like it" (Loiseau 115).  Shown photos of the dark gray and black duffel bag marked RS23,  and asked "how it compared" to the black shoulder bag carried by the person he saw in the lobby that morning (Loiseau 115-16), Loiseau said: "[l]ike I tell you, I was passing.  I was passing. I see the bag, but is this kind, you know," "this size" (Loiseau 116). Finally, asked if the photo of the full-face black ski mask, marked RS12, looked like the one worn by the man in the lobby that morning, he said: "that kind" (Loiseau 115).  He was not shown a second mask.

Edward Patterson, the case detective, who had been one of the first officers at the scene, testified about the video footage and still photographs of security cameras from the Staten Island Ferry.  The videos and photographs were taken from the Whitehall Terminal in Manhattan, just before the 9:15 a.m. ferry on December 8, 2011, and at its arrival at St. George Terminal on Staten Island (Patterson 223; James Vitale, assistant director of security at

17

000032

Whitehall 211-213, Exh. 170; <u>Michael Casiano</u>, security inspector at the Department of Transportation, 158; Trial Exh. 168, 171 A-F at 315-317, 325-333).  On the video, he pointed to "a tall fellow wearing a dark jacket, gray hooded sweatshirt, carrying a large grey and black duffel bag" (Patterson 224-25).  Shown the photograph of the duffel bag, marked RS23, and the gray hooded sweatshirt, marked RS8, Detective Patterson testified that they appeared to be the bag and sweatshirt worn by the man on the video (Patterson 230).  Shown the still photographs of the videos, he pointed to a man wearing a dark colored jacket and gray hooded sweatshirt, carrying a gray and black bag (Patterson 225; Trial Exh.171-A at 315).  In the still photos, marked Exhibit 171-C (Trial Exh. at 335), Patterson noted what appeared to be the same man in dark clothing, wearing a baseball cap and carrying a large bag (227-29).[9]

Earlier, the prosecution had attempted to introduce into evidence the Yankee cap appellant had been wearing when he was stopped, but counsel objected (154-55).  The People argued that appellant's clothes had been entered into evidence without objection; to which the court responded: "[n]o

---

[9]     In the still photos, the person is seen alone from the back and the side carrying a gym bag and does not appear tall. In Exh. 171A, they are two other men in similar attire, similar size, without a gym bag.

18

000033

kidding. I know that, but I haven't heard an objection. I'm getting an objection now to the hat. As I read the decision the hat is suppressible, he was wearing it" (155-56).

Irene Wong, a Criminalist IV, at the Office of the Chief Medical Examiner ("OCME") testified that her office received all the evidence recovered from the duffel bag, from appellant after his arrest, as well as blood samples from the deceased for testing (Wong 317, 329-331).[10] Counsel did not object to the mention of the suppressed clothing. In listing the clothing, Wong identified clothing taken from the duffel bag as "items taken from [appellant]" (Wong 329). Counsel did not object. Only four items of clothing were tested for DNA: the long brown coat marked RS7, the black glove marked RS18, the full-face black mask marked RS12, and a second smaller face mask, never marked, providing partial face coverage (Wong 329-331; Trial Exh. 121, 107, 108, 115; Trial Exh. 176B at 159; Trial Exh. 176D at 161-63). Wong testified that the second smaller face mask came "from inside

---

[10]    All the evidence recovered from the duffel bag was received by OCME for examination, and Wong listed every item (Wong 329-30): long coat; black sock; black glove with yellow trim; black leather jacket; black long sleeved shirt, black duffel bag; pink bath towel; pink hand towel; black hoodie pull over; black shorts; gray t-shirt; black spade; black umbrella; a rifle; and magazine. Similarly, items recovered from appellant at the time of arrest were received for examination and listed: gray hoodie; black hoodie pull over; black ankle sneakers ; blue jeans; black shorts, a short black jacket (Wong 329)

19

the left outside pocket of the brown coat" (Wong 329, 334; Trial Exh. 176B at 159).  A handwritten note on the photo of this second mask, Exh. 176B, states that the "mask will be packed in evidence bag with item 1A" that was never identified.  During voire dire of the masks, counsel had no question about the second smaller mask, asking only about the grey lines showing the areas swabbed for DNA (333).

Wong described the process of DNA analysis. Here, DNA profiles were generated from a buccal swab taken from appellant and from the swabs taken from the coat, glove, and two masks (Wong 336). On the profiles, analysts generally look at 15 specific locations called "loci" (Wong 325).  The loci on one sample is then compared to the loci on another sample (Wong 338-39). On the full-face mask, marked RS12, the generated profile had only 10 loci and that is not enough to obtain a full profile (Wong 335, 340-41; Trial Exh. 176C-D).  Only the unmarked second smaller mask, Trial Exh. 176B, had a full profile matching the DNA obtained from appellant's buccal swab (Wong 334, 340).

During Wong's testimony, the People also introduced into evidence the Forensic Biology files prepared by her office, FB11-S1608 ("FB File

20

000035

1/Suspect File") and FB11-06979 ("FB File 2/Crime Scene File"), containing the underlying paperwork with the actual tests and results.[11]

According to FB File 2/Crime Scene File, a criminalist with the initials DTR opened the packaging and examined the crime scene evidence, including the coat (FB File 2/Crime Scene File at 183-195). DTR did not testify although he was the analyst who discovered the second smaller mask in the pocket of the coat (id. at 30, 195). Criminalist Wong did not participate or directly observe or supervise this evidence examination. Criminalists with initials DMW or SNP edited and constructed the DNA profiles detected on the two masks, and criminalists with initials DMW or KLB edited and constructed the DNA profiles on the duplicate tests on the masks (id. at 104-05). A criminalist with initials MM, Michael Mordente, interpreted and compared the results (id. at 9; FB File 1/Suspect File at 5).

According to FB File 1/Suspect File, a criminalist with initials BMA edited and constructed appellant's profile, and a criminalist with the initials

---

[11]     These electronic versions of FB File 1/Suspect File and FB File 2/Crime Scene File, are being submitted to the Court as "pdf" documents. Page references to these documents refer to the pages of the pdf document. FB File 1/Suspect File  is the OCME's casefile containing the paperwork for the testing of the buccal swab taken from appellant and the results of the comparison between appellant's DNA profile to the crime scene evidence which was suitable for comparison, summarized in the February 28, 2012  laboratory report.  FB File 2/Crime Scene File is the casefile containing the paperwork for the testing of the swabs of the firearm and the interpretation of the results.

000036

FR reviewed the process (FB File1/Suspect File at 32-33). Wong only reviewed and testified about the work performed by others. Counsel did not raise a single objection to Wong's DNA testimony.

At sidebar after Wong's testimony, counsel asked who had taken the buccal swab from appellant because she may want to call that person as a witness (344-45).  The prosecutor said that Detective Streneck had taken the swabs (344-45).  The court suggested that "maybe the DA could ask that question in an effort to reveal the source"; The DA did just that and the court asked: "So we are done with that issue? Counsel explained that what would have happened is that she would have objected, the DA would have had to call Streneck and that would have wasted time (345).  During the same sidebar, counsel noted that the DD5s showed that there was no residue on the glove consistent with the discharge of a firearm (345).  Counsel stated that she wanted to know the name of the person who performed the test and if other tests had been done, but counsel then abandoned the issue (346).

Before the People rested, the court asked about the "second mask," unsure which was the first and which was the second:

The Court:          Okay, the jury has left. I just wanted to ask a question about the second mask. I'm calling it the second, I don't know which is the first. Which ski mask have I been looking at pictures during the trial?

22

000037

| | |
|---|---|
| [Prosecutor]: | The pictures that you've been looking at during the trial have been the ski mask that was found in the duffel bag itself. The second ski mask was found in the pocket of the brown coat found in the duffel bag. |
| The Court: | Who found it, the one in the coat? |
| [Prosecutor:] | The one in the coat, the testimony was that the office of the Chief Medical Examiner found it in the pocket of the coat when they processed the coat. |
| The Court: | I know the coat was in the duffel bag according to the Crime Scene Unit.  There is no testimony she looked into the pockets or took anything out, did she? |
| [Prosecutor:] | No. |
| The Court: | So, the coat is vouchered and sent out to the lab where that mask is taken from the pocket and tested? |
| [Prosecutor:] | Correct. |
| The Court: | Okay. I was just wondering. I haven't reviewed the transcript. I will over the weekend. |

(374). Counsel had no objection.

23

000038

The Defense

On the first day of trial, counsel had not been ready to make an opening statement and had moved to adjourn her opening until after the People rested (2-3). After the People rested, she did not present a case and did not make an opening statement (377-79).[12]

Motions and Summations

Counsel moved for a trial order of dismissal, arguing generally that the People had not established legally sufficient evidence as to the three charges the court intended to submit to the jury: second-degree murder, criminal possession of a weapon in the second degree, and criminal possession of a forged instrument (381). The court denied the motion but later reverse itself and dismissed the latter (461).

In summation, counsel argued that the People had not established beyond a reasonable doubt that appellant was the culprit. She told the jury that the mask with appellant's DNA, found in the duffel bag with the murder weapon, was "proof of nothing" (400). She questioned where the second

---

[12]     The transcript does not include a renewed request by counsel to make an opening statement. The subsequent motion to set aside the verdict pursuant to C.P.L. §330.30 suggests that such a request may have been made. Decision of the motion ("330.30 Decision") dated April 18, 2014, at 1, 3-4.

24

mask with the DNA came from (411).  She said that Detective Streneck had been extremely thorough in cataloguing everything.  Had there been a second mask, she would have found it.[13]  Counsel told the jury that the 4X and 48L clothing in the duffel bag did not prove that appellant was the culprit (400). The clothes could belong to Lonney Walker, another friend of the victim, who was 6'6" and 220 pounds (401). The person the janitor saw in the lobby may have been Lonney Walker (405).  Counsel also questioned the People's failure to investigate Samuel Nelson as a suspect given his prints on the wall of the 7th floor hallway (410).  She told the jury that the prosecution's reason for not investigating Nelson was because he lived in the building, calling that rationale "ridiculous" (409).  She concluded by telling the jury:

> [M]ost importantly, what do we know for sure? Because the detective told you – everyone told you here that the handprint on the wall belonged to Samuel Nelson, but he was ruled out because he lived on the same floor.  That's what we know. Samuel Nelson's hand was in David's blood
>
> Thank you.

(415).[14]

---

[13]     The prosecutor objected but the court denied the objection stating: "I don't know if – will not comment on the evidence" (411).

[14]     There was no evidence in the record that Nelson's hand print had been in David's blood.

000040

The prosecutor began her summation by telling the jury:

> No one knew when they boarded the 9:15 ferry on December 8th of 2011, that with a murderer's intention in his heart and assault rifle strapped to his chest, death in the form of defendant was boarding along with them

(428). She went on "when David met death that morning, he didn't recognize him," "David welcomed death," "death revealed himself," "death tried to hide his identity," "Death sits before you today in his suit and tie, his face is revealed – " At that point, the court said, "I'm going to sustain the objection [not on the record ] as "to death sits before you today in a suit and tie" (428). The prosecutor told the jury that Samuel Nelson was not a suspect because he was 5'7" or a foot shorter than the suspect (445).  The suspect was very tall, between 6'5" and 6'9" and he had shot the victim in the chest and then the head (430, 443).

The prosecutor argued that appellant was the perpetrator based on the "masks" with his DNA, as well as the size extra-large of the clothing in the duffel bag and clothes worn by appellant at the time of arrest (432, 447-48). The prosecutor added that the masks had been recovered from the duffel bag with the murder weapon (431-32, 447-48) and that appellant's clothing at the time of arrest matched the man on the ferry "minus the baseball cap" (437).

26

000041

Counsel did not object.  The prosecutor claimed that the janitor, Jean Loiseau, had recognized the smaller mask as the one worn by the person he saw in the lobby (448). The prosecutor argued that the shell casing found in the duffel bag established that the weapon in the bag was the murder weapon; the masks in the bag had appellant's DNA, the size of the clothes in the duffel bag, a 46XL long coat, a 3XL gray hoodie, and the size of the clothes he wore at the time of arrest – 4XL, US13, W38 – showed that appellant was the tall man in the lobby and the perpetrator (442-444).

<u>Charge, deliberations, and verdict</u>

After summations, the court dismissed the charge of first-degree criminal possession of a forged instrument related to the counterfeit money, on the grounds that there was no evidence of knowledge that the bills were counterfeit or of intent to defraud (460-61).  Counsel asked that an instruction to disregard any testimony during trial and comments in summation about counterfeit money (461).  The court said it would tell the jury that "[f]or reasons that need not and must not concern you, the court will not submit the other counts of the indictment" (462).  Counsel said: "I guess that's fine but just note my objection."  The court asked: "I guess that's fine but note my objection?" (463).

27

000042

The jury deliberated for four days and sent numerous notes. On the first day, it asked for: a "review of the Ferry terminal videos"; the "testimony from detective who apprehended the defendant"; and the "DNA testimony and evidence" (Court Exhs. 3 to 7; 500-07). As to the last request, the jury was read Wong's testimony and given the forensic biology reports, as well as the photos of <u>both</u> masks (504, 521). The jury also asked for the "testimony about Samuel Nelson's prints"; "defendant's clothing, money et cetera [sic]" (502). The court wanted to know if the jury was talking about "clothing in the duffel bag, clothing defendant was wearing" or both (502-03). The court asked the jury: "We're going to need a clarification on that. I have to get it in a note."

> [W]hat I'd like you to do, if you could, is send us another note telling us with a little more specificity, if possible, what you want. We're not sure if you're talking about <u>clothing recovered from the duffel bag, clothing that the defendant was allegedly wearing, both</u>.

 (507)(emphasis added). Counsel did not object. In response, the jury asked for "photos of items found on defendant at time when he was picked up; testimony from detective who picked him up;" and the "list of all items found in the duffel bag." (512). Because no such list existed, the jury was provided the photos of the items: photos 105 to 131 (clothing, rifle, etc.); and photos 140 to 152 (counterfeit bills) (514-515). Counsel did not object. As for the

28

000043

items found on defendant at the time he was arrested, the jury was sent photos 132-35, 138, 139 (arrest photos); 153-160 (clothing at the time of arrest) (515).[15] Counsel did not object.

The next day, the jury asked for the "photos of the outside area where the defendant was apprehended, and secondly, photographs of the hallway where the deceased was found." In another note, the jury also asked, "can the judge review definition of circumstantial evidence, the intent, and reasonable doubt" (530-31; Court Exhs. 9 and 10). On the third day, the jury asked for the "[j]anitor testimony read back. Shell casings at scene," and inquired, "was there any testimony in regard to fingerprints found in the apartment?"; "what were the judge's instructions about Lonney Walker"; and "defense attorney's questions and answers read back regarding Lonney Walker" (Court Exhs. 12, 13, 14, 547-49).

On the last day of deliberations, the jury asked for "part of the neighbor's testimony when she said she heard voices in David's apartment prior to borrowing the lighter" (561; Court Exh. 17). Ultimately, the jury

---

[15]     Counsel noted that Exh [photo]160, the two legitimate bills - $100 and $20 - had been suppressed; she said nothing about the counterfeit money or suppressed clothing.

000044

convicted appellant of second-degree murder and criminal possession of a weapon (568-570).

Post-Verdict Motion and Sentence

Trial counsel filed a motion to set aside the verdict pursuant to C.P.L. §330.30 arguing that (a) the court improperly forced her to go to trial when she had not had the time to hire an expert to review the ferry videotapes and was still waiting for the psychiatric report (330.30 Motion ¶¶4-17); (b) the court had improperly denied her request to adjourn her opening statement (id. ¶¶18, 19); (c) the prosecution had misstated the cause of death in summation and improperly introduced into evidence the suppressed legitimate $100 and $20 bills, and (d) the evidence presented at trial had been legally insufficient (id. ¶¶33-40). Trial counsel was replaced by new counsel, who adopted the original 330.30 Motion but added that prior counsel's failure to object vociferously to the introduction of the suppressed legitimate bills, amounted to ineffective assistance of counsel (Supplemental 330.30 Motion).  New counsel attached the report from Alexander Sasha Bardey, M.D., forensic psychiatrist, that had not been finished when trial began ("Bardey Report").

The court denied the motion (S: 2).  It found that (a) counsel had had almost a year to prepare when trial began  (330.30 Motion at 2-4); (b) counsel

30

000045

had withdrawn her objection to the two legitimate bills and there was no evidence of lack of strategy to do so that would constitute ineffective assistance of counsel; (c) the denial of the request to postpone the opening statement was proper since counsel has no right to set the order of trial and since she did not present a case, an opening statement after the People rested would have been another summation; (d) the People's statement in summation that the victim had been shot first in the chest and then the head was supported by the testimony of the neighbor; and (e) the evidence was legally sufficient supported by the timing of the defendant's arrest, the recovery of the bag with the murder weapon, and defendant's DNA.

The Sentence

Williams' mother expressed her anger in a lengthy statement, ending by telling appellant, "May you rot in hell" (S: 3-5). The prosecutor read a letter from Williams' fiancée, Nicole Hunt, in which she described her loss and the loss to her 5-year-old daughter (S: 7). She wrote that being in the courtroom with appellant made her "sick to her stomach" (S: 7). The People argued that, given the "horrific nature of the crime," and "despite the lack of significant criminal history," the court should impose the maximum term on both counts, to run consecutively (S: 8-9).

Counsel focused on appellant's mental illness (S: 11).  In his report, Dr. Bardey explained that appellant's parents had divorced, then remarried, divorced again, and his mother blamed him for things his father had done. Appellant felt that his parents' dysfunctional relationship had "messed up" his head.  After his parents' divorce, the family moved in with his grandmother but eventually became homeless (Bardey Report at 4). When appellant was in high school, his mother was diagnosed with breast cancer and he became "the man in the house" (Bardey Report at 4).  At 16, he started taking her to her treatments. After graduating from high school, he went to the University of North Carolina and, during his first year, his mother died (Bardey Report at 5).  She had wanted her children to be taken care of by their grandmother and appellant found himself in a dispute with his father over the custody of his siblings.  Although he was unaware of it, he suffered from depression.

In 1997, appellant was convicted of criminal possession of a forged instrument, a check, a misdemeanor offense (H (2/24/2014) 4-5). After that incident, he reconnected with his father, started working for him at a youth summer program.  Appellant was given a partial basketball scholarship at Post University in Connecticut.  He graduated in 2001, then went to law school at the University of Vermont (Bardey Report at 6). Although he managed to graduate, in his second year, he snapped.  He started abusing drugs, lost touch

32

with reality, and started hearing voices (id. at 7).  He had hallucinations and, for the next 10 years, lived on the street (id. at 8).  In 2002, he was convicted of fifth-degree criminal possession of marijuana (H (2/24/2014) at 4).  In June 2011, he was convicted of a misdemeanor criminal possession of a weapon in the fourth degree for having a gravity knife (id.).

According to Dr. Bardey, at the time of this offense, appellant reported that he was "homeless, delusional, and experiencing command auditory hallucinations to commit suicide" (Bardey Report at 13). He was extremely depressed, paranoid, experiencing auditory and visual hallucinations" (id. at 14). Describing his hallucinations, he said that "he would look at a person's face and see another person's face" (id. at 14). He believed an "evil spirit was passing through them" (id. at 14).   Appellant told Dr. Bardey that he worked for David Williams exchanging counterfeit money for him (id. at 14).  He took full responsibility for his action and demonstrated "appropriate remorse" (id. at 15). Dr. Bardey concluded that at the time of the offense, appellant suffered from acute symptoms of a mood disorder and a substance abuse disorder that caused significant impairments in his thinking (id. at 17).

Counsel told the court that appellant had been on the road to success, nearing law school graduation, when mental illness and self-medication ended

000048

a promising life (S: 11).   Counsel asked the court to consider appellant's mental illness as a mitigating factor in imposing sentence (S: 13).   Appellant talked briefly about his mental illness and said, "I'm sorry" (S: 14).

The court noted that no psychiatric or intoxication defense had been raised (S: 15). Appellant had 3 prior misdemeanor convictions, including one for criminal possession of a weapon (S: 3, 16).   The crime had been senseless, brutal, and its impact tragic (S: 15).   Appellant was sentenced to the maximum indeterminate term of imprisonment of 25 years to life on the murder count, and a determinate term of 10 years, with 2 ½ years of post-release supervision, to run concurrently (S: 16-17).

000049

ARGUMENT

POINT I

Where The People's Case Was Based Entirely On
The Inadmissible Hearsay Testimony Of An OCME
Analyst Who Did Not Construct The DNA Profile;
An Inadmissible, Never-Authenticated Mask With
The Only Full DNA Profile; And The Improper,
Repeated Use Of Appellant's Suppressed Clothing,
Counsel's Failure To Object To Any Of This
Inadmissible Evidence Deprived Appellant Of The
Effective Assistance Of Counsel, Mandating
Reversal. U.S. Const., Amends. VI, XIV; N.Y.
Const., Art. I, §6.

The People's case relied on three pieces of evidence, all three

inadmissible: the DNA testimony of an OCME analysist, Irene Wong; the full

DNA profile recovered from the second mask; and the extra-large size

clothing worn by appellant at the time of arrest.  The testimony of OCME

analysist was inadmissible hearsay because she neither generated nor

reviewed the raw material underlying the DNA profiles.  The second partial

mask with the complete DNA profile, fortuitously recovered by another

unnamed OCME employee, was never marked, never vouchered, never

authenticated and was therefore inadmissible. Finally, appellant's clothing

was suppressed following his illegal arrest. Counsel never objected to this

35

inadmissible evidence.  Not only did counsel not object to critical evidence against appellant, she made blunders throughout the trial, culminating in an incoherent summation, showing either ignorance, or lack of preparation, or both. Despite these deficiencies, the jury still struggled to reach a verdict, indicating the weaknesses in the State's evidence.   Because counsel's incompetent representation was highly prejudicial, appellant was deprived of the effective assistance of counsel, warranting reversal. U.S. Const., Amends. VI, XIV; N.Y. Const., Art. I, §6.

To establish ineffective assistance of counsel under the Sixth Amendment, a defendant must show that counsel's performance fell below "an objective standard of reasonableness" and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).  Under the New York State Constitution, effective assistance requires "meaningful representation," a standard that focuses on the "fairness of the process as a whole," more than a specific showing of prejudice.   People v. Benevento, 91 N.Y.2d 708, 713 (1998).   The "meaningful representation" rule is "somewhat more favorable to defendants" than its federal counterpart.   People v. Turner, 5 N.Y.3d 476, 480 (2005). Meaningful representation includes the right to the assistance of a lawyer who

000051

has taken the time to review and prepare both the law and the facts relevant to the defense.  See People v. Droz, 39 N.Y.2d 457, 462 (1976).  The right to be represented by an attorney means more than just having a person with a law degree nominally present asking questions.  People v. Bennett, 29 N.Y.2d 462, 466 (l972).  Under both the federal and state standards, counsel was ineffective.

I.    Counsel's performance fell far below reasonable objective standard.

"Counsel's performance must be evaluated to determine whether the tactics and strategies were consistent with those of a reasonably competent attorney."  People v. Oathout, 21 N.Y.3d 127, 128 (2013).  Counsel is expected to be familiar with rules of evidence, be able to object to inadmissible evidence, present a viable defense, and make cogent opening and closing statements.  Id.; see People v. Cortez, 296 A.D.2d 465 (2d Dept. 2002) (ineffective assistance of counsel where counsel's deficient performance included lack of familiarity with the rules of evidence, failure to review Rosario materials, failure to object to misstatements in summation).

Here, counsel's incompetent performance permeated the trial.  She failed to object to the inadmissible hearsay DNA testimony by Irene Wong. She did not object to the introduction of an inadmissible, never-authenticated

37

000052

second mask purportedly containing the only full DNA profile.  She never objected to the People's repeated use of appellant's extra-large size clothing that had been suppressed.

> A.    Counsel did not object to the People's critical but inadmissible evidence

> 1)    Wong's DNA testimony was inadmissible hearsay

Counsel's failure to object to critical inadmissible hearsay DNA testimony of the OCME analyst, Irene Wong, demonstrated a complete lack of familiarity with the Sixth Amendment right to confrontation.  U.S. Const., Amends. VI and XIV.   The Confrontation Clause protects a criminal defendant from testimonial hearsay untested by prior cross-examination. Crawford v. Washington, 541 U.S. 36, 53-54 (2004); see People v. Goldstein, 6 N.Y. 3d 119 (2005).  "Forensic evidence reports admitted into evidence for proving the truth of the matter asserted are not exempt from the Confrontation Clause under Crawford and its progeny." People v. John, 27 N.Y.3d 294, 303 (2016); see Bullcoming v. New Mexico, 564 U.S. 647, 657 (2011); Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009).

DNA profiling and comparison evidence is subject to confrontation analysis.  John, 27 N.Y.3d at 307.  The key analyst is the one who "conducted

000053

or supervised the laboratory's generation of the DNA profile from the defendant's exemplar" or the crime scene. John, 27 N.Y.3d at 308.  In John, the court explained that in constructing

> A DNA profile, the OCME tests for 15 specific short tandem repeat (STR) locations (loci) and the amelogenin locus, which is used to determine the sex origin of the sample. The STR alleles are identified by the number of core repeats present at the locus. Experienced analysts convert these numeric identifiers into a DNA profile using machine-generated raw data analyzed by a software program and the analyst's independent manual examination which involves an editing process.

27 N.Y.3d at 298 (citations omitted) (emphasis added); People v. King, __ A.D.3d __, 2021WL1202112 (2d Dept. 2021)(the testimony of the criminalist was admissible where she had "independently analyzed the raw data, reviewed tests and arrived at her own conclusion").

John clearly barred the DNA testimony presented in this case.  Here, the Forensic Biology files, FB File 1/Suspect File and FB File 2/Crime Scene File show that the analysts who edited and constructed the DNA profile from appellant's buccal swab was someone with the initials BMA and the reviewer was FR.  The analysts who edited and constructed the DNA profile from the masks and reviewed it were DMW, SNP, and KLB. The analyst who made the original comparison was MM or Michael Mordente.   None of these

39

000054

analysts testified. Unlike the criminalist in <u>King</u>, Wong only reviewed the file and was impermissibly "permitted to parrot the recorded findings that were derived from the critical witnesses' subjective analysis." <u>John</u>, 27 N.Y.3d at 298.   Her DNA testimony as to both masks and the only evidence directly linking appellant to the crime was inadmissible hearsay.   Counsel never objected.[16]

While a single error by counsel will not generally be considered to have deprived a defendant of the effective assistance of counsel, when, as here, it is so egregious and prejudicial, it will amount to ineffective assistance of counsel.  <u>See</u> <u>People v. Turner</u>, 5 N.Y.3d 476 (2005); <u>infra</u> Point I(II). Sadly, counsel's failure to object to the DNA testimony was not isolated; her errors continued.

---

[16]      Criminalist Wong also testified, without objection, that appellant was the donor to the two mask samples to a "reasonable degree of scientific certainty" (Wong 343).   The use of this phrase has been roundly criticized by scientists and legal scholars because, as a term with no actual scientific basis, it can grossly mislead the finder of fact into according the expert testimony undue weight.   The National Commission on Forensic Science concluded that "the term 'reasonable degree of scientific [or discipline] certainty' has no place in the judicial process" because it has "no scientific meaning" and thus the term is "idiosyncratic to the witness."   <u>See</u> "Testimony using the term 'reasonable scientific certainty," National Commission on Forensic Science, <u>available at</u> <u>https://www.justice.gov/archives/ncfs/page/file/641331/download</u>, last visited 4/5/21.  It is not a term scientists use, and therefore has never been defined or standardized, yet purports to establish certainty.  The word "reasonable" could also lead a juror to "equate it with certainty at the level of beyond a 'reasonable' doubt."  <u>Id</u>.

2)    The second mask with the only complete DNA profile was never authenticated and inadmissible

Counsel is expected to know the rules for "laying a proper foundation for the admission of evidence." Oathout, 21 N.Y.3d at 129. A basic evidentiary rule requires that an exhibit be authenticated before it can be admitted into evidence. Authentication of an exhibit requires that the proponent of the evidence demonstrate (1) that the exhibit is actually what it claims to be, People v. Price, 29 N.Y. 3d 472, 476 (2017), and (2) that it is genuine and has not been tampered with, People v. McGee, 49 N. Y.2d 48 (1979). "The requirement of authentication is thus a condition precedent to admitting evidence." Price, 29 N.Y.3d at 476.

Foundation requirements will vary with the type of evidence. Where the object possesses unique characteristics or markings and material alterations would be readily apparent, identification by one familiar with the object may suffice to establish authenticity. Id.; People v. Egan, 6 A.D.3d 1203 (4th Dept. 2004)(where a cell phone had a specific serial number that lit up with the victim's name when it was turned on, the testimony of the police officer and the victim who were present when the telephone was recovered established the necessary foundation). When the evidence is fungible, proof of unbroken chain of custody will generally be the method of showing the

41

accuracy and authenticity. <u>People v. Julian</u>, 41 N.Y.2d 340, 343 (1977). The chain of custody requirement provides assurances of an exhibit's identity and that its condition is unchanged.  <u>See</u> <u>People v. Childs</u>, 29 A.D.3d 709, 710 (2d Dept. 2006)(the People demonstrated neither a complete chain of custody nor circumstances providing reasonable assurances as to the identity and unchanged condition of the drugs).

In this case, the People presented no evidence to authenticate the second face mask that allegedly provided the only full DNA profile of appellant. First, no witness was asked if he or she recognized the unmarked mask.  Jean Loiseau, the building janitor, was shown the full-face mask, marked RS12, and barely recognized it, saying it was "the kind" of mask worn by the person in the lobby.  He was never shown the second unmarked partial mask.

Second, no chain of custody was established for the second mask.  An unnamed employee of the OCME, with the initials DTR, apparently found it in the pocket of the coat marked RS7, found in the duffel bag marked RS23. Given Detective Streneck's meticulous vouchering and marking of every piece of evidence at the scene, in the duffel bag, and recovered from appellant's person, this fortuitous discovery raises serious questions about its authenticity.  Everything Streneck recovered she marked with her initials and photographed with a blue NYPD scale, on which appeared her RS number, as

well as the number of the case and the date.  For example, the duffel bag was marked RS23, the black full-face ski mask was marked RS12, and the long coat was marked RS7. When items were found inside another item, such as the counterfeit bills recovered from the black sock marked RS13, they were marked in a manner showing their origin.  The bills from the sock were marked RS13A, RS13B, and RS13C and photographed protruding from the sock, to show where they were found.

The unmarked second mask was allegedly recovered from the coat Streneck handled and marked RS7.  She took two photos of the coat, one from the outside and one from the inside. Trial Exh. 107 and 108 at 81, 139.  Had there been a mask in the front pocket, Streneck would have felt it, she would have found it, and she would have marked it.  As with the counterfeit money recovered from a sock marked RS13A-C, she would have marked the second mask recovered from the pocket, RS7A, to show that it had been found in the pocket of the coat marked RS7. She would have photographed the second mark protruding from the coat pocket. The probability that Streneck missed this second mask in the pocket of a coat is extremely low and raises serious questions about whether it is what it claimed to be, a small mask worn by appellant that day.

000058

In addition, there was no evidence as to how the second mask was handled. The second unmarked mask does not appear on the list of items received and vouchered by the property clerk, Sergeant Trzcinski, who vouchered "one" black mask: the full-face black mask with eye holes, RS12. A photograph of the second unmarked mask, Trial Exh. 176B at 159, contains an annotation by an unknown person instructing another unknown person to pack this second mask with "item 1A."  There was no explanation for "item 1A." Nor was there evidence of how or where the second mask was stored, raising the troubling possibility that it may have been tampered with and that the DNA on that mask was transferred to the full-face mask marked RS12. The absence of evidence as to where the second mask was stored, the conditions of its storage, or who had access to it and when, cast suspicion on the integrity of the exhibit. See People v. Connelly, 35 N.Y.2d 171 (1974)(the item might have been accessible to others not called as witnesses casting "suspicion on the integrity of the evidence often rendering it inadmissible especially when it appears that the evidence was available to unknown persons over an extended time").

The problem with the authentication of the second mask was clear to the court and, seemingly, to the prosecutor. Twice, the court asked about this new mask. First during the testimony of Irene Wong from the OCME and

000059

again at the end of the People's case (340; 374; <u>supra</u> at 23-24). The prosecutor explained that the second mask was not the "ski mask found in the duffel bag itself," marked RS12. Rather, "[i]t was found in the pocket of the brown coat found in the duffel bag." When the court asked who found it, the prosecutor answered that "the testimony was that the office of the medical examiner found it in the pocket of the coat when they processed the coat." In other words, the court said, "the coat is vouchered and sent out to the lab where the mask is taken from the pocket and tested?"  The court added: "Okay, I was just wondering."  However, according to FB File 1/Suspect File, an OCME employee with initials DTR opened the package.  The prosecutor did not mention DTR, let alone call DTR to testify about the chain of custody. Counsel's silence following this clear prompt from the court to object to the second mask is remarkable.

Reasonable standards of professional competence require that counsel be familiar with rules of evidence and object to inadmissible evidence. <u>People v. Cortez</u>, 296 A.D.2d 465 (2d Dept. 2002); <u>see</u> <u>Oathout</u>, 21 N.Y.3d at 130. Failure to object to the second, unmarked mask due to the absence of foundation showed counsel's incompetence.  <u>See</u> <u>People v. Rodriguez</u>, 94 A.D.2d 805, 806 (2d Dept. 1983)(counsel ineffective for, among other things, failure to object to the lack of foundation for expert testimony opining that

45

000060

drugs recovered were cocaine).  Had counsel objected, the second mask and the DNA profile purportedly recovered from it would never have been admitted into evidence.

> 3)   Appellant's suppressed clothing was introduced into evidence without objection

Before trial, the court ruled that the police illegally stopped appellant and suppressed all the evidence recovered from his person, including his clothes.  Nonetheless, the prosecution repeatedly referred to appellant's clothes at the time of his arrest, drawing a link between the extra-large size of his clothing and extra-large size of the garments in the duffel bag.  Counsel's failure to object to the repeated references to suppressed evidence constituted ineffective assistance of counsel.

The prosecution repeatedly elicited testimony about appellant's suppressed clothing: Streneck was asked about the marking, vouchering, and photographing of appellant's suppressed clothing (supra at 15-16); Streneck was also asked about the size of the suppressed clothing: a waist length black jacket, RS28, size 4XL; of black sneakers, RS29, size US 13; dark jeans, RS30, size 38 waist; a grey  sleeveless T-shirt, RS31, size double extra-large; a black long sleeve shirt, size 6XL, RS 76 (supra at 16); Sergeant Trzcinski of

46

000061

the property clerk's office was asked to list all the clothing he had vouchered which included the suppressed clothing (supra at 12-13); Wong of the OCME was asked to list the evidence she received for analysis, including all the suppressed clothing (supra 19-20); and the People introduced into evidence photos of appellant taken at the precinct, standing in front of a wall of wanted posters, wearing the suppressed clothing (supra at 15).  Finally, the prosecutor referred to the clothing in summation (supra at 27).  Counsel never objected as the prosecution repeatedly flouting the suppression court's ruling.

When counsel finally did object, the court's response strongly suggested that it would have sustained earlier objections had they been made.  Specifically, when counsel objected to the People's use of the baseball cap appellant wore at the time of arrest, the prosecutor—apparently surprised by the objection—reminded the court that it had allowed testimony about appellant's clothes.  The court said: "no kidding," adding that it had heard no objection at the time (supra at 19).  The court's comment did not appear to register with defense counsel but made it clear that objections would have been granted and the evidence precluded.

During deliberations, counsel aggravated the prejudice created by the repeated emphasis on appellant's extra-large clothing.  The People had used

47

000062

the size of the clothing in the duffel bag and the size of appellant's suppressed clothing to argue, in summation, that the clothing belonged to the same person.  At one point, the jury asked for "defendant's clothing, money et cetera [sic]."  The court proposed a clarification that would ask whether the jury was talking about "clothing in the duffel bag, clothing defendant was wearing," or both.  The framing of the clarification mistakenly assumed that the clothing in the bag belonged to appellant, reinforcing the People's case and placing additional emphasis on the suppressed evidence.  Again, counsel did not object and the court proceeded to ask the jury the question (supra at 29).

Without more, counsel's failure to object to the introduction of the inadmissible hearsay DNA testimony, the never-authenticated inadmissible mask, and the suppressed clothing was so prejudicial as to amount to ineffective assistance of counsel.   See infra Point I (II).   Unfortunately, counsel's deficient performance did not end there.

B.    Counsel's indecision evinced a lack of preparation

In addition to counsel's evidentiary errors, other blunders pervaded the trial, showing ignorance and a lack of preparation.  See People v. Wilson, 34 A.D.2d 546 (2d Dept. 1987).  At several points, she made incomprehensible objections and arguments.  For example, she raised numerous arguments about the two legitimate $100 and $20 bills recovered from appellant's pocket at the time of arrest.  These bills were irrelevant to the People's case and the prosecution did not intend to use them.  Given the irrelevance of these (suppressed) bills, counsel's focus on them is puzzling, at best.  First, she objected to their introduction, then withdrew the objection; later, when the jury asked for appellant's suppressed clothing and money, she reminded the court, for no apparent reason, that she had objected to the two bills. Counsel subsequently renewed her objection to the bills' introduction in her motion to set aside the verdict.  Rejecting the argument, the court reminded counsel that the objection to the two bills had been withdrawn.  Defense counsel's myopic focus on these two bills, arguably the only non-prejudicial suppressed items, shows her total lack of preparation.

Counsel's indecisive and incomprehensible conduct continued throughout the People's case. While she failed to object to Wong's testimony

49

on confrontation grounds, she questioned Wong about gray lines on the mask, indicating where it had been swabbed for DNA. Counsel also briefly suggested that the People call Detective Streneck to testify about the buccal swab, only to withdraw her request as potentially time-consuming. Later, she made and abandoned another request for gun powder evidence on a glove. Counsel also abandoned her objection to the 160 photos the People planned to introduce even after the court cited to People v. Lawson, 114 A.D.3d 962, 963 (2d Dept. 2014). In Lawson, this Court sanctioned the introduction of 16 photos, not 160. Counsel never distinguished Lawson. Nor did counsel renew her objection to the graphic autopsy photos after it became clear that the cause of death was uncontested. See id.; see also People v. Duren, 130 A.D.3d 842 (2d Dept. 2015).

The pattern of scattershot objections and withdrawals persisted during summations, charge, and deliberations. During the prosecutor's summation, counsel did not object to the prosecutor's erroneous statement that the janitor had identified the second mask as one worn by the man in the lobby, a devastating misstatement since that was the inadmissible mask with the full DNA. In contrast, counsel objected to the prosecutor's factually supported argument that the deceased had been shot first in the heart and then the head. Finally, after summation when the court belatedly dismissed the charges of

50

criminal possession of a forged instrument, counsel appropriately asked for an instruction to the jury to disregard the evidence related to the charge. The court offered to tell the jury "for reasons that need not and must not concern you, the court will not submit the other counts of the indictment" (supra at 28). That was not what counsel had asked for, but she said: "I guess that's fine but just note my objection." Even the court did not understand, repeating, "I guess that's fine but note my objection?" Counsel said nothing.

### C.    Counsel gave no opening and an incoherent summation

As part of a reasonable performance, counsel must give a cogent opening and a cogent summation, presenting a viable defense. People v. Cortez, 296 A.D.2d 465 (2d Dept. 2002). Counsel did neither. She did not give an opening at all because she did not know what her defense would be. She wanted to wait until the People rested. At the end of the People's case, counsel did not renew her motion on the record.[17] In any event, she did not present a case and, therefore, had no opening to give.

Counsel did give a summation but, after a somewhat logical start, it deteriorated into incoherence. At first, she questioned the fortuitous discovery

---

[17]    Counsel may have renewed her request to make an opening statement off the record because, in her motion to set aside the verdict, she argued that the court erred in denying her request.

of the second mask.  Then, she minimized the importance of the size extra-large clothing, telling the jury that it may belong to the Lonney Walker, who was also 6'6."  This approach made sense: the suspect seen by the janitor in the lobby was very tall, and counsel's argument was consistent with the evidence.  Incomprehensibly, however, she abandoned her Lonney Walker, third-party defense, and pointed the finger at Samuel Nelson, the 5'7" neighbor. Although there was no evidence of Nelson's prints in the blood recovered from the seventh floor, she told the jury that his prints were in the victim's blood on the wall.  Contrary to the testimony, she told the jury that the prosecution had eliminated Nelson because he lived in the building.  In fact, as the prosecutor told the jury, Nelson had been eliminated because he was 5'7".  Raising a third-party defense by pointing the finger at someone a foot shorter that the suspect is like raising an alibi defense on the wrong day. See People v. Long, 81 A.D.2d 521 (2d Dept. 1981)(wrong alibi day amounted to ineffective assistance of counsel notwithstanding counsel's competence during other phases of the trial). It is error. Henry v. Poole, 409 F.3d 48 (2d Cir. 2005)(wrong alibi).

In sum, counsel's conduct throughout the trial shows her lack of preparation and lack of knowledge of basic rules of evidence.  Her failure to object to the inadmissible hearsay DNA testimony, to the inadmissible,

52

unauthenticated mask with the only complete DNA profile of appellant, to the prosecutor's repeated use of the suppressed evidence, was not an "objectively reasonable and legitimate trial strategy," or merely misguided strategic calculations. These critical errors, standing alone, demonstrated a failure to properly comprehend the tactical process necessary to set the stage for the defense. See People v. Clarke, 66 A.D.3d 694, 698, (2d Dept. 2009). Combined and with the string of indecisive objections to peripheral evidence (the two legitimate bills, the gun powder, the buccal swab); the lack of objections to problematic events (an excessive number of photographs, the prosecution's mischaracterization of the janitor's testimony about the second mask); the lack of opening; and the incoherent summation, counsel's performance fell far below any reasonable professional standard of conduct.

II.   <u>The jury deliberated for four days and, but for counsel's incompetence, the outcome would have been different</u>

The evidence was far from overwhelming. The People's case rested entirely on the hearsay DNA testimony, the never-authenticated mask, and the size of appellant's clothing. The jury struggled with the evidence. During four days of deliberations, it asked to see and hear all of that evidence again. Had counsel been competent, none of the People's key evidence would have been before the jury. All the DNA testimony would have been precluded as

53

inadmissible hearsay. The second unauthenticated unmarked mask would have been s inadmissible and appellant's extra-large clothing would have been suppressed. Had counsel's performance been competent, the People's case would have been reduced to inculpating appellant based on his height, with a viable third-party theory based on the victim's friend Lonney Walker, who was also tall. Even with the prejudicial, inadmissible evidence before them, jurors made the connection and, during deliberations, asked to have the testimony about Lonney Walker read back. Had counsel not incomprehensibly undermined her own third-party defense by adding Samuel Nelson, 5'7" as a suspect, the jury may have reached a different conclusion.

The People took advantage of counsel's ineffectiveness, aggravating the prejudice. Apparently confident that counsel would not object, the prosecutor asked multiple witnesses to list the suppressed clothing. The prosecutor also blatantly misrepresented the evidence in summation, without objection, telling the jury that the mask inside the coat pocket – i.e. the inadmissible second mask – was "the same mask that Jean [the janitor] saw appellant wearing on December 8th." Pushing the envelope, the prosecutor told the jury that appellant's (suppressed) clothing matched the clothing of the man on the ferry, "minus the baseball cap," even though the baseball cap was clearly one of the suppressed items of clothing appellant was wearing at the

time of arrest. Finally, during deliberations, the prosecutor took full advantage of counsel's virtual absence. When the jury asked to see appellant's clothing the prosecutor eagerly included photos of all the items of clothing from the duffel bag, as well as appellant's suppressed clothes, linking appellant to the duffel bag. This flagrant disregard of the suppression ruling was facilitated by the court's own clarification question to the jury, assuming that the clothes in the duffel bag belonged to appellant. Again, at the most critical time, counsel said nothing.

Under both the federal and state standards, counsel was ineffective. Indeed, the right to be represented by an attorney means more than just having a person with a law degree sitting there asking questions. People v. Bennett, 29 N.Y.2d 462, 466 (l972). Appellant received just that. Reviewing the totality of the record, it is obvious that counsel engaged in "an inexplicably prejudicial course" of conduct throughout the trial, the cumulative effect of which was to deprive the defendant of the effective assistance of counsel and his right to a fair trial. People v. Clarke, 66 A.D.3d 694, 696 (2d Dept. 2009).[18]

---

[18]    Should the court find that counsel was not ineffective, the verdict is against the weight of the admissible evidence and the judgment should be reversed in the interest of justice.

000070

## POINT II

> Given Appellant's Difficult Background, History of Mental Illness, Insignificant Criminal Record, and Expressed Remorse, The Maximum Sentence Of 25 Years to Life Was Excessive and Should Be Reduced. U.S. Const., Amend. XIV; N.Y. Const. Art. I, §5.

Appellant overcame a difficult childhood and severe depression, caring for his mother as she battled breast cancer, to graduate from law school.  He was on the path to a successful career when mental illness took over his mind and his life.  Before this case, he had an insignificant record equivalent to one misdemeanor and one violation.  Before and after trial, he expressed remorse. The court dismissed these mitigating factors and sentenced him to the maximum permissible sentence of 25 years to life for murder.  The sentence is excessive.

This Court has the power to reduce an unduly harsh or excessive sentence in the interest of justice, even if it falls within the statutory range. C.P.L. §470.15(6)(b); see also People v. Delgado. 80 N.Y. 2d 780 (1992); People v. Thompson, 60 N.Y.2d 513, 520 (1983). In imposing sentence, a court must consider the crime itself but also mitigating factors such as the defendant's family background, criminal history, mental illness, and remorse.

56

000071

People v. Farrar, 52 N.Y.2d 302, 305 (1981).  Looking at all these factors, appellant's sentence is excessive.

Appellant suffered from severe psychiatric problems.  He began suffering from depression when, as a teenager, he was faced with his mother's terminal cancer.  He took her to her treatments and had to watch her die.  For a time, he appeared to survive.  Against all odds, he graduated from high school, college, and Vermont University Law School.  During law school, however, his mental illness worsened.  He had hallucinations, started self-medicating and doing drugs.  He would never pass the Bar exam and became homeless. According to Dr. Bardey, at the time of this offense, he "was extremely depressed, paranoid, delusional and experiencing auditory and visual hallucinations." "He would look at a person's face and see another person's face." He thought an "evil spirit was passing through them."

At sentencing, the court dismissed his illness, noting that no psychiatric defense had been raised.  This was error, since mental illness is a mitigating factor even where a psychiatric defense has not been presented. See People v. Jeffries, 160 A.D.2d 406 (1st Dept. 1990)(reducing prison sentence for first-degree manslaughter from eight-and-one-third to 25 years to five to 15 years); People v. Farrell, 169 A.D.3d 919, 921 (2d Dept. 2019) (evidence of bipolar disorder was a factor in reducing the sentence for second-degree kidnapping

57

000072

and first- degree criminal sexual act from 20 years to 15 years); <u>People v. Reyes</u>, 89 A.D.3d 401 (1st Dept. 2011) (reducing prison term for attempted murder from 11 years to eight years where defendant had a history of hospitalization for schizophrenia); <u>People v. Strawbridge</u>, 299 A.D.2d 584, 594 (3d Dept. 2002) (citing defendant's "documented impaired emotional and mental health" in reducing sentence for depraved indifference murder from 19 years to life to 15 years to life); <u>People v. Watt</u>, 189 A.D.3d 637 (1st Dept. 2020)(sentence of 14 years reduced to 10 years for defendant, 19, who suffered from mental illness and had cognitive limitations in two "horrific" attempted murders, where the defendants "smashed a large brick on the [victim's] head, then kicked him, and kicked a second victim before throwing him in in the Hudson River).

Another mitigating factor was appellant's virtually non-existent criminal record.   In the words of the prosecutor, appellant's criminal history was "insignificant." At the time, it consisted of three misdemeanors: one for possession of a forged check, one for criminal possession of marijuana, and one for criminal possession of a gravity knife. Today, the marijuana possession would be a violation, P.L. §221.10, and the possession of a gravity knife would not be a crime at all, P.L. §265.01, <u>People v. Merrill</u>, 187 A.D.3d 1058 (2d Dept. 2020)(possession of a gravity knife has been decriminalized).

000073

Here, the court mistakenly considered the criminal possession of a gravity knife an aggravating factor.   Appellant's "insignificant" criminal history should have been considered a mitigating factor.   See People v. Forkey, 72 A.D.3d 1209 (3rd Dept. 2010)(lack of criminal record a mitigating factor).

Appellant also expressed remorse. Before trial, Dr. Bardey wrote that appellant took responsibility for his action and demonstrated "appropriate remorse."   At sentencing, he told the court he was sorry.   Such remorse was another mitigating factor.   See Id. (sentenced modified in light of defendant's lack of criminal record and expression of remorse). The court seems to have ignored it.

Focusing on what it considered to be the senseless nature of the crime and its brutality, the court imposed the maximum sentence.   However, the maximum sentence is reserved for particularly "heinous" crimes.   See People v. Hayes, 60 A.D.3d 1097 (3rd Dept. 2009)(where the defendant strangled the victim and stabbed her 33 times in the neck and stabbed her infant multiple times, a sentence of 50 years to life was upheld); see also People v. Haynes, 14 A.D. 3d 789 (3rd Dept. 2005)(where the defendant seriously injured a pizza delivery person with a baseball bat and brutally killed another with a baseball bat a few days later, the court upheld the 50-year to life sentence). There is no denying the seriousness of the offense, but it does not belong in the heinous

59

000074

category justifying the maximum permissible term. Here, the victim was fatally shot twice following an argument. Given appellant's insignificant record, his remorse and his serious mental illness, the maximum sentence is excessive and should be reduced. See People v. Carillo, 186 A.D.3d 849 (2d Dept. 2020)(second degree murder sentence reduced to 20 years to life); see also People v. Sarkodie, 172 A.D.3d 909 (2d Dept. 2019)(same).

CONCLUSION

For the Reasons Stated in Point I, The Judgment Must Be Reversed and a New Trial Ordered. Should the Court Disagree, For the Reasons Stated in Point II, The Sentence Should Be Reduced.

Respectfully Submitted,

JANET E. SABEL
Attorney for Defendant-
Appellant

NATALIE REA
 Of Counsel
April 2021

000075

## PRINTING SPECIFICATIONS STATEMENT

The foregoing brief was prepared on a computer. A proportionally spaced typeface was used as follows:

Name of typeface: Times New Roman

Point Size:   14 (except in footnotes in which 12 point size was used)

Line Spacing: Double

The total number of words in the brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, proof of service, 5531 statement, and printing specification, is 13,328.

1A

ADDENDUM

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:  SECOND DEPARTMENT
------------------------------------------------------------  x

THE PEOPLE OF THE STATE OF NEW YORK,      :
                                         :
                         Respondent,      :
                                           :
               against                  :
                                           :
ARMAND SKRINE,                              :
                                          :
                    Defendant-Appellant.      :

------------------------------------------------------------  x

STATEMENT PURSUANT TO RULE 5531

1.       The indictment number in the court below was No. 454/2011.

2.       The full names of the original parties were The People of the State of
New York against Armand Skrine.

3.       The action was commenced in Supreme Court, Richmond County.

4.       The action was commenced by the filing of an indictment, No.
454/2011.

5.       This is an appeal from a judgment, rendered July 29, 2014, convicting
appellant after a jury trial of second-degree murder (P.L. §125.25) and
second-degree criminal possession of a weapon P.L. §265.03(1)(a)) and
sentencing him to a term of imprisonment of 25 years to life, concurrent

000077

to a determinate term of 10 years, followed by post-release supervision (Collini, J., at hearing and Rooney, J., at trial and sentence).

6.     Appellant has been granted permission to appeal as a poor person on the original record.  The appendix method is not being used.

000078

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:  SECOND DEPARTMENT
------------------------------------------------------------ x

PEOPLE OF THE STATE OF NEW YORK,       :   **AFFIRMATION**
                                       :   **OF SERVICE**

               Respondent,    :

                                      :   Richmond County
               v.                      :   Ind. No. 454/11

                                      :
ARMAND SKRINE,                    :   AD2 No. 2014-
                                      :   07390

              Defendant-Appellant.     :

                                      :
------------------------------------------------------------ x

STATE OF NEW YORK     )
                           ) ss.:
COUNTY OF NEW YORK)

        Natalie Rea, an attorney duly admitted to the practice of law in this State, does hereby affirm and show:

        That, on April 8, 2021, the within brief was served upon the Richmond Count District Attorney, Attention: Hon. Michael McMahon, at 130 Stuyvesant Place, 7th Floor, Staten Island, New York 10301, via email at: Tanya.Janovsky@rcda.nyc.gov and to Attention: Morrie Kleinbart, via email at: Morrie.Kleinbart@rcda.nyc.gov. The District Attorney's Office has consented to be served exclusively by electronic mail.

Dated:      New York, New York
            April 8, 2021

                                */s/Natalie Rea(ak)*
                                   NATALIE REA

000079

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:  SECOND DEPARTMENT
------------------------------------------------------------ x

PEOPLE OF THE STATE OF NEW YORK,          :     AFFIRMATION
                                          :     OF SERVICE
                           Respondent,    :
                                          :     Richmond County
                     v.                   :     Ind. No. 454/11
                                          :
ARMAND SKRINE,                            :     AD2 No. 2014-
                                          :     07390
                        Defendant-Appellant.  :
                                          :
------------------------------------------------------------ x

STATE OF NEW YORK     )
                      ) ss.:
COUNTY OF NEW YORK)

     Natalie Rea, an attorney duly admitted to the practice of law in this State, does hereby affirm and show:

     That, on April 8, 2021, the within brief was served upon the defendant-appellant, Mr. Armand Skrine, DIN: 14A3581, at Great Meadow Correctional Facility, 11739 State Route 22, Box 51, Comstock, New York 12821-0051, by depositing a true copy of the same in a postpaid, properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Post Office Department within the State of New York.

Dated:      New York, New York
            April 8, 2021


                                    /s/Natalie Rea (ak)
                                    NATALIE REA

**To be argued by:**
**Thomas B. Litsky**
**(10 Minutes)**

**Appellate Division No. 2014-07390**

# Supreme Court of the State of New York

## APPELLATE DIVISION: SECOND DEPARTMENT

**THE PEOPLE OF THE STATE OF NEW YORK,**

*Respondent,*

- against -

**ARMAND SKRINE,**

*Defendant-Appellant.*

## RESPONDENT'S BRIEF

MICHAEL E. MCMAHON
DISTRICT ATTORNEY
RICHMOND COUNTY
*Attorney for Respondent*
130 Stuyvesant Place
Staten Island, NY 10301
718-556-7120

MORRIE I. KLEINBART
ALEXANDER FUMELLI
THOMAS B. LITSKY
ASSISTANT DISTRICT ATTORNEYS
*Of Counsel*

**Richmond County Ind. No. 454/2011**

# Table of Contents

Table of Authorities ................................................................................... ii

Preliminary Statement.................................................................................1

Introduction ................................................................................................1

The Evidence at the Suppression Hearing .................................................3

    The People's Case......................................................................................3

    The Court's Decision .................................................................................5

THE EVIDENCE AT TRIAL ..............................................................................5

    THE PEOPLE'S CASE ...................................................................................5

    THE DEFENSE CASE .................................................................................13

ARGUMENT ................................................................................................13

    POINT I

        DEFENDANT'S REPRESENTATION AT TRIAL WAS
        THOROUGHLY EFFECTIVE........................................................13

    POINT II

        DEFENDANT WAS APPROPRIATELY SENTENCED TO
        25 YEARS TO LIFE.....................................................................34

    CONCLUSION ........................................................................................39

i

Table of Authorities

**CASES**

*Amaro v. New York*,
    40 N.Y.2d 30 (1976) ........................................................28

*Bullcoming v. New Mexico*,
    564 U.S. 647 (2011) ........................................................24

*Michigan v. Bryant*,
    562 U.S. 344 (2011) ........................................................24

*People v. Baldi*,
    54 N.Y.2d 137 (1981) ........................................................ 14

*People v. Benevento*,
    91 N.Y.2d 708 (1998) ........................................................14

*People v. Brown*,
    13 N.Y.3d 332 (2009) ........................................................ 25

*People v. Caban*,
    5 N.Y.3d 143 (2005) ........................................................31

*People v. Conwell*,
    115 A.D.2d 552 (2d Dept. 1985) ........................................................38

*People v. Cortez*,
    296 A.D.2d 465 (2d Dept. 2002)........................................................ 19

*People v. DeBour*,
    40 N.Y.2d 210 (1976) ........................................................5

*People v. Esposito*,
    70 Misc.3d 74 (App. Term 2d Dept. 2020) ........................................................29

*People v. Figueroa*,
    83 A.D.2d 564 (2d Dept. 1981) ........................................................18

*People v. Flores*,
    84 N.Y.2d 184 (1994) ...................................................................................14

*People v. Freycinet*,
    11 N.Y.3d 38 (2008) .....................................................................................24

*People v. Gibson*,
    163 A.D.3d 586 (2d Dept. 2018) ..................................................................26

*People v. Gutierrez*,
    172 A.D.3d 1094 (2d Dept. 2019) ................................................................38

*People v. Hansen*,
    290 A.D.2d 47 (3d Dept. 2002) ....................................................................35

*People v. Hawkins*,
    11 N.Y.3d 484 (2008) ...................................................................................29

*People v. Jamison*,
    29 A.D.2d 973 (2d Dept. 1968) ....................................................................28

*People v. Jenkins*,
    34 A.D.3d 833 (2d Dept. 2006) ....................................................................38

*People v. John*,
    27 N.Y.3d 294 (2016) .............................................................................25, 27

*People v. Julian*,
    41 N.Y.2d 340 (1977) ...................................................................................28

*People v. Keough*,
    145 A.D.2d 437 (2d Dept. 1988) ..................................................................38

*People v. Leftenant*,
    22 A.D.3d 603 (2d Dept. 2005) ....................................................................38

*People v. Mancusi*,
    161 A.D.3d 775 (2d Dept. 2018) ..................................................................29

Case 1:23-cv-04575-DG   Document 12-1   Filed 12/01/23   Page 86 of 1061 PageID #: 281

*People v. Maxwell.*
    152 A.D.3d 622 (2d Dept.) ........................................................................27

*People v. Migliaccio,*
    77 A.D.2d 575 (2d Dept. 1980) ..............................................................38

*People v. Nelson*,
    125 A.D.3d 58 (2d Dept. 2014) ...............................................................38

*People v. Orr,*
    267 A.D.2d 177 (1st Dept. 1999)..............................................................18

*People v. Ortiz*,
    76 N.Y.2d 652 (1990) ...............................................................................14

*People v. Rose*,
    307 A.D. 270 (2d Dept. 2003) .................................................................18

*People v. Satterfield*,
    66 N.Y.2d 706. (1985) ..............................................................................19

*People v. Whyte*,
    299 A.D.2d 378 (2d Dept. 2002) .............................................................38

*Powell v. Alabama*,
    287 U.S. 45 (1932) ...................................................................................13

*Strickland v. Washington*,
    466 U.S. 668 (1984) .................................................................................14

**STATUTES**

N.Y. Crim. Proc. Law § 260.30 ...................................................................17

Penal Law § 60.05 .........................................................................................35

Penal Law § 125.25 .....................................................................................1, 2

Penal Law § 170.30 .........................................................................................2

Penal Law § 265.02 .........................................................................................2

Penal Law § 265.03 ...................................................................................... 1-2

**OTHER**

Marrus, Commentary on N.Y. Crim. Proc. Law § 260.30 "Delivering
    Effective Opening Statement for Defense" (Available at link:
    N.Y. Crim. Proc. Law § 260.30) ................................................................17

000086

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

-against-

ARMAND SKRINE,

Defendant-Appellant.

Richmond County
Ind. No. 454/2011

A.D. No. 2014-07390

## **BRIEF FOR RESPONDENT**

### **Preliminary Statement**

Defendant Armand Skrine appeals from a judgment of the Supreme Court of the State of New York, Richmond County (Collini, J., on suppression motion; Rooney, J., at trial and sentence), rendered July 29, 2014. By that judgment, defendant was convicted, following a jury trial, of Murder in the Second Degree [P. L. § 125.25(1)] and Criminal Possession of a Weapon in the Second Degree [P. L. § 265.03(3)]. He was sentenced to concurrent indeterminate and determinate terms of imprisonment of 25 years to life and ten years, the later to be followed by two and a half years of post-release supervision. Defendant is presently serving his sentence.

1

000087

## Introduction

On December 8, 2011, inside a residential apartment complex at 195 Steuben Street in Staten Island, defendant used an assault rifle with a defaced serial number to shoot a friend to death. The gun was recovered from an abandoned duffel bag containing counterfeit currency and defendant's personal items; defendant himself, meanwhile, was spotted on a street just blocks from the bag, and minutes after the shooting.

Defendant was arrested and charged with Murder in the Second Degree [P. L. § 125.25(1)], Criminal Possession of a Weapon in the Second Degree [P. L. § 265.03], Criminal Possession of a Weapon in the Third Degree (assault weapon) [P. L. § 265.02(7)], Criminal Possession of a Weapon in the Third Degree (defaced weapon) [P. L. § 265.02(3)], and Criminal Possession of a Forged Instrument in the First Degree (two counts) [P. L. § 170.30]. See Indictment 454/2011.

On June 14, 2013, the court conducted a Wade/Huntley/Mapp/Dunaway hearing. It granted defendant's suppression motion in part, ordering that property recovered from defendant's person not be introduced at trial.

In March 2014, the parties proceeded to trial on the second-degree murder, criminal possession of a weapon, and first-degree criminal possession of a forged

2

000088

instrument counts.[1] On March 14, 2014, the jury convicted defendant of the murder and weapon possession counts. On July 29, 2014, he was sentenced as described above.

On appeal, defendant raises a pair of objections to his judgment of conviction: (1) that counsel was constitutionally ineffective, owing largely to her failure to object to "critical but inadmissible evidence"; and (2) that his indeterminate sentence was excessive.

### THE EVIDENCE AT THE SUPPRESSION HEARING

### THE PEOPLE'S CASE

At around 11:50 a.m. on December 8, 2011, Police Officer JEFFREY ANDERSON and a partner, both in uniform, traveled to Staten Island in a marked police car (Anderson 22). They were responding to a radio report of a male shot at 195 Steuben Street (Anderson 22).

Officer Anderson drove across the Verrazzano Bridge, then exited onto a service road in the direction of Steuben Street (Anderson 23). Finally within walking distance of 195 Steuben Street, and only five minutes after the radio report, Anderson

---

[1] The forged instrument count concerned defendant's apparent possession of counterfeit money. That count was dismissed at trial following counsel's motion.

3

noticed defendant walking along the service road. He was wearing black jeans; a black jacket; black, muddy sneakers; and a blue Yankees hat (Anderson 26). As Anderson's car passed, defendant made eye contact with him, and then increased his speed (Anderson 26, 34).

Officer Anderson backed up and pulled over (Anderson 27). He asked defendant where he was going. Defendant did not respond. He kept his hands in his pockets, and Anderson noticed he was sweating despite the December cold (Anderson 27-28). Anderson and his partner asked to see defendant's ID; defendant refused. Anderson's partner then placed defendant in handcuffs, and Anderson frisked him (Anderson 28).

The frisk recovered $900 cash, a quantity of counterfeit currency, a passport, and a birth certificate (Anderson 30-31). A check of defendant's name revealed an open "I-card" for his arrest (Anderson 30). Defendant was then arrested.

Following defendant's arrest, Detective EDWARD PATTERSON interviewed him at the precinct stationhouse (Patterson 48).

At around 4:00 p.m., Detective DANIEL GUARIANO observed the recovery of a black and gray duffel bag from a pile of leaves in a wooded area near 195 Steuben Street (Guariano 6-8). Inside the bag was a semiautomatic weapon (Guariano 9; People's Ex. 1 [photograph]).

4

000090

On a later date, Detective Patterson conducted a photo array. It produced a positive identification (Patterson 48).

### The Court's Decision

In a Decision and Order issued July 17, 2013, the court (Collini, J.) determined that the circumstances of defendant's police encounter on the service road permitted no more than a "Level One" request for information under People v. DeBour, 40 N.Y.2d 210 (1976). Thus, the officers' detention and frisk of defendant required that "the … physical evidence from defendant's person (i.e., the counterfeit currency and identification cards) must be suppressed" along with the ensuing statement to police (Decision and Order at 4-5).

The court denied the suppression motion in all other respects.

### The Evidence at Trial

### The People's Case

David Williams lived with his fiancée, JACLYN NICOLE HUNT, and their daughter at 195 Steuben Street, Apartment 7L, Staten Island (Hunt 240). He was an Access-A-Ride employee; she was a preschool teacher (Hunt 240, 241). They had known each other for thirteen years (Hunt 240).

Williams had known defendant for a while, too. He called him "2-5" (Hunt 243). They had been college roommates, and they kept in touch after graduation,

5

spending time together at Williams's apartment and elsewhere (Hunt 243, 245). Williams was 5'11" and skinny; defendant, who had played college basketball, was taller and much heavier (Patterson 233; Hunt 241, 245; DeRoux 361-62).

On Thanksgiving 2011, Hunt noticed defendant was carrying a heavy duffel bag, Hunt identified a photo of that duffel bag (Hunt 246, People's Ex. 124 [photograph]).

On the morning December 8, 2011, Williams dropped Hunt off at work and their daughter off at school (Hunt 247). That same morning, as depicted in surveillance videos downloaded by Department of Transportation employees JAMES VITALE and MICHAEL CASIANO, defendant traveled by ferry from Manhattan to Staten Island during the 9:00 hour (Casiano 162; Vitale 215; People's Ex. 168, 170 [videos]). Defendant was also in a dark jacket, gray hooded sweatshirt, and baseball cap; and he was carrying a large, gray and black bag (Patterson 225; People's Ex. 171 [photographs]). Upon his arrival in Staten Island, defendant walked toward a bus terminal (Patterson 227; People's Ex. 171).

Later that morning, building custodian JEAN LOISEAU noticed a person standing in front of the lobby elevator of 195 Steuben Street (Loiseau 112, 123). The man, who was taller than 6'4", was covered from head to toe – a long coat, a full-

000092

face mask, gloves, and so on – to the point where Loiseau could not even discern his race (Loiseau 113, 114). He was carrying a black "sports bag" (Loiseau 113, 115).

At one point that morning, JANET SMITH, who lived in Apartment 7M, next door, heard male voices coming from Apartment 7L (Smith 164,166). The tone was initially conversational (Smith 167). But later, as Smith walked in the hallway toward the stairwell, she heard "shuffling" and "heavy things being moved around" inside the apartment – and finally a loud shot (Smith 168).

Before Smith could leave the hallway, the door to Apartment 7L opened (Smith 169). Williams emerged, his hands on his stomach (Smith 169). He said, "Help me; oh god, help me," and fell to the floor (Smith 170). The door shut behind him (Smith 170).

Smith ran down the stairs, on her way to a neighbor's apartment from which she could call the police (Smith 171, 175). As she ran, she heard "another bang, a lot of bang" (Smith 171).

Moments later, at around 11:50 a.m., Police Officer JEFFREY ANDERSON, driving in Brooklyn toward the Verrazzano Bridge, heard a radio report of a male shot at 195 Steuben Street (Anderson 186). He drove into Staten Island, then left the Staten Island Expressway onto a service road two blocks south of 195 Steuben Street (People's Ex. 169 [maps]). Between the apartment building and the service road

7

000093

were a single residential block, and a wooded area about one block long (People's Ex. 169 [maps]).

Defendant was walking on the service road; it had no sidewalk (Anderson 189). He was wearing a Yankees cap, a dark jacket, and black jeans (Anderson 191, 192, 193). His shoes were muddy, and his face was sweaty (Anderson 191, 192). As he crossed the side of Officer Anderson's car, he made eye contact with Anderson and picked up speed (Anderson 191-92). Anderson stopped him (Anderson 193-94).

Meanwhile, at about 12 noon, first responders arrived at Apartment 7L (Diniso 105; Aguilo 131). Police Officer VINCENT AGUILO and Detective EDWARD PATTERSON, each responding to a report of shots fired, were among those on the scene.

They encountered Williams lying prone, facedown, in a pool of blood on the hallway floor (Aguilo 132; Patterson 221; People's Ex. 4, 12 [photographs]). Skull fragments and brain matter were visible "a good distance down the hallway" (Steneck 32; Patterson 221; People's Ex. 3, 6 [photographs]). JESSICA DINISO, an emergency medical technician, concluded immediately that Williams had succumbed to a gunshot wound to his head (Diniso 106).

Officer Aguilo, who had been informed that a child might be in the home, opened the apartment door (Aguilo 133). He found that the living area was

8

000094

disheveled, with a drum set and sofa pulled apart and various objects thrown or fallen to the floor (Aguilo 134; Patterson 221; Hunt 250). Chairs and tables were turned over (Patterson 221). A radio played music (Aguilo 134). A shell casing sat on the floor near the doorway (Aguilo 134). Aguilo secured the crime scene.

At around 3 p.m., Detective ROBIN STENECK and other members of the Crime Scene Unit arrived at Apartment 7L (Steneck 25, 36). Apart from the physical evidence already described by Aguilo and Patterson, Steneck observed wounds to Williams's arm and upper torso, and blood spatter on the wall of the hallway (Steneck 35, 42; People's Ex. 23, 25, 33-37 [photographs]).

Detective Steneck also found signs of fired bullets. In the hallway in front of Apartment 7H was a deformed bullet[2] on the floor and a bullet-impact mark on the wall, 4'6" up from the ground (Steneck 35, 54-55, 57). Inside the apartment were a deformed bullet on the floor near the front door and a bullet-impact mark on the door, 4'1" up from the ground (Steneck 51-52, 56, 57).

_____

[2] As Steneck explained: "A shell casing is what the bullet is ejected from in a firearm. When somebody fires a firearm, the pin actually hits the primer in the shell casing, [and] the gunpowder inside that shell casing will force that bullet to explode out of the shell casing. The bullet is what ejects out of the barrel, and the shell casing will eject out of the slide of the firearm. The shell casing doesn't actually fire towards the person; the bullet does" (Steneck 40).

9

000095

Fingerprints were also recovered from the hallway outside Apartment 7L. But the only examinable print ultimately belonged to a non-suspect resident who was 5'7" tall and weighed 170 pounds (Patterson 222-23).

In the wooded area between 195 Steuben Street and the Staten Island Expressway service road, Police Officer ANTHONY JACOBS, of the NYPD's K-9 unit, conducted a search with the help of a German shepherd named Storm (Jacobs 197, 200). The dog located a black and gray duffel bag hidden under some leaves (Jacobs 201, 204-05).

Detective Steneck processed the duffel bag. It contained a long black or brown jacket, a gray hooded sweatshirt, a hand towel, a spade, an umbrella, a rope, a single black glove, a black mask with eye holes, a CD player, a Gatorade bottle, and a sock containing paper currency (Steneck 66-69; Jacobs 205).[3] Finally, it contained both a rifle, loaded with a magazine and a live cartridge in the chamber, and a discharged shell casing (Steneck 69; Jacobs 205).

---

[3] The clothing articles themselves were not introduced at trial; photographs were introduced instead. As Sergeant JOHN TRZCINSKI explained, the NYPD warehouse in which the items were stored became waterlogged on October 29, 2012, as a result of Superstorm Sandy (Trzcinski 148-49). The floodwaters, which rose to a height of eight to ten feet, ultimately caused evidence at the warehouse to sustain "high levels of PCBs, heavy metals, and E. Coli…, thus contaminating … or at least compromising them" (Trzcinski 150). As of the date of trial, the warehouse remained closed (Trzcinski 150).

000096

Williams's autopsy was conducted by Dr. STEPHEN DEROUX, of the Office of the Chief Medical Examiner. DeRoux observed entry and exit gunshot wounds to Williams's head, and a second pair of entry and exit gunshot wounds to his torso (DeRoux 363). The torso wounds suggested that a bullet had traveled through Williams's heart and lungs, entering his body while his arms were at his side (DeRoux 363, 371). Either injury would have caused Williams's death, but the head injury would have killed him instantly (DeRoux 366, 369).

Dr. DeRoux also noticed fresh abrasions to defendant's head, chest, leg, and shoulder (DeRoux 363, 372).

Detective JAMES CLONTZ, of the NYPD's forensic-investigation division, examined the rifle. It was an operable, semi-automatic weapon based on the AK-47 Kalashnikov rifle, and it contained an ejection port designed to catch errant shell casings (Clontz 282, 283, 286, 290-91). Its serial number had been defaced (Clontz 297). Two rounds were missing from the magazine (Clontz 287).

Detective Clontz also determined that the bullets recovered from 195 Steuben Street matched the duffel bag's unused cartridges in appearance and caliber class, and that they were an appropriate shape and size to have been fired from the rifle (Clontz 304-05, 306). He could not conclusively state whether they had actually been fired from the rifle (Clontz 306).

11

000097

After examining the discharged shell casings, however, Clontz was more confident: he determined that the casings been fired from the same firearm (Clontz 309-10).

IRENE WONG, a criminalist in the city medical examiner's forensic-biology department, supervised the generation of a profile based on DNA recovered from two black masks within the duffel bag, including one within the duffel bag's long brown jacket (Wong 329, 331). That profile was then compared to an exemplar profile generated from DNA within the mouth of defendant (Wong 337).

As the report demonstrates (People's Exh. 176 [DNA report]), Wong reached two conclusions: first, that the DNA from both black masks derived from a single source (Wong 341); second, that the characteristics of two profiles were so consistent that they generated a "random match probability" of one in 6.8 trillion people (Wong 343). As Wong explained, "Armand Skrine is the donor to those two mask samples" (Wong 343).

The paper currency from the duffel bag was also examined. They were stacks of U.S. ten-dollar bills divided into multiple sets, and the bills in each set had the same serial number (Steneck 75). Criminalist PATRICIA ZIPPO determined that they were counterfeit (Zippo 271).

12

000098

## **The Defense Case**

Defendant did not call any witnesses.

## **ARGUMENT**

## **POINT I**

### **DEFENDANT'S REPRESENTATION AT TRIAL WAS THOROUGHLY EFFECTIVE (ANSWERING DEFENDANT'S POINT I).**

Defendant's first claim on appeal is that he was deprived of the effective assistance of counsel. In support of this point, defendant notes that his attorney declined to give an opening statement, failed to object to the admission of certain evidence, and displayed "indecision" and "incoheren[ce]" at various points.

In each instance, defendant overstates the significance of counsel's acts and omissions. Waiving an opening statement was an unorthodox but ultimately harmless trial strategy; not a single piece of admissible, significant evidence escaped counsel's objection; and "indecision" and "incoheren[ce]" hardly describe her overall performance before the jury. The claim should be rejected.

### **A.**

The right to the assistance of counsel guaranteed under both the federal and state constitutions extends to the giving of "effective" aid, Powell v. Alabama, 287 U.S. 45, 71 (1932), which generally means "the reasonably competent services of an

13

000099

attorney devoted to the client's best interests," People v. Ortiz, 76 N.Y.2d 652, 655-56 (1990). The phrase "effective assistance" is not amenable to precise demarcation applicable in all cases, People v. Benevento, 91 N.Y.2d 708, 712 (1998); in fact, as long as "the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will have been met," People v. Baldi, 54 N.Y.2d 137, 147 (1981).

Because the Constitution guarantees a defendant a fair trial, not a perfect one, People v. Flores, 84 N.Y.2d 184, 187 (1994), applying the "meaningful representation" standard does not permit a reviewing court to second-guess counsel's efforts "with the clarity of hindsight," People v. Satterfield, 66 N.Y.2d 706. 799 (1985). Thus, "[t]o prevail on a claim of ineffective assistance, defendants must demonstrate that they were deprived of a fair trial by less than meaningful representation; a simple disagreement with strategies, tactics, or the scope of possible cross-examination, weighed long after the trial, does not suffice." Flores at 187. And, under the federal standard, counsel's deficient performance must have also *actually prejudiced the defendant*, which is to say that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694 (1984).

14

000100

## B.

Defendant received the benefit of thorough and impassioned representation, by an attorney well versed in the intricacies of New York criminal procedure.

To be sure, that attorney was faced with significant evidence of her client's guilt. Because the argument and first shot occurred inside David Williams's apartment, the killer was very likely somebody he knew (see Smith 167-69). In fact, as neighbor Janet Smith testified, voices she had heard coming from the murder apartment had been conversational, plainly reflecting that whoever shot Williams had been known to Williams. The trial evidence also reflected that Williams and defendant had been college roommates and remained in touch after their graduation (Hunt 243, 245). Further, since a very tall man, covered from head to toe in ski equipment and carrying a duffel bag -- a description uncannily matching defendant, who was known to carry a similar duffel bag (Hunt 246) -- had visited Williams's apartment building at the time of the homicide, the killer was very likely defendant (see Loiseau 112-15, 123).

Defendant's ties to the scene, and to the apparent killer, were virtually innumerable. He rode the ferry to Staten Island that morning (see Casiano 162, Vitale 215, People's Ex. 168, 170) and, after the murder, was spotted wandering just two

15

blocks from the scene (Anderson 189). A duffel bag recovered from neighboring woods contained an AK-47 missing two bullets – the same number of shots overheard by Williams's neighbor, and the same number evidenced by deformed bullets and impact markings at the scene (Steneck 34, 51-57, 66-69; Smith 167-69).

DNA that matched defendant's was recovered from a ski mask within the bag (Wong 343), and a jacket within the bag was the same one Loiseau had spotted on the camouflaged man standing in the lobby (see Loiseau 115). The duffel bag itself matched the bag carried by the apparent killer (see Loiseau 116), the bag carried by defendant during his ferry travels (see Patterson 225; People's Ex. 171), and as noted,  a bag Williams's fiancée remembered defendant having carried around (see Hunt 246).

In other words, apart from the general notion that the evidence of the killer's identity would be challenged – and that Williams's regular access to the apartment would be helpful – an effective defense theory would largely be contingent on the outcome of cross-examination: on whatever discrepancies, weaknesses, and doubts emerged from prodding at witness testimony. To be sure, waiving an opening statement is not the only way for an attorney to keep those theoretical options open. But counsel's initial desire to defer her opening until she heard the People's case –

a request eventually denied by the court, as memorialized in counsel's motion to set aside the verdict – was understandable.

The notion that the failure to deliver an opening statement can ever be the basis for a conclusion that that failure evinces constitutional ineffectiveness of counsel is belied by the CPL itself.  While CPL Section 260.30(3) requires that the People "deliver an opening address to the jury," it provides that a defendant "may" do so.  In other words, it lies within the tactical discretion of defense counsel whether or not to deliver an opening statement.

At least one commentator has recognized that there are cases in which defense counsel may be better advised not to make an opening statement.  "[T]here are cases in which it is very uncertain who will actually testify on behalf of the prosecution or what a particular witness would actually say. In these situations, other than telling jurors in an opening statement to pay attention and warning jurors that what the prosecutor said in opening is not evidence, refraining from an opening statement may be the best strategy for the defense. By not making an opening statement, defense counsel does not have to commit to a defense. Such a wait-and-see approach allows defense counsel to adapt a defense strategy as the prosecution's case develops."  Marrus, Commentary on N.Y. Crim. Proc. Law § 260.30 "Delivering Effective Opening Statement for Defense" (Available at link: N.Y. Crim. Proc. Law

§ 260.30). This, of course, was a case in which proof of guilt was purely circumstantial. Inasmuch as a defense attorney must be careful not to turn an opening statement into a summation, see, e.g., People v. Orr, 267 A.D.2d 177 (1st Dept. 1999), absent a full picture of what it is the evidence would show, there would be little for counsel to say to the jury and certainly nothing that she might have omitted could have served to deny defendant a fair trial, the very point of the guarantee of counsel at trial.

Consistent with the discretion afforded a defense counsel when it comes to an opening statement, it appears that a waived opening statement has never been the sole basis for a reversal on appeal. It has resulted in affirmances, see People v. Rose, 307 A.D. 270, 271 (2d Dept. 2003) ("That the defense counsel waived an opening statement does not itself amount to ineffective assistance, and we find that the defendant was afforded the effective assistance of counsel."), and it has been cited in reversals on other grounds, see People v. Figueroa, 83 A.D.2d 564, 564 (2d Dept. 1981) (reversal where counsel failed to seek a pretrial Wade hearing, waived his client's Sixth Amendment right to a public trial, failed to make appropriate objections, demonstrated ignorance of basic principles of criminal law and procedure, elicited prejudicial testimony, compounded that prejudice on summation, presented a fundamentally contradictory defense, delivered an incoherent

18

000104

summation, and made no statement on behalf of his client at sentencing). But courts have hesitated to invade the province of trial strategy, see Flores, 84 N.Y.2d at 187; Satterfield, 66 N.Y.2d at 799, and the decision to deliver such statement is just such a matter of strategy. Indeed, second guessing a defendant counsel's strategy simply cannot result in reversal on ineffective assistance grounds, especially in cases where counsel's performance evinces coherent tactics and overall competence.[4]

Here, Ms. Guastella's performance evinced both. The theme of her summation was the overwhelming circumstantiality of the People's case. As she pointed out, it relied on inferences about the manner in which the victim was shot (T. 398-99),[5] inferences about the identity of the ferry rider and the man standing in the lobby (T. 399), inferences that one commonly available mask is the same as another (T. 399, 400), inferences that one commonly available duffel bag is the same as another (T.

---

[4] Defendant cites People v. Cortez, 296 A.D.2d 465 (2d Dept. 2002), for the principle that, "[a]s part of a reasonable performance, counsel must give a cogent opening" (Def. Br. 51). The case says nothing of the sort.

[5] To underscore the limitations of the People's evidence, and perhaps the thoroughness of the responding officers, counsel observed that even the precise location of the shooting had not been thoroughly proven. No one had observed it firsthand. And it did not escape counsel's attention that no one had noticed the bullet in the hallway before Detective Steneck had arrived (T. 407).

406)), and the inference that a gun was used by the same person whose DNA was recovered from a neighboring mask (T. 398, 400).

"They haven't even proved the last time somebody wore that ski mask," counsel told the jury. "You heard Ms. Wong testify that [defendant's] DNA could have been on the mask for over a year. [And the clothes] could have also belonged to Lonney Walker," a neighbor who used to date Hunt's relative.[6] "We know he's 6'6" and over 220 pounds. And in Ms. Hunt's own words, she said he was a big guy. Those could have been his clothes. We know he's been in the apartment" – and that defendant's own visits to that apartment raised the possibility of DNA contamination (T. 401). This was a thoughtful factual argument.

Counsel also challenged the credibility of Detective Anderson's account of defendant wandering on the service road (T. 402), the likelihood that an AK-47 would have slipped past counterterrorism officers at the ferry terminal (T. 404), a description of the "same" duffel bag by different witnesses (T. 406), a description of the "same" jeans by different witnesses (T. 412), and the "sense[less]" fact that the

---

[6] The fact that Lonney Walker had dated Hunt's relative and had been inside Williams's apartment was revealed in a particularly effective display of cross-examination (see Hunt 264).

20

000106

ski mask with defendant's DNA went unmentioned in Detective Steneck's log of recovered items (T. 411).

Although defendant brands as "incoherent" counsel's reference to the on-scene presence of neighbor Samuel Nelson's fingerprint, its purpose was clear: to challenge the thoroughness and credibility of the detective work that settled on defendant as the shooter (see T. 409 ["That's ridiculous. … Not concerned that there is a palm print right on the wall outside … where the deceased was laying? … But he's ruled out because he's a resident of the building. Some investigation."]).[7] This is the very same reason why counsel excoriated investigators for "d[oing] nothing" to test the bite mark on Williams's back (see T. 413), and why she underscored that no one had noticed the bullet in the hallway before Detective Steneck had arrived (see T. 407). At no point did counsel abandon her theory that Lonney Walker might have committed the crime.

Counsel's vigorous closing argument arrived amid – and in some ways was *made possible by* – other displays of alertness and fluency in the relevant facts and

---

[7] Defendant accuses counsel of misunderstanding the reasons for Nelson's elimination as a suspect (Def Br. at 52). In fact, counsel did not. Detective Patterson had indeed testified that Nelson was excluded because "he resides within the building" (Patterson 222).

21

law. Counsel knew to ask for an adverse inference concerning missing property (T. 90).[8] She moved for a trial order of dismissal (S. 388). She objected to numerous aspects of the People's use of Microsoft PowerPoint during summation (S. 418). Another objection resulted in the dismissal of a count of the indictment (T. 460).[9]

Counsel anticipated a possible prosecution theory of a robbery, based on a coincidence in quantities of cash carried by victim and defendant (T. 98). She honed in on arguable discrepancies in the descriptions of defendant's duffel bag and jeans, which helped to challenge the proof that Loiseau's masked man had been defendant (Loiseau 115). She successfully blocked Detective Patterson from mentioning defendant's official height and weight, even though the suppression decision had not expressly ruled out pedigree information (Patterson 232). She repeatedly teased out omissions and discrepancies between witnesses and their associated DD5 reports, from Janet Smith to Jaclyn Nicole Hunt. Her cross-examination of Loiseau, Smith,

---

[8] The citation refers to the minutes of defendant's trial, which began on March 3, 2014.

[9] Again, defendant appears to seriously mischaracterize an aspect of the transcript. Counsel did not "sa[y] nothing" when prompted by the court to clarify her objection (Def. Br. at 51). Instead, she did precisely what the court had asked her to do, explaining that "if the People didn't put it in their PowerPoint and actually expand on the charge and put the elements out in front of them and compare what they think they have proven to each element, then I probably wouldn't have asked for a curative instruction" (T. 463).

22

and Hunt were especially thorough, and her questions to Detective Clontz suggested a longstanding familiarity with guns and ballistics. Finally, of course, the theory that Lonney Walker had killed David Williams was only possible because of counsel's cross-examination of Williams's fiancée (Hunt 264).

For her work, counsel can reasonably be credited with the jury's considerable deliberation over an extremely strong circumstantial case. Her strategy was cogent, and it was backed up by a thorough understanding of the record, as well as the characters, locations, tools, and documents underlying the facts of the case.

## C.

Of defendant's objections to counsel's performance, three are explored in detail in his brief. None have merit.

## i.

The conclusion that defendant was the single source of DNA recovered from two black masks, and that he matched a profile unique among approximately 6.8 trillion people, was based on the testimony of OCME criminalist Irene Wong. Wong "supervise[s] Criminalists Levels II and Criminalists Level III in their case work, which means that [she does] a technical review on their work to make sure that everything is correct" (Wong 318). She supervised the analysis of both masks recounted in the DNA report. See Forensic Biology Case Contact Sheet, 12/11/11

23

("Told her DTR is the analyst and I am his supervisor"); PCR Statistics Sheet, 12/21/11 (listing DTR as analyst); Forensic Biology Schedule of Analysis Sheet, 2/27/12 (Wong ordered extraction, quantitation, DNA typing, a comparison, and a report). In fact, she remained the supervisor of analyst DTR's work well after the generation of the dual black-mask profiles that inculpated defendant. See Electropherograms, 12/19/11; Forensic Biology Case Contact Sheet, 12/29/11.

Defendant complains that counsel was ineffective for failing to object to this testimony, which defendant characterizes as testimonial hearsay in violation of the Confrontation Clause. That characterization is plainly wrong.

The U.S. Supreme Court and the New York State Court of Appeals have set out in clear terms that a defendant's right to be "confronted with the witnesses against him," U.S. Const. Amd. VI, extends only to those witnesses whose words are "testimonial," i.e., "procured with a primary purpose of creating an out-of-court substitute for trial testimony," Michigan v. Bryant, 562 U.S. 344, 358 (2011). A Confrontation Clause violation, then, requires that two conditions be satisfied: first, that the primary purpose of the statement be to create a record for trial, Bullcoming v. New Mexico, 564 U.S. 647, 669 (2011) (Sotomayor, J., concurring); and second, that the statement's declarant not testify in court, People v. Freycinet, 11 N.Y.3d 38,

24

000110

42 (2008) ("Dr. Lacy was not defendant's 'accuser' in any but the most attenuated sense.").

In People v. John, 27 N.Y.3d 294 (2016), the Court of Appeals succinctly applied the relevant rule to DNA reports: "We conclude that an analyst who witnessed, performed *or supervised* the generation of defendant's DNA profile, or who used his or her independent analysis on the raw data, as opposed to a testifying analyst functioning as a conduit for the conclusions of others, must be available to testify." Id. at 305 (emphasis added). Significantly, "one analyst with the requisite personal knowledge" is enough, as "an 'all analysts' rule" would not be "consistent with the decisional law." Id. at 312-13. And "nothing in this record supports the conclusion that the analysts involved in the preliminary testing stages, specifically, the extraction, quantitation or amplification stages, are necessary witnesses." Id. at 313. Cf. Def. Br. at 39 (objecting that "the analysts who edited and constructed the DNA profile" did not testify).

In other words, on one side of the line are cases like Bullcoming, 564 U.S. 647, where "a witness who never tested the forensic evidence that incriminated an accused defendant was asserting that the nontestifying analyst's testing results were truthful." John at 304. And on the other side are cases like People v. Brown, 13 N.Y.3d 332 (2009), where "[t]he testifying witness, an OCME Level IV Criminalist

25

who had supervised the generation of the DNA profile from the defendant's exemplar, had personally examined and independently interpreted the data." John at 310. See also id. ("Determinatively, the expert testified that any conclusions or opinions she reached from the raw data supplied by the outside laboratory were her own and not contained in any reports. By contrast, Huyck, who made no such claim and who was not an OCME supervisor, reviewed the reports of other OCME analysts [and] saw that the 'necessary people' had signed off and agreed with their conclusions.") (internal citations omitted).

"Personally examin[ing] and independently interpret[ing] the data" is exactly what Wong did. A supervising criminalist like the one in Brown, she conducted her own "technical review … to make sure that everything [was] correct," as opposed to simply repeating verbatim what other analysts had concluded (Wong 318). See People v. Gibson, 163 A.D.3d 586, 588 (2d Dept. 2018) ("The testifying criminalist performed a technical review of the analyst's report, independently reviewed the analyst's data interpretation, and reached an independent conclusion, and thus[] was not merely 'functioning as a conduit for the conclusions of others.'") (quoting John at 315). The detailed nature of her description of the particular steps taken in defendant's case confirmed her fluency in the matter.

26

000112

And the conclusion that defendant "is the donor to those two mask samples" was manifestly her own (Wong 343). Thus, for purposes of the Confrontation Clause, the declarant – the only person who can be said to have "accused" defendant – was Wong, the very same person who testified in court and was cross-examined by the defense.

Of course, the irony behind the compatibility of Wong's testimony with People v. John, 27 N.Y.3d 294 (2016), is that John was not decided until two years after defendant was convicted. At the time of defendant's trial, the governing case was Brown, 13 N.Y.3d at 337, which held that a report was not testimonial "because it consisted of merely machine-generated graphs, charts and numerical data," and the relevant "technicians would not have been able to offer any testimony other than how they performed certain procedures." In light of this history, it is impossible to retroactively require defense counsel to anticipate the more precise rules imposed two years later by John – even though, in any event, the court's and the parties' handling of the DNA evidence was entirely compliant with the rules that were yet to be established. See People v. Maxwell. 152 A.D.3d 622, 624 (2d Dept.) ("counsel cannot be found ineffective for failing to anticipate changes in the law"), lv. denied, 30 N.Y.3d 1062 (2017).

27

**ii.**

Matching DNA profiles were generated from not one but two masks within the abandoned duffel bag: a mask that was loose inside the bag (People's Ex. 177C, marked "2" by OCME and "RS12" by Steneck) and a mask that was packaged within the pocket of a long coat (People's Ex. 177B, marked "1B" by OCME and unmarked by Steneck).

In contending that counsel should have objected to the admission of this latter mask, defendant misses an important aspect of how the mask was handled and stored. "Fungible" as the second mask may be, its provenance is not mysterious: it was stored within the pocket of a vouchered coat, an item whose chain of custody cannot be seriously challenged.

To be admissible, any piece of evidence must be shown to accurately portray a relevant and material element of the case. People v. Julian, 41 N.Y.2d 340, 342 (1977). When real evidence purports to be the actual object associated with a crime, such accuracy is established by proof that the evidence is identical to that involved in the crime, and that it has not been tampered with. Id. at 342-43.

But "the chain of custody requirement [need not] be extended to unreasonable limits." Id. at 343 (citing People v. Jamison, 29 A.D.2d 973 [2d Dept. 1986] [postal workers need not testify about the security of mail delivery]). In Amaro v. New

28

000114

York, 40 N.Y.2d 30 (1976), for example, the Court of Appeals recognized that failure to establish a chain of custody may be excused "where the circumstances provide reasonable assurances of the identity and unchanged condition" of the evidence. Id. at 35. And the Court of Appeals in Julian, satisfied that sealed, initialed, and dated packages of cocaine and marijuana had not been altered during a three-year gap in which the packages changed location without explanation, affirmed a conviction because:

> [t]he proof indicates that after being deposited with the property clerk, the evidence was transferred to another unit of the police department, pursuant to a legitimate administrative mandate. When discovered, the drugs were found precisely where they were supposed to be, in the police narcotics laboratory. At all times, the drugs apparently remained safely under police control. That the offered items were the materials seized in defendant's apartment was confirmed by the fact that they remained within identifiable containers. Throughout the period of police custody, the packages were stored in the same suitcases into which they had initially been placed.

Id. at 343-44.

Moreover, even where there is a *gap* in the chain of custody, "testimony [may] establish circumstances providing reasonable assurances of the identity and unchanged condition" of a fungible item. People v. Esposito, 70 Misc.3d 74, 76 (App. Term 2d Dept. 2020) (citing People v. Hawkins, 11 N.Y.3d 484, 494 [2008]; People v. Mancusi, 161 A.D.3d 775 [2d Dept. 2018]).

29

000115

That was precisely what happened here. Detective Steneck testified that she marked the long black jacket from the duffel bag as "RS7" and photographed it (Steneck 65-67; see People's Ex. 107, 108); Sergeant Trzcinski, the property clerk, testified that the long black jacket remained in police custody as it was vouchered, forwarded to the police lab, and forwarded to the OCME (Trzcinski 144); and Irene Wong, the criminalist, testified that it was received by OCME with the original "RS7" label and the exact same appearance, and that the second black mask was "inside the left outside pocket of the . . . brown long coat" (Wong 330, 332-33; see People's Ex. 176A [photograph]). These are no doubt "reasonable assurances of … identity and unchanged condition" as contemplated by Jamison, Julian, and Esposito.

Defendant does not contend that these procedures were insufficient to ensure the authenticity of the long black jacket – or, for that matter, any of the other items recovered from within the duffel bag. Instead, defendant argues that a different standard should be applied to any item found *within* the long black jacket, including the mask, because it is "suspicio[us]" that Steneck would have failed to photograph something "protruding from the coat pocket."

This view is specious. There is no record support for the idea that Steneck checked all of the jacket pockets, or that the mask was "protruding" as described in

30

000116

the brief. Nor is there any record support for the view that the mask, or any other item, had been tampered with. In these respects, the case is indistinguishable from the above-cited precedents. As in Julian, the property remained under police control "pursuant to … legitimate administrative mandate[s]." As in Jamison and Esposito, the *possibility* of tampering is not to be equated with *evidence of* tampering. A mail carrier could conceivably tamper with letters stored within an envelope; a hospital laboratory employee could conceivably tamper with blood from a vial covered by a removable cap. The question is not whether tampering is possible: it is whether testimony about institutional custody and safekeeping provides "reasonable assurances of … identity and unchanged condition." The precedent makes clear that the instant testimony did exactly that. For this reason, counsel cannot be faulted for declining to raise an "argument that has little or no chance of success" People v. Caban, 5 N.Y.3d 143, 152 (2005) (citation omitted).

Of course, the fact that the complained-of mask was only one of *two* masks from which a matching profile had been constructed (Wong 331, 335, 341) puts the lie to the notion that defendant even could have been prejudiced by his attorney's omission. Wong also testified about significant commonalities between defendant's exemplar sample and the partial profile from the *loose* mask (Wong 341 ["So if you're looking at the DNA profile for mask 2 is on the last column on the right."]).

31

000117

Thus, defendant's entire claim rests on the minor distinction between one persuasive DNA match and two persuasive DNA matches. It must be rejected.

**iii.**

Third and finally, defendant complains that counsel did not object when the jury heard references to items of clothing that, in defendant's view, had been suppressed weeks before. Indeed, Justice Collini's hearing decision had suppressed "the … physical evidence from defendant's person (i.e., the counterfeit currency and identification cards)," along with defendant's ensuing statement to police (Decision and Order at 4-5). Inconsistent with defendant's interpretation of the ruling were various references to the full list of vouchered clothes (Steneck 66; Wong 329).

Because Justice Collini had essentially suppressed the fruits of what he had held to be an unlawful detention, defendant extrapolates on appeal that the ruling should have applied to the clothes defendant was wearing at the time of arrest. At the outset, however, that does not actually appear to be the meaning of Justice Collini's suppression decision. The decision and order listened only "the counterfeit currency and identification cards" – in other words, the secreted items that were recovered from defendant's unlawful frisk. The order did not list any items that would have been observable to the officers upon their chance encounter with defendant. Inasmuch as the court used the abbreviation "i.e." rather than "e.g.," the

Case 1:23-cv-04575-DG   Document 12-1   Filed 12/01/23   Page 120 of 1061 PageID #: 315
000118

currency and cards are fairly understood to make up an exhaustive list of the "physical evidence from defendant's person" the court was referring to. Counsel cannot be faulted to failing to read more into the order than was there.[10]

Another distinction between defendant's clothes and the counterfeit items recovered from his person is that defendant's hat, sweatshirt, and other clothes are not particularly useful evidence of his guilt. Jean Loiseau, the custodian, said only that the man who waited by the elevator with a duffel bag wore a long coat, a full-face mask, and gloves. These items bore no connection to the outfit defendant was wearing when stopped by police. They were all recovered from the woods and the duffel bag within.

Defendant suggests that the clothing was especially useful to the prosecution because it pointed to the perpetrator's large size. But the trial record contains references to defendant's height and weight that were not grounded in the Steneck and Wong's voucher recitations. Hunt said he was taller and heavier than her fiancé

---

[10] If what defendant is suggesting is that the description of defendant's clothing at the time of arrest was suppressible, that is simply not the case. People v. Watkins, 40 A.D.3d 290, 291 (1st Dept. 2007). And this would be true even if the clothing itself had been recovered from defendant and suppressed as the result of illegality. People v. Mackey, 5 A.D.3d 136, 138 (1st Dept. 2004).

000119

(Hunt 241, 245); Detective Patterson guessed that he was 6'7" (Patterson 233). There was no dispute over defendant's size.

For all of these reasons, counsel's treatment of the DNA evidence and her client's clothing were *not error*, let alone the sort of error that would sufficiently prejudice her client and sufficiently taint her overall performance to amount to an ineffective-assistance reversal.

\* \* \* \*

In sum, defense counsel ably defended her client in a circumstantial evidence case in which that circumstantial proof was, indeed, overwhelming. None of the conduct claimed to evince ineffectiveness did anything of the sort. Reversal is unwarranted.

## POINT II

### DEFENDANT WAS APPROPRIATELY SENTENCED TO 25 YEARS TO LIFE (ANSWERING DEFENDANT'S POINT II).

Defendant's final claim is a plea that the indeterminate sentence associated with his Murder in the Second Degree [P. L. § 125.25(1)] conviction should be reduced. In support of this request, defendant cites three factors: (1) his "mental illness"; (2) his "remorse"; and (3) a background framed as one in which defendant overcame adversity, moving from a "difficult childhood" to graduation from law school (Def. Br. at 56). Because these factors are either unsupported by the evidence

34

or outweighed by obvious aggravating factors, the prayer for resentencing should be rejected.

At the outset, courts "have repeatedly held that the imposition of the sentence rests within the sound discretion of the trial court, and we should not interfere unless there has been a clear abuse of discretion or extraordinary circumstances." People v. Hansen, 290 A.D.2d 47, 57 (3d Dept. 2002) (internal quotation omitted). Defendant can demonstrate no such abuse of discretion or extraordinary circumstances.

Indeed, it will bear no repeating that the premeditated killing of another person is among the most serious of criminal offenses. Here, defendant carried out the task like a hardened, calculating professional. Maintenance worker Jean Loiseau watched defendant stand by the elevator, covered from head to toe to evade identification. Once inside the apartment, defendant took pains to ensure that his deadly goal was achieved: as David Williams fled Apartment 7L, arms to his stomach, desperately seeking aid following the initial gunshot, defendant shot him again, this time in the head. Finally, on his way out of the building, defendant appeared to execute a plan: it did not take him very long to abandon his weapon and attire in organized fashion, leaving both in a duffel bag under some foliage in the center of neighboring woods.

For the murder alone, the Penal Law permits a narrow set of possible sentences, ranging from 15 years to life to 25 years to life. P. L. §§ 60.05(2), 70.00.

35

000121

Defendant's maximum penalty could be said to reflect the relative penury of available sentencing options. More to the point, though, it reflects the gravity of defendant's crime.

As Justice Rooney noted, "The evidence indicated that … the defendant went to the victim's apartment with an AK-47 semiautomatic rifle and shot the victim twice. One shot penetrated the chest and went through the lungs and heart. The other shot went through the victim's head … while the victim was lying prone on the hallway floor. … [E]ach shot was fatal. … These were senseless crimes, as far as I can tell, and committed in a brutal manner with tragic effect" (S. 15).[11]

As a matter of general deterrence, the court's reasoning cannot be disputed, and it was right to impose the harshest sanction available. As a matter of specific deterrence, too, there was no shortage of aggravating factors before the court. Defendant was no model citizen at the time of this offense; he was dealing drugs, not just using them (S. 13). And he had already been convicted of three misdemeanors, one of them for fourth-degree criminal possession of a weapon, the same type of offense for which he was convicted here (S. 15).

---

[11] The citation refers to defendant's sentencing proceeding on July 29, 2014.

36

000122

Moreover, contrary to defendant's claim, what defendant expressed to the court was the opposite of "remorse." As his attorney noted, "My client adamantly maintains his innocence" – a sentiment repeated by defendant himself, when he disputed "the way that … certain people … pointed out certain things to indicate that I am the guilty person in this" (S. 10, 14). Continuing to plead his innocence, defendant continued: "And I just felt that there were certain things they did sloppy, that should have been looked at a little bit more clearly… I hope one day that the truth you see is fully brought to you" (S. 14).

In fact, defendant's only reference to "the loss that this family is dealing with" came by way of analogy to his own victimhood: "Just like you all suffered losses," he remarked, "I have gone through a lot of pain, and a lot of trials and tribulations to this point in my life" (T. 13).

Nor does defendant's mental-health history outweigh the aggravating factors here described. To be sure, counsel noted that his client lost his mother at a young age, attended law school, began to encounter "periodic episodes of depression," and then started "self-medicat[ing]" (S. 11). This background was self-reported to Dr. Alexander Bardey, whose findings were expressly considered by the court (S. 15). But Justice Rooney decided that they should not be dispositive in light of, among other factors, the pain caused Williams's fiancée and seven-year-old daughter and

37

000123

the brutal, senseless nature of the crime (S. 15). The court also referenced, "in passing," defendant's failure to raise a psychiatric defense at trial (S. 15).

In these respects, defendant is situated no more favorably any number of perpetrators of violent crimes whose sentences of 25 years to life have been affirmed. See, e.g., People v. Gutierrez, 172 A.D.3d 1094 (2d Dept. 2019); People v. Nelson, 125 A.D.3d 58 (2d Dept. 2014); People v. Jenkins, 34 A.D.3d 833 (2d Dept. 2006); People v. Leftenant, 22 A.D.3d 603 (2d Dept. 2005); People v. Whyte, 299 A.D.2d 378 (2d Dept. 2002); People v. Keough, 145 A.D.2d 437 (2d Dept. 1988); People v. Conwell, 115 A.D.2d 552 (2d Dept. 1985); People v. Migliaccio, 77 A.D.2d 575 (2d Dept. 1980).

Because of these factors, defendant should not be heard to argue in favor of a 15- or 20-year minimum. For all the reasons set out by Justice Rooney, the harshest penalty was called for.

000124

## CONCLUSION

**FOR THE FOREGOING REASONS, THE JUDGMENT SHOULD BE AFFIRMED IN ALL RESPECTS.**

Dated: Staten Island, New York
       July 23, 2021

                                    Respectfully submitted,

                                    MICHAEL E. MCMAHON
                                    DISTRICT ATTORNEY,
                                    RICHMOND COUNTY
                                    130 Stuyvesant Place
                                    Staten Island, N.Y. 10301
                                    (718) 556-7120

MORRIE I. KLEINBART
ALEXANDER FUMELLI
THOMAS B. LITSKY
Assistant District Attorneys
   Of Counsel

39

000125

*Printing Specifications Statement*

I, Alexander Fumelli, attorney for Respondent, do hereby certify pursuant to the rules of the Appellate Division as follows:

1. The within brief was generated on a computer;
2. The margins are at least one inch on all sides;
3. The typeface is Times New Roman, 14-point type;
4. The line spacing is double space;
5. The word count is 7836, exclusive of Tables of Contents and Authorities.

Dated: July 23, 2021

/s Thomas B. Litsky

_____

Thomas B. Litsky

SUPREME COURT OF THE STATE OF NEW YORK
APELLATE DIVISION: SECOND DEPARTMENT
-------------------------------------------------------------------X
PEOPLE OF THE STATE OF NEW YORK,

                      Respondent,

                -against-                        AFFIRMATION OF
                                                    SERVICE

ARMAND SKRINE,                          Docket No. 2014-07390

                    Defendant-Appellant.
-------------------------------------------------------------------X

State of New York    )
County of Richmond  ) ss.:

        Thomas B. Litsky, affirms under penalty of perjury:

1.     I am over 18 years of age and am employed by the Richmond County District Attorney's Office, 130 Stuyvesant Place, Staten Island, New York. I am admitted to practice before the Courts State of New York.

2.     On July 23, 2021, I served the annexed brief by in the above-captioned case by electronic means by emailing it to Natalie Rea, Esq. at [NRea@legal-aid.org](mailto:NRea@legal-aid.org) and by sending it by regular mail to:

           Natalie Rea, Esq.
           THE LEGAL AID SOCIETY
           Criminal Appeals Bureau
           199 Water Street, 5th Floor
           New York, New York 10038

July 23, 2021                        /s Thomas B. Litsky
Staten Island, New York           THOMAS B. LITSKY

*To be argued by*
**NATALIE REA**
(10 Minutes)

# NEW YORK SUPREME COURT

## APPELLATE DIVISION -- SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

-against-

ARMAND SKRINE,

Defendant-Appellant.

**TO BE HEARD ON THE
ORIGINAL RECORD**

**Richmond County**

**Ind. No. 454/11**

**AD No. 2014-07390**

## REPLY BRIEF FOR DEFENDANT-APPELLANT

**JANET E. SABEL**
Attorney for Defendant-
Appellant
THE LEGAL AID SOCIETY
Criminal Appeals Bureau
199 Water Street, 5th Floor
New York, New York 10038
Email: NRea@legal-aid.org
(212) 577-3300

**NATALIE REA**
*Of Counsel*
August 2021

000128

<u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................... ii

PRELIMINARY STATEMENT ...................................................................1

ARGUMENT

        Contrary To The People's Contentions, The
        Judgment Must Be Reversed Because The People's
        Case Hinged On Connecting Appellant To The
        Duffle Bag Through The DNA Testimony Of
        Wong, The Second Mask, And Appellant's
        Clothing At The Time Of Arrest, But  All That
        Evidence Was Inadmissible And  Counsel's Never
        Objected To It, Depriving Appellant Of The
        Effective Assistance Of Counsel. (Reply To RB
        Point I at 13--34) ........................................................................3

I.     Counsel's performance fell below reasonable standards….. …. 4

    A    <u>Wong's DNA testimony violated the Confrontation
        Clause and was inadmissible</u>……………………………….4

    B    <u>The "second" mask was inadmissible</u>………………….. 9

    C    <u>Appellant's clothing at the time of arrest
        was suppressed</u>…………………………………………12

    D    <u>Counsel's other blunders showed her lack
        of preparation</u>…………………………………………..14

II.    The People's case was far from overwhelming and
        counsel errors devastating…………………………………….15

CONCLUSION............................................................................16

PRINTING SPECIFICATIONS STATEMENT ..........................................1A

i

000129

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

Bullcomings v. New Mexico, 564 U.S. 647 (2011) ....................................5, 9

Crawford v. Washington, 541 U.S. 36 (2004)...................................9

Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009) ............................5, 9


**STATE CASES**

People v. Austin, 30 N.Y.3d 98 (2018)  ............................................8

People v. Brown, 13 N.Y. 3d 332 (2009)........................................8

People v. Esposito, 70 Misc. 3d 74 (App. Term. 1st Dept. 2020).................11

People v. Gibson, 163 A.D.3d 586 (2d Dept. 2018) .......................................5

People v. Jamison, 29 A.D.2d 973 (1968)........................................11

People v. John, 27 N.Y.3d 294 (2016) .......................................*passim*

People v. Julian, 41 N.Y.2d 340 (1977) ........................................10

People v. King, 192 A.D.3d 1140 (2d Dept. 2021) .......................................5

People v. McGee, 49 N.Y.2d 48 (1979) ........................................9

People v. Powell, 165 A.D.3d 842 (2d Dept. 2018)......................................12

People v. Price, 29 N.Y. 3d 472 (2017).......................................9, 10

000130

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:  SECOND DEPARTMENT
------------------------------------------------------------- x

THE PEOPLE OF THE STATE OF NEW YORK,   :
                                                         :

                         Respondent,     :

                                                    :

                 against                   :

                                                    :

ARMAND SKRINE,                        :

                                                  :

                   Defendant-Appellant.   :

------------------------------------------------------------- x

<u>PRELIMINARY STATEMENT</u>

The facts and procedural history of the case are fully discussed in appellant's opening brief (hereinafter "AB").  In Point I, appellant argued that counsel's  failure to object to the introduction of (A) the inadmissible DNA profile testimony of Irene Wong, a criminalist at the Office of the Chief Medical Examiner ("OCME"), who never reviewed the raw data or the editing process that generated appellant's DNA profile (AB at 38-41); (B) the unauthenticated inadmissible "second" mask of unknown origin containing the only full DNA profile (AB at 41-46);[1] (C) the size extra-large clothing worn by appellant at the time of arrest and suppressed before trial (AB at 46-49), and her added blunders throughout the trial amounted to ineffective

_____

[1]      A different full-face mask was recovered on the day of the crime and properly authenticated.

1

assistance of counsel mandating reversal (AB at 35-54). In Point II, appellant argued that the imposed maximum sentence of 25 years was excessive in light of appellant's psychiatric problems, lack of criminal record, and remorse (AB at 56-60).

This reply is being submitted for the limited purpose of responding to the People's arguments that counsel provided effective representation because (1) Wong was a supervisor in the OCME and the proper witness to testify about the DNA analysis (Respondent's Brief ("RB") at 23-29); (2) the "second" mask of unknown origin was properly authenticated since it was found in the pocket of a properly authenticated coat (RB at 29-32); (3) the order to suppress all "physical evidence [recovered] from defendant's person" did not include appellant's size extra-large clothing and was limited to the items recovered from his pocket (RB at 32-34); and (4) the evidence was overwhelming.

2

000132

## ARGUMENT

> Contrary To The People's Contentions, The Judgment Must Be Reversed Because The People's Case Hinged On Connecting Appellant To The Duffle Bag Through The DNA Testimony Of Wong, The Second Mask, And Appellant's Clothing At The Time Of Arrest, But All That Evidence Was Inadmissible And Counsel's Never Objected To It, Depriving Appellant Of The Effective Assistance Of Counsel. (Reply To RB Point I at 13-34).

The murder weapon was recovered from a duffel bag. No fingerprints were recovered. No one identified appellant as the perpetrator. To connect appellant to the duffel bag, the People relied on the DNA testimony of OCME Criminalist Wong, a "second" mask of unknown origin recovered by a non-testifying OCME employee with the only full DNA profile, and the size extra-large clothing worn by appellant at the time of arrest matching the size extra-large clothing in the duffel bag. All that evidence was inadmissible: Wong's testimony violated the Confrontation Clause because she never reviewed, supervised or otherwise observed the raw, unedited data or observed the editing process underlying the DNA profiles; the "second" mask was never authenticated; and the size extra-large clothing worn by appellant had been suppressed. Shockingly, counsel never objected to any of this evidence. Instead, she pursued useless objections, made and withdrew baseless arguments, and gave an incoherent summation pointing the finger at a

3

neighbor of the victim who was a foot shorter than the perpetrator.  The jury struggled with the evidence and deliberated for four days.  But for counsel's incompetence, the result would have been very different.

**I     Counsel's performance fell below reasonable standards**

A     <u>Wong's DNA testimony violated the Confrontation Clause and was inadmissible</u>

The DNA evidence in this case consisted of the partial DNA profile on the full-face mask, the full DNA profile match on the "second" inadmissible mask, and the DNA profile from appellant's buccal swab.  The OCME analyst and reviewer of the raw data and edits on the first tests of the full-face mask, marked RS12 but referred to in the OCME file as mask 2, and "second" mask, unmarked but referred to in the OCME file as  mask 1B, were DMW and SNP (FB File 2-Crime Scene, Part II ("FB2 Part II") at pdf 93-96, 9 [Kastle11-127ID-A Table (showing the edits)]).[2]   The analyst and reviewer on the second, duplicate tests of these masks were DMW and KLB (FB2 Part II at pdf 5; Kastle11-130ID-A (table). The OCME analyst and reviewer of the raw data and edits on the first and second tests on appellant's buccal swab were BMA and FR (FB File 1 ("FB1") at pdf 32-33).  None of these analysts

---

[2]     The digital copy of the Forensic Biology files introduced by the People at trial were submitted to the Court with appellant's opening brief and consist of FB File 1-Suspect File and FB File 2-Crime Scene Parts I and II.

000134

testified. The only DNA witness was Wong who never reviewed the raw data before it was edited by others. Under People v. John, 27 N.Y.3d 294, 315 (2016), Bullcomings v. New Mexico, 564 U.S. 647, 651 (2011), and Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), her DNA testimony violated the Confrontation Clause and was inadmissible (AB at 38-40). This DNA evidence was the only evidence directly linking appellant to the duffel bag. Counsel never objected.

In People v. John, 27 N.Y.3d 294, 315 (2016), the Court explained that a supervisor may testify about the DNA analysis without running afoul of the Confrontation Clause if the "testifying criminalist performed a technical review of the analyst's report, independently reviewed the analyst's data interpretation, and reached an independent conclusion." Id. at 315 (RB at 26, citing People v. Gibson, 163 A.D.3d 586, 588 (2d Dept. 2018), quoting John at 315)). John makes it clear that a supervisor is a proper witness if that person reviewed the raw data on the computer and the allele editing process. John, 27 N.Y.3d at 310; see John at 298-301 (describing the DNA analysis process). The testifying analyst in John had not.  She had only reviewed the DNA profile "after the editing process" and had agreed with the conclusion. As a result, her testimony violated the Confrontation Clause.  Id.  In contrast, in People v. King, 192 A.D.3d 1140 (2d Dept. 2021), the testifying criminalist

had independently analyzed the raw data, reviewed the tests, and arrived at her own conclusion.  Her testimony satisfied the Confrontation Clause.

Without pointing to any evidence in the record showing that Wong observed or reviewed the raw data or editing process, the People erroneously argue that as an OCME supervisor she was the proper witness to testify about the DNA analysis.[3]  Wong has the title of supervisor but, like the analyst in John, she did not review the raw data on the computer and the editing of the DNA material recovered.   The forensic files show that the analysts and reviewers on the DNA tests of the masks and buccal swab were DMW and SNP, DMW and KLB, and BMA and FR. See Supra at 4.  They, not Wong, reviewed the raw data on the computer. They, not Wong, made editing decisions and generated DNA profiles.  See John, 27 N.Y.3d at 314 ("it is the generated numerical identifiers and the calling of the alleles at the final stage of the DNA typing that effectively accuses defendant of his role in the crime charged").

---

[3]     The People cite to entries in the FB file dated 12/11/11 (FB2 Part I at pdf 94); and 12/29/11 (FB2 Part I at pdf 95) (RB at 22-23) referring to Irene Wong as supervisor.  In the 12/19/11 entry on the next page, Wong actually informed the trial prosecutor that "the case was passed to MWM" (FB2 Part I at 95). The 12/29/11 entry mentions the Gatorade bottle recovered from the duffel bag, not masks, and notes that the additional evidence has not yet been received (FB2 Part I at pdf 95).

000136

All Wong did in this case was review the already-called alleles. In her testimony, she confirmed her limited involvement. When she explained how a DNA profile is generated, she did not even mention the editing process. She said that the DNA material is put "into an instrument for STR, or short tandem repeat, what that does is it's going to come out with a DNA profile" (Wong 324). Her testimony mistakenly suggested that the DNA profile had been generated by an instrument, "a fiction" the Court in <u>John</u> rejected.[4]   When explaining the testing of the "second" mask, Wong testified that the grey lines on the photo of the mask showed where "the analyst," not her, "did the testing swabbed that middle position of the mask" (334).  She also testified that the "lab," not her, "was successful in generating DNA profile from that item that was swabbed by the technician" (Wong 334).  There is absolutely no evidence that Wong reviewed the raw material on the computer or reviewed the edits that generated the DNA profile as required by <u>John</u>.  The review and editing steps in the process are critical areas of cross-examination.  Since Wong had no personal knowledge of the process in this case, her DNA testimony violated the Confrontation Clause.

---

[4]      "We will not indulge in the science fiction that DNA evidence is merely machine-generated." <u>John</u>, 27 N.Y.3d at 311.

000137

The People state in very general terms that "the detailed nature of [Wong's] description of the particular steps taken in defendant's case confirmed her fluency in the matter" (RB at 26).   Wong testified as DNA expert (Wong 322).   Her "fluency in the matter" is not the issue.   Cross-examination is the issue and the Confrontation Clause "does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination."   <u>Bullcomings</u>, 564 U.S. at 662. Wong did not have personal knowledge of the testing conducted in this case. She did not review the editing process and allele-calling or conduct an independent review of the raw data.   She acted as a surrogate witness for those who did.   Her testimony violated the Confrontation Clause and was inadmissible. <u>People v. Austin</u>, 30 N.Y.3d 98, 100 (2017)(the introduction of DNA evidence through the "surrogate testimony" "of a witness who had not performed, witnessed or supervised the generation of the DNA profiles violated the Confrontation Clause). Counsel never objected to this most critical evidence.[5]   Had counsel objected, Wong's testimony connecting appellant to the masks and the duffel bag would have been precluded.

---

[5]      The People also argue that because <u>John</u> had not been decided at the time of this trial, <u>People v. Brown</u>, 13 N.Y. 3d 332 (2009) governs.   Under <u>Brown</u>, the DNA report,

000138

B     The "second" mask was inadmissible

No trial witness identified the "second" mask as one worn by the suspect to establish that it was what it purported to be. People v. Price, 29 N.Y.3d 472 (2017). There was no evidence of chain of custody to establish that it had not been tampered with. People v. McGee, 49 N.Y.2d 48 (1979). The origin of this "second" mask is totally unknown. There is no indication that Detective Streneck who marked, vouchered, and photographed all the evidence recovered at the scene, from the duffel bag and from appellant, was aware of its existence.  It was allegedly found by a non-testifying OCME employee with the initials DTR in the pocket of the long coat found in the duffel bag, but there was no evidence as to how it got there.  The non-testifying OCME employee reported the unusual discovery on the "Evidence Deficiency/Discrepancy Form," as an "administrative deficiency" and "evidence discrepancy quantity more" (FB2 Part I at pdf 30 ["Also in the pocket of item#1 [the coat] was another black mask"]).  Since the mask was never authenticated, it was inadmissible.

---

then considered to be is generated by a machine, was not testimonial and thus, Wong's testimony was not subject to the confrontation clause under Crawford v. Washington, 541 U.S. 36 (2004)(RB at 27).  At the time of the trial, however, Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009) and Bullcomings v. New Mexico, 564 U.S. 647, 651 (2011), had been decided and held that forensic laboratory reports created "for the purpose of proving the guilt of appellant at trial" were testimonial subject to cross-examination. The Court in John did not go beyond what was clear from these cases and should have been known to counsel.

9

000139

The People disagree and argue that the "second" mask was properly authenticated because it was found in the pocket of a properly authenticated coat and that a proper chain of custody had been established (RB at 28-32). These arguments are without merit.  First, there is no legal basis for the People's novel derivative authentication theory that all items allegedly recovered by anyone at any time from a properly authenticated different properly authenticated coat are also authenticated and admissible.  Under such a theory, the proper authentication of the duffel bag would confer proper authentication to all the items in the bag.  That would negate the purpose of authentication which is to make sure that every piece of evidence is what it purports to be and has not been tampered with.  People v. Price, 29 N.Y. 3d 472, 476 (2017).[6]

Second, no chain of custody was established for the "second" mask. Contrary to the People's claim (RB at 29-31), this is not a case where there was a "gap" in the chain of custody as in People v. Julian, 41 N.Y.2d 340, 343-44 (1977).  The drugs in Julian had been recovered, sealed, initialed,

---

[6]       Contrary to the People's statement (RB at 30), appellant never claimed that the second mask was protruding from the pocket of the coat and, therefore, Detective Streneck was bound to have seen it.  Instead, appellant argued that Detective Streneck was extremely meticulous in marking the evidence (AB at 42-43).  When she found money in socks marked as RS13, found in the duffel bag, she marked the money RS13A, RS13B and RS13C, to show that the money had been found in the sock. Had the mask been in the coat pocket, she would have found it and marked it appropriately.

10

000140

packaged, and deposited with the property clerk before being transferred to another police unit. The three years between the time the sealed and packaged drugs were moved to another police department and the time they were tested did not break the chain of custody. The drugs remained in the originally marked, signed and sealed package.[7]

Here, in contrast, the People utterly failed to establish any chain of custody. The police did not recover the mask, mark it, voucher it, and seal it in an evidence bag. It was never deposited with the property clerk. Instead, DTR, a non-testifying OCME employee, recovered it at some point after all the evidence had been recovered by the police, sent to the property clerk and the OCME. He acknowledged his unusual finding as a discrepancy in the chain of evidence. There is absolutely no evidence as to when or who put it there or where it originally came from. Since this mask was never authenticated, it was inadmissible, but again, counsel never objected.[8]

---

[7]     Other cases cited by the People, People v. Jamison, 29 A.D.2d 973, 973, (1968) and People v. Esposito, 70 Misc. 3d 74, 75–76 (App. Term. 1st Dept.2020), are not on point. In both cases, the evidence was recovered and given to an officer who placed the evidence in a bag, signed, and sealed it. Detective Streneck who recovered all the evidence, marked it and signed it did not recover the second mask, or mark it, of photograph it. The second mask appeared miraculously in the OCME's office with no evidence of who put it there. It could have been recovered from appellant at the time of arrest and placed by someone in the pocket.

[8]     The People minimize the importance of the DNA profile recovered from the second mask by incorrectly asserting that that "[m]atching DNA profiles were generated from not one but two masks within the abandoned duffel bag" (RB at 28). In fact, only one mask

11

C       Appellant's clothing at the time of arrest was suppressed

The motion court explicitly suppressed the physical evidence "from the defendant's person (i.e. the counterfeit currency and identification cards)," which had been recovered from the pocket of his pants. The trial court logically interpreted the ruling as suppressing all the evidence from appellant's person, rather than just evidence from his pocket (96, 98). The court made that clear when it granted counsel's objection to the introduction of the baseball cap worn by appellant at the time of arrest. The prosecutor objected by reminding the court that it had allowed appellant's other clothes into evidence (154-56). The court responded "no kidding. I know that but haven't heard an objection. I'm getting an objection now to the hat. As I read the decision the hat is suppressible, he was wearing it" (155-56; AB at 18-19). The prosecutor did not argue for a more limited reading of the suppression order.

The People now argue for the first time on appeal that the trial court misread the scope of the suppression hearing. They now argue that because the motion court used the term "i.e." in listing the counterfeit currency and

---

was recovered from the duffel bag and that mask had a partial profile. Only the second unauthenticated mask had full profile and there is no evidence that it was found in the duffel bag. Given "the powerful influence of DNA evidence on juries" and "the opportunity for juror confusion," the erroneous use of the second mask was extremely prejudicial. People v. Powell, 165 A.D.3d 842 (2d Dept. 2018).

000142

identification cards, it somehow meant to suppress only those two items (RB at 32). Their new argument is not only unpreserved, it is nonsensical. The motion court suppressed all evidence recovered from appellant's "person," not his pocket. It made the common error of using "i.e." instead of "e.g." to list examples. Its ruling included suppression of all appellant's clothing.[9]

Although the People argue on appeal that evidence of appellant's extra-large clothing at the time of arrest was "not particularly useful" (RB at 33), at trial they used it over and over again. Counsel did not object. They elicited a list of the clothing from Detective Streneck, from Sergeant John Trzcinski, the property clerk, and from Irene Wong from the OCME (AB at 12-13, 19 n. 10, 46-47). They introduced photos of appellant's clothing including black shorts, RS31, a gray XXL sleeveless T-shirt, RS32, a 6XL long sleeve shirt, and his size 13 shoes, and 4XL jacket, RS28 (AB at 14-15). The People referred to the items in summation to connect appellant to the crime. Referring to the coat recovered from the duffel bag, the prosecutor told the jury "And if you'll note, that's a 46XL" and a grey hoodie in the bag "that's

---

[9]       Furthermore, this Court has no jurisdiction to review the suppression court's ruling or the trial court's ruling (interpreting the suppression ruling) because both of those rulings were decided in appellant's favor. See N.Y. Crim. Proc. Law § 470.15 (McKinney)("Upon an appeal to an intermediate appellate court from a judgment, sentence or order of a criminal court, such intermediate appellate court may consider and determine any question of law or issue of fact involving error or defect in the criminal court proceedings which may have *adversely affected the appellant*"; emphasis added).

13

a 3XL" (442).  Drawing the jury's attention to the suppressed clothing, the prosecutor said: "And look at the sizes, this is what's on the defendant: 4XL, US13, W38. That's what the defendant is wearing of the time of arrest." (444). The clothing had been suppressed; counsel never objected.

> D    Counsel's other blunders showed her lack of preparation

The People characterize counsel's blunders as understandable, part of a coherent tactics, and overall competence (RB at 17, 19, 21).  They were not. As described in detail in appellant's opening brief, counsel's incomprehensible objections to two irrelevant bills - $100 and $20 – found on appellant, her failure to object to the prosecutor's statement in summation that the janitor had identified the second mask as one worn by the suspect, her waiver of an opening statement and incoherent summation, showed her complete lack of preparation (AB at 49-53).

## II.  The evidence was far from overwhelming and counsel's errors devastating

The evidence was troubling.  Had counsel been competent, the DNA evidence from both masks would have been precluded; the only full DNA profile from the second mask would never have been entered into evidence; and the repeated comparison of the extra-large clothing in the duffel bag and on appellant at the time of arrest would never have been made.  Even with the improperly introduced evidence, the jury deliberated for four days.   Had

000144

counsel's performance not fallen short of constitutional standards, the verdict would have been different.   Accordingly, appellant was deprived of the effective assistance of counsel and the judgment must be reversed.

CONCLUSION

FOR    THE    REASONS    STATED    IN APPELLANT'S OPENING BRIEF AND THIS REPLY,   THE   JUDGMENT   MUST   BE REVERSED AND A NEW TRIAL ORDERED. SHOULD   THE   COURT   DISAGREE,   THE SENTENCE SHOULD BE REDUCED OR THE MATTER REMANDED FOR RESENTENCING.

Respectfully Submitted,

JANET E. SABEL
Attorney for Defendant-
Appellant

NATALIE REA
 Of Counsel
August 2021

15

000145

## PRINTING SPECIFICATION STATEMENT

The foregoing brief was prepared on a computer.  A proportionally spaced typeface was used as follows:

Name of typeface: Times New Roman

Point Size:   14 (except in footnotes in which 12-point size was used)

Line Spacing: Double

The total number of words in the brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, proof of service, 5531 statement, and printing specification, is 3,530.

*/s/Natalie Rea(ak)*

NATALIE REA

1A

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:  SECOND DEPARTMENT
------------------------------------------------------------ x

PEOPLE OF THE STATE OF NEW YORK,    :   AFFIRMATION
                              :   OF SERVICE
                  Respondent,   :
                              :   Richmond County
               v.            :   Ind. No. 454/11
                              :
ARMAND SKRINE,               :   AD2 No. 2014-
                              :   07390
                Defendant-Appellant.   :
                              :
------------------------------------------------------------ x

STATE OF NEW YORK    )
                      ) ss.:
COUNTY OF NEW YORK)

     Natalie Rea, an attorney duly admitted to the practice of law in this
State, does hereby affirm and show:

     That, on August 2, 2021, the within reply brief was served upon the
Richmond Count District Attorney, Attention: Thomas B. Litsky, at 130
Stuyvesant Place, 7th Floor, Staten Island, New York 10301, via email at:
Thomas.Litsky@rcda.nyc.gov. The District Attorney's Office has consented
to be served exclusively by electronic mail.

Dated:     New York, New York
            August 2, 2021

                            /s/Natalie Rea(ak)
                             NATALIE REA

000147

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:  SECOND DEPARTMENT
------------------------------------------------------------ x

PEOPLE OF THE STATE OF NEW YORK,

                    Respondent,

                v.

ARMAND SKRINE,

                 Defendant-Appellant.

------------------------------------------------------------ x

                          :
                          :
**AFFIRMATION OF SERVICE**

Ind. No. 454/11

AD2 No. 2014-07390

STATE OF NEW YORK    )
                       ) ss.:
COUNTY OF NEW YORK)

     Natalie Rea, an attorney duly admitted to the practice of law in this State, does hereby affirm and show:

     That, on August 2, 2021, the within Reply Brief was served upon the defendant-appellant, Mr. Armand Skrine, DIN: 14A3581, at Great Meadow Correctional Facility, 11739 State Route 22, Box 51, Comstock, New York 12821-0051, by depositing a true copy of the same in a postpaid, properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Post Office Department within the State of New York.

Dated:    New York, New York
           August 2, 2021

                                   /s/Natalie Rea (ak)
                                    NATALIE REA

# Supreme Court of the State of New York
# Appellate Division: Second Judicial Department

D68241
Y/htr

_____AD3d_____

Argued - November 12, 2021

VALERIE BRATHWAITE NELSON, J.P.
REINALDO E. RIVERA
WILLIAM G. FORD
DEBORAH A. DOWLING, JJ.

―――――――――――――――――――――――――――

2014-07390

DECISION & ORDER

The People, etc., respondent,
v Armand Skrine, appellant.

(Ind. No. 454/11)

―――――――――――――――――――――――――――

Janet E. Sabel, New York, NY (Natalie Rea of counsel), for appellant.

Michael E. McMahon, District Attorney, Staten Island, NY (Morrie I. Kleinbart, Alexander Fumelli, and Thomas B. Litsky of counsel), for respondent.

Appeal by the defendant from a judgment of the Supreme Court, Richmond County (Stephen J. Rooney, J.), rendered July 29, 2014, convicting him of murder in the second degree and criminal possession of a weapon in the second degree, upon a jury verdict, and imposing sentence.

ORDERED that the judgment is affirmed.

In fulfilling our responsibility to conduct an independent review of the weight of the evidence (*see* CPL 470.15[5]; *People v Danielson*, 9 NY3d 342), we nevertheless accord great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor (*see People v Mateo*, 2 NY3d 383). Upon reviewing the record here, we are satisfied that the verdicts of guilt were not against the weight of the evidence (*see People v. Romero*, 7 NY3d 633).

"[T]he evidence, the law, and the circumstances of this case, viewed in the totality and as of the time of the representation, reveal that counsel provided the defendant with meaningful representation" (*People v Benevento*, 91 NY2d 708, 712; *see People v Baldi*, 54 NY2d 137, 147). Contrary to the defendant's contention, counsel was not ineffective for failing to assert a Confrontation Clause challenge to the testimony of a criminalist employed by the Office of the Chief Medical Examiner of the City of New York (*see People v John*, 27 NY3d 294, 295). The alleged

error involves an issue which was not "so clear-cut and dispositive" (*People v Rodriguez*, 31 NY3d 1067, 1068 [internal quotation marks omitted]) at the time of the defendant's trial that "no reasonable defense counsel would have failed to assert it" (*id*. at 1068 [internal quotation marks omitted]; *see People v McGee*, 20 NY3d 513, 518; *People v Cunningham*, 194 AD3d 954, 956).  In addition, counsel's failure to object to improper testimony and evidence regarding the clothing worn by the defendant at time of his arrest was not "sufficiently egregious and prejudicial as to compromise [the] defendant's right to a fair trial" (*see People v Caban*, 5 NY3d 143, 152).

The sentence imposed was not excessive (*see People v Suitte*, 90 AD2d 80).

BRATHWAITE NELSON, J.P., RIVERA, FORD and DOWLING, JJ., concur.

ENTER:

*Maria T. Fasulo*

Maria T. Fasulo
Clerk of the Court

January 12, 2022

PEOPLE v SKRINE, ARMAND

Page 2.

000150



THE
LEGAL AID
SOCIETY
CRIMINAL
DEFENSE

Criminal Appeals Bureau
199 Water Street
New York, NY 10038
(212) 577-3564
www.legal-aid.org

NRea@Legal-Aid.org

Tel : 212-577-3403

Janet E. Sabel
*Attorney-in-Chief*
*Chief Executive Officer*

Justine M. Luongo
*Attorney-in-Charge*
*Criminal Practice*

David Loftis
*Attorney-in-Charge*
*of Post-Conviction and Forensic Litigation*

January 18, 2022

The Honorable Janet DiFiore
Chief Judge
Court of Appeals
Eagle Street
Albany, New York  12207

Re:   People v. Armand Skrine
Richmond Co No. 454/11

Your Honor:

Pursuant to Criminal Procedure Law Section 460.20, I am submitting this letter as an application for permission to appeal to the Court of Appeals in the above-entitled case.  An application has not been made to a justice of the Appellate Division.  By decision rendered January 12, 2022, the Appellate Division Second Department affirmed a judgment rendered July 29, 2014, by the Supreme Court Richmond County, convicting appellant after trial of second-degree murder and criminal possession of a weapon. Appellant was sentenced to the maximum permissible term of 25 years to life.

I am enclosing a copy of the decision and order of the Appellate Division.  Please advise me of the judge designated to decide this application so that I may send that judge a follow-up letter in support of the application.  We request this Court to consider and review all issues outlined in defendant-appellant's brief.

Respectfully yours,

NATALIE REA
Associate Appellate Counsel
212-577-3403

Encl.

Cc:    Hon. Michael McMahon
District Attorney
Richmond County
130 Stuyvesant Place
Staten Island, New York 10301
Attn: Morrie Kleinbart (Morrie.Kleinbart@rcda.nyc.gov)

**Justice in Every Borough.**

000151

**THE**
**LEGAL AID**
**SOCIETY**
CRIMINAL
DEFENSE

Criminal Appeals Bureau
199 Water Street
New York, NY 10038
(212) 577-3564
www.legal-aid.org

NRea@Legal-Aid.org

Tel : 212-577-3403


Janet E. Sabel
*Attorney-in-Chief*
*Chief Executive Officer*

Justine M. Luongo
*Attorney-in-Charge*
Criminal Practice

David Loftis
*Attorney-in-Charge*
*of Post-Conviction and Forensic Litigation*

February 10, 2022

The Honorable Madeline Singas
Judge of the Court of Appeals
Court of Appeals Hall
20 Eagle Street
Albany, New York  12207


Re:    People v. Armand Skrine
       Richmond Co No. 454/11


Your Honor:

Under well-established constitutional standards set in Strickland v. Washington, 466 U.S. 668 (1984), People v. Benevento, 91 N.Y. 91 N.Y.2d 708 (1998), and more recently in Padilla v. Kentucky, 559 U.S. 356 (2010),  the reasonableness of counsel performance must be assed under "prevailing professional norms."  In this case, the Appellate Division Second Department in a complete departure from these well-established standards, applied a much stricter standard limiting counsel's constitutional obligations to raising arguments to those "so clear-cut and dispositive […] that no reasonable defense counsel would have failed to assert" them. People v. Skrine, __ A.D.3d __, 2022WL108383 (2d Dept. 2022). Leave should be granted for the Court of Appeals to address this new strict and unconstitutional standard.

In this case, the only direct evidence connecting appellant to the crime was the DNA testimony of Irene Wong, an analyst from the Office of the Chief Medical Examiner ("OCME") who had neither supervised, conducted, or observed the testing as required by Crawford v. Washington, 541 U.S. 36, 53-54 (2004), Bullcoming v. New Mexico, 564 U.S. 647, 657 (2011), as subsequently confirmed in People v. John, 27 N.Y.3d 294, 303 (2016). The trial took place in 2014 and, under prevailing professional norms at the time, counsel had to raise a confrontation clause objection to Wong's testimony.  Counsel did not do so even though the Supreme Court in Bullcoming, had previously held that the testimony of an expert who had neither supervised, conducted or observed the blood alcohol testing violated the confrontation clause. The Appellate Division found that counsel's failure to make a confrontation clause objection to Wong's DNA testimony was not error because John had

**Justice in Every Borough.**

not been decided and therefore, the issue was not "so clear-cut and dispositive [. . .] that no reasonable defense counsel would have failed to assert it."

Counsel's failure to object to Wong's DNA testimony was not her only error. Among her more serious errors were her failure to object to the introduction of a mask never vouchered, never marked and never authenticated that contained the only matching full DNA profile and to the People's repeated use of previously suppressed clothing connecting appellant to the crime.[1] Counsel admitted to being unprepared. Contrary to the findings of the Appellate Division, these errors were "sufficiently egregious and prejudicial" to deprive appellant of his constitutional right to the effective assistance of counsel.

Case Summary

The facts and arguments are fully discussed in appellant's opening and reply briefs submitted to the Appellate Division (Appellant's Opening Brief ("AOB"), filed herewith as PeoplevSkrine-App-Skrine-ADbrf, and Reply Brief ("ARB"), filed herewith as PeoplevSkrine-App-Skrine-ADrpl. The following is a summary relevant to this leave application.

Appellant was charged with the murder on December 8, 2011, of David Williams outside his 7th floor apartment at 195 Steuben Street on Staten Island. According to the trial testimony, that morning, the building janitor saw a very tall person by the elevator in the lobby. He could not tell whether the person was a man or a woman, black or white. He testified that he was 6'4", and the person was taller, wearing a long black coat, black gloves, a full-face black mask, and carrying a gym bag. The face mask covered the person's head and face except for the eyes. Around 11:00 a.m., Williams' neighbor was in the hallway when she heard men talking in Williams' apartment, and furniture moved around. She then heard what sounded like a shot, saw the door to Williams' apartment open, Williams come out with his hands on his stomach, saying "help me," and then fall. As she ran down the stairs, she heard a second shot. Williams died of two gunshot wounds.

Appellant, 6'5" to 6'7", and Williams' former college roommate, was stopped in the vicinity without probable cause. That afternoon, a duffel bag was recovered in a nearby wood containing the murder weapon, a full-face mask, size extra-large clothing, and other items. The People had to connect appellant to the duffel bag and all the evidence recovered from the bag was meticulously vouchered, numbered, and photographed (AOB at 11-15). Appellant's clothing at the time of arrest was suppressed (AOB at 5-7) but along with items from the duffel bag was sent to the OCME for testing (AOB at 19-23). At the time of testing, a non-testifying OCME employee noted the presence of partial face mask of unknown origin, referred to as the second mask, in the pocket of a vouchered

---

[1]     Black jacket size 4XL, the shoes, a size 13, the jeans, W38, the gray sleeveless T-shirt, XXL, and the black long-sleeve shirt, a 6XL (AOB at 16, 46 ). Clothing recovered from the duffel bag included a long black jacket/coat, size 46XL, a gray hooded zip sweatshirt, size 3XL; a black hooded sweatshirt, size 3XL (AB at 13, 27).

**Justice in Every Borough.**

000153

coat from the duffel bag. The non-testifying employee noted the finding on the "Evidence Deficiency/Discrepancy Form," as an "administrative deficiency" and "evidence discrepancy quantity more."

At the beginning of the trial, counsel admitted to being unprepared.  Later, when the People repeatedly compared the size extra-large clothing of appellant's suppressed clothing to the size extra-large clothing found in the duffel bag, she did not object.  When the People introduced the DNA test results from the second never-vouchered and never-authenticated mask discovered by the non-testifying OCME employee. She did not object.  Most importantly, counsel never objected to Wong's DNA testimony that provided the only direct evidence connecting appellant to the crime. Wong had reviewed the DNA tests results but had not supervised, or conducted, or observed the DNA testing.  Nevertheless, she testified, without objection, that a partial DNA profile matching appellant had been found on the vouchered and authenticated full-face mask recovered from the duffel bag and a full DNA profile recovered from the never-vouchered, never-authenticated second mask. After four days of deliberations, appellant was convicted of murder.  Though he had no prior felony and suffered from mental issues, appellant was sentenced to the maximum term of imprisonment 25 years to life.

Appeal to The Appellate Division

Appellant argued that under both the federal and state standards, counsel's failure to object to Wong's DNA testimony, to the admissibility of the never-authenticated second smaller mask with the only full DNA profile, and the suppressed clothing, along with a slew of smaller errors amounted to ineffective assistance of counsel (AOB at 35-55; ARB at 4-15).[2] Under the Sixth Amendment, to establish ineffective assistance of counsel a defendant must show (1) that counsel's performance fell below "an objective standard of reasonableness" and (2) that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).  The New York State Constitution is "somewhat more favorable to defendants" than its federal counterpart.  People v. Turner, 5 N.Y.3d 476, 480 (2005). Under the State Constitution, the second prong of Strickland, prejudice, "is examined more generally in the context of whether defendant received meaningful representation." People v. Benevento, 91 N.Y.2d 708, 713 (1998).  Meaningful representation includes the right to the assistance of a lawyer who has taken the time to review and prepare both the law and the facts relevant to the defense.  See People v. Droz, 39 N.Y.2d 457, 462 (1976).

With respect to Wong's DNA testimony, appellant argued that counsel's failure to raise a confrontation clause objection was error because it fell below reasonable professional standards (AOB at 38-40; ARB at 4-8).  Indeed, forensic evidence reports admitted into evidence for proving the truth of the matter asserted are not exempt from the Confrontation Clause under Crawford and its progeny." People v. John, 27 N.Y.3d 294, 303 (2016); see Bullcoming v. New Mexico, 564 U.S.

---

[2]      This leave letter will focus on the confrontation clause issues arising out of Wong's testimony.

**Justice in Every Borough.**

647, 657 (2011); Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009).  Appellant argued that to satisfy the Confrontation Clause, the DNA criminologist testifying must be the one who "conducted or supervised the laboratory's generation of the DNA profile from the defendant's exemplar" or the crime scene. John, 27 N.Y.3d at 308. (AOB at 39; ARB at 6).  In this case, the analysts who edited and constructed the DNA profile from the masks and reviewed it were DMW, SNP, and KLB. The analyst who made the original comparison was MM or Michael Mordente.  None of these analysts testified (AOB at 39-40; ARB at 4, 6-7). Wong had reviewed the results but never edited or constructed the DNA profile.

The People took the position that there was "significant evidence" of guilt and counsel's performance did not amount to ineffective assistance (People's Brief ("PB") at 13-34, filed herewith as PeoplevSkrine-Res-People-ADBrf).  As to Wong's testimony, they argued that, as a supervisor, she was the proper witness for confrontation clause purposes under People v. John, 27 N.Y.3d 294, 303 (2016); see Bullcoming v. New Mexico, 564 U.S. 647, 657 (2011) (PB at 24-26).  The People added that the "irony behind the compatibility of Wong's testimony with" John, "is that John was decided two years after the 2014 trial.  At the time, People v. Brown, 13 N.Y.3d 332, 337 (2009), was controlling and Wong's DNA testimony was deemed not testimonial and not subject to the confrontation clause (PB at 27).[3]

The Appellate Division affirmed the conviction finding that "as of the time of the representation," counsel provided meaningful representation," under People v. Benevento, 91 N.Y.2d 708 (1998). According to the court, "counsel was not ineffective for failing to assert a confrontation clause challenge to the testimony of a criminalist employed by the Office of the Chief Medical Examiner of the City of New York (see People v. John, 27 N.Y.3d 294, 295).  The alleged error involves an issue which is not "so clear-cut and dispositive' (People v. Rodriguez, 31 N.Y.3d 1067, 1068 [internal quotation omitted]) at the time of defendant's trial that no reasonable defense counsel would have failed to assert it." The court added that counsel's failure to object to "improper testimony and evidence regarding the clothing," was "not sufficiently egregious and prejudicial to compromise appellant's right to a fair trial."

Leave should be granted

The Appellate Division applied a new and seemingly unconstitutional standard. Counsel's Sixth Amendment constitutional obligations are not limited to raising arguments "so clear-cut and dispositive" that "no reasonable defense counsel would have failed to assert" them." See Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).  Under the first prong of Strickland, counsel's

---

[3]     The People argued that the second partial mask was properly in evidence since its origins were well known.  It came from the vouchered and marked coat found in the duffel bag (PB at 27-32).  As to the repeated use of appellant's suppressed clothing, they argued, for the first time on appeal, that the trial court misread the suppression ruling and that appellant's clothing had not been suppressed clothing was not  (PB at 32).  In any event, the suppressed clothing was not particularly important since there was other evidence that appellant was tall (PB at 32-33).

**Justice in Every Borough.**

performance is assessed under "an objective standard of reasonableness." "The first prong – constitutional deficiency – is necessarily linked to the practice and expectations of the legal community." Padilla v. Kentucky, 559 U.S. 356, 366 (2010). "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id, quoting Strickland. In Padilla, where the Court held that the Sixth Amendment required defense counsel to advise a non-citizen defendant about the immigration consequences of a guilty plea, the Court looked to the prevailing practices "reflected in American Bar Association standards." Padilla, 559 U.S. at 367. The Court noted that they were guides and not "inexorable commands," but they were a "valuable measure of the prevailing norms of effective representation." Id.

In 2014, at the time of the trial in this case, two years before the Court of Appeals' decision in John, but two after Bullcoming, the "practice and expectations of the legal community" required trial counsel to raise a confrontation clause objection to Wong's DNA testimony. Defense lawyers had been making confrontation clause objections to similar OCME analyst testimony based on Crawford and Bullcoming. See People v. Butler, 183 A.D.3d 665 (2d Dept. 2020)(trial in 2013, two years after Bullcoming and three years before John, counsel objected to the criminalist who had not performed or supervised the DNA testing); People v. Tsintzelis, 35 N.Y.3d 925 (2020)(trial in 2014, three years after Bullcoming and two years before John, counsel objected to the criminalist testimony); People v. Velez, 35 N.Y. 3d (2020)(same); People v. Austin, 30 N.Y. 3d 98 (2017)(trial in 2012, one year after Bullcoming and four years before John, counsel objected to similar testimony); People v. Welch, 137 A.D.3d 1313, 1314-15 (3d Dept. 2016)(trial in 2012, one year after Bullcoming and four years before John, counsel had a reasonable trial strategy not to object to the analyst's DNA testimony); People v. Pascall, 164 A.D.3d 1265 (2d Dept. 2018)(trial in 2013, two years after Bullcoming and three years before John, counsel preserved the confrontation clause objection); People v. Metellius, 157 A.D.3d 821 (2d Dept. 2018)(trial in 2012, two years after Bullcoming and four years before John, counsel failed to preserve the confrontation clause violation). At trial in John, counsel made the argument counsel should have made in this case.

John did not set new standards. It simply adopted the analysis of the Court in Bullcoming. John, 27 N.Y.3d at 304. Bullcoming involved the testing of the defendant's blood alcohol level. At trial, the prosecution relied on an analyst who had not performed the gas chromatograph test. Describing the testifying expert witness in Bullcoming, the Court in John explained that the witness had "reviewed the reported test results, but had not supervised, conducted or observed the testing that produced the results upon which he relied for his opinion." John, 27 N.Y. 3d at 94. In John, the DNA testing of the defendant was conducted as the criminal action was pending. There was no question that the "primary (truly sole) purpose" was proving a particular fact," i.e., that the defendant possessed the gun, and thus, the evidence testimonial and subject to the confrontation clause. On this record, wrote the Court in John,

> the admission into evidence of the laboratory reports for their truth as
> to the generation of the DNA profile from the gun without  testifying

**Justice in Every Borough.**

Page 6

> analyst who performed, witnessed or supervised any portion of the
> testing is <u>indistinguishable</u> from <u>Bullcoming</u>

27 N.Y.3d at 97 (emphasis added). If, in <u>Padilla</u>, counsel had to follow ABA guides that were not "inexorable commands," here, under prevailing professional norms, counsel had to follow the "inexorable command" of the Supreme Court precedent in <u>Bullcoming</u>, "indistinguishable" from <u>John</u>.

The "so clear-cut and dispositive" that "no reasonable defense counsel would have failed to assert it" standard applied by the Second Department to assess counsel's performance violates the Sixth Amendment, <u>Strickland</u>, and <u>Padilla</u>, and necessarily the broader right to counsel under the New York Constitution. The Court of Appeals has recognized, that "DNA evidence is powerful forensic evidence in determining the guilt or innocence of an accused." <u>John</u>, 27 N.Y.3d at 303. Under the strict new "so clear-cut and dispositive" that "no reasonable defense counsel would have failed to assert it" standard to assess counsel's performance, a defendant accused of the most serious crime under the Penal Law would be deemed to have received constitutionally effective representation where counsel failed to object to the prosecution most powerful evidence. Such a standard renders the right to counsel meaningless.

Leave should be granted for the Court of Appeals to address this erroneous strict new standard and reiterate the proper standard to assess the performance of counsel in an ineffective assistance of counsel claim. The standard adopted by the Appellate Division will make a mockery of the "meaningful representation" standard set by the Court of Appeals and reasonable professional standards set by <u>Strickland</u>. U.S. Const., Amends. VI And XIV; N.Y. Const., Art. I, §6. Should your Honor wish to discuss this matter at a hearing, I would, of course, be most happy to do so at your convenience.

Respectfully yours,

NATALIE REA
Associate Appellate Counsel
212-577-3403
NRea@Legal-Aid.org

Cc:   Hon. Michael McMahon
      District Attorney
      Richmond County
      130 Stuyvesant Place
      Staten Island, New York 10301
      Attn: Morrie Kleinbart (Morrie.Kleinbart@rcda.nyc.gov)

**Justice in Every Borough.**

000157



## OFFICE OF THE DISTRICT ATTORNEY
### RICHMOND COUNTY

THOMAS B. LITSKY
ASSISTANT DISTRICT ATTORNEY
(718)-556-7120

MICHAEL E. MCMAHON
DISTRICT ATTORNEY

March 9, 2022

Hon. Madeline Singas
Judge of the Court of Appeals
Court of Appeals Hall
20 Eagle Street
Albany, New York 12207-1095

Dear Judge Singas:

RE: <u>People v. Armond Skrine</u>, CLA 2022-00133, Richmond Co. Ind. No. 454/11

I submit this letter in response to defendant's application for leave to appeal from the January 12, 2022 Order of the Appellate Division, Second Department, affirming a July 29, 2014 judgment of the Supreme Court, Richmond County, convicting defendant, following a jury trial, of Murder in the Second Degree and Criminal Possession of a Weapon in the Second Degree, and sentencing him to state prison.

Defendant seeks further review of his conviction, claiming that he received ineffective assistance of counsel. That application should be denied.

In this case, there was significant evidence connecting defendant to the crime to the scene, and to the apparent killer. Defendant rode the ferry to Staten Island that morning (see Casiano 162, Vitale 215, People's Ex. 168, 170) and, after the murder, was spotted wandering just two blocks from the scene (Anderson 189). A duffel bag recovered from neighboring woods contained an AK-47 missing two bullets – the same number of shots overheard by the deceased's neighbor, and the same number evidenced by deformed bullets and impact markings at the scene (Steneck 34, 51-57, 66-69; Smith 167-69).

The duffel bag itself matched the bag carried by the apparent killer (see Loiseau 116), the bag carried by defendant during his ferry travels (see Patterson 225; People's Ex. 171), a bag Williams's fiancée remembered defendant having carried around (see Hunt 246). And a jacket within the bag was the same Jean Loiseau had spotted on the camouflaged man standing in the lobby of the deceased's apartment building on the day of the murder (see Loiseau 115).

DNA evidence further linked defendant to two black masks recovered from the duffel bag. A detective recovered, and vouchered, one loose mask and a camouflage jacket inside the duffel bag that the police found in the woods.  An OCME analyst recovered a second mask from the vouchered camouflage jacket's pocket. At trial, the conclusion that defendant was the single source of DNA recovered from two black masks, and that he matched a profile unique among approximately 6.8 trillion people, was based on the testimony of OCME criminalist Irene Wong. Wong "supervise[s] Criminalists Levels II and Criminalists Level III in their case work, which means that [she does] a technical review on their work to make sure that everything is correct" (Wong 318). She supervised the analysis of both masks recounted in the DNA report. See e.g., Forensic Biology Case Contact Sheet, 12/11/11 ("Told her DTR is the analyst and I am his supervisor"); PCR Statistics Sheet, 12/21/11 (listing DTR as analyst); Forensic Biology Schedule of Analysis Sheet, 2/27/12 (Wong ordered extraction, quantitation, DNA typing, a comparison, and a report). In fact, she remained the supervisor of analyst DTR's work well after the generation of the dual black-mask profiles that inculpated defendant. See Electropherograms, 12/19/11; Forensic Biology Case Contact Sheet, 12/29/11.

At the time of defendant's trial, the governing case was People v. Brown, 13 N.Y.3d 332 (2009), which held that a DNA report was not testimony "because it consisted of merely machine-generated graphs, charts and numerical data," and the relevant "technicians would not have been able to offer any testimony other than how they performed certain procedures." Id. at 337. It is impossible to retroactively require defense counsel to anticipate the more precise rules articulated by the Court of Appeals two years later in People v. John, 27 N.Y.3d 294 (2016), requiring that "an analyst who witnessed, performed or supervised the generation of defendant's DNA profile, or who used his or her independent analysis on the raw data, as opposed to a testifying analyst functioning as a conduit for the conclusions of others, must be available to testify." Id. at 305 (emphasis added).  Here, the court's and the parties' handling of the DNA evidence was entirely compliant with the rules that were yet to be established by John. In any event, as the Appellate Division recognized the "alleged error" -- not objecting to the DNA testimony on confrontation clause ground – was "not 'so clear-cut and dispositive . . . at the time of defendant's trial." People v. Skrine. 2022 NY Slip Op 00197, 156 N.Y.S.3d 888 (2d Dept. 2022). Thus, counsel was not deficient by refraining from objecting on confrontation clause grounds.

MARCH 9, 2022          RICHMOND COUNTY DISTRICT ATTORNEY                    P A G E | 3

     In his application, without record cite, defendant avers that counsel -- who had represented him for one year – stated that she was "unprepared" "at the beginning of the trial."  It is unclear where in the record such a statement appears. In any event, this claim provides no basis for further review. As outlined in Point I of respondent's Appellate Division brief. defendant received the benefit of thorough and impassioned representation by an attorney whose performance evinced both coherent tactics and overall competence in a very difficult case.

     This case presents no leave worthy issue. And not granting leave will neither "make a mockery" of standards set by People v. Baldi , 54 N.Y.2d 137 (1981), nor Strickland v. Washington, 466 U.S. 668 (1984). Accordingly, defendant's application for leave to appeal should be denied.

                         Respectfully,

                         Thomas B. Litsky
                         Assistant District Attorney

cc: Natalie Rea, Esq.
    The Legal Aid Society
    Criminal Appeals Bureau
    199 Water Street
    New York, NY 10038
    (NRea@legal-aid.org)

000160

COURT OF APPEALS
STATE OF NEW YORK
-----------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

                       Respondent,

         v.                                    AFFIRMATION OF SERVICE

  ARMOND SKRINE,                   CLA 2022-00133

                                          Ind. No. 454/11

                        Defendant-Appellant.
-----------------------------------------------------------------------X

STATE OF NEW YORK )
COUNTY OF RICHMOND)

       Thomas B. Litsky, affirms under penalty of perjury:

       I am over 18 years of age and am employed by the Richmond County District Attorney's Office, 130 Stuyvesant Place, Staten Island, New York. I am admitted to practice before the Courts State of New York.

       On March 9, 2022, I served the annexed letter response to defendant's leave application, by mailing and emailing to

               Natalie Rea, Esq.
               The Legal Aid Society
               Criminal Appeals Bureau
               199 Water Street
               New York, NY 10038
               (NRea@legal-aid.org)

               /s Thomas B. Litsky

               Thomas B. Litsky

Dated:  Staten Island, New York
       March 9, 2022

000161

# State of New York

## Court of Appeals

BEFORE: HON. MADELINE SINGAS
                Associate Judge

---

THE PEOPLE OF THE STATE OF NEW YORK,

                                    Respondent,

              -against-

SKRINE, ARMAND,

                                Appellant.

**ORDER
DENYING
LEAVE**

---

       Appellant having applied for leave to appeal to this Court pursuant to Criminal Procedure

Law § 460.20 from an order in the above-captioned case;*

       UPON the papers filed and due deliberation, it is

       ORDERED that the application is denied.

Dated:    March 24, 2022
          at Albany, New York

                                        Associate Judge

*Description of Order:  Order of the Appellate Division, Second Department, entered January 12, 2022, affirming a judgment of Supreme Court, Richmond County, rendered July 29, 2014.

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND - CRIMINAL TERM - PART 12
----------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK    : INDICTMENT NO.
                                         454/2011

            -against-                  :


ARMAND SKRINE,                         :


                        Defendant.   : HEARING
----------------------------------------X
(Det. Guarino)              18 Richmond Terrace
(P.O. Anderson)            Staten Island, New York
(Det. Patterson)           June 14, 2013


B E F O R E:

    HONORABLE ROBERT COLLINI, Justice.



A P P E A R A N C E S:

    DANIEL DONOVAN, ESQ.
    District Attorney - Richmond County
        130 Stuyvesant Place
        Staten Island, N.Y. 10301
    BY:  JENNIFER CILIA, ESQ., and
        WANDA DeOLIVEIRA, ESQ.,
        Assistant District Attorneys

    MARIA GUASTELLA, ESQ.
    Attorney for the Defendant
        88 New Dorp Plaza
        Staten Island, N.Y. 10306




                        MAURIZIA M. SELLECK
                        SENIOR COURT REPORTER

Proceedings

1               THE COURT CLERK:  Calling number 1 on the

2       calendar, Indictment 454/2011, Armand Skrine.

3               THE COURT:  This case is on for hearings.  Both

4       parties ready?

5               MS. CILIA:  Yes.

6               MS. GUASTELLA:  Yes.

7               THE COURT:  Off the record.

8               (Whereupon, a discussion is held off the record.)

9               THE COURT CLERK:  Appearances, please.

10              MS. CILIA:  Jennifer Cilia and Wanda DeOliveira

11      for the People.

12              MS. GUASTELLA:  Maria Guastella on behalf of

13      Mr. Skrine.

14              THE COURT:  Apparently, a Wade hearing and a

15      Huntley hearing were granted in this case; is that

16      correct?

17              MS. CILIA:  Yes.

18              THE COURT:  All right.  With respect to the Wade

19      hearing, what's the subject of the Wade hearing?

20              MS. CILIA:  There is a photo array, Judge, one

21      photo array.

22              MS. GUASTELLA:  I think it was a Dunaway/Mapp.

23      Is it a Dunaway/Mapp/Wade?

24              THE COURT:  And a Dunaway/Mapp.  Okay.  I'm

25      sorry.  With respect to the Huntley hearing, what is the

MMS

Proceedings

1    subject of the hearing?

2              MS. CILIA:  There are two oral statements, one

3    made on scene to Police Officer Anderson --

4              THE COURT:  Two oral statements is fine.  Thank

5    you.

6              And with respect to the Dunaway/Mapp?

7              MS. CILIA:  There was property recovered on scene

8    and later at the precinct from the defendant.  There was

9    also a duffel bag recovered that was abandoned that is

10   apparently also the subject matter of this hearing.

11             THE COURT:  There was property on the scene that

12   was recovered.  Does that include the duffel bag?

13             MS. CILIA:  The duffel bag was recovered later by

14   a K-9.

15             THE COURT:  And the property in the precinct from

16   the defendant?

17             MS. CILIA:  Yes.

18             THE COURT:  And the duffel bag.  All right.

19             Ready to proceed?

20             MS. CILIA:  I am.  I do need to call the

21   witnesses out of order for scheduling purposes, so I'm

22   going to --

23             THE COURT:  I didn't know there was an order.

24             MS. CILIA:  It won't be -- All right.

25             THE COURT:  Counsel, are you ready to proceed?

Proceedings

1                MS. GUASTELLA:  Yes.

2                THE COURT:  Call your first witness.

3                MS. CILIA:  The People call Daniel Guariano.

4            Also, for the record, I provided to defense

5     counsel certain discovery and other disclosures, and

6     defense counsel has signed acknowledging receipt of those.

7                MS. GUASTELLA:  Acknowledge receipt, Judge.

8                THE COURT OFFICER:  Witness entering.

9                THE COURT:  Is there a list of the discovery?

10               MS. CILIA:  Yes.

11               THE COURT:  Could you give that to defense

12    counsel, and I'd ask that she --

13               MS. CILIA:  I did.

14               MS. GUASTELLA:  I did sign it, Judge.

15               THE COURT:  -- date it and we'll make it part of

16    the court file.

17           Just an extra one for the court files.

18    Obviously, if you review the list and there is something

19    that's been alleged --

20               The officers do that.

21               MS. CILIA:  I'm sorry.

22               THE COURT:  They get mad.

23           If there is something on the list that is alleged

24    to have been brought -- given to you, if it's not there

25    when you have a better opportunity to review all the

People - Det. Guariano - Direct/Cilia

1    documents, bring it to my attention.  If it's something

2    material with respect to any of the issues during the

3    course of this hearing, I'll allow you to reopen the

4    hearing.

5                MS. GUASTELLA:  That's fine, Judge.  Thank you.

6                THE COURT:  Counsel.

7                THE COURT OFFICER:  Step up, remain standing, and

8    face the clerk.

9    D E T.  D A N I E L  G U A R I A N O, bearing shield number

10   5748, assigned to the 120 Precinct Detective Squad, having

11   been called as a witness on behalf of the People, having

12   been duly sworn by the clerk of the court, was examined and

13   testified as follows:

14               THE COURT OFFICER:  State your full name and

15   title for the record.

16               THE WITNESS:  Detective Daniel Guariano,

17   G-U-A-R-I-A-N-O, is 120 Detective Squad.

18               THE COURT CLERK:  And your shield number.

19               THE WITNESS:  5748.

20               THE COURT CLERK:  Thank you, Officer.  Be seated.

21               MS. CILIA:  May I inquire?

22               THE COURT:  Yes.

23   DIRECT EXAMINATION

24   BY MS. CILIA:

25        Q.   Detective, how long have you approximately been with

                                MMS

People - Det. Guariano - Direct/Cilia

1    the NYPD?

2        A.    Nine years.

3        Q.    Approximately how many arrests have you participated

4    in in your career?

5        A.    300.

6        Q.    Directing your attention to December 8th of 2011, were

7    you working on that day?

8        A.    Yes, I was.

9        Q.    What was your assignment?

10              THE COURT:   Slow down.   What day are we talking

11       about?

12              MS. CILIA:   December 8th of 2011.

13              THE COURT:   Go ahead.

14       Q.    What was your assignment on that day?

15       A.    Investigative field in 120 Detective Squad.

16       Q.    Were you working on a particular case?

17       A.    Yes, I was.

18       Q.    What was that?

19       A.    A homicide that occurred at 195 Steuben Street.

20       Q.    As part of this investigation, were you present for

21   the recovery of anything?

22       A.    Yes, I was.

23       Q.    What specifically was recovered?

24       A.    A large black and gray duffel bag.

25       Q.    And approximately what time was that recovered?

People - Det. Guariano - Direct/Cilia

1        A.    1600 hours.

2        Q.    From where?

3        A.    From a wooded area in the rear of 198 --

4              THE COURT:  Before we go any further, I'm not

5        sure exactly what 1600 hours means.

6              THE WITNESS:  I'm sorry.  4 p.m.

7              THE COURT:  4 p.m.?

8              THE WITNESS:  4 p.m.

9              THE COURT:  Okay.  The record should reflect what

10       you meant is 4 p.m.  Fine.

11             MS. CILIA:  Thank you, your Honor.

12       Q.    Can you just go back to describing what that area is

13       like?

14       A.    Sure.  It's a heavily wooded area which is across from

15       a residential neighborhood.

16             THE COURT:  I'm going to stop you, because I take

17       notes during these hearings.  So, when you speak really

18       fast, sometimes I miss something.

19             THE WITNESS:  No problem.

20             THE COURT:  So, where were you at 4 p.m. on 12/8?

21             THE WITNESS:  It was the rear of 198 Pierce

22       Street, which is a heavily wooded area.

23       Q.    And with respect to that --

24             THE COURT:  Hold on.

25             MS. CILIA:  I'm sorry.

MMS

People - Det. Guariano - Direct/Cilia

1          THE COURT:  Go ahead.

2     Q.    Where is 195 Steuben Street in relation to that wooded

3    area?

4     A.    In close proximity.

5     Q.    Is that a walkable distance?

6     A.    Yes, it is.

7     Q.    Now, at the time that you participated in the search,

8    were you aware of whether anyone had been arrested in

9    connection with this case?

10    A.    No, I was not.

11    Q.    Were there any civilians on scene who were

12    participating in the search?

13    A.    No, there was not.

14    Q.    Can you describe the recovery of this bag?

15    A.    Sure.  I was assigned to work with the K-9 officers

16    and their dogs.  At around that time, 1600, which is 4 p.m., I

17    was alerted to a bark from K-9 Storm.  I approached the dog.

18    The dog was scratching in a heavily wooded area.  There was

19    leaves.  I then moved the leaves to the side, and right there

20    there was a large gray and black duffel bag underneath the

21    leaves.

22    Q.    What does it mean when the dog scratches?

23    A.    He concentrated on a certain area, and he just -- he

24    brought it to his handler's attention.

25    Q.    Now, did there come a time when you saw what was

MMS

People - Det. Guariano - Direct/Cilia

1   underneath those leaves?

2       A.   Yes, I did.

3       Q.   What was that?

4       A.   Inside of this large gray and black duffel bag was a

5   semiautomatic weapon with gray masking tape affixed to it.

6       Q.   Now, were there other items inside of that bag as

7   well?

8       A.   Yes, there was.

9            MS. CILIA:   I'd ask that People 1 and 2 be deemed

10      marked for identification.

11           THE COURT:   We will deem it marked 1 and 2.

12           (Whereupon, People's Exhibits 1 and 2 are deemed

13      marked for identification.)

14      Q.   Detective, taking a look at People's 1 and 2 for

15  identification, do you recognize these?

16      A.   Yes, I do.

17      Q.   What are they?

18      A.   This is a photo of the large gray and black duffel bag

19  that I observed on that day at that time.

20      Q.   And is the duffel bag open or closed in that picture?

21      A.   In this photo the duffel bag is open.

22           MS. CILIA:   We're going to deem that 1 for

23      identification, Judge.

24      Q.   And, Detective, does that fairly and accurately --

25  Detective, does that fairly and accurately depict the way that

MMS

People - Det. Guariano - Direct/Cilia

1    the duffel bag looked on December 8th when you saw it?

2        A.   Yes, it does.

3        Q.   And the contents within that duffel bag, does that

4    also fairly and accurately depict the way that it looked inside

5    the duffel bag?

6        A.   Yes, it does.

7        Q.   Has it been altered in any way?

8        A.   No.

9             MS. CILIA:  I'd ask that this be moved into

10   evidence as People's 1.

11            MS. GUASTELLA:  Judge, if I may.

12            Detective, did you take these photos?

13            THE WITNESS:  No, I did not.

14            MS. GUASTELLA:  Were you present when the photos

15   were taken?

16            THE WITNESS:  No, I was not.

17            MS. GUASTELLA:  Judge, I am going to object to

18   these photos coming in.  He wasn't present when the photos

19   were taken.  We're not sure where these photos came from.

20   If, in fact --

21            THE COURT:  Overruled.  So moved.  Deemed marked

22   People's 1 in Evidence for purposes of the hearing.

23            (Whereupon, People's Exhibit 1 is deemed marked

24   in evidence.)

25       Q.   Taking a look at People's 2 for ID, what is that?

MMS

People - Det. Guariano - Direct/Cilia-Voir Dire/Guastella

1    A.    This is a photo of the location where I observed the
2    duffel bag and the duffel bag was recovered.

3    Q.    And can you describe the area within that photo?

4    A.    Sure.  Once again, a heavily wooded area.  To the left
5    in the depicted photo is a retainer wall that separates the
6    service road and the wooded area.

7    Q.    Does it fairly and accurately depict where you saw the
8    duffle bag on December 8th of 2011?

9    A.    Yes, it does.  Minus the -- I observed it during the
10   day.  This was taken at night.

11   Q.    So, in terms of the lighting, the lighting is
12   different?

13   A.    The lighting is different.

14   Q.    But in terms of the placement of the bag, is there
15   anything that's been altered with respect to that?

16   A.    No.  Same location.

17             MS. CILIA:  I'd ask that this be moved into
18        evidence as People's Exhibit Number 2.

19             THE COURT:  Counsel?

20             MS. GUASTELLA:  Again, Judge --

21   VOIR DIRE EXAMINATION

22   BY MS. GUASTELLA:

23   Q.    Detective, you said you observed it in the daytime?

24   A.    Correct.

25   Q.    At what time did you observe the bag?

MMS

People - Det. Guariano - Voir Dire/Guastella

1        A.    4 p.m.

2        Q.    And then at some point later you went back to the

3    scene and saw the bag still there?

4        A.    No.

5        Q.    Were you there when the bag was recovered out of the

6    woods?

7        A.    Can you explain "recovered"?

8        Q.    Were you present when this was recovered from the

9    woods?    Withdrawn.

10             You see the bag at 4:00, correct?

11       A.    Correct.

12       Q.    And you didn't take this photo?

13       A.    No.

14       Q.    And then the next time you see it is in this photo,

15   correct?

16       A.    Correct.

17                 MS. GUASTELLA:   Judge, I have an objection.

18                 THE COURT:   Overruled.  So moved.  Deemed marked

19        People's 2 in Evidence for purposes of the hearing.

20                 (Whereupon, People's Exhibit 2 is deemed marked

21        in evidence.)

22                 THE COURT:   In People's 2, is that the duffel

23        bag?

24                 THE WITNESS:   Yes, that is, your Honor.

25   DIRECT EXAMINATION (Continued)

MMS

People - Det. Guariano - Direct/Cilia-Cross

1   BY MS. CILIA:

2       Q.    Detective, regarding People's Exhibit Number 2, you

3   mentioned that there is a retaining wall in that picture.

4       A.    Yes.

5       Q.    What's behind that retaining wall?

6       A.    On the other side of that retaining wall is the

7   service road on the side of the Expressway.

8       Q.    And can you tell us where Steuben Street is in

9   relation to People's Exhibit Number 1?

10      A.    Sure.  From this depicted photo, Steuben Street would

11  be to the right of this photo, going that way, to the right.

12            MS. CILIA:  I have no further questions for this

13      witness.

14            THE COURT:  Counsel?

15  CROSS-EXAMINATION

16  BY MS. GUASTELLA:

17      Q.    Detective, how were you assigned this case?

18      A.    I wasn't assigned this case.

19      Q.    Well, earlier in the record you said you were assigned

20  to a homicide that occurred at 195 Steuben.

21      A.    I was assigned to assist.

22      Q.    Okay.  By who?

23      A.    By my squad CO.

24      Q.    Who were you assisting in particular on that day?

25      A.    Detective Patterson.

People - Det. Guariano - Cross

1    Q.   He is the lead detective on this?

2    A.   Correct.

3    Q.   And what was your assignment to assist, what did it

4    include?

5    A.   That was my assign -- The exact assignment was to work

6    with K-9 that day.

7    Q.   Have you personally been trained to working with K-9?

8    A.   No.

9    Q.   And what were your duties working -- assisting the K-9

10   unit?

11   A.   If K-9 had recovered --

12        THE COURT:   I'm going to stop there.  You said

13   you weren't trained to work with K-9.  Does that mean

14   you're not trained to train the dogs and to work with the

15   dog personally?

16        THE WITNESS:   Correct.  They are assigned to

17   handlers who are --

18        THE COURT:   There are other handlers.

19        THE WITNESS:   There are other handlers, yes.

20        THE COURT:   Have you ever worked K-9?

21        THE WITNESS:   I have, yes.

22        THE COURT:   Are you familiar with how they

23   operate?

24        THE WITNESS:   Yes.

25        THE COURT:   So, when you said they -- was it

MMS

People - Det. Guariano - Cross

1        scratch something, or you --

2                THE WITNESS:  Paid attention to a certain

3        location.

4                THE COURT:  You understand what this means?

5                THE WITNESS:  Yes, I do.

6                THE COURT:  Go ahead.

7    Q.   Who were the handlers that you were assigned to work

8    with?

9    A.   If I could go back to my notes that I believe we have.

10   I have written it down.

11               MS. CILIA:  I am going to turn up notes that were

12       turned over to defense previously.

13               THE WITNESS:  May I proceed, your Honor?

14               THE COURT:  Go ahead.

15   A.   Police Officer Jacobs (phonetic), and Police Officer

16   Figueroa (phonetic) from the K-9 unit.

17   Q.   And what time did you meet up with them?

18   A.   At 3:40 p.m., 1540 hours.

19   Q.   And you met them at the location of 198 Pierce Street?

20   A.   In the vicinity of the wooded area.

21   Q.   Okay.  Do you know what time they got there?

22   A.   I don't.

23   Q.   But when you arrived, they were already there with the

24   dogs?

25   A.   I was there before them.

                        People - Det. Guariano - Cross

 1        Q.   You were there before them?

 2        A.   Correct.

 3        Q.   Do you know where they were prior to that?

 4        A.   No, I do not.

 5        Q.   Do you know if they were at Steuben Street first?

 6        A.   I do not know.

 7        Q.   So, you're location approximately 3:40.  Where do you

 8   first go?

 9        A.   3:40 is when I meet with the K-9 officers.

10        Q.   What time do you get to the location?

11        A.   I don't recall.

12                  THE COURT:  By "location," do we mean this wooded

13        area?

14                  MS. GUASTELLA:  Yes, I'm sorry, the wooded area.

15        A.   Oh, the wooded area.  I apologize.  At that time, at

16   3:40 p.m.

17        Q.   And at some point K-9 arrives?

18        A.   Yes, correct.

19        Q.   And did you yourself search the woods?

20        A.   Assisted.

21        Q.   Prior to them reaching you, the K-9 unit, did you

22   search the woods on your own?

23        A.   No.

24        Q.   Did you peer over the fence or look around yourself?

25        A.   No.


                                 MMS

People - Det. Guariano - Cross

1    Q.   So, you just waited for them to show up?

2    A.   Correct.

3    Q.   And then approximately how long were they there before

4    Storm barked?

5    A.   15 minutes.

6              THE COURT:   Before what?

7              MS. GUASTELLA:   Storm, the dog Storm, barked.

8              THE COURT:   Just so the record is clear.

9    Q.   Were you in the woods with the dog?

10   A.   No, I was not.

11   Q.   Were the handlers in the woods with the dog?

12   A.   Yes.

13   Q.   At the time you heard this bark, you knew what that

14   meant?

15   A.   Yes, I did.

16   Q.   And what did that mean?

17   A.   That meant that the dog Storm had found or located

18   something that he was bringing to the attention of his handler.

19   Q.   Could have been anything, correct?

20   A.   I guess so.

21             MS. CILIA:   Objection.

22             THE COURT:   Overruled.

23   Q.   And you then went into the woods?

24   A.   Correct.

25   Q.   And you noticed, you said, a duffel bag, correct?

MMS

People - Det. Guariano - Cross

1      A.   Correct.

2      Q.   And you're saying the duffel bag is black and gray?

3      A.   Black and gray.

4      Q.   Did you open up the bag?

5      A.   Yes, I did.

6      Q.   Were you wearing gloves?

7      A.   Yes, I was.

8      Q.   And what did you see in the bag?

9      A.   A large assault rifle and a black shovel.

10     Q.   Black shovel?

11     A.   Black shovel, mini shovel, yes.

12     Q.   Anything else?

13     A.   I didn't touch anything after that.

14     Q.   And then what did you do next?

15     A.   I called my immediate supervisor and he then spoke

16   with police personnel who secured the scene until Crime Scene

17   would arrive.

18     Q.   Your immediate supervisor, meaning Detective

19   Patterson?

20     A.   Lieutenant Nilsen.

21     Q.   Was Nilsen at the scene?

22     A.   Yes.

23     Q.   And approximately -- So, you didn't see the recovery

24   of the duffel bag from the woods, correct?

25     A.   Can you explain what you mean by "recovery"?

People - Det. Guariano - Cross/Redirect-Cilia

1    Q.  In other words, taken out of the woods.

2    A.  No.

3    Q.  At some point you leave it -- you leave it there?

4    A.  Yes, it's secured.

5    Q.  When you say "secured," who was securing it?

6    A.  A police officer secured it.  I don't have his name.

7    Q.  Uniformed?

8    A.  Yes.

9    Q.  Approximately how many?

10    A.  How many?

11    Q.  How many officers were in the woods securing the bag?

12    A.  I don't recall.  I know when I left there was one

13  person -- there was one officer there.

14            MS. GUASTELLA:  Nothing further.

15            THE COURT:  Counsel?

16            MS. CILIA:  Just one quick thing.

17  REDIRECT EXAMINATION

18  BY MS. CILIA:

19    Q.  Detective, you mentioned that there were some

20  additional contents in the bag.  Is that right?

21    A.  That's right.

22    Q.  Do you know what happened to those contents?

23    A.  Yes, I do.

24    Q.  What happened?

25    A.  They were vouchered.

Proceedings

1          MS. CILIA:  I have no further questions.  Thank

2      you.

3               THE COURT:  Counsel?

4               MS. GUASTELLA:  Nothing further.

5               THE COURT:  Thank you, Detective.  You're

6      excused.

7               Call your next witness.

8               (Witness excused.)

9               MS. CILIA:  The People are next going to be

10     calling Police Officer Jeffrey Anderson.

11               I'll just note for the Court that I will be

12     playing a brief portion of the radio run.

13               THE COURT OFFICER:  Are you ready for the

14     witness, your Honor?

15               THE COURT:  Yes.

16     P. O.   J E F F R E Y   A N D E R S O N, bearing shield number

17     11068, assigned to the 120 Precinct Detective Squad, having

18     been called as a witness on behalf of the People, having

19     been first duly sworn by the clerk of the court, was

20     examined and testified as follows:

21               THE COURT CLERK:  Please state your full name and

22     your title for the record.

23               THE WITNESS:  Police Officer Jeffrey Anderson,

24     120 Precinct, shield number 11068.

25               THE COURT CLERK:  Okay, Officer, please be

MMS

People - P.O. Anderson - Direct/Cilia

1        seated.

2                    THE WITNESS:  Thank you.

3                    THE COURT:  Counsel.

4    DIRECT EXAMINATION

5    BY MS. CILIA:

6        Q.   Officer, approximately how long have you been with the

7    NYPD?

8        A.   Approximately six years.

9        Q.   And about how long have you been with your current

10   command?

11       A.   Approximately five years.

12       Q.   Where did you start your career?

13       A.   70 Precinct, Brooklyn.

14       Q.   And what type of cases did you handle there?

15       A.   General police work: foot patrols, arrests.

16       Q.   I am just going to ask that you keep your voice up.

17       A.   Sure.

18       Q.   And now that you're in the 120, what types of cases do

19   you handle at the 120?

20       A.   Right now I'm currently Anti-Crime patrol.  I patrol

21   high-crime areas in plain clothes.

22       Q.   About how many arrests have you participated in in

23   your career?

24       A.   Approximately 108.

25                   THE COURT:  I'm sorry.  What precinct are you

MMS

000183

22

People - P.O. Anderson - Direct/Cilia

1   stationed at?

2            THE WITNESS:  120 Precinct, sir.

3       Q.   Officer, I'm going to draw your attention to

4   December 8th of 2011.  Were you working?

5       A.   Yes.

6       Q.   What was your tour that day, your hours?

7       A.   My tour that day was 7:05 in the morning to 3:40 in

8   the afternoon.

9       Q.   And drawing your attention to about 11:50, were you --

10  where were you at that time?

11      A.   I was in my RMP, my radio car that's given to me.

12      Q.   When you say "RMP," was that a marked car or an

13  unmarked car?

14      A.   A marked police vehicle.

15      Q.   And were you alone or were you with someone else?

16      A.   I was with a partner.

17      Q.   And were you in the car the driver or the passenger?

18      A.   I was the driver, I was the operator.

19      Q.   Were you in plain clothes or were you in uniform?

20      A.   I was in full uniform.

21      Q.   What, if anything, did you hear at the time?

22      A.   At that time I heard a radio run for a male shot at

23  195 Steuben Street.

24      Q.   And in what vicinity were you in when you got that

25  call?

MMS

People - P.O. Anderson - Direct/Cilia

1     A.   When I got that call I was in my radio car, in

2  Brooklyn, on a highway.

3     Q.   And which direction were you traveling?

4     A.   I was traveling towards the Verrazano Bridge, towards

5  Staten Island.

6     Q.   When you heard the radio run, what, if anything, did

7  you do?

8     A.   I responded to that location.  I was responding to

9  that location.

10     Q.   Which route did you take?

11     A.   I took the Verrazano Bridge to a service road, Narrows

12  Road North.

13     Q.   Narrows Road North?

14     A.   Correct.

15     Q.   And is there a cross street near there?

16     A.   I think -- I believe Clove Road -- I'm not sure.

17     Q.   Why did you take that service road to get to Steuben?

18     A.   That would be the quickest route to get to Steuben

19  Street.

20     Q.   Now, did you actually reach Steuben Street?

21     A.   No.

22     Q.   Why not?

23     A.   Because I observed a male on the highway walking

24  towards my RMP.

25     Q.   This male on the highway, do you see this person in

People - P.O. Anderson - Direct/Cilia

1    court today?

2        A.    Yes.

3        Q.    Can you please point to this person and indicate an

4    article of clothing that he is wearing?

5        A.    Excuse me?

6        Q.    Can you point to the person and then indicate an

7    article of clothing that he's wearing on the record?

8        A.    The collared shirt right there.

9                   THE COURT:  Excuse me?

10                  THE WITNESS:  The collared shirt male right

11       there.

12                  THE COURT:  You got to get more specific.

13       Q.    Like the color of his shirt.

14       A.    Dark green shirt right here.

15                  THE COURT:  Green?

16                  THE WITNESS:  Gray shirt.  It's pretty faded.

17                  THE COURT:  Gray shirt?

18                  THE WITNESS:  Dark gray shirt.

19                  THE COURT:  Are you colorblind?

20                  THE WITNESS:  Dark shirt right here.

21                  THE COURT:  There's about six people sitting here

22       with dark collared shirts.  Which -- Be specific.

23                  THE WITNESS:  The male right here, the dark

24       shirt, dark collared shirt.

25                  THE COURT:  There is one, two, three, four, five

MMS

People - P.O. Anderson - Direct/Cilia

1    males in the direction that you are pointing all wearing

2    dark collared shirts.  Which one are you talking about?

3             THE WITNESS:  I would say the green shirt, dark

4    green.  It's faded, sir -- your Honor.

5             THE COURT:  There's one person in a green shirt,

6    that's Mr. King, who's a clerk of the court.

7             THE WITNESS:  Brown shirt, sir.

8             THE COURT:  Brown shirt?  Okay.  Indicating the

9    defendant.

10            MS. GUASTELLA:  Judge, I'd ask him to answer the

11   question your Honor asked, if he was colorblind.

12            THE COURT:  I'll strike that question.  That was

13   inappropriate to begin with.  It's just that there was

14   nobody there except for Mr. King in a green shirt.  If you

15   want to identify him as the person on the highway, I don't

16   have an objection to that, but obviously not the second

17   person you identified wearing a brown shirt with a collar,

18   which would be the defendant.

19            MS. CILIA:  I also ask the record reflect that

20   the witness was pointing toward the defendant at that time.

21            THE COURT:  He was pointing in the direction of

22   about six people --

23            THE WITNESS:  I'm sorry, your Honor.

24            THE COURT:  -- over to the right.  Otherwise, if

25   there were one person sitting there, it would be specific,

MMS

People - P.O. Anderson - Direct/Cilia

1    but it wasn't.

2              Officer, I just want you to answer the questions.

3              Go ahead, Counsel.

4    Q.    Officer, can you describe that location when you saw

5    the defendant initially?

6    A.    It was a highway, wooded area on service road.

7    Q.    Now, on the service road, was there just the defendant

8    or were there other people walking around?

9    A.    Just the defendant.

10   Q.    And what about this person, the defendant, drew your

11   attention to him?

12   A.    He made eye contact with me.  He made eye contact with

13   me and he looked very nervous.

14   Q.    What do you mean by "nervous"?

15   A.    He started walking a little bit faster when I passed

16   him and that caught my attention.

17   Q.    What, if anything, did you do?

18   A.    At that point I stopped my police vehicle and I put it

19   in reverse and I backed up towards the defendant.

20   Q.    Now, Officer, this area that you stopped the

21   defendant, where was that location in relation to 195 Steuben

22   Street?

23   A.    That location was within the proximity.

24   Q.    Can you explain about how close that is?

25   A.    It's within walking distance to where the area is.

People - P.O. Anderson - Direct/Cilia

1     Q.   From the place where you stopped the defendant, is

2  there a pathway with which you can get to 195 Steuben Street?

3     A.   Yes.

4     Q.   What would that path be?

5     A.   That path would be a wooded area, dirt area, with

6  trees and everything, and you could walk down that area towards

7  Steuben Street.

8     Q.   What was the defendant wearing at that time?

9     A.   The defendant had on black jeans, black jacket, black

10  sneakers with mud on them, and a blue Yankee hat.

11     Q.   Did you see mud in the area?

12     A.   Yes.

13     Q.   Where specifically?

14     A.   In that wooded area that you can get down towards

15  Steuben Street.

16     Q.   And with respect to the time that you first heard that

17  call come over the radio to the time that you stopped the

18  defendant, about how long had gone by?

19     A.   Approximately five minutes.

20     Q.   You mentioned that you stopped the defendant.  Tell us

21  what happened at that point.  How did you stop the defendant?

22     A.   At that point I backed my police vehicle up, got out

23  of the vehicle.  I asked the defendant where he was going.  He

24  stated to me he was going to the S53 bus.  And at that point I

25  noticed he was very nervous, sweating, fidgety.  When I asked

1    him to produce identification, he refused.

2        Q.    When you say, "he refused," how did he refuse?

3        A.    I just -- He would not respond to me, kept his hands

4    in his pocket.

5        Q.    Now, you mentioned that he was sweating?

6        A.    Yes.

7        Q.    Could you actually see sweat on his face?

8        A.    Yes.

9        Q.    And what were the weather conditions that day?

10       A.    That day the weather was cool out.  It was

11   approximately 40, 45 degrees.

12       Q.    This was in December?

13       A.    Yes.

14       Q.    When the defendant refused to produce ID, tell us what

15   happened next.

16       A.    At that point, my partner handcuffed the subject and

17   we conducted a pat-and-frisk to get his identification.

18       Q.    And tell us what happened next.

19       A.    At that point, I felt a hard object in his back

20   pocket, which turned out to be his wallet, and we recovered his

21   identification from his wallet.

22       Q.    When you say "we recovered," who specifically

23   recovered it?

24       A.    I recovered it.

25       Q.    And when you say "the wallet," can you describe where

                                    MMS

People - P.O. Anderson - Direct/Cilia

1  in the wallet you recovered this ID?

2       A.    The identification was in the wallet, in the general

3  area which at that point is when I also recovered counterfeit

4  money.

5       Q.    Okay.  Well, let's talk about the ID first.

6       A.    Okay.

7       Q.    What type of ID was this?

8       A.    This was a driver's license.

9       Q.    And was that the only ID that was there?

10      A.    No.

11      Q.    In the wallet specifically, was that the only ID that

12  was there?

13      A.    Correct.

14      Q.    Okay.  And you said that there was something else

15  within that same area?

16      A.    Yes.

17      Q.    What was that?

18      A.    There was counterfeit money in there.

19      Q.    You say counterfeit money.  Have you seen counterfeit

20  money before?

21      A.    Yes.

22      Q.    Where?

23      A.    In my scope of work, the Police Academy, and other

24  arrests.

25      Q.    Have you been trained in observing counterfeits?

MMS

People - P.O. Anderson - Direct/Cilia

1       A.      Yes.

2       Q.      And being able to identify them?

3       A.      Yes.

4       Q.      And are you also -- as a layperson, are you familiar

5    with legitimate money?

6       A.      Yes.

7       Q.      Why did you think that this particular money was

8    counterfeit?

9       A.      Just the texture of it, very papery, the serial

10   numbers.  Several of the bills matched all the same serial

11   numbers, no watermarks, very light.

12      Q.      Tell us what happened next after that, Officer.

13      A.      At that point the other units knew my location and

14   proceeded to come and meet me.  And that's when a name check

15   was conducted by the 120 Precinct Detective Squad, and it was

16   found out to be that the defendant had a open I-card in Queens

17   for an Assault 2.

18      Q.      Okay.  And that was through a name check?

19      A.      Yes, ma'am.

20      Q.      Was that conducted on scene?

21      A.      Yes.

22      Q.      What happened next?

23      A.      Next, we transported the defendant back to the 120

24   Precinct Detective Squad.

25      Q.      Did you, yourself, transport the defendant?

MMS

People - P.O. Anderson - Direct/Cilia

1      A.    Yes.

2            (Whereupon, a discussion is held off the record.)

3      Q.    You said that you transported him back to the

4   precinct?

5      A.    Yes, ma'am.

6      Q.    And once he was at the precinct, where did you place

7   him?

8      A.    In the 120 Precinct Detective Squad's holding room.

9      Q.    While at the precinct, did you conduct any additional

10  searches?

11     A.    Yes.

12     Q.    What did you search?

13     A.    We removed the belts and shoelaces of all the

14  defendants, and inside of his shoe was -- $900 in U.S. currency

15  was found in his shoe.

16     Q.    And when you say $900 U.S. currency, are you talking

17  about counterfeit or legitimate?

18     A.    Legitimate.

19     Q.    And just going back to the scene, after going and --

20  into the wallet and finding those items that you already

21  described, is there any other search that you conducted on the

22  scene?

23     A.    Well, there was also a passport and a birth

24  certificate found in that pocket, too.

25     Q.    Okay.   That was also found on his person?

People - P.O. Anderson - Direct/Cilia

1      A.    Yes.

2      Q.    Were those in the name of the defendant?

3      A.    Yes.

4      Q.    Now, Officer, you mentioned that you were

5 communicating with other police officers while you were on the

6 scene.  Is that right?

7      A.    Yes.

8      Q.    How were you communicating?

9      A.    By my department-issued radio.

10     Q.    And are those radio runs, are they recorded?

11     A.    Yes.

12     Q.    Had you had an opportunity to listen to the radio run

13 from this time period prior to coming to court today?

14     A.    Yes.

15     Q.    And when was the last time that you listened to it?

16     A.    This morning.

17            MS. CILIA:  I'm going to ask this be deemed

18     marked People's Exhibit Number 3 for ID.

19            THE COURT:  Deemed marked.

20            (Whereupon, People's Exhibit 3 is deemed marked

21     for identification.)

22            THE COURT:  Counsel?

23            MS. GUASTELLA:  Yes.

24     Q.    Officer, taking a look at what's been deemed marked

25 People's 3 for ID, do you recognize that?

People - P.O. Anderson - Direct/Cilia

1      A.   Yes.

2      Q.   What is it?

3      A.   This is a -- the recording of the radio run from that

4   day.

5      Q.   How do you know that there is a recording on that,

6   People's Exhibit Number 3?

7      A.   This is what I listened to this morning and I

8   initialed right here with the date.

9      Q.   And did you listen to the whole recording?

10     A.   Yes.

11     Q.   Does it fairly and accurately depict what was said on

12  December 8th --

13     A.   Yes.

14     Q.   -- on the radio run?

15          Has it been altered in any way?

16     A.   Yes.

17     Q.   How has it been altered?

18     A.   The caller's name and phone number has been --

19     Q.   -- redacted?

20     A.   Yes.

21     Q.   Besides those redactions of a name and a phone number,

22  is everything else on People's Exhibit Number 3 for ID, is

23  that -- is it a fair and accurate representation of what was

24  said?

25     A.   Yes.

MMS

People - P.O. Anderson - Direct/Cilia

1          MS. CILIA:   I'd ask to move that into evidence as

2      People's 3.

3          THE COURT:   Counsel?

4          MS. GUASTELLA:   No objection.

5          THE COURT:   Deemed marked People's 3 in evidence

6      for purposes of the hearing.

7          (Whereupon, People's Exhibit 3 is deemed marked

8      into evidence.)

9          THE COURT:   Do you want to play that now,

10     Counsel?

11         MS. CILIA:   I would, just a specific portion, in

12     a few minutes.   I am going to play from 7 minutes and

13     40 seconds for the record into the radio run.

14         (Whereupon, People's Exhibit Number 3 in evidence

15     is played.)

16     Q.   I've stopped the recording at this time.   I just have

17     a couple of questions regarding the recording that we just

18     listened to.

19         There were two things that you say that I want to ask

20     you about.   The first one is when you said that he was acting

21     nervous.   Can you just describe what you meant by he was acting

22     nervous, when you said that on the radio?

23     A.   Sure.   The defendant's hands were in his pockets; he

24     was sweating profusely.   When he made eye contact with me, he

25     started walking faster away from my patrol car.

MMS

1    Q.    And when you said that he might have cut through the

2    woods, first of all, what woods were you referring to?

3    A.    The wooded area from where I stopped the defendant.

4    Q.    Why specifically did you think that?

5    A.    Because of the mud on his shoes and that's the -- that

6    would be the general way to get towards that scene.

7              MS. CILIA:   Thank you, Officer.  I have no

8         further questions.

9              THE COURT:   Just, does a transcript of that

10        recording exist?

11             MS. CILIA:   The DA's office has prepared a --

12        like a draft transcript which I can give to the Court and

13        defense counsel later today.  I would just like to go

14        through it and make sure it's as accurate as possible.

15             THE COURT:   Any objections, Counsel?

16             MS. GUASTELLA:   No.

17             THE COURT:   I would ask that -- It doesn't have

18        to be today, I am not going to render a decision today, but

19        if there's -- We'll talk about that in a few minutes.  But

20        I would ask that you do supply counsel and the Court with a

21        transcript, if it exists.

22             MS. CILIA:   Yes.  It may be rough.  But I have

23        also provided --

24             THE COURT:   I am going to need -- Obviously, the

25        tape is in evidence, so I am going to need the tape, we'll

People - P.O. Anderson - Cross

1    keep the tape.  And if you have a transcript, that would be

2    of great service.  Thank you.

3              MS. CILIA:  Yes, we'll definitely provide that.

4              No further questions.

5              THE COURT:  Counsel?

6    CROSS-EXAMINATION

7    BY MS. GUASTELLA:

8    Q.   Officer, who was your partner on this particular day?

9    A.   Police Officer Kimberly McKnight (phonetic).

10   Q.   McKnight?

11   A.   Yes.

12   Q.   You were with her the whole day?

13   A.   Yes.

14   Q.   You said you were coming back from Brooklyn?

15   A.   Yes.

16   Q.   Were you coming back from the job or from lunch?

17   A.   Job.

18   Q.   And you worked at the 120, correct?

19   A.   Yes.

20   Q.   So, does Anti-Crime go into Brooklyn?

21             MS. CILIA:  Objection as to the scope of this

22   hearing.

23             THE COURT:  Sustained with respect to that

24   question.  I'll allow a moderate amount of latitude with

25   regard to the fact that he was in Brooklyn and he works in

People - P.O. Anderson - Cross

1    Staten Island.

2           MS. GUASTELLA:  Thank you, Judge.

3    Q.   Did you receive a call to go into Brooklyn to respond

4    to a call?

5    A.   I had to conduct police business in another borough.

6           THE COURT:  Did it have anything to do with this

7       case?

8           THE WITNESS:  No, sir.

9    Q.   On your way back, that's when you first heard the

10   radio run, correct?

11   A.   Yes, ma'am.

12   Q.   And what exactly was in the radio run that you first

13   heard?

14   A.   A male shot at 195 Steuben Street.

15   Q.   Okay.  And no description was transmitted through that

16   radio run, correct?

17   A.   No.

18   Q.   So --

19          THE COURT:  Just so we're clear, is 195 Steuben

20      Street close to the bridge?

21          THE WITNESS:  Yes, sir -- your Honor.

22          THE COURT:  Is that why you responded to the

23      call, because you were coming back over the bridge?

24          THE WITNESS:  Yes.

25          THE COURT:  And it was close to where you were?

                         People - P.O. Anderson - Cross

 1                    THE WITNESS:  Yes.

 2                    THE COURT:  Go ahead.

 3                    MS. GUASTELLA:  Thank you, Judge.

 4         Q.   So, there was no description in the radio run,

 5    correct?

 6         A.   No.

 7         Q.   And at the time you first see this individual, you

 8    didn't have a description, correct?

 9         A.   No.

10         Q.   And, so, you didn't know at the time -- Withdrawn.

11              So, you didn't know if you were looking for a female

12    or male, white or black, correct?

13         A.   No.

14         Q.   You had no idea?

15         A.   No.

16         Q.   So, you're saying that you saw this individual that

17    looked nervous because he made eye contact with you?

18         A.   Yes.

19         Q.   Is that unusual for someone to be nervous when a

20    police car slowly drives past them?

21         A.   It could be.

22         Q.   And, in fact, when you saw him, there is a bus stop

23    for the S53, correct?

24         A.   I'm not sure where that is.

25         Q.   Did you see anybody else walking around near him?

People - P.O. Anderson - Cross

1       A.      No.

2       Q.      Was it raining when you saw him?

3       A.      No.

4       Q.      And he was walking -- Which direction was he walking

5    in?

6       A.      He was walking towards the Verrazano Bridge.

7       Q.      Okay.  You made a right off the service road onto

8    Steuben?

9       A.      I was on Steuben Street.  I made a right?

10      Q.      Okay.  Let me take you back to the bridge.  You come

11   over the bridge and you hear the radio run?

12      A.      Okay.

13      Q.      And you go lights and sirens --

14      A.      Yes.

15      Q.      -- or are you slowly driving?

16      A.      Lights and sirens.

17      Q.      Where did you go exactly?

18      A.      I proceeded over the Verrazano Bridge and I went onto

19   the service road.

20      Q.      And then you made a turn onto what street?

21      A.      I never made a turn.

22      Q.      Okay.  And your intention was to go to Steuben?

23      A.      Correct.

24      Q.      As you're on the service road, you see a person

25   walking towards the vehicle?

People - P.O. Anderson - Cross

1    A.    Correct.

2    Q.    On the right side of the bridge, correct?

3    A.    Yes.

4    Q.    And you then -- How far past did you go before you

5    stopped the vehicle?

6              THE COURT:    Just so we're clear, when you say the

7         "right side of the bridge" --

8              MS. GUASTELLA:    Coming from Brooklyn.

9              THE COURT:    The right side of the bridge as you

10        enter Staten Island?  Coming from Brooklyn?  Is that what

11        you meant?

12             MS. GUASTELLA:    Yes.

13             THE COURT:    I'm trying to -- because depending on

14        where you're standing, the "right side of the bridge" could

15        mean a lot of different things.

16   Q.    Officer, you're driving straight on North Narrows

17   Road, correct?

18   A.    Correct.

19   Q.    And this individual was to your right of the police

20   car, right?

21   A.    Correct.

22   Q.    And he's walking down the sidewalk towards the

23   vehicle?

24   A.    Yes.

25   Q.    And you pass him?

People - P.O. Anderson - Cross

1    A.   There is no sidewalk there.

2    Q.   Okay.  So there is woods?

3    A.   It's a service road with no pedestrian walkways.

4    Q.   Okay.  So, you're saying he's in the street then?

5    A.   He's on the side road, in the grassy wooded area.

6    Q.   The grassy wooded area.  So, and it had just rained

7    that day?

8    A.   I'm not sure if it rained.

9    Q.   Would your memo book reflect if it was raining?

10   A.   I don't believe so.  I can look at it.

11   Q.   Were you the driver of the vehicle?

12   A.   Yes.

13   Q.   Can you take a look at your memo book?

14   A.   Sure.  I don't have it notated.

15   Q.   Okay.  So, but he was in the grassy woody part,

16   correct?

17   A.   Yes.

18   Q.   Walking towards the vehicle?

19   A.   Correct.

20   Q.   And you pass him?

21   A.   Yes.

22   Q.   And then at some point you stop?

23   A.   Yes.

24   Q.   And did he run?

25   A.   He started putting more effort into his walk, walking

MMS

People - P.O. Anderson - Cross

1    faster away from me.

2       Q.   He didn't jog away or anything like that?

3       A.   No.

4       Q.   And you backed up towards him?

5       A.   Yes.

6       Q.   And was your vehicle in front of him when you stopped?

7       A.   No.

8       Q.   Where did you stop in relation to him, where he was

9    walking?

10      A.   I stopped a few feet before him for my safety and my

11   partner's safety.

12      Q.   A few feet before him?

13      A.   Yes.

14      Q.   And you jumped out of the car?

15      A.   Yes.

16      Q.   And so did your partner?

17      A.   Yes.

18      Q.   And guns were drawn, correct?

19      A.   My gun was to my side.  I don't believe my partner had

20   a gun out.

21      Q.   So, you think you were responding to someone that may

22   have just killed someone and you don't jump out of the car with

23   guns drawn?  Is this your testimony?

24               MS. CILIA:  Objection.

25      A.   I did have my gun out.

MMS

People - P.O. Anderson - Cross

1    Q.   You did have your gun out?

2    A.   Yes.

3    Q.   Can you describe how you were holding your gun?

4    A.   To the side.

5    Q.   So, you said you were driving?

6    A.   Yes.

7    Q.   So, you come around the car and approach him in this

8   wooded area?

9    A.   Yes.

10    Q.   Okay.  And do you know where your partner is at that

11   point?

12    A.   She's on the side where the defendant is.

13    Q.   And can you describe what he looked like?  Was he full

14   of blood?

15    A.   No.  He was a tall individual, male black, black

16   jeans, black jacket, with a blue Yankee hat.

17    Q.   Any cuts or bruises on him that you could see?

18    A.   No.

19    Q.   Were his clothes ripped or disheveled?

20    A.   No.

21    Q.   And he didn't have any blood on him, correct?

22    A.   No.

23    Q.   You said at that point that's when you noticed muddy

24   shoes?

25    A.   Yes.

People - P.O. Anderson - Cross

1    Q.   But he was just walking in the muddy path, correct?

2    A.   Correct.

3    Q.   Do you recall testifying in the grand jury in

4    connection with this case?

5    A.   Yes.

6    Q.   And do you recall telling the grand jury that you

7    stopped someone that fit the description?

8              MS. CILIA:  Objection.  I think we need a --

9              THE COURT:  Sustained as to form.

10             MS. CILIA:  We need a specific.  And I believe I

11   know what she's talking about and I'd ask that she just --

12             MS. GUASTELLA:  Okay.

13   Q.   Do you recall being asked this series of questions --

14             THE COURT:  Give me a line and page.

15             MS. GUASTELLA:  Line 24 on page 5.

16   Q.   "Did you, in fact, respond to that location?"

17        And do you recall giving the answer, "No"?

18             "QUESTION:  Why not?

19             "ANSWER:  Because I ended up stopping the suspect

20   that fit the description, didn't fit the description.  I

21   went to the location, I saw a male who looked suspicious,

22   and I stopped him, and that's when I stopped on Narrows

23   North Road."

24        Can you tell us what description it is that you were

25   referring to in the grand jury?

People - P.O. Anderson - Cross

1      MS. CILIA:  Objection, Judge.  I think that the

2      statement speaks for itself.  He stopped himself in the

3      middle of the statement because he misspoke.  It's clear

4      from the statements.

5      MS. GUASTELLA:  No.  He testifies in the grand

6      jury "suspect that fit the description, didn't fit the

7      description."  What description was he referring to?

8      THE WITNESS:  I clearly made an error in --

9      Q.  You corrected yourself by saying he didn't fit the

10     description.  What description were you referring to?

11     MS. CILIA:  Objection.  This is very

12     argumentative.  I think that the statement speaks for

13     itself.

14     THE COURT:  Number one, is the objection to the

15     introduction of this statement as an attempt to impeach the

16     witness?

17     MS. CILIA:  Yes.

18     THE COURT:  That's sustained, because there's

19     nothing in that statement that seems to contradict what he

20     said.

21     Now, if your implication is that he made

22     reference in the grand jury to a statement, I don't know

23     how it's introduced into the hearing, but if you want to

24     ask whether or not there was a description, you can ask

25     that question.

MMS

People - P.O. Anderson - Cross

1    Q.   Officer, is it your testimony today you had no

2   description when you stopped Mr. Skrine, correct?

3        A.   Correct.

4        Q.   Approximately how many arrests have you made while in

5   Anti-Crime?

6        A.   I have approximately 108.  I don't know how many I

7   made in Anti-Crime.

8        Q.   Okay.  And the next step after Anti-Crime is a shield,

9   it's a detective shield, correct?

10       A.   Correct.

11                 MS. CILIA:  Objection.

12                 THE COURT:  Sustained.

13       Q.   Detective -- I'm sorry.  Officer, can you explain to

14   us how you become a detective on NYPD?

15                 MS. CILIA:  Objection.

16                 THE COURT:  Sustained.

17       Q.   Did you get a commendation in connection with this

18   case?

19       A.   No.

20       Q.   Did you put in for a commendation?

21       A.   No.

22       Q.   At some point you ask him for his ID?

23       A.   Yes.

24       Q.   And he refuses to give you his identification?

25       A.   Yes, ma'am.

MMS

                     People - P.O. Anderson - Cross

1    Q.   And at that point that's when you cuffed him, correct?

2    A.   Yes.

3              MS. GUASTELLA:  Nothing further, Judge.

4              THE COURT:  Counsel?  Counsel, any more

5    questions?

6              MS. CILIA:  I just have one clarification.

7              You just said to Ms. Guastella that you cuffed

8    the defendant.  Was it you or your partner?

9              THE WITNESS:  My partner handcuffed him.

10             MS. CILIA:  I just needed that clarification.

11   Thank you.

12             THE COURT:  Counsel?

13             MS. GUASTELLA:  She cuffed him while you still

14   had the gun on him, correct?

15             THE WITNESS:  Correct, my gun was out of my

16   holster.  Correct.

17             MS. GUASTELLA:  In your hands?

18             THE WITNESS:  Yes.

19             MS. GUASTELLA:  Nothing further.

20             THE COURT:  Counsel?

21             MS. CILIA:  No further questions.

22             THE COURT:  Thank you, Officer.  You're excused.

23             (Witness excused.)

24             THE COURT:  Call your next witness.

25             MS. CILIA:  The People call Detective Patterson.

People - Det. Patterson - Direct/Cilia

1         THE COURT:  Come on up while we're waiting for

2    Detective Patterson.

3         (Whereupon, a discussion is held at the bench off

4    the record.)

5         THE COURT OFFICER:  Are you ready for the

6    witness?

7         THE COURT:  Yes, please.

8  D E T.   E D W A R D   T.   P A T T E R S O N, bearing shield

9    number 6786, assigned to the 120 Precinct Detective Squad,

10   having been called as a witness on behalf of the People,

11   having been first duly sworn by the clerk of the court, was

12   examined and testified as follows:

13        THE COURT CLERK:  Please state your full name and

14   title for the record.

15        THE WITNESS:  Yes, sir.  Detective Edward T.

16   Patterson, shield number 6786, of the 120 Precinct

17   Detective Squad.

18        THE COURT CLERK:  Thank you.  Detective, please

19   be seated.

20        THE WITNESS:  Thank you.

21        MS. CILIA:  May I inquire?

22        THE COURT:  Yes.

23  DIRECT EXAMINATION

24  BY MS. CILIA:

25    Q.   Detective, approximately how long have you been with

MMS

People - Det. Patterson - Direct/Cilia

1    NYPD?

2         A.    Approximately 21 and 1/2 years.

3         Q.    And about how many arrests have you made in your

4    career?

5         A.    Approximately 350.

6         Q.    Were you assigned to investigate a homicide that

7    occurred on December 8, 2011?

8         A.    Yes, ma'am, I was.

9         Q.    Did you arrest anyone --

10              THE COURT:   Slow down just a little.

11        Q.    Did you arrest anyone in connection with that case?

12        A.    Yes, ma'am, I did.

13        Q.    Who did you arrest?

14        A.    I arrested Armand Skrine.

15        Q.    Do you see that person in court?

16        A.    I do.

17        Q.    Can you please point to that person and indicate an

18   article of clothing that that person is wearing?

19        A.    I certainly will.  He's the gentleman, the

20   African-American gentleman, seated at the table next to you in

21   the brown shirt.

22              THE COURT:   Indicating the defendant.

23        Q.    Now, did there come a time when you met the defendant?

24        A.    There did.

25        Q.    When was that?

MMS

People - Det. Patterson - Direct/Cilia

1    A.    Approximately 1400 hours on the 8th of December, 2011.

2    Q.    And where was that?

3    A.    At the 120 Precinct Detective Squad.

4    Q.    When you met the defendant, were you alone or were you

5    with someone?

6    A.    I was with two partners, ma'am.

7    Q.    And who were those partners?

8    A.    Detectives Hoti and Cosenza, H-O-T-I, C-O-S-C-Z --

9    C-E -- C-O-S-E-N-Z-A.

10   Q.    Where specifically in the precinct did you meet the

11   defendant?

12   A.    In the Detective Squad interview room.

13   Q.    Can you just describe briefly that room?

14   A.    Yes, ma'am.  It's a room approximately eight by ten

15   with no windows, one door, a table --

16            THE COURT:  I'm sorry.  Did you say the Detective

17       Squad interview room?

18            THE WITNESS:  Yes, your Honor.  I'm sorry.

19            THE COURT:  Thank you.  Go ahead.

20   A.    Has a table in the middle of the room with a singular

21   chair on one side and two or three chairs on the other.

22   Q.    When you entered that room, tell us what happened.

23   A.    I entered the room to speak with Mr. Skrine.  I was

24   discussing with Det. Hoti the counterfeit money, and as we sat

25   down, Mr. Skrine said, I picked that money up.

People - Det. Patterson - Direct/Cilia

1    Q.    Now, when you say that you were talking to Det. Hoti,

2    tell us what specifically you said.

3    A.    To Det. Hoti?

4    Q.    Yes.

5    A.    I said that the counterfeit money is a very

6    interesting detail.

7    Q.    And who did you direct that comment to?

8    A.    To Det. Hoti.

9    Q.    And then what's the next thing that happened?

10    A.    Mr. Skrine made the statement I just said, that he

11    picked up the money.

12    Q.    What's the next thing that happens?

13    A.    I attempted to read Mr. Skrine his Constitutional

14    rights, commonly referred to as Miranda warnings.

15    Q.    And what happened?

16    A.    He had absolutely no reaction whatsoever.

17    Q.    When you say that he had no reaction, did he say

18    anything?

19    A.    He was completely unresponsive.  He neither said

20    anything nor had any facial expression.

21    Q.    And when you said that you attempted to Mirandize him,

22    did you attempt once or more than once?

23    A.    I attempted eight times.

24    Q.    With a similar response?

25    A.    Each time, yes.

People - Det. Patterson - Direct/Cilia

1      Q.    Now, Detective, I am going to direct your attention to

2    January 6th of 2012, at approximately 1:45 p.m.  Did you

3    conduct an identification procedure at that time?

4      A.    I did.

5      Q.    Was that inside the precinct or at another location?

6      A.    At another location.

7      Q.    What type of identification procedure was that?

8      A.    I conducted a photo array.

9      Q.    What is a photo array?

10     A.    A photo array is an identification procedure

11   consisting of six computer-generated photographs that are

12   shown -- with individuals of similar description to the subject

13   that is shown to a witness.

14     Q.    And how many photos are in a photo array?

15     A.    There are six.

16     Q.    Was there a subject in this photo array?

17     A.    There was.

18     Q.    Who was it?

19     A.    Armand Skrine.

20           MS. CILIA:  I would like to have this deemed

21   marked People's Exhibit Number 4 for ID.

22           THE COURT:  Before we do that, let me see.

23           Do you have a different one than this?

24           MS. CILIA:  This is the original.

25           THE COURT:  I understand that.  But for reasons

MMS

People - Det. Patterson - Direct/Cilia

1    that I'd rather not go into on the record at this point, do

2    we have a different one?

3              MS. CILIA:  Sure.  I have a black-and-white one.

4              THE COURT:  No, we'll use this then.

5              Just so the record is clear, what's on --

6              MS. CILIA:  I'm sorry, your Honor.  I do have a

7    color one.  It's completely blank.

8              THE COURT:  Just so the record is clear, there

9    is -- the issue the Court has with this is there are --

10             MS. CILIA:  Redactions?

11             THE COURT:  -- stickies on this one that has what

12   looks like a black Crayon mark on it.  That's covering what

13   the Court knows is a signature.  In light of other things

14   involved in this case, I'd rather not use this document,

15   because I'm going to have to give this to defense counsel

16   and defendant's going to have an opportunity to scrutinize

17   this during the hearing to see whether or not it meets the

18   foundational requirements that you're going to want to try

19   to put forward.

20             There is a sticky on the back and there is a

21   sticky on the front.  If there is no objection, Counsel,

22   I'd -- there is a copy of this that has no writing on it.

23   The one that was presented has where it says, Photo

24   Selected, it says, Number One.  That is not on this copy.

25   And where it says, Identification Made, there is a

MMS

People - Det. Patterson - Direct/Cilia

1        checkmark on -- in the box, Yes.  And also there is a date,

2        1/6/12.

3                 With those stipulations, Counsel, just for

4        purposes of the hearing, can we utilize the copy?

5                 MS. GUASTELLA:  That's fine, Judge.

6                 THE COURT:  No objection?

7                 MS. GUASTELLA:  No.

8                 THE COURT:  Hand this back.

9                 Counsel, utilize the copy for purposes of the

10       hearing at this point.

11                MS. CILIA:  That's fine, your Honor.

12                THE COURT:  With those stipulations that the

13       items that are written --

14                There is also, just so we're clear, there's a

15       signature on that document that's been redacted.

16                MS. CILIA:  Yes.

17                THE COURT:  Which is why I've proposed to use the

18       other copy.

19                With no objection, let's go forward.

20                (Whereupon, People's Exhibit 4 is deemed marked

21       for identification.)

22       Q.   Detective, taking a look at what's been deemed marked

23       People's 4 for ID, can you take a look at that --

24                THE COURT:  Just so we're clear, did you get a

25       copy of this photo?

MMS

People - Det. Patterson - Direct/Cilia

1              MS. GUASTELLA:  I may have.

2              MS. CILIA:  There is a copy.

3              THE COURT:  In color or in black-and-white?

4              MS. CILIA:  No, it was black-and-white.

5              THE COURT:  Show counsel the color copy, please.

6              And the black-and-white copy has those markings

7    that I indicated were on the original?  Counsel, so we're

8    clear?

9              MS. CILIA:  Yes.

10             MS. GUASTELLA:  Just for the record, I did

11   actually see the original, so I know it's the same.

12             THE COURT:  Right, with the redaction I would

13   assume.

14             MS. GUASTELLA:  Yes.

15             THE COURT:  But you saw the 1, the date, the

16   identification made checkmark?

17             MS. GUASTELLA:  Yes.

18             MS. CILIA:  Yes.  And what I turned over to

19   defense counsel was the exact copy.

20             THE COURT:  I just want the record to be clear

21   that counsel has all that information --

22             MS. CILIA:  Yes.

23             THE COURT:  -- and we're simply using this

24   non-black-and-white -- color reproduction of the purported

25   photo array simply because we don't want to have that

MMS

People - Det. Patterson - Direct/Cilia

1              redaction involved.

2                        MS. CILIA:   Thank you.

3                        THE COURT:   Counsel?

4         Q.   Taking a look at People's 4 for ID, do you recognize

5    this?

6         A.   Yes, ma'am, I do.

7         Q.   What do you recognize it to be?

8         A.   I recognize it to be a color photocopy of a photo

9    array that I conducted on 6, January, 2012.

10        Q.   When you say a copy of the photo array, is it an exact

11   copy?

12        A.   It is.

13        Q.   Okay.  And was this the exact copy of the photo array

14   that you showed to the witness on January 6th of 2012?

15        A.   It is.

16        Q.   Has it been altered in any way?

17        A.   It has not.

18                       MS. CILIA:   I'd ask that this be moved into

19        evidence as People's 4.

20                       MS. GUASTELLA:   No objection, Judge.

21                       THE COURT:   So moved.  Deemed marked for purposes

22        of the hearing.

23                       (Whereupon, People's Exhibit 4 is deemed marked

24        into evidence.)

25        Q.   Detective, did you create this photo array?

MMS

People - Det. Patterson - Direct/Cilia

1    A.    I did.

2    Q.    How did you do that?

3    A.    I utilized the Photo Manager database.  I entered

4  Mr. Skrine's NYSID number into the computer.  The computer

5  takes the information it knows regarding descriptives from that

6  NYSID number and it locates five similarly descriptive

7  individuals and places them in the photo array.

8    Q.    Now, in what position is the defendant?

9    A.    Mr. Skrine is in position number 1.

10   Q.    Did you choose this spot?

11   A.    I did not.  There is a feature in the computer program

12  that allows you to select insert subject random.

13   Q.    Do you have a formal procedure with respect to showing

14  photo arrays?

15   A.    We do, in fact.

16   Q.    Can you explain what that is?

17   A.    Yes, ma'am.  There is a preprinted instruction form

18  that we read to the witnesses prior to the showing of the photo

19  array.

20   Q.    And is that committed to writing?

21   A.    It is, yes.

22           MS. CILIA:  I'm now holding in my hand a copy of

23       an original that I'd ask to be deemed marked People's 5 for

24       ID.

25           THE COURT:  Can I see it?

MMS

People - Det. Patterson - Direct/Cilia

1            MS. CILIA:  Sure.  I also have the original if

2       the Court would like to take a look at it.

3            THE COURT:  No, this is fine.  Show that to

4       defense counsel.

5            MS. GUASTELLA:  Let me see this one, I can't find

6       mine now.

7            (Whereupon, People's Exhibit 5 is deemed marked

8       for identification.)

9            THE COURT:  Counsel.

10      Q.   Detective, taking a look at what's been premarked --

11  I'm sorry -- deemed marked People's 5 for ID, do you recognize

12  this?

13      A.   I do.

14      Q.   What is it?

15      A.   It is a copy of the Photo Array Preview of the

16  Instructions Report.

17      Q.   Specific to any particular identification procedure?

18      A.   Yes.  Specific to the one I had conducted on 6,

19  January, 2012.

20      Q.   When you say it's a copy, is it an exact copy?

21      A.   It is, except for some redaction marks.

22      Q.   And what specifically is redacted out?

23      A.   The location of the photo array and the witness's

24  signature and name.

25      Q.   And besides those redactions, does this, People's

MMS

People - Det. Patterson - Direct/Cilia

1   Exhibit Number 5 for ID, fairly and accurately depict the

2   instructions that you used on January 6th of 2012?

3       A.    It does.

4             MS. CILIA:  I'd ask that this be moved into

5       evidence as People's Exhibit Number 5.

6             MS. GUASTELLA:  No objection.

7             THE COURT:  So moved.  Deemed marked 5 in

8       evidence for purposes of the hearing.

9             (Whereupon, People's Exhibit 5 is deemed marked

10      into evidence.)

11      Q.    Taking a look at People's 5, can you please

12  demonstrate to the Court the way in which you showed the photo

13  array to the witness?

14      A.    Yes, ma'am.  I read the instructions on the report.

15      Q.    Why don't you read those for the Court.

16      A.    Yes, I will.

17            As part of an ongoing investigation into a crime that

18  occurred at 195 Steuben Street on December the 8th, 2011 --

19  Although I didn't write that, I read that aloud at the time --

20  you are about to view a photo array.  It consists of six

21  photographs of individuals.  Each photograph has a number

22  underneath the photograph --

23            THE COURT:  Just so that we're clear, the

24      195 Steuben Street is not part of any particular form.

25      It's actually blank on the form.  You correlated that form

MMS

1    to the case you were actually investigating?

2              THE WITNESS:  I did, your Honor, yes.

3              THE COURT:  That's where that comes from?

4              THE WITNESS:  That's correct.

5              THE COURT:  And it's blank on what you're

6    actually reading?

7              THE WITNESS:  That is correct.

8              THE COURT:  Go ahead.

9         A.    Take whatever time you want to view the photo array.

10   The perpetrator may or may not be among the pictures.  Do not

11   assume that I know who the perpetrator may be.

12             Do not ask me or anyone else in the room for guidance

13   during the procedure.  Individuals presented in the photo array

14   may not appear exactly as they did on the date of the incident

15   because features such as head and facial hair are subject to

16   change.

17             Photographs may not always depict the true complexion

18   of a person; it may be lighter or darker than shown in the

19   photo.

20             Pay no attention to any markings that may appear on

21   the photos or any difference in the type or style of the

22   photographs.

23             Do not discuss with other witnesses what you see, say,

24   or do during this procedure.

25             After you have had an opportunity to view the photo

MMS

People - Det. Patterson - Direct/Cilia

1  array, I will ask you the following three questions:

2       1.  Do you recognize anyone?

3       2.  If you do, what is the number of the person you

4  recognize?

5       And, 3, from where do you recognize the person?

6       I may ask you follow-up questions.

7  Q.   Okay.  And then what happened next?

8  A.   I placed the photo array in a manila folder and I slid

9  it across the table to the witness.

10  Q.   And what did the witness do?

11  A.   The witness opened the manila folder, looked at the

12  photo array, and pointed his index finger at position number 1.

13  Q.   And did the witness say anything?

14  A.   He did.  He said, That's the man I met at David's

15  after Thanksgiving.

16  Q.   Did the witness mark the photo array in evidence as

17  People's 4 or --

18       Did the witness mark the actual photo array in any

19  way?

20  A.   He did.  He signed underneath photograph number 1.

21  Q.   I want to go back just for a moment to when the

22  defendant made this statement about the counterfeit money.  You

23  said that you were talking to Det. Hoti at that time?

24  A.   That is correct.

25  Q.   Where specifically were you?

People - Det. Patterson - Direct/Cilia-Cross

1        A.    We were entering the room.

2        Q.    You were entering the room.  So, were you in the

3    process of opening the door at that time?

4        A.    Detectives Hoti and Cosenza were coming through the

5    door behind me.  I was stepping past the chair to pick a chair

6    to sit in.

7        Q.    Where was the defendant?

8        A.    He was seated in the interview room.

9        Q.    Okay.  And so, were you standing or seated when you

10   made this conversation with Det. Hoti?

11              THE COURT:    I think we can just move on.

12              MS. CILIA:    Okay.  Thank you, Detective.  I have

13        no further questions.

14   CROSS-EXAMINATION

15   BY MS. GUASTELLA:

16       Q.    Detective, the photo array was conducted January 6,

17   2012?

18       A.    That is correct.

19       Q.    And the person viewing the photo array, the purpose of

20   that -- Withdrawn.  This person was not a eyewitness to the

21   homicide, correct?

22              MS. CILIA:    Objection.

23              THE COURT:    Is that an objection?

24              MS. CILIA:    Yes.

25              THE COURT:    I thought that might be.  Sustained.

People - Det. Patterson - Cross

1    Q.   This witness told you that he met Mr. Skrine after

2    Thanksgiving?

3    A.   That is correct.

4    Q.   What time did you get to the precinct on 12/8?

5    A.   I was performing a day tour that day.

6    Q.   Do you recall what time you first met Mr. Skrine?

7    A.   Around 1400 hours, ma'am.

8    Q.   That's about 2:00?

9    A.   Yes, ma'am.

10   Q.   And he had been placed in a room, correct?

11   A.   That is correct.

12   Q.   And the door was closed?

13   A.   It was, yes.

14   Q.   Do you know how long he was in the room prior to you

15   arriving?

16   A.   I do not.

17   Q.   And you had the opportunity to speak to other

18   detectives prior to speaking to Mr. Skrine, correct?

19   A.   Yes.

20   Q.   And that was Det. Hoti and Cosenza?

21   A.   Correct.

22   Q.   And did they tell you that they heard noises coming

23   out of the squad room -- I'm sorry -- out of the room that

24   Mr. Skrine was sitting in?

25   A.   Not that I recall.

MMS

People - Det. Patterson - Cross

1    Q.    And when you entered the room, was he talking to

2    himself?

3    A.    I do not believe so.

4    Q.    You stated that he was -- Withdrawn.

5          Approximately how long were you in the room before you

6    attempted to read him Miranda?

7    A.    Less than 30 seconds.

8    Q.    And then you said you tried eight more times, correct?

9    A.    That is correct.

10   Q.    And about how long of a period of time was this?

11   A.    Over a period of approximately eight to ten hours.

12   Q.    And during those eight to ten hours, he maintained --

13   he was always unresponsive, correct?

14   A.    That is correct.

15   Q.    He seemed kind of out of it?

16              MS. CILIA:   Objection.  That's very vague.

17              THE COURT:   Rephrase the question.

18   Q.    Did he seem to know what was going on?

19              THE COURT:   Did he appear to know?

20   A.    Yes.

21   Q.    And at any time between the eight to ten hours, did

22   you ever hear him talking to himself or anyone else that was

23   clearly not in the room?

24   A.    I did not.

25   Q.    What did you mean by he had no facial expressions?

People - Det. Patterson - Cross

1    A.   When I read the Miranda warnings, he, again, did not

2    answer, and his expression was, I believe, deadpan.

3    Q.   And at that point -- At some point you told him he was

4    being arrested for a homicide, correct?

5    A.   Yes, we did.

6    Q.   And he continued to remain deadpan, as you said?

7    A.   That is correct.

8    Q.   Just one other question: Going back to the oral

9    statement, you said as you're walking into the room he just

10   blurted out, I picked that money up?

11   A.   That's correct.

12   Q.   Was it directed at you?

13   A.   I don't know whom it was directed at.

14   Q.   Was he facing you when he said that?

15   A.   He was sitting in the chair facing the table.  We were

16   entering through the doorway.  So, roughly.

17   Q.   He was sitting at the table.  The table doesn't face

18   the door, correct?

19   A.   No, it does not.

20   Q.   So, when you walked in, was he looking straight at the

21   wall?

22   A.   He was.

23   Q.   And that's when he made that statement, correct?

24   A.   That is correct.

25        MS. GUASTELLA:   Judge, I have nothing further.

MMS

Proceedings

1        THE COURT: Counsel?

2        MS. CILIA: Nothing further.

3        THE COURT: Thank you, Detective. You're

4        excused.

5        Call your next witness, please.

6        THE WITNESS: Thank you, your Honor.

7        (Witness excused.)

8        MS. CILIA: The People rest at this time.

9        THE COURT: Call your first witness, please.

10       MS. GUASTELLA: Defense rests, Judge.

11       THE COURT: Come on up.

12       (Whereupon, a discussion is held at the bench off

13       the record.)

14       THE COURT: Court's ordering the minutes.

15       Counsel, do you want the minutes pursuant to

16       18-B?

17       MS. GUASTELLA: Yes.

18       THE COURT: So ordered.

19       We just had a conference at which case defense

20       counsel indicated they want to adjourn this case till the

21       17th of July. Is that correct?

22       MS. GUASTELLA: Yes, Judge.

23       THE COURT: Because you have vacation, et cetera?

24       MS. GUASTELLA: Right.

25       THE COURT: And you want to have whatever

MMS

Proceedings

1       submissions in support of your position with respect to the

2       hearing in by the 12th of July; is that correct?

3                       MS. CILIA:  Yes.

4                       THE COURT:  Counsel, you'll have whatever

5       memorandum you want to submit to the Court also in by the

6       12th?

7                       MS. CILIA:  Yes.

8                       THE COURT:  And I'll render a decision on the

9       17th.

10                      Same bail conditions.  July 17th.

11                      MS. CILIA:  Thank you.

12                      THE COURT CLERK:  Take charge.

13                      (Defendant remanded.)

14      *      *      *      *      *      *      *      *      *      *      *
        I hereby certify that the foregoing is a true and
15      accurate transcript of the above proceedings to the best of my
        knowledge, skill, and ability.
16
        (Certification valid when signed in blue ink.)
17

18                                      MAURIZIA M. SELLECK
19                                      Senior Court Reporter

20

21

22

23

24

25

SUPREME COURT OF THE STATE OF NEW YORK
RICHMOND COUNTY - CRIMINAL TERM-PART 5
----------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,   :
                                       :
        - against -                    :Indict. No.
                                       :454/2011
                                       :
ARMAND SKRINE,
                        Defendant.     :
----------------------------------------X
VOIR DIRE

                        County Courthouse
                        18 Richmond Terrace
                        Staten Island, New York
                        February 26, 27, 2014

B E F O R E :

        HONORABLE STEPHEN ROONEY
                        Justice, Supreme Court.

A P P E A R A N C E S :

        MICHAEL E. MC MAHON, ESQ.,
            District Attorney - Richmond County
            Appearing for the People
        BY:  JENNIFER CILIA and
             KYLE REEVES, ESQS.
             Assistant District Attorneys

        MARIA GUASTELLA, ESQ.,
            For the Defendant

                        ---

                        SUSAN MAYDAN
                        OFFICIAL COURT REPORTER

Proceedings

1    THE CLERK:  Calendar Number 1, Armand Skrine from

2    the back, Indictment 454 of 2011.

3    Appearances, counsel.

4    MS. CILIA:  Jennifer Cilia and Kyle Reeves for

5    the People.

6    MS. GUASTELLA:  Maria Guastella on behalf of

7    Mr. Skrine.

8    Good morning, your Honor.

9    THE COURT:  Good morning.

10    All right, Mr. Skrine is present.  Anything for

11    the record?

12    MS. GUASTELLA:  Judge, just a couple of quick

13    issues.

14    I am asking at this point, since we are about to

15    pick a jury, for the unredacted DD-5's.  I received

16    numerous amounts of DD-5's which are redacted.  I know I

17    received a witness list with civilian names on them.  I am

18    not sure which civilian witnesses pertain to which DD-5's,

19    and if all the witnesses in the DD-5's are going to be

20    called at this trial I may want to call one two of those

21    witnesses.

22    MS. CILIA:  I spoke to Ms. Guastella this morning

23    about this when she asked me.  What I can do is turn over

24    the index sheet which has the names of each of the

25    witnesses.  She already has the DD-5.  So it would indicate

Proceedings

1    which witness goes with which particular DD-5.

2            THE COURT: Is that all right?

3            MS. GUASTELLA: Yeah. Or they can just give me

4    the redacted DD-5's. I don't see what the big deal is. We

5    can photocopy them; take me five minutes.

6            THE COURT: Whatever you want.

7            MS. CILIA: The only things that are redacted

8    from the DD-5's are the names, the addresses and the phone

9    numbers of each witness. But the index has the name of

10   the -- the number of the DD-5 and the name of the witness.

11           THE COURT: So you are saying in effect the names

12   are unredacted.

13           MS. CILIA: Yes. And obviously I will continue

14   to redact the address and the phone number from the DD-5

15   itself, so it would just be easier, unless the Court wants

16   us to do it the other way. But it would be easier for --

17           THE COURT: I have no preference. I think the

18   defense is entitled to the names but apparently they have

19   it. Why don't you look over whatever they have given you.

20           MS. GUASTELLA: What I have is I don't have the

21   names that pertain -- she is going to give me an index I

22   guess of names and I am going to match them up to a DD-5.

23   I think it would be a lot easier if I just have the DD-5's.

24           THE COURT: Take a look at what they give you.

25   Either way is good for me. I will make sure you get back

Proceedings

1     on the record, or you make sure we get back on the record

2     before you open. I don't think that should slow us down in

3     terms of jury selection.

4                MS. CILIA: The index though does have a number

5     of the DD-5 right next to it. So number one would say

6     interview with witness so and so, and then the number.

7                MS. GUASTELLA: Of the DD-5.

8                MS. CILIA: Yes.

9                MS. GUASTELLA: I will try it that way.

10               MS. CILIA: Just also for the record -- I am

11    sorry.

12               MS. GUASTELLA: No, I just -- Judge, also

13    throughout my packet I do not see an E-Justice search for

14    the deceased.

15               THE COURT: I don't know what that means.

16               MS. GUASTELLA: A rap sheet or a search.

17    Criminal justice search.

18               MS. CILIA: We wouldn't turn over an E-Justice or

19    rap sheet for the deceased.

20               MS. GUASTELLA: I am entitled to know if the

21    victim has been convicted.

22               MS. CILIA: No, she is not.

23               THE COURT: I am not sure you are. May I ask --

24    of course, you don't necessarily have to answer this.

25    What's your defense here?

5

Proceedings

1        MS. GUASTELLA:  Judge, at this time I am not

2    going to answer that.

3        THE COURT:  Pardon?

4        MS. GUASTELLA:  I am not going to answer that at

5    this time.

6        THE COURT:  Okay.  I can't see at this point

7    anyway what the relevance of the defendant's NYSID history,

8    if he had one, would be, but I will certainly hear you

9    further if that becomes an issue.

10        MS. GUASTELLA:  Okay.

11        The other issue I have is I did get to look over

12    the photos that were given to me.  They are black and white

13    photos.  Photos of the deceased.  Some of them are very, I

14    guess for lack of a better term, gruesome in nature, and I

15    would ask that the People be precluded from displaying them

16    to the jury.

17        THE COURT:  I don't know which ones you intend to

18    use.  What are you talking about; autopsy photos?

19        MS. CILIA:  First of all, just for clarification,

20    we did turn over a disc of the color photos, so we turn

21    over hard copies of black and white photos, one per page.

22    We also turned over the color photos onto a disc is what

23    Miss Guastella --

24        THE COURT:  Do you know which ones you intend to

25    use at trial?

Proceedings

1        MR. REEVES: We don't right now, but if

2    Miss Guastella wants to tell us which ones she objects to.

3        MS. GUASTELLA: Maybe we could have a motion in

4    limine or side bar before they introduce the photos.  There

5    are photos of the deceased with his -- unfortunately, his

6    brains hanging out.  I don't know if the People plan on

7    not -- they are not relevant and are only going to inflame

8    the jury.  I don't know if they plan on introducing those.

9    I don't see how they are relevant.  But we could address it

10   as they are about to put them in.

11       THE COURT: After?

12       MS. GUASTELLA: After we pick a jury they could

13   tell us which ones they plan on using.

14       THE COURT: That is fine.  We can do it.

15       What is our plan?  I think I might have committed

16   myself.  Did I say we would pick a jury this week and start

17   testimony Monday?  Did I say that?

18       MR. REEVES: Yes.

19       THE COURT: Everybody agreed to that.

20       MS. GUASTELLA: Yes.

21       THE COURT: All right.  Then we will have ample

22   time after jury selection before openings to address

23   evidentiary issues.  If you want to talk about photos at

24   that point, that's fine.  If you wanted to wait until they

25   are offered and have a side bar, we can do it this way.

7

Proceedings

1        There is ample case law on photos, gruesome or

2    otherwise, so we should have sufficient guidance.

3            Anything else?

4            MS. GUASTELLA:  Not at this time, Judge.

5            THE COURT:  People?

6            MS. CILIA:  We turned over to defense counsel a

7    copy of a 911 call, also Kodachrome from the autopsy and

8    also color photos from the DNA report I believe that we

9    just received.

10           THE COURT:  Kodachrome.  What is that?

11           MR. REEVES:  Pictures taken during the autopsy.

12           THE COURT:  Okay.  I had reserved decision on the

13   last application by the People in terms of Sandoval.  Do

14   you want to discuss that now or do you want me to continue

15   to reserve decision?

16           MS. GUASTELLA:  Judge, I inquired as to my client

17   what the situation was with that.  He tells me he was in a

18   dorm-like setting with 50 or 60 other inmates playing chess

19   with other individuals.  The chess piece that Mr. Skrine

20   was in possession of is what I believe the item was

21   recovered from.  So that item was recovered from a dorm

22   area belonging to a chess set that 50 or 60 people at any

23   given time have access to.

24           THE COURT:  Was he arrested in connection with

25   that?

Proceedings

8

1        MS. GUASTELLA: No, Judge, not even -- he tells

2    me not even a ticket was issued.

3        THE COURT: My inclination is to Sandoval that

4    out at this point, so that is what I will do. If things

5    change I will let you know. Sandoval is not carved in

6    stone; things can change during the course of trial. But

7    for now I will rule it out.

8        Anything else?

9        Okay. Anthony, shall we get a panel over here?

10        I am sticking with March 14th as the outside

11    date.

12        MR. REEVES: Yes, your Honor.

13        THE COURT: Did either of you or any of you hear

14    about a snowstorm this weekend?

15        MS. GUASTELLA: Flurries.

16        I am sorry, I do have one other name for the

17    witness list. Carmen Skrine.

18        THE COURT: First name?

19        MS. GUASTELLA: Carmen, C-A-R-M-E-N.

20        THE COURT: C-A-R-M-E-N.

21        MS. GUASTELLA: Uh-Hum.

22        THE COURT: And last name Skrine.

23        MS. GUASTELLA: Yes.

24        (Short pause in proceedings.)

25                      o0o

Jury Selection

1          (Prospective jurors enter courtroom.)

2          THE CLERK:  Will everyone seated please stand,

3     raise your right hand.

4          (Prospective jury panel sworn.)

5          THE COURT:  Good morning.  Welcome to Supreme

6     Court Richmond County.  I am sorry some of you are standing

7     at the moment.  I anticipate seats will open up shortly.

8          We are about to begin jury selection in a

9     criminal case.  This case is entitled the People of the

10    State of New York against Armand Skrine.  Mr. Skrine is

11    known as the defendant in the case.

12         The indictment in this matter involves charges of

13    murder in the second degree, criminal possession of a

14    weapon in the second degree and third degrees, and criminal

15    possession of a forged instrument in the first degree, and

16    the trial is the process by which we will determine if any

17    of those charges are proven by sufficient evidence.  And I

18    will talk to you about that shortly.

19         The first thing I want to do is give you an idea

20    of our schedule.  We anticipate picking a jury this week.

21    The process takes a little bit of time; I anticipate today

22    and tomorrow.  After that we will go over until Monday.

23    This upcoming Monday.  We will begin the trial on Monday.

24    That would be Monday, the 3rd of March.  And we will

25    continue from that point until we are finished.

000238

Jury Selection

10

1       The lawyers and I have discussed this, and we

2  think it's about a week and-a-half trial after we get

3  started.  So that would mean the case would go to the

4  jury -- that is, the proof would be finished, the case

5  would go to the jury so the jury could begin deliberating

6  in an effort to reach a final unanimous verdict or

7  verdict -- by March 12th.  That would be a week from this

8  upcoming Wednesday.  I am going to add a couple of days

9  into the schedule in case something unforeseen delays us,

10  so what I am going to say to you is the case will go to the

11  jury -- that is, the proof will be closed, the jury will

12  begin deliberating -- no later than March 14.  That would

13  involve next week and the week after, probably March 12,

14  but it could be as late as March 14.  So keep that in mind.

15  That is the anticipated duration of this trial.

16       In terms of our day-to-day operations, we

17  generally work from 9:30 to 4:30 with our jurors.  We take

18  an hour off for lunch, usually between 1:00 and 2:00.  I

19  try to avoid going past 4:30.  Occasionally we do.  If that

20  happens, it won't be long past 4:30, and if that happens I

21  will give the jury as much advance notice of that as I can.

22  But generally during the trial itself you can count on

23  being out of the courthouse by 4:30.

24       So that is the anticipated day-to-day schedule of

25  this and every trial that is conducted in this courtroom.

Jury Selection

1      I appreciate the fact all of you have come down here in

2      response to the Commissioner of Jurors' summons.  We cannot

3      try cases without citizens who are willing to sit as

4      jurors, but I recognize the schedule I have outlined may

5      pose problems for some of you.

6              At this point, when it comes to excusing people

7      immediately, I am permitted to consider three categories.

8      The first category is health problems, the second category

9      is pressing business obligations.  I emphasize the word

10     "pressing."  And I have to say that if you work for a large

11     entity, a large corporation, the City, the State, something

12     of that sort, it's difficult for me to let you go

13     immediately on that basis.  Not to say I won't listen to

14     you, but keep that in mind.

15             The third category is pressing personal reasons.

16     Obviously you will be the judge of what they are or if you

17     have any such reasons.

18             So I hope you can stay with us through the

19     selection process during which I and the lawyers will be

20     asking questions of you in an effort to determine if you

21     can be fair, but if you think you fit into one of those

22     three categories I just mentioned and you would like to

23     speak to me and the lawyers immediately about being excused

24     from this case, would you raise your hands, please.

25             ...Okay.  I am going to ask those of you who have

 1    raised your hands to form a line at the corner of the rail

 2    where the officer is, and we will speak to you one at a

 3    time.

 4              (The following take place at side bar, outside

 5    the presence of the jurors.)

 6              THE COURT:  For the record, we are at a side bar

 7    in the courtroom.  We can start.

 8              (A prospective juror approaches side bar.)

 9              THE CLERK:  State your name for the record.

10              A PROSPECTIVE JUROR:  John Grasso, G-R-A-S-S-O.

11              THE COURT:  What's the problem, sir?

12              A PROSPECTIVE JUROR:  The issue that I have is we

13    just have some long-awaited doctors appointments coming up

14    to determine whether my son -- the degree of autism that he

15    has.  We have been waiting awhile for these appointments. I

16    have one scheduled for tomorrow and I have another one

17    scheduled for next week which would involve myself, my wife

18    and my son.

19              THE COURT:  That would take you out of commission

20    for the day?

21              A PROSPECTIVE JUROR:  We have four-hour sessions

22    set aside.

23              THE COURT:  Counsel?

24              MS. GUASTELLA:  No objection.

25              MS. CILIA:  Consent.

Jury Selection

1           THE COURT:  Consent.

2           MR. REEVES:  Yes.

3           THE COURT:  You are excused.  Thank you.  I think

4    you go back to Central Jury.

5           (Mr. Grasso leaves and the next prospective juror

6    approaches sidebar.)

7           THE CLERK:  State your name for the record.

8           A PROSPECTIVE JUROR:  William Romero,

9    R-O-M-E-R-O.

10          THE COURT:  Yes, sir.

11          A PROSPECTIVE JUROR:  Yes.  I have a heart

12   condition.  I have a monitor placed on my heart.  I may be

13   going for an operation maybe the next couple of weeks

14   probably.

15          THE COURT:  Is this the kind of thing that would

16   make it difficult for you to sit as a juror?

17          A PROSPECTIVE JUROR:  It might, yes, because I

18   have an irregular heartbeat.

19          THE COURT:  Counsel?

20          MS. CILIA:  Consent.

21          MS. GUASTELLA:  Okay.

22          THE COURT:  You are excused.  Thank you.

23          (Mr. Romero leaves and the next prospective juror

24   approaches side bar.)

25          THE CLERK:  State your name for the record.

Jury Selection

1    A PROSPECTIVE JUROR:  Margaret Aulletti,

2    A-U-L-L-E-T-T-I.

3    I have a vacation scheduled for March 15th.

4    THE COURT:  March 15.

5    A PROSPECTIVE JUROR:  Until the 19th.

6    THE COURT:  You begin a vacation.  And you are

7    leaving town.

8    A PROSPECTIVE JUROR:  Yes.

9    THE COURT:  I don't know.  What do you think?

10   March 15.

11   MS. CILIA:  Yes.  I would consent on that.

12   MS. GUASTELLA:  Consent.

13   THE COURT:  Okay, you are excused.  Thank you.

14   Next, please.

15   (Ms. Aulletti leaves and the next prospective

16   juror approaches side bar.)

17   THE CLERK:  This is N-E-N-N-A, Alan, A-L-L-E-N.

18   A PROSPECTIVE JUROR:  I am not sure but I think I

19   recognize the...

20   THE COURT:  Defendant?

21   A PROSPECTIVE JUROR:  Yes.  And I think the

22   person who he is accused of may be my best friend's

23   fiancee.

24   THE COURT:  What's the name of the deceased?

25   MS. CILIA:  David Williams.

1           A PROSPECTIVE JUROR:  I think that's him.  I am

2     nervous.

3           THE COURT:  You think but you are not sure.

4           A PROSPECTIVE JUROR:  I am not sure.  I can call

5     her.  But I know his street name, Beans.

6           MS. CILIA:  Yes.

7           MS. GUASTELLA:  That is right.

8           THE COURT:  So that's consent, counsel?

9           MS. GUASTELLA:  Yes.

10          MS. CILIA:  Consent.

11          THE COURT:  You are excused.

12          (Ms. Allen leaves and the next prospective juror

13    approaches side bar.)

14          THE CLERK:  This is I-L-L-A-N-T-A, G-O-R-D-O-N.

15          THE COURT:  Yes.

16          A PROSPECTIVE JUROR:  I went through very bad

17    domestic violence abuse with custody and I have been like

18    living in fear for years.  I really don't want to be here.

19          THE COURT:  Could you be fair?

20          A PROSPECTIVE JUROR:  I don't think I will be.

21          THE COURT:  Counsel?

22          MS. GUASTELLA:  Consent.

23          MS. CILIA:  Consent.

24          THE COURT:  Okay.  You are excused.

25          Next, please.

1        (Ms. Gordon leaves and the next prospective juror

2     approaches side bar.)

3              THE CLERK: L-E-N-A, last name Y-O-O-N.

4              A PROSPECTIVE JUROR: So I am applying to dental

5     schools and I have to take the dental admission test on the

6     20th. And I am going up to Binghamton to take it. So I am

7     going this Friday to Binghamton and I am staying there for

8     about two weeks to take the exam.

9              THE COURT: Counsel?

10             MS. GUASTELLA: Consent.

11             MS. CILIA: Consent.

12             THE COURT: You are excused.

13             Next, please.

14             (Ms. Yoon leaves and the next prospective juror

15    approaches side bar.)

16             THE CLERK: This is Megan Ernst, E-R-N-S-T.

17             A PROSPECTIVE JUROR: Good morning. I have three

18    things. My boss requested because I am a new hire and I am

19    the only person to open up the operation every morning, and

20    I have an eye doctor appointment for an eye infection

21    today, tomorrow, and my mother just had hand surgery this

22    morning so she needs me. I have to leave my job and go

23    help her out.

24             THE COURT: Counselor?

25             MS. GUASTELLA: Consent.

Jury Selection

1        MS. CILIA: Consent.

2        THE COURT: Okay, you are excused.

3        Next, please.

4        (Ms. Ernst leaves and the next prospective juror

5    approaches side bar.)

6        THE CLERK: This is Frank O-R-O-U-R-K-E.

7        A PROSPECTIVE JUROR: Yeah. I am the only one,

8    sole supporter of my family and I don't get paid for the

9    days, and I am supposed to be in Texas on a shoot next

10   Tuesday.

11       THE COURT: What do you do?

12       A PROSPECTIVE JUROR: Mobile video, videotape. I

13   am working for National Geographic on a shoot in Texas next

14   week.

15       THE COURT: You don't get paid while you are

16   here?

17       A PROSPECTIVE JUROR: I don't.

18       MS. CILIA: Consent.

19       MS. GUASTELLA: Consent.

20       THE COURT: You are excused.

21       Next, please.

22       (Mr. O'Rourke leaves and the next prospective

23   juror approaches side bar.)

24       THE CLERK: This is Raquel, R-A-Q-U-E-L,

25   Donofrio, D-O-N-O-F-R-I-O.

Jury Selection

1          A PROSPECTIVE JUROR:  Hi.  I pick up my son every

2     day from school, Pre-K, at 3:00 o'clock.

3          THE COURT:  3:00 o'clock.  How old is he?

4          A PROSPECTIVE JUROR:  Four.  Five.  He just

5     turned five.

6          THE COURT:  Is there anybody else who could pick

7     him up?

8          A PROSPECTIVE JUROR:  Not really, no.  I go

9     straight after work.  I am a teacher.

10          THE COURT:  Counselor?

11          You pick him up after school.

12          A PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Counselor?

14          MS. CILIA:  Consent.

15          MS. GUASTELLA:  Consent.

16          THE COURT:  You are excused.

17          Next, please.

18          (Ms. Donofrio leaves and the next prospective

19     juror approaches side bar.)

20          THE CLERK:  Joseph Barry, B-A-R-R-Y.

21          A PROSPECTIVE JUROR:  I am self-employed.  I have

22     a little hardware store and I work by myself.  The store's

23     closed today.  This is my busy time.

24          THE COURT:  Counselor?

25          MS. GUASTELLA:  Consent.

Jury Selection

1              MS. CILIA:  Consent.

2              THE COURT:  You are excused.

3              Next, please.

4              (Mr. Barry leaves and the next prospective juror

5       approaches side bar.)

6              THE CLERK:  This is Carmine L-A-C-E-R-T-O-S-A.

7              A PROSPECTIVE JUROR:  Your Honor, good morning.

8              THE COURT:  Good morning.

9              A PROSPECTIVE JUROR:  I am in the process of

10      moving.  I am supposed to move on the 28th.  And also my

11      house is for sale.  I am supposed to be closing within

12      between March 1 to the 15th, and I don't want to go through

13      a hardship.

14             THE COURT:  You don't have a specific closing

15      date yet?

16             A PROSPECTIVE JUROR:  The closing date is set for

17      March 1st, but they are doing title work now and...

18             THE COURT:  March 1 is this weekend; right?

19             A PROSPECTIVE JUROR:  Yeah.

20             THE COURT:  I don't know.  I mean we don't work

21      on Saturdays, so if you could do the closing while we are

22      not in session...

23             A PROSPECTIVE JUROR:  It is projected for

24      March 1.  It could be from March 1 to the 15th.

25             THE COURT:  They haven't given you a specific

Jury Selection

1    date, in other words.

2              A PROSPECTIVE JUROR:  We have a contract for

3    March 15 which was canceled, supposed to be back to March 1

4    because of the buyer wants to move in right away.  The

5    house is upside-down.  I got to move.

6              THE COURT:  I don't know real estate.

7              MS. CILIA:  Consent.

8              MS. GUASTELLA:  Consent, Judge.

9              MR. REEVES:  Are you moving to another house on

10   Staten Island?

11             A PROSPECTIVE JUROR:  Another house.  The thing

12   is, I move from a big house into a smaller house.  I got 35

13   years of furniture in there.  It's a mess.

14             THE COURT:  People?

15             MS. CILIA:  Consent.

16             THE COURT:  You are excused.

17             Next, please.

18             A PROSPECTIVE JUROR:  Thank you.

19             (Mr. Lacertosa leaves and the next prospective

20   juror approaches side bar.)

21             THE CLERK:  This is C-H-A-N-D-R-A-N-I, last name

22   S-U-R-A-W-E-E-R-A.

23             A PROSPECTIVE JUROR:  Your Honor, this is a

24   criminal case because I know this.  I don't even watch TV,

25   any violations, any gun, anything.  I can't watch.  And I

1    would love to serve the other case because criminal, I

2    can't do it.

3               MS. CILIA:  Consent.

4               MS. GUASTELLA:  Consent.

5               THE COURT:  You are excused.

6               Next, please.

7               (Mr. Suraweera leaves and the next prospective

8    juror approaches side bar.)

9               THE CLERK:  This is Ashraf, A-S-H-R-A-F, last

10   name S-A-R-H-A-N.

11              A PROSPECTIVE JUROR:  I own a store, I work seven

12   days a week and I have nobody to cover me in the morning.

13              THE COURT:  Counselor?

14              A PROSPECTIVE JUROR:  I ask my neighbor to cover

15   me.  I am worried if she going to sell cigarette, not

16   asking for ID.

17              MS. CILIA:  Consent.

18              MS. GUASTELLA:  Consent.

19              THE COURT:  You are excused.

20              (Mr. Sarhan leaves and the next prospective juror

21   approaches side bar.)

22              THE CLERK:  This is Melinda Haskell,

23   H-A-S-K-E-L-L.

24              THE COURT:  Hi.

25              A PROSPECTIVE JUROR:  I don't mind serving, but

Jury Selection

1    we get out at 4:30.  My son gets out at 2:30.

2              THE COURT:  How old?  You have to pick him up?

3              A PROSPECTIVE JUROR:  I work at night so I am

4    home during the day.  I pick him up.

5              THE COURT:  How old is he?

6              A PROSPECTIVE JUROR:  Nine.  He goes to P.S.11.

7              THE COURT:  Counselor?

8              MS. CILIA:  Consent.

9              MS. GUASTELLA:  Consent.

10             THE COURT:  Okay.  You are excused.

11             Next, please.

12             (Ms. Haskell leaves and the next prospective

13   juror approaches side bar.)

14             THE CLERK:  This is Kevin Quinn.

15             A PROSPECTIVE JUROR:  I manage a restaurant with

16   only a couple of employees.  I am the only one who has

17   Department of Health certification for that restaurant, and

18   we are expecting the Health Department in any day now

19   because --

20             THE COURT:  What restaurant?

21             A PROSPECTIVE JUROR:  Justino's Pizzeria in

22   Manhattan, West 57th Street.

23             THE COURT:  Do they pay you while you are here?

24             A PROSPECTIVE JUROR:  No.

25             THE COURT:  Counsel?

Jury Selection

1                    MS. GUASTELLA:  Consent.

2                    MS. CILIA:  Consent.

3                    THE COURT:  You are excused.

4                    Next, please.

5                    (Mr. Quinn leaves and the next prospective juror

6        approaches side bar.)

7                    THE CLERK:  This is Esther Piccarillo Capone.

8                    A PROSPECTIVE JUROR:  I work for two law offices.

9        I am the only paralegal secretary in the office.  I also

10       have chronic lymphocytic leukemia, so I think the time -- I

11       can't promise to be here every day because every day that I

12       get up I am incapable of getting out of bed.

13                   THE COURT:  Counselor?

14                   MS. CILIA:  Consent.

15                   MS. GUASTELLA:  Consent.

16                   THE COURT:  You are excused.

17                   Next, please.

18                   (Ms. Capone leaves and the next prospective juror

19       approaches side bar.)

20                   THE CLERK:  This is Jim Ng, N-G last name.

21                   THE COURT:  Hi.

22                   A PROSPECTIVE JUROR:  You talk, I can't

23       understand.

24                   THE COURT:  English?

25                   A PROSPECTIVE JUROR:  Yes.

Jury Selection

```
 1            THE COURT:  Counselor?

 2            MS. CILIA:  Consent.

 3            MS. GUASTELLA:  Consent.

 4            THE COURT:  You are excused.

 5            A PROSPECTIVE JUROR:  Thank you.  We go home?

 6            THE COURT:  You go back across the street.

 7            (Mr. Ng leaves and the next prospective juror

 8     approaches side bar.)

 9            THE CLERK:  This is Amelia Mattera,

10     M-A-T-T-E-R-A.

11            A PROSPECTIVE JUROR:  Hi, Judge.

12            THE COURT:  Hi.

13            A PROSPECTIVE JUROR:  I may not be able to hear

14     every word you are going to say.  I have a -- I have a

15     hearing aid.  But I am just scared that I won't be able to

16     hear well all the words that they are going to say.

17            THE COURT:  Counsel?

18            MS. GUASTELLA:  Consent.

19            MS. CILIA:  Consent.

20            THE COURT:  Okay.  You are excused.

21            (Ms. Mattera leaves and the next prospective

22     juror approaches side bar.)

23            THE CLERK:  This is Andrea Bernard,

24     B-E-R-N-A-R-D.

25            A PROSPECTIVE JUROR:  I have a health issue;
```

1     however, I am scheduled to have a surgical procedure

2     tomorrow so I won't be able to attend tomorrow's jury.

3           THE COURT: Surgical procedure tomorrow. I don't

4     know if we could reach her today. I don't know. What do

5     you want to do?

6           MS. CILIA: Would you be available next week or

7     is it a one-day thing?

8           A PROSPECTIVE JUROR: It is just in and out. In

9     and out of the hospital tomorrow.

10           THE COURT: Well, we could ask the lady to stay

11     with us, but if we are still selecting tomorrow and her

12     name is called and she is not here we will know why.

13           MS. CILIA: Right.

14           THE COURT: So what I am going to do is ask you

15     to stay with us. We might talk to you today.

16           A PROSPECTIVE JUROR: Okay.

17           THE COURT: If it's tomorrow, we don't want to

18     interfere with your surgical procedure; go ahead and have

19     it done. If it is still early enough, come on back here

20     after that. Is that all right?

21           A PROSPECTIVE JUROR: That is fine.

22           THE COURT: Thank you. You could have a seat.

23           (The next prospective juror approaches side bar.)

24           THE CLERK: This is L-Y-U-D-M-I-L-A, last name

25     Z-A-G-A-R-O-V-A.

Jury Selection

1                    A PROSPECTIVE JUROR:  I am afraid I don't have

2          enough English to --

3                    THE COURT:  English?

4                    A PROSPECTIVE JUROR:  Yes.

5                    THE COURT:  Counsel?

6                    MS. GUASTELLA:  Consent.

7                    A PROSPECTIVE JUROR:  I understand everything

8          but...

9                    MS. CILIA:  Consent.

10                   THE COURT:  Consent on both sides.

11                   MS. CILIA:  Yes.

12                   THE COURT:  You are excused.

13                   (Ms. Zagarova leaves and the next prospective

14         juror approaches side bar.)

15                   THE CLERK:  This is Aiman Khan, A-I-M-A-N

16         K-H-A-N.

17                   A PROSPECTIVE JUROR:  I am a businessman.  I

18         recently bought a diner.  Nobody over there right now.

19         That is why.

20                   THE COURT:  You run the whole place yourself?

21                   A PROSPECTIVE JUROR:  Yes.

22                   THE COURT:  You are the whole.  You are it.

23                   A PROSPECTIVE JUROR:  Two partners.  The other

24         one is not feeling good.

25                   THE COURT:  What do you want to do?

1              A PROSPECTIVE JUROR:  They texted me before I

2    don't know show up today.

3              MS. GUASTELLA:  Consent.

4              MS. CILIA:  Consent.

5              THE COURT:  You are excused.

6              Next, please.

7              (Mr. Khan leaves and the next prospective juror

8    approaches side bar.)

9              THE CLERK:  This is Matthew Wong, W-O-N-G.

10             THE COURT:  Yes, sir.

11             A PROSPECTIVE JUROR:  Hi.  So I just start my

12   first job little bit less than a month ago and I am not

13   sure how this will affect me if I take two weeks.

14             THE COURT:  What do you do?

15             A PROSPECTIVE JUROR:  Software engineer.

16             THE COURT:  And you just started.

17             A PROSPECTIVE JUROR:  Yeah, little bit less than

18   a month ago.

19             MS. GUASTELLA:  Consent.

20             MS. CILIA:  Consent.

21             THE COURT:  Okay.  You are excused.

22             (Mr. Wong leaves and the next prospective juror

23   approaches side bar.)

24             THE CLERK:  This is Carl Colombo, C-O-L-O-M-B-O.

25             A PROSPECTIVE JUROR:  I work for the School

Jury Selection

1    Construction Authority, New York City.  I have a group of

2    85 people and I think the duration is going to be a little

3    too long for me. I don't have any problem serving but it is

4    just two weeks duration.

5                 THE COURT:  I understand.  You work for the City.

6                 A PROSPECTIVE JUROR:  For the schools.  I do

7    construction in the schools.

8                 THE COURT:  I can't let you go at this point.

9    Doesn't mean you are on the jury, but I am going to have to

10   ask you to stay with us and answer some questions if your

11   name is called.

12                A PROSPECTIVE JUROR:  Okay.

13                THE COURT:  Thank you very much.

14                (The next prospective juror approaches side bar.)

15                THE CLERK:  This is Tommy Lim, L-I-M.

16                A PROSPECTIVE JUROR:  Yes, sir.  I work for an

17   insurance company in the finance area.  There is only four

18   of us in our group and our manager broke his leg so he is

19   out, and if I am out I think that would reduce the staff to

20   half.  And I don't think -- I would like to be able to help

21   them, if possible.

22                THE COURT:  What do you think?

23                MS. GUASTELLA:  I will consent.

24                MS. CILIA:  Consent.

25                THE COURT:  Okay.  You are excused.

Jury Selection

1          Next, please.

2          (Mr. Lim leaves and the next prospective juror

3     approaches side bar.)

4          THE CLERK:  This is Michael Suo, S-U-O.

5          A PROSPECTIVE JUROR:  So I am an only supporting

6     analyst of CFO that runs a communications company, and I

7     will have to be make up all the work while I am out of the

8     office for two weeks.  So they are paying me but this is --

9     it is just going to add a lot of pressure.

10         THE COURT:  There is nobody who can do your work

11    for you while you are here?

12         A PROSPECTIVE JUROR:  I am his only analyst.

13         THE COURT:  In other words, when you get back you

14    are going to have to back makeup two weeks.

15         A PROSPECTIVE JUROR:  After I leave here at night

16    I will be working.

17         THE COURT:  You will be working at night.

18         A PROSPECTIVE JUROR:  Yes.

19         THE COURT:  Counselor?

20         MS. GUASTELLA:  Consent.

21         MS. CILIA:  Consent.

22         THE COURT:  Okay.  You are excused.

23         Next, please.

24         (Mr. Suo leaves and the next prospective juror

25    approaches side bar.)

Jury Selection

1    THE CLERK: This is Ashley L-A-G-Z-I-A-L.

2    A PROSPECTIVE JUROR: Hi. I actually have a

3    client trade show to go to the second week of March, the

4    second weekend from Friday to Monday, and I am supposed to

5    be representing a client there. And I also have a --

6    THE COURT: We are talking about from?

7    A PROSPECTIVE JUROR: The 8th to the 10th. I am

8    sorry, the 17th. That long weekend. Friday to Monday.

9    THE COURT: Is it out of town somewhere?

10    A PROSPECTIVE JUROR: Boston.

11    THE COURT: Counselor?

12    MS. GUASTELLA: Consent.

13    MS. CILIA: Consent.

14    THE COURT: Okay. You are excused.

15    (Ms. Lagzial is excused.)

16    THE COURT: How many do we have left?

17    THE CLERK: Sixty-eight.

18    THE COURT: Hopefully that works. .

19    (The following takes place in open court.)

20    THE COURT: Thank you for staying with us. I am

21    going to give you some preliminary remarks and then we are

22    going to fill the jury box and begin questioning people.

23    As I said, the trial is the process by which we

24    will determine if any of the charges are proven by

25    sufficient evidence, and in that process those of you

1   selected as jurors and I as the judge in the case perform

2   separate functions.

3           Jurors are called upon to determine whether or

4   not the evidence they hear and see in this case establishes

5   the defendant's guilt of the charges.  In order to do this

6   the jury will have to evaluate all the evidence at the end

7   of the trial in order to determine whether what they have

8   heard from witnesses and seen as exhibits is true and, if

9   so, what it all means.  This is called finding of facts.

10  That is the jury's job alone.  The judge finds no facts at

11  a jury trial.

12          The jury's ultimate decision is called the

13  verdict.  The verdict will be either guilty or not guilty,

14  or after hearing all the evidence the jury may find the

15  defendant guilty of some charges and not guilty of others.

16          The attorneys present the evidence.  They usually

17  do this by calling witnesses, and they may suggest that the

18  jury draw certain conclusions from the evidence.  But only

19  the jury can decide what really happened and the verdict as

20  to each of the counts will remain the jury's determination

21  alone.  The judge makes no determination of guilt or lack

22  of guilt at a jury trial.  My role at the trial is simply

23  to insure that the jury reaches its verdict in accordance

24  with the law.  I will explain the law as to all the issues

25  at this trial.  You are not required to know any law in

Jury Selection

1  order to be a juror.

2          In order for both sides to receive a fair trial I

3  may have to rule on questions concerning the conduct of the

4  trial.  Those rulings have nothing to do with whether this

5  defendant is guilty or not guilty.  I may also rule on

6  questions concerning what evidence may be considered and,

7  if so, for what purpose.

8          When I do make a ruling concerning whether the

9  jury may hear some testimony or see an exhibit which is

10  offered as evidence I will be ruling on whether or not the

11  jury's permitted to hear or see this as a matter of law.

12  Likewise, should the jury be instructed to disregard

13  something they may have heard, it will be because that's

14  the law.

15          None of my rulings during the trial or during

16  this jury selection process, if I have to make any, should

17  be taken by you as indicating whether all or part of what's

18  eventually offered as evidence should be believed or

19  whether the defendant is guilty or not guilty.  Again,

20  that's solely the jury's job to determine.  You do,

21  however, have to agree to accept the law as given to you if

22  both sides are to have a fair trial, and I will be

23  discussing some fundamental legal issues with you shortly.

24          In Richmond County the People of the State of New

25  York are represented by the District Attorney, Daniel

Jury Selection

1    Donovan.  Mr. Donovan is represented at this trial by

2    Assistant District Attorneys Jennifer Cilia and Kyle

3    Reeves.  They are seated at this table.

4              MS. CILIA:  Good morning, everyone.

5              MR. REEVES:  Good morning, ladies and gentlemen.

6              THE COURT:  The defendant, as I have already

7    said, is Armand Skrine, and Mr. Skrine is represented by

8    his attorney, Maria Guastella.  They are seated at this

9    table.

10             MS. GUASTELLA:  Good morning, everyone.  Welcome.

11             THE COURT:  The fact that this action is brought

12   in the name of the People or that the evidence is presented

13   by public officials does not in any way indicate that the

14   public wants a specific verdict.  The people of this state

15   are served by whatever verdict is justified by the

16   evidence.

17             Serving on a jury is a vital function for

18   citizens under our system of law.  It is also a great

19   responsibility, which is to accord both sides a fair trial.

20   In order to do this the jury must be free from any

21   preconceived notions or any sympathies or prejudices which

22   might prevent them from returning a fair and a just verdict

23   based solely on the evidence or lack of evidence, and to

24   help insure this our first order of business is to conduct

25   an examination of prospective jurors.

Jury Selection

1    I will be asking some questions when I am

2    finished. The lawyers will ask some questions. The

3    purpose of this questioning is simply to determine whether

4    or not you are qualified to sit as a juror in this

5    particular case. A number of you will not be selected.

6    Some of you will be excused because you are not qualified

7    to sit in this case as a matter of law. Others amongst you

8    will be excused peremptorily, which means by one of the

9    attorneys without any cause being given.

10    I want to stress at this point that if you are

11    excused it is not a reflection on you as a citizen, it has

12    nothing to do with your honesty or your integrity. Please

13    don't feel insulted if you are excused. If you are

14    excused, it is simply the result of a decision by one or

15    more of the lawyers or by me that you are not to sit as a

16    juror in this particular case.

17    Should I or the lawyers ask you any questions you

18    would rather not answer in open court, just tell us and we

19    will step to the side and discuss it at a side bar.

20    So, with that, the clerk is going to call or pull

21    16 names at random from the drum. If you hear your name

22    called, just step up and have a seat in the jury box where

23    the officer directs you.

24    THE CLERK: M. Pascarella, P-A-S-C-A-R-E-L-L-A,

25    Seat Number 1; Mary Ogofa, O-G-O-F-A, Seat Number 2; Barney

1  Chen, C-H-E-N, Seat Number 3; Daniel Conniff,

2  C-O-N-N-I-F-F, Seat Number 4; Tabitha Gronock,

3  G-R-O-N-O-C-K, Seat Number 5; Maria Trimboli,

4  T-R-I-M-B-O-L-I, Seat Number 6; Andrea Bernard, Seat

5  Number 7, B-E-R-N-A-R-D; Richard Taber, T-A-B-E-R, Seat

6  Number 8; Jane Gentile, G-E-N-T-I-L-E, Seat Number 9; Jerit

7  George, G-E-O-R-G-E, first name J-E-R-I-T, Seat Number 10;

8  Michael Minogue, M-I-N-O-G-U-E, Seat Number 11; Ryan

9  Connolly, C-O-N-N-O-L-L-Y, Seat Number 12; Mary Cummings,

10  C-U-M-M-I-N-G-S, Seat Number 13; Danielle Diez, D-I-E-Z,

11  Seat Number 14; Jennifer Hamilton, H-A-M-I-L-T-O-N, Seat

12  Number 15; Damaris Yonko, Y-O-N-K-O, first name

13  D-A-M-A-R-I-S, Seat Number 16.

14  THE COURT:  Okay.  I will be addressing my

15  questions to the people in the jury box.  It would help if

16  everybody listened.  We will probably speak to more of you

17  before this process is finished, and it helps if you know

18  what the questions are that are coming at you.  But for now

19  I am speaking to the people in the jury box.

20  The allegations -- and I stress allegations at

21  this point -- allege that on or about December 8, 2011,

22  with intent to cause the death of a person named David

23  Williams, the defendant shot and killed David Williams.

24  That's the nature of the allegation or allegations in the

25  case.  I know that's not a lot of information, but my

1    question is, based on that little bit of information, do

2    any of you think you know anything about this case?

3           ...Do you think you have heard anything about it,

4    read anything about it?  I don't know if the Advance wrote

5    anything about this case or not.

6           ...No. okay.

7           I have introduced the lawyers and the defendant

8    to you.  Do any of you know any of them?

9           ...Nobody.  Good.

10          Let me read to you a list of potential witnesses

11   and the names of people that may come up during the course

12   of the trial, and I would like to know if you recognize any

13   of those names.  I will read them all and then you can tell

14   me.

15          As I said, the deceased in the case is David

16   Williams.  Was David Williams.

17          Other names:  Jaclyn Hunt; Loney Walker; Michael

18   Ambrose; Gloria Fields; Janet Smith; Saheed Babatunde.

19   That's B-A-B-A-T-U-N-D-E.

20          Jean or John Loiseau, L-O-I-S-E-A-U; Michael

21   Casiano; Police Officers Vincent Aguilo, Stephen DiMassa,

22   Anthony Jacobs, Jonathan Kane; Detectives Jeff Anderson,

23   Edward Patterson, Daniel Guariano, Patricia Angst, Robin

24   Steneck, James Clontz, Beverly Des Vignes.  That's two

25   words, D-E-S and V-I-G-N-E-S.  I am not pronouncing that

1   right.

2          Also, Sgt. Trzcinski, T-R-Z-C-I-N-S-K-I.

3          Dr. Stephen deRoux from the Medical Examiner's

4   Office; Patricia Zippo; Irene Wong; and an emergency

5   medical technician, last name Schenker, S-C-H-E-N-K-E-R.

6   Natalia Diaz and Carmine Skrine.

7          Do any of you recognize any of those names?

8          This is Mr. Taber; right?

9          A PROSPECTIVE JUROR:  Ambrose?  I don't know if

10  it is the same Ambrose you are talking about from

11  Tottenville?  Michael Ambrose.

12          THE COURT:  Is it somebody you know?

13          A PROSPECTIVE JUROR:  I don't know if it is the

14  same Ambrose.  We call him Ambrose.  Tottenville.  He is

15  from Tottenville?

16          THE COURT:  I don't know.

17          No?  Apparently not from Tottenville.

18          A PROSPECTIVE JUROR:  All right.

19          THE COURT:  Anybody else?

20          ...Okay.  Let me press on.  My next series of

21  questions I will direct to all of you.  If you have an

22  affirmative answer, just raise your hand.  I will get to

23  you probably in no particular order.

24          First question:  Are any of you or anyone close

25  to you -- and by that I mean close friends or relatives --

Jury Selection

1   involved in law enforcement in any capacity, or have you --

2   have they been so involved?

3            I will just jump around here.

4            Mr. Minogue?

5            A PROSPECTIVE JUROR:  Yes.

6            THE COURT:  Who do you know in law enforcement?

7            A PROSPECTIVE JUROR:  My brother.

8            THE COURT:  A police officer?

9            A PROSPECTIVE JUROR:  Yes.

10            THE COURT:  N.Y.P.D.?

11            A PROSPECTIVE JUROR:  Yes.

12            THE COURT:  Anything about his job that would

13   prevent you from being fair in your mind?

14            A PROSPECTIVE JUROR:  No.

15            THE COURT:  Thank you.

16            Mr. Connolly?

17            A PROSPECTIVE JUROR:  My cousin George Ricker is

18   a cop.

19            THE COURT:  N.Y.P.D.

20            A PROSPECTIVE JUROR:  Yes.

21            THE COURT:  Same question:  Anything about that

22   that would prevent you from being fair?

23            A PROSPECTIVE JUROR:  No, sir.

24            THE COURT:  Thank you.

25            Mr. Conniff.

1          A PROSPECTIVE JUROR:  Father, sergeant, retired

2     sergeant, and brother sergeant.

3          THE COURT:  Your brother's still working?

4          A PROSPECTIVE JUROR:  Negative.  He was hurt in a

5     criminal act.  He has been in a coma for 16 years.

6          THE COURT:  Sorry to hear that.

7          Well, the question is would either or both of

8     these relationships, considering what they did for a

9     living, would that prevent you from being a fair juror?

10         A PROSPECTIVE JUROR:  Possibly.

11         THE COURT:  This is because of discussions you

12    had with them.

13         A PROSPECTIVE JUROR:  Because of the criminal

14    act, yes.

15         THE COURT:  Beg pardon?

16         A PROSPECTIVE JUROR:  Because of the criminal

17    act, yes.

18         THE COURT:  Okay.  I will leave you alone for

19    now.  The lawyers might want to follow up on that. I will

20    leave it up to them.

21         A PROSPECTIVE JUROR:  Thank you.

22         THE COURT:  Other hands.

23         Miss Gronock.

24         A PROSPECTIVE JUROR:  Brother.

25         THE COURT:  N.Y.P.D.

Jury Selection

1           A PROSPECTIVE JUROR:  Yes.

2           THE COURT:  Same question:  Would that affect

3      your ability to be fair?

4           A PROSPECTIVE JUROR:  No.

5           THE COURT:  Thank you.

6           Anyone else?

7           Miss Ogofa.

8           A PROSPECTIVE JUROR:  Brother retired mounted

9      N.Y.P.D. officer.  Retired in April.

10          THE COURT:  How long ago did he retire?

11          A PROSPECTIVE JUROR:  April.

12          THE COURT:  You think his former occupation would

13     have any effect on your ability to be fair?

14          A PROSPECTIVE JUROR:  No.

15          THE COURT:  Thank you.

16          Miss Gentile?

17          A PROSPECTIVE JUROR:  My husband's retired

18     N.Y.P.D.

19          THE COURT:  Would that have any bearing here in

20     terms of your ability to be a fair juror?

21          A PROSPECTIVE JUROR:  I don't think so.

22          THE COURT:  Thank you.

23          Anyone else?  Again, I am just jumping around.

24          Miss Yonko?

25          A PROSPECTIVE JUROR:  Father, detective.

1          THE COURT:  Still working?

2          A PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Anything about his job that would

4     prevent you from being a fair juror?

5          A PROSPECTIVE JUROR:  No.

6          THE COURT:  Thank you.

7          Miss Diez?

8          A PROSPECTIVE JUROR:  Yes.  My grandfather's

9     retired.

10          THE COURT:  Grandfather.

11          A PROSPECTIVE JUROR:  Yes.  My cousin.

12          THE COURT:  Cousin still working?

13          A PROSPECTIVE JUROR:  No.  Retired.

14          THE COURT:  Both retired from the N.Y.P.D.

15          A PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Anything about their former

17     occupations that would prevent you in your mind from being

18     a fair juror?

19          A PROSPECTIVE JUROR:  No.

20          THE COURT:  Thank you.

21          Did I get everybody?

22          ...Okay.  Next question.  Are any of you or

23     anyone close to you involved in the legal field in any way

24     as a lawyer or paralegal, an employee of a law firm,

25     prosecutor's office, anything of that sort?

1            Miss Ogofa.

2            A PROSPECTIVE JUROR:  Yes, pro bono coordinator,

3       Shepard Mullen.

4            THE COURT:  Okay.  You are.  I am guessing that

5       doesn't involve any criminal law.  Am I right?

6            A PROSPECTIVE JUROR:  Not that I am involved in,

7       no.

8            THE COURT:  Okay.  Anything about your job that

9       would prevent you from being fair?

10           A PROSPECTIVE JUROR:  No.

11           THE COURT:  Thank you.

12           Anyone else?

13           Mr. Chen.

14           A PROSPECTIVE JUROR:  I work for the New York

15      City Law Department.

16           THE COURT:  What do you do there?

17           A PROSPECTIVE JUROR:  I am an examiner.  Benefits

18      examiner.

19           THE COURT:  Do you get involved in any criminal

20      law?

21           A PROSPECTIVE JUROR:  No.

22           THE COURT:  Anything about your job that would

23      prevent you from being fair?

24           A PROSPECTIVE JUROR:  No.

25           THE COURT:  Thank you.

1          Anyone else?

2              ...Have you or anyone close to you, to your

3      knowledge, ever been the victim of a crime?

4              ...Nobody.  Okay.

5              Mr. Conniff.

6              A PROSPECTIVE JUROR:  Same thing.  My brother was

7      assaulted.

8              THE COURT:  Thank you.  Anyone else?

9              ...Have any of you been a witness in any kind of

10     a courtroom proceeding or Grand Jury proceeding or anything

11     of that sort?

12             ...Have any of you ever been a litigant in a

13     civil lawsuit or action?  That is, a plaintiff or defendant

14     in any kind of a civil lawsuit or civil action.

15             Let me remind you we can discuss anything

16     privately if you wish.  And having said that, my next

17     question is have any of you or anyone close to you, to your

18     knowledge, ever been a defendant in any kind of a criminal

19     proceeding?

20             ...Nobody.

21             Have any of you ever served on a jury before?

22             This is a very easy group to examine.

23             Mr. Chen?

24             A PROSPECTIVE JUROR:  Jury.

25             THE COURT:  Jury.

Jury Selection

1          A PROSPECTIVE JUROR:  Like a long time ago.

2          THE COURT:  Pardon?

3          A PROSPECTIVE JUROR:  A long time ago.

4          THE COURT:  About how long?  Approximately.

5          A PROSPECTIVE JUROR:  Eight years.

6          THE COURT:  Eight years.

7          A PROSPECTIVE JUROR:  It was a traffic accident.

8          THE COURT:  Traffic accident.  Civil case?

9          A PROSPECTIVE JUROR:  Yes.

10         THE COURT:  Did the jury reach a verdict?

11         A PROSPECTIVE JUROR:  Yes.

12         THE COURT:  Was there anything about that

13    experience that would prevent you from being able to serve

14    in this case?

15         A PROSPECTIVE JUROR:  No.

16         THE COURT:  Thank you.

17         Anyone else, jury experience?

18         ...Have any of you ever served on a Grand Jury

19    before?

20         ...Okay.  What I would like to do now is just go

21    down the list here from 1 through 16 and ask you if you are

22    employed, what type of work you do.  I don't necessarily

23    need to know for whom you work, but I am interested in the

24    type of work you do if you are employed.  Sometimes

25    occupations help us in jury selection.  If you are not

Jury Selection

1   employed, just tell me that.

2            Mr. Pascarella, working?

3            A PROSPECTIVE JUROR:  Yes.

4            THE COURT:  What do you do?

5            A PROSPECTIVE JUROR:  Pizzeria.

6            THE COURT:  Thank you.

7            Miss Ogofa, you have told us what you do.  What

8   does that involve actually, coordinator?

9            A PROSPECTIVE JUROR:  So I support three partners

10  in my law firm, as well as the office administrator, and I

11  run the entire pro bono -- I work with -- one of the

12  partners I work for is the pro bono chair, so I assist him

13  in the coordinator position and just basically getting all

14  pro bono cases into the firm.  Process, paperwork.  There

15  are so many facets to my job.

16           THE COURT:  Thank you.

17           Mr. Chen, employed?

18           A PROSPECTIVE JUROR:  Yes.

19           THE COURT:  What do you do?

20           A PROSPECTIVE JUROR:  Benefits examiner.  Just I

21  deal with disability benefits.

22           THE COURT:  Thank you.

23           Mr. Conniff.

24           A PROSPECTIVE JUROR:  Firefighter.

25           THE COURT:  Thank you.

Jury Selection

1          Miss Gronock.

2          A PROSPECTIVE JUROR:  Social worker.

3          THE COURT:  Thank you.

4          Miss Trimboli.

5          A PROSPECTIVE JUROR:  Laboratory technologist.

6          THE COURT:  Thank you.

7          Miss Bernard.

8          A PROSPECTIVE JUROR:  Retail store manager.

9          THE COURT:  Thank you.

10         Mr. Taber.

11         A PROSPECTIVE JUROR:  Mechanic.

12         THE COURT:  Miss Yonko.

13         A PROSPECTIVE JUROR:  Jet Blue Airways flight

14  attendant.

15         THE COURT:  Ms. Hamilton.

16         A PROSPECTIVE JUROR:  A chef.

17         THE COURT:  Thank you.

18         Miss Diez.

19         A PROSPECTIVE JUROR:  Not employed.

20         THE COURT:  Miss Cummings.

21         A PROSPECTIVE JUROR:  Substitute teacher for

22  children with special needs.

23         THE COURT:  Thank you.

24         Mr. Connolly.

25         A PROSPECTIVE JUROR:  I transport patients in a

Jury Selection

1    hospital.

2              THE COURT:  Thank you.

3              Mr. Minogue.

4              A PROSPECTIVE JUROR:  Fire Department.

5              THE COURT:  Okay, thank you.

6              Mr. George.

7              A PROSPECTIVE JUROR:  Financial analyst.

8              THE COURT:  Thank you.

9              And Miss Gentile.

10             A PROSPECTIVE JUROR:  Teacher's aide.

11             THE COURT:  Thank you.  Is it Gentile or Gentile?

12             A PROSPECTIVE JUROR:  Gentile.

13             THE COURT:  Thank you all for that information.

14             What I am going to do at this point is go over

15   several fundamental principles of law that apply in all

16   criminal trials.  As I said before, you don't have to know

17   any law in order to be a juror.  It is my job to explain

18   the law to the jury.  But you do have agree to accept the

19   law if both sides are to have a fair trial.

20             So I am going to go through some of these

21   fundamental principles that apply in all criminal trials

22   and ask collectively probably whether you can promise us

23   you will abide by them.  If you cannot accept any of these

24   propositions, please tell me.  It is important we know how

25   you feel.

Jury Selection

1       First of all, you heard me mention a little while
2   ago the indictment.  The indictment is the instrument that
3   contains the charges.  The mere fact that a defendant has
4   been indicted is not evidence of anything, and in
5   particular it's not evidence of guilt.  Should you be
6   chosen to serve as a trial juror, our law requires that you
7   decide the case wholly and solely on the evidence, and
8   since it is our rule of law that an indictment is evidence
9   of nothing, I ask if you will promise us that you will
10  follow and accept that rule in our law.

11      Is there anybody who cannot make us that promise?

12      ...If selected as a juror here you would be
13  called upon at the end of the trial to deliberate with 11
14  other people in the jury room in an effort to reason
15  together and arrive at a final unanimous verdict or
16  verdicts.  Do any of you feel you could not deliberate with
17  11 other people if called upon to do so?

18      ...Under our law everyone accused of a crime or
19  brought to trial is presumed innocent unless or until he is
20  proved guilty beyond a reasonable doubt.  The defendant in
21  this case is presumed innocent and, to put this another
22  way, a defendant is never required to prove his innocence.
23  On the contrary; the People, represented by the District
24  Attorney, having accused the defendant of the crimes
25  charged, have the burden of proving him guilty beyond a

1      reasonable doubt.  The People carry this burden of proof

2      throughout the trial.  It never shifts.  It always remains

3      on the People, and the presumption of innocence remains

4      with every defendant throughout every criminal trial.

5              Is there anyone amongst you who cannot now in

6      your own mind grant the defendant this presumption of

7      innocence?

8              ...On the burden of proof issue, again, as I

9      said, in a criminal case the burden of proof is entirely on

10     the People and remains on them throughout the trial.  A

11     defendant is not required to prove anything, nor is a

12     defendant required to disprove anything.  As I say, the

13     entire burden of proof is on the People and remains on them

14     throughout the trial.

15             Is there anyone amongst you who will be unable

16     to, in your judgment, to follow and accept that rule in our

17     law?

18             ...If a defendant does not testify in a criminal

19     trial, that is not a factor from which any inference

20     unfavorable to such defendant may be drawn.  Is there

21     anybody who cannot accept that rule in our criminal law?

22             ...Okay.  What I am going to do now is define for

23     you the standard of proof required for conviction in every

24     criminal case.  That standard of proof is called proof of

25     guilt beyond a reasonable doubt.  That standard does not

1    require the People to prove the defendant guilty beyond all

2    possibility of doubt or beyond a shadow of a doubt.  It

3    does require the People to establish the defendant's guilt

4    beyond a reasonable doubt.

5           Our law therefore requires that before a jury may

6    convict a defendant, each juror must be satisfied that the

7    credible evidence is sufficient to convince him or her

8    beyond a reasonable doubt that the defendant is, in fact,

9    guilty.  The evidence must satisfy the jury beyond a

10   reasonable doubt that the defendant is, in fact, the person

11   who committed the crime or crimes charged, and the evidence

12   must also establish beyond a reasonable doubt each and

13   every essential element of a charged crime.  I will define

14   the elements at the end of the trial.

15          Now, what does our law mean when it requires

16   proof of guilt beyond a reasonable doubt?

17          A doubt of a defendant's guilt, to be a

18   reasonable doubt, must be a doubt for which some reason can

19   be given.  The doubt, to be reasonable, must therefore

20   arise because of the nature and quality of the evidence in

21   the case or from the lack or insufficiency of the evidence

22   in the case.  The doubt, to be a reasonable doubt, should

23   be one which a reasonable person acting in a matter of this

24   importance would be likely to entertain because of the

25   evidence or because of the lack or insufficiency of the

1    evidence.

2         A doubt of guilt is not reasonable if, instead of
3    being based on the nature and quality of the evidence or
4    insufficiency of the evidence, it's based on some guess, or
5    whim, or speculation unrelated to the evidence.  Also, a
6    doubt of guilt is not a reasonable doubt if it's based
7    merely on sympathy for a defendant or from a mere desire by
8    a juror to avoid a disagreeable duty.

9         I repeat, a doubt of a defendant's guilt, to be a
10   reasonable doubt, must arise either from the nature and
11   quality of the evidence or from the lack or insufficiency
12   of the evidence.  Therefore, the first duty of each juror
13   is to consider and weigh all the evidence and decide what
14   evidence you believe is credible and worthy of your
15   consideration.

16        The next duty of each juror is to determine
17   whether that juror has, in fact, a reasonable doubt of the
18   defendant's guilt as that term is defined in our law.

19        A reasonable doubt, our law says, is an actual
20   doubt, one which you are conscious of having in your mind
21   after you have considered all the evidence.  If after doing
22   so you then feel uncertain and not fully convinced of the
23   defendant's guilt and you are also satisfied that in
24   entertaining such a doubt you are acting as a reasonable
25   person should act in a matter of this importance, then

Jury Selection

1      that's a reasonable doubt of which every defendant is

2      entitled to the benefit.

3              I repeat, it is the duty of each juror carefully

4      to review, weigh and consider all the evidence.  If after

5      doing so you find that the People have not proved the

6      defendant's guilt beyond a reasonable doubt as I have

7      defined the term for you, then you must find the defendant

8      not guilty.  On the other hand, if you are satisfied that

9      the People have proved the defendant's guilt beyond a

10     reasonable doubt as I have defined the term, then you must

11     find the defendant guilty.

12             And the question is, will you promise us now that

13     if selected here you will in your final deliberations

14     follow and apply the standard of proof -- that is, proof

15     beyond a reasonable doubt -- that I have defined for you?

16     Is there anybody amongst you who cannot make us that

17     promise?

18             ...Thanks.  I am required to advise prospective

19     jurors that if selected you may not during deliberations

20     consider the subject of punishment.  Sentencing, if there

21     is to be any, lies solely within the exclusive province of

22     the Court.  The jury has no role to play in that.  The jury

23     is not permitted to consider the possibility of punishment

24     or penalty in their deliberations, and the jury may not

25     include any sentencing recommendation in their verdict.

Jury Selection

1      The trial jury is the sole and exclusive judge of the facts

2      and the facts only.  The Court is the sole and exclusive

3      judge of the law and of any sentence to be imposed

4      following a verdict.

5                  Will you promise us now that if selected here you

6      will render your verdict free from fear, favor or sympathy

7      and without considering any possibility of sentence or

8      punishment?  Is there anybody who could not make us that

9      promise?

10                 ...And my last question has to do with police

11     officer testimony.  As you know from the list of

12     prospective witnesses I read, it's likely that the jury in

13     this case will hear from police officers and detectives and

14     possibly a sergeant.  Police officers take the same oath as

15     anyone else.  The mere fact that a witness is a police

16     officer does not make that witness any more or any less

17     credible.

18                 Is there anyone amongst you who has any feelings

19     about the police or who has had any experiences with the

20     police which would lead you in your mind to give a police

21     officer's testimony greater or lesser weight than anyone

22     else's merely because of the officer's occupation?

23                 Does anybody have that feeling one way or the

24     other?

25                 Mr. Pascarella.

Jury Selection

1           A PROSPECTIVE JUROR:  Yeah.

2                THE COURT:  Which?

3           A PROSPECTIVE JUROR:  Less, I guess.

4                THE COURT:  Less?  This is because of personal

5      experiences?

6           A PROSPECTIVE JUROR:  Yeah.

7                THE COURT:  Would that apply even if you didn't

8      know the officer?

9           A PROSPECTIVE JUROR:  I guess so.  Yeah.

10               THE COURT:  Okay.  Again, I will let the People

11     follow up on that if they want.  I will leave that up to

12     them.

13               Anyone else?

14               ...Okay.  Thanks very much.  And I will let the

15     lawyers talk to you now, starting with the District

16     Attorney.

17               MR. REEVES:  Thank you, your Honor.

18               Good afternoon, ladies and gentlemen.

19               Miss Cummings, let me ask you a question.  Are

20     you tired of it?  Winter?

21          A PROSPECTIVE JUROR:  Of course.  I am from the

22     south so...

23               MR. REEVES:  There is supposed to be a little bit

24     more snow.  Have you had enough?

25          A PROSPECTIVE JUROR:  I have had enough, yes.

Jury Selection

1               MR. REEVES:  Okay.  Rather have the sun come out.

2               A PROSPECTIVE JUROR:  The sun is out.

3               MR. REEVES:  All right.  Anybody here a winter

4       person?  Exactly.

5               Mr. Conniff.  Let me just change gears a minute

6       and ask how many Yankee fans are here.  Anybody Yankee

7       fans?

8               All right, Mr. George, I am going to pick on you.

9       Are the Yankees better or worse off with A-Rod gone?

10              A PROSPECTIVE JUROR:  They are better.

11              MR. REEVES:  Mr. Conniff, what do you think?

12              A PROSPECTIVE JUROR:  I guess better.

13              MR. REEVES:  Anybody disagree?  All right.

14      Here's why I just did two minutes of silliness.  You are

15      not used to talking, I presume, in a big room, and what we

16      wanted to do here during this part of the trial is to get

17      your opinions on things.  So if Miss Cummings is sick of

18      winter, that's your opinion.  Tell us.  Mr. Conniff thinks

19      the Yankees are better off without A-Rod.  Tell us.  Okay?

20              At this point we are not trying to convince you

21      of anything.  We want to hear what you have to say about

22      things, okay?

23              Mr. Taber, does that sound like something we can

24      do for about 15 minutes?

25              A PROSPECTIVE JUROR:  No.

Jury Selection

1          MR. REEVES:  No?  I am not going to pick on you.

2     The reason I wanted to get you guys talking is because

3     Miss Cilia and I know what kind of evidence we are going to

4     use in this trial and you may, through your life

5     experience, have an idea in your head of how criminal cases

6     are supposed to be conducted, okay?

7          How many people have that kind of opinion?  How

8     many people think they know the type of evidence that

9     should be used or what's going to come?

10         Miss Gentile, what do you think?  Do you have an

11    idea of what's coming in a criminal trial?

12         A PROSPECTIVE JUROR:  No.  I have no idea.

13         MR. REEVES:  Okay.  Anybody at all?

14         Miss Gronock, what do you think?

15         A PROSPECTIVE JUROR:  No.

16         MR. REEVES:  You all know what evidence is;

17    right?  That's what we are going to use.  In this

18    particular trial I am not allowed to tell you at this point

19    what my evidence will prove, but what I want to talk to you

20    a little bit about is the type of evidence we are going to

21    use to prove that this man shot and killed another human

22    being.

23         Mr. Chen, have you heard of testimony?

24         A PROSPECTIVE JUROR:  Yeah.

25         MR. REEVES:  You know what testimonial evidence

1    is?

2                A PROSPECTIVE JUROR:  No.

3                MR. REEVES:  Okay.  It is real simple.  The Court

4    is always going to be the source of the law, but

5    testimonial evidence is when people come into court, take

6    an oath, they sit in that chair and they tell you what they

7    saw, what they heard, what they did, and you listen to it.

8                Mr. Minogue, you think you could do that?

9                A PROSPECTIVE JUROR:  Yes.

10               MR. REEVES:  It's not that hard; right?

11               Anybody think they couldn't do that; sit and

12   listen to what people saw and heard back on December 8,

13   2011?

14               Mr. Pascarella, what do you think?  Could you do

15   it?

16               A PROSPECTIVE JUROR:  Yes.

17               MR. REEVES:  Okay.  You don't sound too

18   convincing.

19               A PROSPECTIVE JUROR:  I guess not.

20               MR. REEVES:  I am just asking you.  If you don't

21   think you could, let me know.

22               Now, you have had an experience with the police,

23   you have heard about experiences where you don't think you

24   would listen to them?

25               A PROSPECTIVE JUROR:  Yeah.

Jury Selection

1          MR. REEVES:  Do you think you would be able to

2     put that out of your mind for this trial?

3          A PROSPECTIVE JUROR:  No.

4          MR. REEVES:  Okay.

5          Does anyone else have similar experiences?

6          Mr. Taber.

7          A PROSPECTIVE JUROR:  Rather not talk.

8          MR. REEVES:  You don't have to talk about it.  I

9     am just asking overall your experiences in life.

10         You think you might be inclined not to believe

11    what a police officer has to say?

12         A PROSPECTIVE JUROR:  Maybe.  It's private.

13         MR. REEVES:  The same question I just asked

14    Mr. Pascarella.  You don't think you would be able to put

15    those feelings out of your mind for this trial?

16         A PROSPECTIVE JUROR:  I don't know.

17         MR. REEVES:  You don't know.

18         A PROSPECTIVE JUROR:  I never did this before

19    so...

20         MR. REEVES:  Okay.  I think only Mr. Chen was on

21    jury service before, so this is new for everybody.  So if

22    you could just think about it, and at the end if you don't

23    think you could put it out of your mind, just let us know.

24    Okay?  Does that sound fair?

25         A PROSPECTIVE JUROR:  Sure.

Jury Selection

1           MR. REEVES:  Good.

2                So does everybody think they could sit and listen

3       to witnesses that come in and tell you what they saw and

4       they heard?

5                Miss Yonko, what do you think?  Could you do it?

6                A PROSPECTIVE JUROR:  Yes.

7                MR. REEVES:  And in addition to testimonial

8       evidence, you are going to get physical evidence.  In other

9       words, there will be pictures of the scene, there will be

10      pictures of other things that are connected to the case.

11      You will see the rifle the defendant used.  There is a

12      whole host of physical evidence.

13               And it sounds silly, Mr. George, but do you think

14      you could use physical evidence when you are trying to make

15      a decision in a case like this?

16               A PROSPECTIVE JUROR:  Yes.

17               MR. REEVES:  Okay.  Is there anyone who thinks

18      they couldn't use physical evidence?

19               ...Okay, good.

20               The third part or the third type of evidence that

21      I expect Miss Cilia and I will use in this case will be

22      some scientific evidence.  There will be two major types of

23      scientific evidence.  You are going to hear from a doctor

24      who did an autopsy on David Williams' body, and he will

25      tell you scientifically or medically what the cause of

1    death was.  And then you are going to hear from someone --

2    you will hear from two laboratory people.  One will come in

3    and talk to you about DNA and another one will come in and

4    talk to you about another area of specialty and counterfeit

5    money.

6              Does anybody think they would have trouble

7    listening to that type of evidence?

8              Mr. Conniff, what do you think?  Could you sit

9    and listen?

10             A PROSPECTIVE JUROR:  Sure.

11             MR. REEVES:  They are not going to try to turn

12   you into experts themselves, they will just come in and

13   explain to you the type of tests they did and what their

14   results were, and you would listen and accept or reject it.

15   Does that sound fair?

16             Miss Trimboli, you think that is something you

17   could do?

18             A PROSPECTIVE JUROR:  I guess so.

19             MR. REEVES:  Okay.  So far is everyone okay with

20   the type of evidence that is going to be used?  Okay?

21   Doesn't sound too hard; right?

22             And as Justice Rooney has already told you, what

23   jurors do is they sit and they listen, they evaluate, and

24   at the end of the trial you discuss among the 12 of you

25   whether or not Miss Cilia and I have proved beyond a

1       reasonable doubt the defendant's guilty.  Okay?

2                  Does that sound like something everybody could do

3       so far?

4                  ...Okay.  Now, here's where I just wanted to add

5       something.

6                  Mr. Connolly, do you know what circumstantial

7       evidence is?

8                       A PROSPECTIVE JUROR:  No.

9                  MR. REEVES:  Never heard the term before?

10                      A PROSPECTIVE JUROR:  No.

11                 MR. REEVES:  Has anyone heard that term,

12      circumstantial evidence?  What do you think it is?

13                      A PROSPECTIVE JUROR:  Evidence that it's -- you

14      are not sure if the person did it or not, because it is

15      circumstantial.

16                 MR. REEVES:  Okay.  Do you think you could listen

17      to Justice Rooney when he gives the technical legal

18      definition of it?

19                      A PROSPECTIVE JUROR:  Yes.

20                 MR. REEVES:  Okay?  And in this trial, even

21      though it is a murder case, I don't expect you are ever

22      going to have a witness come in, take that stand and point

23      at that man and say I saw him shoot David Williams.  It is

24      not going to happen in this case.

25                 Miss Gronock, instead, what we are going to do is

Jury Selection

1      there will be a series of witnesses.  They will come and

2      tell you about what they saw and they heard.  You will see

3      some videotape, you will see some physical evidence.  And

4      the type of evidence we are using is circumstantial, okay?

5      In other words, it's a series of circumstances that when

6      you put them together they prove beyond a reasonable doubt

7      the defendant committed this murder.  Okay?

8             Now, the Court will tell you at the appropriate

9      time direct evidence, which is when someone sees something

10     or they hear it, and circumstantial evidence -- there is

11     no -- one is not better than the other, okay?  Do you

12     understand me so far?

13            Do you have any opinion about what I have just

14     said?

15            A PROSPECTIVE JUROR:  Not really.

16            MR. REEVES:  Okay, because there are some people

17     who might feel, well, you know, what if you don't have an

18     eyewitness?  If you don't have five eyewitnesses, the way I

19     was raised I couldn't convict.

20            Miss Yonko, what do you think?  If the law allows

21     me to present circumstantial evidence, do you think you

22     could use that to reach a verdict in a case?

23            A PROSPECTIVE JUROR:  Most likely.

24            MR. REEVES:  Okay.  Is there anything that you

25     think would prevent you?

Jury Selection

1          A PROSPECTIVE JUROR:  No.

2          MR. REEVES:  Miss Cummings, what do you think?

3          A PROSPECTIVE JUROR:  I am fine with it.

4          MR. REEVES:  Okay.  The reason I ask,

5   Mr. Connolly -- and I didn't mean to put you on the spot --

6   is that sometimes people think, well, there is no

7   eyewitness, how are you going to prove it?  But the law

8   doesn't tell Miss Cilia and I how to prove our case, just

9   to what level we have to prove.  Okay?

10          Do you think you could use, Mr. Connolly -- you

11   could use circumstantial evidence?

12          A PROSPECTIVE JUROR:  Yes, sir.

13          MR. REEVES:  Mr. Minogue, do you think you could

14   do it?

15          A PROSPECTIVE JUROR:  Yes.

16          MR. REEVES:  Is there anyone who thinks, you know

17   what, it is a murder case, I couldn't do it?

18          Miss Gentile, what do you think in the back?

19          A PROSPECTIVE JUROR:  I think --

20          MR. REEVES:  You are actually in a really good

21   spot because I have trouble seeing you, and generally if I

22   don't see you I don't ask questions.  I know you can go

23   right around the wall and I will leave you alone.

24          What do you think though?

25          A PROSPECTIVE JUROR:  No, I think I could.

Jury Selection

1        MR. REEVES:  Is there anyone who just heard what

2   I said that feels, you know, deep down, oh, I am not

3   comfortable?

4            Miss Diez, what do you think?

5            A PROSPECTIVE JUROR:  No, I am comfortable.

6            MR. REEVES:  Miss Hamilton, do you think you

7   could use it?

8            A PROSPECTIVE JUROR:  Yes.

9            MR. REEVES:  The one thing I do want to tell you,

10   kind of be up front with you about, the physical evidence

11   is -- well, before I start that.

12            Anyone here affected by Hurricane Sandy in a

13   sense that you lost your house or anything or anybody that

14   you know?

15            Miss Gentile, you did.

16            A PROSPECTIVE JUROR:  Yes.

17            MR. REEVES:  Have you recovered from it?

18            A PROSPECTIVE JUROR:  Yes.

19            MR. REEVES:  Okay.  Now, in this case I talked a

20   little bit about the physical evidence.  Some of the

21   evidence we had was stored in a warehouse that was

22   destroyed in Hurricane Sandy.  So we will be able to

23   present pictures of the evidence to you but you are not

24   going to see or touch the physical evidence.  And the Court

25   again will give you an instruction on that if it is

1   appropriate.

2           But do you think that would affect,

3   Miss Trimboli, the way you -- if you could see pictures of

4   it and not the actual physical evidence, do you think that

5   would --

6           A PROSPECTIVE JUROR:  I guess it is the same

7   thing, I guess.  If you have pictures.

8           MR. REEVES:  Okay.  Anybody feel differently?

9           Mr. George, what do you think?

10          A PROSPECTIVE JUROR:  I don't think it would be a

11  problem.

12          MR. REEVES:  Okay.  Now, with that out of the

13  way, the next thing I wanted to talk to you about -- so far

14  everybody's okay with the type of evidence and the

15  circumstantial evidence stuff; right?  No one has any

16  serious concerns about that?

17          Mr. Chen?

18          A PROSPECTIVE JUROR:  No.

19          MR. REEVES:  You will sit and listen.

20          A PROSPECTIVE JUROR:  Yes.

21          MR. REEVES:  Let me just talk briefly about your

22  job as jurors.

23          Mr. Minogue, what do you have to do as a juror?

24          A PROSPECTIVE JUROR:  Listen?  Decide.

25          MR. REEVES:  That's it.  Those are the only two

Jury Selection

1    things.  What do I have to do as a prosecutor in this case?

2    I have to do two things.  Miss Cilia has to do the same two

3    things.  We have to prove beyond a reasonable doubt the

4    following two things:  The defendant caused the death of

5    David Williams and he did it on purpose.  That's all we

6    have to do.  Okay?  We are going to do it with the type of

7    evidence I told you about.  We are going to use

8    circumstantial evidence to prove it.

9            Is everybody with me so far?

10           Miss Hamilton, any questions?

11           A PROSPECTIVE JUROR:  No.

12           MR. REEVES:  Does it sound like it is something

13   you could do?

14           A PROSPECTIVE JUROR:  Yes.

15           MR. REEVES:  Now, you as jurors -- Mr. Minogue

16   was right on the money:  You have got to listen and decide.

17   When you listen you also have to evaluate.  In other words,

18   you have to pay attention to what's being said and figure

19   out does it make sense, does it sound logical, does it

20   sound implausible.

21           Okay.  Ms. Ogofa, do you think that is something

22   you could do?

23           A PROSPECTIVE JUROR:  Yes.

24           MR. REEVES:  Do you have any children?

25           A PROSPECTIVE JUROR:  I do.

Jury Selection

1              MR. REEVES:  How many kids do you have?

2              A PROSPECTIVE JUROR:  Two daughters.

3              MR. REEVES:  If you don't mind me asking their

4        ages.

5              A PROSPECTIVE JUROR:  Six and four.

6              MR. REEVES:  So they are a little young.  I have

7        teenagers so I am like a referee.

8              Do your children have any situations where you

9        have to decide when the six-year old or the four-year old

10       was telling you an accurate version of events?

11             A PROSPECTIVE JUROR:  Yes.

12             THE CLERK:  Okay.  What kind of things do you use

13       to figure out who's telling you the accurate version?

14             A PROSPECTIVE JUROR:  First and foremost, I don't

15       take sides of either one of them; try to call them down and

16       ask what happened.

17             MR. REEVES:  Could you just keep your voice up.

18             A PROSPECTIVE JUROR:  That I just never take

19       sides with my daughters.  I always just explain to them

20       that they have to be kind to each other and find out what

21       went wrong.  And then I ask them to just unconditionally

22       love and be kind and, you know, whatever.

23             MR. REEVES:  So you give them a listen.

24             A PROSPECTIVE JUROR:  Absolutely.

25             MR. REEVES:  Do you think it would be any

1    different if you came in here to listen to our witnesses in

2    this case?

3              A PROSPECTIVE JUROR:  No.

4              MR. REEVES:  Everybody understand what I just

5    asked?  You know, what you do outside of court you would do

6    here.  You sit and you listen, and if something makes sense

7    and it's logical, it's accurate.  If it doesn't make sense,

8    maybe it's not accurate.

9              Mr. Connolly, does that make sense to you?

10             A PROSPECTIVE JUROR:  Yes, sir.

11             MR. REEVES:  You think you could come in and sit

12   and listen?

13             A PROSPECTIVE JUROR:  Yes, sir.

14             MR. REEVES:  Make a decision later on?

15             A PROSPECTIVE JUROR:  Yes, sir.

16             MR. REEVES:  Okay.  Now, the one thing the Court

17   will never tell you that a prosecutor has to prove in the

18   State of New York is motive.

19             Miss Hamilton, do you know what motive is?

20             A PROSPECTIVE JUROR:  The reason why the person

21   committed a crime.

22             MR. REEVES:  There you go.  That is exactly it.

23   We only have to prove the two things I told you about, and

24   the Court will tell you what those are:  The defendant did

25   it and he did it on purpose.  You may not hear during the

Jury Selection

1    course of this entire trial why he did it, okay?

2              Do you think that would affect your ability to

3    make a decision, Miss Hamilton?

4              A PROSPECTIVE JUROR:  No.

5              MR. REEVES:  Why is that?

6              A PROSPECTIVE JUROR:  Because the crime is a

7    crime proven for any reason.  It doesn't matter why it was

8    committed.

9              MR. REEVES:  Okay.

10             And, Mr. George, what Miss Hamilton just said is

11   accurate?

12             A PROSPECTIVE JUROR:  Yeah.

13             MR. REEVES:  I have to prove two things, the

14   defendant did it and he did it on purpose.  If you as a

15   juror figured out, oh, we did that, you know, he proved

16   beyond a reasonable doubt the defendant shot the victim and

17   he did it on purpose, but in the back of your mind you

18   think but they never told me why it happened, therefore I

19   am not going to convict, do you understand that that would

20   be holding me to a higher standard than the law itself?

21             Do you think you would do that, Mr. George?

22             A PROSPECTIVE JUROR:  I don't think it would be a

23   problem.

24             MR. REEVES:  It may be that during the course of

25   the trial it comes out on why this happened, but that's not

Jury Selection

1     one of the things that we have to prove.

2             Mr. Chen, do you understand --

3             A PROSPECTIVE JUROR:  Yes.

4             MR. REEVES:  -- what I am getting at?

5             A PROSPECTIVE JUROR:  Yes.

6             MR. REEVES:  Is there anyone here that if you

7     didn't hear why the defendant did this would be so troubled

8     that you couldn't follow the law and convict if everything

9     else, the two elements we have to prove, are proven beyond

10    a reasonable doubt?

11            Mr. Minogue, did you follow that?  What do you

12    think about that?

13            A PROSPECTIVE JUROR:  No.  It wouldn't bother me.

14    I wouldn't have to know that.

15            MR. REEVES:  The last thing I want to talk to you

16    about -- and in the beginning there was a little silliness

17    with the Yankees and the weather.  I want you to understand

18    that I take this very seriously, and the crime the

19    defendant is charged with is probably the most serious

20    charge you could have in the State of New York, okay?

21            With that being said, I want you to look at the

22    defendant, okay?  And I want you to ask yourself this

23    question:  If it's proven with evidence beyond a reasonable

24    doubt that that defendant shot and killed David Williams on

25    December 8, 2011, could you follow the law and convict him?

Jury Selection

1          Miss Diez, what do you think?

2          A PROSPECTIVE JUROR:  If the evidence showed it.

3          MR. REEVES:  Yes.  If the evidence doesn't show

4    it, what do you have to do?

5          Mr. Chen, if I can't prove it, what must your

6    verdict be as a juror?

7          A PROSPECTIVE JUROR:  Not guilty.

8          MR. REEVES:  Not guilty.  You see, that is the

9    easy one.  My question is if it's proven -- you heard the

10   Court tell you you must convict.

11         Ma'am, could you do it?

12         A PROSPECTIVE JUROR:  Absolutely.

13         MR. REEVES:  Miss Trimboli, what do you think?

14         A PROSPECTIVE JUROR:  I think so.

15         MR. REEVES:  If it is not proven, that is easy;

16   he is not guilty.  If it's proven, could you do it?

17         A PROSPECTIVE JUROR:  Beyond a reasonable doubt?

18         MR. REEVES:  Absolutely.  That's the standard.

19         A PROSPECTIVE JUROR:  Yes.

20         MR. REEVES:  Miss Gronock, could you do it?

21         A PROSPECTIVE JUROR:  Yes.

22         MR. REEVES:  Is there anyone here who thinks, you

23   know what, based on the way I was raised, you know, my

24   teachings in the church, my life experience, I couldn't do

25   it no matter how much proof you give me?  I couldn't vote

1    guilty on a murder case?  Is there anyone here who feels

2    that way?

3              Miss Yonko, how do you feel about it?

4              A PROSPECTIVE JUROR:  If the evidence showed,

5    then yes; otherwise, if not, then not guilty.

6              MR. REEVES:  That's it.

7              Miss Gentile, what do you think?

8              A PROSPECTIVE JUROR:  I believe given the

9    evidence I could find him guilty or not guilty.

10             MR. REEVES:  If it's beyond a reasonable doubt,

11   could you vote guilty?  That would be my question.  It is

12   not a trick question, it's just that.

13             A PROSPECTIVE JUROR:  Yes.

14             MR. REEVES:  I wanted to make it real for you on

15   what the jury --

16             A PROSPECTIVE JUROR:  Yes.

17             MR. REEVES:  At the end of the trial Miss Cilia

18   is going to make an argument to you that based on the

19   evidence you must convict this defendant and, Miss

20   Cummings, I want to know if you can do it.

21             A PROSPECTIVE JUROR:  Yes.

22             MR. REEVES:  If the evidence is there.

23             A PROSPECTIVE JUROR:  As far as I know I could.

24             MR. REEVES:  Last chance.  Anyone who thinks they

25   couldn't do it?  Even if the evidence is there I still

Jury Selection

1    won't do it?

2              Miss Diez?  You still okay with it?

3              A PROSPECTIVE JUROR:  Yes.

4              MR. REEVES:  Thank you, ladies and gentlemen.

5    Thank you, your Honor.

6              THE COURT:  Miss Guastella.

7              MS. GUASTELLA:  Thank you.

8              Well, I guess the only good thing about jury duty

9    is there are no right or wrong answers, just very honest

10   answers.  I appreciate your taking your time.  I apologize

11   for talking fast and mispronouncing anybody's names.

12             Mr. Minogue, you said your brother is a police

13   officer?

14             A PROSPECTIVE JUROR:  Yes.

15             MS. GUASTELLA:  Does he work on Staten Island?

16             A PROSPECTIVE JUROR:  No.

17             MS. GUASTELLA:  Where does he work?

18             A PROSPECTIVE JUROR:  He is the commanding

19   officer, Brooklyn South Homicide.

20             MS. GUASTELLA:  Do you have an occasion to speak

21   to him about his cases?

22             A PROSPECTIVE JUROR:  No, not really.

23             MS. GUASTELLA:  How often do you talk to your

24   brother?

25             A PROSPECTIVE JUROR:  Every couple of weeks, I

Jury Selection

1        guess.

2                    MS. GUASTELLA:  How long has he been in homicide?

3                    A PROSPECTIVE JUROR:  Going to say about three

4        years he has been there.

5                    MS. GUASTELLA:  Do you know if he has testified

6        at trials?

7                    A PROSPECTIVE JUROR:  I am sure he has.  I don't

8        really ask him.

9                    MS. GUASTELLA:  How long have you been a

10       firefighter?

11                   A PROSPECTIVE JUROR:  16 years.

12                   MS. GUASTELLA:  On Staten Island?

13                   A PROSPECTIVE JUROR:  No, Brooklyn.

14                   MS. GUASTELLA:  Have you ever had occasions to

15       deal with fire marshals on an investigation?

16                   A PROSPECTIVE JUROR:  Yes.

17                   MS. GUASTELLA:  Have you assisted them in putting

18       together cases for a trial?

19                   A PROSPECTIVE JUROR:  No.

20                   MS. GUASTELLA:  Have you ever attended a trial --

21                   A PROSPECTIVE JUROR:  No.

22                   MS. GUASTELLA:  -- with them?  No.

23                   A PROSPECTIVE JUROR:  No.

24                   MS. GUASTELLA:  Now, we are here because the

25       prosecution is accusing Armand of committing a crime.

Jury Selection

1    Murder.  Anybody here offended by the fact that he is

2    accused of committing a murder?

3              How about you?  Does it bother you that it's a

4    murder; that you might hear from someone from his family

5    explain how they loved him and he is no longer here because

6    of Armand?

7              A PROSPECTIVE JUROR:  No.

8              MS. GUASTELLA:  And you understand that it is an

9    accusation; right?  Miss Gentile?  We are here because an

10   accusation is made?

11             A PROSPECTIVE JUROR:  Excuse me?

12             MS. GUASTELLA:  We are here because an accusation

13   is made.

14             A PROSPECTIVE JUROR:  Right.

15             MS. GUASTELLA:  Does that make it more true

16   because the prosecution is accusing him of a crime?

17             A PROSPECTIVE JUROR:  No.

18             MS. GUASTELLA:  Does anybody here think because

19   we have come this far he must have done something wrong?

20             What about you?

21             A PROSPECTIVE JUROR:  No.

22             MS. GUASTELLA:  I am sorry.  I am bad with names.

23   Not as great as obviously the other attorney.

24             Miss Diez.

25             A PROSPECTIVE JUROR:  Diez.

Jury Selection

1        MS. GUASTELLA:  I apologize.

2        A PROSPECTIVE JUROR:  That is okay.

3        MS. GUASTELLA:  Do you think because we have come

4   this far he must have done something wrong?

5        A PROSPECTIVE JUROR:  Not necessarily.  It has to

6   be based on evidence and hearing, listening to -- that's

7   how I would be able to judge guilty or not guilty.

8        MS. GUASTELLA:  Can you think of any reasons why

9   we would be here this far?

10        MR. REEVES:  Objection, your Honor.

11        THE COURT:  I think I will sustain that

12   objection.

13        MS. GUASTELLA:  Miss Trimboli, how about you?  Do

14   you think because we came this far he must have done

15   something wrong?

16        A PROSPECTIVE JUROR:  I kind of tend to think

17   that.  I do.

18        MS. GUASTELLA:  Now, the prosecution has the

19   burden of proving the case beyond a reasonable doubt, but

20   it is not that simple.  As the judge will explain to you,

21   each crime has elements, and they have to prove each

22   element beyond a reasonable doubt, not just in general the

23   actual crime.

24        Miss Cummings, do you understand that?

25        A PROSPECTIVE JUROR:  I think so.

Jury Selection

1              MS. GUASTELLA:  You said you are a social worker.

2              A PROSPECTIVE JUROR:  No.

3              MS. ROBIN:  I am sorry, teacher with special

4     needs.

5              A PROSPECTIVE JUROR:  Yes.

6              MS. GUASTELLA:  What level of special needs?

7              A PROSPECTIVE JUROR:  Severe autism.

8              MS. GUASTELLA:  Some children speak and some

9     don't; correct?

10             A PROSPECTIVE JUROR:  Right.

11             MS. GUASTELLA:  Did you ever have occasion where

12    you had to decide what happened with an incident in the

13    classroom?

14             A PROSPECTIVE JUROR:  Not so far.  I am a

15    substitute so...

16             MS. GUASTELLA:  How long have you been doing

17    that?

18             A PROSPECTIVE JUROR:  This is my first year.

19             MS. GUASTELLA:  Oh.  I commend you for that.  It

20    is difficult work.

21             Miss Gronock, you're a social worker.

22             A PROSPECTIVE JUROR:  Yes.

23             MS. GUASTELLA:  I was close.

24             Okay.  And where do you work?

25             A PROSPECTIVE JUROR:  East New York.

Case 1:23-cv-04575-DG  Document 12-1  Filed 12/01/23  Page 308 of 1061 PageID #: 503

1          MS. GUASTELLA:  What do you do?

2          A PROSPECTIVE JUROR:  Work for a preventive

3      agency.

4          MS. GUASTELLA:  What is that exactly?

5          A PROSPECTIVE JUROR:  So basically we work with

6      families and children referred to us through ACS to prevent

7      their removal from the parents.

8          MS. GUASTELLA:  Have you ever attended or

9      testified at hearings?

10          A PROSPECTIVE JUROR:  Not in this job, but I used

11      to work in foster care, so I have.

12          MS. GUASTELLA:  Foster care on Staten Island.

13          A PROSPECTIVE JUROR:  In Harlem.

14          MS. GUASTELLA:  How long have you been doing

15      this?

16          A PROSPECTIVE JUROR:  Eight years?

17          MS. GUASTELLA:  Miss Gentile, you said your

18      husband is a police officer?

19          A PROSPECTIVE JUROR:  Retired.

20          MS. GUASTELLA:  Where did he retire from?

21          A PROSPECTIVE JUROR:  Brooklyn.

22          MS. GUASTELLA:  Do you know what he did?  Did he

23      work in a special unit?  Was he uniformed?

24          A PROSPECTIVE JUROR:  NSU.

25          MS. GUASTELLA:  Did you ever talk to him about

```
 1       any of the incidents that he had to report to?
 2                  A PROSPECTIVE JUROR:  Sure.
 3                  MS. GUASTELLA:  Miss Yonko, your husband is
 4       retired.
 5                  A PROSPECTIVE JUROR:  Father.
 6                  MS. ROBIN:  I am sorry.  Where is he a detective?
 7                  A PROSPECTIVE JUROR:  He is on Staten Island.
 8                  MS. GUASTELLA:  Do you know where?
 9                  A PROSPECTIVE JUROR:  He is actually in a special
10       unit now, ESU.
11                  MS. GUASTELLA:  Do you speak to your dad about
12       his cases?
13                  A PROSPECTIVE JUROR:  Sometimes.
14                  MS. GUASTELLA:  Miss Ogofa, you said you work at
15       a law firm; correct?
16                  A PROSPECTIVE JUROR:  Yes.
17                  MS. GUASTELLA:  And you organize the pro bono
18       cases that come in.
19                  A PROSPECTIVE JUROR:  Yes.
20                  MS. GUASTELLA:  Are some of those criminal cases?
21                  A PROSPECTIVE JUROR:  No.
22                  MS. GUASTELLA:  Do you take the ferry to work
23       every day?
24                  A PROSPECTIVE JUROR:  I don't.
25                  MS. GUASTELLA:  Does anybody here take the ferry
```

Jury Selection

1    back and forth to work?  Take the ferry every day?

2              A PROSPECTIVE JUROR:  Yes.

3              MS. GUASTELLA:  Travel back and forth?

4              A PROSPECTIVE JUROR:  Yes.

5              MS. GUASTELLA:  Anybody else take the ferry back

6    and forth every day?

7              A PROSPECTIVE JUROR:  Yes.

8              MS. GUASTELLA:  Anyone here a member of the PTA?

9              Anybody a member of a community board on Staten

10   Island?

11             Anybody a member of the NRA?

12             Anyone here like to go hunting and fishing?

13   Anybody hunt?  No?

14             Mr. Minogue.

15             A PROSPECTIVE JUROR:  No.

16             MS. GUASTELLA:  Do you have a gun license?

17             A PROSPECTIVE JUROR:  No.

18             MS. GUASTELLA:  Anybody here have a gun license

19   or permit?

20             Mr. Pascarella, if you are selected in this case,

21   can you be fair to Armand, give him a fair shake?

22             A PROSPECTIVE JUROR:  I feel like it is not

23   really my business so I mean I would be fair with the

24   evidence given, so...

25             MS. GUASTELLA:  Thank you.

1    Mr. George, how about you? Can you give my

2    client a fair shake?

3    A PROSPECTIVE JUROR: I would give him a fair

4    shake.

5    MS. GUASTELLA: Does everybody understand as he

6    sits here he is presumed innocent, and by sitting here he

7    has already testified, in effect telling --

8    MR. REEVES: Objection.

9    THE COURT: I will sustain that. The presumption

10   of innocence is defined. I think I went over it pretty

11   thoroughly.

12   MS. GUASTELLA: We are here because he pled not

13   guilty, so as we sit here he is presumed innocent. So if

14   we had to vote -- go into the jury room right now and

15   deliberate, the only verdict you could come back with is

16   not guilty. The judge will explain it to you a little bit

17   more. That is just basically the presumption of innocence.

18   And they have to do all the work.

19   Mr. Minogue, do you think it is unfair that they

20   have all the work?

21   A PROSPECTIVE JUROR: No. You said you have to

22   prove it -- you know, he is innocent until proven guilty.

23   MS. GUASTELLA: They have to prove that. We have

24   to do nothing.

25   A PROSPECTIVE JUROR: Right.

 1           MS. GUASTELLA:  But at the end of the trial if

 2     they don't prove a motive to you, are you going to look to

 3     Armand to solve the case for you or to tell you what

 4     happened in this case?

 5           MR. REEVES:  Objection, your Honor.

 6           MS. GUASTELLA:  Miss Bernard --

 7           THE COURT:  You mixed motive with something else.

 8     I didn't quite follow it.  Why don't you rephrase it.

 9           MS. GUASTELLA:  I will withdraw it.

10           At the end of the case, Miss Bernard, are you

11     going to look for Armand to answer any unresolved questions

12     that the prosecution left you with?

13           A PROSPECTIVE JUROR:  No.

14           MS. GUASTELLA:  Anybody going to want to hear

15     from Armand in this case?

16           MR. REEVES:  Objection, your Honor.

17           THE COURT:  Want to hear, and that's one concept.

18     I will let you pursue it.  I might jump in.

19           MS. GUASTELLA:  Mr. Connolly, are you going to

20     expect to hear from Armand in this case?

21           A PROSPECTIVE JUROR:  I am sure he will be

22     questioned at some point.

23           MS. GUASTELLA:  What if he is not?

24           A PROSPECTIVE JUROR:  It is their job to convince

25     me that he is guilty.

1     MS. GUASTELLA:  Thank you.  Can you take a look

2  at Armand?  Anything about him, his hair, his clothes,

3  anything about him makes him look guilty?

4     MR. REEVES:  Objection, your Honor.

5     THE COURT:  Anything about him makes him look

6  guilty?

7     MS. GUASTELLA:  Sitting at the defense table.

8     THE COURT:  Are you asking if any of them think

9  he is guilty right now?

10     MS. GUASTELLA:  I guess so, Judge.  Thank you.

11     THE COURT:  Okay.

12     MS. GUASTELLA:  Anybody feel that way?  No?

13     It is a tough question to answer but I need an

14  honest answer, so does Armand.  Does anybody really feel

15  that way?

16     ...Okay.  Thank you.

17     I am sorry, one more thing.

18     Mr. Taber, do you still want to talk privately?

19     A PROSPECTIVE JUROR:  Yeah, sure.

20     MS. GUASTELLA:  Judge, could we have a side bar?

21  He wanted -- before he had told Mr. Reeves he would like to

22  speak privately.

23     THE COURT:  Oh, okay.  Why don't we do this.  I

24  will let everybody go for lunch.  We will speak to

25  Mr. Taber.  Stay with us, Mr. Taber.

84

Jury Selection

1    It's 10 to 1:00.  It is too late really to get

2    into the next round.  We are going to break for lunch.

3    What we would like all of you to do, those in the audience,

4    those in the jury box, is please be back in Central Jury

5    where you were this morning at 2:00.  Don't come here.  Go

6    there.  We will send an officer over or two to bring you

7    back here.

8        Don't discuss the case, please, with each other

9    or anyone else.

10       (Prospective jurors leave courtroom, with the

11   exception of Mr. Taber.)

12       THE CLERK:  State your name for the record.

13       A PROSPECTIVE JUROR:  Rich Taber.

14       THE COURT:  I don't know if Mr. Taber wanted to

15   say something or if you wanted to ask him some questions.

16       A PROSPECTIVE JUROR:  You asked me about a

17   problem with the Police Department.  I just don't trust

18   lawyers.

19       THE COURT:  You don't trust lawyers.

20       A PROSPECTIVE JUROR:  Nope.  I don't believe

21   everything.  I have a feeling they twist things around.

22       THE COURT:  Okay.

23       A PROSPECTIVE JUROR:  Because I am going through

24   a custody and a support case now and there is a lot of

25   stuff that I am hearing from my ex-'s lawyer that don't

Jury Selection

1    make sense, and I don't believe a word they say sometimes.

2                    THE COURT:  Obviously the trial is conducted by

3    lawyers.

4                    A PROSPECTIVE JUROR:  I know, but you asked me

5    about if I believe cops.

6                    THE COURT:  Is that feeling, Mr. Taber, the kind

7    of thing you think would prevent you from being fair and

8    impartial?

9                    A PROSPECTIVE JUROR:  Absolutely.

10                    THE COURT:  Counsel, any questions?

11                    MR. REEVES:  None from the People, your Honor.

12                    MS. GUASTELLA:  No, Judge.

13                    A PROSPECTIVE JUROR:  I am not saying all of you

14    lawyers.  I just have a bad feeling right now with the

15    lawyer I am working with.

16                    MS. GUASTELLA:  Like I said, I appreciate your

17    honest answer.

18                    A PROSPECTIVE JUROR:  Nobody asked me about

19    lawyers.  Everybody asked me about everybody else but

20    lawyers so...

21                    THE COURT:  Okay.  I will let you go to lunch.

22    Don't discuss this with anyone else.

23                    A PROSPECTIVE JUROR:  Not a problem.  All right,

24    take care.

25                    (Mr. Taber leaves courtroom.)

1    (Mr. Conniff enters courtroom.)

2    THE CLERK:  State your name for the record.

3    A PROSPECTIVE JUROR:  Daniel Conniff.

4    THE COURT:  Mr. Conniff, you wanted to speak to

5    us, I understand?

6    A PROSPECTIVE JUROR:  Yes.  I apologize but I

7    don't believe I could be fair to the defendant because of

8    my personal experience with my brother's assault.  I don't.

9    THE COURT:  I think I got that impression

10   earlier.  I don't know if the lawyers did.

11   Counselor, do you want to ask Mr. Conniff any

12   questions?

13   MR. REEVES:  No, your Honor.

14   A PROSPECTIVE JUROR:  I apologize.  I don't want

15   to waste everybody's time.

16   MS. GUASTELLA:  I appreciate your honesty.

17   THE COURT:  Thanks.  I am going to let you go to

18   lunch.  Don't discuss this with anyone else.

19   (Mr. Conniff leaves courtroom.)

20   THE COURT:  Okay.  Mr. Conniff has left.

21   2:00 o'clock?  I guess we can go right into challenges

22   then.  There is nothing left, is there?

23   No.  Okay.  I will see you at 2:00.

24   (Luncheon recess taken.)

25   o0o

1        A F T E R N O O N   S E S S I O N

2              THE COURT:  Where do you want to do the

3    challenges, counsel?  In the courtroom?

4              MS. CILIA:  Sure.

5              MS. GUASTELLA:  That's fine.

6              THE COURT:  Wherever you like.  We could do it at

7    the side-bar as we did --

8              MS. CILIA:  Are the jurors coming in now?

9              MS. GUASTELLA:  We are bringing them in?

10             THE COURT:  I assume you want them in the box

11   when you exercise challenges.  I don't know.  I don't care.

12             MR. REEVES:  We are ready to do it now if the

13   Court wants.  It is totally up to you.

14             MS. GUASTELLA:  We are ready too, Judge.

15             THE COURT:  You want to do that?

16             MS. GUASTELLA:  Yes.  Fine.

17             THE COURT:  Why don't we do challenges then.  The

18   defendant's present.  We are in open court but the jury is

19   not here.

20             What I would like to do, if it is acceptable, is

21   1 through 12 since we need 12.  Is that all right?

22             MR. REEVES:  Yes.

23             THE COURT:  Okay.  1 through 12.  That is up to

24   and including Number 12, Mr. Connolly.

25             Cause, People?

Jury Selection

1           MR. REEVES:  Mr. Pascarella.

2           THE COURT:  Is that a consent?

3           MS. GUASTELLA:  Judge, I did ask him if he could

4    be fair.  He said he would listen to the evidence, he could

5    be fair.

6           THE COURT:  That is why we need the jury in the

7    box.  I am going to talk to him.

8           You know what, actually -- are you bringing them

9    over?

10          THE COURT OFFICER:  Yes.

11          THE COURT:  Bring them over.  I would like to

12   speak to Mr. Pascarella in the courtroom, just him.  He is

13   in Seat Number 1.

14          The issue with Number 1, as I understand it, is

15   can he evaluate police testimony fairly.  The People's

16   position is no.

17          MR. REEVES:  Correct.

18          THE COURT:  I assume.  And I gather,

19   Ms. Guastella, you think you might have rehabilitated him

20   in terms of his ability to do what?

21          MS. GUASTELLA:  He would be fair.  He would

22   listen to the evidence.  He could be fair.

23          THE COURT:  I am not sure he has been

24   rehabilitated in terms of police testimony, but what I will

25   do is bring him in and ask him a couple of questions.  If

Jury Selection

1    either side wants to ask him further questions, go right

2    ahead.

3              (Short pause in proceedings.)

4              (Mr. Pascarella enters courtroom.)

5              THE COURT:  Mr. Pascarella, right?  I just wanted

6    to ask you a question or two.

7              If you were selected as a juror in this case, do

8    you think you could be fair and impartial to both sides?

9              A PROSPECTIVE JUROR:  Fair and -- yeah.  Yes.

10             THE COURT:  Let me ask you again about police

11   officer testimony.  As you know from the witness list I

12   read, the jury in this case is going to hear from police

13   officers and detectives.

14             A PROSPECTIVE JUROR:  Yeah.

15             THE COURT:  What do you think about that?  Could

16   you evaluate a police witness' testimony fairly and

17   impartially as would you any other witness or not?

18             Be honest.  I know I don't have to tell you that,

19   but we want to know how you feel.  It is important.

20             A PROSPECTIVE JUROR:  No.

21             THE COURT:  No?

22             A PROSPECTIVE JUROR:  No.

23             THE COURT:  Any questions, counsel?

24             MS. GUASTELLA:  No.

25             MS. CILIA:  No, your Honor.

Jury Selection

1           THE COURT:  What I am going to do,

2    Mr. Pascarella, is let you step out.  The lawyers and I are

3    going to talk for another couple of minutes and then we are

4    going to bring everybody back in.  So you can step out and

5    I will see you shortly.  Thank you very much.

6           A PROSPECTIVE JUROR:  No problem.

7           (Mr. Pascarella leaves courtroom.)

8           THE COURT:  Okay.  He has left.  Any further

9    discussion on this cause challenge?

10          MS. GUASTELLA:  No, Judge.

11          THE COURT:  All right.  I will grant the People's

12   cause challenge as to Mr. Pascarella.

13          People, any other cause challenges up to and

14   including Seat 12?

15          MR. REEVES:  Number 4, Mr. Conniff, your Honor.

16          MS. GUASTELLA:  No objection.

17          THE COURT:  Okay.  May I mark that as cause on

18   consent?

19          MS. GUASTELLA:  Yes.

20          THE COURT:  For cause on consent, Number 4,

21   Mr. Conniff.

22          MR. REEVES:  And Number 8, Mr. Taber.

23          MS. GUASTELLA:  On consent, Judge.

24          THE COURT:  Number 8 on consent, Mr. Taber, for

25   cause.

```
 1            MR. REEVES:  The People have no further
 2     challenges for cause.
 3            THE COURT:  Defense, any cause challenges up
 4     through and including Seat 12?
 5            MS. GUASTELLA:  Miss Trimboli.  I asked her the
 6     fact we got this far, does that mean that --
 7            THE COURT:  I am sorry?
 8            MS. GUASTELLA:  The fact we got this far, does
 9     that mean Mr. Skrine must have did something wrong, and she
10     said that she does tend to think he must have done
11     something wrong.
12            THE COURT:  People?
13            MR. REEVES:  I would oppose that, your Honor.  I
14     don't think it rises to the level of a challenge for cause.
15            THE COURT:  Shall I bring her in?  Let's bring in
16     Miss Trimboli, Seat Number 6.
17            (Ms. Trimboli enters courtroom.)
18            THE COURT:  Miss Trimboli, I just wanted to ask
19     you a question.
20            Is it or is it not your feeling that since we
21     have gotten to this stage of the proceeding, as we are
22     beginning jury selection in a criminal trial, is it or is
23     it not your feeling that Mr. Skrine, the defendant, must
24     have done something wrong?  Answer me truthfully, please.
25            A PROSPECTIVE JUROR:  I did say that before that
```

1    you would think that.  You would think that.  But he is

2    entitled to a fair trial.

3              THE COURT:  It is important.

4              A PROSPECTIVE JUROR:  Like everybody else.

5              THE COURT:  It is important I know what, if any,

6    effect, if you were selected here, this would have on your

7    ability to be fair and impartial.  If you are feeling as

8    you think he must have done something wrong, maybe your

9    mindset is wrong for this case.  On the other hand, if you

10   can accept the law in terms of presumption of innocence and

11   wash that feeling out of your mind and be completely open,

12   that's another story.

13             I want you to tell me how you feel because it's

14   very important that we know that.  So don't hold back.

15             A PROSPECTIVE JUROR:  Well, it is the first thing

16   that came out of my mouth so I don't know.  I guess it's

17   how I feel.  It's the first thing that came out of my

18   mouth, but at the same time I didn't finish it by saying

19   but everyone's entitled to a fair trial.

20             THE COURT:  Okay.

21             A PROSPECTIVE JUROR:  You know?

22             THE COURT:  Counsel, any questions?

23             A PROSPECTIVE JUROR:  That's how I feel.

24             MR. REEVES:  Miss Trimboli, remember before when

25   I said if we don't prove beyond a reasonable doubt the

1    defendant's guilt what would you have to do as a juror?

2              A PROSPECTIVE JUROR:  Could you repeat that?

3              MR. REEVES:  Sure.  When I was talking to the

4    group before I said if the prosecution, Miss Cilia and I,

5    don't prove beyond a reasonable doubt with evidence the

6    defendant was guilty, what would a juror have to vote?

7              A PROSPECTIVE JUROR:  Not guilty.

8              MR. REEVES:  And could you do that?

9              A PROSPECTIVE JUROR:  Of course.  If it's -- if I

10   feel that, you know, you didn't prove that.  Of course.

11             MR. REEVES:  Conversely, if it is proven with

12   evidence you would have to vote guilty.

13             A PROSPECTIVE JUROR:  Yes.

14             MR. REEVES:  Would you have any problem putting

15   aside -- you know, when you were asked the question since

16   we have gotten to a trial do you think he must have done

17   something wrong, when you answered yes --

18             A PROSPECTIVE JUROR:  It sounded kind of harsh

19   but I think it is the first thing that would pop into

20   anyone's mind but --

21             MR. REEVES:  Does the defendant start this trial

22   presumed innocent?  That is, the standard that is --

23             A PROSPECTIVE JUROR:  It has to be, of course.

24             MR. REEVES:  Thank you, Miss Trimboli.

25             I have no further questions, your Honor.

Jury Selection

1          THE COURT:  Okay.  I will let you step out.  We

2     are going to bring everybody back in a minute or two.

3               (Miss Trimboli leaves courtroom.)

4          THE COURT:  Okay.  She has stepped out.  Any

5     argument?

6          MR. REEVES:  I would rest on the record, your

7     Honor.

8          MS. GUASTELLA:  No argument.

9          THE COURT:  You are maintaining your challenge.

10          MS. GUASTELLA:  Yes.

11          THE COURT:  I am going to grant the cause

12     challenge.  I think she is equivocal, and the Court of

13     Appeals has made it clear that equivocation should be

14     cleared up.  So I will grant that cause challenge.

15          Any other cause challenges?  That's Number 6,

16     Anthony.

17          THE CLERK:  Yes, sir.

18          THE COURT:  Any other, defense?

19          MS. GUASTELLA:  To Number 12, no.

20          THE COURT:  People, peremptory challenges up to

21     and including Seat 12.

22          MR. REEVES:  Number 2, Miss Ogofa.  That is it,

23     your Honor.

24          THE COURT:  Defense?  Peremptory challenge up

25     through and including Seat 12.

Jury Selection

1           MS. GUASTELLA:  Mr. Chen, Miss Gentile,

2      Mr.  Minogue.  That's it.

3           THE COURT:  That's it?  Okay.  So stay with me,

4      everybody.  Seat Number 5, Miss Gronock, becomes Juror 1;

5      Seat Number 7, Miss Bernard, becomes Juror 2; Seat

6      Number 10, Mr. George, becomes Juror 3; and Seat Number 12,

7      Mr. Connolly, becomes Juror 4.  Agreed?

8           MS. GUASTELLA:  Yes, Judge.

9           MS. CILIA:  Yes.

10          THE COURT:  Let's do the remaining four, 13, 14,

11     15 and 16.

12          Cause, People?

13          MR. REEVES:  No challenges for cause, your Honor.

14          MS. GUASTELLA:  None for cause.

15          THE COURT:  Peremptory, People?

16          MR. REEVES:  Number 14, Miss Diez.  I have no

17     further challenges.

18          THE COURT:  Peremptory, defense?

19          MS. GUASTELLA:  Miss Cummings and Miss Yonko.

20          THE COURT:  So Seat Number 15, Miss Hamilton,

21     becomes Juror Number 5.  Agreed?

22          MS. GUASTELLA:  Yes.

23          MR. REEVES:  Yes.

24          THE COURT:  Okay.  We could bring them in.  We

25     are going to swear in those five people and we agreed I am

1   going to tell them to come back Monday for the commencement

2   of the trial?

3                MS. GUASTELLA:  Yes.

4                THE COURT:  You think there is any point in

5   talking about sooner?  I mean I am not going to fight you

6   on this because I agreed to it yesterday, I think, or some

7   time ago.

8                MR. REEVES:  We have been planning for Monday for

9   witnesses so...

10               THE COURT:  All right.  Of course, that means

11  these people are going to be leaving, if you agree, on

12  Wednesday afternoon, we won't see them again until Monday

13  morning, which is fine with me, as long as you all agree.

14               MS. GUASTELLA:  That is okay.

15               THE COURT:  So both sides agree I will swear them

16  in at least until Monday morning.  Is that right?

17               MS. GUASTELLA:  Yes, Judge.

18               MS. CILIA:  Yes.

19               THE COURT:  All right, fine.

20               MS. GUASTELLA:  At some point you will instruct

21  them that if they see us on the street, if we don't say

22  hello we are not being rude.

23               THE COURT:  I usually do that if the lawyers want

24  me to in my preliminary instructions.  Is that all right?

25               MS. GUASTELLA:  That's fine.

1          THE COURT:  We could bring them in, Vito.

2          (Prospective jurors enter courtroom.)

3          THE CLERK:  When I say your name, just remain

4   seated.  The people in the box, the rest of the people in

5   the box just step to the court officer.

6          Tabitha Gronock, Andrea Bernard, Jerit George,

7   Ryan Connolly and Jennifer Hamilton, please remain seated.

8   Everyone else, please rise and step out of the box.

9          (Challenged jurors leave courtroom.)

10          THE COURT:  Thank you.

11          THE CLERK:  Are the jurors satisfactory to the

12   People?

13          MS. CILIA:  Yes.

14          THE CLERK:  Are the jurors satisfactory to the

15   defendant?

16          MS. GUASTELLA:  Yes.

17          (Five jurors sworn.)

18          THE COURT:  Thank you.  You could have a seat.  I

19   am going to give you some instructions and let you go.

20          As I said earlier, our plan is to start the trial

21   proper -- that is, with opening statements, preliminary

22   instructions and testimony -- Monday morning.  So we are

23   going to excuse you until Monday morning.  We would like

24   you to be back at 9:30 Monday morning in the jury room.

25   The jury room is right across the hall.  The officers will

1    show you where it is on your way out.  And we should be

2    ready to go by then.  Let me, as I am required to, give you

3    some instructions before you go.

4              First of all, do not converse amongst yourselves

5    or with anyone else about anything related to this case.

6              Secondly, prior to being discharged, don't speak

7    to anyone about taking anything, any payment or benefit, in

8    return for supplying information concerning this trial.

9              Third, you must promptly report directly to me

10   any incident within your knowledge involving an attempt by

11   any person to improperly influence you or any member of the

12   jury.

13             Fourth, do not visit or view the premises or

14   place where any charged crime was allegedly committed or

15   any other premises or place involved in the case.  I don't

16   think you have heard any locations yet.  You will.

17             Fifth, don't read through or listen to any media

18   accounts of this case, should there be any.  And that

19   includes the internet.

20             And, finally, don't attempt to research any facts

21   at issue or law related to this case, whether by discussion

22   with others, by researching in the library, on the internet

23   or by any other means or source.

24             Thank you very much.  Have a good day and

25   weekend, and we will see you Monday morning, 9:30.  They

Jury Selection

1    will show you the jury room on the way out.

2              (Five sworn jurors leave courtroom.)

3              THE COURT:  Counselor, do you want to stay with

4    16 or 20?

5              MR. REEVES:  Sixteen is fine.

6              MS. GUASTELLA:  Yes.

7              THE COURT:  Both of you agree?  Okay, 16.

8              THE CLERK:  When you hear your name, please step

9    up to the box.

10             Carmela, C-A-R-M-E-L-A, last name

11   B-A-L-E-S-T-R-I-E-R-I, Seat Number 1; Rosemary Runer,

12   R-U-N-E-R, Seat Number 2; Lisa Podeszwa, P-O-D-E-S-Z-W-A,

13   Seat Number 3; William Smith, S-M-I-T-H, Seat Number 4;

14   Maureen Finegan Silvestri, F-I-N-E-G-A-N,

15   S-I-L-V-E-S-T-R-I, Seat Number 5; Susan Sparacio,

16   S-P-A-R-A-C-I-O, Seat Number 6; Gerald Hart, H-A-R-T, Seat

17   Number 7; Denise Moran, M-O-R-A-N, Seat Number 8; Paul

18   Gottlieb, G-O-T-T-L-I-E-B, Seat Number 9; Edward

19   P-R-A-Z-D-N-I-K, Seat Number 10; Pratap Pakala, P-A-K-A-L-A

20   is the last name, first name P-R-A-T-A-P, Seat Number 11;

21   Jennifer Roman, R-O-M-A-N, Seat Number 12; Joel Rubin,

22   R-U-B-I-N, Seat Number 13; Tyrone Walker, W-A-L-K-ER, Seat

23   Number 14; Rawan Husein, H-U-S-E-I-N, first name R-A-W-A-N,

24   Seat Number 15; Annessa Freesmith, A-N-N-E-S-S-A first

25   name, last name F-R-E-E-S-M-I-T-H, Seat Number 16.

1           THE COURT:  My questions don't change so things

2       usually go a little quicker the second time through.

3               Do any of you think you know anything about this

4       case apart from what you heard here in court today?

5               ...Ms. Balestrieri, you think you heard something

6       about it?

7               A PROSPECTIVE JUROR:  I read about it, I think.

8               THE COURT:  Hold that thought.  I am going to

9       talk to you privately in a minute.  In the Advance, you

10      think?

11              A PROSPECTIVE JUROR:  Yes.

12              THE COURT:  Okay.  I saw another hand.

13              Mr. Smith?  Same thing?

14              A PROSPECTIVE JUROR:  Same thing.

15              THE COURT:  Okay.  We are going to talk to you

16      both at the side-bar shortly.

17              Anyone else?

18              ...I read a list of potential witnesses and names

19      that may come up during the course of the trial this

20      morning.  Did you all hear me when I read those names?

21              The question is do any of you recognize any of

22      those names?

23              ...I have introduced the lawyers and the

24      defendant to you.  Do any of you know any of them?

25              ...Have any of you or anyone close to you ever

1  worked for or do you now work for law enforcement in any

2  capacity?

3                    Ms. Balestrieri.

4                    A PROSPECTIVE JUROR:  My nephew is a police

5  officer.  He was on Staten Island, now he is in Manhattan.

6                    THE COURT:  N.Y.P.D.

7                    A PROSPECTIVE JUROR:  Yes.

8                    THE COURT:  Anything about his job that would

9  prevent you from being fair?

10                   A PROSPECTIVE JUROR:  No.

11                   THE COURT:  Other hands?  I will stay with the

12  first row.

13                   Miss Sparacio.

14                   A PROSPECTIVE JUROR:  Sparacio.

15                   THE COURT:  Beg your pardon.  Who do you know in

16  law enforcement?

17                   A PROSPECTIVE JUROR:  My husband's retired NYPD,

18  father-in-law is retired, my husband's retired, my cousin

19  and brother-in-law are active.

20                   THE COURT:  All New York City Police Department.

21                   A PROSPECTIVE JUROR:  Yes.

22                   THE COURT:  Same question:  Anything about these

23  relationships individually, collectively, whatever, that

24  would prevent you from being a fair juror in a criminal

25  trial?

1          A PROSPECTIVE JUROR:  Potentially.

2          THE COURT:  Beg your pardon?

3          A PROSPECTIVE JUROR:  Potentially.  Potentially.

4          THE COURT:  Is this based on perhaps discussions

5     you have had with your relatives?

6          A PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Okay.  I will let the lawyers follow

8     up on that if they want to.

9          Mr. Hart, did you raise your hand?

10         A PROSPECTIVE JUROR:  Yes.  Brother-in-law,

11    sister and godson.

12         THE COURT:  What do you think?  Same question.

13    Would it have any bearing on your ability to be fair?

14         A PROSPECTIVE JUROR:  No.

15         THE COURT:  Let me go to the second row.

16    Anybody?

17         Miss Husein.

18         A PROSPECTIVE JUROR:  Yes.  No.  My cousin, but

19    no.  It wouldn't.

20         THE COURT:  Wouldn't affect your ability to be

21    fair.  Thank you.

22         Anyone else?

23         ...Any of you, anyone close to you, involved in

24    the legal field in any way as a lawyer, paralegal, employee

25    of a law firm, a D.A.'s office, anything of that sort?

Jury Selection

1              Ms. Finegan Silvestri.

2              A PROSPECTIVE JUROR:  I am a freelance court

3       reporter.

4              THE COURT:  You are.  Okay.  What county are you

5       working in?

6              A PROSPECTIVE JUROR:  I freelance for various

7       companies.

8              THE COURT:  All over.

9              A PROSPECTIVE JUROR:  Yes.

10             THE COURT:  Have you ever worked on criminal

11      trials?

12             A PROSPECTIVE JUROR:  No.

13             THE COURT:  Grand Jury?

14             A PROSPECTIVE JUROR:  No.

15             THE COURT:  Anything about your occupation,

16      background, training, experience that would prevent you

17      from being a fair juror?

18             A PROSPECTIVE JUROR:  I think so.

19             THE COURT:  Based on your experiences.

20             A PROSPECTIVE JUROR:  Yes.

21             THE COURT:  In, what, civil trials?

22             A PROSPECTIVE JUROR:  Just freelancing, just

23      hearing different things, different cases.

24             THE COURT:  Are you talking about EBTs?

25             A PROSPECTIVE JUROR:  Yes, EBTs depositions.

Jury Selection

1       THE COURT:  EBT's depositions.

2       A PROSPECTIVE JUROR:  Yes.

3       THE COURT:  That would prevent you from being a

4  fair juror.

5       A PROSPECTIVE JUROR:  I think it would.

6       THE COURT:  Okay.

7       Anyone else?  On this question?

8       ...Have any of you or anyone close to you, to

9  your knowledge, ever been the victim of a crime?

10      Miss Balestrieri, can you tell me about it.

11      A PROSPECTIVE JUROR:  My nephew was mugged for

12 his IPhone about eight months ago.

13      THE COURT:  Was anybody arrested?

14      A PROSPECTIVE JUROR:  No.  No, because he was

15 afraid to testify.

16      THE COURT:  So there were no court proceedings.

17      A PROSPECTIVE JUROR:  No.

18      THE COURT:  Anything about that event that would

19 prevent you from being fair in this case?

20      A PROSPECTIVE JUROR:  No.

21      THE COURT:  Thank you.

22      Anyone else on this question?

23      ...Have any of you ever been a litigant -- that

24 is, a plaintiff or defendant -- in any kind of a civil

25 action or civil lawsuit?

1             ...Have any of you ever been a witness in any

2     kind of a courtroom proceeding or Grand Jury proceeding?

3             ...Have any of you or anyone close to you, to

4     your knowledge, ever been a defendant in any kind of a

5     criminal proceeding?

6                   We could speak privately.

7                   Ms. Roman; right?

8                   A PROSPECTIVE JUROR:  Yeah.

9             THE COURT:  Do you want to talk privately about

10    that?

11                  A PROSPECTIVE JUROR:  Yeah.

12            THE COURT:  Okay.  We will get to you shortly.

13                  Anyone else?

14            ...Have any of you ever served on a jury before?

15                  Mr. Prazdnik.

16                  A PROSPECTIVE JUROR:  Yes.

17            THE COURT:  Can you tell me when, sir,

18    approximately?

19                  A PROSPECTIVE JUROR:  Nine years ago?

20            THE COURT:  Was it a criminal or civil case?

21                  A PROSPECTIVE JUROR:  Criminal.

22            THE COURT:  Just yes or no, please:  Did the jury

23    reach a verdict?

24            A PROSPECTIVE JUROR:  I don't know.  I was an

25    alternate.

Jury Selection

1          THE COURT:  Okay.  Was there anything about that

2     experience as an alternate nine years ago that would

3     prevent you from serving as a juror in this case?

4               A PROSPECTIVE JUROR:  No.

5               THE COURT:  Thank you.  Anyone else?

6               Mr. Runer.

7               A PROSPECTIVE JUROR:  Runer.  It was as an

8     alternate.

9               THE COURT:  How long ago?

10              A PROSPECTIVE JUROR:  About two years ago.

11              THE COURT:  Was it a criminal or civil case?

12              A PROSPECTIVE JUROR:  It was criminal.  It was

13    the Federal Court in Brooklyn.

14              THE COURT:  Federal Court in Brooklyn.  Are you

15    sure it was two years ago?

16              A PROSPECTIVE JUROR:  It was about two.

17              THE COURT:  Okay.  And you didn't deliberate, I

18    guess.  You were an alternate.

19              A PROSPECTIVE JUROR:  No, we were dismissed

20    before they decided.

21              THE COURT:  Okay.  Anyone else?

22              A PROSPECTIVE JUROR:  I was.

23              THE COURT:  Okay.  I will stay with Ms. -- I am

24    sorry.

25              A PROSPECTIVE JUROR:  Don't.  Just say my first

Jury Selection

1    name.

2              THE COURT:  What's your first name?

3              A PROSPECTIVE JUROR:  Lisa.

4              THE COURT:  I didn't write it down.

5              A PROSPECTIVE JUROR:  Lisa.

6              THE COURT:  Thank you very much, Lisa.

7              When were you a juror?  How long ago?

8              A PROSPECTIVE JUROR:  About eight years ago.

9              THE COURT:  Do you remember if it was a criminal

10   or civil case?

11             A PROSPECTIVE JUROR:  Criminal.

12             THE COURT:  Just yes or no, please:  Did the jury

13   reach a verdict?

14             A PROSPECTIVE JUROR:  Yes.

15             THE COURT:  Was there anything about that

16   experience that would prevent you from being able to serve

17   in this case?

18             A PROSPECTIVE JUROR:  No.

19             THE COURT:  Anyone else?

20             Mr. Hart.  When?

21             A PROSPECTIVE JUROR:  Six years ago.

22             THE COURT:  Criminal or civil?

23             A PROSPECTIVE JUROR:  I am not sure.

24             THE COURT:  You are not sure.  Didn't leave much

25   of an impression.

Jury Selection

1    A PROSPECTIVE JUROR:  It has been awhile.  It was

2    a family matter.  It was a dispute.

3    THE COURT:  Okay.  Was there anything about that

4    jury experience that would prevent you from serving here?

5    A PROSPECTIVE JUROR:  No.

6    THE COURT:  Thank you.

7    Anyone else?

8    ...Have any of you ever served on a Grand Jury

9    before?

10    ...Okay.  What I am going to do now is, as I did

11    before, go down the list here from 1 through 16 and I am

12    going to ask you if you are employed, what you do for a

13    living.  If you are not employed, just tell me that.

14    Miss Balestrieri, are you employed?

15    A PROSPECTIVE JUROR:  Yes.  Manager of a book

16    store.

17    THE COURT:  Thank you.

18    Miss Runer.

19    A PROSPECTIVE JUROR:  Employed; work as a

20    secretary.

21    THE COURT:  Thank you.

22    Lisa.

23    A PROSPECTIVE JUROR:  Unemployed.

24    THE COURT:  Thank you.

25    Mr. Smith.

Jury Selection

1    A PROSPECTIVE JUROR:  Employed for the financial

2    district.

3              THE COURT:  Thank you.

4              Miss Finegan Silvestri.

5              A PROSPECTIVE JUROR:  Court reporter.

6              THE COURT:  Right.  You told me.  Thanks.

7              Miss Sparacio.

8              A PROSPECTIVE JUROR:  Human resources

9    coordinator.

10             THE COURT:  Thank you.

11             Mr. Hart.

12             A PROSPECTIVE JUROR:  Retired.

13             THE COURT:  From what, please?

14             A PROSPECTIVE JUROR:  Post office.

15             THE COURT:  Thank you.

16             Miss Moran.

17             A PROSPECTIVE JUROR:  Financial institution.

18             THE COURT:  Thank you.

19             Mr. Gottlieb.

20             A PROSPECTIVE JUROR:  Fire and life safety

21    director.

22             THE COURT:  Mr. Prazdnik.

23             A PROSPECTIVE JUROR:  Employed, New York City

24    Transit.

25             THE COURT:  Thank you.

Jury Selection

 1              Mr. Pakala.

 2              A PROSPECTIVE JUROR:  Pakala

 3              THE COURT:  I beg your pardon.  Are you employed?

 4              A PROSPECTIVE JUROR:  Self-employed.

 5              THE COURT:  What type of work?

 6              A PROSPECTIVE JUROR:  We do on-line sales.

 7              THE COURT:  Thank you.

 8              Miss Roman.

 9              A PROSPECTIVE JUROR:  City employee's union.

10              THE COURT:  Thank you.

11              Mr. Rubin.

12              A PROSPECTIVE JUROR:  Factory manager.

13              THE COURT:  Thank you.

14              Mr. Walker.

15              A PROSPECTIVE JUROR:  I do floors in the

16     hospital.

17              THE COURT:  Thank you.

18              Miss Husein.

19              A PROSPECTIVE JUROR:  Tutor in an after-school

20     program.

21              THE COURT:  Thank you.

22              Miss Freesmith.

23              A PROSPECTIVE JUROR:  Station agent for New York

24     City Transit.

25              THE COURT:  Okay.  Thank you all for that

1    information.

2            Let me go through these principles of law again.

3    You have heard them once already so I am going to

4    paraphrase where I can.  But just keep in mind the idea

5    here is to find out if you can all assure us you will

6    follow and accept these rules.  If you cannot, please tell

7    us.  It is important we know.

8            As you now know, if you didn't before, an

9    indictment is evidence of nothing.  The mere fact that a

10   defendant has been indicted is, as I say, evidence of

11   nothing.  In particular, it is not evidence of guilt.

12           Is there anyone here who cannot accept this

13   proposition in our criminal law?

14           If selected as a juror here you would be called

15   upon to deliberate at the end of the trial with 11 other

16   people in the jury room in an effort to reason together and

17   arrive at a unanimous verdict or verdict.

18           Do any of you feel you could not deliberate with

19   11 other people if called upon to do so?

20           ...Under our law everyone accused of a crime and

21   brought to trial is presumed innocent unless or until he is

22   proved guilty beyond a reasonable doubt.  The defendant in

23   this case is presumed innocent and, to put this another

24   way, a defendant is never required to prove his innocence.

25   On the contrary; the People, represented by the District

1     Attorney, having accused the defendant of the crimes

2     charged, have the burden of proving him guilty beyond a

3     reasonable doubt.  The People carry this burden of proof

4     throughout the trial.  It never shifts.  It always remains

5     on the People, and the presumption of innocence remains

6     with every defendant throughout every criminal trial.

7                Is there anyone amongst you who cannot now in

8     your own mind grant the defendant this presumption of

9     innocence?

10               ...On the burden of proof issue.  Again, as I

11    said, in the criminal case the burden of proof is entirely

12    on the People and remains on them throughout the trial.  A

13    defendant is not required to prove anything, nor is a

14    defendant required to disprove anything.  As I say, the

15    entire burden of proof is on the People and remains on them

16    throughout the trial.

17               Is there anyone amongst you who cannot accept and

18    follow this fundamental rule in our criminal law?

19               ...If a defendant does not testify in a criminal

20    trial, that is not a factor from which any inference

21    unfavorable to such defendant may be drawn.  Is there

22    anybody who cannot accept this rule in our criminal law?

23               ...I defined earlier today the standard of proof

24    required for conviction in every criminal case.  That

25    standard, as you now know, if you didn't before, is called

1   proof of guilt beyond a reasonable doubt.  Did all of you

2   hear that definition when I read it earlier today?

3           I am getting nods.  Would anybody like me to read

4   it again?  I am happy to if anybody wants me to.

5           ...I am getting no takers.  Okay.  Keep that

6   definition in mind.

7           Let me remind you, it is the duty of each juror

8   carefully to review, weigh and consider all the evidence in

9   the case.  If after doing so you find that the People have

10   not proved the defendant's guilt beyond a reasonable doubt

11   as I defined the term earlier, then you must find the

12   defendant not guilty.

13           On the other hand, if you are satisfied that the

14   People have proved the defendant's guilt beyond a

15   reasonable doubt as I defined that term earlier, then you

16   must find the defendant guilty.

17           Will you promise us now that, if selected as a

18   juror in this case, you will in your final deliberations

19   follow and apply the standard of proof that I have defined

20   for you; that is, proof beyond a reasonable doubt?  Is

21   there anyone amongst you who cannot make us that promise?

22           ...Thank you.

23           I will remind you if you didn't know before that

24   a deliberating jury is not permitted to consider the

25   subject of punishment.  If there is to be any sentencing

1     following a verdict, that's for the Court and the Court

2     alone to deal with.  The jury has no role to play in that.

3            Will you promise us now that if you are selected

4     as a juror here you will render your verdict free from

5     fear, favor or sympathy and without considering any

6     possibility of sentence or punishment?  Is there anybody

7     who cannot make us that promise?

8            ...And, lastly, that police officer issue.

9     Police officers will testify in this case.  They take the

10    same oath as anyone else.  The mere fact that a witness is

11    a police officer does not make that witness any more or any

12    less credible.

13           Is there anyone amongst you who has any feelings

14    about the police or who has had any experiences with the

15    police which would lead you to give a police officer's

16    testimony greater or lesser weight than anyone else's

17    merely because of the officer's occupation?

18           Anybody have that feeling one way or the other?

19           Mr. Gottlieb, what do you think?

20           A PROSPECTIVE JUROR:  Yes.  I am a retired

21    captain in the Fire Department.  I have a lot of policeman

22    under my control.  I am more apt to agree with what they

23    say as a witness.

24           THE COURT:  Would this be the case even if you

25    didn't know the individual officer?

Jury Selection

1      A PROSPECTIVE JUROR:  As a general statement I

2  would say I would still go along with what they say.

3      THE COURT:  Okay.  I think I saw another hand.

4      Miss Roman?

5      A PROSPECTIVE JUROR:  I have never had anything

6  directly, but my family has had run-ins with the police and

7  I just feel like I would feel less.

8      THE COURT:  Less.  Would this be the case, Miss

9  Roman, even if you didn't personally know the officer?

10     A PROSPECTIVE JUROR:  Yes.

11     THE COURT:  Just because of the occupation.

12  Okay.

13     Anyone else on this question?

14     Mr. Smith.

15     A PROSPECTIVE JUROR:  Yes.  I know you are going

16  to ask this question later.  I run all the soccer here on

17  Staten Island and I have a lot of friends who are police

18  officers, and they are in my league, and I --

19     THE COURT:  Is that good or bad?

20     A PROSPECTIVE JUROR:  Could be bad sometimes.

21     THE COURT:  Sometimes bad, sometimes good.

22     A PROSPECTIVE JUROR:  Sometimes good.  You know

23  what --

24     THE COURT:  That sounds like a balanced thing.

25     A PROSPECTIVE JUROR:  I don't know, I don't know,

1     you know?  I don't know how I would feel about being --

2     some are friends and some are enemies but...

3                 THE COURT:  Okay.  You didn't recognize the names

4     of any of the officers I read.

5                 A PROSPECTIVE JUROR:  I don't think so.

6                 THE COURT:  What I am supposed to do if I can is

7     to try to get an unequivocal response on various issues.  I

8     don't know if I can get an unequivocal response from you,

9     but what I would like you to be able to say, if you can --

10    and if you can't you can't -- is, yes, I will evaluate a

11    police witness' testimony as I would anyone else's or, no,

12    I could not evaluate a police witness as I would anyone

13    else.

14                Can you give me an answer one way or the other or

15    not?  If you can't, you can't.

16                A PROSPECTIVE JUROR:  No.

17                THE COURT:  Okay.  That is no, I can't give you

18    an answer.

19                A PROSPECTIVE JUROR:  Can't give you an answer.

20                THE COURT:  Okay, fine.  I will let the lawyers

21    talk to you further if they want to.

22                Anybody else on this question?

23                ...Okay.  We are going to step to the side and

24    talk to a couple of people and then I will let the lawyers

25    get back to you.

Jury Selection

1          (The following takes place at side bar, outside

2     the presence of the jurors.)

3          (Miss Balestrieri approaches the side-bar.)

4          THE CLERK:  Carmela Balestrieri,

5     B-A-L-E-S-T-R-I-E-R-I.

6          THE COURT:  What do you think you remember

7     reading in the Advance?

8          A PROSPECTIVE JUROR:  About the shooting.

9          THE COURT:  Can you give me any details?

10          A PROSPECTIVE JUROR:  Just like a cold-blooded

11     on-the-street type of thing?

12          THE COURT:  Are you sure we are talking about the

13     same matter?

14          A PROSPECTIVE JUROR:  I am not sure but I

15     remember the name Williams.

16          THE COURT:  How long ago do you recall reading

17     this?

18          A PROSPECTIVE JUROR:  Oh, it was awhile ago.

19          THE COURT:  If you were selected as a juror in

20     this case, could you put aside whatever little bit

21     apparently you remember from the Advance?

22          A PROSPECTIVE JUROR:  Oh, yeah.

23          THE COURT:  And decide the case only on what you

24     hear in the courtroom?

25          A PROSPECTIVE JUROR:  Yeah.

Jury Selection

1          THE COURT:  You can assure us of that.

2          A PROSPECTIVE JUROR:  Yeah, I think so.

3          THE COURT:  That is how people speak, I

4     understand, but what we are looking for, if you can give

5     it, is an unequivocal assurance.  Put whatever --

6          A PROSPECTIVE JUROR:  I don't know.  The answer

7     is I don't know.  I don't know.

8          THE COURT:  Counselor, any questions?

9          ...Okay, thank you, ma'am.  I will let you resume

10    your seat.

11          (Miss Balestrieri returns to her seat.)

12          MR. REEVES:  I did want to bring to the Court's

13    attention when Miss Cilia and I were walking back during

14    the lunch break Mr. Hart, Number 7, approached us and we

15    didn't talk with him, but he asked if I was Dan Donovan.

16          THE COURT:  He thought you were Dan Donovan?

17          MR. REEVES:  Yes.  I just wanted to put that on

18    the record.

19          (Mr. Smith approaches the side-bar.)

20          THE CLERK:  William Smith, your Honor.

21          THE COURT:  Do you remember what you read in

22    the -- was it the Advance?

23          A PROSPECTIVE JUROR:  I remember the victim's

24    name in the Advance.  I remember the name clear as day as

25    soon as you said it this morning.  Correct.

Jury Selection

1     THE COURT:  Do you remember anything else about

2  the article?

3     A PROSPECTIVE JUROR:  Just it was a dispute

4  between the two of them and he ended up shooting him.  I do

5  remember that.

6     THE COURT:  If you were selected here as a juror,

7  could you keep the Advance out of your mind and just --

8     A PROSPECTIVE JUROR:  I could keep the Advance

9  out of my mind but I don't feel comfortable, your Honor,

10  honestly.

11     THE COURT:  Based on the other thing we talked

12  about.

13     A PROSPECTIVE JUROR:  The other thing being I am

14  so active in the borough here.  I have five children.  He

15  is writing names down all day and everything.  I don't feel

16  comfortable right now sitting here.

17     THE COURT:  Okay.  Counselor, any questions?

18     MS. GUASTELLA:  No.

19     MS. CILIA:  No.

20     THE COURT:  All right.  Thank you, sir.  I will

21  let you resume your seat.

22     (Mr. Smith resumes his seat and Miss Roman

23  approaches the side-bar.)

24     THE CLERK:  This is Jennifer Roman, R-O-M-A-N.

25     THE COURT:  You know somebody who is a defendant.

Jury Selection

1           A PROSPECTIVE JUROR:  My sister's husband just

2    got sentenced for 16 years in federal prison.

3           THE COURT:  This is your sister.

4           A PROSPECTIVE JUROR:  Sister's husband.

5           THE COURT:  Oh, I see.  Okay.  Was it here in New

6    York City Federal Court?

7           A PROSPECTIVE JUROR:  Yes.

8           THE COURT:  Did you go to any court proceedings?

9           A PROSPECTIVE JUROR:  I was at the whole trial.

10          THE COURT:  You were.

11          A PROSPECTIVE JUROR:  Yes.

12          THE COURT:  Is there anything about that trial

13   experience that would prevent you from being fair in this

14   case?

15          A PROSPECTIVE JUROR:  Yeah.  I don't feel like it

16   was -- his sentencing was fair.

17          THE COURT:  You think that would affect your

18   ability to be fair in this case.

19          A PROSPECTIVE JUROR:  Yeah.

20          THE COURT:  Counselor, any questions?

21          MS. GUASTELLA:  No.

22          MS. CILIA:  No.

23          THE COURT:  Okay.  Thank you, ma'am.  I will let

24   you resume your seat.

25          (Miss Roman resumes her seat.)

 1          THE COURT:  I would never tell a trial lawyer not

 2     to try to rehabilitate anyone, but some of these people are

 3     probably beyond that.  I am just saying you don't have to

 4     voir dire everyone.

 5          (The following takes place in open court.)

 6          THE COURT:  Okay.  I will let the lawyers speak

 7     to you now.  If they ask you anything you want to talk

 8     about privately, just let them know.

 9          MS. CILIA:  Good afternoon, everyone.  As you

10     have already heard, my name is Jennifer Cilia.  With me is

11     ADA Kyle Reeves, and together we are representing the

12     People of the State of New York in this case against the

13     defendant.  And a lot of the things that Mr. Reeves talked

14     about I am going to be reiterating with you.  I am going to

15     be talking with you about them again.

16          One of the things he was talking about was the

17     jury selection and how important it is, so I just wanted to

18     bring that up for a second and tell you that if you are

19     chosen as a juror in this case you are going to be doing a

20     lot of listening.  You are going to be listening to the

21     lawyers, you are going to be listening to the judge, you

22     are going to be listening obviously to the witnesses who

23     take the stand.  This is the only time in the entire case

24     that we actually get to speak to you and you get to talk to

25     us, so I really invite you to please talk to us, you know?

Jury Selection

1    If there is something you would rather say at the side-bar,

2    that's fine.  We can do that.  But I am just inviting you

3    to please speak your mind.  That is all that we are asking

4    for.  There are no right or wrong answers in this.

5         So Mr. Reeves talked a little bit about the types

6    of evidence that you are going to hear in this case.  I

7    just wanted to expand on that also.

8         He used the word circumstantial evidence.

9    Circumstantial evidence as opposed to direct evidence.  So

10   what exactly does that mean?

11        Direct evidence might be in a purse snatching

12   case somebody gets on the stand, points out and says that's

13   the person who did it.  I saw that person, he stole my

14   purse.  That's different than a circumstantial case.  There

15   is going to be no one in this case that we expect who is

16   going to take the stand, point to the defendant and say

17   that's the person who I saw shoot David Williams to death.

18        Mr. Prazdnik.

19        A PROSPECTIVE JUROR:  Yes.

20        MS. CILIA:  We are going to be using other types

21   of evidence.  We are going to be using witnesses who talk

22   about what they saw before the crime happened, we are going

23   to be bringing in experts who are going to talk about

24   evidence -- ballistic evidence from the murder weapon that

25   is linked to the defendant, we are going to talk about DNA

1    evidence.  If we prove circumstantially -- after you hear

2    all the evidence in this case, if we prove to your

3    satisfaction beyond a reasonable doubt the evidence in this

4    case through circumstantial evidence without anybody taking

5    the stand saying that's the man who did it, would you be

6    able to vote guilty in this case?

7              A PROSPECTIVE JUROR:  Yes.

8              MS. CILIA:  Mr. Rubin, do you agree with that?

9    Would you be able to do that, as well, or do you need

10   somebody to take that witness stand?

11             A PROSPECTIVE JUROR:  Being that it is murder, I

12   might need someone to take the stand, point it out.

13             MS. CILIA:  And point out the defendant as that

14   person.

15             If the evidence that we show you -- the weapon,

16   the DNA, the ballistics -- if those types of things point

17   to the defendant beyond a reasonable doubt as the person

18   who murdered David Williams, would you still hold us to a

19   higher standard and say I need somebody?

20             A PROSPECTIVE JUROR:  Being that it is murder, I

21   might.

22             MS. CILIA:  And does anybody else agree with

23   Mr. Rubin; that they would still need, even if we proved

24   the case beyond a reasonable doubt with what's called

25   circumstantial evidence -- and Judge Rooney is going to

1    tell you there is no one type of evidence that we need in

2    order to prove a case.  If we prove it circumstantially

3    beyond a reasonable doubt, then at that point it's your

4    duty to vote guilty.  If we don't prove beyond a reasonable

5    doubt, then obviously it is your duty to vote not guilty.

6              Is there anybody who agrees with Mr. Rubin that

7    they would require the prosecution to have a direct

8    evidence case here; somebody who takes that witness stand,

9    points to the defendant and says I saw that man shoot to

10   death David Williams?

11             Mr. Moran?  What do you think?

12             A PROSPECTIVE JUROR:  I could do it.

13             MS. CILIA:  Sorry, I couldn't hear you.

14             A PROSPECTIVE JUROR:  I could vote guilty if that

15   were the case, yes.

16             MS. CILIA:  So if we prove our case beyond a

17   reasonable doubt without somebody taking that stand,

18   pointing out the defendant as the person who shot to death

19   David Williams, you would be able to convict?

20             A PROSPECTIVE JUROR:  Yes.

21             MS. CILIA:  You wouldn't require anything else?

22             A PROSPECTIVE JUROR:  No.

23             MS. CILIA:  Ms. Freesmith, what do you think?

24             A PROSPECTIVE JUROR:  Same.

25             MS. CILIA:  Same?

Jury Selection

1    A PROSPECTIVE JUROR:  Uh-Hum.

2    MS. CILIA:  Miss Husein.

3    A PROSPECTIVE JUROR:  The same.

4    MS. CILIA:  Mr. Walker?

5    A PROSPECTIVE JUROR:  The same.

6    MS. CILIA:  Does anybody else here agree with

7    Mr. Rubin; they would need somebody to take that stand and

8    point out the defendant?

9    A PROSPECTIVE JUROR:  I might agree with him.

10   MS. CILIA:  Miss Roman.  Okay.

11   Something else that Mr. Reeves touched upon was

12   this issue of motive.  Everybody knows from TV, from just

13   general life, what motive is.  It is the reason why people

14   do things.

15   Under our law we are not required as the

16   prosecution to prove why.  We have to prove in this case

17   that the defendant killed to death David Williams on

18   purpose, but not why.  If we do that, if we prove beyond a

19   reasonable doubt that that defendant committed that crime

20   but we never talk about why, you never hear evidence about

21   that, will you still be able to vote guilty in this case?

22   Mr. Pakala?

23   A PROSPECTIVE JUROR:  Yes.

24   MS. CILIA:  Yes.  You might be wondering why this

25   might happen -- might have happened, but is anybody going

Jury Selection

1    to require us to prove that before they are satisfied to

2    vote guilty in this case?

3                Miss Podeszwa?

4                A PROSPECTIVE JUROR:  Yes.

5                MS. CILIA:  How did I pronounce your name?

6                A PROSPECTIVE JUROR:  Close.

7                MS. CILIA:  Miss Lisa.  Okay.

8                Anyone who disagrees?

9                Miss Runer.

10               A PROSPECTIVE JUROR:  No.

11               MS. CILIA:  What do you think?

12               A PROSPECTIVE JUROR:  I don't think you need to

13   show a motive.

14               MS. CILIA:  Okay.  Ms. Finegan Silvestri.

15               A PROSPECTIVE JUROR:  I think I would like to

16   hear why.

17               MS. CILIA:  You would like to hear why.

18               A PROSPECTIVE JUROR:  Yes.

19               MS. CILIA:  Ms. Sparacio?

20               A PROSPECTIVE JUROR:  Uh-Hum.

21               MS. CILIA:  What do you think?

22               A PROSPECTIVE JUROR:  No motive is necessary.

23               MS. CILIA:  Is there anyone who would require

24   that on this panel right now?

25               Okay.  I have a really talkative group here, I

Jury Selection

1   can tell.

2          Let's talk about the type of case that this is

3   for a second.  This is a murder case, as you have heard.

4   You haven't heard all the facts, obviously, about the case,

5   and we are not going to go through that right now, but the

6   fact this is that level type of case, a murder, okay?  Very

7   serious crime.  Is there anything about that that makes

8   somebody feel like they wouldn't be able to sit and vote in

9   this case?  Just raise your hands if you feel that way.

10         Okay.  Mr. Smith.

11         Anybody else who feels like, based on the type of

12  case that this is, they wouldn't be able to sit and hear

13  evidence and evaluate in this case?

14         Mr. Gottlieb.

15         A PROSPECTIVE JUROR:  I would say the burden

16  would have to be a little higher just because of the nature

17  of the crime.

18         MS. CILIA:  Okay.  So in this case the judge is

19  going to talk to you about the prosecution's burden, about

20  proof beyond a reasonable doubt.  Are you saying that you

21  would still hold us to a higher standard, or would you hold

22  us to what the judge -- what the law requires of us?

23         A PROSPECTIVE JUROR:  I understand what the law

24  requires, but I think human nature says, well, this is

25  based on severity of the consequences.  It would be an

Jury Selection

1    issue.

2                    MS. CILIA:  Does anybody else agree with

3    Mr. Gottlieb, that they would require something higher than

4    what the law requires?

5                    Yes.  Mr. Rubin.

6                    A PROSPECTIVE JUROR:  I agree with him.

7                    MS. CILIA:  You agree.

8                    Anyone else?

9                    No right or wrong answers here, so if anybody

10   else feels that way, please let us know.

11                   Is there anything else about this case that you

12   feel, whether it be personal feeling, political, religious,

13   anything whatsoever that makes you feel that you would not

14   be able to sit and deliberate, listen to the evidence and

15   vote in this case?

16                   Yes.

17                   A PROSPECTIVE JUROR:  I like religious, yeah.  I

18   don't think I would be able to do a murder case.

19                   MS. CILIA:  So you wouldn't be able to listen to

20   the evidence, evaluate it and then come to a decision?

21                   A PROSPECTIVE JUROR:  Yeah.

22                   MS. CILIA:  As to whether this person is guilty

23   or not guilty.

24                   A PROSPECTIVE JUROR:  Yeah.

25                   MS. CILIA:  Thank you, Miss Husein.

Jury Selection

1          Does anyone else agree with Miss Husein for

2     whatever reason it may be?

3          Yes.

4          A PROSPECTIVE JUROR:  I think I might feel

5     uncomfortable.  I really have to be shown thoroughly.

6          MS. CILIA:  Okay.  Now, you are sort of --

7     Mr. Gottlieb was talking a little bit about this, and I

8     just want to explore whether it is a similar thing for you.

9          We have a particular burden in this case.  Would

10    you hold us to a higher burden than what the law requires

11    of us to prove because it's a murder case?

12         A PROSPECTIVE JUROR:  You would have to

13    thoroughly convince me that you had all the proof that he

14    did it.

15         MS. CILIA:  Would you be able to listen to the

16    judge's instruction as to what he says the law requires of

17    us, or would you say I am not going to be able to listen to

18    that instruction, I have my own instruction in my head

19    because of the type of case it is?

20         A PROSPECTIVE JUROR:  I would listen to the

21    instructions.  It is just I am not sure deep down if, you

22    know, if I feel that you didn't prove it thoroughly whether

23    I could, you know, commit him.

24         MS. CILIA:  And I appreciate that, Miss Runer.

25         Does anyone else feel the way Mr. Gottlieb or

Jury Selection

1    Miss Runer feels?

2              No?  Okay.  All right.  Thank you very much.

3              MS. GUASTELLA:  Miss Runer, do you have any

4    children?

5              A PROSPECTIVE JUROR:  No.

6              MS. GUASTELLA:  And you are a secretary.  Where

7    do you work?

8              A PROSPECTIVE JUROR:  Not-for-profit community

9    agency for senior citizens right on Bay Street.

10             MS. GUASTELLA:  How long have you been there?

11             A PROSPECTIVE JUROR:  13 and-a-half years.

12             MS. GUASTELLA:  And Lisa -- I am sorry, I

13   couldn't pronounce your name.

14             A PROSPECTIVE JUROR:  That is okay.

15             MS. GUASTELLA:  What did you do when you were

16   working?

17             A PROSPECTIVE JUROR:  I worked for health care.

18             MS. GUASTELLA:  How long have you been

19   unemployed?

20             A PROSPECTIVE JUROR:  About two years.

21             MS. GUASTELLA:  Where was the health care?

22   Health care for the City.

23             A PROSPECTIVE JUROR:  Staten Island.

24             MS. GUASTELLA:  You had stated that you were a

25   juror on a criminal case eight years ago.

Jury Selection

1           A PROSPECTIVE JUROR:  Yes.

2           MS. GUASTELLA:  Did that go to verdict?

3           A PROSPECTIVE JUROR:  Yes.

4           MS. GUASTELLA:  Approximately how long did that

5       last?

6           A PROSPECTIVE JUROR:  Couple of days.

7           MS. GUASTELLA:  Anything about the length of this

8       trial -- the judge I believe instructed the jury that it

9       would go probably until the 14th.  Anything about the

10      length of this trial that would prohibit you from sitting?

11          A PROSPECTIVE JUROR:  No.

12          MS. GUASTELLA:  Miss Moran, I missed what you did

13      for a living.

14          A PROSPECTIVE JUROR:  Executive assistant in the

15      financial industry.

16          MS. GUASTELLA:  In the city.

17          A PROSPECTIVE JUROR:  Yeah.

18          MS. GUASTELLA:  How do you get to work?

19          A PROSPECTIVE JUROR:  I take the ferry when I go

20      to New York and drive to Jersey when I am in Jersey.

21          MS. GUASTELLA:  Do you have any children?

22          A PROSPECTIVE JUROR:  No.

23          MS. GUASTELLA:  Mr. Hart, you stated your

24      sister's a police officer.

25          A PROSPECTIVE JUROR:  Sister, brother-in-law and

Jury Selection

1    nephew.

2            MS. GUASTELLA:  And all of them are currently

3    working.

4            A PROSPECTIVE JUROR:  No, just my nephew now.

5            MS. GUASTELLA:  Where does your nephew work?

6            A PROSPECTIVE JUROR:  Brooklyn.

7            MS. GUASTELLA:  Do you know what unit he works

8    out of?

9            A PROSPECTIVE JUROR:  I think it is the

10   78th precinct.

11           MS. GUASTELLA:  Uniform or detective?

12           A PROSPECTIVE JUROR:  Undercover.

13           MS. GUASTELLA:  Undercover.  Do you talk to him

14   about the cases that he works on?

15           A PROSPECTIVE JUROR:  No.

16           MS. GUASTELLA:  Miss Freesmith, you stated you

17   work fork the Transit Authority?

18           A PROSPECTIVE JUROR:  Yes.

19           MS. GUASTELLA:  What do you do for them?

20           A PROSPECTIVE JUROR:  Station agent.

21           MS. GUASTELLA:  Is that actually in the subway

22   terminal?

23           A PROSPECTIVE JUROR:  Yes, in the booth.

24           MS. GUASTELLA:  Do you work overnight, do you

25   work during the day?

Jury Selection

1          A PROSPECTIVE JUROR:  Daytime.

2          MS. GUASTELLA:  Nighttime?

3          A PROSPECTIVE JUROR:  Daytime.

4          MS. GUASTELLA:  Have you ever had any occasion to

5     witness anybody fighting?

6          A PROSPECTIVE JUROR:  No.

7          MS. GUASTELLA:  Witness anybody jumping the

8     turnstile?

9          A PROSPECTIVE JUROR:  Yes.

10         MS. GUASTELLA:  As part of your duties, did you

11    ever have to testify at a hearing or in court?

12         A PROSPECTIVE JUROR:  No.

13         MS. GUASTELLA:  And did you ever have to be

14    interviewed by a police officer?

15         A PROSPECTIVE JUROR:  No.

16         MS. GUASTELLA:  Do you have any children?

17         A PROSPECTIVE JUROR:  Yes.

18         MS. GUASTELLA:  How many children?

19         A PROSPECTIVE JUROR:  Two.

20         MS. GUASTELLA:  How old are they?

21         A PROSPECTIVE JUROR:  27 and 12.

22         MS. GUASTELLA:  Mr. Walker, you stated you clean

23    floors.

24         A PROSPECTIVE JUROR:  Yes.

25         MS. GUASTELLA:  Are you self-employed or you work

Jury Selection

1    for a company?

2              A PROSPECTIVE JUROR:  I work in the hospital.

3              MS. GUASTELLA:  On Staten Island.

4              A PROSPECTIVE JUROR:  Uh-Hum.

5              MS. GUASTELLA:  How long have you been doing

6    that?

7              A PROSPECTIVE JUROR:  Going on five years.

8              MS. GUASTELLA:  Mr. Pakala, is that how you

9    pronounce it?

10             A PROSPECTIVE JUROR:  Pakala.

11             MS. GUASTELLA:  You are self-employed.

12             A PROSPECTIVE JUROR:  Yes.

13             MS. GUASTELLA:  I missed what you did for a

14   living though.

15             A PROSPECTIVE JUROR:  Right now I do on-line

16   sales.

17             MS. GUASTELLA:  Being here during this trial for

18   the length of the trial, is that going to affect your

19   earning a living and being fair to the defendant?

20             A PROSPECTIVE JUROR:  I suppose.

21             MS. GUASTELLA:  It will affect.

22             A PROSPECTIVE JUROR:  Yes.

23             MS. GUASTELLA:  Mr. Prazdnik.

24             A PROSPECTIVE JUROR:  Yes.

25             MS. GUASTELLA:  You have prior criminal jury

Jury Selection

1   experience; correct?  And you were an alternate?

2              A PROSPECTIVE JUROR:  Yes.

3              MS. GUASTELLA:  How long did that trial last?

4              A PROSPECTIVE JUROR:  Six days.

5              MS. GUASTELLA:  Six days?  And when did they

6   release you?

7              A PROSPECTIVE JUROR:  At the end of the trial

8   before deliberation.

9              MS. GUASTELLA:  Before deliberations, okay.

10             And did you stay around for the verdict?

11             A PROSPECTIVE JUROR:  No.

12             MS. GUASTELLA:  Did you ever speak to any of the

13   jurors after that?

14             A PROSPECTIVE JUROR:  No, they didn't go out.

15             MS. GUASTELLA:  I think I covered everything.

16   Thank you.

17             THE COURT:  I am going to give the lawyers a few

18   minutes to go over their notes and then they and I will

19   step to the side of the courtroom and discuss jury

20   selection.  You are all free to step out for a little while

21   if you want to, or you can stay here.  Just don't discuss

22   the case, please, with each other or anyone else.  Thanks

23   for your patience.

24             If you do step out, come back, please.

25             (The following takes place at side-bar, outside

Jury Selection

1        the presence of the jurors.)

2                THE COURT:  Just for the record, we are at a side

3        bar in the courtroom on the record.  The defendant's about

4        nine feet away.  Is this all right with him?

5                MS. GUASTELLA:  Yes.

6                THE COURT:  So you are okay to exercise

7        challenges here.

8                MS. GUASTELLA:  Yes.

9                THE COURT:  If you need to consult with him at

10       any point, you are free to do that.

11               MS. GUASTELLA:  Thank you, Judge.

12               THE COURT:  I think for a minute or two I want to

13       go one at a time.  Let's do Number 1, Miss Balestrieri.

14               Cause, People?

15               MS. CILIA:  Yes.

16               THE COURT:  Is that consent or not?

17               MS. GUASTELLA:  Consent.

18               THE COURT:  For cause on consent.

19               We come to Number 2, Miss Runer.  She says she

20       served as a juror in a federal case two years ago.  The

21       judiciary law Section 524 says -- I have it right here, you

22       can read it if you want -- anyone who served on a grand or

23       petty jury in any court or in federal court shall not be

24       competent to serve again for four years.  They talk about a

25       waiver further on.  And if the woman stayed on the jury it

Jury Selection

1    probably wouldn't affect the verdict, although we now know

2    about this law ahead of time.  So I don't know how you feel

3    about it.

4            MS. CILIA:  I actually thought there might be a

5    cause challenge.

6            THE COURT:  What?

7            MS. CILIA:  There might be a cause challenge for

8    her, as well.

9            THE COURT:  I think there might be based on your

10    questioning of her, but I mean if you consent I let her go

11    pursuant to the judiciary law.  I don't know how you feel.

12            MS. GUASTELLA:  Let her go for that.

13            THE COURT:  Okay.  People?

14            MS. CILIA:  Yes.  That's fine.

15            THE COURT:  So I will on consent of both sides

16    excuse this lady, citing Section 524 of the Judiciary Law.

17    That's Miss Runer.

18            I think we will keep going one at a time.

19    Number 3 is Lisa.

20            Cause, People?

21            MS. CILIA:  No cause for Number 3.

22            THE COURT:  Defense?

23            MS. GUASTELLA:  Not for cause.

24            THE COURT:  Peremptory, People?

25            MS. CILIA:  Yes.

Jury Selection

1           THE COURT:  Next is Mr. Smith.

2           Cause, People?

3           MS. CILIA:  Yes.

4           MS. GUASTELLA:  Consent.

5           THE COURT:  For cause on consent.

6           Next is Miss Finega Silvestri.

7           Cause, People?

8           MS. CILIA:  Yes.

9           MS. GUASTELLA:  Consent.

10          THE COURT:  For cause on consent.

11          Next is Miss Sparacio.

12          Cause, People?

13          MS. CILIA:  No.

14          THE COURT:  Defense?

15          MS. GUASTELLA:  Yes, Judge.  She said she

16     potentially could not be fair.

17          THE COURT:  People?  Do you want to respond or

18     not?

19          MS. CILIA:  Should we bring her over?

20          THE COURT:  I don't think there is any need.  She

21     clearly said, based on her relatives who were police

22     officers, she didn't think she could be fair.

23          MS. CILIA:  Okay.

24          THE COURT:  Okay.  I will grant that challenge.

25     That is a cause challenge as to Number 6.

Jury Selection

1          Next is Mr. Hart.

2          Cause, People?

3          MS. CILIA:  Not for cause.

4          THE COURT:  Defense?

5          MS. GUASTELLA:  No.

6          THE COURT:  Peremptory, People?

7          MS. CILIA:  Yes.

8          THE COURT:  Next is Miss Moran.

9          Cause, People?

10         MS. CILIA:  No.

11         THE COURT:  Defense?

12         MS. GUASTELLA:  No.

13         THE COURT:  Peremptory, People?

14         MS. CILIA:  No.

15         THE COURT:  Defense?

16         MS. GUASTELLA:  Yes.

17         THE COURT:  Next is Mr. Gottlieb.

18         Cause, People?

19         MS. CILIA:  Yes.

20         MS. GUASTELLA:  Consent.

21         THE COURT:  For cause on consent.

22         Next -- I don't know how -- Prazdnik, if is that

23    right.

24         MS. CILIA:  Yes.

25         THE COURT:  Cause, People?

Jury Selection

1              MS. CILIA:  No.

2              THE COURT:  Defense?

3              MS. GUASTELLA:  No.

4              THE COURT:  Peremptory, People?

5              MS. CILIA:  No.

6              THE COURT:  Defense?

7              MS. GUASTELLA:  Yes.

8              THE COURT:  Next is Mr. Pakala?

9              Cause, People?

10             MS. CILIA:  No.

11             THE COURT:  Defense?

12             MS. GUASTELLA:  Yes, Judge.  He said that the

13   fact he was self-employed and the length of the trial would

14   affect him being fair.

15             THE COURT:  People, do you want to be heard?

16             MS. CILIA:  No.

17             THE COURT:  He did say that.  I will grant it.

18             Next is Miss Roman.

19             Cause, People?

20             MS. CILIA:  Yes.

21             MS. GUASTELLA:  Consent.

22             THE COURT:  For cause on consent.

23             Next is Mr. Rubin.

24             Cause, People?

25             MS. CILIA:  Yes.

Jury Selection

1        MS. GUASTELLA:  Consent.

2        THE COURT:  For cause on consent.

3        Next is Mr. Walker.

4        Cause, People?

5        MS. CILIA:  No.

6        THE COURT:  Defense?

7        MS. GUASTELLA:  No.

8        THE COURT:  Peremptory, People?

9        MS. CILIA:  Yes.

10       THE COURT:  Next is Miss Husein.

11       Cause, People?

12       MS. CILIA:  Yes.

13       MS. GUASTELLA:  Consent.

14       THE COURT:  For cause on consent.

15       The last is Miss Freesmith.

16       Cause, People?

17       MS. CILIA:  No.

18       THE COURT:  Defense?

19       MS. GUASTELLA:  No.

20       THE COURT:  Peremptory, People?

21       MS. CILIA:  No.

22       THE COURT:  Defense?

23       MS. GUASTELLA:  No.

24       THE COURT:  That is Number 6.

25       Where do we stand on peremptories?

Jury Selection

1          THE CLERK:  The People have used five, the

2     defense has used seven.

3               (The following takes place in open court.)

4          THE CLERK:  If I state your name, please remain

5     seated.  The rest of the people, please step up and step

6     out of the box.

7               Annessa Freesmith.

8               The rest of you please rise, step out.

9          THE COURT:  Thank you.

10              (Challenged jurors leave courtroom.)

11         THE CLERK:  Is the juror satisfactory to the

12    People?

13              MR. REEVES:  Yes.

14         THE CLERK:  To the defendant?

15              Ms. Guastella?  Is the juror satisfactory?

16              MS. GUASTELLA:  Yes.

17         THE CLERK:  Ma'am, please rise.

18              (Ms. Freesmith is sworn.)

19         THE COURT:  Miss Freesmith, I will give you some

20    instructions and then let you go.

21              I am going to ask you to come back Monday morning

22    and join the other sworn jurors.  We anticipate you get the

23    trial then.  That will be Monday.  We would like you to be

24    in the jury room.  It is right across the hall.  The

25    officers will show you where it is on the way out.

1    Permit me to instruct you as I am required to as

2    follows:  First, don't converse with anyone, including

3    other jurors, about anything related to this case.

4    Secondly, prior to being discharged don't speak

5    with anyone about taking anything, any payment or benefit,

6    in return for supplying information concerning this trial.

7    Third, you must promptly report directly to me

8    any incident within your knowledge involving an attempt by

9    anyone to improperly influence you or any member of the

10   jury.

11   Fourth, do not visit or view the premises or

12   place where any charged crime was allegedly committed or

13   any other premises or place involved in the case.

14   Fifth, don't read, view or listen to any media

15   accounts involving this case should there be any.

16   And, finally, don't attempt to research any fact,

17   issue or law related to this case, whether by discussion

18   with others, by research in the library or on the internet

19   or by any other means or source.

20   Thank you very much.  Have a good day.  And we

21   will see you Monday morning.

22   (Ms. Freesmith leaves courtroom.)

23   THE CLERK:  Mohamed Z-A-M-A-N, Seat Number 1;

24   Alena Rubinshteyn, R-U-B-I-N-S-H-T-E-Y-N, Seat Number 2;

25   Carl Columbo, Seat Number 3; Christina Greco, G-R-E-C-O,

000372

144

Jury Selection

1    Seat Number 4; Nicole Ierardi, I-E-R-A-R-D-I, Seat

2    Number 5; Eric Roman, R-O-M-A-N, Seat Number 6; Jason

3    Rivera, R-I-V-E-R-A, Seat Number 7; Nancy Lyons, L-Y-O-N-S,

4    Seat Number 8; Joseph Gilman, Seat Number 9; Rita Martin,

5    Seat Number 10, M-A-R-T-I-N; Italia Connor, first name

6    I-T-A-L-I-A, last name C-O-N-N-O-R, Seat Number 11; Henry

7    Mino, M-I-N-O, Seat Number 12; Leonard Postiglione

8    P-O-S-T-I-G-L-I-O-N-E, Seat Number 13; Lynn Simone,

9    S-I-M-O-N-E, Seat Number 14; Anthony Tampa, T-A-M-P-A, Seat

10   Number 15; and Anthony Polo, P-O-L-O, Seat Number 16.

11            THE COURT:  Okay.  Do any of you think you know

12   anything about this case apart from what you have heard in

13   court today?

14            ...Do any of you know the lawyers or the

15   defendant?

16            ...Did any of you recognize the names that I read

17   earlier today regarding potential witnesses and people

18   whose names might come up during the course of the trial?

19            Mr. Mino?  Who do you know?

20            A PROSPECTIVE JUROR:  I think he said Joanne

21   Smith?

22            THE COURT:  Janet Smith, I think.

23            A PROSPECTIVE JUROR:  Then it is not her.

24            THE COURT:  Let me just make sure there is no

25   Joanne.

Jury Selection

1            ...I read Janet Smith.

2            A PROSPECTIVE JUROR:  All right.

3            THE COURT:  Anybody else?

4            ...Have any of you or anyone close to you ever

5    worked for or do you or they work for law enforcement in

6    any capacity?

7            Mr. Tampa, who do you know in law enforcement?

8            A PROSPECTIVE JUROR:  I am a former New York City

9    police officer.  I stopped for about four years.

10           THE COURT:  You left four years ago.

11           A PROSPECTIVE JUROR:  No, I left in 2000.

12           THE COURT:  You served for four years.

13           A PROSPECTIVE JUROR:  Yes, I served for four

14   years.  My father is a former federal investigator,

15   Treasury Department, and he also worked for the Manhattan

16   District Attorney as an investigator.  And my mother is a

17   former Supreme Court clerk.

18           THE COURT:  Did your mother work in criminal

19   term, or do you know?  Criminal, civil or both?

20           A PROSPECTIVE JUROR:  Both.

21           THE COURT:  Anything about any of this that would

22   prevent you from being a fair juror in a criminal trial?

23           A PROSPECTIVE JUROR:  Being a former police

24   officer, based on --

25           THE COURT:  Doesn't disqualify you.

Jury Selection

1              A PROSPECTIVE JUROR:  No.

2              THE COURT:  Nobody is exempt.  I have been called

3      three or four times.  Nobody ever choose me; I don't know

4      why.  But everybody gets called.

5              A PROSPECTIVE JUROR:  No, no, I understand that.

6      Just based on the investigative background and to me the

7      preliminary hearings going up, up to the event, I don't

8      think in my personal opinion -- I don't think it would go

9      past Grand Jury if it wasn't --

10             THE COURT:  Don't say anymore.

11             Have you testified at hearings during the course

12     of your four years?

13             A PROSPECTIVE JUROR:  Yes.

14             THE COURT:  What do you do now?

15             A PROSPECTIVE JUROR:  I am a firefighter.

16             THE COURT:  Firefighter.  That is not uncommon

17     for police officer to move over.  Well, okay.  I am going

18     to leave it alone.  The lawyers might wanted to talk to you

19     further, and I will leave that up to them.

20             Anyone else, law enforcement?

21             I am just jumping around here.  Miss Martin?

22             A PROSPECTIVE JUROR:  My husband's retired eight

23     years, N.Y.P.D.

24             THE COURT:  Anything about his former job that

25     would prevent you from being fair?

Jury Selection

1              A PROSPECTIVE JUROR:  Potentially.  We still have

2    a lot of friends that are on the job and very close friends

3    to us that are retired, as well.

4              THE COURT:  That is all right, but the question

5    is --

6              A PROSPECTIVE JUROR:  Potentially, yes.

7              THE COURT:  Potentially.

8              A PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Yes, what?

10             A PROSPECTIVE JUROR:  That it might sway, you

11   know.  It might sway my decision.

12             THE COURT:  Other hands on this?

13             Miss Connor.

14             A PROSPECTIVE JUROR:  My brother and

15   sister-in-law and close family friends.

16             THE COURT:  Is that going to have any effect on

17   your ability to be fair?

18             A PROSPECTIVE JUROR:  I would assume not, but I

19   don't know for sure.

20             THE COURT:  Anyone else?

21             Mr. Mino.

22             A PROSPECTIVE JUROR:  My brother-in-law's retired

23   N.Y.P.D. and a close friend is a homicide detective.

24             THE COURT:  Currently.  Currently a homicide

25   detective.

Jury Selection

1          A PROSPECTIVE JUROR:  Yes, on Staten Island.

2          THE COURT:  Anything about this that would

3     prevent you from being fair?

4          A PROSPECTIVE JUROR:  It may.

5          THE COURT:  Anyone else?

6          Mr. Roman?

7          A PROSPECTIVE JUROR:  Yes.  I am retired New York

8     City Corrections Officer.

9          THE COURT:  How long ago did you retire?

10         A PROSPECTIVE JUROR:  Eleven years ago.

11         THE COURT:  How long were you on that job?

12         A PROSPECTIVE JUROR:  Twenty years.

13         THE COURT:  Is there anything about your

14    background, training and experience in that regard that

15    wore prevent you from being fair?

16         A PROSPECTIVE JUROR:  It will prevent me from

17    being fair, yes.

18         THE COURT:  It will.

19         A PROSPECTIVE JUROR:  Yes.

20         THE COURT:  That is a definite from you, I guess;

21    right?

22         A PROSPECTIVE JUROR:  Yes, sir.

23         THE COURT:  Anyone else, law enforcement?

24         Mr. Rivera.

25         A PROSPECTIVE JUROR:  My cousin is a homicide

1  detective in Brooklyn.

2              THE COURT:  In Brooklyn.

3              A PROSPECTIVE JUROR:  Yes.

4              THE COURT:  Anything about that that would

5  prevent you from being a fair juror?

6              A PROSPECTIVE JUROR:  Yes.

7              THE COURT:  Anyone else?

8              Miss Simone.

9              A PROSPECTIVE JUROR:  Yes.  My daughter's

10  currently a sergeant in Brooklyn South.

11             THE COURT:  Is that going to have any effect on

12  your ability to be fair?

13             A PROSPECTIVE JUROR:  No.

14             THE COURT:  Thank you.

15             Mr. Postiglione.

16             A PROSPECTIVE JUROR:  That is correct.  Many

17  years ago while working as a lawyer for the MTA I

18  represented the Transit Police Force before it was absorbed

19  into the N.Y.P.D., and more recently in the private sector

20  I represented the PBA in grievance arbitrations and

21  contract negotiations.

22             THE COURT:  Is that what you do now?

23             A PROSPECTIVE JUROR:  I am retired.

24             THE COURT:  Retired.

25             A PROSPECTIVE JUROR:  I retired from the job with

Jury Selection

1    the MTA.

2              THE COURT:  Okay.  Well, what do you think?  Is

3    this background going to affect your ability to be fair and

4    impartial or not?

5              A PROSPECTIVE JUROR:  I would hope not, your

6    Honor.

7              THE COURT:  Can you do better than that?

8              A PROSPECTIVE JUROR:  I think not, your Honor.

9              THE COURT:  Okay.  Thank you.

10             Other hands.  Law enforcement.

11             Mr. Columbo.

12             A PROSPECTIVE JUROR:  My brother-in-law's brother

13   is a retired narcotics detective.

14             THE COURT:  Your brother in law's --

15             A PROSPECTIVE JUROR:  Brother.

16             THE COURT:  Your brother-in-law's brother.

17             A PROSPECTIVE JUROR:  Yes.

18             THE COURT:  Anything about that that is going to

19   have any bearing here?

20             A PROSPECTIVE JUROR:  No.

21             THE COURT:  Anyone else?

22             ...Have any of you or anyone close to you, to

23   your knowledge, ever worked in the legal field, or do you

24   or they work in the legal field?

25             I guess Mr. Postiglione already answered this.

1  Anyone else on that? Lawyer, paralegal, employee of a law

2  firm, prosecutor's office, anything like that?

3            ...Have any of you or anyone close to you, to

4  your knowledge, ever been the victim of a crime?

5            Miss Ierardi.

6            A PROSPECTIVE JUROR: Yes.

7            THE COURT: Can you tell me about it?

8            A PROSPECTIVE JUROR: My cousin was murdered.

9            THE COURT: How long ago was this?

10           A PROSPECTIVE JUROR: 2008.

11           THE COURT: Was anybody arrested?

12           A PROSPECTIVE JUROR: Yes.

13           THE COURT: Did you go to any court proceeding?

14           A PROSPECTIVE JUROR: I was not allowed, no.

15           THE COURT: Keeping in mind the nature of the

16  charge in this case, do you think there is anything about

17  that event that would have an effect on your ability to be

18  fair? Fair to both sides?

19           A PROSPECTIVE JUROR: I would like to speak in

20  private with the lawyers.

21           THE COURT: Okay. We will do that shortly.

22  Thank you.

23           A PROSPECTIVE JUROR: Thank you.

24           THE COURT: Anyone else on this question?

25           Mr. Postiglione?

Jury Selection

1           A PROSPECTIVE JUROR:  Many years ago, your Honor,

2    in Jamaica, Queens my mother was the victim of a push-in

3    robbery.  Her house was ransacked and she was injured.  I

4    ended up testifying in the criminal case.

5           THE COURT:  You did as a --

6           A PROSPECTIVE JUROR:  As a background witness

7    about the area, the location.

8           THE COURT:  Let's talk about that event.  Is

9    there anything about that event -- I am not talking about

10   the other matter we discussed -- that would prevent you

11   from being fair in a criminal case?

12          A PROSPECTIVE JUROR:  I don't think so.

13          THE COURT:  Okay.  Mr. Roman.

14          A PROSPECTIVE JUROR:  Yes.  My wife was also a

15   Correction Officer.  She got assaulted by a male inmate and

16   they had to retire her on disability.

17          THE COURT:  How long ago was this?

18          A PROSPECTIVE JUROR:  About five years ago.

19          THE COURT:  Five years ago.  That was a city

20   facility?

21          A PROSPECTIVE JUROR:  City, yes.

22          THE COURT:  Anything about that event that would

23   affect you in terms of being fair?

24          A PROSPECTIVE JUROR:  Won't be fair.

25          THE COURT:  Pardon?

000381

Jury Selection

1          A PROSPECTIVE JUROR:  Won't be fair.

2          THE COURT:  Okay.  I got two stars next to your

3     name.

4          Anyone else on this question?  Crime victims.

5          Mr. Tampa?

6          A PROSPECTIVE JUROR:  I was once a victim of an

7     assault when I was in high school.  It was basically, you

8     know, about 20 kids against me.  And then another time when

9     I was working in Manhattan I was a victim of a robbery

10    walking into my office building.

11         THE COURT:  Was anybody arrested in either of

12    these events?

13         A PROSPECTIVE JUROR:  No.

14         THE COURT:  Would these experiences have any

15    effect on your ability to be a fair juror in a criminal

16    trial?

17         A PROSPECTIVE JUROR:  I really don't know.

18         THE COURT:  Okay.  Anyone else?

19         Mr. Rivera.

20         A PROSPECTIVE JUROR:  My father was murdered.

21         THE COURT:  I am sorry.  How long ago?

22         A PROSPECTIVE JUROR:  Before I was one years old.

23         THE COURT:  Do you know if anybody was arrested

24    and prosecuted?

25         A PROSPECTIVE JUROR:  No.

000382

Jury Selection

1      THE COURT:  Anything about that that would --

2  keeping in mind the charge here, anything about that that

3  would keep you from being fair?

4      A PROSPECTIVE JUROR:  I wouldn't be fair.

5      THE COURT:  Okay.  Did I get everybody on that?

6      ...Have any of you or anyone close to you ever

7  been a defendant in any kind of a criminal proceeding?  We

8  will talk privately if you want.

9      ...Have any of you, I guess outside of

10  Mr. Postiglione, ever been a witness -- and Mr. Tampa --

11  ever been a witness in any kind of courtroom proceeding?

12      ...Have you ever been a litigant, plaintiff or

13  defendant, in any kind of civil lawsuit or civil action?

14      Mr. Mino, can you tell me the nature of the

15  action?

16      A PROSPECTIVE JUROR:  It was a motorcycle

17  accident.

18      THE COURT:  How long ago?

19      A PROSPECTIVE JUROR:  25, 30 years ago?

20      THE COURT:  I assume it is over now.

21      A PROSPECTIVE JUROR:  Yes.

22      THE COURT:  Anything about that experience that

23  would have any bearing here in terms of being fair?

24      A PROSPECTIVE JUROR:  Yeah.  Yes.

25      THE COURT:  You did not have a good experience, I

Jury Selection

1    gather.

2              A PROSPECTIVE JUROR:  Exactly.

3              THE COURT:  Okay.

4              Mr. Gilman.

5              A PROSPECTIVE JUROR:  Yes.  Construction

6    accident.

7              THE COURT:  How long ago, sir?

8              A PROSPECTIVE JUROR:  Over 20 years.

9              THE COURT:  It is over now?

10              A PROSPECTIVE JUROR:  Over, yes.

11              THE COURT:  Anything about that experience as a

12    litigant that would prevent you from being a fair juror?

13              A PROSPECTIVE JUROR:  No.

14              THE COURT:  Anyone else?

15              ...Have any of you ever served on a jury before?

16              Mr. Mino, when, approximately?

17              A PROSPECTIVE JUROR:  Six years ago?

18              THE COURT:  Criminal or civil, if you remember?

19              A PROSPECTIVE JUROR:  Civil.

20              THE COURT:  Did the jury reach a verdict?

21              A PROSPECTIVE JUROR:  Yes.

22              THE COURT:  Was there anything about that

23    experience that would prevent you from being able to serve

24    here?

25              A PROSPECTIVE JUROR:  Just the way we voted.  The

Jury Selection

```
 1        judge asked us how we voted.  I didn't feel comfortable
 2        with it.
 3                    THE COURT:  Okay.  Thank you.
 4                    Mr. Gilman, when, please, approximately?
 5                    A PROSPECTIVE JUROR:  Oh, approximately 30 years
 6        ago.
 7                    THE COURT:  Do you remember if it was a civil or
 8        criminal?
 9                    A PROSPECTIVE JUROR:  Civil.
10                    THE COURT:  Did the jury reach a verdict?
11                    A PROSPECTIVE JUROR:  Yes.
12                    THE COURT:  Anything about that experience or
13        what you recall of it that would prevent you from being
14        able to serve in this case?
15                    A PROSPECTIVE JUROR:  No.
16                    THE COURT:  Thank you.
17                    Other hands?
18                    Mr. Columbo.  When, please?
19                    A PROSPECTIVE JUROR:  About eight years ago.  I
20        was an alternate on a civil case.
21                    THE COURT:  Did you get to deliberate or not?
22                    A PROSPECTIVE JUROR:  No, we did not.
23                    THE COURT:  Anything about that experience --
24                    A PROSPECTIVE JUROR:  No.
25                    THE COURT:  -- as far as it went that would have
```

1    any effect on your ability to serve here?

2              A PROSPECTIVE JUROR:  No.

3              THE COURT:  Thank you.

4              Other hands?

5              ...Have any of you ever served on a Grand Jury?

6              Mr. Zaman.

7              A PROSPECTIVE JUROR:  Yes, sir.

8              THE COURT:  Are you employed, sir?

9              A PROSPECTIVE JUROR:  Yes.

10             THE COURT:  What do you do?

11             A PROSPECTIVE JUROR:  Construction work.

12             THE COURT:  Thank you.

13             Miss, is it, Rubinshteyn, are you employed?

14             A PROSPECTIVE JUROR:  Yes.

15             THE COURT:  What do you do?

16             A PROSPECTIVE JUROR:  Pharmacist.

17             THE COURT:  Thank you.

18             Mr. Columbo.

19             A PROSPECTIVE JUROR:  School construction.

20             THE COURT:  Thank you.

21             Ms. Greco.

22             A PROSPECTIVE JUROR:  Office manager.

23             THE COURT:  Thank you.

24             Ms. Ierardi.

25             A PROSPECTIVE JUROR:  Waitress at a restaurant.

Jury Selection

1              THE COURT:  Thank you.

2              Mr. Roman, are you retired?

3              A PROSPECTIVE JUROR:  Yes.

4              THE COURT:  Mr. Rivera.

5              A PROSPECTIVE JUROR:  Project manager.

6              THE COURT:  Thank you.

7              Ms. Lyons.

8              A PROSPECTIVE JUROR:  I am a housewife starting

9     my own party decorating business.

10             THE COURT:  Okay.

11             Mr. Polo.

12             A PROSPECTIVE JUROR:  Mailman.

13             THE COURT:  Thank you.

14             Mr. Tampa, you are firefighter.

15             A PROSPECTIVE JUROR:  Yes.

16             THE COURT:  Miss Simone.

17             A PROSPECTIVE JUROR:  Retired pharmacy

18    technician.

19             THE COURT:  Mr. Postiglione, are you retired?

20             A PROSPECTIVE JUROR:  I am now not practicing but

21    I am still licensed.

22             THE COURT:  Mr. Mino.

23             A PROSPECTIVE JUROR:  Bus operator.

24             THE COURT:  Thank you.

25             Ms. Connor.

Jury Selection

1        A PROSPECTIVE JUROR:  Welfare Department.

2        THE COURT:  Thank you.

3        Ms. Martin?

4        A PROSPECTIVE JUROR:  Preschool teacher.

5        THE COURT:  Thank you.

6        And Mr. Gilman.

7        A PROSPECTIVE JUROR:  Retired.

8        THE COURT:  From what?

9        A PROSPECTIVE JUROR:  Electrical construction.

10       THE COURT:  Thank you.  Thank you all for that

11   information.

12       Let me give these principles of law again and

13   then I will let the lawyers finish up.

14       As you now know if you didn't before, an

15   indictment is evidence of nothing in particular.  It is not

16   evidence of guilt.  Can you all accept this?  Is there

17   anybody here who could not accept this proposition in our

18   law?

19       If selected here you would be called upon at the

20   end of the trial to deliberate with 11 other people in an

21   effort to reason together and arrive at a final unanimous

22   verdict or verdict.  Do any of you feel you could not

23   deliberate with 11 other people if called upon to do so?

24       Under our law everyone accused of a crime or

25   brought to trial is presumed innocent unless or until he is

Jury Selection

1   proved guilty beyond a reasonable doubt.  The defendant in

2   this case is presumed innocent.  And to put this another

3   way, a defendant is never required to prove his innocence.

4   On the contrary; the People, having accused the defendant

5   of the crimes charged, have the burden of proving him

6   guilty beyond a reasonable doubt.  The People carry this

7   burden of proof throughout the trial.  It never shifts, it

8   always remains on the People, and the presumption of

9   innocence remains with every defendant throughout every

10  criminal trial.

11         Is there anyone amongst you who cannot now in

12  your own mind grant the defendant this presumption of

13  innocence?

14         Again, in a criminal trial the burden of proof is

15  entirely on the People, on the District Attorney, and

16  remains on them throughout the trial.  A defendant is not

17  required to prove anything, nor is a defendant required to

18  disprove anything.  As I said, the entire burden of proof

19  is on the People and remains on them throughout the trial.

20         Is there anyone here who cannot accept and follow

21  this rule in our criminal law?

22         If a defendant does not testify in a criminal

23  trial, that's not a factor from which any inference

24  unfavorable to such defendant may be drawn.  Is there

25  anybody who could not accept this rule in our law?

1        I defined earlier today the standard of proof

2    required for conviction in every criminal trial.  That

3    standard, of course, is called proof of guilt beyond a

4    reasonable doubt.  Did you all hear that definition when I

5    read it earlier?

6        I am getting nods, for the record.

7        Would anybody like me to read it again?  I am

8    happy to do that if you want me to.

9        ...Nobody wants me to.  Okay.  Keep that

10    definition in mind.

11        Let me remind you it is the duty of each juror

12    carefully to review, weigh and consider all the evidence.

13    If after doing this you find that the People have not

14    proved the defendant's guilt beyond a reasonable doubt as I

15    have defined the term, then you must find the defendant not

16    guilty.  On the other hand, if you are satisfied that the

17    People have proved the defendant's guilt beyond a

18    reasonable doubt as I have defined the term, then you must

19    find the defendant guilty.

20        Will you promise us now that, if selected here,

21    you will in your final deliberations follow and apply the

22    standard of proof that I have defined, proof beyond a

23    reasonable doubt?  Is there anybody who cannot make us that

24    promise?

25        A deliberating jury, as you now know, is not

Jury Selection

1    permitted to consider the subject of punishment.  If there

2    is to be any sentencing following a verdict, that is for

3    the Court and the Court alone to deal with.  The jury has

4    no role to play in that.

5              Will you promise us now that, if selected here,

6    you will render your verdict free from fear, favor or

7    sympathy and without considering any possibility of

8    sentence or punishment?  Can you all make us that promise?

9              And, lastly, police officers will testify in this

10   case.  They take the same oath as anyone else.  The mere

11   fact that a witness is a police officer does not make that

12   witness any more or any less credible.  Is there anyone

13   here who has had any experiences with the police or who has

14   any feelings about the police which would lead you in your

15   judgment to give a police officer's testimony greater or

16   lesser weight than anyone else's merely because of the

17   officer's occupation?

18             I think some of you feel that way.  Am I right?

19   I made notes.  And if you think you have already answered

20   that question, that's fine.

21             Anybody else?

22             ...No. okay.

23             Let's step to the side.  We are going to talk to

24   one lady and then I will let the lawyers finish up.

25             (The following takes place at side bar.)

Jury Selection

1            THE COURT:  Miss Ierardi.

2            THE CLERK:  Nicole Ierardi, I-E-R-A-R-D-I.

3            (Ms. Ierardi approaches side bar.)

4            THE COURT:  What did you mean to talk about?  I

5       don't remember.

6            A PROSPECTIVE JUROR:  I don't feel comfortable

7       with this case.  I mean it is 2008, the same year as my

8       cousin, as well, so ...

9            THE COURT:  Can you say that again?

10           A PROSPECTIVE JUROR:  My cousin was murdered in

11      2008, as well.  I don't feel comfortable with this case.

12           THE COURT:  That was how long ago?  2008?

13           A PROSPECTIVE JUROR:  Yes.

14           THE COURT:  So you think the nature of the charge

15      here, considering that experience --

16           A PROSPECTIVE JUROR:  Yes.

17           THE COURT:  -- you couldn't be fair?

18           A PROSPECTIVE JUROR:  I don't think so, no.

19           THE COURT:  Counselor, any questions?

20           MS. GUASTELLA:  No.

21           MS. CILIA:  No.

22           THE COURT:  Okay.  Thank you.  I will let you

23      take your seat.

24           (The following takes place in open court.)

25           MS. CILIA:  Hello again.  I am going to be

1    talking about a lot of the same issues as last time.  I am

2    sorry that it's the same questions that you have been here

3    for over and over again.

4              Again, I just want to point out that this is the

5    only time that we get to talk to you, so please feel free

6    to speak, okay?  I know it is very difficult being here on

7    this side.  I have imagined it, being on that side in jury

8    selection.  It's not fun to talk in public with people who

9    you have never met before, but this is the only time we get

10   to speak to you and actually get a response from you.  So I

11   just ask that you please give us your opinions.  Even if I

12   am talking to somebody else.

13             THE COURT:  They know that already.  It is five

14   to 4:00.

15             MS. CILIA:  All right.  Fair enough.

16             Let's talk about circumstantial evidence.  That's

17   something that you have heard round after round after

18   round.

19             No one's going to be taking the stand, pointing

20   to the defendant and saying that's the man who shot and

21   killed David Williams.  Is there anyone here who is going

22   to require that of us?

23             If we can prove beyond a reasonable doubt through

24   circumstantial evidence, which we have talked about before,

25   is anyone still going to require that direct evidence in

Jury Selection

1    the case?

2            Mr. Zaman, why don't I start with you.

3            A PROSPECTIVE JUROR:  Yes.

4            MS. CILIA:  What do you think about that?  Are

5    you going to require someone to take that witness stand,

6    point to the defendant and say that's the man, I saw him

7    shoot and kill David Williams?  Or if we can prove the case

8    beyond a reasonable doubt using circumstantial evidence,

9    using DNA evidence, using what witnesses saw beforehand and

10   afterwards, using forensic evidence, would that be enough?

11   If we prove beyond a reasonable doubt in that way, would

12   you be satisfied and vote guilty in this case?

13           A PROSPECTIVE JUROR:  After hearing both sides,

14   you know, then maybe we make decision which side was wrong.

15           MS. CILIA:  Well, in this case this is -- the

16   burden is on the prosecution.  We have got to prove our

17   case beyond a reasonable doubt.  There is no burden for the

18   defense.

19           A PROSPECTIVE JUROR:  Okay.

20           MS. CILIA:  Let me just talk about that for a

21   second.  No burden for the defense whatsoever, so it's our

22   burden to prove beyond a reasonable doubt the guilt of the

23   defendant.  If we are able to do that with forensic

24   evidence and DNA, would you still require somebody to take

25   that stand and point to the defendant and say that's the

Jury Selection

1   person who did it?

2           A PROSPECTIVE JUROR:  No.

3           MS. CILIA:  Miss Rubinshteyn, what do you think?

4           A PROSPECTIVE JUROR:  Not if there is definitive

5   evidence supporting.

6           MS. CILIA:  Would you listen to the law and what

7   the law says and what the judge says is our burden in

8   proving the case, or would you require something more, the

9   witness to take the stand and point to the defendant?

10          A PROSPECTIVE JUROR:  Not a witness, but it

11  depends how strong the evidence is.

12          MS. CILIA:  Okay.  Would you be willing to follow

13  the law when it comes to what that burden is?

14          A PROSPECTIVE JUROR:  Uh-Hum.

15          MS. CILIA:  Proof beyond a reasonable doubt.

16          A PROSPECTIVE JUROR:  Yes.

17          MS. CILIA:  Mr. Columbo?  What do you think?

18          A PROSPECTIVE JUROR:  As long as the evidence is

19  there, I have no problem.  I will follow the law.

20          MS. CILIA:  And, Miss Greco, do you agree or

21  disagree with that?

22          A PROSPECTIVE JUROR:  No, I could convict if it

23  is proven beyond a reasonable doubt.

24          MS. CILIA:  What about the fact of what we talked

25  about earlier about motive?  Motive is not an element of

1    this crime.  We don't need to prove why somebody did what

2    they did.  In this case we have to prove that the defendant

3    purposely killed David Williams.  You may never know the

4    motive, the reason why.  Would you still be able to convict

5    in that case?

6              A PROSPECTIVE JUROR:  Yes.

7              MS. CILIA:  Okay.  Does everybody feel that way

8    or does somebody feel like -- yes?

9              A PROSPECTIVE JUROR:  No.  I would want to know

10   why.

11             MS. CILIA:  Miss Simone.

12             A PROSPECTIVE JUROR:  Yes.

13             MS. CILIA:  You would require the prosecution to

14   prove the element -- an element of motive even though that

15   is not --

16             THE COURT:  Motive is not an element.

17             MS. CILIA:  Right.  You would require --

18             A PROSPECTIVE JUROR:  I would want to know why;

19   what would make him want to kill somebody.

20             THE COURT:  Would you require it I think is her

21   question.  It is a little different.

22             A PROSPECTIVE JUROR:  Yes.

23             MS. CILIA:  Thank you for that.

24             Does anybody feel the same way as Miss Simone?

25             A PROSPECTIVE JUROR:  Yes, I do too.

000396

Jury Selection

1          MS. CILIA:  Okay.  You would require that we

2    prove motive even though it is not an element of the crime.

3          A PROSPECTIVE JUROR:  Yes.  I would want to know

4    why this happened.

5          MS. CILIA:  Anyone else who feels that way?

6          Okay.  I got a couple of hands.  Mr. Polo?

7          A PROSPECTIVE JUROR:  Yes.

8          MS. CILIA:  You would.

9          A PROSPECTIVE JUROR:  Only because it's the

10   severity of the murder.  If only because it is murder I

11   would want a 1ittle more of why, if it was self-defense.

12   Or just because it is murder, you know, I want to know

13   everything.

14         MS. CILIA:  The judge is going to instruct you

15   that motive is not an element of the crime that we need to

16   prove.

17         A PROSPECTIVE JUROR:  No, I understand.  Just in

18   my mind.

19         MS. CILIA:  But you would still require that.

20         A PROSPECTIVE JUROR:  I mean, yeah, I guess when

21   it comes down to it.

22         MS. CILIA:  And I also saw, Mr. Rivera, that you

23   raised your hand.

24         A PROSPECTIVE JUROR:  The same reasons.

25         MS. CILIA:  Anyone else who feels that way?

Jury Selection

1              ...Okay.

2              Miss Martin, you said you were a school teacher?

3              A PROSPECTIVE JUROR:  Preschool.

4              MS. CILIA:  Preschool.  Okay.  So you are working

5       with the little ones.  And your husband is a former police

6       officer; is that right?

7              A PROSPECTIVE JUROR:  Yes.  Retired homicide

8       detective.

9              MS. CILIA:  I am sorry.  Retired detective.

10             And you gave -- when the judge asked you about

11      that you said that you may -- your opinion may be swayed.

12             A PROSPECTIVE JUROR:  Potentially, yes.  Just

13      from, you know, we talk.  You know, he tells me stories.

14             MS. CILIA:  Did you recognize any of the names of

15      the police officers or detectives in this case?

16             A PROSPECTIVE JUROR:  No.  He was out of

17      Brooklyn.

18             MS. CILIA:  Would you be able to give us an

19      assurance that you would listen to the police officers' and

20      detectives' testimony in this case like any other witness?

21      You wouldn't give it more or less weight than any other

22      type of witness?

23             A PROSPECTIVE JUROR:  I would listen, yeah.  I

24      have no problem listening.

25             THE COURT:  Listening's fine, but the second part

Jury Selection

1        of the question is the crucial one.

2                MS. CILIA:  Would you be able to assure us that

3        you would not give those witnesses more or less weight than

4        any other type of witness who takes the stand?

5                A PROSPECTIVE JUROR:  No.  I am going to be

6        honest.

7                MS. CILIA:  Mr. Mino, same question to you.

8        Would you be able to give us an assurance?

9                A PROSPECTIVE JUROR:  No, I wouldn't.

10                MS. CILIA:  What about you, Mr. Tampa?

11                A PROSPECTIVE JUROR:  Being a former police

12        officer, I tend to believe that the cops are here to tell

13        the truth and I would definitely lean more towards their

14        opinion on the matter.

15                MS. CILIA:  There is nothing wrong with

16        appreciating the Police Department and what they do, but

17        the question here is would you be able to listen to their

18        testimony like any other witness, or would you

19        automatically believe them, for instance?

20                A PROSPECTIVE JUROR:  I would believe them.

21                MS. CILIA:  Okay.  Mr. Postiglione, I think that

22        you also gave an answer "I would hope not" when the judge

23        asked you a similar question.  Could you give a definitive

24        answer one way or the other?

25                A PROSPECTIVE JUROR:  I told the judge I think

1    not definitively.

2              MS. CILIA:  I think not.  Would you be able to

3    give us a definitive answer one way or the other?

4              A PROSPECTIVE JUROR:  Restate the question,

5    counselor.

6              MS. CILIA:  I believe that when Judge Rooney was

7    asking you about your experiences that you said, "I would

8    think not, I would hope not," in terms of would that have

9    an effect on your ability to be fair in this case.

10             A PROSPECTIVE JUROR:  It would not.

11             MS. CILIA:  It would not.  Okay.

12             Now, regarding the type of case this is.  You

13   have heard that it is a murder.  These are obviously very

14   serious charges, some of the most serious charges that we

15   have.  Is there anything about the type of case that this

16   is or any other personal, political or religious reason

17   that makes anyone here feel like they would not be able to

18   sit, listen to the testimony, deliberate and reach a

19   verdict in this case?

20             Ms. Lyons?  What do you think?

21             A PROSPECTIVE JUROR:  I am fine.  I would take

22   the evidence that you have and listen to it.

23             MS. CILIA:  And, Ms. Greco?  What do you think?

24             A PROSPECTIVE JUROR:  I could listen to the

25   evidence.

1              MS. CILIA:  Mr. Gilman?

2              A PROSPECTIVE JUROR:  Yes, I can listen to

3      evidence and make a decision.  Sure.

4              MS. CILIA:  This is the first time that I have

5      talked to you, Mr. Gilman.

6              A PROSPECTIVE JUROR:  First time, yes.

7              MS. CILIA:  You said that you are in

8      construction.

9              A PROSPECTIVE JUROR:  I was.

10             MS. CILIA:  Oh, retired construction.  Okay.  And

11     you were a civil juror awhile ago.

12             A PROSPECTIVE JUROR:  Quite awhile ago, yes.

13             MS. CILIA:  Anything about that experience

14     that -- did that leave with you a positive, negative or

15     sort of no feeling toward the justice system?

16             A PROSPECTIVE JUROR:  No, it was positive.

17             MS. CILIA:  All right.  Thank you very much.

18             MS. GUASTELLA:  Mr. Zaman, I think I heard you

19     say you are a construction worker?

20             A PROSPECTIVE JUROR:  Yes.

21             MS. GUASTELLA:  Where do you work?

22             A PROSPECTIVE JUROR:  In Brooklyn.

23             MS. GUASTELLA:  Are you in a union?  Do you work

24     for a private company?

25             A PROSPECTIVE JUROR:  No, no, private.

1        MS. GUASTELLA:  Private company.  Okay.

2            Now, if at the end of the case the People have

3    not proven their case beyond a reasonable doubt I may

4    decide that Armand does not have to take the stand on his

5    own behalf.  Are you going to want to hear from him anyway?

6            THE COURT:  The question is --

7            MR. REEVES:  Objection.

8            THE COURT:  Sustained.

9            MS. GUASTELLA:  Are you going to expect

10   Mr. Skrine to take the stand on his own behalf?

11           MR. REEVES:  There is an objection.

12           A PROSPECTIVE JUROR:  I don't know.

13           THE COURT:  The answer is I don't know.  I have

14   already voir dired these people on the issue.  If the

15   defendant does not testify in a criminal trial, that's not

16   a factor from which any inference unfavorable to such

17   defendant may be drawn.

18           Is there anybody who cannot accept and abide by

19   this fundamental principle in our criminal law?

20           ...Nobody is raising their hand.  Okay.

21           MS. GUASTELLA:  Mr. Gilman, do you have any

22   children?

23           A PROSPECTIVE JUROR:  No.

24           MS. GUASTELLA:  You have been out of work

25   approximately how long?

Jury Selection

 1              A PROSPECTIVE JUROR:  Retired.

 2              MS. GUASTELLA:  Retired.  I am sorry.

 3              A PROSPECTIVE JUROR:  Two years.

 4              MS. GUASTELLA:  And, Miss Rubinshteyn, you are a

 5    pharmacist?  Here on Staten Island?

 6              A PROSPECTIVE JUROR:  Brooklyn.

 7              MS. GUASTELLA:  In like a CVS or a private

 8    pharmacy?

 9              A PROSPECTIVE JUROR:  Retail chain.  Duane Reade.

10              MS. GUASTELLA:  Do you have -- well, does the

11    pharmacy Duane Reade have any problems with people trying

12    to steal prescription pills?

13              A PROSPECTIVE JUROR:  No, not pills.

14              MS. GUASTELLA:  But you were shaking your head.

15    You have had problems.

16              A PROSPECTIVE JUROR:  Like front stuff, yeah,

17    they steal.

18              MS. GUASTELLA:  Mr. Columbo, your brother-in-law

19    is a retired homicide detective?

20              A PROSPECTIVE JUROR:  My brother-in-law's

21    brother.

22              MS. GUASTELLA:  Are you in contact with him?

23              A PROSPECTIVE JUROR:  I see him once in a while.

24              MS. GUASTELLA:  What's once in a while?

25              A PROSPECTIVE JUROR:  Every couple of months.

Jury Selection

1    MS. GUASTELLA:  Do you talk about his cases?

2    A PROSPECTIVE JUROR:  No.

3    MS. GUASTELLA:  Do you have children?

4    A PROSPECTIVE JUROR:  Yes, I do.

5    MS. GUASTELLA:  How old are they?

6    A PROSPECTIVE JUROR:  28 and 22.

7    MS. GUASTELLA:  Boys or girl?

8    A PROSPECTIVE JUROR:  One and one.

9    MS. GUASTELLA:  Have you ever overheard them

10   having a fight?

11   A PROSPECTIVE JUROR:  Of course.

12   MS. GUASTELLA:  And have you ever maybe blamed

13   one child where the other one was wrong?

14   A PROSPECTIVE JUROR:  Sometimes.

15   MS. GUASTELLA:  How do you determine who is

16   actually telling you the truth?

17   A PROSPECTIVE JUROR:  Ask them to explain what

18   the situation was and then go through the issues and figure

19   out who was at fault.

20   MS. GUASTELLA:  Did you have to apologize to the

21   other child?

22   A PROSPECTIVE JUROR:  Yeah.  I would say

23   reluctantly.

24   MS. GUASTELLA:  I know I do.

25   Miss Greco, you are an office manager?

Jury Selection

1           A PROSPECTIVE JUROR:  Uh-Hum.

2           MS. GUASTELLA:  Where?

3           A PROSPECTIVE JUROR:  I work for an advocacy firm

4      for children with special needs.

5           MS. GUASTELLA:  Are there attorneys in this firm?

6           A PROSPECTIVE JUROR:  No.

7           MS. GUASTELLA:  Do you go to court?

8           A PROSPECTIVE JUROR:  No.

9           MS. GUASTELLA:  Do you get to interview any of

10      the people that come in?

11           A PROSPECTIVE JUROR:  The parents, yes.

12           MS. GUASTELLA:  What is your role in interviewing

13      them?

14           A PROSPECTIVE JUROR:  Asking mostly information

15      about their child.

16           MS. GUASTELLA:  Not in an accusatory manner, just

17      for information.

18           A PROSPECTIVE JUROR:  No.

19           MS. GUASTELLA:  For case files.

20           A PROSPECTIVE JUROR:  Uh-Hum.

21           MS. GUASTELLA:  Miss Lyons, you are doing

22      decorating.

23           A PROSPECTIVE JUROR:  Yes.

24           MS. GUASTELLA:  What is it, private parties?

25           A PROSPECTIVE JUROR:  Yes.

Jury Selection

1          MS. GUASTELLA:  Sweet 16's and things like that.

2          A PROSPECTIVE JUROR:  Lollipops.

3          MS. GUASTELLA:  Do you have children?

4          A PROSPECTIVE JUROR:  Yes.

5          MS. GUASTELLA:  How old?

6          A PROSPECTIVE JUROR:  Two girls and a boy.  Mary

7     is 27, Laura 26 and Charles is 23.  They don't live with me

8     anymore.

9          MS. GUASTELLA:  Have you ever had an occasion to

10    overhear an argument or a fight or witness a fist fight

11    between them?

12         A PROSPECTIVE JUROR:  The three of them, yes.

13         MS. GUASTELLA:  Did you ever blame the wrong

14    child for something?

15         A PROSPECTIVE JUROR:  Not that I recall.

16         MS. GUASTELLA:  Mr. Gilman, I am sorry, you said

17    you were in a civil trial.

18         A PROSPECTIVE JUROR:  I was a juror in a civil

19    trial.

20         MS. GUASTELLA:  How long did that last?

21         A PROSPECTIVE JUROR:  A day or two.

22         MS. GUASTELLA:  And, Mr. Postiglione, you stated

23    you represented the PBA?  Did you represent the police

24    officers at GO-15 hearings?

25         A PROSPECTIVE JUROR:  No.

Jury Selection

1      MS. GUASTELLA:  Did you ever have the occasion to

2   interview those police officers and prepare them for the

3   hearings?

4      A PROSPECTIVE JUROR:  No.

5      MS. GUASTELLA:  What did you do for the PBA?

6      A PROSPECTIVE JUROR:  Grievance arbitrations;

7   what the contract means.

8      MS. GUASTELLA:  Not disciplinary hearings.

9      A PROSPECTIVE JUROR:  Not discipline.  I did

10   disciplinary matters involving Transit police officers.

11      MS. GUASTELLA:  So tell me a little bit about

12   that.  What was your role in that?

13      A PROSPECTIVE JUROR:  Any form of misconduct,

14   people draft charges and bring cases before the office, and

15   administrative trials and hearings.

16      MS. GUASTELLA:  You were sort of like the

17   prosecutor.

18      A PROSPECTIVE JUROR:  Prosecutor.

19      MS. GUASTELLA:  Miss Simone, your daughter's a

20   police officer in Brooklyn South?

21      A PROSPECTIVE JUROR:  Yes.

22      MS. GUASTELLA:  How long has she been a police

23   officer?

24      A PROSPECTIVE JUROR:  Seventeen years.

25      MS. GUASTELLA:  Does she live with you?

Jury Selection

1          A PROSPECTIVE JUROR:  No.

2          MS. GUASTELLA:  When's the last time she lived

3     with you; about how long ago?

4          A PROSPECTIVE JUROR:  Twelve years ago?

5          MS. GUASTELLA:  Sorry.

6          A PROSPECTIVE JUROR:  Twelve years ago.

7          MS. GUASTELLA:  Do you talk to her every day?

8          A PROSPECTIVE JUROR:  Yes.

9          MS. GUASTELLA:  Does she share with you what

10    happens at work?

11         A PROSPECTIVE JUROR:  Yes.

12         MS. GUASTELLA:  And does she talk to you about

13    her arrests?

14         A PROSPECTIVE JUROR:  Yes.

15         MS. GUASTELLA:  And does she ever tell you the

16    outcome of those arrests?

17         A PROSPECTIVE JUROR:  Sometimes.  Yes.

18         MS. GUASTELLA:  Thank you.

19         THE COURT:  Okay.  I will give the lawyers a few

20    minutes and we will be right back.  If you need to step out

21    for a moment, go ahead.  Don't discuss the case.  Thank you

22    all.

23         (The following takes place at side bar.)

24         THE COURT:  Okay.  Again, we are at a side bar in

25    the courtroom on the record.

Jury Selection

1        What do we have, six sworn?

2              THE CLERK:  Six sworn.

3              THE COURT:  We will go one at a time.  Number 1,

4    Mr. Zaman.

5        Cause, People?

6              MS. CILIA:  No.

7              THE COURT:  Defense?

8              MS. GUASTELLA:  No.

9              THE COURT:  Peremptory, People?

10             MS. CILIA:  No.

11             THE COURT:  Defense?

12             MS. GUASTELLA:  Yes.

13             THE COURT:  Next, Miss Rubinshteyn.

14       Cause, People?

15             MS. CILIA:  No.

16             THE COURT:  Defense?

17             MS. GUASTELLA:  Oh, no.  I am sorry.

18             THE COURT:  Peremptory, People?

19             MS. CILIA:  No.

20             THE COURT:  Defense?

21             MS. GUASTELLA:  No.

22             THE COURT:  So Rubinshteyn becomes Juror 7.

23             THE CLERK:  Yes, sir.

24             THE COURT:  Next is Mr. Columbo.

25       Cause, People?

Jury Selection

1        MS. CILIA:  No.

2        THE COURT:  Defense?

3        MS. GUASTELLA:  No.

4        THE COURT:  Peremptory, People?

5        MS. CILIA:  No.

6        THE COURT:  Defense?

7        MS. GUASTELLA:  Yes.

8        THE COURT:  Next is Mr. Greco.

9        Cause, People?

10       MS. CILIA:  Miss Greco?

11       THE COURT:  I beg your pardon.  Miss Greco.

12       MS. CILIA:  No.

13       THE COURT:  Defense?

14       MS. GUASTELLA:  No.

15       THE COURT:  Peremptory, People?

16       MS. CILIA:  No.

17       THE COURT:  Defense?

18       MS. GUASTELLA:  Yes.

19       THE COURT:  Next is Miss Ierardi.

20       Cause, People?

21       MS. CILIA:  Yes.

22       MS. GUASTELLA:  Consent.

23       THE COURT:  For cause on consent.

24       Next is Mr. Roman.

25       Cause, People?

Jury Selection

1          MS. CILIA:  Yes.

2          MS. GUASTELLA:  Consent.

3          THE COURT:  Cause on consent.

4          Next is Mr. Rivera.

5          Cause, People?

6          MS. CILIA:  Yes.

7          MS. GUASTELLA:  Consent.

8          THE COURT:  Cause on consent.

9          Next is Miss Lyons.

10          Cause, People?

11          MS. CILIA:  No.

12          THE COURT:  Defense?

13          MS. GUASTELLA:  No.

14          THE COURT:  Peremptory, People?

15          MS. CILIA:  No.

16          THE COURT:  Defense?

17          MS. GUASTELLA:  Yes.

18          THE COURT:  Next is Mr. Gilman.

19          Cause, People?

20          MS. CILIA:  No.

21          THE COURT:  Defense?

22          MS. GUASTELLA:  No.

23          THE COURT:  Peremptory, People?

24          MS. CILIA:  No.

25          THE COURT:  Defense?

Jury Selection

1      MS. GUASTELLA:  Yes.

2      THE COURT:  Next is Miss Martin.

3      Cause, People?

4      MS. CILIA:  No.

5      THE COURT:  Defense?

6      MS. GUASTELLA:  Yes.

7      MR. REEVES:  I worked with her husband for 15

8  years in Brooklyn South Homicide.  I don't know if she

9  knows me, and I do know him.

10     THE COURT:  Okay.

11     MR. REEVES:  Mike Martin's retired now, but I

12  just put that on the record.  Maybe it doesn't impact

13  anything we are doing but...

14     MS. GUASTELLA:  If she goes home and then tells

15  her husband --

16     THE COURT:  The defense is making a cause

17  challenge.

18     MR. REEVES:  We are not objecting to it.

19     THE COURT:  I will mark it for cause on consent.

20     MR. REEVES:  Yes.

21     THE CLERK:  I lost that.

22     THE COURT:  Number 10.

23     Next is Miss Connor.

24     Cause, People?

25     MS. CILIA:  No.

Jury Selection

1          THE COURT:  Defense?

2          MS. GUASTELLA:  Yes.  She said she wouldn't be

3     sure.  She assumed not, but I don't know for sure.

4          THE COURT:  I think that is right.  That is what

5     I wrote down.  I will grant that challenge.

6          Next is Mr. Mino.

7          Cause, People?

8          MS. CILIA:  Yes.

9          MS. GUASTELLA:  Consent.

10          THE COURT:  Cause on consent.

11          Next is Mr. Postiglione.

12          Cause, People?

13          MS. CILIA:  No.

14          THE COURT:  Defense?

15          MS. GUASTELLA:  No.

16          THE COURT:  Peremptory, People?

17          MS. CILIA:  Yes.

18          THE COURT:  That was a yes.

19          MS. CILIA:  Yes.

20          THE COURT:  Next is Miss Simone.

21          Cause, People?

22          MS. CILIA:  Yes.

23          MS. GUASTELLA:  Consent.

24          THE COURT:  Cause on consent.

25          Mr. Tampa.

Jury Selection

```
 1                  Cause, People?

 2                  MS. CILIA:  Yes.

 3                  MS. GUASTELLA:  Consent.

 4                  THE COURT:  For cause on consent.

 5                  Mr. Polo.

 6                  Cause, People?

 7                  MS. CILIA:  Yes.

 8                  MS. GUASTELLA:  Yes.

 9                  THE COURT:  That is consent.

10                  MS. GUASTELLA:  Consent, yes.

11                  THE COURT:  All right.  We got 18, 19 people

12     left.  They are going to try to get us some more jurors

13     tomorrow.  I don't know if they are going to be successful.

14                  Where do we stand on challenges?

15                  THE CLERK:  The People have used six, the defense

16     has used 12.

17                  (The following takes place in open court.)

18                  THE CLERK:  If you hear your name, remain seated.

19     Everyone else, please rise, step out of the box.

20                  Alena Rubinshteyn.

21                  Everyone else stand up.

22                  (Challenged jurors leave courtroom.)

23                  THE CLERK:  Is the juror satisfactory to the

24     People?

25                  MS. CILIA:  Yes.
```

Jury Selection

1      THE CLERK:  Is the juror satisfactory to the

2  defendant?

3      MS. GUASTELLA:  Yes.

4      THE CLERK:  Ma'am, please rise.

5      (Ms. Rubinshteyn sworn.)

6      THE COURT:  You can have a seat.  I will just

7  give you the same instruction you heard me give other sworn

8  jurors.

9      Don't discuss the case with other jurors or with

10 anyone else prior to being discharged.

11     Don't speak with anyone about taking any payment

12 or benefit in return for supplying information about this

13 trial.

14     Promptly report directly to me any incident

15 within your knowledge involving an attempt by anyone to

16 improperly influence you or any member of the jury.

17     Don't visit or view the premises or place where

18 any charged crime was allegedly committed or any other

19 premises or place involved in the case.

20     Don't listen to any media accounts regarding this

21 case should there be any.  That includes the internet.

22     And, finally, don't attempt to research any fact,

23 issue or law related to this case, whether by discussion

24 with others, by research in the library or on the internet

25 or by any other means or source.

Jury Selection

1       Thank you very much.  Have a good evening.  We

2   will see you Monday morning at 9:30 in the jury room.  The

3   officers will show you where that is.

4       (Sworn juror leaves courtroom.)

5       THE COURT:  To everyone else in the audience, it

6   is too late for us to do another round today.  I am

7   supposed to close by about 4:30.  Those are my rules these

8   days.

9       We are going to ask you to come back tomorrow

10  morning.  There are about 18 or 19 of you left.  We are

11  going to do everybody in one round.  I am going to make it

12  9:45.  If we get started at about 9:45 you should learn

13  your fate by 10:45 or 11:00, something like that.

14      Thank you very much for your patience.  The same

15  rules apply to you, but primarily just don't talk to

16  anybody about the case.  That shouldn't be hard; you don't

17  know much about it.

18      (Prospective jurors leave courtroom.)

19      THE COURT:  Okay, 9:45.

20      (Whereupon, court was recessed and this matter

21  adjourned to February 27, 2014 at 9:45 a.m.)

22                              o0o

23  Certified to be a true and accurate
    transcription of the above-captioned
24  proceedings,

25  Susan Maydan
    Official Court Reporter

```
SUPREME COURT OF THE STATE OF NEW YORK
RICHMOND COUNTY - CRIMINAL TERM-PART 12
---------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,   :
                                       :
         - against -                   :Indict. No.
                                       :454/2011
                                       :
ARMAND SKRINE,
                        Defendant.     :
---------------------------------------X
```

VOIR DIRE

                County Courthouse
                18 Richmond Terrace
                Staten Island, New York
                February 27, 2014

B E F O R E :

        HONORABLE STEPHEN ROONEY
                    Justice, Supreme Court.

A P P E A R A N C E S :

        MICHAEL E. MC MAHON, ESQ.,
            District Attorney - Richmond County
            Appearing for the People
        BY:  JENNIFER CILIA and
            KYLE REEVES, ESQS.,
            Assistant District Attorneys

        MARIA GUASTELLA, ESQ.,
            For the Defendant

                    ---

                            SUSAN MAYDAN
                        OFFICIAL COURT REPORTER

Jury Selection

1   THE CLERK:  Calendar Number 4, Armand Skrine.

2   Case on trial continues, Indictment 454 of 2011.

3   Appearance, counsel.

4   MS. CILIA:  Jennifer Cilia and Kyle Reeves for

5   the People.

6   MS. GUASTELLA:  Maria Guastella on behalf of

7   Mr. Skrine.

8   Good morning, your Honor.

9   (Defendant present.)

10   THE COURT:  Good morning.  Let's get the

11   remainder over here and get through that.  I think there

12   are 18 or 19 people.  We will do them in one round.  I will

13   sit the extra two or three in the front row.

14   (Prospective jurors enter courtroom.)

15   THE CLERK:  If you hear your name, please take a

16   seat in the box.  Paul DeGregorio, D-E-G-R-E-G-O-R-I-O,

17   Seat Number 1; Lori Guastavino, G-U-A-S-T-A-V-I-N-O, Seat

18   Number 2; Margaret Tito, T-I-T-O, Seat Number 3; Nicole

19   Arce, A-R-C-E, Seat Number 4; Joanne Budnick, Seat

20   Number 5; Rhonda Eleazer, E-L-E-A-Z-E-R, Seat Number 6;

21   Frank Filocamo, Seat Number 7, F-I-L-O-C-A-M-O; Robert

22   Mistretta, M-I-S-T-R-E-T-T-A, Seat Number 8; Cynthia

23   Yalartai, Y-A-L-A-R-T-A-I, Seat Number 9; Christine

24   Griffiths, G-R-I-F-F-I-T-H-S, Seat Number 10; Issam

25   Morawed, M-O-R-A-W-E-D, first name I-S-S-A-M, Seat

Jury Selection

1    Number 11; Paige Prudente, P-R-U-D-E-N-T-E, Seat Number 12;

2    Carmine Tropepe, T-R-O-P-E-P-E, Seat Number 13; Patricia

3    Mezzacappa, M-E-Z-Z-A-C-A-P-P-A, Seat Number 14; Iris

4    Munoz, M-U-N-O-Z, Seat Number 15; Bonnie Rogers,

5    R-O-G-E-R-S, Seat Number 16; Philip Ma, M-A, Seat

6    Number 17; Jeganathan Kumaresu, J-E-G-A-N-A-T-H-A-N first

7    name, last name K-U-M-A-R-E-S-U, Seat Number 18; and James

8    McHugh, M-C-H-U-G-H, Seat Number 19.

9        THE COURT:  Good morning.  I am sorry to bring

10   you over here so late.  We ran into an unavoidable delay.

11   It had nothing to do with the parties in this case.  It is

12   not their fault, so don't hold it against them.  And I

13   apologize to you.  It was simply unavoidable.

14       So let me launch into this.  Do any of you think

15   you know anything about this case apart from what you heard

16   here in court yesterday?

17       ...Do any of you know the lawyers or the

18   defendant?

19       ...Did any of you recognize the names of any of

20   those potential witnesses or names of people that may come

21   up during the trial?

22       Anybody want to hear me read those names again?

23   I am happy to do it if you want me to.

24       ...Are any of you or anyone close to you involved

25   or have you or they been involved in law enforcement in any

Jury Selection

1    way?

2              Ms. Arce?

3              A PROSPECTIVE JUROR:  Arce.

4              THE COURT:  Okay.

5              A PROSPECTIVE JUROR:  My father's a police

6    officer.  He is active.  He works in Brooklyn.  My uncle is

7    a retired N.Y.P.D. officer.  Both my boyfriends' parents

8    are officers, as well.

9              THE COURT:  Both of your boyfriends?

10             A PROSPECTIVE JUROR:  His mother and his

11   stepfather.

12             THE COURT:  Your boyfriend's parents.

13             A PROSPECTIVE JUROR:  Yes.

14             THE COURT:  Are in law enforcement.

15             A PROSPECTIVE JUROR:  One of them used to work

16   for the N.Y.P.D; now he works for the MTA.

17             THE COURT:  The MTA.  Okay.

18             You know the question, Ms. Arce.  Is there

19   anything about these relationships that would have any

20   effect on your ability to be fair?

21             A PROSPECTIVE JUROR:  No, sir.

22             THE COURT:  Thank you.

23             Anyone else in the first row?  I will stick with

24   the first row.

25             Miss Budnick.

Jury Selection

1           A PROSPECTIVE JUROR:  My brother's a retired cop.

2           THE COURT:  Retired N.Y.P.D.

3           A PROSPECTIVE JUROR:  Yes.

4           THE COURT:  Is it going to have any effect on

5      your ability to be fair?

6           A PROSPECTIVE JUROR:  No, not at all.

7           THE COURT:  Anyone in the back row?  Still in the

8      first row.

9           Mr. Filocamo.

10          A PROSPECTIVE JUROR:  My two cousins,

11     brother-in-law.

12          THE COURT:  N.Y.P.D.?

13          A PROSPECTIVE JUROR:  Yes.

14          THE COURT:  What do you think?  Is that going to

15     have any bearing on your ability to be fair?

16          A PROSPECTIVE JUROR:  No.  Just some stories, but

17     I think I will be okay.

18          THE COURT:  Okay.  Mr. Mistretta.

19          A PROSPECTIVE JUROR:  My nephew is second year on

20     the force.

21          THE COURT:  Two years.  What do you think?

22     Anything about that that would prevent you from being fair?

23          A PROSPECTIVE JUROR:  No.

24          THE COURT:  Thank you.

25          Mr. McHugh.

Jury Selection

1          A PROSPECTIVE JUROR:  Yeah.  My father-in-law and

2     uncle.

3          THE COURT:  Are they still on the job?

4          A PROSPECTIVE JUROR:  No.

5          THE COURT:  Retired?

6          A PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Is that going to have any effect on

8     your ability to be a fair juror?

9          A PROSPECTIVE JUROR:  No.

10         THE COURT:  Thank you.

11              Anyone else in the front row?

12              Anyone else in the jury box?

13              ... Okay.  Are any of you or anyone close to you

14    involved in the legal field in any way?

15              Mr. McHugh.

16         A PROSPECTIVE JUROR:  I have friends.  I am okay.

17         THE COURT:  You have friends who are lawyers.

18         A PROSPECTIVE JUROR:  Yeah, for the Assistant

19    District Attorney in the Bronx.

20         THE COURT:  They are assistant D.A.'s in the

21    Bronx.

22         A PROSPECTIVE JUROR:  Yes.

23         THE COURT:  Anything about these friendships that

24    would prevent you from being fair and impartial?

25              A PROSPECTIVE JUROR:  No.

Jury Selection

1          THE COURT:  I say the legal field.  I don't just

2    mean lawyers, I mean anybody working in the legal field in

3    any capacity.

4          ... Okay.  Have any of you or anyone close to

5    you, to your knowledge, ever been the victim of a crime?

6          Mr. Filocamo, could you tell me about it?

7          A PROSPECTIVE JUROR:  Yeah.  My mom was.

8          THE COURT:  Can you give me a little -- I don't

9    need everything.  We will talk privately if you prefer.

10          A PROSPECTIVE JUROR:  Yes.

11          THE COURT:  Okay.  Talk to you shortly.

12          Anyone else?

13          ...Have any of you ever been a witness in any

14    kind of a courtroom proceeding or Grand Jury proceeding?

15          ... Have any of you ever been a litigant -- that

16    is, a plaintiff or a defendant -- in any kind of a civil

17    action, civil lawsuit, civil trial?

18          ...Have any of you or anyone close to you ever

19    been a defendant in any kind of a criminal proceeding?  And

20    we can talk privately.

21          ...Have any of you ever served on a jury before?

22          Ms. Guastavino.  Is that right?

23          A PROSPECTIVE JUROR:  Yes.

24          THE COURT:  When were you on a jury,

25    approximately?

Jury Selection

1                A PROSPECTIVE JUROR:  It was 25 to 30 years ago.

2                THE COURT:  Do you remember if it was a criminal

3      or a civil case?

4                A PROSPECTIVE JUROR:  Civil.

5                THE COURT:  Did the jury reach a verdict?

6                A PROSPECTIVE JUROR:  Yes, they did.

7                THE COURT:  Was there anything about that jury

8      experience that would affect your ability to sit here?

9                A PROSPECTIVE JUROR:  Not at all.

10                THE COURT:  Thank you.

11                Other hands.  Mr. Mistretta.  When, please?

12                A PROSPECTIVE JUROR:  Twice; once 12 years ago

13      and once six years ago.

14                THE COURT:  Do you remember if they were civil or

15      criminal cases?

16                A PROSPECTIVE JUROR:  Both civil cases.

17                THE COURT:  Did the jury reach a verdict?

18                A PROSPECTIVE JUROR:  Yes.

19                THE COURT:  Was there anything about those

20      experiences that would prevent you from being able to sit

21      in this case?

22                A PROSPECTIVE JUROR:  No.

23                THE COURT:  Thank you.

24                Miss Rogers?  Did you have your hand up?

25                A PROSPECTIVE JUROR:  Yes.

Jury Selection

1          THE COURT:  When were you on a jury?

2          A PROSPECTIVE JUROR:  A long time ago.

3          THE COURT:  More than four years ago?

4          A PROSPECTIVE JUROR:  More.

5          THE COURT:  Do you remember what kind -- was it a

6      civil --

7          A PROSPECTIVE JUROR:  Both civil cases.

8          THE COURT:  Beg pardon?

9          A PROSPECTIVE JUROR:  Civil.

10         THE COURT:  Did you reach a verdict?

11         A PROSPECTIVE JUROR:  Yes.

12         THE COURT:  Was there anything about that jury

13     experience that would affect your ability to be able to sit

14     here?

15         A PROSPECTIVE JUROR:  No.

16         THE COURT:  Thank you.

17         Anyone else in the jury box?

18         Miss Mezzacappa, when were you on a jury?

19         A PROSPECTIVE JUROR:  20 to 30 years ago.  It was

20     a civil suit but they settled.  After the openings it

21     settled.

22         THE COURT:  Okay.  Was there anything about that

23     experience that would prevent you from sitting here?

24         A PROSPECTIVE JUROR:  No.

25         THE COURT:  Thank you.

000425

Jury Selection

1           Anyone else?

2           Mr. Tropepe?

3           A PROSPECTIVE JUROR:  Tropepe, yes.  I was on two

4      about eight years ago in Brooklyn, civil and criminal.

5           THE COURT:  In the criminal case, just yes or no,

6      did the jury reach a verdict?

7           A PROSPECTIVE JUROR:  Yes.

8           THE COURT:  In the civil case, did you reach a

9      verdict?

10          A PROSPECTIVE JUROR:  Never got to court.

11          THE COURT:  Never got to it.  Okay.  Anything

12     about those experiences that would prevent you from being

13     able to sit in this case?

14          A PROSPECTIVE JUROR:  No.

15          THE COURT:  Thank you.

16          Anybody else in the jury box?  Anybody in the

17     front row?

18          ...Have any of you ever served on a Grand Jury?

19          Nobody.  Okay.

20          Mr. DeGregorio, are you employed, sir?

21          A PROSPECTIVE JUROR:  Yes, sir.

22          THE COURT:  What type of work do you do?

23          A PROSPECTIVE JUROR:  Electrical.

24          THE COURT:  Thank you.

25          Ms. Guastavino, are you employed?

000426

Jury Selection

1          A PROSPECTIVE JUROR:  Yes, I am.

2          THE COURT:   What do you do?

3          A PROSPECTIVE JUROR:  I am a nurse.

4          THE COURT:   Thank you.

5          Ms. Tito, are you employed?

6          A PROSPECTIVE JUROR:  No.

7          THE COURT:  Ms. Arce?

8          A PROSPECTIVE JUROR:  Yes.  Actually, I have

9   three different jobs.  I am a receptionist at a tax office,

10  and I also work with kids with disabilities.

11          THE COURT:  Okay.  Thank you.

12          Ms. Budnick.

13          A PROSPECTIVE JUROR:  Laboratory technologist.

14          THE COURT:  What kind of field?  Are we talking

15  medical?

16          A PROSPECTIVE JUROR:  Yes, medical.

17          THE COURT:  Okay.

18          Miss Eleazer.

19          A PROSPECTIVE JUROR:  Unit clerk at Staten Island

20  University North.

21          THE COURT:  Thank you.

22          Mr. Filocamo.

23          A PROSPECTIVE JUROR:  Yes.  Operating engineer.

24          THE COURT:  Thank you.

25          Mr. Mistretta.

Jury Selection

```
 1              A PROSPECTIVE JUROR:  Retired science teacher.

 2              THE COURT:  Thank you.

 3              Mr. McHugh.

 4              A PROSPECTIVE JUROR:  I am a banker.

 5              THE COURT:  Thank you.

 6              Mr. Morawed.

 7              A PROSPECTIVE JUROR:  In a bank.

 8              THE COURT:  Thank you.

 9              Mr. Ma.

10              A PROSPECTIVE JUROR:  Nursing.

11              THE COURT:  Nursing?  Thank you.

12              Miss Rogers?

13              A PROSPECTIVE JUROR:  Retired telecommunications.

14              THE COURT:  Thank you.

15              Miss Munoz.

16              A PROSPECTIVE JUROR:  I work for the Finance

17      Department.

18              THE COURT:  Thank you.

19              Ms. Mezzacappa.

20              A PROSPECTIVE JUROR:  I am an English teacher.

21              THE COURT:  Thank you.

22              Mr. Tropepe.

23              A PROSPECTIVE JUROR:  Retired.

24              THE COURT:  From what, please?

25              A PROSPECTIVE JUROR:  National Grid.  Keyspan.
```

Jury Selection

1    National Grid.

2              THE COURT:   Thanks.

3              Miss Prudente.

4              A PROSPECTIVE JUROR:   A waitress.

5              THE COURT:   Thank you.

6              Mr. Morawed.

7              A PROSPECTIVE JUROR:   Manage a dispatch limo

8    company.

9              THE COURT:   Miss Griffiths.

10             A PROSPECTIVE JUROR:   Nurse and hospital

11   administrator.

12             THE COURT:   Thank you.

13             And Miss Yalartai.

14             A PROSPECTIVE JUROR:   PCA for hospice and mental

15   patients.

16             THE COURT:   Thank you.   Thank you all for that

17   information.

18             I will get to the principles of law now. I am

19   going to paraphrase because you heard them several times

20   already.

21             As you now know, an indictment is evidence of

22   nothing.   In particular, it is not evidence of guilt.   Can

23   everybody accept this proposition in our criminal law?

24             Anybody who cannot accept this proposition?

25             ...If selected as a juror here you would be

1    called upon at the end of the trial to deliberate with 11

2    other people in the jury room in an effort to reason

3    together and arrive at a final unanimous verdict or

4    verdicts.  Those of you who served on juries before know

5    what this is all about.  The question is, do any of you

6    feel you could not deliberate with 11 other people if

7    called upon to do so?

8              ...Under our law everyone accused of a crime or

9    brought to trial is presumed innocent unless or until he is

10   proved guilty beyond a reasonable doubt.  The defendant in

11   this case is presumed innocent.  And to put this another

12   way, a defendant is never required to prove his innocence.

13   On the contrary; the People, having accused the defendant

14   of the crimes charged, have the burden of proving him

15   guilty beyond a reasonable doubt.  The People carry this

16   burden of proof throughout the trial.  It never shifts, it

17   always remains on the People, and a presumption of

18   innocence remains with every defendant throughout every

19   criminal trial.

20             Is there anyone amongst you who cannot now in

21   your own mind grant the defendant this presumption of

22   innocence?

23             ...In a criminal trial the burden of proof is

24   entirely on the People and remains on them throughout the

25   trial.  The defendant's not required to prove anything, nor

000430

Jury Selection

1     is the defendant required to disprove anything.  As I say,

2     the entire burden of proof is on the People and remains on

3     them throughout the trial.  Is there anyone here who would

4     have difficulty following this rule in our law?

5              ...If a defendant does not testify in a criminal

6     trial, that is not a factor from which any inference

7     unfavorable to such defendant may be drawn.  Is there

8     anybody amongst you who cannot accept this fundamental rule

9     in our criminal law?

10             ...I defined yesterday the standard of proof

11    required for conviction in every criminal case.  That

12    standard, of course, is called proof of guilt beyond a

13    reasonable doubt.  Did all of you hear that definition when

14    I read it to the panel yesterday?  Would anybody -- I am

15    getting nods, for the record.

16             Would anybody like me to read it again?  I am

17    happy to do it if anybody would like me to.

18             ...Nobody does.  Okay.  Keep that definition in

19    mind.

20             Let me remind you it is the duty of each juror

21    carefully to review, weigh and consider all the evidence.

22    If after doing this you find that the People have not

23    proved the defendant's guilt beyond a reasonable doubt as I

24    have defined the term, then you must find the defendant not

25    guilty.

1          On the other hand, if you are satisfied that the

2     People have proved the defendant's guilt beyond a

3     reasonable doubt as I have defined the term, then you must

4     find the defendant guilty.

5          Will you promise us now that if you are selected

6     here you will in your final deliberations follow and apply

7     the standard of proof that I have defined; that is, proof

8     beyond a reasonable doubt?  Is there anyone amongst you who

9     cannot make us that promise?

10         ...I will remind you that a deliberating jury is

11    not permitted to consider the subject of punishment.  If

12    there is to be any sentencing following a verdict, that is

13    for the Court and the Court alone to deal with.  The jury

14    has no role to play in that.

15         Will you promise us now that if selected here you

16    will render your verdict free from fear, favor or sympathy

17    and without considering any possibility of sentence or

18    punishment?  Is there anybody who cannot make us that

19    promise?

20         ...And my last question.  The jury in this case

21    will likely hear from police officers and detectives.  They

22    take the same oath as anyone else.  The mere fact that a

23    witness is a police officer does not make that witness any

24    more or any less credible.

25         Is there anyone amongst you who has any feelings

Jury Selection

1    about the police or who has had any experiences with the

2    police which would lead you in your judgment to give a

3    police officer's testimony greater or lesser weight than

4    anyone else's merely because of the officer's occupation?

5              Somebody have a feeling one way or the other?

6              ...Okay.  Thanks very much.  We are going to step

7    to the side and speak to one potential juror and then I

8    will let the lawyers talk to you.

9              (The following takes place at side bar.)

10             THE COURT:  Mr. Filocamo.

11             (Mr. Filocamo approaches side bar.)

12             THE CLERK:  This is Frank F-I-L-O-C-A-M-O.  Step

13   right up, sir.  Stand right here.

14             THE COURT:  I think the question was do you know

15   anybody who was a victim of a crime.

16             A PROSPECTIVE JUROR:  My mother was.  She was

17   carjacked and she was sexually assaulted and almost raped

18   by the man.

19             THE COURT:  How long ago was this?

20             A PROSPECTIVE JUROR:  '96?

21             THE COURT:  Was anybody arrested?

22             A PROSPECTIVE JUROR:  No.  They let him go.  But,

23   honestly, I don't know how fair I can be because he looks a

24   little bit like the defendant and I don't want that to, you

25   know, hinder my decision.

Jury Selection

```
 1              THE COURT:  Okay.
 2              A PROSPECTIVE JUROR:  Just to let you know that.
 3              THE COURT:  Sure.  Thank you.
 4              Counselor, any questions?
 5              MS. GUASTELLA:  No.  Thank you for your honesty.
 6              MS. CILIA:  Thank you.
 7              THE COURT:  Thank you, sir.  I will let you
 8      resume your seat.
 9              (Mr. Filocamo resumes his seat.)
10              THE COURT:  Incidentally, we are at a side bar on
11      the record in court.
12              We got a couple of nurses and somebody works in a
13      med lab.  I doubt very much that their expertise would be
14      involved.  We got a gunshot wound and an ME testifying;
15      right?
16              MR. REEVES:  Right.
17              THE COURT:  But I do have an expert juror charge
18      which I give occasionally when say nurses are involved or
19      there is a question of whether we have physical injury or
20      serious physical injury.  The Court of Appeals --
21              MR. REEVES:  I am not asking for it.  I don't
22      think we will ask for it at this point.
23              THE COURT:  Personally, I don't think it is
24      necessary given the fact, as I understand it, we are
25      dealing with a gunshot wound to the head?  Or the chest?
```

1               MR. REEVES:  Both.

2               THE COURT:  So I can't imagine that a nurse's

3       expertise would be implicated here by you.  I just throw

4       that out to you.  I have a charge if anybody wants me to --

5       right now, for example, I could run it by the jurors with

6       medical backgrounds and see if they could promise to abide

7       by it, although I don't think it is necessary.

8               MS. GUASTELLA:  I don't think so either.

9               THE COURT:  And the People don't either,

10      apparently.

11              MR. REEVES:  No.

12              THE COURT:  Okay.

13              (The following takes place in open court.)

14              MS. CILIA:  Good morning, everyone.  Thank you

15      for joining us this morning.  Was it cold outside this

16      morning?

17              A PROSPECTIVE JUROR:  Just a little bit.

18              MS. CILIA:  Colder yesterday?

19              A PROSPECTIVE JUROR:  Warmer today.

20              MS. CILIA:  It was truly actually freezing in

21      this room until about 10 minutes ago.

22              A PROSPECTIVE JUROR:  It still is.

23              THE COURT:  The officers are tough on the heat.

24      They like it cold.

25              MS. CILIA:  You all sat through jury selection

1    yesterday.  You heard the questions that we were talking

2    about.  Does anyone here want to take a stab at what they

3    think circumstantial evidence is, having heard it quite a

4    few times yesterday?  Does anybody feel comfortable with

5    that?

6         I don't want to forget about you guys too on the

7    side here.  I am going to pick on Mr. DeGregorio.

8         A PROSPECTIVE JUROR:  Yes.

9         MS. CILIA:  Do you think that you could tell us?

10        THE COURT:  You are asking the potential juror to

11   define circumstantial evidence?  I am not going to let you

12   do that.

13        MS. CILIA:  All right.

14        You heard us talking about the types of evidence

15   that we were going to be using in this particular trial.

16        A PROSPECTIVE JUROR:  Yes.

17        MS. CILIA:  There are basically two different

18   types of evidence.  There is direct evidence and then there

19   is circumstantial evidence, which are just legal terms you

20   don't really need to think about, but, most importantly,

21   what I would ask all of you to consider is if we are able

22   to prove this case through witnesses who are going to talk

23   about what they saw before the crime happened, what

24   happened after the crime, where the defendant was after

25   this crime occurred, DNA evidence, ballistic evidence that

1        is going to point toward the defendant, is anyone here

2        going to require somebody to take that stand and point to

3        the defendant and say I saw that man right there shoot and

4        kill David Williams?

5                Is there anyone who is going to require that

6        particular type of evidence before they can convict in this

7        case?

8                I see a nodding head over here.

9                Miss Prudente.

10               A PROSPECTIVE JUROR:  No, I am not nodding.

11               MS. CILIA:  Oh, okay.  What do you think about

12       that?  Would you require that type of evidence?

13               A PROSPECTIVE JUROR:  No.

14               MS. CILIA:  Okay.  I am going to come back to

15       you, Mr. DeGregorio.  What do you think?

16               A PROSPECTIVE JUROR:  No, I wouldn't need

17       somebody to point.

18               MS. CILIA:  Okay.  If we were able to prove this

19       case through circumstantial evidence, through ballistics

20       and DNA, forensic evidence, as well as some other

21       information that you are going to hear from witnesses,

22       would that be -- if we proved that beyond a reasonable

23       doubt, would you be able to vote guilty in this case?

24               A PROSPECTIVE JUROR:  Yes.

25               MS. CILIA:  What do you think, Miss Guastavino?

Jury Selection

1            A PROSPECTIVE JUROR:  Guastavino.

2            MS. CILIA:  Guastavino.

3            A PROSPECTIVE JUROR:  If the evidence,

4    circumstantial or direct, proved beyond a reasonable doubt

5    then I would be able to say guilty.

6            MS. CILIA:  Okay.

7            Ms. Tito, how do you feel about that?

8            A PROSPECTIVE JUROR:  Same thing.  If it was

9    proved that he was guilty, then I would vote guilty.  If

10   not, not guilty.

11           MS. CILIA:  Ms. Mezzacappa.

12           A PROSPECTIVE JUROR:  Yes.

13           MS. CILIA:  Is there anyone who feels

14   differently; who feels like this is a serious case, this is

15   a murder case, we can't think of many other types of crimes

16   that are more serious than this one?  Is there anyone who

17   feels like, based on the charges in this case, that they

18   would need something more than circumstantial evidence?

19           Miss Eleazer, what do you think?

20           A PROSPECTIVE JUROR:  Eleazer.

21           MS. CILIA:  I am sorry.  What do you think?

22           A PROSPECTIVE JUROR: Solid evidence.  It would

23   have to be solid evidence.

24           MS. CILIA:  Okay.  Our burden in this case is

25   going to be proof beyond a reasonable doubt.  That's what

1  the judge is going to talk to you about, about the standard

2  in law.  Would you be able to follow that standard or would

3  you hold us to a higher standard?

4  A PROSPECTIVE JUROR:  No, I would be able to

5  follow it.

6  MS. CILIA:  Okay, thank you.

7  And Miss Griffiths?

8  A PROSPECTIVE JUROR:  Yes.  I guess it would -- I

9  am a little concerned because in my present position we do

10  a lot of different investigations on different outcomes,

11  incidents, and we really require the facts.  That's what

12  has been my practice for many years.  It depends on --

13  MS. CILIA:  Tell us your job.  What types of

14  investigations are you talking about?

15  A PROSPECTIVE JUROR:  It could be patient

16  outcomes, it could be staff behavioral incidents.  Whole

17  range.

18  MS. CILIA:  So do you deal with victims that come

19  into the hospital with injuries?

20  A PROSPECTIVE JUROR:  Could.  We don't do our own

21  obviously police investigation there.  It is more of

22  employee.

23  MS. CILIA:  Are there ever times when, based on

24  the types and natures of the injuries, they are able to

25  draw certain conclusions?

Jury Selection

1        A PROSPECTIVE JUROR:  I don't know if injury is

2    the correct thing to use in my workplace.

3        MS. CILIA:  Okay.  Is there anyone here -- we had

4    some other people who dealt with hospitals, as well.

5        Mr. McHugh, you said nursing; right?

6        A PROSPECTIVE JUROR:  No, I am a banker.

7        MS. CILIA:  Oh, banker.

8        A PROSPECTIVE JUROR:  This gentleman here

9    (Indicating).

10       MS. CILIA:  I am sorry.  Mr. Ma?

11       A PROSPECTIVE JUROR:  Yes.

12       MS. CILIA:  Nursing.

13       A PROSPECTIVE JUROR:  Yes.

14       MS. CILIA:  Do you ever deal with victims that

15   come in who have different injuries?

16       A PROSPECTIVE JUROR:  Rarely, but they do appear

17   once in a while.

18       MS. CILIA:  Do you sometimes draw conclusions

19   based on the types of injuries that you see on a particular

20   patient?

21       A PROSPECTIVE JUROR:  I can assume certain things

22   but I wouldn't make an exact conclusion.  But based on if

23   they had injuries on a hand or something like that, I would

24   question whether it was domestic abuse.

25       MS. CILIA:  I want to talk to you also about

1      motive, which is another thing that we touched upon

2      yesterday.

3              Does anybody want to talk about what they

4      think -- what do you think motive is?

5              Miss Rogers, what do you think motive is?

6              A PROSPECTIVE JUROR:  What made somebody do

7      something.

8              MS. CILIA:  That sounds pretty much what I would

9      say too:  What makes somebody do something.  In your mind,

10     you know, what's the reason why somebody does something.

11     Under our law we don't need to prove that.  We just need to

12     prove in this case the intentional killing of David

13     Williams, not why David Williams was killed.

14             Would you require that before you were able to

15     convict in this case?

16             A PROSPECTIVE JUROR:  No.

17             MS. CILIA:  Ms. Munoz, what do you think?

18             A PROSPECTIVE JUROR:  I would not.

19             MS. CILIA:  Over here.  Mr. Kumaresu, what do you

20     think?  Would you require that from us?

21             A PROSPECTIVE JUROR:  No.

22             MS. CILIA:  You wouldn't require a motive in this

23     case?

24             A PROSPECTIVE JUROR:  I don't know.

25             MS. CILIA:  Okay.  What the judge is going to

Jury Selection

1    tell you at the end of the case is that we don't need to

2    prove motive.  We don't need to prove why the defendant did

3    what he did, we have to prove that he, in fact, killed on

4    purpose David Williams.  Knowing that, would you be able to

5    follow the law that the judge tells you?

6              A PROSPECTIVE JUROR:  Yes.

7              MS. CILIA:  Or would you still -- would you

8    require that you need to know why?

9              A PROSPECTIVE JUROR:  No, I will follow the

10   judge.

11             MS. CILIA:  Okay.  Mr. McHugh, what about you?

12             A PROSPECTIVE JUROR:  I agree with him.  I

13   wouldn't need it.

14             MS. CILIA:  Does anyone disagree?  Does anybody

15   say, "You know what, this is a murder, I need to know why?"

16             Mis Yalarfai, what about you?

17             A PROSPECTIVE JUROR:  Yes.

18             MS. CILIA:  Would you need to know why?

19             A PROSPECTIVE JUROR:  Not really.  I can't answer

20   for sure's the reason, I will just look at the facts and

21   evidence.

22             MS. CILIA:  So if we prove beyond a reasonable

23   doubt that the defendant shot and killed on purpose David

24   Williams, would you be able to convict?

25             A PROSPECTIVE JUROR:  Based on the evidence, yes.

Jury Selection

1            MS. CILIA:  Okay.  And does anybody feel

2    differently?  Does anybody feel like because of this kind

3    of case -- Ms. Arce?

4            A PROSPECTIVE JUROR:  Arce.  It's okay.  It's all

5    right.

6            I mean I would like to know why he did it if he

7    did do it, but obviously he is saying he didn't do it so

8    motive wouldn't really matter.

9            MS. CILIA:  And I can understand why people would

10   want to know these things.  Of course it is a natural

11   reaction.  You want to know why people do things.  But

12   under the law the judge is going to tell you that we are

13   not required to prove that.

14           A PROSPECTIVE JUROR:  Right.

15           MS. CILIA:  Would you be able to follow the law?

16           A PROSPECTIVE JUROR:  I mean of course.  Anybody

17   would like to know, but under the law we don't have to know

18   and so we would have to be able to decide without knowing

19   what the motive was.

20           MS. CILIA:  You think you would be able to do

21   that?

22           A PROSPECTIVE JUROR:  Yes.

23           MS. CILIA:  Is there anybody here who feels

24   differently; who feels like they would just need to know

25   that before they voted in this case?

1          Mr. Mistretta.

2          A PROSPECTIVE JUROR:  No.  I agree with what she

3     said.

4          MS. CILIA:  We have talked about this a few times

5     now.  This is an extremely serious case.  The charges are

6     murder in the second degree.  I want to ask all of you

7     whether you believe that after hearing all the evidence in

8     the case and seeing all the evidence in the case, whether

9     if we prove this case beyond a reasonable doubt you will be

10    able to convict and vote guilty in this case.

11         I see Ms. Budnick?  I don't mean to pick on you.

12         A PROSPECTIVE JUROR:  Go ahead.

13         MS. CILIA:  But for any particular reason.  It

14    could be personal, it could be religious, it could be

15    political.

16         A PROSPECTIVE JUROR:  No, no.  You are just

17    handing us a really big responsibility.

18         MS. CILIA:  It is a big responsibility, and

19    that's why I am asking you, because --

20         A PROSPECTIVE JUROR:  It is nerve-wracking.

21         MS. CILIA:  -- because whatever the answer is

22    there is no right or wrong here.  But we need to know

23    before -- we need to know at this stage now.  So if the

24    answer is no, let us know.  If you don't feel like --

25         THE COURT:  What's the question?

Jury Selection

1           A PROSPECTIVE JUROR:  Yes.  You lost me on the

2     question too.

3           MS. CILIA:  At the end of this case if you

4     believe beyond a reasonable doubt that we have proven that

5     the defendant in this courtroom shot and killed David

6     Williams on purpose, are you going to be able to vote

7     guilty?

8           A PROSPECTIVE JUROR:  Yes.

9           MS. CILIA:  Okay.  And if the answer's no --

10          A PROSPECTIVE JUROR:  Yes.  I said yes.

11          MS. CILIA:  Okay.  I am bringing that --

12          THE COURT:  Move it along, please.

13          MS. CILIA:  I am opening up to the entire panel.

14          Does anybody else feel differently?

15          A PROSPECTIVE JUROR:  I feel I wouldn't be able

16    to.

17          MS. CILIA:  You would not be able to.

18          A PROSPECTIVE JUROR:  Yes.

19          MS. CILIA:  Thank you for that.

20          Is there anybody else who, like Ms. Munoz, feels

21    like they wouldn't be able to do that?

22          Yes.  You also feel, Miss Prudente?

23          A PROSPECTIVE JUROR:  Yes.

24          MS. CILIA:  Thank you.

25          Anyone else?

Jury Selection

1            ...Thank you very much.  Appreciate it.

2            MS. GUASTELLA:  Miss Mistretta, where did you

3      teach science?

4            A PROSPECTIVE JUROR:  Catholic high school in

5      Brooklyn.

6            MS. GUASTELLA:  How long were you there for?

7            A PROSPECTIVE JUROR:  Thirty-seven years.

8            MS. GUASTELLA:  Did you ever act as an assistant

9      dean or dean in the school?

10           A PROSPECTIVE JUROR:  No.

11           MS. GUASTELLA:  Guidance counselor?

12           A PROSPECTIVE JUROR:  No.

13           MS. GUASTELLA:  Just strictly a science teacher.

14           A PROSPECTIVE JUROR:  Right.

15           MS. GUASTELLA:  Mr. McHugh, you said your friend

16     was an Assistant District Attorney in the Bronx?

17           A PROSPECTIVE JUROR:  Yes.

18           MS. GUASTELLA:  How long has that friend been

19     there?  Do you know?

20           A PROSPECTIVE JUROR:  Over 10 years.

21           MS. GUASTELLA:  How friendly are you with this

22     person?

23           A PROSPECTIVE JUROR:  Pretty friendly.  She

24     married one of my closest friends.  I get together with

25     them often and I have known her since high school.

Jury Selection

1           MS. GUASTELLA:  Do you know what unit in the

2    D.A.'s office she works in?

3           A PROSPECTIVE JUROR:  I know she was -- she did

4    criminal cases.

5           MS. GUASTELLA:  Did she try cases?  Did she go to

6    trial a lot?

7           A PROSPECTIVE JUROR:  I believe so.  But then she

8    had twins so now she still works there, but I don't know in

9    what capacity.

10          MS. GUASTELLA:  While she was doing the trials,

11   did you guys ever talk about her cases at dinner?

12          A PROSPECTIVE JUROR:  No.

13          MS. GUASTELLA:  Mr. DeGregorio, you said you were

14   an electrician.

15          A PROSPECTIVE JUROR:  Yes.

16          MS. GUASTELLA:  Are you self-employed or do you

17   work for a company?

18          A PROSPECTIVE JUROR:  I work for a company.

19          MS. GUASTELLA:  Are you going to be paid

20   throughout this trial?  Are you going to be getting paid

21   while you are here?

22          A PROSPECTIVE JUROR:  Yes.

23          MS. GUASTELLA:  Anybody here self-employed?

24   Anybody with a job the length of trial -- the judge told

25   you guys yesterday it ends approximately March 14.  Will

Jury Selection

1    that affect anybody's ability to be fair in terms of their

2    job duties?

3           You kind of nodded a little.

4           THE COURT:  Will that affect your job at all,

5    being here?  Miss Eleazer.

6           A PROSPECTIVE JUROR:  No, not at all.  Eleazer.

7           MS. GUASTELLA:  I am sorry.

8           A PROSPECTIVE JUROR:  It is okay.

9           MS. GUASTELLA:  Anyone here for religious beliefs

10   or moral beliefs cannot sit as a fair juror?

11          Miss Diaz?  Okay.

12          A PROSPECTIVE JUROR:  Munoz.

13          MS. GUASTELLA:  Any medical reasons a person

14   can't sit until March 14th on this jury?

15          Miss Tito, before you were unemployed, what did

16   you do for a living?

17          A PROSPECTIVE JUROR:  I didn't work.  I get

18   S.S.I.

19          MS. GUASTELLA:  Sorry.

20          A PROSPECTIVE JUROR:  I didn't work, I get S.S.I.

21          MS. GUASTELLA:  Okay.  That is for a disability;

22   correct?  Disability?

23          A PROSPECTIVE JUROR:  Just S.S.I.

24          MS. GUASTELLA:  Miss Eleazer -- I said it wrong

25   again.

1          A PROSPECTIVE JUROR:  That is okay.

2          MS. GUASTELLA:  You stated before you would need

3    some solid evidence.  What did you mean by solid evidence?

4          A PROSPECTIVE JUROR:  In my mind not a doubt that

5    he did it.  Like I wouldn't want to think -- I would have

6    to know that he did not commit this crime.

7          MS. GUASTELLA:  So you are starting off with the

8    premise that he is presumed innocent.

9          A PROSPECTIVE JUROR:  I wouldn't say that.  I

10   wouldn't say that -- I don't know.  You know what, I am

11   saying I don't know.  I would have to hear and see the

12   evidence.

13         MS. GUASTELLA:  Okay.  Do you think because we

14   are at this point of the stage of the game, we are on

15   trial, that he must have done something wrong to be here?

16         A PROSPECTIVE JUROR:  No.

17         MS. GUASTELLA:  Miss Arce, you shook your head

18   yes.

19         A PROSPECTIVE JUROR:  I mean obviously he got

20   here so there was something that led to it.  He could have

21   been in the wrong place at the wrong time but something

22   about him being around, whether it was the neighborhood or

23   something led people to believe this.

24         Do I think he is guilty because he is here?  No.

25   But whether he has fingerprints on the doorknob of the

Jury Selection

1    guy's house or a car, something led them to think it was

2    him.

3            MS. GUASTELLA:  Okay.  Thank you.

4            Anybody else feel the same way?

5            You do too?  Okay.

6            Miss Prudente, you feel the same way?  You say

7    you are a waitress; correct?  On Staten Island?

8            A PROSPECTIVE JUROR:  Yes.

9            MS. GUASTELLA:  How long have you been a

10   waitress?

11           A PROSPECTIVE JUROR:  Three years?

12           MS. GUASTELLA:  What did you do prior to that?

13           A PROSPECTIVE JUROR:  Same like mediocre jobs:

14   Pizzeria, paper route, stuff like that.

15           MS. GUASTELLA:  Mr. Morawed?  Is that how you

16   pronounce it?  You said you dispatch, manage a limo

17   company?

18           A PROSPECTIVE JUROR:  In a limo company, yes.

19           MS. GUASTELLA:  How long have you been a

20   dispatcher?

21           A PROSPECTIVE JUROR:  Sixteen years.

22           MS. GUASTELLA:  Has your company ever been the

23   victim of a robbery?

24           A PROSPECTIVE JUROR:  Not really.

25           MS. GUASTELLA:  Anybody here members of their

1     like local community boards?  Anybody here members of the

2     PTA at their kids' school?

3            PTA?

4            A PROSPECTIVE JUROR:  I am chairman of a Catholic

5     academy.

6            MS. GUASTELLA:  On Staten Island.

7            A PROSPECTIVE JUROR:  In Brooklyn.

8            MS. GUASTELLA:  What is your role as a chairman

9     there?

10           A PROSPECTIVE JUROR:  Pretty much oversee

11    everything at the school:  Hiring, firing, making sure we

12    have the right principal, fundraising.

13           MS. GUASTELLA:  What about disciplinary hearings?

14           A PROSPECTIVE JUROR:  I get involved with certain

15    things, yes.

16           MS. GUASTELLA:  I don't mean to like I am

17    cross-examining you, but when you say "involved," do you

18    actually investigate those cases before they go to hearing?

19           A PROSPECTIVE JUROR:  The investigation would be

20    done by the principal and then ultimately the board makes

21    final decisions on certain issues.

22           MS. GUASTELLA:  And you being the chairman of the

23    board, do you have a higher, I guess, opinion?

24           A PROSPECTIVE JUROR:  No.  It's equal on the

25    board.

Jury Selection

1              MS. GUASTELLA:  How many people are on the board?

2              A PROSPECTIVE JUROR:  Seven.

3              MS. GUASTELLA:  Anyone a member of the NRA?

4              Ms. Guastavino, you are a nurse on Staten Island.

5              A PROSPECTIVE JUROR:  Yes.

6              MS. GUASTELLA:  At a hospital.

7              A PROSPECTIVE JUROR:  No, I am not.  I work with

8        dementia residents in an assisted living facility.

9              MS. GUASTELLA:  And have you ever had the

10       occasion of having anyone have an argument in the assisted

11       living that you work in; two patients or two workers?

12             A PROSPECTIVE JUROR:  At this point I kind of can

13       anticipate and we kind of manage before, so rarely.

14             MS. GUASTELLA:  So basically let's say somebody's

15       had fights before or had troubles before, arguments before,

16       and something would come up; you don't automatically assume

17       that person was involved or is wrong.

18             A PROSPECTIVE JUROR:  No, not at all.

19             MS. GUASTELLA:  How do you determine if one of

20       the patients or the two patients -- who is telling the

21       truth?

22             A PROSPECTIVE JUROR:  Most of my residents are

23       severely demented and they are kind of non-verbal at this

24       point.

25             MS. GUASTELLA:  Okay.

1        A PROSPECTIVE JUROR:  And it is more like getting

2   too close to somebody or -- it could be anybody.  It's not

3   that it's, you know, two of the same residents all the

4   time.  It's just trying to keep people out of other

5   people's space.

6        MS. GUASTELLA:  Okay.  Thank you.

7        Thank you.

8        THE COURT:  I have one question.  Oh, Mr. McHugh,

9   are you a resident of Richmond County?

10       A PROSPECTIVE JUROR:  Yes, sir.

11       THE COURT:  I just wondered if your Brooklyn ties

12  indicated you lived somewhere else.  I wanted to be sure.

13  Thank you.

14       All right, the lawyers are going to take a few

15  minutes to go over their notes and we will get back you

16  with you.  If you want to go out for a minute, go right

17  ahead.  Just don't discuss the case.

18       (The following takes place at side bar.)

19       THE COURT:  We are at a side bar on the record

20  and in the courtroom.  What do we have, Anthony; seven?

21       THE CLERK:  Seven chosen.

22       THE COURT:  Why don't we do the first five.  Is

23  that all right?

24       MS. CILIA:  Sure.

25       THE COURT:  One through five.

000453

Jury Selection

 1                    Cause, People?

 2                    MS. CILIA:  No.

 3                    THE COURT:  Defense?

 4                    MS. GUASTELLA:  No.

 5                    THE COURT:  Peremptory, People?

 6                    MS. CILIA:  Number 4.

 7                    THE COURT:  Peremptory, defense?

 8                    MS. GUASTELLA:  Number 1.  That's it.

 9                    THE COURT:  So, Anthony, Seat Number 2, Miss

10       Guastavino, becomes Juror 8; right?

11                    THE CLERK:  Yes, sir.

12                    THE COURT:  Seat Number 3, Miss Tito, becomes

13       Juror 9.

14                    THE CLERK:  Yes, sir.

15                    THE COURT:  Seat Number 5, Miss Budnick, becomes

16       Juror 10.

17                    THE CLERK:  Yes, sir.

18                    THE COURT:  Let's do the next two, 6 and 7.

19                    Cause, People?

20                    MS. CILIA:  Number 6.

21                    THE COURT:  Number 6.

22                    MS. CILIA:  Yes.

23                    THE COURT:  Why?

24                    MS. GUASTELLA:  Consent.

25                    THE COURT:  That is consent?

Jury Selection

1          MS. GUASTELLA:  Yes.

2          THE COURT:  She must have said something that got

3    by me but I will grant it for cause on consent.

4          Number 7.

5          MS. CILIA:  That is also for cause.

6          MS. GUASTELLA:  Consent.

7          THE COURT:  That is a consent.  He was at a side

8    bar, so granted.

9          All right, let's do the next two, Seats 8 and 9.

10         Cause, People?

11         MS. CILIA:  No.

12         THE COURT:  Defense?

13         MS. GUASTELLA:  No.

14         THE COURT:  Peremptory, People?

15         MS. CILIA:  No.

16         THE COURT:  Defense?

17         MS. GUASTELLA:  Number 8.

18         THE COURT:  So 9 is acceptable to both sides.

19         MS. GUASTELLA:  Yes.

20         MS. CILIA:  Yes.

21         THE COURT:  So, Anthony, Mr. or Ms. Yalarfai

22   becomes Juror 11; right?

23         THE CLERK:  Yes.

24         THE COURT:  All right, we will go one at a time

25   now.  Seat 10 is Miss Griffiths.

Jury Selection

```
 1            Cause, People?

 2            MS. CILIA:  No.

 3            THE COURT:  Defense?

 4            MS. GUASTELLA:  Judge, I have in my notes that

 5    initially she had said she would be concerned about being

 6    able to be fair but I kind of...

 7            THE COURT:  Do the People have that?

 8            MS. GUASTELLA:  Usually I have more information

 9    than that.

10            MS. CILIA:  I didn't write it down.

11            THE COURT:  I didn't either.  You want me to

12    bring her over?

13            MS. GUASTELLA:  Yes.  I don't know why I wrote

14    that.  It was early on though.

15            THE COURT:  Can we bring Miss Griffiths over,

16    Seat 10.

17            (Ms. Griffiths approaches side bar.)

18            THE CLERK:  Christine Griffiths,

19    G-R-I-F-F-I-T-H-S.

20            THE COURT:  Sometimes we forget what people said.

21    Did you ever express any reservations about the ability to

22    be fair and impartial?

23            A PROSPECTIVE JUROR:  My concern is because for

24    my years in administration when we do investigations we go

25    on fact, okay?  Not loose hearsay.  We don't use -- so not
```

1    knowing what the circumstantial might be?  I don't know if

2    that would affect my decision, quite frankly, because

3    that's what we are used to do.

4         THE COURT:  You know, it is funny you say that.

5    That's what juries do.  They decide what the facts are.

6    The juries are the fact-finders.  Then they take the law as

7    the Court gives it to them, apply the law and hopefully

8    render a unanimous verdict.

9         I mean if you are telling us what you do is go by

10    facts, I don't know that there is anything wrong with that.

11    On the other hand, if you are expressing some kind of

12    reservations about the ability to be fair and impartial,

13    that's another story.  I don't know, what do you think?

14         A PROSPECTIVE JUROR:  I guess my concern is I

15    have to be absolutely -- that is a serious crime, okay,

16    obviously, so I have to be very comfortable with making

17    that decision based on the evidence that's presented.

18         THE COURT:  If you determined after listening to

19    the evidence and deliberating that the case had not been

20    proved to your satisfaction beyond a reasonable doubt,

21    would you vote not guilty?

22         A PROSPECTIVE JUROR:  Uh-Hum.

23         THE COURT:  And, conversely, if you are satisfied

24    that the case had been proved to your satisfaction beyond a

25    reasonable doubt, would you vote guilty?

1           A PROSPECTIVE JUROR:  Clearly, yes.

2           THE COURT:  Beg your pardon?

3           A PROSPECTIVE JUROR:  Yes, clearly.

4           THE COURT:  Counselor, if you have any questions,

5   go right ahead.

6           MS. GUASTELLA:  No.

7           MS. CILIA:  No.  Thank you.

8           THE COURT:  Okay.  Thank you, ma'am.

9           (Miss Griffiths resumes her seat.)

10          THE COURT:  Do you want to be heard?

11          MS. GUASTELLA:  No, Judge.

12          THE COURT:  You are withdrawing your challenge?

13  You really didn't make it, you just brought it -- so you

14  are not making a cause challenge.

15          MS. GUASTELLA:  Not at this time.

16          THE COURT:  And you are not making one.

17          MR. REEVES:  Not a cause challenge.

18          THE COURT:  So nobody is making a cause challenge

19  for Seat 10, Miss Griffiths.  Am I right?

20          MS. GUASTELLA:  That is correct.

21          THE COURT:  Peremptory, People?

22          MS. CILIA:  Yes.

23          THE COURT:  We go to Seat 11, Mr. Morawed.

24          Cause, People?

25          MS. CILIA:  No.

Jury Selection

```
 1              THE COURT:  Defense?

 2              MS. GUASTELLA:  No.

 3              THE COURT:  Peremptory, People?

 4              MS. CILIA:  No.

 5              THE COURT:  Defense?

 6              MS. GUASTELLA:  Yes.

 7              THE COURT:  Next is Miss Prudente.

 8              Cause, People?  That is Seat 12.

 9              MS. CILIA:  That's a cause, yes.

10              THE COURT:  Is there a consent or not?

11              MS. GUASTELLA:  Consent.

12              THE COURT:  For cause on consent.

13              Next is Mr. Tropepe.

14              Cause, People?

15              MS. CILIA:  No.

16              THE COURT:  Defense?

17              MS. GUASTELLA:  No.

18              THE COURT:  Peremptory, People?

19              MS. CILIA:  No.

20              THE COURT:  Defense?

21              MS. GUASTELLA:  No.

22              THE COURT:  So Tropepe becomes Juror 12.  Am I

23         right, Anthony?

24              THE CLERK:  Yes, sir.

25              THE COURT:  All right.  You get two peremptories
```

000459

Jury Selection

1    for each alternate seat, so let's see if we can get some

2    alternates.  Next is Mr. or Ms. Mezzacappa.

3                   Cause, People?

4                   MS. CILIA:  No.

5                   THE COURT:  Defense?

6                   MS. GUASTELLA:  No.

7                   THE COURT:  Peremptory, People?

8                   MS. CILIA:  No.

9                   THE COURT:  Defense?

10                  MS. GUASTELLA:  Yes.

11                  THE COURT:  That is your first peremptory for the

12   first alternate seat.

13                  Next is Miss Munoz.

14                  Cause, People?

15                  MS. CILIA:  Yes.

16                  MS. GUASTELLA:  On consent.

17                  THE COURT:  For cause on consent.

18                  Next is Miss Rogers.

19                  Cause, People?

20                  MS. CILIA:  No.

21                  THE COURT:  Defense?

22                  MS. GUASTELLA:  No.

23                  THE COURT:  Peremptory, People?

24                  MS. CILIA:  No.

25                  THE COURT:  Defense?

Jury Selection

1        MS. GUASTELLA:  Yes.

2        THE COURT:  That is your second challenge for the

3    first alternate seat.

4        Next is Mr. Ma.

5        Cause, People?

6        MS. CILIA:  No.

7        THE COURT:  Defense?

8        MS. GUASTELLA:  No.

9        THE COURT:  Peremptory, People?

10       MS. CILIA:  No.

11       THE COURT:  Okay.  So the defense having used

12   their two peremptories for the first alternate seat, Mr. Ma

13   becomes Alternate 1.

14       Next is Mr. Kumaresu.

15       Cause, People?

16       MS. CILIA:  No.

17       THE COURT: Defense?

18       MS. GUASTELLA:  No.

19       THE COURT:  Peremptory, People?

20       MS. CILIA:  No.

21       THE COURT:  Defense?

22       MS. GUASTELLA:  No.

23       THE COURT:  So he is Alternate 2.

24       MS. GUASTELLA:  I have two left?  I am sorry.  I

25   do have two left?  That's fine.  That's fine.

Jury Selection

1          THE COURT:  You have two for the next seat.

2          MS. GUASTELLA:  That's fine.

3          THE COURT:  So you are not exercising your

4     peremptory.

5          MS. GUASTELLA:  No.  So we are agreed

6     Mr. Kumaresu becomes Alternate 2.

7          MS. CILIA:  Yes.

8          THE COURT:  We might as well deal with the last

9     man.

10         Cause, People?

11         MS. CILIA:  No.

12         THE COURT:  Defense?

13         MS. GUASTELLA:  No.

14         THE COURT:  Peremptory, People?

15         MS. CILIA:  No.

16         THE COURT:  Defense?

17         MS. GUASTELLA:  Yes.

18         THE COURT:  Okay.  That is your first challenge

19    for the third seat.  What do you think?  Is two enough?

20         MS. CILIA:  No.  I don't think two is enough.

21         THE COURT:  Do you want me to see if I can get

22    more people over here to pick a third alternate?

23         MS. CILIA:  And fourth.  That is what I would

24    want.  Am I correct?

25         MR. REEVES:  Unless there is any way we can agree

Jury Selection

1    on the people we struck.

2              THE COURT:  That is an idea.  If you want to go

3    back and see if you can agree on a third or even a fourth

4    alternate from people who have been peremptorily struck,

5    that's fine.  The law says you can do that.

6              MR. REEVES:  I would agree to reseat Miss

7    Griffiths.  That's one of the --

8              MS. GUASTELLA:  Are we comfortable with three?  I

9    am okay with three.  Do we need to do four?

10             THE COURT:  I will go with whatever you agree on.

11             MR. REEVES:  I would like four alternates.

12             THE COURT:  He is suggesting Miss Griffiths,

13   somebody he struck.

14             MS. GUASTELLA:  Yes.  That's fine.

15             THE COURT:  I want you to check with your client

16   before we do that.

17             Hang on one second.

18             MR. REEVES:  I would need her to give someone

19   back, as well.  I only struck two people.

20             MS. GUASTELLA:  I am fine with three alternates.

21   We don't need to do four.

22             THE COURT:  Three is okay, isn't it?  No?

23             MR. REEVES:  Well, I am not going to give back

24   somebody when I exercised two perempts in the last round.

25   That's not going to happen.

Jury Selection

1        THE COURT:  I am perfectly willing to go with

2    two.  This is not that long of a trial.  We are not talking

3    about a month.

4        MR. REEVES:  Go with two then.

5        THE COURT:  What about his suggestion?  He says

6    he will seat Miss Griffiths as Alternate Number 3, they

7    struck her, but what he is suggesting is can you give up

8    one that you struck to be Alternate Number 4?

9        MS. GUASTELLA:  I don't like any of the ones I

10   struck.  That is the problem.

11       MR. REEVES:  We will go with two alternates then.

12   That's fine.

13       THE COURT:  Go with two.

14       MS. GUASTELLA:  That's fine.

15       THE COURT:  Okay.

16       (The following takes place in open court.)

17       THE CLERK:  When you hear your name, please

18   remain seated:  Lori Guastavino, Margaret Tito, Joanne

19   Budnick, Cynthia Yalartai, Carmine Tropepe, Philip Ma,

20   Jeganathan Kumaresu.  Everyone else please rise.  You can

21   step out of the box.

22       THE COURT:  Thank you all.

23       (Challenged jurors leave courtroom.)

24       THE CLERK:  Are the jurors satisfactory to the

25   People?

Jury Selection

1              MS. CILIA:  Yes.

2              THE CLERK:  Are the jurors satisfactory to the

3    defendant?

4              MS. GUASTELLA:  Yes.

5              THE CLERK:  Everybody please stand.

6              (Six jurors sworn.)

7              THE COURT:  Thank you.  You can have a seat.

8              Well, we have completed our jury selection so we

9    are going to break now and, as I told the people who were

10   sworn yesterday, we are going to adjourn until Monday

11   morning at 9:30.  That would be Monday, March 3.  Next

12   Monday at 9:30.  We would like you to be back then.  We

13   would like you to report to the jury room.  The officers

14   will show you where the jury room is on your way out.  It

15   is right across the hall.

16             I want to thank you all for your patience

17   throughout the last two days, and permit me to instruct you

18   before you leave as follows:

19             Do not discuss this case with each other or with

20   anyone else.

21             Prior to being discharged you must not speak with

22   anyone about taking anything, any payment or benefit, in

23   return for supplying information concerning this trial.

24             You must promptly report directly to me any

25   incident within your knowledge involving an attempt by

1    anyone to improperly influence you or any member of the

2    jury.

3              Do not visit or view the premises or place where

4    any charged crime was allegedly committed or any other

5    premises or place involved in the case.  You haven't heard

6    any locations yet.  I don't think you will.

7              Don't read, view or listen to any media accounts

8    involved in this case should there be any, and that

9    includes the internet.

10             And, finally, don't attempt to research any fact,

11   issue or law related to this case, whether by discussion

12   with others, by research in the library or on the internet

13   or by any other means or source.

14             Again, thank you very much for your patience.

15   Have a good weekend.  We will see you Monday morning at

16   9:30.  The officers will show you the jury room on your way

17   out.

18             (Jurors leave courtroom.)

19             THE COURT:  All right.  The jury has left.  Do

20   you want to do something with the remainder of the day?

21   You were talking about photographs.  I haven't seen them.

22   If you want, we could review them now.  I might not

23   necessarily be able to give you a ruling until I hear some

24   testimony.

25             The law, as I am sure both sides know, says

Jury Selection

1     photographs are admissible for the sole purpose if they do

2     not inflame the jury and if they have some legitimate

3     purpose; for example, illustrating or corroborating

4     testimony.

5             Typically with these kinds of photos -- I think

6     the kind of photos we are talking about, they do or do not

7     become relevant when the ME testifies.  I don't know what

8     your feelings are.

9             You know what we could do if you like.  You have

10    all seen them.  I will ask the D.A. to send them over to me

11    so I can look at them and we can pick it up Monday morning

12    or during the trial when we get to that point.  Is that

13    easier?

14            MS. GUASTELLA:  That is fine.

15            THE COURT:  I am not going to keep them.  I just

16    want to look at them.  I will send them right back to you.

17            MR. REEVES:  There are some photos -- there are

18    160 crime scene photos.  Some of them are duplicitous, some

19    of them are not necessary for what we are going to prove.

20    So what I can do is Miss Cilia and I will send over to the

21    Court all the photographs and we will have a list of which

22    ones we intend to move into evidence.

23            There is one photograph which shows the victim

24    with the top of his skull and his brains spilling out as a

25    result of the gunshot wound fired by the defendant.  I

1    don't see any reason that we need to show that.  It is

2    somewhat irrelevant to what we have to prove.  However,

3    there are some pictures from the crime scene which will

4    illustrate points that we are going to make relating to the

5    defendant's intent and that would, if it is raised, tend to

6    rebut the defense of justification.

7          THE COURT:  I don't know if that is the defense

8    here.

9          MR. REEVES:  I don't know what the defense is but

10   that doesn't preclude me from -- I don't have to -- the way

11   I understand it, I can prove my case.

12         THE COURT:  Yes.  You all know what the law is.

13   People against Poblin(ph) or People against Woods.  It is

14   all in Richardsons.  We just got a Second Department

15   case -- it was decided yesterday -- which I will give you a

16   copy of if you want it.  I mean it's one day old.  On that

17   point.

18         Are you planning on introducing any autopsy

19   photos?

20         MR. REEVES:  Yes.

21         THE COURT:  So they will be -- so as I understand

22   it, the one photo that you just talked about with brains in

23   the picture is a crime scene photo.

24         MR. REEVES:  Yes.

25         THE COURT:  And you are not necessarily offering

Jury Selection

1    that.

2              MR. REEVES:  No.

3              THE COURT:  Okay.  All right.  Well, if that's

4    acceptable to both sides, send it over.  I won't hear any

5    argument in chambers; I will just look at them and I will

6    send them right back.  Just so I know what I am dealing

7    with.  And we will pick it up later.  Is that okay?

8              MS. GUASTELLA:  Yes.

9              MR. REEVES:  The autopsy photos ironically are

10   somewhat less gruesome than the crime scene photos because

11   they don't have the attendant blood.  But there are

12   pictures from the crime scene that show blood spatter,

13   skull fragments and brain fragments which are things that

14   we need in evidence to prove the defendant's intent and to

15   disprove, if it is ever raised, the defense of

16   justification.

17             THE COURT:  Okay.  I am not giving you a ruling.

18             MR. REEVES:  I understand.

19             THE COURT:  I just would like to get a little bit

20   of a heads-up so I don't have to take a lot of time out

21   during the trial.

22             Anything else?

23             Okay.  You want your client produced tomorrow?

24   Sometimes lawyers on trial do it for conference purposes.

25   I don't know how he feels about it.

Jury Selection

1          MS. GUASTELLA:  Not tomorrow, Judge.  Thank you.

2      I appreciate the thought, but not tomorrow.

3          THE COURT:  Not tomorrow.  Okay.  Then we are

4      adjourned until Monday the 3rd at 9:30.  Thank you.

5          MR. REEVES:  Thank you, your Honor.

6          (Whereupon, court was recessed and this matter

7      adjourned to Monday, March 3, 2014 at 9:30 a.m.)

8

9                        o0o

10
       Certified to be a true and accurate
11     transcription of the above-captioned
       proceedings.
12

13     _____
       Susan Maydan
14     Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

000470

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND - CRIMINAL TERM - PART 5
---------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK   : INDICTMENT NO.
                                        454/2011

          -against-                   :


ARMAND SKRINE,                        : JURY TRIAL


                        Defendant.  :
---------------------------------------X
(Det. Steneck)            18 Richmond Terrace
                          Staten Island, New York
                          March 3, 2014


 B E F O R E:

     HONORABLE STEPHEN J. ROONEY, Justice.



 A P P E A R A N C E S:

     DANIEL DONOVAN, ESQ.
     District Attorney - Richmond County
          130 Stuyvesant Place
          Staten Island, N.Y. 10301
     BY:  KYLE REEVES, ESQ.,
          JENNIFER CILIA, ESQ.,
          Assistant District Attorneys

     MARIA GUASTELLA, ESQ.
     Attorney for the Defendant
          88 New Dorp Plaza
          Staten Island, N.Y. 10306




                              MAURIZIA M. SELLECK
                              TAMMY RODRIGUEZ
                              SENIOR COURT REPORTERS

                    MMS

Proceedings

1          THE COURT CLERK:  Calendar number 1, Indictment

2     454/2011: Armand Skrine.  Case on trial continues.

3          Counsel, please, appearances on the record.

4          MS. CILIA:  Jennifer Cilia and Kyle Reeves for

5     the People.  Good morning.

6          MS. GUASTELLA:  Maria Guastella on behalf of

7     Mr. Skrine.  Good morning, your Honor.

8          THE COURT:  Good morning.

9          The jury is here, so we can start up.

10         I understand you might want to make a record,

11    Ms. Guastella?

12         MS. GUASTELLA:  Judge, at this time I had

13    indicated in chambers that I would like the opportunity to

14    reserve my opening for after the People rest.  I know I'm

15    permissible pursuant to case law, I understand it is the

16    Court's discretion, but, as I indicated, I'm not sure

17    which -- what defense I am going to be using.  I don't want

18    to promise the jury something I can't deliver.

19         THE COURT:  All right.  Well, you certainly don't

20    have to open at the outset; that's your choice.  In terms

21    of reserving it, I'll entertain that application if we

22    reach that point.  I'm not promising you anything.  I'm not

23    suggesting to you I'll permit you to open at the close of

24    the People's case, but I'm not denying it either.  I'll

25    entertain your application then.  I've never granted that

Proceedings

1    application before.  You know that.

2           MS. GUASTELLA:  I know that.  The other issue is

3    the photographs that Mr. Reeves provided the Court.  I

4    understand it's your intention to allow the photos that he

5    intends on introducing to be introduced, and my objection

6    is still on the record.

7           THE COURT:  All right.  Well, that's not

8    necessarily my intention.  It depends, of course, on a

9    sufficient foundation.  And if you wanted to make any

10   specific argument as to any specific photo, we can do that

11   on the record or at a sidebar on the record.  I've been

12   through them.  Mr. Reeves sent them over.  I think there

13   are 160 that have been marked for ID, but he doesn't intend

14   to introduce them all.  According to Mr. Reeves's memo, he

15   doesn't intend at this point anyway to introduce numbers

16   11, 18 through 20, 22, 24, and 26 through 31.  Is that

17   correct?

18          MR. REEVES:  That is correct, your Honor.

19          THE COURT:  One of those is a fairly graphic

20   photo indicating a head injury to the deceased, and brain

21   matter is prominently displayed.  And that's one of the

22   ones you don't intend to introduce.

23          MR. REEVES:  I am not introducing that into

24   evidence, your Honor.

25          THE COURT:  Okay.  The others -- and I went

Preliminary Instructions

1    through them all on Friday -- don't strike me as

2    particularly graphic or gruesome, and if a proper

3    foundation is laid and there is a relevant purpose for

4    them, I will probably let them in, but I'll reserve

5    judgment unless and until I get a specific objection.   I

6    understand you're making a general objection.

7              Okay.  Anything else?

8              MR. REEVES:  No, your Honor.

9              THE COURT:  All right.  Why don't we bring the

10   jury in.  I'll give them preliminary instructions, the

11   People can open, and, depending on what time it is, we'll

12   start up.

13             THE COURT OFFICER:  Ready for the jury?

14             THE COURT:  Yes.

15             THE COURT OFFICER:  Jury entering.

16             (Whereupon, the clerk takes roll-call of the

17   jury.)

18             THE COURT CLERK:  Are the jurors satisfactory to

19   the People?

20             MS. CILIA:  Yes.

21             THE COURT CLERK:  Are the jurors satisfactory to

22   the defendant?

23             MS. GUASTELLA:  Yes.

24             THE COURT:  Okay.  Good morning.  Welcome back.

25             Now that you've all been sworn, I'll give you

Preliminary Instructions

1    some preliminary instructions to guide you in your

2    participation in this trial.

3                It will be your duty to find from the evidence

4    what the facts are.  You and you alone are the judges of

5    the facts.  You'll then have to apply those facts to the

6    law as I will give it to you.  You must follow that law

7    whether you agree with it or not.  But nothing that I may

8    say or do during the course of this trial should be taken

9    by you as indicating what your verdict should be.

10               The evidence from which you will find the facts

11   will consist of the testimony of witnesses, documents, and

12   other things received into the record as exhibits, and any

13   facts the lawyers agree or stipulate to or that the Court

14   may instruct you to find.

15               Certain things are not evidence and must not be

16   considered by you and I'll list those for you now.

17               First of all, statements, arguments and questions

18   by lawyers are not evidence.

19               Secondly, objections to questions are not

20   evidence.  Lawyers have an obligation to their clients to

21   make an objection when they believe evidence being offered

22   is improper under our rules of evidence.  You should not be

23   influenced by the objection or by the Court's ruling on it.

24   If the objection is sustained, ignore the question.

25   Questions are never evidence.  If the objection is

MMS

1    overruled, treat the answer like any other.  And if you're

2    instructed that some item of evidence is received for a

3    limited purpose only, you must follow that instruction.

4              Third, testimony that the Court has excluded or

5    told you to disregard is not evidence and must not be

6    considered.

7              Finally, anything you may have seen or heard

8    outside the courtroom is not evidence and must be

9    disregarded.  You are to decide the case solely on the

10   evidence presented here in this courtroom.  It will be up

11   to you to decide which witnesses to believe, which

12   witnesses not to believe, and how much of any witness's

13   testimony to accept or reject.  I'll give you some

14   guidelines for that purpose at the end of the trial.

15             As you know, this is a criminal case, and there

16   are three basic rules about a criminal case that you must

17   keep in mind.  First of all, the defendant is presumed

18   innocent unless and until proved guilty.  The indictment

19   against the defendant is only an accusation, nothing more.

20   It's not proof of guilt or anything else.  The defendant,

21   therefore, starts out with a clean slate.

22             Second, the burden of proof is on the People.

23   The defendant has no burden to prove his innocence.

24             And, third, the People must prove the defendant's

25   guilt beyond a reasonable doubt.  We discussed that during

Preliminary Instructions

1    jury selection.  I'll give you some further instructions on

2    that point later.

3              In this case, the defendant is charged with

4    Murder in the Second Degree, two counts of Criminal

5    Possession of a Weapon in the Second Degree, two counts of

6    Criminal Possession of a Weapon in the Third Degree, and

7    one count of Criminal Possession of a Forged Instrument in

8    the First Degree.  I'll give you detailed instructions on

9    the law at the end of the trial and those instructions will

10   control your deliberations and decision.

11             Our law requires jurors to follow certain

12   instructions in order to help assure a fair and a just

13   trial.  I alluded to them last week, but I'll give them to

14   you in detail now.

15             First of all, do not converse either amongst

16   yourselves or with anyone else about anything related to

17   this case.  You may tell the people with whom you live and

18   your employers that you are a juror and give them

19   information about when you'll be required to be in court,

20   but you may not speak with them or anyone else about

21   anything related to the case.

22             Second, do not at any time during the trial

23   request, accept, agree to accept, or discuss with any

24   person the receipt or acceptance of any payment or benefit

25   in return for supplying any information concerning the

Preliminary Instructions

1    trial.

2            Third, you must promptly report directly to me

3    any incident within your knowledge involving an attempt by

4    any person improperly to influence you or any member of the

5    jury.

6            Fourth, do not visit or view the premises or

7    place where any charged crime was allegedly committed or

8    any other premises or place involved in the case.  And you

9    must not use internet maps or Google Earth or any other

10   program or device to search for and view any location

11   discussed in the testimony.

12           Now, fifth, do not read, view, or listen to any

13   accounts or discussions of the case reported by newspapers,

14   television, radio, the internet, or any other news media.

15           And, sixth, do not attempt to research any fact,

16   issue or law related to this case, whether by discussion

17   with others, by research in the library or on the internet,

18   or by any other means or source.

19           In this age of instant electronic communication

20   and research, I'm required to emphasize that in addition to

21   not conversing face-to-face with anyone about the case, you

22   must not communicate with anyone about the case by any

23   other means, including by telephone, text message, e-mail,

24   internet, chat rooms, blogs, or social websites such as

25   Facebook, My Space or Twitter.  You must not provide any

MMS

1    information about the case to anyone by any means

2    whatsoever, and that includes the posting of information

3    about the case or what you're doing in the case, on any

4    device or internet site, again, including blogs, chat

5    rooms, social websites or by any other means.  You must

6    also not google or otherwise search for any information

7    about the case or the law which applies to the case, or the

8    people involved in the case, including the defendant, the

9    witnesses, the lawyers, and the judge.

10            Our law does not permit jurors to converse with

11   anyone else about the case or to permit anyone to speak

12   with them about the case, because only jurors are

13   authorized to render a verdict.  Only you have been found

14   to be fair and only you have promised to be fair.  No one

15   else has been qualified in that way.

16            Our law also doesn't permit jurors to converse

17   amongst themselves about the case until the Court tells

18   them to begin deliberations, because premature discussions

19   can lead to a premature final decision.

20            Our law also does not permit you to visit a place

21   discussed in the testimony.  First, you cannot always be

22   sure that the place is in the same condition as it was on

23   the day in question.  Second, even if it were in the same

24   condition, once you go to a place discussed in the

25   testimony to evaluate the evidence in light of what you

Preliminary Instructions

1    see, you become a witness, not a juror; and, as a witness,

2    you may now have an erroneous view of the scene that may

3    not be subject to correction by either party, and that's

4    not fair.  And, finally, our law requires that you not read

5    or listen to any news accounts of the case and that you not

6    attempt to research any fact, issue, or law related to the

7    case.

8              Your decision must be based solely on the

9    testimony and other evidence presented in this courtroom.

10   It would not be fair to the parties for you to base your

11   decision on some reporter's view or opinion or upon

12   information you acquire outside the courtroom.

13             These rules are designed to help guarantee a fair

14   trial, and our law, accordingly, sets forth serious

15   consequences if the rules are not followed.  I'm sure you

16   understand and appreciate the importance of following these

17   rules and I'm sure you will do so.

18             Let me say a few words about note-taking.  You

19   may, but you are not required to, take notes during this

20   trial.  If you wish to take notes, we have provided

21   material to you for that purpose.  If you decide to take

22   notes, you must follow these rules:

23             First, remember, every word of each witness is

24   recorded by the court reporter, and during deliberations,

25   upon your request, the testimony will be read back to you

Preliminary Instructions

1    in whole or in part, and, so, there is no need to take

2    verbatim notes of a witness's testimony.  Notes by

3    definition are a brief written record of something to

4    assist the memory.  A note should not take precedence over

5    your own independent recollection.

6              Second, remember also, you are the finders of

7    fact, you are responsible for evaluating the believability

8    and accuracy of a witness's testimony, and so it's

9    important that you be able to fully comprehend what a

10   witness is saying and how a witness is saying it.

11   Accordingly, you must not permit note-taking to distract

12   you from the proceedings.  If you make a note, it should be

13   brief and not distract you from what the next question and

14   answer is.

15             Any notes a juror takes are only for that juror's

16   own personal use in refreshing his or her recollection,

17   and, so, jurors who choose not to take notes must rely on

18   your own independent recollection and must not be

19   influenced by any notes that another juror may take.

20             Also, a juror's notes are not a substitute for

21   the recorded transcript of the testimony or for any exhibit

22   received in evidence.  If during your deliberations there

23   is a discrepancy between a juror's recollection and his or

24   her notes regarding the evidence, you should ask to have

25   the relevant testimony read back or the exhibit produced

Preliminary Instructions

1    for your inspection.

2              Additionally, a juror's notes are not a

3    substitute for the detailed explanation I will give you of

4    the principles of law that govern this case.  If there is a

5    discrepancy between a juror's recollection and his or her

6    notes regarding those principles, you should ask me to

7    explain those legal principles again.  I will, of course,

8    do so.

9              At the end of each trial day, until the jury

10   retires to deliberate, any notes taken will be collected

11   from each juror who takes notes.  A juror may only refer to

12   his or her notes during the proceedings and during

13   deliberations.  Any notes taken are confidential and shall

14   not be available for examination or review by any party or

15   any other person, and after the jury has rendered its

16   verdict or verdicts, we will collect the notes and destroy

17   them.

18             Let me also say at this point, this is a

19   relatively small courthouse as compared to some of the

20   bigger courthouses around the city.  As a result, you're

21   liable to find yourself passing the lawyers in the hallways

22   or out on the street.  You'll find they won't talk to you.

23   They probably won't even acknowledge you.  It's not because

24   they're rude; they're not.  It's because I'm sure you can

25   understand a trial lawyer must have no contact with a juror

Preliminary Instructions

1    outside of the courtroom during a trial.  So, if that

2    happens, that's what that's all about.

3            We're going to start the trial now and I want to

4    give you the idea of the course that a criminal trial

5    takes.

6            First of all, the People, represented by an

7    assistant district attorney, will make an opening statement

8    which is simply an outline to help you understand the

9    evidence as it comes in.  Next, the defense attorney may,

10   but does not have to, make an opening statement.  Opening

11   statements are not evidence.

12           Following this, the People will present witnesses

13   and counsel for the defendant may cross-examine those

14   witnesses.  Following the People's case, the defendant may

15   present witnesses whom the People may cross-examine.  And

16   after all the evidence is in, the attorneys will present

17   their closing arguments to summarize and interpret the

18   evidence for you, and then I will instruct you on the law.

19   After that you'll retire to deliberate on your verdict.

20           Please bear in mind, nothing the lawyers say in

21   their opening statements or in their closing arguments or,

22   for that matter, nothing the lawyers say at any time during

23   the trial will constitute evidence in this case.

24           So, we'll commence the trial now, and I'll

25   recognize the prosecution for its opening statement.

MMS

1              MS. CILIA:  It is horrific the level of

2      destruction that two small pieces of metal can do in the

3      hands of a killer.  Two small pieces of metal, smaller than

4      my pinky, pressed into a magazine.  That magazine filled to

5      the brim placed into an assault rifle.  That loaded rifle

6      hidden in a duffel bag, carried across boroughs, through

7      subways, onto the ferry, onto a bus, to David Williams'

8      home in Staten Island.  That duffel bag opened in David's

9      apartment by his killer, outside of view from all and the

10     intended victim, revealing the murder weapon inside.  And

11     then in the hands of this killer two squeezes of the

12     trigger pointed directly at David's heart and David's head.

13             The first pull of the trigger literally pulpified

14     David's heart, and the second left David's head in pieces

15     strewn across the hallway of his apartment.  Just two small

16     pieces of metal, but in the hands of his killer David

17     didn't stand a chance.

18             What the evidence will prove to you during the

19     course of this trial, beyond all reasonable doubt, is that

20     the man who stood behind the barrel of that gun, who placed

21     those devastating bullets inside of that magazine, who

22     pressed that magazine into the murder weapon, who traveled

23     through boroughs on the subway, on the ferry, on the bus,

24     to the doorstep of David Williams' apartment, and who

25     purposefully ended David's life with two squeezes of the

1    trigger on December 8th of 2011 was none other than the

2    defendant.

3              Now, let's talk about the evidence that will

4    prove that the defendant murdered David Williams.

5              You are going to hear and you are going to learn

6    that David and the defendant met in college where they were

7    roommates at a small school in Connecticut.  You are going

8    to hear that David and the defendant stayed in touch after

9    college so much so that you are going to hear that even

10   years after college David maintained the relationship and

11   the defendant would travel to Staten Island to visit David

12   and his family in his apartment on Steuben Street, here on

13   Staten Island.

14             And then came December 8th of 2011.  It was a

15   Thursday.  It was cool out.  It was also the last day of

16   David Williams' life.  You are going to hear that the day

17   started like any other day:  David and his partner, Jaclyn,

18   they followed their normal routine.  They got up early,

19   they got their five-year-old daughter ready for school.

20   Everyone piled into the car and David drove Jaclyn, his

21   partner, to work and the baby to school.  But David never

22   got to pick up his daughter from school that day.  Instead,

23   Jaclyn got a call from work saying she needed to get home

24   immediately.  What Jaclyn learned and what you are going to

25   learn is that David was shot to death at point-blank range

Opening - People/Cilia

1    with a high-powered rifle, found dead in the common hallway

2    right outside of his apartment door.

3            You are going to hear from Det. Robin Steneck who

4    processed the crime scene where David's lifeless body was

5    found, and you are going to hear from Dr. Stephen deRoux

6    who did the autopsy -- conducted the autopsy of David's

7    body.

8            Det. Robin Steneck is the one who went to the

9    crime scene.  She checked all the evidence.  She documented

10   everything; she photographed everything, where the shell

11   casings were recovered, forensic evidence.  And Dr. Stephen

12   deRoux, he's the one who looked at the body, looked at

13   where these shots came from, what the cause and the manner

14   of David's death was.

15           They are going to tell you about the injuries

16   that David sustained when he was shot to death; that the

17   first shot went through David's arm and into his heart, and

18   then, when David was laying face down on the ground, on the

19   hallway floor, that he was shot in the back of the head a

20   second time.

21           You will hear that the shot in the back of

22   David's head was so powerful that pieces of David's brain

23   were found in the hallway approximately 80 feet away.

24           You are also going to trace the steps of the

25   defendant prior to and after the massacre of David

Opening - People/Cilia

1    Williams.  You are going to see Ferry video from the

2    morning of December 8th of 2011 showing a man, strapped

3    with a large black and gray duffel bag, taking the ferry to

4    Staten Island.  You are going to learn that just prior to

5    the purposeful killing of David Williams that an extremely

6    tall man, wearing a dark face mask, was seen walking into

7    David's building strapped with a large black and gray

8    duffel bag.  You are going to hear that less than ten

9    minutes after the police received the call of shots fired

10   and while they were on their way to Steuben Street, that

11   the defendant was stopped walking on a service road where

12   no pedestrians were walking, between the crime scene at

13   195 Steuben Street and a wooded path, and that wooded path

14   abutted Steuben Street.  He was found just minutes away.

15   And you are going to hear that a large black and gray

16   duffel bag was recovered from within that wooded area

17   between Steuben Street and where the defendant was stopped;

18   that's where the duffel bag was found.

19           What was in this gray and black duffel bag?  Some

20   small items: clothing, sweatshirts, gloves, towels, a small

21   shovel, some rope, some counterfeit money; and then there

22   was one large item that wouldn't be able to fit into a

23   smaller bag.  You are going to learn that a defaced assault

24   rifle, which is an extremely large rifle, and magazines

25   with additional ammunition were inside of that duffel bag.

MMS

1        It was defaced.  It was defaced because the serial number

2        on that rifle had been scratched out, meaning that it

3        couldn't be traced, it was an untraceable rifle.  And

4        you'll hear that the ballistics at the scene of the crime

5        was compared to the assault rifle in that duffel bag and

6        that they were a match.  The assault rifle in that gray

7        duffel bag was identified as the murder weapon.  You are

8        going to get to see that weapon.

9               You heard Mr. Reeves tell you during jury

10       selection that some of the property -- actually, most of

11       the property in this case was in a facility that was

12       affected by Sandy.  The facility is contaminated, the

13       property is not available.  We are going to be showing you

14       pictures of that property rather than the property itself.

15       However, you are going to hear that the assault rifle was

16       sent to the ballistics lab where it was tested, and then it

17       was brought to another facility that was not affected by

18       Sandy.  So, you are actually going to see the assault rifle

19       during the course of this trial.

20              But that's not the only thing the duffel bag was

21       carrying.  Also inside was a black face mask.  This face

22       mask you are going to hear was tested for DNA.  And you'll

23       learn that DNA was identified as belonging to the

24       defendant, the defendant found less than ten minutes from

25       the time of the 911 call, in close proximity to the crime

Opening - People/Cilia

1    scene; the large black and gray duffel bag found in the

2    woods in between where the defendant was stopped and

3    David's apartment; the ballistics evidence from that weapon

4    matching the ballistics evidence left at the scene of the

5    crime; the Defendant's DNA all over a mask in the same bag

6    as the murder weapon; witness testimony that an extremely

7    tall man wearing a face mask, carrying a large black and

8    gray duffel bag, entered the defendant's building moments

9    before David was shot and killed.  Which brings us back to

10   the beginning: the horrific level of devastation that two

11   small pieces of metal caused in the hands of that

12   defendant.

13           At the end of this case, after you've heard from

14   all of the witnesses, you've listened to all of the

15   testimony, and you've seen all the evidence, I submit that

16   each and every one of you will be satisfied that the

17   evidence has proven the defendant's guilt beyond a

18   reasonable doubt.  And at that time I am going to come back

19   before you, I am going to ask you to do one thing, just one

20   thing, and that's follow the law, vote to convict this

21   defendant for the purposeful killing of David Williams.

22           Thank you.

23           THE COURT:  Ms. Guastella, do you wish to open?

24           MS. GUASTELLA:  Not at this time, Judge.

25           THE COURT:  Very good.  People, call your first

People - Det. Steneck - Direct/Reeves

1   witness, please.

2           MR. REEVES:  Thank you, your Honor.  People call

3   Det. Robin Steneck from the Crime Scene Unit.

4           THE COURT OFFICER:  Your Honor, ready for the

5   witness?

6           THE COURT:  Yes.

7           THE COURT OFFICER:  Witness entering.

8   D E T.   R O B I N   S T E N E C K, bearing shield number 882,

9   assigned to the NYPD Crime Scene Unit, having been called

10  as a witness on behalf of the People, having been duly

11  sworn by the clerk of the court, was examined and testified

12  as follows:

13          THE COURT CLERK:  State your name, shield number,

14  and command for the record.

15          THE WITNESS:  Det. Robin Steneck, assigned to the

16  NYPD Crime Scene Unit, shield 882.

17          MR. REEVES:  May I inquire, your Honor?

18          THE COURT:  Yes.

19          MR. REEVES:  Thank you.

20  DIRECT EXAMINATION

21  BY MR. REEVES:

22  Q.   Good morning, Detective.  How are you?  Actually, good

23  afternoon.

24  A.   Good afternoon.

25  Q.   How are you today?

MMS

000490                                                                  21

People - Det. Steneck - Direct/Reeves

1      A.   Good.   You?

2      Q.   I'm good.   Thank you.

3           What I'd like you to do, start off telling the jury

4  how long you've been with the New York City Police Department.

5      A.   I came on the Police Department in 1999.  I did patrol

6  for a few years.  I then was assigned to the Queens North

7  Evidence Collection Team, where I processed low-level crimes,

8  like burglaries and robberies.  From there I went to the

9  Forensic Investigation Division in 2007, where I was assigned

10  to the latent print section, where I more or less identified

11  fingerprints that were collected from crime scenes.  And then

12  in 2009 I was then transferred to the Crime Scene Unit where

13  I've been ever since.

14      Q.   Would you explain to the jury what the Crime Scene

15  Unit is responsible for doing within the New York City Police

16  Department.

17      A.   In the Crime Scene Unit we're -- I was a detective

18  when I got there, but most people get promoted to detectives.

19  We then are requested by precinct detective squads throughout

20  the City, it's a citywide unit.  They request us for any major

21  crimes: homicide, rape, felony assault cases where the victim

22  is likely to die.  We arrive at the scene, they give us a

23  walk-through.  We'll photograph the scene, we'll sketch a

24  diagram of the scene, and then we'll recover any evidence

25  that's left behind, document it, and then hand it off to an

People - Det. Steneck - Direct/Reeves

1   invoicing officer.

2       Q.    And, Det. Steneck, is what you've just described, is

3   that called processing a crime scene?

4       A.    Yes.

5       Q.    Have you had any training while you were either a

6   member of ECT, or the Evidence Collection Team, or the Crime

7   Scene Unit on how to handle and process crime scenes?

8       A.    Yes.

9       Q.    Would you briefly describe for the jury what your

10  training is.

11      A.    While I was in ECT we do a week-long crime scene

12  course with the detectives from the Crime Scene Unit that are

13  in charge of the training unit.  They teach us how to process

14  crime scenes, do the walk-throughs, what to look for, how to

15  measure the evidence, where to measure it from, and things like

16  that.  And then, once you get to the Crime Scene Unit, you go

17  through another training period of a couple of months.  You're

18  assigned to a veteran detective and respond to crime scenes.

19  You go out with other teams that have been there for a while

20  and they teach you.  And there is also a lot of in-house

21  training; they'll bring outside people from other agencies to

22  train us.

23      Q.    And, Det. Steneck, since you've been with the Crime

24  Scene Unit, can you estimate for us the number of crime scenes

25  that you've either processed yourself or been with a partner

Case 1:23-cv-04575-DG   Document 12-1   Filed 12/01/23   Page 494 of 1061 PageID #: 689

People - Det. Steneck - Direct/Reeves

1   who's processed?

2       A.   We handle on a team and I handle approximately 70, 80

3   jobs a year on a team, either assisting or handling it myself.

4       Q.   And if you could, I'd like to talk to you about

5   something specific that you did on December 8, 2011, if we can

6   just shift gears for that.  Okay?

7       A.   Yes.

8       Q.   Do you remember if you were working on that day?

9       A.   Yes, I was.

10       Q.   And what tour or tours of duty do the Crime Scene

11   detectives do?

12       A.   We do rotating tours.  Our first two are actually day

13   tours, unless a day tour changes for what's called a double;

14   and third or fourth is a double, where we come in at two in the

15   afternoon and work until eight in the morning, unless you're

16   stuck on a job you would work later.

17       Q.   Det. Steneck, on December 8, 2011, were you working

18   with a steady partner?

19       A.   Yes.

20       Q.   What was your partner's name?

21       A.   Det. Patty Angst.

22       Q.   Does Det. Angst still work with the Crime Scene Unit?

23       A.   Yes.

24       Q.   Now, what I'd like to do is ask you if you received a

25   notification from within the New York Police Department on

MMS

People - Det. Steneck - Direct/Reeves

1    December 8, 2011, to respond from your headquarters to Staten

2    Island to process a job?

3        A.    Yes.

4        Q.    Where is your headquarters located?

5        A.    Jamaica Queens, 150 Street and Jamaica Avenue.

6        Q.    And do you recall approximately what time you were

7    asked to provide services to the New York City Police

8    Department's 120 squad?

9              THE WITNESS:  May I look at my notes?

10             THE COURT:  Sure.

11       A.    We were requested sometime before 2 o'clock, because

12   we were on route at 1415 hours, 2 in the afternoon.

13       Q.    Now, did you and Det. Angst arrive on Staten Island

14   after receiving the notification?

15       A.    Yes.

16       Q.    And approximately what time did you arrive and what

17   location did you arrive at?

18       A.    We arrived at approximately 3:10 in the afternoon at

19   195 Steuben Street in Staten Island.

20       Q.    And can you tell us what's located at 195 Steuben

21   Street here in Staten Island?  Is it residential, commercial,

22   or mixed?

23       A.    It looked like a residential building.

24       Q.    Now, did you and Det. Angst have an opportunity to

25   process a scene at 195 Steuben Street?

People - Det. Steneck - Direct/Reeves

1       A.    Yes.

2       Q.    And was the scene inside or outside?

3       A.    The scene was inside at that location.

4       Q.    As part of processing the scene, did you and

5  Det. Angst take photographs of the scene as you saw it when you

6  arrived at around 3 o'clock in the afternoon?

7       A.    Yes.

8       Q.    Approximately how many photographs did you take?

9       A.    I think it was approximately 100 -- 160 photos.

10      Q.    Okay.  Now, in addition to processing an indoor scene,

11  did you also lend services to process an outdoor scene near 195

12  Steuben Street?

13      A.    Yes.

14      Q.    And when that was finished, did you respond to the 120

15  to finish your job and process some evidence at the 120?

16      A.    Yes.

17      Q.    Det. Steneck, I'm going to hand up what's been

18  premarked as People's 1 through 160.  Detective, just so we're

19  clear, I have removed photograph 11, 18, 19 and 20, 22, 24, and

20  26 through 31.  With that understanding, I'd like you to take a

21  look at what's been premarked as People's 1 through 160 and

22  tell me generally if you recognize those photographs.

23      A.    They look like photographs from the crime scene.

24      Q.    Now, Detective, photographs 1 through 89, do you

25  recognize those as photographs taken on the 7th floor hallway

MMS

People - Det. Steneck - Direct/Reeves

1    of 195 Steuben Street on December 8, 2011, 1 through 89?

2        A.   Yes, it looks like the hallway and the apartment at

3    Steuben Street.

4        Q.   Now, People's 1 through 89 for identification, do

5    those photos fairly and accurately depict the scene as you

6    observed it when you arrived at around 3 o'clock on December 8,

7    2011?

8        A.   Yes.

9             MR. REEVES:   Your Honor, I'd offer People's 1

10       through 89 in evidence at this time.

11            MS. GUASTELLA:   No objection.

12            THE COURT:   All right.   1 through 89 are marked

13       in evidence.   Mr. Reeves, just bear with me.   I believe you

14       said except for 11, 18, 19, 20, 22, 24, and 26 through 31.

15       Is that right?

16            MR. REEVES:   That's correct, your Honor, those

17       have been removed.

18            THE COURT:   Okay.   Except for those then,

19       Exhibits 1 through 89 previously marked for ID are now in

20       evidence.

21            (Whereupon, People's Exhibits 1 through 89 with

22       the exceptions of 11, 18, 19, 20, 22, 24, 26 through 31, as

23       previously listed, are deemed marked in evidence.)

24       Q.   Det. Steneck, if you look at People's 90 through 106,

25    that series of photos in 90 through 106 for identification, do

MMS

People - Det. Steneck - Direct/Reeves

1   those fairly and accurately depict the scene outside that you

2   assisted in processing on December 8, 2011, and that would be

3   the wooded area?

4        A.   You said through 96?

5        Q.   90 through 106.

6        A.   Okay.  Yes.

7             MR. REEVES:  Your Honor, I'd offer People's 90

8        through 106 in evidence at this time.

9             MS. GUASTELLA:  No objection.

10            THE COURT:  All right.  Exhibits 90 through 106

11       are now marked in evidence.

12            (Whereupon, People's Exhibits 90 through 106 are

13       deemed marked in evidence.)

14       Q.   The remaining photographs, 107 through 160, do those

15  photographs fairly and accurately depict the items that you saw

16  at the 120 Precinct on December 8, 2011, related to the

17  services you provided in this case?

18       A.   You said the remaining through 160?

19       Q.   Yes.

20       A.   Yes.

21            MR. REEVES:  Your Honor, I'd offer People's 107

22       through 160 in evidence at this time.

23            MS. GUASTELLA:  No objection, Judge.

24            THE COURT:  All right.  Exhibits 107 through 160

25       are marked in evidence.

MMS

People - Det. Steneck - Direct/Reeves

1          (Whereupon, People's Exhibits 107 through 160 are

2     deemed marked in evidence.)

3     Q.   Det. Steneck, I think one of the things that you and I

4     talked about when you were processing the scene, you indicated

5     to the jury that, in addition to photographing the scene, that

6     on occasion you would do sketch or diagrams of the scene as it

7     appeared to you.  Did you do that in this case?

8     A.   Yes.

9     Q.   I am going to hand up to you what's been premarked as

10    People's 161, 162, and 163 for identification.

11         Det. Steneck, if you can take a look at 161 for

12    identification.  It should have a little red sticker on it.  Do

13    you recognize that?

14    A.   Yes.

15    Q.   What do you recognize that to be?

16    A.   That was a diagram I sketched of the hallway at

17    Steuben.

18    Q.   And does that diagram fairly and accurately depict the

19    hallway and items in the hallway that you observed when you

20    arrived on December 8, 2011?

21    A.   Yes.

22    Q.   Now, that diagram is not drawn to scale, correct,

23    Detective?

24    A.   Correct.

25              MR. REEVES:  Your Honor, with the understanding

People - Det. Steneck - Direct/Reeves

1     it is not drawn to scale, the People would offer 161 in

2     evidence.

3                    MS. GUASTELLA:  No objection.

4                    THE COURT:  161 is marked in evidence.

5                    (Whereupon, People's Exhibit 161 is received in

6     evidence.)

7                    THE COURT OFFICER:  So marked.

8     Q.    Detective, if you could be kind enough to post that

9     next to you on the easel.  Thank you.

10          Detective, before we talk about that, what I'd like to

11    do is just show you the next two sketches, which would be

12    People's 162 and 163 for identification.

13          Do you recognize 162 for identification?

14    A.    Yes.

15    Q.    What do you recognize that to be?

16    A.    The basic layout of the Apartment 7L at Steuben

17    Street.

18    Q.    And does that fairly and accurately depict Apartment

19    7L at 195 Steuben Street the way you saw it when you arrived on

20    December 8, 2011?

21    A.    Yes.

22    Q.    And, again, that's not drawn to scale, correct?

23    A.    Correct.

24                   MR. REEVES:  With that understanding, People

25    offer 162, your Honor.

MMS

People - Det. Steneck - Direct/Reeves

1           MS. GUASTELLA:  No objection.

2           THE COURT:  Okay.  This is, I'm sorry, 162,

3      right?

4           MR. REEVES:  162.

5           THE COURT:  In evidence.

6           (Whereupon, People's Exhibit 162 is received in

7      evidence.)

8           THE COURT OFFICER:  So marked.

9           MR. REEVES:  If we can show the detective the

10     last sketch.

11     Q.   Det. Steneck, do you recognize that diagram, 163 for

12     identification?

13     A.   Yes.

14     Q.   What is that?

15     A.   This was a layout of the wooded area that I responded

16     to after responding to Steuben Street.

17     Q.   And does that diagram fairly and accurately depict the

18     wooded area outside of 195 Steuben as you observed it when you

19     arrived?

20     A.   Yes.

21     Q.   It's not drawn to scale, correct?

22     A.   Not to scale.

23          MR. REEVES:  Your Honor, with that understanding,

24     People would offer 163 in evidence at this time.

25          MS. GUASTELLA:  No objection, Judge.

People - Det. Steneck - Direct/Reeves

1       THE COURT:  163 is marked in evidence.

2           (Whereupon, People's Exhibit 163 is received in

3       evidence.)

4           THE COURT OFFICER:  So marked.

5       Q.   Detective, what I'm going to do is ask you to take the

6   photos and I'm going to display them on the monitor.  And if

7   you could, just describe to the jury what they're looking at in

8   People's 1.  What is this?

9       A.   That's just a photograph of my case folder.  We do

10  that on every job, take a photo of the case folder in case

11  there is a mix-up with the photographs.

12      Q.   Now, what I'd like to do is show you People's 2.  What

13  is that a picture of?

14      A.   That's the front of 195 Steuben Street.

15      Q.   And, Det. Steneck, when you and Det. Angst arrived on

16  December 8, 2011, did you take note of the air temperature

17  outside?

18      A.   Yes.

19      Q.   What was the air temperature when you and Det. Angst

20  arrived around 3:00 in the afternoon?

21      A.   It was approximately 45 degrees.

22      Q.   That's 45 Fahrenheit?

23      A.   Yes.

24      Q.   Thank you.

25           People's 3, what are we looking at in People's 3?

People - Det. Steneck - Direct/Reeves

1    A.    That's the 7th floor hallway of that Steuben Street,
2    195 Steuben Street.

3    Q.    Now, I'm going to ask you some questions about each of
4    the photos.

5          In People's 3, can you tell us what is in the
6    foreground to the left side of the photo?

7    A.    Those were pieces of skull fragment.  The victim was
8    at the far end of the hallway.

9    Q.    When you say "the far end," that would be at the
10   opposite end of the hallway?

11   A.    Yes, sir.

12   Q.    Now, you have the diagram next to you.  Could you
13   just, if you don't mind -- and I hate to have people like a
14   tennis match -- but just show us where on the diagram People's
15   161, where were you standing when you took this photo.

16   A.    I was standing down here.

17   Q.    Okay.  And the camera was pointed in what direction?

18   A.    This direction.

19   Q.    Thank you.

20         People's 4, what is this a picture of?

21   A.    I'm sorry?

22   Q.    This is People's 4.  What is this a picture of?

23   A.    This was the same picture.  I just stepped forward

24   down the hallway, a little closer to the victim.

25   Q.    People's 5, what is that a picture of?

MMS

000502                                                                      33

People - Det. Steneck - Direct/Reeves

1      A.   This is an opposite view.  That was me standing down

2   towards where the victim was, back towards the other end of the

3   hallway.

4      Q.   So, in this picture, what apartment are you standing

5   in front of when you take it?

6      A.   I'm standing in front of 7L.

7      Q.   This is People's 6.  What is this a picture of?

8      A.   I'm standing in front of Apartment 7L with the victim

9   pointing back down the hallway.

10     Q.   Now, to the right side of the photo there appears to

11  be a white piece of paper.  Can you tell me what that is?

12     A.   That's an evidence marker.

13     Q.   And there appear to be in the middle of the photograph

14  several cups.  Can you tell me what those are?

15     A.   Those are more pieces of the skull fragment.

16     Q.   Did you ever learn the name of the victim?

17     A.   I did get the pedigree on the victim, yes.

18     Q.   What was his name?

19     A.   I got David Williams.

20     Q.   The next photo, People's 6 -- I'm sorry, People's 7,

21  what is this a picture of?

22     A.   That's looking north towards 7L, an overview.

23     Q.   So now we're back at the other end of the hallway?

24     A.   Yes.

25     Q.   Incidentally, how do you get on or off the floors in

MMS

People - Det. Steneck - Direct/Reeves

1   this apartment building?  Are there stairs or elevators or

2   both?

3        A.   Elevators and stairs.

4        Q.   Where were the stairs located?

5        A.   The stairs are near where the cups were placed on the

6   floor, in that photograph.

7        Q.   Did you also mark the stairs on your sketch?

8        A.   Yes.

9        Q.   And are they clearly labeled?

10       A.   Yes.

11       Q.   Thank you.  Could you just use the pointer.  You don't

12  have to get up.  Just use the pointer and show us where the

13  stairs are.

14       A.   (Indicating.)

15       Q.   Where is the elevator located?

16       A.   You have to go back through these doors.  The elevator

17  isn't in the sketch.

18       Q.   Thank you.

19            The next photo, People's 8, can you tell us what this

20  is?

21       A.   Those are pieces of skull fragment on the ground.

22       Q.   Now, did you have an opportunity to measure the

23  distance that the skull fragments were from the body of David

24  Williams which was in front of Apartment 7L?

25       A.   Yes.  The skull fragments in front of the stairwell,

People - Det. Steneck - Direct/Reeves

1  7B door, the furthest I marked as 76'8" south of the

2  complainant victim's head.

3      Q.   People's 9, can you tell us what that's a picture of?

4  You can use the photos in front of you, too, if you need to.

5      A.   That's the 7th floor hallway from where I was

6  standing, in front of the Apartment 7H showing evidence 1 --

7  evidence marker 1.

8      Q.   And can you tell us what evidence marker 1 was?

9      A.   Evidence marker 1 was a deformed bullet.

10     Q.   I am going to switch photos.  This is People's 10.

11  What is that a photo of?

12     A.   Let me see.  That's back towards the elevator door,

13  from marker 1.

14     Q.   Okay.  So, where on -- if we use the diagrams as a

15  reference point, where would you be standing when you take this

16  photo?

17     A.   About here.  Going back that way.

18     Q.   Indicating the center of the photo, towards the bottom

19  of the photo, Detective?

20     A.   Yes.

21     Q.   Thank you.

22          Now, we've removed People's 11.

23          This is now People's 12.  What does this show?

24     A.   This is a photo of the victim showing marker 2.

25     Q.   Now, Detective, when you arrived at the scene, was the

People - Det. Steneck - Direct/Reeves

1    scene safeguarded or secured in any way?

2        A.    Yes.

3        Q.    How was it safeguarded or secured?

4        A.    By uniform police officer.

5        Q.    And were there any other other than -- Were there any

6    uniformed police officers present on the 7th floor when you and

7    Det. Angst arrived?

8        A.    Yes.

9        Q.    Were there any civilians walking through the crime

10   scene, either from Apartment 7L to the end of the hallway where

11   the elevators were?

12       A.    No.

13       Q.    Did you have an opportunity to examine Mr. Williams'

14   body at any point in time when you and Det. Angst were present?

15       A.    Yes.

16       Q.    Did he appear to have any recent injuries to his body?

17       A.    Yes.

18       Q.    Where were his injuries, best you can recall?

19       A.    The best I recall was through the arm, through the

20   upper torso, and also through the head.

21       Q.    This is People's 13.  Can you tell us what you're

22   looking at in People's 13?

23       A.    That's a close-up of the evidence that was present at

24   marker 1.  It's a deformed bullet with copper jacketing.

25       Q.    And, Detective, on your sketch, which is in evidence

People - Det. Steneck - Direct/Reeves

1   as 161, where on your sketch is that piece of evidence located?

2       A.   Right there.

3       Q.   So, that's in the middle of the hallway towards the

4   middle of the sketch, Detective?

5       A.   Yeah, approximately.

6       Q.   Now, when you label -- when you collect evidence, do

7   you label it in any specific way?

8       A.   I label it with a marker with a scale and I throw it

9   in a package and I'll label that package.

10      Q.   Now, in this particular case, the bullet that you

11  found in the middle of the hallway, the deformed bullet you

12  found in the middle of the hallway, did you give that a

13  designation so you can refer to it later on?

14      A.   I marked it RS1.

15      Q.   What does "RS" stand for?

16      A.   My initials.

17      Q.   Now, when you mark it "1," do you give any

18  significance to what that piece of evidence means in the

19  overall context of your investigation, or is there a reason you

20  marked it 1?

21      A.   No.  It was the first piece of evidence I collected.

22      Q.   And the item in the photograph, there seems to be an

23  item on top of or next to it.  The lower one is a scale that

24  we've been talking about, correct?

25      A.   Yes.

People - Det. Steneck - Direct/Reeves

1    Q.   And what is the upper item in that photograph?

2    A.   That's just a marker.

3    Q.   Now, did you have an opportunity to measure from

4    Mr. Williams' body where this bullet was?

5    A.   I did measure the bullet.  I don't believe it was from

6    his body.  I usually use two fixed points at a location,

7    because his body will be removed.  So, measuring evidence is

8    more for reconstruction purposes at a later date, so we usually

9    use two fixed points, so I didn't measure from his body that

10   piece of evidence.

11   Q.   That's fine.  Can you tell us where you measured from

12   and how far the bullet that was marked as RS1 was found?

13   A.   I measured it south of the north hallway wall, and I

14   measured it east of the west hallway wall.

15   Q.   Can you use the sketch to show us where those two

16   reference points were.

17   A.   I measured it from south of the north hallway wall,

18   which would be approximately where Apartment 7L is.  That was

19   approximately 36'2".

20   Q.   Okay.

21   A.   And east of the west wall, so I went in this

22   direction, from here to here.  It was approximately 2'5".

23   Q.   Thank you, Detective.

24        Can you move on to the next photo, People's 14.  Can

25   you tell us what we're looking at in People's 14?

People - Det. Steneck - Direct/Reeves

1    A.    I have written down possible skull fragments south of

2    Apartment 7N entry door with scales.

3    Q.    Approximately how far or where were these located, and

4    what did use for reference points?

5    A.    These I just measured from furthest to closest to the

6    victim, because I didn't collect these.  These will be taken by

7    other authorities from the OME office.  I measured these.

8    These two were approximately in front of the 7B stairwell door.

9    So, these I measured from the complainant victim's head.  Like

10   I said, they were just approximate measurements.  They are not

11   evidence that I collected, so they're not from fixed points.

12   Q.    How far from David's head were these skull fragments

13   found?

14   A.    These two pieces approximately 76'8" and one was 75'1"

15   from his head.

16   Q.    And the next photo, what is this a picture of?

17   A.    Those are three more pieces of possible skull

18   fragments.

19             THE COURT:  I'm sorry.  What number is this?

20             MR. REEVES:  This is People's I believe it's 15,

21        your Honor.

22   Q.    How close to Mr. Williams' body did you find these

23   skull fragments?

24   A.    The furthest I have down is 13'10" from his head, and

25   I have approximately 12'2", and approximately 7 feet.

People - Det. Steneck - Direct/Reeves

1    Q.   Thank you.

2         People's 16, what is this a picture of?

3    A.   That's another piece of skull fragment.

4    Q.   Approximately how far from Mr. Williams' head was this

5    found?

6    A.   Approximately 3'11".

7    Q.   People's 17, what is that a picture of?

8    A.   That's a picture of RS2, a shell casing that I

9    recovered at the location.

10   Q.   Now, what is the difference between a shell casing and

11   a deformed bullet?

12   A.   A shell casing is what the bullet is ejected from in a

13   firearm.  When somebody fires a firearm, the pin actually hits

14   the primer in the shell casing, the gun powder inside that

15   shell casing will force that bullet to explode out of the shell

16   casing.  The bullet is what ejects out of the barrel and the

17   shell casing will eject out of the slide of the firearm.  The

18   shell casing doesn't actually fire towards the person, the

19   bullet does.

20   Q.   Can you show us on the diagram where you recovered the

21   shell casing that you marked as RS2.

22   A.   Right there.

23   Q.   And that's closest to Apartment 7L?

24   A.   Yeah, between 7L and 7M.

25   Q.   Thank you.

People - Det. Steneck - Direct/Reeves

1          The next photo, I believe, is People's 21.  What's

2    that a picture of?

3        A.   That's the lower portion of the victim's body.

4        Q.   Now, in the lower left-hand corner there seems to be a

5    blue scale.  Can you tell us what piece of evidence that

6    related to?

7        A.   That related to RS2, the shell casing.

8        Q.   Now, next photo is People's 23.  What is that a

9    picture of?

10       A.   That's a wound to the victim's inner left arm with a

11   scale.

12       Q.   People's 25, what's that a picture of?

13       A.   That's a wound to the victim's left side of his -- of

14   the body portion, not the arm, the one on the body.

15       Q.   We will skip to People's 32.  What's that a picture

16   of?

17       A.   That's just a photograph of the victim's right hand

18   with the tattoo.

19       Q.   People's 33, what's that a picture of?

20       A.   That's showing a wound to the victim's right arm on

21   the inside.

22       Q.   People's 34?

23       A.   That's a wound to the victim's right arm, the outside

24   of the arm.

25       Q.   People's 35, what's that a picture of?

People - Det. Steneck - Direct/Reeves

1      A.    That's a wound to the victim's left arm on the inside.

2      Q.    People's 36?

3      A.    That's a wound to the victim's left arm on the

4  outside.

5      Q.    People's 37, what's that a picture of?

6      A.    That's a wound to the victim's left side of his body,

7  on the side.

8      Q.    Now, before we talk about People's 38, what I'd like

9  to do is ask you, how many weapons did you find by

10  Mr. Williams' body?

11      A.    No weapons.

12      Q.    Now, People's 38, can you tell us what this is a

13  picture of?

14      A.    This is just a photograph of some blood spatter on the

15  wall.

16      Q.    Can you explain to the ladies and gentlemen what the

17  term "blood spatter" means?

18      A.    It's just when you -- when a bullet hits somebody, the

19  blood shoots out, pretty much flies all over the place.

20      Q.    Now, is there a difference -- Withdrawn.  Do you know

21  what high velocity spatter is?

22      A.    No.

23      Q.    Can you tell us, did you have an opportunity to

24  measure the spatter on the wall?

25      A.    I just took approximate heights and lengths of it,

MMS

People - Det. Steneck - Direct/Reeves

1  very basic.

2       Q.    Now, can you tell us in People's 38, the picture that

3  we're looking at, can you tell us where Mr. Williams' head

4  would have been located in that photo?

5       A.    The blood spatter would have been in this area here

6  between Apartment 7N and 7M.  So, the blood spatter was in this

7  location.

8       Q.    Okay.  The next series of photos --

9                THE COURT:  Perhaps before we get to the next

10        series we should break for lunch.  Is that all right?

11                MR. REEVES:  If I can just finish three related

12        photos.

13                THE COURT:  That's fine.  My orders these days

14        are break as close to five to one as possible, so I'll give

15        you a minute or two.

16      Q.    Det. Steneck, what is this photo a picture of?  This

17  is People's 39.

18      A.    This is an additional photo of the west wall of the

19  7th floor hallway north of Apartment 7N, south of Apartment 7M.

20      Q.    That's just measuring the height of the spatter?

21      A.    Yes, it's just the other side of that spatter that was

22  in the People's photo.

23      Q.    People's 40?

24      A.    Again, just an additional photo with the scale.

25      Q.    And 41?

People - Det. Steneck - Direct/Reeves

1      A.   An additional photo, but this time there's another --

2   a ruler going across the top.

3      Q.   And those rulers are in inches?

4      A.   Yes.

5      Q.   And, finally, People's 42, what is that a picture of?

6      A.   Again, additional of the spatter, just the rulers

7   brought down to the center of the -- the height ruler.

8      Q.   And the spatter was found on the wall which would be

9   to the right of Mr. Williams' head?

10      A.   Yes, the west wall.

11             MR. REEVES:   Your Honor, we can stop at People's

12         43 and break for lunch if that's good for the Court.

13             THE COURT:   I couldn't hear you.

14             MR. REEVES:   We can stop now.

15             THE COURT:   Good.   Okay.   We'll break for lunch.

16             Members of the jury, we will ask you to be back

17         in the jury room at 2 p.m.   We'll bring you back and resume

18         then.

19             Remember the rules, I won't repeat them.   You

20         just heard them earlier:   Don't discuss the case, and so

21         on.

22             Just leave your notebooks.   We'll lock them up,

23         nobody reads them, and we'll give them back to you at 2:00.

24             Thank you.   Have a good lunch.

25             (Whereupon, the jury exits the courtroom.)

People - Det. Steneck - Direct/Reeves

1           THE COURT:  All right.  The jury has left.

2      2 p.m.?

3           MR. REEVES:  Yes, your Honor.

4           THE COURT:  Thank you.

5           (Witness excused.)

6           (Whereupon, a luncheon recess is taken, after

7      which Tammy Rodriguez replaces Maurizia Selleck as the

8      official court reporter.)

9           (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                            MMS

Detective Steneck - Direct - Reeves

1           THE COURT OFFICER:  Jury entering.

2           (At this time the jury enters the courtroom.)

3           THE COURT OFFICER:  Both sides stipulate to the

4       presence of a complete jury panel, properly seated?

5           MR. REEVES:  Gentleman.

6           MS. GUASTELLA:  So stipulated.

7           THE COURT:  This is continued direct examination

8       of Detective Steneck.

9   DIRECT EXAMINATION

10  BY MR. REEVES:

11      Q.   Good afternoon Detective Steneck?

12      A.   Good afternoon.

13      Q.   I believe we were about to talk about People's 43.

14  Tell the jury what they're looking at in this photo?

15      A.   That's the front of the apartment 7 L.

16      Q.   And People's 44, what is this a picture of?

17      A.   That's from the front entrance of apartment 7 L.

18  looking inside.

19      Q.   People's 45, what's that a picture of?

20      A.   A photograph of the door jam of apartment 7 L.

21      Q.   We're going to talk about that in a little bit.  Is

22  there anything unique or unusual about the door jam inside the

23  apartment when you observed it on December 8, 2011?

24      A.   In this particular picture?

25      Q.   No, in general?

TR

Detective Steneck - Direct - Reeves

1        A.    In general, I usually photograph because if I didn't

2    see any damage or any evidence of forced entry, I usually look

3    for damage in the door jam that's why I photographed it.

4        Q.    You didn't see any damage from the door jam?

5        A.    No.

6        Q.    Thank you, Detective.

7              People's 46, what is that a picture of?

8        A.    The door lock assembly on apartment 7 L.

9        Q.    No visible damage when you got there?

10       A.    It was in tact.  It wasn't damaged.

11       Q.    47, what is that a picture of?

12       A.    That is from the inside of the apartment looking back

13   at the apartment entry door, apartment 7 L.

14       Q.    That child's toys just the opposite view of the

15   photographs that we saw earlier?

16       A.    Yes.

17       Q.    Tell me what 48 is?

18       A.    That's an overview of the kitchen area.

19       Q.    49?

20       A.    That's from inside the kitchen looking back out.

21       Q.    Now just to help us with that, if you could, I would

22   like you to take down the sketch that's 161.

23             If we can put up 162 in evidence.  For the next series

24   of photos, I would like you to refer to the sketch that's in

25   evidence as 162 when you talk about the photos.

Detective Steneck - Direct - Reeves

1          While you're standing, can you just show us on that
2    diagram where the entrance to the apartment is?
3          A.   Right here.
4          Q.   The child's play things, toys that we were talking
5    about, where is that in the sketch?
6          A.   About here.
7          Q.   Indicating the center to the left side of that
8    diagram.  Thank you, Detective.  Take a seat.
9          This is now People's 50, what's that a picture of?
10         A.   That's from when he came into the apartment, the entry
11   area looking into the living room.
12         Q.   The living room area is depicted in your sketch on the
13   lower right hand corner?
14         A.   Yes.
15         Q.   51, what does that show?
16         A.   That's an opposite view of the photograph that I took
17   deeper inside the living room back towards the entry door.
18         Q.   People's 52, what is that a picture of?
19         A.   Additional view of the living room.
20         Q.   53?
21         A.   Again, another additional view of the living room.
22         Q.   Detective Steneck, when you are processing a crime
23   scene why do you take all these pictures?
24         A.   It's part of procedure when you go to a crime scene.
25         Q.   Now once the scene has been released to the public,

TR

Detective Steneck - Direct - Reeves

1    would it be significant for to you go back in and take more

2    pictures, or is it best to take all the pictures while you're at

3    the scene?

4         A.   We only photograph when the crime scene is secure.

5    Once we leave it's up to the detective's squad to determine when

6    they're going to release the crime scene.

7         Q.   When you're processing the scene, when you talked

8    about earlier doing a walkthrough, do you also talk to the case

9    detective to get a feel from them of why or what you're

10   assisting with?

11        A.   They'll give us preliminary information that they have

12   as far as why they requested us.

13        Q.   Sometimes early on in the investigation the detectives

14   themselves don't know what they have, correct?

15        A.   Correct.

16        Q.   So you would take more pictures rather than less?

17        A.   Yes.

18        Q.   Okay.   In the pictures that you're taking in the

19   living room you as the crime scene detective have no idea what

20   is or is not of any significance in these photos, correct?

21        A.   Things that are pointed out like bullets I know are

22   significant, but there could be other things that arise in the

23   investigation that may become significant.

24        Q.   Now People's 54, can you tell the jury what a misfire

25   is when you're taking a photo?

TR

Detective Steneck - Direct - Reeves

1    A.   A blurry picture.  Sometimes I shut the flash off when

2    I'm in the middle of something, and then I forget to turn it

3    back on the shutter slows down so I take another photo.

4        Q.   People's 54 is an example of a misfire?

5        A.   Yes.

6        Q.   People's 55 what's that a picture of?

7        A.   An additional picture of that misfire.

8        Q.   Now again, as you're taking the photos on December 8,

9    2011, you don't have any idea whether or not anything in this

10   photo would be relevant later on, correct?

11       A.   Correct.

12       Q.   People's 56, what is that I a picture of?

13       A.   That's just the additional -- the back corner of the

14   living room.

15       Q.   People's 57?

16       A.   That's just the hallway leading to the bathroom.

17       Q.   58, what's that a picture of?

18       A.   That's an opposite view of that hallway from the

19   bathroom.  Now going back towards -- looks like the kitchen

20   area.

21       Q.   Tell me what People's 59 is?

22       A.   Just an overview of the bathroom.

23       Q.   People's 60?

24       A.   An additional view of the bathroom.

25       Q.   People's 61?

Detective Steneck - Direct - Reeves

1    A.    That's from the hallway into the bedroom.

2    Q.    62, what is that a picture of?

3    A.    Just an additional view of the bedroom.

4    Q.    63?

5    A.    Another additional view of the bedroom.

6    Q.    64?

7    A.    Again, an additional view of the bedroom.

8    Q.    65?

9    A.    Additional view of the bedroom.

10   Q.    Show us on the diagram that's in evidence as People's

11   162, where the bedroom was located?

12         The upper right hand corner?

13   A.    The northeast corner of the diagram.

14   Q.    What's People's 66?

15   A.    Just another view of the bedroom that I couldn't get

16   in the other overall, so I took an additional.

17   Q.    67?

18   A.    Again an additional of the bedroom.

19   Q.    68, what's that a picture of?

20   A.    Towards the floor in the entry area of the apartment

21   just outside the kitchen and just east of the entry door into

22   the apartment.

23   Q.    Now on the floor you can see by the left shoe there

24   appears to be a glass or a cup, can you explain to the jury what

25   that glass or cup was doing on the floor by the shoes?

Detective Steneck - Direct - Reeves

 1      A.    Originally it was placed over a deformed bullet to
 2   protect it from being kicked around.

 3      Q.    What's People's 69?

 4      A.    That's an additional view of that area with now marker
 5   label 3, and blue scale.

 6      Q.    The blue scale is something that you placed?

 7      A.    Yes.  I placed the marker on the blue scale.

 8      Q.    People's 70, what is that a picture of?

 9      A.    It's just another view, an additional view of that
10   area with marker 3 towards the front entry of apartment 7 L.

11      Q.    Now, I want to talk to you about People's 71, if I
12   could.

13            Can you tell us what we're looking at in that photo?

14      A.    That's deformed bullet with copper jacketing.

15      Q.    Now we earlier talked about a deformed copper jacket
16   bullet in the hallway, is this the same or different bullet?

17      A.    Different.

18      Q.    Can you tell us what you did with People's 71 the
19   bullet that's shown in that photo what did you do with that?

20      A.    I photographed it.  I measured it, packaged it, and
21   handed it over to the invoicing officer.

22      Q.    What's People's 72?

23      A.    That is in the hallway again.  Possible blood swab, an
24   area that I swabbed.

25      Q.    Now, is that photograph, People's 72 in evidence, if

Detective Steneck - Direct - Reeves

1  you're facing apartment 7 L., is that on the right or the left?

2  If you need we can put 161 back up for you.

3       A.    No that's fine.

4             If I'm looking at RS 4I, would be facing westbound.

5  So apartment 7 L. would be to my right.

6       Q.    Now you indicated that you took a swab, what does that

7  mean?

8       A.    It just means that I took a sample of it.  Take a

9  swab, put a little distilled water on it, take a sample, put it

10 into an envelope, and forward it.

11      Q.    Where does it get forwarded to?

12      A.    In this case -- it's a case by case basis.  In this

13 case it was to the Property Clerk.

14      Q.    Detective, take a look at People's 73, what is that a

15 picture of?

16      A.    A close up view of that same area.

17      Q.    Is this on the hallway outside of the apartment?

18      A.    Yes, the west wall.

19      Q.    Where is this in relationship -- before when we talked

20 about the blood spatter and we had the rulers or the tape

21 measures, do you recall where in relationship to that blood

22 spatter was RS 41?

23      A.    That was just south of the spatter.  The spatter was

24 closer to the apartment 7 L.

25      Q.    So this is a little further away from where David

TR

Detective Steneck - Direct - Reeves

1  Williams was?

2      A.   Yes.

3      Q.   People's 74 what is that?

4      A.   A misfire.

5      Q.   We'll show you People's 75, what is that a picture of?

6      A.   Towards a bin mark on apartment 7 M. on the door frame

7  door jam area.

8      Q.   Would you take a moment and explain to the jury what a

9  bullet impact mark is or BIM mark?

10     A.   A BIM mark is -- it's just an indentation in a wall or

11 any kind of surface, concrete, depending where the bullet hit

12 and leaves a mark.

13     Q.   Now, the previous photos where we showed have what

14 appeared to be biological matter on the wall, is that in this

15 picture as well?

16     A.   Yes.

17     Q.   On the right hand side of this photograph is the

18 biological maternal you took a swab of?

19     A.   Yes.

20     Q.   Where the blue ruler is or scale is in this photo is

21 that where the bullet impact mark is?

22     A.   This is apartment 7 M. I believe that area there

23 wasn't the area that I swabbed.  I believe the area was south of

24 apartment 7 M. so I don't believe that was the area that I

25 swabbed.

Detective Steneck - Direct - Reeves

1    Q.    So this is a different --

2    A.    That was a part of the blood spatter area showed

3    earlier.

4    Q.    Thank you.

5          Where the blue scale is shown on this photo is

6    something that you designated as a bullet impact mark?

7    A.    Yes.

8    Q.    We'll talk about that.

9          People's 76 the scale has written on it BIM 1, can you

10   explain to the jury what that is?

11   A.    That's again just a ballistic impact mark that I

12   marked number one on the door frame area of apartment 7 M.

13   Q.    Now where in relationship was RS 1, the round that you

14   recovered, relative to the bullet impact mark that you

15   designated on the door jam here?

16   A.    It was further south down the hallway further away

17   from the victim, the bullet RS 1.

18   Q.    Can we put 161, the diagram of the hallway up.

19         What I would like to you do is, if we can hand you a

20   red marker, I would like you to circle bullet impact 1, and then

21   circle RS 1 the deformed copper jacket.  Thank you.

22         People's 77, what is that a photograph of?

23   A.    Inside of apartment 7 L. looking inside the entry

24   door.

25   Q.    You've take a photograph of bullet impact 1 in the

Detective Steneck - Direct - Reeves

1    hallway and going back into the apartment 7 L?

2        A.   Yes.

3        Q.   Did you find a second bullet impact mark inside the

4    apartment 7 L. at 195 Steuben Street on December 8, 2011?

5        A.   Yes.

6        Q.   I would like to talk to you about that.

7             Does this photo show that bullet impact mark that you

8    designated number 2?

9        A.   Yes.

10       Q.   By calling them 1 and 2, you don't mean to infer that

11   they occurred in that order or sequence?

12       A.   Correct.

13       Q.   That's just the order that you labeled them?

14       A.   Yes.

15       Q.   How do you know that's a bullet impact mark?

16       A.   Just from experience it was fresh paint that was

17   chipped in the wall and the location of the deformed bullet on

18   the ground.

19       Q.   The same question for bullet impact 1, how did you

20   know?

21       A.   It was a fresh mark in the door and the location of it

22   in regards to the victim and the deformed bullet that was found

23   on the ground.

24       Q.   Did you have an opportunity to measure the height off

25   the floor of bullet impact 1 in the hallway?

TR

                           Detective Steneck - Direct - Reeves

1        A.   Yes.

2        Q.   What was the height off the ground of bullet impact

3    mark 1?

4        A.   Approximately 4 feet 6 inches up from the ground.

5        Q.   The same question, this bullet impact mark that's

6    being displayed to the jury number 2, what was the height off

7    the ground of bullet impact mark 2?

8        A.   Approximately 4 feet 1 inch up from the ground.

9        Q.   I show you People's 79, what is that a picture of?

10       A.   That's a picture of the wall in the hallway just

11   opposite the entry door of the apartment 7 L.

12       Q.   People's 80, what is that a picture of?

13       A.   That's just an area I swabbed that could possibly have

14   been blood on that same wall that was shown in the prior

15   picture.

16       Q.   That's inside of the apartment, correct?

17       A.   Yes.

18       Q.   People's 81, what does that show?

19       A.   That's a cell phone that was in the living room of

20   apartment 7 L. on the couch.

21       Q.   Now the next series of photos, can you tell me what is

22   shown in People's 82?

23       A.   This was something that I designated as going to be RS

24   6, a possible latent print on the wall, on the west wall of the

25   hallway just south of the stairwell 7 B. the door, the exit door

                                    TR

1  stairwell 7 B.

2      Q.   Would you explain to the jury what a latent print is?

3      A.   Would be something, a fingerprint that possibly

4  somebody had their hands in oil or blood and touched that

5  substance that substance leaves an image of their fingerprint of

6  their fingers.

7      Q.   Now, when you take a photograph you don't know it's a

8  latent print as you take the photo?

9      A.   No, I take examination quality photos to enhance the

10  ridge detail if there is any.

11      Q.   The next series 83, is that the same photo?

12      A.   Just additional photos with additional lighting from

13  the camera.

14      Q.   84 is the same with the scale?

15      A.   Yes.

16      Q.   85 is over exposed picture?

17      A.   Yes.

18      Q.   86 picture?

19      A.   Additional.

20      Q.   Finally 87, we got the lighting right we took a good

21  photo of the scale?

22      A.   Yes.

23      Q.   86, what is that a picture of?

24      A.   That's a picture of the hallway floor just in front of

25  the apartment 7 L.

Detective Steneck - Direct - Reeves

1      Q.    Now, Detective Steneck, the period of time that you

2   spend processing the scene did anything happen with Mr.

3   Williams' body in the hallway while you were photographing

4   inside the apartment 7 L?

5      A.    The ME's office came and removed the body.

6      Q.    In addition to removing the body was permission given

7   to the superintendent or a member of the staff of the building

8   to clean the hallway floor?

9      A.    Yes.

10     Q.    When you left the apartment after finishing did you

11   learn where David Williams lived in that building?

12     A.    I believe it was apartment 7 L.

13     Q.    When you finished processing 7 L. and came out, was

14   the hallway floor cleaned?

15     A.    Yes.

16     Q.    Did you have an opportunity to look for bullet impact

17   marks on the floor?

18     A.    Yes.

19     Q.    People's 88, do see in the hallway, is that where Mr.

20   William's body had previously been?

21     A.    Yes.

22     Q.    When the body was removed, and the hallway was clean,

23   did you see any bullet impact on the floor?

24     A.    Yes.

25     Q.    The impact marks displayed or impact mark displayed

1  with the scale in this photo?

2      A.   Yes.

3      Q.   I show you People's 89, what is that a picture of?

4      A.   Close up of the same location.

5      Q.   What's depicted in that photo?

6      A.   It's marked ballistic impact mark 3.

7      Q.   Again you don't imply any sequence of events, this is

8  just a clear bullet impact mark that you found on December 8,

9  2011?

10     A.   Yes.

11     Q.   Again, how do you know that's a bullet impact mark?

12     A.   Just from responding to hundreds of shootings over

13 time you get expertise in it.  I've taken numerous advanced

14 shooting courses.  I've been trained.

15     Q.   Where was this mark, Mr. Williams body relative to the

16 impact mark that you labeled number 3?

17     A.   His body was on top.

18     Q.   What part of his body was on top?

19     A.   Approximately where his head was laying.

20     Q.   Now, what I would like to do if I could shift gears to

21 talk to you about the second part of the job that you did on

22 December 8, 2011, what we've talked about so far, all happened

23 inside of 195 Steuben?

24     A.   Yes.

25     Q.   Did you have an opportunity to leave 195 Steuben later

TR

1    on in the evening of December 8, 2011 to assist in processing

2    the scene outside?

3         A.   Yes.

4         Q.   What I would like if you could is post 163 that

5    diagram.

6              While you were processing inside of 195 Steuben up on

7    the 7th floor, did you become aware of things that had happened

8    outside of the building by speaking to other members of the New

9    York City Police Department?

10        A.   Yes.

11        Q.   As a result of those conversations, were you asked to

12   help process a scene outside of the building?

13        A.   Yes.

14        Q.   Can you tell us in People's 163 in evidence what that

15   sketch is meant to represent?

16        A.   That sketch I was requested to go to Pierce Street and

17   Mosel Avenue that sketch represents a wooded area at that

18   intersection along the Staten Island Expressway and Narrows Road

19   North.

20        Q.   I think I asked you, that's not drawn to scale?

21        A.   Correct.

22        Q.   Where would 195 Steuben be the top or bottom of that

23   chart that you've drawn?

24        A.   I was up towards the top.

25        Q.   Now, I'm going to show you the next series of photos

                                    TR

Detective Steneck - Direct - Reeves

1  People's 90, what is that the intersection of what two streets?

2      A.    Pierce Street and Mosel Avenue.

3      Q.    People's 91, what is that a picture of?

4      A.    That is looking down Pierce Street from Mosel Avenue.

5      Q.    Now by the time you had finished processing the inside

6  of 195 Steuben on the 7th floor it had gotten dark out?

7      A.    Yes.

8      Q.    The second photo that I showed you was taken during

9  the daytime of the outside of the building?

10     A.    The very first after the case folder, yes.

11     Q.    Approximately how long did it take you to process the

12 inside of the building?

13     A.    I would say we responded to the second location

14 approximately 11 o'clock at night.

15     Q.    People's 92, what is that a picture of?

16     A.    That's looking back at the intersection, the first

17 picture that was taken at the scene.

18     Q.    People's 93?

19     A.    That's now going towards the wooded area along the

20 retaining wall.

21     Q.    Now when you went outside to process the second scene

22 were any other units from the New York City Police Department

23 there to assist you in aiding with artificial light or anything

24 of that nature?

25     A.    Yes the Emergency Service Unit.

TR

Detective Steneck - Direct - Reeves

1    Q.   What services did Emergency Service Unit provide to

2  assist you to do your job?

3    A.   They provided additional lighting in the wooded area.

4    Q.   People's 94, what is that a picture of?

5    A.   Again the wooded area.   It's opposite view of the last

6  photo.

7    Q.   95, what does that show?

8    A.   That's the wooded area again headed closer towards the

9  ESU light.

10   Q.   Now the object that's on the left hand side of the

11 photo, can you tell us what that object is?

12   A.   I just document it as a retaining wall, the wall

13 between the wooded area and the highway.

14   Q.   People's 96, what does that show?

15   A.   Opposite view of the previous photo.

16   Q.   97?

17   A.   It's further down the wooded path towards the light.

18   Q.   98 what's that?

19   A.   That's a misfire.

20   Q.   We'll go to 99, what does that show?

21   A.   That's an opposite view of the two photographs before

22 this.

23   Q.   People's 100, can you tell us what's shown in People's

24 100 in evidence?

25   A.   That's the wooded area.   It shows a duffel bag that's

Detective Steneck - Direct - Reeves

1    in that wooded area.

2        Q.   Now, is the duffel bag also shown on the diagram

3    that's in evidence as People's 163?

4        A.   Yes.

5        Q.   If you could just take that red marker we gave you,

6    and circle approximately where on People's 163 where the gray

7    and black duffel bag was found.

8             Thank you.

9             People's 101 what is that a picture of?

10       A.   An additional view of the duffel bag in the wooded

11   area.

12       Q.   102, what is that a picture of?

13       A.   Opposite view showing that same duffel bag.

14       Q.   103?

15       A.   That's just -- I went further down the path and took

16   another additional view of the wooded path.

17       Q.   People's 104 another misfire?

18       A.   Yeah, that's misfire.

19       Q.   People's 105, what is that a picture of?

20       A.   Close up view of the duffel back that was found.

21       Q.   That's the duffel bag that appeared when you arrived

22   at 11 o'clock in the evening on December 8, 2011?

23       A.   Yes.

24       Q.   People's 106, what is does that show?

25       A.   It's just a photograph looking into the duffel bag.

Detective Steneck - Direct - Reeves

1      Q.    Now was the duffel bag that was recovered brought

2   anywhere to your knowledge?

3      A.    Prior to me getting there?

4      Q.    No.  After you took pictures of it, was it taken

5   anywhere?

6      A.    I recovered it.

7      Q.    Where did you go with it?

8      A.    I went to my crime scene truck.

9      Q.    What was the purpose of bringing the duffel bag to

10  the truck?

11     A.    To itemize it carefully and go through it.

12     Q.    Now, prior to you taking it from the scene was it

13  secured by any other police officers?

14     A.    Yes.

15     Q.    How was it secured?

16     A.    Uniformed police officer that was there.

17     Q.    Now, did you have an opportunity to go to the 120

18  Precinct or to your truck to process the contents of the duffel

19  bag?

20     A.    Yes.  I processed it in my truck?

21     Q.    We'll talk about that in a few minutes.

22           First of all could you describe for the jury how large

23  a bag are you talking about?

24     A.    It was -- I can only give an approximation it was like

25  a normal size duffel bag, pretty big.

1      Q.    You had your hands apart three or four feet?

2      A.    Four feet wide, by two feet high, by three or four

3   feet long, approximately.

4      Q.    In People's 107 you had an opportunity to take the

5   contents of the bag out?

6      A.    Yes.

7      Q.    Let's talk about that for a moment.  What's been shown

8   in People's 107?

9      A.    107 is a long black jacket that I marked RS 7.

10      Q.    People's 108, what does that show?

11      A.    That's just the jacket turned over to the backside of

12   it.

13      Q.    People's 109, what does that show?

14      A.    That's a gray hooded zip up sweatshirt that I marked

15   RS 8.

16      Q.    People's 110?

17      A.    That's that same RS 8 hooded sweatshirt.

18      Q.    Did you have an opportunity to examine the hooded

19   sweatshirt and the jacket that we just showed?

20      A.    Whenever I photograph and document evidence I take

21   information off of it.

22      Q.    Do you recall what the size of the brown jacket was?

23      A.    RS 7?

24      Q.    Yes.

25      A.    The brown long coat I documented it as a 46 XL.

TR

Detective Steneck - Direct - Reeves

1    Q.    What about the sweatshirt?

2    A.    RS 8 the gray hooded sweatshirt, 3 XL.

3    Q.    People's 111, what is that a picture of?

4    A.    That is RS 9, which was a pink towel from inside the

5  duffel bag.

6    Q.    112, what is that a picture of?

7    A.    RS 10, a smaller pink hand towel recovered from inside

8  the duffel bag.

9    Q.    113, what is that a picture of?

10   A.    That is a black hooded sweatshirt that I marked RS 11

11  that was recovered inside the duffel bag.

12   Q.    Do you recall what the size of that sweatshirt was?

13   A.    RS 11 I documented as 3 XL, written on the tag.

14   Q.    114, is it just the back of the black sweatshirt?

15   A.    Yes.

16   Q.    What's 115?

17   A.    That is an item that I marked RS 12, one black mask

18  with eye holes that was recovered from inside the duffel bag.

19   Q.    116, what is that a picture of?

20   A.    That was a black sock containing numerous bills inside

21  that I marked RS 13.

22   Q.    117, what does that show?

23   A.    That is evidence marked RS 14, one black spade with

24  yellow handle recovered from inside the duffel bag.

25   Q.    118, what does that show?

TR

Detective Steneck - Direct - Reeves

1      A.   That is a black umbrella that I recovered inside the

2  duffel bag marked, RS 15.

3      Q.   119, what does that show?

4      A.   Additional black umbrella that I marked RS 16.

5      Q.   120?

6      A.   That was one white rope approximately 9 feet in length

7  that I marked RS 17.

8      Q.   121?

9      A.   That is a black glove with yellow trim, RS 18 that I

10  recovered from inside the duffel back.

11      Q.   How many black gloves with yellow trim did you

12  recover?

13      A.   I just have one.

14      Q.   122, what is that a picture of?

15      A.   122 is a CD player marked RS 19, a disk from inside

16  that CD player marked RS 19A, and head phones, RS 20 recovered

17  from inside the duffle bag.

18      Q.   123, what does that show?

19      A.   That shows two white latex gloves marked RS 121 and

20  122 that I recovered from inside the duffel bag.

21      Q.   Finally People's 124, what does that show?

22      A.   That is the actual duffel bag that I marked RS 23

23  after all the contents were removed.

24      Q.   And 125, what is that a picture of?

25      A.   That is a Gatorade bottle inside the duffel back,

TR

1  marked RS 24.

2      Q.  126, what does that show?

3      A.  That is the rifle that I recovered from inside the

4  duffle bag marked RS 25.

5      Q.  Now when you recovered the riffle from inside of the

6  black and gray duffel bag, was the rifle loaded?

7      A.  Yes.

8      Q.  Can you tell us, if you can recall, how it was loaded?

9      A.  It had a magazine in the chamber and I'm sorry a

10 magazine in the firearm, and the live cartridge in the chamber.

11     Q.  Did you or any other members of the New York City

12 Police Department make the weapon safe?

13     A.  Yes.

14     Q.  Do you recall who did that?

15     A.  That was ESU on the scene made it safe for me.

16     Q.  That's one of the specialties that emergency services

17 has?

18     A.  Yes.

19     Q.  Find weapons and make them safe for other officers to

20 handle?

21     A.  Yes.

22     Q.  People's 127, what is that a picture of?

23     A.  That's just an additional photo of the other side of

24 the rifle.

25     Q.  Detective Steneck, I would like to ask you some

TR

1  questions about this picture, can you tell us what the grayish

2  interior is on the middle part of the weapon in this photo?

3      A.   On this rifle the black bag was duct taped to the

4  actual assembly part of the rifle.

5      Q.   Is that a standard feature on this type of weapon?

6      A.   I'm not a gun expert I would say no.

7      Q.   Now, in addition to finding the loaded rifle in the

8  bag, did you find any discharged shell casings in the bag?

9      A.   Yes.

10     Q.   On the top of this photo underneath is the blue scale

11  and there's an object, can you tell us what that is?

12     A.   That is the cartridge that was removed from the

13  chamber.

14     Q.   We talked about the weapon being loaded with a

15  magazine, how many magazines did you find in that duffel bag on

16  December 8, 2011?

17     A.   There was one magazine in the firearm and then an

18  additional magazine inside the duffel bag.

19     Q.   Do you recall which magazine is being displayed in

20  People's 128?

21     A.   RS 27, with the shell casing RS 26 the additional

22  magazine.

23     Q.   Now, from underneath the magazine in this photo is a

24  discharged shell casing?

25     A.   That's RS 26.

TR

Detective Steneck - Direct - Reeves

1    Q.   So the previous photo was shown a live cartridge, the
2    bullet, and the casing together?

3    A.   Yes.

4    Q.   That came from the chamber of the weapon, correct?

5    A.   Yes.

6    Q.   In People's 128 there's a discharged shell casing
7    only, correct?

8    A.   Yes.

9    Q.   People's 129, what do we see in that picture?

10   A.   That's the same discharge shell casing without the
11   magazine.

12   Q.   Did you give that any designation with an RS number?

13   A.   RS 26.

14   Q.   People's 130, what does that show?

15   A.   That shows that magazine from the previous photo with
16   RS 26 in one now marked RS 27, the magazine.

17   Q.   Now the magazine that was in the weapon when it was
18   recovered had ammunition in it?

19   A.   Yes, with loaded magazine.

20   Q.   Do you recall how many rounds, if you can remember?

21   A.   I don't have it documented.  I don't believe I emptied
22   it.  I believe I left in a loaded magazine to not disturb any
23   potential DNA evidence or fingerprints on it.

24   Q.   The second magazine, do you recall if that was loaded
25   or unloaded?

Detective Steneck - Direct - Reeves

1        A.    It was loaded.

2        Q.    Again did you have an opportunity to unload that

3   magazine or did you leave that in ballistics?

4        A.    No, I left that for ballistics.

5        Q.    People's 131, what does that show?

6        A.    It's just an additional view of that same magazine the

7   other side, RS 27.

8        Q.    Now did you have an opportunity after you finished

9   processing the items from the duffel bag, and the duffel bag in

10  your truck to go to the 120 Precinct to do additional work?

11       A.    Yes.

12       Q.    What did you do at the 120?

13       A.    I took a photo of the suspect.

14       Q.    People's 132 in evidence, what is that a picture of?

15       A.    The front of the suspect.

16       Q.    Do you recall what his name was?

17       A.    Armand Skrine.

18       Q.    Now, the next series of photos, can you explain what

19  133 is?

20       A.    That's the left side of Mr. Skrine.

21       Q.    134?

22       A.    That's the back of Mr. Skrine.

23       Q.    135?

24       A.    That's the right side of Mr. Skrine.

25       Q.    Did you have an opportunity to observe Mr. Skrine's

TR

Detective Steneck - Direct - Reeves

1   demeanor during the taking of these photos?

2       A.   I was in the room with him for a few minutes.

3       Q.   Can you describe the demeanor while you were with him?

4       A.   Just very stoic, passive, quiet, didn't say anything.

5       Q.   Did you note any injuries to the face or body of Mr.

6   Skrine while were you taking photos on December 8, 2011?

7       A.   No.

8       Q.   People's 136, can you tell us what that's a picture

9   of?

10      A.   A photo of the topside of his hands, Mr. Skrine's

11  hands.

12      Q.   137?

13      A.   The palm side of Mr. Skrine's hands.

14      Q.   The band aid on his left hand, were there any

15  injuries, fresh oar recent injuries to the hand that you

16  noticed?

17      A.   I noticed that band aid.  I didn't see any other

18  injuries.

19      Q.   People's 138, what is that a picture of?

20      A.   Mr. Skrine's face.

21      Q.   139?

22      A.   Just an additional.

23      Q.   The first one was a bit of a misfire?

24      A.   A little bit.

25      Q.   Did you have an opportunity after photograph the

TR

Detective Steneck - Direct - Reeves

 1    defendant, to photograph the clothing that he was wearing when
 2    you saw him at the 120 Precinct?
 3        A.    Yes.
 4        Q.    Before you did that did you take a picture of the
 5    manufacture's name of the weapon that was recovered from the
 6    bag?
 7        A.    Yes.
 8        Q.    What is in People's 140, what does that show?
 9        A.    It shows the inscription on the metal portion of the
10    rifle.
11        Q.    Did you have an opportunity to take pictures of the
12    money that was found in the sock that we talked about?
13        A.    Yes.
14        Q.    People's 141, is was does that show?
15        A.    It shows a series of $10 bills that were removed from
16    the sock.
17        Q.    There seem to be two columns of $10 bills.  Was there
18    anything unique or unusual about serial numbers on those $10
19    bills?
20        A.    Yeah, they all matched.  They all had the same serial
21    number.
22        Q.    People's 142, what is that picture of?
23        A.    A close up just showing the serial number.
24        Q.    143, what does that show?
25        A.    The reverse side of the bill marked 13 A.

                                TR

Detective Steneck - Direct - Reeves

1      Q.    144, what is that a picture of?

2      A.    These are additional $10 bills with different serial

3   numbers than 13 A. had, so these were marked 13 AB.

4      Q.    Were you able to compare the serial numbers on B 13 AB

5   to one another?

6      A.    Yes.

7      Q.    What did you find?

8      A.    They were the same.

9      Q.    So they were different than 13 A., but all these bills

10  were the same?

11     A.    Yes.

12     Q.    People's 145, what does that show?

13     A.    It's a close up of 13 AB showing the serial number on

14  the front.

15     Q.    People's 146?

16     A.    Just the reverse side of the bill 13 AB.

17     Q.    And finally 147, what does that show?

18     A.    Those were additional $10 bills removed from the sock

19  with different serial numbers than the previous, and I marked

20  these RS 13 AC.

21     Q.    So you grouped all is the bills that had the same

22  serial number in 13 A, 13 AB, and 13 AC?

23     A.    Yes.

24     Q.    148, what does that show?

25     A.    That's a close up of 13 AC serial number.

TR

Detective Steneck - Direct - Reeves

1      Q.   149, what does that show?

2      A.   That's the reverse side of that bill RS 13 A.

3      Q.   150, what does that show?

4      A.   These were $5 bills that were removed from the sock

5    marked 13 RS 13 B.

6      Q.   151, what is that a picture of?

7      A.   A close up of the $5 bill showing the serial number.

8      Q.   152, what does that show?

9      A.   The reverse side of the bill, the backside of the bill

10   of 13B.

11     Q.   Detective Steneck, what I would like to do is talk to

12   you about the clothing of the defendant on December 8, 2011.

13          Did you have an opportunity top photograph the

14   clothing that the defendant was wearing when you saw him on

15   December 8, 2011?

16     A.   Yes.

17     Q.   What is People's 153, what is that a picture of?

18     A.   RS 28 that's a black jacket.

19     Q.   154, what is that a picture of?

20     A.   Those are -- that's RS 29, two black sneakers.

21     Q.   155, what is that a picture of?

22     A.   That's an item marked RS 30, one pair of jeans.

23     Q.   Now, in the first three items, were you able to tell

24   or determine the size of those, the jacket the shoes and the

25   pants?

TR

Detective Steneck - Direct - Reeves

1    A.    Yes.

2    Q.    What was the size of the jackets?

3    A.    The jacket tag was marked 4 XL.

4    Q.    The shoes?

5    A.    The shoes were marked US 13.

6    Q.    And finally the pants, did they have a size on them?

7    A.    The pants were marked on the tag W38.

8    Q.    156, what is that a picture of?

9    A.    That's a pair of black shorts marked RS 31.

10   Q.    Taken from the defendant as well?

11   A.    Yes.  On the suspect at the 120 Precinct detective's

12   squad.

13   Q.    157, what is that a picture of?

14   A.    That's item marked RS 32 a gray sleeveless T-shirt.

15   Q.    Was there a size on the gray sleeveless T-shirt?

16   A.    Double XL.

17   Q.    Can you see the person who you photographed at the 120

18   Precinct here in court today?

19   A.    Yes.

20   Q.    Can you tell me what he's wearing today?

21   A.    He's wearing a suit and blue shirt.

22   Q.    Can you point to him?

23         MR. REEVES:  Indicating the defendant.

24         THE COURT:  Very well.

25   Q.    158, Detective Steneck, what is that a picture of?

TR

Detective Steneck - Direct - Reeves

1      A.   That's a misfire.

2      Q.   So we'll go to 159?

3      A.   That's black long sleeve shirt marked RS 33.

4      Q.   The side?

5      A.   The tag was marked 6 XL

6      Q.   Finally People's 160, what does that show?

7      A.   That's shows two additional bills that were found in

8  the clothing of the suspect.

9      Q.   Now, what are the two items above the bills found in

10  the clothing of the defendant?

11     A.   That's an OBTI test.

12     Q.   Explain to the jury what that is?

13     A.   Just a test we do to test to see if something has

14  blood.

15     Q.   What were the results of testing these two bills?

16          THE COURT:   Step up a moment please.

17          (Off the record discussion held at the Bench.)

18          We had a brief bench conference.

19          Go ahead.

20     Q.   Detective Steneck, what were the results of testing

21  these two bills for the presence of blood?

22     A.   Negative.

23     Q.   Detective, I'm going to shift focus now.  I'm going to

24  show you some physical.  I would like you to tell me if you

25  recognize these items.

TR

Detective Steneck - Direct - Reeves

1        First I'll hand up to you People's 164 for
2   identification.

3        With the Court's permission unseal that white envelope
4   and look at the contents.  I want to ask you some questions
5   about that.

6        Do you recognize the contents of People's 164 for
7   identification?

8   A.    I identify them as ballistics recovered from the scene
9   of 195 Steuben Street.

10  Q.    Now were they packaged in the original packaging that
11  you placed them in on December 8, 2011?

12  A.    No.

13  Q.    That original packaging in that the larger white
14  envelope?

15  A.    Yes.

16  Q.    Do the four items -- can you tell us what the four
17  items inside the ballistics items are?

18  A.    Two items are deformed bullets previously marked RS 1
19  and RS 3.

20       The deformed bullets one from the hallway, one from
21  inside the apartment 7 L., then there's two shell casings one
22  was marked RS 3 -- I'm sorry RS 2 from the hallway at the
23  location and the other one is a shell casing from inside the
24  duffel bag marked RS 26.

25  Q.    Do those four pieces of ballistics evidence, are they

TR

1   in the same or substantially the same condition as when you

2   observed them in the duffel bag or in the 195 Steuben, 7th floor

3   building?

4       A.   Yes.

5            MR. REEVES:  Your Honor, I offer People's 164 in

6       evidence at this time.

7            MS. GUASTELLA:  No objection.

8            THE COURT:  164 is in evidence.

9            (So marked. )

10           This exhibit is two deformed bullets and two

11      shell casings?

12           MR. REEVES:  That's right.

13      Q.   Detective, were you able to determine the caliber of

14  the shell casings, both the shell casing recovered from the

15  duffel bag and the shell casing recovered from the hallway at

16  195 Steuben on the 7th floor?

17      A.   When I collect the shell casings I mark the stamping

18  on the bottom of them.  I leave it to the ballistics guys to

19  determine the caliber.  This was deemed 7.62 by 39 at the bottom

20  of the shell casing.

21      Q.   7.62 would be the caliber?

22      A.   Yes.

23      Q.   If we can clear those.

24           I have a series of questions about another piece of

25  evidence.  I'm going to show you what's been premarked 165?

Detective Steneck - Direct - Reeves

1          MR. REEVES:  With the Court's permission I'm not

2     asking to open it, but I would ask the Court's for

3     permission to unfasten the tape, so that the whole bag can

4     be laid out.  Not opened.

5          THE COURT:  Okay.  I'm not sure I understand.

6          MR. REEVES:  The bag is folded over so the

7     writings can't be seen.  There's some crime scene tape or

8     evidence tape that's wrapped around it.

9          THE COURT:  You can cut the tape, Detective.

10    Q.   Without unsealing the weapon at this time.

11         As you're doing that, Detective, after you

12    photographed the weapon that you showed us in the picture, did

13    you box or seal it in any containers to be sent to the

14    ballistics lab for testing?

15    A.   Yes, I put it in a box.

16    Q.   Tell us if you recognize the contents of that plastic

17    bag at this time?

18    A.   Yes.

19    Q.   What do you recognize the contents to be?

20    A.   To be the black rifle from the duffel bag marked RS

21    25.

22    Q.   In addition to that, do you see the magazine and the

23    ammunition that we talked about earlier?

24    A.   Yes.

25    Q.   Does the weapon and magazine that was with the weapon,

Detective Steneck - Direct - Reeves

1    is it all contained in that plastic bag?

2        A.   Yes.

3        Q.   What about the plastic bag that had been ducked tape

4    to the ejection part of the weapon that was on December 8, 2011

5    does that appear to be in there as well?

6        A.   Yes.

7        Q.   It's not in the same physical form, but does appear to

8    be in the same condition as when you observed it on December 8,

9    2011 after you removed it from the duffel bag?

10       A.   Well, the black bag and the duct tape were left on the

11   firearm when I packaged it.

12       Q.   Other than that being removed?

13       A.   Yes, it looks the same.

14              MR. REEVES:  I offer People's 165 in evidence.

15              MS. GUASTELLA:  No objection.

16              THE COURT:  No objection.  All right 165 marked

17        in evidence.

18              Again, this is a rifle, two magazines, and

19        ammunition.

20              MR. REEVES:  One magazine.  I'm going to hand you

21        up the second in a minute.

22              THE COURT:  All right.

23              THE COURT OFFICER:  Some marked.

24       Q.   Detective Steneck, after you boxed the weapon and the

25   ammunition and the magazine that was with the weapon, what did

000552                                                                    83

Detective Steneck - Direct - Reeves

1   you do with it?

2       A.   I boxed it up, taped it up to secure it, and then I

3   gave it to the invoicing officer for vouchering.

4       Q.   Did you give the invoicing officer any instructions on

5   where the weapon and ammunition were to go?

6       A.   I forwarded it to the NYPD lab for the ballistics

7   analysis.

8       Q.   The same evidence that has been received as 164, the

9   two discharged shell casing and deformed bullets, did you give

10  the officer any instructions as to what was to be done?

11      A.   Yes.  I told him as well to forward it to the NYPD

12  ballistics lab for analysis.

13      Q.   Do you know if that was done to the best of your

14  knowledge?

15      A.   I don't know what he does after I hand him the

16  evidence.

17      Q.   The last thing I have for you is People's 166 for

18  identification.

19           MR. REEVES:  With the Court's permission I would

20      ask Detective Steneck to show the jury what the riffle

21      looked like and then we can put it to the side.

22           THE COURT:  Sure.  So we're back to 165 you want

23      her to hold it up?

24           MR. REEVES:  However she could display it to the

25      jury.

TR

Detective Steneck - Direct - Reeves

1      Q.    Do you recognize that box?

2      A.    Yes.

3      Q.    What do you recognize that to be?

4      A.    That's the box that I packaged RS 27, which was one

5  black loaded magazine.

6      Q.    With the Court's permission if we can open that box so

7  that the detective can remove the contents?

8            THE COURT:   That's all right.

9            It's not in evidence, so don't take it out.  You

10     can open it and look into it.

11     Q.    For the record the box is sealed?

12     A.    Yes.

13     Q.    Now, that it's opened do you recognize the content of

14  the box?

15     A.    Yes, it's one magazine.

16     Q.    Is there any ammunition in there?

17     A.    Not in the magazine itself, no.

18     Q.    Is there ammunition in the box?

19     A.    Yes.

20     Q.    Now the contents of the box are they in the same,

21  substantially the same condition as when it was processed by you

22  on December 8, 2011?

23     A.    Except for the fact that I boxed it when it was

24  loaded, now it's unloaded.

25     Q.    Now the magazine is unloaded?

Detective Steneck - Direct - Reeves

1   A.   Yes.

2   Q.   That ammunition is separated from the magazine?

3   A.   Yes.

4   Q.   Other than that is it in the same condition?

5   A.   Yes.

6            MR. REEVES:   I would offer People's 166.

7            MS. GUASTELLA:   The detective testified herself

8        that she did not unload the magazine.

9            THE COURT:   Do you want to ask a few more

10       foundation questions.   I'll permit it.

11   Q.   Detective, when you received the magazine that we're

12   talking about that's in the box marked as 166 for

13   identification, where was that for?

14   A.   Where?

15   Q.   Where did the magazine come from?

16   A.   RS 27 came from inside the duffel bag.

17   Q.   When you packaged it in the box was the ammunition

18   inside the magazine?

19   A.   Yes.

20   Q.   You didn't remove the ammunition, correct?

21   A.   No.

22   Q.   Now the magazine is empty and the ammunition is in a

23   separate bag?

24   A.   In two separate bags.

25            MR. REEVES:   I offer it subject to connection to

TR

Detective Steneck - Direct - Reeves

1    the testimony of the ballistics expert?

2              THE COURT: Subject to connection.

3              MS. GUASTELLA: No objection.

4              THE COURT: I'll mark 166 in evidence subject to

5    connection.

6              I didn't hear any questions as to whether these

7    items were forward to ballistics.

8              MR. REEVES: We're getting there. Thank you,

9    your Honor.

10             THE COURT OFFICER: So marked.

11   Q.   After you packaged it, what was done with People's

12   166?

13   A.   After I packaged it, I handed it over to the invoicing

14   officer for forwarding to the NYPD.

15   Q.   Do you recall who the invoicing officer for all this

16   evidence was?

17   A.   Officer Kane.

18   Q.   Now when Officer Kane received, in particular, 166 he

19   would have gotten a white box?

20   A.   He would have gotten a sealed white box.

21   Q.   Did you give him any instructions relative to 166, the

22   magazine that you put inside the box?

23   A.   I told him to forward it to DNA, to the lab for DNA

24   latent, and ballistics lab.

25   Q.   Finally, Detective, I'm going to hand you People's 167

TR

Detective Steneck - Direct - Reeves

1 || for identification.

2 ||    I'm going to ask the Court's permission to unseal that

3 || envelope, and Detective Steneck I ask you to look, with the

4 || Court's permission, if you can do that, tell me if you recognize

5 || the contents of that brown envelope?

6 ||   A. Yes.

7 ||   Q. What are the contents of the brown envelope?

8 ||   A. The contents is the bills removed from the black sock

9 || that I marked RS 13.

10 ||   Q. Those were the ones that we had pictures of before?

11 ||   A. RS 13A and 13AB, and RS 13AC.

12 ||   Q. Did the bills appear to be in the same, substantially

13 || the same condition as when you had photos of them December 8,

14 || 2011?

15 ||   A. Yes.

16 ||   Q. I offer People's 167 in evidence.

17 || VOIR DIRE

18 || BY MS. GUASTELLA:

19 ||   Q. All those bills, they were recovered from the sock?

20 ||   A. Inside the sock.

21 ||     MS. GUASTELLA:  No further questions.

22 ||     THE COURT:  Any objection?

23 ||     MS. GUASTELLA:  No.

24 ||     THE COURT:  167 is marked in evidence.

25 ||     THE COURT OFFICER:  So marked.

Detective Steneck - Direct - Reeves

1  CONTINUED DIRECT EXAMINATION

2  BY MR. REEVES:

3       Q.   Can you tell us what was done with the bills that were

4  received in evidence as People's 167?

5       A.   Again, I laid them out.  I compared the serial

6  numbers.  I photographed them.  I placed them in this brown bag,

7  sealed it up, and gave it to Officer Kane for invoicing.

8       Q.   Were any instructions given to Officer Kane on what to

9  do with the bills after they were vouchered?

10      A.   I believe I told him to forward them to the Property

11 Clerk.

12      Q.   Thank you.

13           Other than what you've discussed with me today, did

14 you perform any other services related to the investigation into

15 the death of David Williams on December 8, 2011?

16      A.   No.

17      Q.   Thank you, Detective Steneck.

18           MR. REEVES:  I have no further questions, your Honor.

19           MS. GUASTELLA:  I don't have any questions.

20           THE COURT:  No questions.

21           Can you step up one moment?

22           (Off the record discussion held at the Bench.)

23           That concludes the detective's testimony, members

24      of the jury.

25           We were just discussing scheduling.  That's as

TR

Detective Steneck - Direct - Reeves

1    far as we can go today.  We're going to break.  We'll resume

2    at 9:30 tomorrow.  Let me give you a heads up.

3              Tomorrow we cannot work on the case in the

4    afternoon.

5              I have another matter that I have to handle.

6    It's simply unavoidable.  The bottom line is we'll work

7    until noon tomorrow and break at noon on this case and

8    resume Wednesday at 9:30.

9              After tomorrow we anticipate uninterrupted

10   testimony, so hopefully tomorrow is the only short date that

11   we'll face.

12             Thank you for your patience.

13             Keep in mind the rules.  Don't discuss the case

14   and so on.

15             Leave your notebooks.  We'll lock them up.

16   Nobody reads them.

17             We'll see you tomorrow at 9:30.  Thanks again.

18             (At this time the jury is excused from the

19   courtroom.)

20             The jury has left.  Did the detective take any

21   evidence with her?

22             MR. REEVES:  I believe I have all the evidence

23   except for the weapon.

24             THE COURT:  We have it over here.

25             Who do you anticipate tomorrow.

Detective Steneck - Direct - Reeves

1        MS. CILIA:  We have Sergeant Trzcinski.  We also

2   have Police Officer Aguilo and Officer Jacobs.  We don't

3   know whether we'll get to them or not.

4        We have the officer from the ferry Casiano.  He's

5   notified, as well as Jean Loiseau.

6        THE COURT:  Is that a police officer?

7        MS. CILIA:  No.

8        THE COURT:  So five people for tomorrow?

9        MR. REEVES:  We also notified the EMT who would

10  be very quick.  She's five months pregnant.  We told her we

11  would try to accommodate her.

12        THE COURT:  If we start at or about 9:30 we're

13  good until noon.  Hopefully we can knock out a few of these

14  people.

15        MS. GUASTELLA:  Sergeant John Trzcinski, he's the

16  Property Clerk that's going to testify that the property

17  that was vouchered was destroyed in storm Sandy.  I'm going

18  to ask for an adverse inference at some point.

19        THE COURT:  I'm not sure what is the People's

20  position?

21        MR. REEVES:  People would oppose that, your

22  Honor.

23        THE COURT:  I'm not sure you get it.  I have a

24  couple of cases that deal with situations in which property

25  is lost not intentionally, essentially through no fault of

TR

Detective Steneck - Direct - Reeves

1          anybody.

2                 Of course, here we have a hurricane or super

3          storm.

4                 Let me put a couple cases on the record.  You can

5          look into this and I'll hear you more.  People against

6          Seignious, this is a second department case from last week

7          February 19, 2014.

8                 I don't have an official cite.  It's at 2014 West

9          Law, 6266746.  The lose or destruction of evidence prior to

10         trial does not necessarily require imposition of a sanction.

11         It goes on to say that the evidence was not destroyed in bad

12         faith and under the circumstances of the case the Court

13         providently exercised it's discretion in denying the

14         defense's request for an adverse inference charge with

15         respect to the lost evidence.

16                Another case called People against Hernandez.

17         This is 207 Appellate Division 2d, page 719 a First

18         Department case from 1994 standing for the same.  The

19         Property Clerk inadvertently destroyed evidence.

20                The trial court conducted an appropriate inquiry,

21         which revealed that the evidence was destroyed without

22         participation or knowledge of the prosecution and these

23         circumstances the defendant was not prejudiced by denial of

24         the request for an adverse inference charge.

25                Can you tell me a little bit about the nature and

000561

92

Detective Steneck - Direct - Reeves

1    circumstance surrounding this issue we're talking about?

2            MR. REEVES:  Certainly.  As the Court knows

3    October 29, 2012 hurricane Sandy came.

4            The property in this case, specifically the

5    defendant's clothing and duffel bag and contents of the

6    duffel bag, except for the counterfeit money, magazine, and

7    the riffle itself had been tested and sent to the Kingsland

8    Avenue warehouse that was flooded by the Newtown Creek.

9            The Newtown Creek to my understanding contains a

10   lot of toxic sludge including PCP and other contaminants

11   such as heavy metals.

12           The Kingsland facility was flooded.  Barrels in

13   this facility were destroyed.  As part of the destruction

14   those barrels disintegrated, so in addition to the heavy

15   metals and PCP Kingsland was contaminated with e-coli

16   bacteria.

17           The OSHA people shut down Kingsland and my

18   understanding is Sergeant Trzcinski will testify that

19   Kingsland is still not open nor is there any plan in the

20   future to open it because it has been condemned by the OSHA

21   people.

22           Sergeant Trzcinski expected tomorrow will testify

23   that because the facility was shut down they cannot retrieve

24   any of the items from that facility.

25           THE COURT:  All right.  I guess we'll hear from

TR

Detective Steneck - Direct - Reeves

1    the sergeant tomorrow, and of course you're free to cross

2    examine him.  I don't need to tell you that.

3          At this point I don't think an adverse inference

4    charge would be appropriate.  If you want to renew that

5    application that's fine.  Of course, we can discuss that

6    again in a charge conference ultimately, but I'll keep an

7    open mind.

8          At this point, based on what I heard, it doesn't

9    sound like an adverse inference charge is appropriate.  I'll

10   wait until we're finished with the sergeant and we can talk

11   about it again.

12         Of course, if anyone wants to research this

13   further I'm happy to read cases.  I'll see you at 9:30.

14         THE CLERK:  I returned all the evidence to the

15   DA.

16         Certified to be true and accurate.

17

18   _____

19         Maurizia M. Selleck, Court Reporter

20

21   _____

22         Tammy Rodriguez, Court Reporter

23

24

25

                              TR

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND - CRIMINAL TERM - PART 5
--------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK   : INDICTMENT NO.
                                        454/2011

            -against-                 :


ARMAND SKRINE,                        :

                                        JURY TRIAL
                      Defendant.   :
--------------------------------------X
(J. Diniso)                 18 Richmond Terrace
(J. Loiseau)                Staten Island, New York
(P.O.  Aguilo)              March 4, 2014
(Sgt.  Trzcinski)



B E F O R E:

    HONORABLE STEPHEN J. ROONEY, Justice.



A P P E A R A N C E S:

    DANIEL DONOVAN, ESQ.
    District Attorney - Richmond County
        130 Stuyvesant Place
        Staten Island, N.Y. 10301
    BY:  KYLE REEVES, ESQ.,
        JENNIFER CILIA, ESQ.,
        Assistant District Attorneys

    MARIA GUASTELLA, ESQ.
    Attorney for the Defendant
        88 New Dorp Plaza
        Staten Island, N.Y. 10306




                            MAURIZIA M. SELLECK
                            SENIOR COURT REPORTER

                    MMS

Proceedings

1           THE COURT CLERK:  Calendar number 2, case on

2      trial continues: Armand Skrine, Indictment 454/2001.

3                 Appearances, Counsel.

4           MR. REEVES:  On behalf of the People, Kyle Reeves

5      and Jennifer Cilia.

6           Good morning, your Honor.

7           MS. GUASTELLA:  Maria Guastella on behalf of

8      Mr. Skrine.

9                 (Defendant present.)

10          MS. GUASTELLA:  Judge, I have an issue.

11          THE COURT:  Go ahead.

12          MS. GUASTELLA:  Judge, the $120 photo, the

13     photograph that was shown to the jury of that 120 being

14     tested, that $100 bill and the $20 bill.  I'm questioning

15     where they got that $120 from.  I know they claim they

16     recovered it from my client, but I'm going to ask where and

17     why 120 out of the -- He had more than 120 on his person.

18     And I think I know where the prosecution is going with

19     this; I just would like them to answer that.

20          THE COURT:  You're talking about the end of

21     Det. Steneck's testimony when he asked her about two bills

22     and whether she tested them for the presence of blood, and

23     she said she did and that it was negative?

24          MS. GUASTELLA:  That's correct.

25          THE COURT:  Let me make a record in that regard.

MMS

Proceedings

1        When that started up, I called a bench

2   conference.  I reminded the parties of Judge Collini's

3   suppression decision, and, as I recall, the DA said this

4   was not counterfeit currency and that the tests for blood

5   were negative.  I then asked you your position.  This is at

6   a bench conference.  You said you had no objection, so we

7   continued.

8        MS. GUASTELLA:  Right.

9        THE COURT:  Now, if you want to revisit that,

10  that's fine with me.  I don't know.  You say you think you

11  know where they're going with it.  I don't.

12       MS. GUASTELLA:  When I went over the DD5s, I came

13  across last night the victim's girlfriend testified that

14  she -- the deceased withdrew the $120 on the morning of the

15  incident, and I believe that they are going to link that

16  120 up to the 120 that they showed the jury, which puts my

17  client in a predicament forced to testify to explain that

18  he had other monies on his person.

19       THE COURT:  So, are you objecting now?

20       MS. GUASTELLA:  Yes.

21       THE COURT:  People?

22       MR. REEVES:  I don't quite know what to say, your

23  Honor.  There was no objection yesterday.  I don't believe

24  that Ms. Cilia nor I were going anywhere else other than to

25  be complete with what Det. Steneck had performed.  I don't

Proceedings

1     know of any way to link that money to the defendant.

2                 THE COURT:  Where was it recovered?  She said

3     from his person, right?

4                 MR. REEVES:  I believe it was, yes.

5                 THE COURT:  And it was a $100 bill and a $20

6     bill?

7                 MR. REEVES:  Correct.

8                 MS. GUASTELLA:  But he did have other monies on

9     him in his pocket: fives, singles, not just the 120, which

10    just so happens that the victim may have withdrew 120 out

11    of the bank that morning.

12                THE COURT:  And that 120 was not counterfeit, am

13    I correct?

14                MS. GUASTELLA:  Right.

15                MR. REEVES:  No, it was not.

16                THE COURT:  There were counterfeit bills

17    allegedly recovered from your client.  They were suppressed

18    along with identification cards.

19                MS. GUASTELLA:  Those were for safekeeping.  I'm

20    not sure why, but, anyhow, that's not what I'm questioning

21    now.  What I'm questioning now is the link of the 120.

22    Then I am going to say that they instruct the witness not

23    to say how much he withdrew from the bank.

24                THE COURT:  I have another suggestion, if you

25    want.  I'm reading Judge Collini's decision.  I'll read it,

1     two lines that bear on this issue.  This is from page 5 of

2     his decision:  Based on the foregoing, the recovery of

3     physical evidence from defendant's person, and in

4     parentheses, i.e., the counterfeit currency and

5     identification cards, must be suppressed.

6           He found the stop to be bad, therefore, it seems

7     to me everything recovered, including a subsequent

8     statement, is suppressible and is suppressed.

9           Now, I got no objection yesterday, but if you

10    want me to, I'll instruct the jury to disregard that line

11    of testimony, I'll strike it.

12          MR. REEVES:  That's fine.

13          THE COURT:  On the other hand, if you don't want

14    me to do anything about it, I won't.  The DA says they're

15    not going to link it up in any way.  Is that right?

16          MR. REEVES:  That's correct.

17          MS. GUASTELLA:  When she testifies that she took

18    120, although you are going to instruct the jury to strike

19    that testimony, they've heard it already.  Now they're

20    going to hear Ms. Hunt testify that he withdrew $120 from

21    her bank account.

22          THE COURT:  What would the relevance of that be,

23    withdrawing the $120?

24          MS. GUASTELLA:  Their theory is that he went and

25    executed the victim and that he is recovering -- from his

Proceedings

1      person $120 is recovered.  Without the defendant

2      testifying, it's going to lead the jury to believe he only

3      had the 120 on his person which is the 120 that the victim

4      had in his apartment.

5                    THE COURT:  Is that true, is that part of your

6      proof?

7                    MS. CILIA:  No.

8                    MS. GUASTELLA:  Then I'm going to ask that they

9      not ask her how much she took out of the bank.

10                   THE COURT:  What about that?

11                   MS. CILIA:  We were never planning on asking

12     that.

13                   MS. GUASTELLA:  Well, it was in the DD5, I just

14     wanted to make sure.

15                   THE COURT:  So, apparently they're not going to

16     ask.

17                   MS. GUASTELLA:  Okay.

18                   THE COURT:  So what do you want me to do?  I'm

19     happy to strike it.  On the other hand, at this point, if

20     there is no harm or no prejudice in your view, maybe you

21     want to leave it alone.  I'll leave it up to you.

22                   MS. GUASTELLA:  Well, I'm going to rely on the

23     People stating that they are not going to elicit from her,

24     and I'd ask that they tell her ahead of time that she not

25     volunteer the amount she withdrew from the bank that

MMS

Proceedings

1   morning.

2                   THE COURT:   That's fine me.

3                   Is that all right with the DA?

4                   MS. CILIA:   Fine.

5                   THE COURT:   If you change your mind, let me know.

6   If I am going to strike it, it's probably better I do it

7   sooner rather than later.   If I go back to it later in the

8   trial, well, it might make it a little more complex.

9                   (Whereupon, a discussion is held off the record.)

10                  THE COURT:   Does that end this inquiry?   Once

11  again, I'll offer you -- I'll strike it and tell the jury

12  to disregard it.   On the other hand, based on what the DA

13  said, maybe you prefer to leave it alone.   I'll really

14  leave it up to you.

15                  MS. GUASTELLA:   I would like if you'll indulge me

16  some time to think about that, Judge.

17                  THE COURT:   Okay, think about it.   I'd prefer, as

18  I said, to deal with it sooner rather than later, but I'll

19  deal with it whenever you want to get back to it, if you

20  want to get back to it.

21                  Who's next?

22                  MR. REEVES:   The next witness is going to be

23  Jessica Diniso.   And just for the record, this morning I

24  was able to obtain the ACR, Ambulance Call Report, which I

25  provided to counsel together with one of the other

Proceedings

1    witness's memo book entries, Officer Aguilo; and counsel

2    had asked for another copy of the DD5, which I also

3    provided this morning.

4              THE COURT:  I'm sorry, I didn't get the name of

5    the next witness.

6              MR. REEVES:  Jessica Diniso, D-I-N-I-S-O.  I

7    think she was Schenker.  Her maiden name was on the witness

8    list.  She's since gotten married.

9              MS. GUASTELLA:  She's the EMT person?

10             MR. REEVES:  Correct.

11             THE COURT:  Okay.  Well, first name Jessica, last

12   name Diniso.

13             MR. REEVES:  Yes.

14             THE COURT:  I guess I better ask the jury if they

15   know that name.

16             MR. REEVES:  Her maiden name was Schenker.

17   That's what the paperwork was under.

18             THE COURT:  Okay.  We can bring them in if

19   they're here.

20             Is your witness in the courtroom?

21             MS. CILIA:  She's upstairs.

22             MR. REEVES:  No, your Honor.

23             THE COURT:  Witness first, Jessica Diniso.

24             THE COURT OFFICER:  Your Honor, are you ready for

25   the jury?

Proceedings

1            THE COURT:  Yes.

2            THE COURT OFFICER:  Jury entering.

3            (Whereupon, the jury enters the courtroom.)

4            THE COURT CLERK:  Do both sides stipulate the

5       presence of a complete jury panel, properly seated?

6       People?

7            MS. CILIA:  Yes.

8            THE COURT CLERK:  Defense?

9            MS. CILIA:  So stipulated.

10           THE COURT:  Good morning.  Welcome back.

11           Next witness, please.

12           MR. REEVES:  Thank you, your Honor.  People call

13      Jessica Diniso.

14  J E S S I C A   D I N I S O, having been called as a witness on

15      behalf of the People, having been duly sworn by the clerk

16      of the court, was examined and testified as follows:

17           THE COURT CLERK:  State your name.

18           THE WITNESS:  Jessica Diniso.

19           THE COURT CLERK:  And your county of residence.

20           THE WITNESS:  Staten Island, Richmond.

21           THE COURT CLERK:  Thank you.

22           THE COURT:  Members of the jury, when we selected

23      you and I read you a list of potential witnesses, I think

24      we had Ms. Diniso's maiden name on there.  Her full name,

25      as you've heard, is Jessica Diniso.  Do any of you know

MMS

1     her?  Nobody does, good.

2              Ms. Diniso, keep your voice up, please.   That

3     microphone works, you can speak right into it.

4              MR. REEVES:  May I inquire, your Honor?

5              THE COURT:  Yes.

6              MR. REEVES:  Thank you.

7     DIRECT EXAMINATION

8     BY MR. REEVES:

9     Q.   Hi, Ms. Diniso.  Good morning.

10    A.   Good morning.

11    Q.   How are you doing today?

12    A.   I'm all right.

13    Q.   Okay.  What I'd like to do is, if you could, just tell

14    the jury what you do for a living.

15    A.   I work for the Fire Department.  I'm an emergency

16    medical technician.

17    Q.   And can you tell us how long you worked for the Fire

18    Department as an emergency medical technician?

19    A.   Five and a half years.

20    Q.   Can you tell us a little bit about the training you

21    receive to be an EMT with the Fire Department?

22    A.   I went to the academy with the Fire Department for

23    about two and a half months to learn how to do blood pressures,

24    bandage patients, and take care of patients, and write

25    paperwork.

People - Diniso - Direct/Reeves

1    Q.    Okay.   Now, as an EMT with the Fire Department, are

2    there two different types, a basic life support and an advanced

3    life support?

4        A.    Yes.

5        Q.    And what type are you?

6        A.    I'm basic.   I'm basic -- I do basic training.   I

7    don't -- I don't have -- I don't start IVs and stuff.

8        Q.    Okay.   So, that would be something that an advanced

9    life support tech would do, correct?

10       A.    Yes.

11       Q.    Now, what I'd like to do, if I could, is talk to you

12   about a job that you did back in December of 2011.

13            On December 8th of 2011, were you working?

14       A.    Yes, I was.

15       Q.    Now, EMTs, do they work alone or do they work with

16   partners?

17       A.    We have partners.

18       Q.    And on December 8, 2011, did you have a steady

19   partner?

20       A.    Yes, I did.

21       Q.    What was your partner's name?

22       A.    Debbie Melon (phonetic).

23       Q.    Now, did you and EMT Melon receive an assignment on

24   December 8, 2011, that caused you or made you go to 195 Steuben

25   Avenue -- Steuben Street, here in Staten Island?

MMS

People - Diniso - Direct/Reeves

1        A.    Yes.

2        Q.    Now, back in December of 2011, do you remember what

3    station you were working at?

4        A.    Station 22.

5        Q.    And where is station 22 located?

6        A.    It's on -- I'm sorry.

7        Q.    Are you nervous?

8        A.    A little bit.

9        Q.    Just take a deep breath, you'll be fine.

10       A.    It's in Seaview.

11       Q.    Okay.  Now, do you remember what time you and EMT

12   Melon received this job to go to Steuben Street?

13       A.    May I refer to my ACR?

14             MR. REEVES:  Your Honor, with the Court's

15       permission.

16             THE COURT:  Yes.

17       Q.    If you need something to refresh your recollection,

18   just let the judge know and he'll tell you if it's okay.

19             THE WITNESS:  Am I allowed to?

20             THE COURT:  Yes.

21       A.    Can you --

22       Q.    What time did you get the job?

23       A.    11:53.

24       Q.    Now, do you recall or would paperwork help refresh

25   your recollection on how long it took from the time you got the

MMS

People - Diniso - Direct/Reeves

1   call to when you arrived at Steuben Street?

2       A.   Yes.

3       Q.   How long did it take you to arrive?

4       A.   Ten minutes.

5       Q.   What I am going to do is I am going to hand you up

6   something that's been received in evidence.

7            When you got to Steuben, did you have a chance with

8   EMT Melon to go up to the 7th floor of that building?

9       A.   Yes.

10      Q.   When you got to the 7th floor, do you recognize the

11  person in the picture that I'm handing up to you?  This is

12  People's 6.

13      A.   Yes.

14      Q.   You can turn that over.

15           When you got to the scene, did you notice if the

16  person in that photo had any injuries?

17      A.   Yes.

18      Q.   And where do you remember his injuries being?

19      A.   Can I refer?

20      Q.   Sure, if you need to refresh your recollection.

21      A.   Would you like me to read the --

22      Q.   No.  I just want you to read it if it helps you

23  remember and then tell me what you remember.

24      A.   Fatal gunshot wound to the head.

25      Q.   Now, Ms. Diniso, when you and Ms. Melon arrived, was

People - Diniso - Direct/Reeves

1    there anything that you could do to save or help this person

2    medically?

3        A.    No.

4        Q.    Why is that?

5        A.    Because we pronounced.

6        Q.    Can you tell the ladies and gentlemen of the jury what

7    it means to pronounce?

8        A.    Um, patient was lying prone and -- He was dead at

9    12:06.

10       Q.    That's one of the things that you're allowed to do as

11   a Fire Department EMT is pronounce people dead?

12       A.    Yes.

13       Q.    And the people -- And the time that you pronounced

14   this person dead was December 8, 2011, around 12:06 in the

15   afternoon?

16       A.    Yes.

17       Q.    Ms. Diniso, other than what you and I have talked

18   about, did you have any other involvement in this case?

19       A.    No, I did not.

20             MR. REEVES:  Thank you, ma'am.

21             I have no further questions for the EMT.  Thank

22        you, your Honor.

23             MS. GUASTELLA:  I have no questions.

24             THE COURT:  Okay, Ms. Diniso, you're excused.

25        You're free to step out.

MMS

People - Loiseau - Direct/Cilia

1                    (Witness excused.)

2                    MS. CILIA:  People are going to call Jean

3          Loiseau.

4                    THE COURT OFFICER:  Ready for the witness?

5                    THE COURT:  Yes.

6     J E A N   L O I S E A U, having been called as a witness on

7          behalf of the People, having been duly sworn by the clerk

8          of the court, was examined and testified as follows:

9                    THE COURT CLERK:  State your name.

10                   THE WITNESS:  My name is Jean Loiseau,

11         L-O-I-S-E-A-U.

12                   MS. CILIA:  May I inquire?

13                   THE COURT:  Yes.

14    DIRECT EXAMINATION

15    BY MS. CILIA:

16         Q.   Sir, do you live here on Staten Island?

17         A.   Yes.

18         Q.   For about how long have you lived here?

19         A.   Like seven years.

20         Q.   And are you employed?

21         A.   Yes.

22         Q.   What do you do?

23         A.   Maintenance.

24         Q.   Where do you work doing maintenance?

25         A.   On Steuben, 231, 195.

People - Loiseau - Direct/Cilia

1      Q.    That's here in Staten Island?

2      A.    Yes.

3      Q.    And you said two buildings.  You said 195 Steuben

4   Street and --

5      A.    And 231.

6      Q.    -- 231?

7      A.    231.

8      Q.    Where are these two buildings in relation to one

9   another?

10     A.    Yes, because they are the same owner.  I'm working for

11  both.

12     Q.    Okay.  And, physically, where do they sit one to the

13  next?

14     A.    One side of each other.

15     Q.    So they're on --

16     A.    One is one.  Street in the middle.

17     Q.    So, next to each other with the street in the middle?

18     A.    Yes.

19     Q.    Regarding 195 Steuben Street, what type of building is

20  this?

21     A.    It's like 100 apartment each one.  The entrance, the

22  lock is broken, but they don't fix it.

23     Q.    So, the type of building is a residential building?

24     A.    Yes.

25     Q.    Okay.  And what types of responsibilities do you have

People - Loiseau - Direct/Cilia

1    working doing maintenance at those two buildings?  What kind of

2    jobs do you do?

3        A.   I do everything, like painting, floor, plumbing;

4    everything.

5        Q.   Now, tell us, you were just mentioning the door going

6    in.  How does one enter into 195 Steuben Street?

7        A.   The door wasn't locked.

8        Q.   Is there a front door?

9        A.   Yes.

10       Q.   Okay.  And you're saying that that door doesn't lock.

11   Is that right?

12       A.   No.

13       Q.   So you don't need a key to get in?

14       A.   No.  Anybody could get in.

15       Q.   Now, once you get into the building of 195 Steuben

16   Street, can you tell us about the layout of the lobby that's

17   there?

18       A.   Nine by sixteen feet.  The lobby is big.

19       Q.   And is there an elevator in the lobby?

20       A.   Elevator in front of in the lobby, yes.

21       Q.   And is there a staircase also?

22       A.   Two side, two, A and B.

23       Q.   Now, as of December 8th of 2011, were there any

24   working surveillance cameras in the building?

25       A.   No.

MMS

People - Loiseau - Direct/Cilia

1    Q.   What about nonworking surveillance cameras?

2    A.   No.

3    Q.   Were there any cameras that were not working?

4    A.   None of them working.

5    Q.   Okay.  So, none of them were working, meaning that

6    there was a camera that was not working?

7    A.   They have a camera in front of the elevator in the

8    lobby.

9    Q.   Now, you just mentioned that there was a nonworking

10   surveillance camera in the lobby.

11   A.   Yes.

12   Q.   Was there a sign or something indicating that the

13   camera was not working?

14   A.   Nobody know it not working, only us, workers.

15   Q.   Now, I want to talk to you about December 8th of 2011.

16   Do you remember that day?

17   A.   Yes.

18   Q.   Was that a weekday or a weekend?

19   A.   Weekday.

20   Q.   Were you working on that day?

21   A.   Yeah, I was working that day.

22   Q.   I want to draw your attention to that morning,

23   December 8th, before noon.  What were you doing at that time?

24   A.   I was working at 231.  My shop is in 195.  Whenever I

25   need something I have to cross the street to get it and go to

People - Loiseau - Direct/Cilia

1   do it at 231.

2       Q.   So you were working in 231.  Is that right?

3       A.   Yes.

4       Q.   And then you needed to go to your shop in 195?

5       A.   To get something to come back in 231.

6       Q.   And did you do that, did you go into your shop?

7       A.   Yes.

8       Q.   When you go into your shop in 195, do you pass through

9   the lobby?

10      A.   Yes, I have to pass through the lobby.

11      Q.   When you pass through the lobby to go to your shop,

12  was there anybody in the lobby?

13      A.   No.

14      Q.   And then at some point did you leave the shop?

15      A.   Like three or five minute after.

16      Q.   When you left, did you also go through the lobby?

17      A.   Yes.

18      Q.   When you went through the lobby to go back to the

19  other building, was there anyone in the lobby?

20      A.   One person I see standing in the lobby.

21           MS. GUASTELLA:  What was that?

22      Q.   Can you repeat that?

23      A.   It was one person standing in the lobby.

24      Q.   Okay.  Did you recognize this person?

25      A.   No.  He is covered.  I can't tell you if it's black or

People - Loiseau - Direct/Cilia

1  if it's white because he covered completely: mask, glove, bag,

2  and everything.  But I'm tall, I see that person is so tall, I

3  turn and look at him and I go.

4      Q.   Well, I'm just going to go back a little bit.  This

5  person who you saw in the lobby, what was this person doing?

6      A.   Standing.  Doing nothing.

7      Q.   And where was this person standing in relation to the

8  nonworking camera?

9      A.   He was underneath of the camera.

10     Q.   And if the camera had been working, would it have

11 captured this person?

12     A.   No.

13     Q.   Now, you said that this person was covered, but can

14 you give a physical description of the person?

15     A.   He was all covered.  I can't tell you if he is white

16 or black.

17     Q.   Could you tell whether it was a man or a woman?

18     A.   It was a man, but at the end, one of the police

19 officer call me --

20              MS. GUASTELLA:  I am going to object.

21              THE COURT:  Sustained.

22              Next question.

23     Q.   So, you could tell this was a man.  Can you describe

24 the body type of this person?

25     A.   Yeah, he is taller than me.  I am 6'4".

People - Loiseau - Direct/Cilia

1    Q.    You're 6'4"?

2    A.    Yes.

3    Q.    And you're saying that the person who you saw --

4    A.    That's why I'm turn and look at him, because he is

5    taller than me.

6    Q.    And can you give a clothing description of what this

7    man was wearing?

8    A.    He was a long coat, that kind, black; and a bag; and

9    he covered.

10    Q.    Okay.  Now, you mentioned there was a coat, a long

11    dark coat.  And what about his -- the hands, was anything

12    covering the hands?

13    A.    He had glove, mask, and a bag.

14    Q.    You mentioned a mask.  Was that a face mask?

15    A.    Yeah.

16    Q.    Can you describe the face mask?

17    A.    He got -- He can see because he got that on his head.

18    I can't tell you who the person is.  The only thing I can tell

19    you is height.  Because of his height I turn, but I see he is

20    covered completely and a bag hanging.

21    Q.    So, you're saying that the face mask was a full face

22    mask?

23    A.    Yes.

24    Q.    And that only the eyes you could see?

25    A.    Yes.

People - Loiseau - Direct/Cilia

1    Q.   You mentioned a bag.  Was this person carrying a bag?

2    A.   Yes, on the shoulder, hanging on the shoulder.

3    Q.   Can you describe that bag?

4    A.   It's a sport bag.  It's a black sports bag.  It got

5    two round thing on the side and you open on top.

6    Q.   Can you tell the jurors approximately the size of that

7    bag?  You can even show us with your hands, if it helps.

8    A.   (Indicating.)

9    Q.   So, indicating to the jurors approximately four feet.

10   Is that right?

11   A.   No, not that big.  Like 16 inches.

12   Q.   Okay.  I'd like to show you some pictures that are in

13   evidence.  I am going to show them to you on this board over

14   here, at the same time I am going to hand you the pictures

15   which are in evidence.

16        The first one is People's 107.  Taking a look at this

17   photograph I want to ask you how the coat depicted in People's

18   Exhibit 107 compares to the coat that you saw the masked man

19   wearing on that day.

20   A.   Yes.

21   Q.   How does it compare?

22   A.   It look like it.

23   Q.   I want to talk to you about People's 115, which the

24   officer is going to show you now and is also on the screen.

25        I want to ask you, how does the face mask that you see

MMS

Case 1:23-cv-04575-DG  Document 12-1  Filed 12/01/23  Page 587 of 1061 PageID #: 782

People - Loiseau - Direct/Cilia

1    in People's 115, how does that compare to the face mask that

2    you saw the man wearing on December 8th?

3         A.    That kind.

4                THE COURT:  I didn't hear the answer.  Did you

5         get it?

6                (Whereupon, the previous answer is read back by

7         the court reporter.)

8         Q.    And now moving on to People's 124, showing you

9    People's 124 in Evidence, how does the black and gray duffel

10   bag that you see in this exhibit, how does that compare to the

11   duffel bag that you saw on December 8th of 2011?

12        A.    Like I tell you, I was passing.  I was passing.  I see

13   the bag, but is this kind, you know.

14        Q.    It's this kind of bag?

15        A.    This size.

16        Q.    Now, I'm going to go back to your day of December 8th

17   of 2011.  After you saw the masked man in the lobby, where did

18   you go?

19        A.    I'm going to 231.

20        Q.    And did there come a time when you heard that

21   something had happened in the building of 195 Steuben Street?

22        A.    Like --

23        Q.    About how soon after?

24        A.    -- five to ten minutes after, some -- a tenant came

25   and asked me what happened in the lobby -- what happened in the

MMS

People - Loiseau - Direct/Cross

1  building.

2      Q.   And did the police arrive?

3      A.   Right away everywhere I saw police, were everywhere.

4      Q.   Did there come a time when you had occasion to go to

5  the 7th floor of 195 Steuben Street later on that evening?

6      A.   Okay.  It was two police officer came.  They call me

7  and they tell me to send somebody to clean the 7th floor,

8  because there are people living on the 7th floor.  Since the

9  start those people are outside, they want to go home.  No, I

10 don't have nobody.  I have to go upstairs and clean everything,

11 the blood.

12     Q.   So, did you go up to the 7th floor and --

13     A.   At night.

14     Q.   Okay.  And when you went up to the 7th floor, can you

15 tell us the condition of the hallway at that time?

16     A.   Full of blood.  I'm doing cleaning that night.

17          MS. CILIA:  Thank you, sir.  I have no further

18     questions.

19          MS. GUASTELLA:  May I inquire, your Honor?

20          THE COURT:  Yes.

21 CROSS-EXAMINATION

22 BY MS. GUASTELLA:

23     Q.   I'm sorry, how do you pronounce your last name?

24     A.   Loiseau.

25     Q.   Loiseau?

MMS

000587

118

People - Loiseau - Cross

1       A.   Yes.

2       Q.   195 Steuben is a pretty busy area, correct?

3       A.   No.

4       Q.   It's not busy?

5       A.   No.

6       Q.   You said there's about 100 apartments between both

7   buildings?

8       A.   Yes, in that time.  In that time most of the people at

9   work, at school, kids at school, thing like that.  You don't

10  see that much.

11      Q.   It's in the morning?

12      A.   Yes.

13      Q.   What time do you start in the morning?

14      A.   Eight.

15      Q.   Eight.

16           Eight o'clock, that's when there is a lot of children

17  in both buildings, correct?

18      A.   Yes.

19      Q.   And the school is right down the block?

20      A.   No.  Most of them attend school otherwhere (sic).

21      Q.   There is a school down the block on Steuben?

22      A.   Yeah.

23      Q.   And there is a lot of activity in the morning around

24  8:00, 7:30, 8:00?

25      A.   Yeah.

People - Loiseau - Cross

1    Q.   And people are going to work, right?

2    A.   Yeah.

3    Q.   Residential area?

4    A.   Yeah.

5    Q.   In addition to the two buildings, adjacent to the two

6    buildings there's all residential homes, correct?

7    A.   Across.

8    Q.   Across the street from the building?

9    A.   Yeah.

10   Q.   And you say you start working at about 8 o'clock in

11   the morning?

12   A.   I start at 8 o'clock in the morning.

13   Q.   Do you live at 195 Steuben?

14   A.   No, in 231.

15   Q.   You live in 231.

16        And you've been there about seven years?

17   A.   Yeah.

18   Q.   So you know some of the residents in both buildings,

19   correct?

20   A.   Yeah.

21   Q.   Get to know them, fix the things in their apartment,

22   right?

23   A.   Yeah.

24   Q.   Now, on this particular morning, do you remember what

25   you were doing at 235 -- I'm sorry, at 231 Steuben Street?

MMS

1        A.    I was doing the floor because I got two apartment

2    empty.  There I was doing a floor.  I got -- I tried to fix the

3    floor 2G, and 2G was empty.  When the management call me they

4    say they need that apartment next week.  I try to work on them

5    to be done.

6        Q.    So you were working on the empty apartment floors?

7        A.    Yes.

8        Q.    And what were you doing to those floors; were you

9    sanding them?

10       A.    No.

11       Q.    What were you doing?

12       A.    It was vinyl tile.  I went across street to get a

13   bucket of glue to put glue on the floor and after to put the

14   tile.

15       Q.    Do you remember what time you started working that

16   morning?

17       A.    8 o'clock.

18       Q.    And approximately what time was the first time you

19   went back over to 195 to get some supplies?

20       A.    Before -- It was before 12, because the guy after me,

21   he went to the management to take out a check.  That's payday.

22   It was payday.

23       Q.    I'm going to stop you there.

24             Let's go back to 8 o'clock in the morning.  You go to

25   work, right?

                          People - Loiseau - Cross

 1        A.    Yeah.

 2        Q.    You go to 231?

 3        A.    Yeah.

 4        Q.    And what did you do in the apartment?

 5        A.    Okay.  The first thing I do at 8 o'clock, I have to go

 6   to the top, walking downstairs.  Whatever I miss, I fix.

 7        Q.    So, you didn't start the day off by fixing the floors

 8   of the apartment, right?

 9        A.    I start fixing after inspection.

10        Q.    In those two apartments, in 231?

11        A.    No, no, no.

12        Q.    Just the building in general?

13        A.    Yes.

14        Q.    Okay.  Do you recall the first time you went back over

15   to 195?

16        A.    Only at that time.

17        Q.    In the morning?

18        A.    Yeah.  At that time I went to pick up the glue to come

19   back because is empty.  All the tools is already in the

20   apartment, I finish plumbing, I finish everything.  Now I have

21   to do the floor and send somebody to clean it.

22        Q.    But you don't remember what time you went over to 195?

23        A.    It was almost 12 o'clock.

24        Q.    It was almost 12, okay.

25              And when you went back into 195, where is your shop in

                                   MMS

People - Loiseau - Cross

1    comparison to the lobby?

2         A.   It's in the back of the -- inside the building, was in

3    the back.  I have to cross the lobby to go to my shop.

4         Q.   You didn't go through the back way, you went through

5    the front way?

6         A.   Out the front way.

7         Q.   There is a back door, right, to the building?

8         A.   Yes.

9         Q.   And that door is unlocked as well, right?

10        A.   Yes.

11        Q.   And your shop is in the back, by the back door, right?

12        A.   After the laundry.  You have to get inside the

13   building, pass by the mailbox, the laundry, my shop.

14        Q.   Okay.  But you went in through the front, you said,

15   right?

16        A.   Yes.

17        Q.   And when you went in, you actually went to the shop,

18   got your glue, and came back out?

19        A.   Yes.

20        Q.   And that's when you first saw the gentleman in the

21   lobby?

22        A.   Yes.

23        Q.   Okay.  And he was waiting for the elevator?

24        A.   No, I'm going across the street.  I'm not waiting for

25   the elevator.

People - Loiseau - Cross

1    Q.   No.  Was the person you saw in the lobby waiting for

2    the elevator?

3         A.   Yes.

4         Q.   He was just standing there, right?

5         A.   Yes, just standing.

6         Q.   So, you sort of walked past him and he saw you looking

7    at him, correct?

8         A.   Like I tell you, I'm curious, because I saw somebody

9    who's --

10        Q.   -- tall, okay.

11             And he stayed at the elevators, correct?  He stayed at

12   the elevator, correct?

13        A.   In front of the elevator.

14        Q.   Waiting for the elevator to open?

15        A.   Yeah.

16        Q.   Okay.  And then you left 195 and you went back over to

17   231, right?

18        A.   Yeah.

19        Q.   And that's when you started working on the floor?

20        A.   Yeah.

21        Q.   Okay --

22        A.   I don't even start, because a tenant call me, tell me

23   what happened in the building.

24        Q.   Not even how many minutes later?

25        A.   Not even ten minutes later.

MMS

People - Loiseau - Cross

1    Q.   Do you recall speaking to a Det. Buscanera that day?

2    A.   By 4:00 I'm finished working.

3    Q.   What time?

4    A.   By four --

5    Q.   Okay.

6    A.   -- I'm finish working.  I'm going across the street.

7    Q.   Back to 195?

8    A.   231.

9    Q.   Okay.

10   A.   An officer call me, I don't know his name.

11   Q.   I missed what you said.

12   A.   He call me.

13   Q.   You went back to 195 after you finished working,

14   right?

15   A.   After that happen, everybody, but I'm finish working.

16   Q.   Fair enough.  Okay.

17   A.   When I'm going across the street, an officer on the

18   sidewalk, he call me.

19   Q.   Uniformed?

20   A.   No.

21   Q.   Was he in jeans, in a suit?

22   A.   Yeah, jean, and he call me.

23   Q.   How do you know it was an officer?

24   A.   The whole block is only those people there after, that

25   day.

MMS

People - Loiseau - Cross

1      Q.   No residents were outside?

2      A.   A lot.  They ask a lot of people question.  But what I

3   tell you, um, when I finish to take the thing in the shop, when

4   I come back, it was only me in the lobby and that person

5   standing, doing nothing, standing in front of the elevator.

6      Q.   Okay.  So you remember speaking to a police officer,

7   you just don't remember who it was, correct?

8      A.   No, I don't remember.

9      Q.   And you remember that person wearing jeans?

10     A.   Yes, light-skinned, Spanish complexion.

11     Q.   Spanish?

12     A.   He call me and tell me, You the super, why you can't

13  help us?

14     Q.   I am going to stop you there again.  I'm sorry.

15          Could you describe his height?  Was he shorter than

16  you, taller than you?

17     A.   No, he not taller than me.

18     Q.   He was shorter?

19     A.   Yes.

20     Q.   Was he wearing an NYPD jacket?

21     A.   No.  Regular clothes.

22     Q.   And he asked you if you saw an individual, correct?

23  This police officer asked you if you saw an individual in the

24  lobby?

25     A.   No, no, he wasn't in the lobby.  He was in the

People - Loiseau - Cross

1  sidewalk, that police officer.

2      Q.   The police officer was, okay.

3           Do you remember telling this police officer that you

4  observed an individual outside and eventually that person

5  walked into 195?

6      A.   Say it again.

7      Q.   Do you recall telling a police officer that you --

8  that you saw a tall black male walking outside and eventually

9  entered Steuben Street?  Do you recall that?

10     A.   No, I can't tell black male, because I don't see the

11 person.  He is all covered.

12     Q.   I apologize.  Tall male.  Not black male, tall male.

13     A.   Yes, I tell him, because he call me and ask me

14 question.

15     Q.   That's fine.  That's understandable.  But do you

16 recall telling him that, that you saw him outside and

17 eventually he went into 195?  Do you recall telling him that?

18     A.   The police officer?

19     Q.   Did you tell him that?

20     A.   No.  I tell him I saw a guy, a tall male, covered, all

21 covered, stand in the lobby.

22     Q.   Okay.

23     A.   Not walking in the --

24     Q.   Thank you.

25          The black jacket you saw, can you describe it?  Did it

People - Loiseau - Cross

1   have a zipper, did it have snaps?

2      A.  No.

3      Q.  You can't describe it?  The one you saw in the lobby.

4      A.  Yes.  Is this kind of jacket.  I can't tell you

5   exactly, because I don't stand and talking and looking.  I

6   just, you know.

7      Q.  Can you describe the mask, the type of material it

8   was?

9      A.  That was.

10     Q.  Was it a ski mask that you would wear if you were

11   skiing?  Would you wear it skiing or if it was very cold out,

12   that type of a mask?

13     A.  Mm-hmm, what happened?

14           MS. GUASTELLA:  I'm going to withdraw the

15     question.

16           Just one moment, your Honor.

17           (Whereupon, there is a pause in the proceedings.)

18           MS. GUASTELLA:  Nothing further.

19           THE COURT:  Anything else?

20           MS. CILIA:  No, your Honor.

21           THE COURT:  Mr. Loiseau, you're excused, you're

22     free to step out.

23           (Witness excused.)

24           THE COURT:  Next witness, please.

25           MS. CILIA:  People call Police Officer Vincent

People - P.O. Aguilo - Direct/Cilia

1    Aguilo.

2            THE COURT OFFICER:  Your Honor, ready for the

3        witness?

4            THE COURT:  Yes.

5            THE COURT OFFICER:  Witness entering.

6    P. O.  V I N C E N T   A G U I L O, bearing shield number 382,

7        assigned to the 120 Precinct, having been called as a

8        witness on behalf of the People, having been duly sworn by

9        the clerk of the court, was examined and testified as

10       follows:

11           THE COURT CLERK:  State your name, shield number,

12       and command for the record.

13           THE WITNESS:  Officer Vincent Aguilo, shield 382,

14       from the 120 Precinct.

15           MS. CILIA:  May I inquire?

16           THE COURT:  Yes.

17   DIRECT EXAMINATION

18   BY MS. CILIA:

19       Q.  Officer, approximately how long have you been with the

20   NYPD?

21       A.  Almost ten years.

22       Q.  And about how long have you been with the 120

23   Precinct?

24       A.  Same time.

25       Q.  Can you tell the jury about your duties and

MMS

People - P.O. Aguilo - Direct/Cilia

1   responsibilities that you hold as a police officer?

2       A.   Right now I'm in the Anti-Crime team, so we pretty

3   much address crime, serious offenses on the street, radio runs.

4       Q.   Can you tell the jurors, what is a radio run?

5       A.   It's a 911 call from a civilian that calls the 911

6   dispatcher and relays the message to the police officers.

7       Q.   So, it starts with a 911 call?

8       A.   Yes.

9       Q.   Okay.  And then there is an operator who gives that

10  information to the dispatcher?

11      A.   Yes.

12      Q.   And then the dispatcher gives it to the police?

13      A.   Yes.

14      Q.   Over the radio?

15      A.   Yes.

16      Q.   And I want to direct your attention now to

17  December 8th of 2011.  Were you working on that day?

18      A.   Yes.

19      Q.   What were your hours that day?

20      A.   I was working 9:30 a.m. to about 6:05 p.m.

21      Q.   Were you working alone or did you have a partner or

22  partners?

23      A.   I had one police officer partner and a sergeant.

24      Q.   What are their names?

25      A.   Officer DiMassa, Steve DiMassa, and Sgt. Parquette.

People - P.O. Aguilo - Direct/Cilia

1     Q.   What was your assignment that day?

2     A.   I was doing my Anti-Crime Unit.

3     Q.   Can you explain to the jurors, when you're assigned to

4   Anti-Crime, tell us what you do.

5     A.   We pretty much listen to the 911 calls, serious

6   offenses, weapons possession, you know, just observe jobs on

7   the street.

8     Q.   Do you respond to those jobs as well?

9     A.   Yes.

10    Q.   I want to direct your attention to shortly before

11  noon.  Did you receive a radio run at that time?

12    A.   Yes.

13    Q.   What was that call regarding?

14    A.   It came over as a -- Over police radio it was a 1034,

15  shots fired.

16    Q.   And was there a location?

17    A.   At 195 Steuben.

18    Q.   Was there an apartment number?

19    A.   It was given a floor.  It was the 7th floor.

20    Q.   And where were you when you received this particular

21  call?

22    A.   We were in the neighborhood, we were in the area,

23  driving around.

24    Q.   What did you and your partners do?

25    A.   We responded immediately to the location.

People - P.O. Aguilo - Direct/Cilia

1    Q.    About what time did you arrive to 195 Steuben Street?

2    A.    It was about, I'd say, like 11:56, shortly before

3    12:00.

4    Q.    Were any other police officers already there?

5    A.    Yes.

6    Q.    And where were those police officers?

7    A.    They were outside of the apartment building.

8    Q.    Were there any police officers inside the building?

9    A.    No.

10   Q.    So, you -- where did you go?

11   A.    We went directly to the building to take the stairway.

12   Q.    So, you were the first police officers to enter that

13   building?

14   A.    Yes.

15   Q.    Once you got to the building, tell us how you got to

16   the 7th floor.

17   A.    We took the stairs to the 7th floor and we exited out

18   the staircase.

19   Q.    Now, when you got to the 7th floor, tell us what you

20   saw.

21   A.    It was a long hallway and -- There was pretty much

22   nobody in the hallway at the time, but at the very end you

23   could see somebody was laying on the ground.

24   Q.    When you say, "There was pretty much nobody in the

25   hallway," can you just explain what you mean?

People - P.O. Aguilo - Direct/Cilia

1    A.    As we were walking towards where there appeared to be

2    a body, somebody opened up an apartment and they were on 911,

3    they were on the phone.  And they were telling us that they

4    heard a loud noise and they think somebody is hurt down the

5    hallway.

6        Q.    And you said the "body."

7        A.    Yes.

8        Q.    Can you explain to the jurors where specifically you

9    saw that body.

10       A.    It was in front of Apartment 7L on the 7th floor of

11   195 Steuben.

12       Q.    And what condition was this person in?

13       A.    Unresponsive, laying flat on his face.

14       Q.    What did you do when you saw this?

15       A.    My sergeant, who was with me, immediately went on the

16   radio, the police radio, and notified saying that there was a

17   confirmed male shot.

18       Q.    Now, can you explain to the jury what it means to

19   secure a crime scene?

20       A.    Pretty much try not to disturb anything, don't touch

21   anything.  Prevent any other people from entering the crime

22   scene besides police officers so nothing is altered.

23       Q.    And what is the significance of securing a crime

24   scene?

25       A.    To do the investigation.

People - P.O. Aguilo - Direct/Cilia

1    Q.   Was this particular crime scene secured?

2    A.   Yes.

3    Q.   By whom?

4    A.   Us.

5    Q.   "Us," meaning you and your --

6    A.   Yes, myself, my partner, and the sergeant.

7    Q.   And how did you and your partner and your sergeant do

8    that?

9    A.   We just made sure nobody else entered the hallway.

10   Went over the radio advising our location and just prevented

11   anybody from walking or touching anything.

12   Q.   Talking about civilians?

13   A.   Yes.

14   Q.   Did there come a time when you entered Apartment 7L?

15   A.   Yes.

16   Q.   Why did you do that?

17   A.   We had some information saying that he might have a

18   child inside the apartment.

19   Q.   Okay.  And by the time that you entered the apartment,

20   were there other police officers on scene?

21   A.   Yes.

22   Q.   Did those officers stay in the hallway while you went

23   into the apartment to look for the child?

24   A.   Yeah.  We were the first ones to enter into the

25   apartment and the officers were arriving at the scene.

MMS

People - P.O. Aguilo - Direct/Cilia

1      Q.   Okay, so at no point was the crime scene left

2 unattended; is that correct?

3      A.   Yes.

4      Q.   Did you go through all the rooms of the apartment or

5 just some of them?

6      A.   No, we went through all the rooms.

7      Q.   Describe what you saw when you went into the

8 apartment.

9      A.   The radio -- A radio was actually playing really loud,

10 music was still on.  We checked every apartment -- every area

11 of the apartment to see if there was anybody else in there.

12 There was nobody else in there, but there was, like, papers on

13 the ground, looked like maybe like children's toys were thrown

14 on the ground, and a few things looked like they were knocked

15 over.

16     Q.   Did you find a child in the apartment?

17     A.   No.

18     Q.   Did you notice any ballistic evidence while inside the

19 apartment?

20     A.   Yes.

21     Q.   Where was that?

22     A.   As soon as we opened the door, on the ground there was

23 a shell casing.

24     Q.   Did you move or did you rearrange anything in the

25 apartment while you were there?

People - P.O. Aguilo - Direct/Cilia

1        A.    No.

2        Q.    Similarly, from the time you got to the 7th floor and

3    secured the location, did you move or rearrange anything in the

4    hallway?

5        A.    No.

6        Q.    After you were done sweeping the apartment, what did

7    you do next?

8        A.    We just advised the other officers coming to the scene

9    that there was nobody else in the apartment.

10       Q.    I'd like to show you some photos now that are already

11   in evidence.  We're going to turn over the photos themselves

12   and we are going to also play them on this board.

13             Officer, looking at People's Exhibit Number 4, I want

14   to ask you about the body that's depicted in that photo.  And

15   can you tell us how this compares to the way that you saw the

16   body on December 8th of 2011?

17       A.    It's pretty much exactly the same but without the

18   cups.

19       Q.    Without the cups?

20       A.    Yeah.

21       Q.    Okay.  So, when you got there, there were no cups on

22   the floor?

23       A.    Yes.

24       Q.    And when you left, had Crime Scene arrived yet?

25       A.    They were -- They were responding to the scene, but I

People - P.O. Aguilo - Direct/Cilia

1    didn't observe them, I didn't see them.

2        Q.   By the time that you left, were the cups there yet?

3        A.   They were there, still there, yes.  Somebody was still

4    there.

5        Q.   So, when you left for the day, were the cups there?

6        A.   Yes.

7        Q.   But not when you got there?

8        A.   Yeah.

9        Q.   I now want to direct your attention to People's 12.

10   Now, I want to ask you regarding the body that you see in this

11   photo, is this how the body was positioned when you arrived on

12   the 7th floor of 195 Steuben Street on December 8th?

13       A.   Yes.

14       Q.   Did you ever move the body?

15       A.   No.

16       Q.   And then the same question regarding the cups and the

17   markers that you saw there, were those there when you got

18   there?

19       A.   No.

20       Q.   Moving on now to People's Exhibit Number 13, I am

21   going to direct your attention to the deformed bullet in this

22   photo.  Did you notice this, this particular deformed bullet,

23   on December 8th of 2011?

24       A.   I don't recall this deformed bullet.

25       Q.   Did you ever touch or did you ever move this

People - P.O. Aguilo - Direct/Cilia

1    particular item?

2        A.    No.

3        Q.    Now moving on to People's Exhibit Number 17.

4    Directing your attention to the shell casing in this photo, did

5    you ever -- did you notice this particular shell casing on

6    December 8th of 2011?

7        A.    Yes.

8        Q.    And did you ever touch or move this item?

9        A.    No.

10       Q.    Where specifically did you notice this item?

11       A.    As soon as you walk -- As soon as -- Right by the

12   entrance of the apartment, behind the door.

13       Q.    I'd like to show you some pictures of the inside of

14   the apartment now.  So, we're going to move on to People's

15   Exhibit Number 44.

16            I want to ask you, when you entered as the first

17   police officer Apartment 7L, was this the condition of the

18   apartment when you entered?

19       A.    Yes.

20       Q.    Now, if you can see a glass on the floor next to the

21   two shoes, I just want to ask you if that was there when you

22   arrived.

23       A.    I think that was put after.

24       Q.    Okay.  So, besides the glass that's on the floor,

25   everything else is the way that you saw it when you arrived on

People - P.O. Aguilo - Direct/Cilia

1    December 8th?

2        A.    Yes.

3        Q.    Now moving on to People's Exhibit Number 71.  This is

4    from inside of the apartment.  Did you notice this ballistic

5    evidence when you entered the apartment?

6        A.    Yeah, I think this -- I remember the shell casing.

7    I'm not really a hundred percent sure on this, but I remember

8    there was a few -- there was a shell casing, there might have

9    been a bullet right inside the apartment.

10       Q.    My question to you is, did you ever touch or move this

11   item?

12       A.    No.

13       Q.    Now moving on to People's Exhibit Number 52, the

14   living room.  Was this the condition of the living room when

15   you entered the apartment on December 8th?

16       A.    Yes.

17       Q.    Did you disturb anything in this room?

18       A.    No.

19       Q.    And, finally, People's Exhibit Number 55.  Taking a

20   look at the fish tank, there is some things floating in there.

21   Was this the condition in and around the fish tank when you

22   entered?

23       A.    Yes.

24       Q.    Again, did you disturb anything in this area?

25       A.    No.

000608                                                                    139

People - P.O. Aguilo - Direct/Cross

1        Q.   Officer, besides what we've already gone over today,

2    was there anything else that you did with respect to this

3    homicide investigation?

4        A.   No.

5                  MS. CILIA:   Thank you, Officer.

6    CROSS-EXAMINATION

7    BY MS. GUASTELLA:

8        Q.   Officer, a couple of hours after you left the

9    apartment you wrote a statement for one of the assigned

10   detectives in the case, correct?

11       A.   Yes.

12       Q.   And in the statement you wrote that it appeared that

13   there was a struggle or a fight inside the apartment, right?

14       A.   Yes.

15       Q.   And when you got to the apartment, you didn't have a

16   description of the alleged perpetrator, right?

17       A.   No.

18       Q.   And when you and your partner went upstairs, is that

19   when you first found out -- you thought maybe there was a child

20   inside?

21       A.   Yes.

22       Q.   Okay.  So, with urgency you went in to try to find

23   this child, correct?

24       A.   Yes.

25       Q.   And you had to step around things and move around

People - P.O. Aguilo - Cross

1    things to go look into the different rooms for this child?

2         A.   Yes.

3         Q.   And were you wearing protective covering on your

4    shoes?

5         A.   I had just my regular shoes of the day, my boots.

6         Q.   And you found -- you didn't want to wait because you

7    wanted to make sure there was nobody in danger, correct?

8         A.   Exactly.

9         Q.   When you got there, was the door opened or closed?

10        A.   It was --

11                  THE COURT:   Which door?

12        Q.   The door to Apartment 7L.

13        A.   It wasn't fully closed.   It was open, but it was like

14   not shut completely.

15        Q.   Did you have to open it to get in?

16        A.   Yeah.

17                  MS. GUASTELLA:   Nothing further.   Thank you.

18                  THE COURT:   Anything else?

19                  MS. CILIA:   Nothing further, thank you.

20                  THE COURT:   Officer, you're excused, you're free

21        to step out.

22                  (Witness excused.)

23                  MS. CILIA:   Judge, can we approach for one

24        second?

25                  THE COURT:   Yes.

Proceedings

1          (Whereupon, a discussion is held at the bench off

2     the record.)

3          THE COURT:  We have one more witness, members of

4     the jury, and I understand he's across the street, so we

5     are going to take a short break, then we'll bring you back

6     in and finish up with that last witness.  Why don't we say

7     ten minutes and I'll let you step out.

8          Don't discuss the case.  Thanks for your

9     patience.  Just leave your notebooks on your chairs; nobody

10    reads them.

11         (Whereupon, the jury exits the courtroom.)

12         THE COURT:  All right, the jury's left.  Second

13    call.

14         (Whereupon, a brief recess is taken.)

15         THE COURT OFFICER:  Your Honor, ready for the

16    jury?

17         THE COURT:  Yes.

18         THE COURT OFFICER:  Jury entering.

19         THE COURT CLERK:  Do both sides stipulate to a

20    complete jury panel, properly seated?  People?

21         MS. CILIA:  Yes.

22         THE COURT CLERK:  Defense?

23         MS. GUASTELLA:  So stipulated.

24         THE COURT:  Next witness.

25         MR. REEVES:  People call Sgt. John Trzcinski,

People - Sgt. Trzcinski - Direct/Reeves

1      your Honor.

2   S G T.   J O H N   T R Z C I N S K I, bearing shield number

3      3499, assigned to the Property Clerk Division, having been

4      called as a witness on behalf of the People, having been

5      duly sworn by the clerk of the court, was examined and

6      testified as follows:

7              THE COURT CLERK:  State your name, shield number,

8      and command for the record.

9              THE WITNESS:  Sergeant John Trzcinski,

10     T-R-Z-C-I-N-S-K-I.  My command is the Property Clerk

11     Division.  My shield is 3499.

12             MR. REEVES:  May I inquire, your Honor?

13             THE COURT:  Yes.

14  DIRECT EXAMINATION

15  BY MR. REEVES:

16     Q.  Good morning, Sergeant.  How are you today?

17     A.  Good morning.  Fine.

18     Q.  What I'd like for you to do is just start off telling

19  the jury how long you've been with the New York City Police

20  Department.

21     A.  Actually, it's 20 years and 4 days.

22     Q.  And how many years have you spent with the Property

23  Division?

24     A.  I was a police officer from the Property Clerk

25  Division from 2006 until 2009.  I was promoted to sergeant and

People - Sgt. Trzcinski - Direct/Reeves

1   I came back to the Property Clerk Division in August of 2012.

2       Q.   And, Sergeant, would you explain to the jury what the

3   Property Division is responsible for within the New York City

4   Police Department.

5       A.   Okay.  Essentially, the main function of the Property

6   Clerk Division is to safeguard and secure property that comes

7   within the Police Department's possession.

8       Q.   Would you explain to the jury what a voucher is?

9       A.   Okay.  A voucher is also known as a Property Clerk

10  Invoice.  What happens is that when we obtain a piece of

11  property, for us to identify it, we tie it into a Property

12  Clerk Invoice.

13      Q.   And does every invoice or voucher have a unique or

14  specific number?

15      A.   Yes, it does.

16      Q.   And can multiple items be vouchered under one invoice

17  number?

18      A.   Yes.  As long as they're related, yes, they would be.

19      Q.   What I'd like to do is just ask you, where physically

20  is evidence stored once it's received by the Property Clerk's

21  Office or the Property Division of the Police Department?

22      A.   We have storage facility warehouses throughout all

23  five boroughs in New York City that we store property.

24      Q.   Sergeant, what I'd like to do is speak to you about

25  three specific vouchers.

People - Sgt. Trzcinski - Direct/Reeves

1          First I'd like to talk to you about a voucher that

2     ends with the number 9541.  Can we talk about that for a few

3     minutes?

4          A.   Yes, we can.

5          Q.   Did the Property Clerk's Office receive from the 120

6     Precinct property under that voucher number in 2011?

7               THE WITNESS:  Can I refer to my notes, your

8          Honor?

9               THE COURT:  Yes.

10         A.   Actually, it did originate from the 120 Precinct.  The

11    120 Precinct had forwarded it to the police lab.  The police

12    lab had forwarded it to the Office of the Chief Medical

13    Examiner's office, also known as OCME.  And also then the

14    officer at Chief Medical Examiner had brought it to one of our

15    facilities, which was the Kingsland Avenue warehouse.

16         Q.   Now, on that voucher, do you have any indication of

17    what type of property was contained under 9541?

18         A.   Yes.  There was a total of eight different -- seven

19    different items.

20         Q.   And did those items include brown coat, a black mask,

21    a black sock --

22         A.   I could -- If you wish, I could read the items that's

23    on the invoice number.

24              MR. REEVES:  With the Court's permission, your

25         Honor?

1        First I'd like to talk to you about a voucher that

2   ends with the number 9541.  Can we talk about that for a few

3   minutes?

4        A.   Yes, we can.

5        Q.   Did the Property Clerk's Office receive from the 120

6   Precinct property under that voucher number in 2011?

7             THE WITNESS:  Can I refer to my notes, your

8        Honor?

9             THE COURT:  Yes.

10       A.   Actually, it did originate from the 120 Precinct.  The

11  120 Precinct had forwarded it to the police lab.  The police

12  lab had forwarded it to the Office of the Chief Medical

13  Examiner's office, also known as OCME.  And also then the

14  officer at Chief Medical Examiner had brought it to one of our

15  facilities, which was the Kingsland Avenue warehouse.

16       Q.   Now, on that voucher, do you have any indication of

17  what type of property was contained under 9541?

18       A.   Yes.  There was a total of eight different -- seven

19  different items.

20       Q.   And did those items include brown coat, a black mask,

21  a black sock --

22       A.   I could -- If you wish, I could read the items that's

23  on the invoice number.

24             MR. REEVES:  With the Court's permission, your

25        Honor?

People - Sgt. Trzcinski - Direct/Reeves

1          THE COURT:  It's all right with me.

2          Any objection?

3          MS. GUASTELLA:  No.

4          THE COURT:  Okay.

5     A.    Item number 1, quantity one, was a brown long coat.

6 Item 2 was a -- quantity one, was a black mask with eye holes.

7 Item number 3, quantity one, was black sock.  Item number 4,

8 quantity one, was a black glove, yellow trim.  Item number 5,

9 quantity one, is a black waist -- I mean -- yeah, black

10 waist-length jacket.  Item number 6, quantity one, is a black

11 long-sleeve shirt.  And item number 7, quantity one, is a black

12 duffel bag with gray trim.

13    Q.    Now, each of those items also had an RS number,

14 correct?

15    A.    Yes.

16    Q.    And that has nothing to do with you; that would be the

17 person who physically recovered or marked the evidence?

18    A.    I believe it would be.

19    Q.    Now, do you know or is there anything that would

20 tell you what date that property came back from the Office of

21 Chief Medical Examiner and was stored at the Kingsland

22 facility?

23    A.    Well, what happened with that particular invoice, the

24 Office of the Chief Medical Examiner brought it to Pearson

25 Place warehouse back on 4/27/11.  What happens at Pearson Place

MMS

People - Sgt. Trzcinski - Direct/Reeves

1   warehouse, which is in Long Island City, Queens, is that we

2   intake some property over there, but there is space

3   limitations, so then they transferred it over to Kingsland

4   Avenue warehouse, which is at 520 Kingsland Avenue, in

5   Brooklyn, on 5/11 of 2012.

6       Q.   And to your knowledge, that's where the property was

7   finally stored, correct?

8       A.   That's where it -- the last known location where that

9   property was brought to, according to our records.

10      Q.   Sgt. Trzcinski, I'd like to turn your attention to a

11  property voucher that ends in 9542.

12      A.   Yes.

13      Q.   And if you can tell me the histories as you know it to

14  be for that particular voucher.

15      A.   It originated back in the 120 Precinct where it went

16  to Pearson Place on 12/23 of 2011, and went from Pearson Place

17  to the lab -- When I'm saying the "lab," I mean the police lab.

18  And then it went on 12/30, 2011, it went from the police lab to

19  the Office of the Chief Medical Examiner.  On 4/30 of 2012 it

20  went from the Office of the Chief Medical Examiner to the

21  Kingsland Avenue warehouse.

22      Q.   What items were vouchered under 4 -- I'm sorry, 9542?

23      A.   Okay.  There's nine items.  Item number 1, quantity

24  one, is a gray hoodie zip-up sweatshirt, marked RS8.  Item

25  number 2, quantity one, is a pink bath towel, marked RS9.  Item

People - Sgt. Trzcinski - Direct/Reeves

1    number 3, quantity one, is a pink hand towel, marked RS10.

2    Item number 4, quantity one, is a black hoodie sweatshirt

3    pullover, marked RS11.  Item number 5, quantity one, it says

4    black ankle sneaker boot, marked RS29.  Item number 6, quantity

5    one, is a black ankle sneaker boot, marked RS29A.  Item number

6    7, quantity one, is blue jeans, marked RS30.  Item number 8,

7    quantity one, black shorts with white trim, marked RS31.  Item

8    number 9, quantity one, is gray sleeveless T-shirt, marked

9    RS32.

10       Q.   Sgt. Trzcinski, where is the last known location for

11   the items on this voucher?

12       A.   520 Kingsland Avenue, which is one of our warehouses.

13       Q.   And, Sergeant, the last voucher I want to talk to you

14   about ends with the number 9543.  If you can tell us what the

15   history of that voucher was.

16       A.   On 12/16, 2011, it went from the 120 Precinct to

17   Pearson Place.  On 12/23, 2011, it went from Pearson Place to

18   the police lab.  On 1/5, 2012, it went from the police lab to

19   the OCME.  And on 6/8/2012, OCME had transferred it to the

20   Kingsland Avenue facility.

21       Q.   And, Sgt. Trzcinski, what was under that voucher

22   number that ends 9543?  What items were received?

23       A.   There is a total of nine items that were listed on the

24   invoice.  Item 1, quantity one, it says black spade with yellow

25   handle, marked RS14.  Item number 2, quantity one, black

MMS

People - Sgt. Trzcinski - Direct/Reeves

1    umbrella, marked RS15.  Item number 3, quantity one, is a black

2    umbrella, marked RS16.  Item number 4, quantity one, it says

3    white robe, marked RS17.

4                    THE COURT:  White what, Sergeant?

5                    THE WITNESS:  A white robe.

6                    THE COURT:  White robe.

7                    THE WITNESS:  I'm sorry.

8         A.    Item number 5, quantity one, gray CD player, marked

9    RS19.  Item number 6, quantity one, it says CD-ROM, marked

10   RS19A.  Item number 7, quantity one, black headphones, marked

11   RS20.  Item number 8, quantity one, white glove, marked RS21.

12   Item number 9, quantity one, white glove, marked RS22.

13        Q.    Sgt. Trzcinski, what date were the items under 9543

14   received at the Kingsland facility?

15        A.    6/8, 2012.

16        Q.    Sgt. Trzcinski, would it be a fair statement to say

17   that as of October 29, 2012, all three of these vouchers were

18   secured at the Kingsland Avenue warehouse?

19        A.    Yes, according to our records, that's the location

20   they were stored at on that date.

21        Q.    Can you tell us if anything happened to the Kingsland

22   warehouse on October 29, 2012?

23        A.    Unfortunately, we have all heard of the effects of

24   Superstorm Sandy which hit us on that date.  We didn't have

25   time to relocate all the barrels that were inside of the

People - Sgt. Trzcinski - Direct/Reeves

1    warehouse.  What they did was that they stored up some of

2    the -- well, the roll-up gates and the doorways they had

3    sandbagged, because on the northern end of the property there

4    is the Newtown Creek, which is a waterway, which is only

5    several feet away from the back of the warehouse.

6           On that night, we had a storm surge that hit the

7    New York City area from Superstorm Sandy.  Eight to ten feet of

8    water had entered into the warehouse itself from the Newtown

9    Creek.  That waterway is designated as a Superfund site by the

10   Federal government.

11          We also have a sewage treatment plant that is right

12   next to the facility called Metro Fuel Oil.  And after the

13   flood waters had receded from the warehouse, we had a

14   representative from OSHA, which is Occupational Safety and

15   Health Administration, inspect the warehouse to see what the

16   conditions were.

17          The warehouse itself is something like a Costco or a

18   BJ's the way this particular property is stored.  It's due to

19   be stored inside of a paper bag or a cardboard box.

20          The flood waters had entered inside of the warehouse,

21   had came in about 8 to 10 feet.  The barrel itself is like a

22   55-gallon drum container made out of cardboard and wax.  All

23   the barrels were submerged underneath this storm water that

24   had entered the warehouse and compromised all of the property

25   that would have been stored inside of these cardboard-wax

MMS

000620

150

People - Sgt. Trzcinski - Direct/Reeves

1  barrels.  So, we were concerned about the levels of -- if there

2  was any kind of contamination that could be led inside the

3  warehouse.

4      The tests came back that there were high levels of

5  PCBs, heavy metals, and E. Coli that was present inside of the

6  warehouse, thus contaminating any property that would have been

7  inside of the warehouse, or at least compromising them.

8  Q.   Sgt. Trzcinski, to the present date, is the Kingsland

9  Avenue warehouse still closed?

10  A.   As of this date it is.

11  Q.   And is there any projected date for, either, reopening

12  or doing anything with the evidence that is inside of Kingsland

13  now?

14  A.   Unfortunately, they have not come up with a date.  If

15  they had come up with a date, there is a possibility I wouldn't

16  have had to come here today.

17      MR. REEVES:  Thank you, Sgt. Trzcinski.

18      I have no further questions, your Honor.

19      MS. GUASTELLA:  I have no questions.

20      THE COURT:  Sergeant, you're excused.  You're

21  free to step out.

22      THE WITNESS:  Thank you, your Honor.

23      (Witness excused.)

24      THE COURT:  Counsel, is that it?

25      MR. REEVES:  For today.

Proceedings

1        THE COURT:  For today, okay.  All right.

2        Members of the jury, we'll break for the day.

3   We'll resume tomorrow.  I think I'll make it 10 a.m.

4   tomorrow.  I'll see if I can get my calendar done before

5   you get here, which could cut on the downtime, which I

6   apologize for.  This is an all-purpose part.  We do all

7   other cases in addition to a trial, that's the reason for

8   the delay.

9        In any event, thanks for your patience and

10  attention.  Have a good day.  Remember the rules:  Don't

11  discuss the case, and so on.  Thank you.

12       (Whereupon, the jury exits the courtroom.)

13       THE COURT:  The jury has left.  Who do you

14  anticipate tomorrow?

15       MS. CILIA:  Just one second.

16       Officer Jacobs from K9; Det. Guariano.

17       THE COURT:  Hang on one second.  Detective --

18       MS. CILIA:  -- Daniel Guariano.

19       Det. Jeff Anderson; Det. Edward Patterson;

20  P.O. Casiano from the Ferry.

21       THE COURT:  P.O. Casiano?

22       MS. CILIA:  Yes.

23       Janet Smith, and, potentially, Michael Ambrose.

24       THE COURT:  Okay.  I'll see you 10 a.m.

25       MR. REEVES:  Yes, your Honor.

Proceedings

1          THE COURT:  Thank you.

2          (Defendant remanded.)

3          (Whereupon, court stands in recess and this

4     matter is adjourned to March 5, 2014, at 10 a.m.)

5  *     *     *     *     *     *     *     *     *     *     *

6     I hereby certify that the foregoing is a true and
   accurate transcript of the above proceedings to the best of my
7     knowledge, skill, and ability.

8

9

10     MAURIZIA M. SELLECK
       Senior Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    SUPREME COURT OF THE STATE OF NEW YORK

 2    COUNTY OF RICHMOND:  CRIMINAL TERM - PART 5

 3    PEOPLE OF THE STATE OF NEW YORK

 4

 5                    against

 6

 7    ARMAND SKRINE,

 8                    Defendant

 9    _____
```

**Indictment #434-2011**

```
11                    18 Richmond Terrace

12              Staten Island, New York, 10301

13                    March 5, 2014

14        B E F O R E:  HONORABLE STEPHEN ROONEY, Judge

15

16    A P P E A R A N C E S:

17

18    DANIEL DONOVAN, ESQ.
      District Attorney-Richmond County
19
      JENNIFER CILIA, ESQ.
20    KYLE REEVES, ESQ.
      Assistant District Attorney
21
      MARIA GUASTELLA, ESQ.
22    Appearing on behalf of the Defendant

23

24

25              Maurizia Selleck, Senior Court Reporter
                Tammy Rodriguez, Senior Court Reporter
```

TR

000624                                                        154

                              Proceedings

1            THE CLERK:  Case on trial continues, indictment

2     434 of 2011, People v. Armand Skrine.

3            MS. CILIA:  Jennifer Celia and Kyle Reeves for

4     the People.

5            MS. GUASTELLA:  Maria Guastella for Mr. Skrine.

6            THE COURT:  Are we.

7            MS. CILIA:  We have a couple of preliminary

8     things, your Honor.  The first being Detective Anderson's

9     testimony.

10           We intend to offer into evidence a hat that the

11    defendant was wearing, however this hat was vouchered in the

12    same voucher as other items that were suppressed at the

13    suppression hearing.

14           We can either present the entire voucher to

15    Detective Anderson, and only put into evidence the hat or we

16    can basically, if Ms. Guastella has another suggestion a hat

17    that the defendant was wearing.

18           MS. GUASTELLA:  Which is what?

19           MS. CILIA:  Black baseball cap.

20           THE COURT:  When?

21           MS. CILIA:  When he was stopped.  It was not on

22    him.  It was not in his pockets.  It was on top of his head.

23    He was wearing it.

24           THE COURT:  Do you have a position on this?  I'll

25    reminds you --

                              TR

000625

155

Proceedings

1          MS. GUASTELLA:  I'm trying to relive the hearing.

2          THE COURT:  I'm reading from Judge Collini's

3    decision, Based on the foregoing recovered the physical

4    evidence from the defendant's person i.e. the counterfeit

5    currency and identification cards must be suppressed.

6          MS. GUASTELLA:  When do you plan on putting him

7    on this afternoon or this morning?

8          MS. CILIA:  Our third witness.

9          MS. GUASTELLA:  May be we can break after the

10    second witness.  At this point I'm asking not to allow that

11    in since it could be part --

12          THE COURT:  If he was wearing it at the time that

13    he was stopped, and if you're asking me to keep it out based

14    on Judge Collini's decision I'll grant that application.  I

15    read his decision.

16          MS. GUASTELLA:  That's what I'm asking.

17          THE COURT:  All right.

18          People do you want to be heard?

19          MS. CILIA:  Well, your Honor I would note that

20    the defendant's clothes that he was wearing are already

21    entered into evidence.

22          THE COURT:  No kidding.  I know that, but I

23    haven't heard an objection.  I'm getting an objection now to

24    the hat.

25          As I read his decision the hat is suppressible,

TR

Proceedings

1       he was wearing it.

2               MS. CILIA:  My next question is am I allowed to

3       ask Detective Anderson what the defendant was wearing?

4               THE COURT:  Who is Detective Anderson now?

5               MS. CILIA:  The officer who stopped the

6       defendant.

7               THE COURT:  You can ask him what he was wearing,

8       his observations aren't suppressed.

9               He saw the man allegedly on the street.

10              MS. CILIA:  Yes.

11              THE COURT:  So I don't think that it's

12      objectionable to ask him to describe the defendant and what

13      he was wearing at the time, but I think the hat is out over

14      objection, a picture of the hat I guess you don't have the

15      hat?

16              MS. CILIA:  We have the hat.

17              THE COURT:  That survived Sandy?

18              MS. CILIA:  Yes.

19              THE COURT:  That doesn't matter to me if I have

20      an objection, and I do to the hat, if he was wearing it at

21      the time that he was stopped as I read Judge Collini's

22      decision the hat is suppressed.

23              So anything else?

24              MR. REEVES:  The only other thing, your Honor

25      there will be an additional witness from the ferry terminal,

Proceedings

1     a witness by the name of James Vitally.

2               Michael Casiano who I was under the impression

3     had downloaded the videos from Whitehall and this ferry

4     terminal only the Staten Island Ferry terminal.

5               Mr. Vitally, we reached out to him and should be

6     available this afternoon.

7               THE COURT:  You're not calling Casiano?

8               MR. REEVES:  He's our first witness.  He did the

9     Staten Island side of the ferry.

10              THE COURT:  You have another witness for the

11    Whitehall side.

12              MR. REEVES:  Vitally.

13              THE COURT:  Well, if and when he's called to the

14    stand, I'll ask the jury if any of them know him.

15              They haven't heard his name.  Nothing else?

16              Why don't you get your first witness in the front

17    row and we'll get the jury in.

18              MR. REEVES:  Michael Casiano.

19              THE COURT OFFICER:  Jury entering.

20              (At this time the jury enters the courtroom. )

21              THE CLERK:  Both sides stipulate the presence of

22    a complete jury panel properly seated, People?

23              MS. CILIA:  Yes.

24              MS. GUASTELLA:  So stipulated.

25              THE COURT:  Good morning welcome back.  Next

Michael Casiano - Direct - Reeves

1       witness please.

2                MR. REEVES:  People call Michael Casiano.

3    MICHAEL CASIANO, Richmond, the witness herein, having been first

4    duly sworn, was examined and testified as follows:

5    DIRECT EXAMINATION

6    BY MR. REEVES:

7        Q.   Good morning, Mr. Casiano.  How are you?

8        A.   Good.

9        Q.   Would you start off by telling the jury what you do

10   for a living?

11       A.   Security inspector with the DOT.

12       Q.   How long have you been working for the Department of

13   Transportation, DOT?

14       A.   Approximately seven years.

15       Q.   Mr. Casiano, could you tell me some of the things that

16   you're responsible for doing with the Department of

17   Transportation?

18       A.   Overseeing the security operations and camera

19   operations as well.

20       Q.   What area or what facility within the Department of

21   Transportation are you responsible for overseeing the

22   surveillance camera system?

23       A.   Repeat that.

24       Q.   Where do you work out of?

25       A.   I work out of St. George.

Michael Casiano - Direct - Reeves

1    Q.   Is your office based on the ferry terminal?

2    A.   Yes.

3    Q.   Are you responsible for security cameras that are both

4    in the terminal and on the ferry boats themselves?

5    A.   Correct.

6    Q.   Now, what I would like to do is talk to you about the

7    security system in the ferry terminal here Staten Island.

8         Can you tell us are there cameras in and around the

9    ferry terminal that record?

10   A.   Yes.

11   Q.   Approximately how many cameras are you aware of?

12   A.   About 80.

13   Q.   Now, on December 9th of 2011 did you get a request

14   from the New York City Police Department to download certain

15   cameras for December 8, 2011, between 9:45 a.m. to 10:00 a.m?

16   A.   Yes, I did.

17   Q.   Were you able to download six camera angles?

18   A.   Yes.

19   Q.   I'm going to hand up to you what's been premarked as

20   People's 168 for identification?

21             MS. GUASTELLA:   Fine.

22   Q.   I'm going to show you this disk, and ask you if you

23   recognize it?

24   A.   Yes.

25   Q.   What do you recognize that to be?

Michael Casiano - Direct - Reeves

1      A.   Video that I have archived.

2      Q.   Mr. Casiano, this morning in my office across the
3  street, did you have an opportunity to view the contents of the
4  disk?

5      A.   Yes.

6      Q.   After you viewed the contents of the disk, did you
7  mark the disk with your initials and the date?

8      A.   Yes, I did.

9      Q.   The contents that you saw on the disk is the same that
10  you downloaded on December 89, 2011?

11      A.   That is correct.

12              MR. REEVES:   Your Honor, I offer People's 168 in
13       evidence.

14              MS. GUASTELLA:   No objection.

15              THE COURT:   All right.   Exhibit 168 is marked in
16       evidence.

17              (So marked.)

18              MR. REEVES:   With the Court's permission I would
19       like to put 168 on display.

20              THE COURT:   Sure.

21      Q.   Mr. Casiano, what I'm going to do is I'm going to play
22  the camera angles.   What I would like you to do the camera
23  angles are playing, just tell the jury what camera angle they're
24  looking at on the screen okay.

25              Now the first camera angle will be camera 46.   If you

TR

Michael Casiano - Direct - Reeves

1    can tell us --

2        A.    That's in the corridor right outside where they

3    disembark the ferry.

4        Q.    Now, I'm going to change -- that was camera 46,

5    correct?

6        A.    Yes.

7        Q.    I'm going to change to camera 47.

8              The same question.  If you can tell me what area of

9    the ferry terminal is covered by camera 47?

10       A.    That's a rotating camera.  That's in the main corridor

11   area.

12       Q.    What just happened now the camera rotated?

13       A.    Yes.

14       Q.    Is that done manually or by machine?

15       A.    By machine.

16       Q.    So camera 47 will rotate at it's own at a fixed period

17   of time?

18       A.    Yes.

19       Q.    Okay.  Thank you.

20             Now, I'm going to show you camera 60 and ask you what

21   camera 60 covers?

22       A.    That's inside the corridor.

23       Q.    Now would this be the opposite view of the first

24   camera that I showed you, 46?

25       A.    Right where the passengers disembark.

Michael Casiano - Direct - Reeves

1      Q.   This particular area that's being displayed, is that

2  open to the public area or is that secured?

3      A.   That's actually a restricted area.

4      Q.   Mr. Casiano, I'm going to switch to camera 65.  I'm

5  going to ask you what is camera 65 focused on?

6      A.   Bus ramp D., lower level.

7      Q.   Now is camera 65 a fixed or a rotating camera?

8      A.   Fixed.

9      Q.   I'm going to switch to camera 70.

10          The same series of questions.  What is that focused

11  on?

12     A.   Bus ramp D. it's like the mid-camera in the middle.

13     Q.   So on the far end of the picture, what area of the

14  terminal would that be?

15     A.   The far end would be bus ramp D., upper level.

16     Q.   Finally, I'm going to show you the last camera, which

17  is camera 75, what are we looking at with camera 75?

18     A.   That is the upper level camera bus ramp D.

19     Q.   When you come out of the last camera?

20     A.   Yes.

21     Q.   Mr. Casiano, other than downloading the images from

22  those six cameras that cover December 8, 2011 between 9:45 in

23  the morning until 10 o'clock in the morning, did you have any

24  other involvement in this case?

25     A.   No.

                        Michael Casiano - Cross - Guastella

1          Q.   Thank you, sir.  No further questions.

2     CROSS-EXAMINATION

3     BY MS. GUASTELLA:

4          Q.   Just a couple of questions.

5               How long have you been working out of the ferry

6     terminal area?

7          A.   I would say approximately seven years.

8          Q.   What are your hours?

9          A.   6:00 to 2:00 or 2:00 to 10:00.

10         Q.   So you're familiar with the ferry terminal, correct?

11         A.   Yes.

12         Q.   There's a little mini police station in the ferry

13    terminal?

14         A.   Yes.

15         Q.   How many officers would you say work on each shift?

16         A.   I couldn't tell you that.

17         Q.   More than six?

18         A.   More than six.

19         Q.   How many of those officers actually ride the ferry

20    back and forth?

21         A.   Two usually assigned to the boats.

22         Q.   The K-9 Unit, how many units, how many teams work at

23    the same time?

24         A.   Upstairs in the terminal waiting area?

25         Q.   Yes.

Janet Smith - Direct - Cilia

1      A.    Two.

2      Q.    Do they sometimes travel the ferry as well?

3      A.    No.

4      Q.    Never?

5      A.    They don't.

6      Q.    Nothing further.

7                  THE COURT:  Anything else?

8                  MR. REEVES:  No, thank you.

9                  THE COURT:  Mr. Casiano, you're excused.

10                 You're free to step out.

11                 Next witness please.

12                 MS. CILIA:  The People call Janet Smith.

13     JANET SMITH, Richmond, the witness herein, having been first

14     duly sworn, was examined and testified as follows:

15     DIRECT EXAMINATION

16     BY MS. CILIA:

17     Q.    I'd like to ask you where do you live?

18     A.    I live 195 Steuben Street.

19     Q.    What apartment do you live in?

20     A.    Apartment 7 M.

21     Q.    What floor is apartment 7 M. on?

22     A.    The 7th floor.

23     Q.    For about how long have you lived there for?

24     A.    Over eight years.

25     Q.    Do you work?

TR

Janet Smith - Direct - Cilia

1        A.    Yes.

2        Q.    What type of work do you do?

3        A.    I'm a nurse.

4        Q.    I'd like to direct your attention to December 8th of

5    2011, do you remember that day?

6        A.    Yes.

7        Q.    On December 8 of 2011, did you know your next door

8    neighbor?

9        A.    Yes.

10       Q.    Or your neighbor?

11       A.    Yes.

12       Q.    Who were they?

13       A.    David and Nicole and they had a little daughter.

14       Q.    What apartment did they live in?

15       A.    7 L.

16       Q.    That's the apartment right next to yours?

17       A.    Yes.

18       Q.    I'd like to show you the chart that's in evidence

19   People's 161.

20             Taking a look at that, Ms. Smith, do you see where

21   your apartment is?

22       A.    Yes.

23       Q.    Can you point that out to the jury and also I'd like

24   to bring up a pen to the witness.

25             Can you point out where your apartment is?

TR

Janet Smith - Direct - Cilia

1    A.   Here.

2    Q.   Can you circle that also for the jury with your pen.

3         Can you point -- you don't have to circle it, point

4    out where David was living?

5    A.   Here.

6    Q.   Indicating the very top of the exhibit.

7         Now, the morning of December 8th shortly before noon

8    were you home?

9    A.   Yes.

10   Q.   Can you tell the jurors what you were doing at that

11   time?

12   A.   I was cleaning up, cleaning my stove.

13   Q.   What happened at that point?

14   A.   I realized that I had turned the lighter off on the

15   stove, so I decided to go out and borrow a lighter because I

16   don't have a lighter at home.

17   Q.   Your stove wasn't lighting properly?

18   A.   Yes.

19   Q.   When you left your apartment to look for somebody who

20   had a lighter, where did you go?

21   A.   I initially wanted to go to 7 L.  When I opened my

22   door, when I got out there, I heard people talking in the

23   apartment.  I didn't hear a women's voice, so I assumed Nicole

24   wasn't home.  So I walked down the stairs, went to the fourth

25   floor to another person that I knew there, and I missed the door

1    actually and rang another neighbor, another girl, and she opened

2    the door and I asked her for her lighter.  She gave it to me.

3        Q.   I'm going to take you back to when you went towards

4    David's door, you said you heard voices?

5        A.   Yes.

6        Q.   Can you describe what those voices sounded like?

7        A.   They were males just talking like having normal

8    conversation.  Don't know what they was talking, but it was

9    normal.

10       Q.   Normal tones, these were male voices?

11       A.   Yes.

12       Q.   Now, you said that you went downstairs to the fourth

13   floor and you borrowed a lighter down there?

14       A.   Yeah.

15       Q.   Where did you go after you borrowed the lighter?

16       A.   I came back upstairs to my apartment.

17       Q.   What did you do in your apartment?

18       A.   I light the stove, and I put my food on the stove.  I

19   came back out.

20       Q.   What was your intention at that time?

21       A.   To return the lighter.

22       Q.   When you walked out of the your apartment, which

23   direction did you go?

24       A.   I got out of my apartment, make a right going towards

25   the exit.

1       Q.    What happened at that time?

2       A.    I walked like the first apartment, the next one and I

3    heard things being moved around shuffling in 7 L., so I turned

4    and the next thing I heard was a bang, sounds like a shot, so I

5    started running.

6       Q.    So let's, if you could, just point out to the jury

7    where you were when you heard that shot and turned around?

8       A.    Right there.

9       Q.    You're indicating there's actually a red circle in

10   that vicinity?

11      A.    Yes.

12      Q.    Is that about where you were when you heard the shot?

13      A.    Yes.

14      Q.    I wanted to go back to when you heard things shuffled

15   around in the apartment, can you explain that to the jury what

16   you heard?

17      A.    I heard like furniture moving around, people fighting.

18   That's what I heard.  It wasn't yelling, loud noise or

19   screaming, but I heard people moving things, heavy things being

20   moved around.

21      Q.    And you're saying that you didn't hear any voices at

22   that point?

23      A.    At that point I didn't hear no voices.  I just heard

24   heavy tumbling, things being thrown over.

25      Q.    When you heard these noises, what did you do?

Janet Smith - Direct - Cilia

1       A.   I turned around actually to see, so I turned around

2   and I when I turned that's when I heard the sounds like a shot.

3       Q.   After you heard the shot what happened next?

4       A.   I started running, so I ran maybe like somewhere here

5   around this end and the apartment door opened and I saw my

6   neighbor.

7       Q.   Now I'm going to note for the record you pointed out a

8   red circle that was in the middle of the exhibit, is that right?

9       A.   Yes.

10      Q.   Then you said that you saw a door open and you

11  indicated that, that was door 7 L?

12      A.   Yes.

13      Q.   Which way were you facing when you saw that door being

14  opened?

15      A.   I was facing this way coming down this way.  Actually,

16  when the door opened I was facing this way.  When I heard the

17  door open I turned around to see who was coming out.

18      Q.   When you saw -- prior to seeing the door open was the

19  door shut at that point?

20      A.   Yes, it was shut.

21      Q.   Tell us what you saw when you saw the door open?

22      A.   The door opened, and I saw my neighbor.  He came out.

23  He was wearing like a white T-shirt and gray pants.  I noticed

24  that he had his hands on his stomach.  I was running.

25           I was running you know, and he walked a few doors

TR

Janet Smith - Direct - Cilia

1  almost to my door and he fell to the floor.  He said, Help me.

2  Oh, God help me.

3          I was not looking anymore.  I could only hear his

4  voice at the time.  I was already to the exit door.

5     Q.  Now, Ms. Smith after you said your neighbor, can you

6  indicate who that was?

7     A.  David.

8     Q.  When you saw David come out of his apartment and he

9  was yelling, Help me and Oh God, what did the door do

10  afterwards?

11     A.  Shut behind him.

12     Q.  So David was the only person that you saw leave the

13  apartment?

14     A.  Yes.

15     Q.  Tell us again you saw him do what after he got into

16  the hallway?

17     A.  He stopped and fell.

18     Q.  At that point approximately where are you in your

19  hallway?

20     A.  At that point I was at the exit door, the door.  When

21  he fell I was already to the staircase door.

22     Q.  After you saw and you heard that, where did you go

23  next?

24     A.  I opened the staircase door, I put my foot down.  I

25  took the first and second stairs.  I heard another bang, a lot

TR

Janet Smith - Cross - Guastella

1   of bang.  I just ran right where I took the lighter from.  I

2   went right back there.  I knock on the door.  I said call the

3   cops my neighbor was shot.  Call the cops.  She do it.

4       Q.   I want to talk to you a little bit about that first

5   shot that you heard, and the second shot that you heard.

6            Can you tell us what the first shot that you heard

7   sounded like?

8       A.   Sounds like a pop like that.

9       Q.   That was from within?

10      A.   In the apartment.

11      Q.   7 L?

12      A.   Yeah.

13      Q.   Now talking about the second shot that you heard,

14  where were you at that particular moment?

15      A.   I was on the second stair.  Like I open the exit door,

16  put the foot down.  Immediately I put my second foot down that's

17  when I heard the second shot.

18      Q.   What did that particular shot sound like?

19      A.   Sounded like a loud bang, heavier than the first one.

20      Q.   Now after you heard that you said that you went into

21  your neighbor's apartment?

22      A.   I went downstairs to where I got the lighter from.

23      Q.   Were you able to get into that apartment?

24      A.   Yes, she opened the door for me.

25      Q.   You were taking the stairs at that time?

TR

1        A.   Yes.

2        Q.   When you took the stairs down, did you hear anyone

3   behind you?

4        A.   No.

5        Q.   Did you hear any noises behind you?

6        A.   No.

7        Q.   You said that at the point when you got into your

8   neighbor's apartment somebody called 911?

9        A.   She did.

10       Q.   I want to show you a picture, Ms. Smith.  I want to

11   ask you whether or not you recognize the clothing that David was

12   wearing inside of that picture.  You can take your time with it.

13   It's going to be People's exhibit number 6.

14            I want to ask you if this is the way that David was

15   dressed when you saw him?

16       A.   I'm not sure the pants.  I remember his shirt.

17       Q.   You remember that he was wearing that white shirt?

18       A.   Yes.

19            MS. CILIA:   Thank you very much, Ms. Smith.  I

20       have no further questions.

21   CROSS-EXAMINATION

22   BY MS. GUASTELLA:

23       Q.   Ms. Smith, you said that you lived in the apartment

24   building.  You still live there?

25       A.   Yeah.

Janet Smith - Cross - Guastella

1    Q.   You've been there for about eight years?

2    A.   Over eight years.

3    Q.   You David's neighbor for about seven years?

4    A.   No, I think about five.

5    Q.   About five?

6    A.   Yeah.

7    Q.   Now, on this particular morning were you getting --

8    were you working that morning?

9    A.   I worked 3:00 to 11:00.

10   Q.   Then you got some sleep, and then you got up to clean

11   your stove?

12   A.   Yeah.

13   Q.   Now, you went down to the -- withdrawn.

14        Your intention was to borrow someone's lighter?

15   A.   Yeah.

16   Q.   You took the stairs down to the fourth floor?

17   A.   Yeah.

18   Q.   The stairs are basically where the elevator is?

19   A.   The elevator -- there's a door then the elevator.

20   Q.   Steel door?

21   A.   Yeah.  Not really steel door, regular door.

22   Q.   Was it your intention to go down to four?

23   A.   No, my intention was to go to David's apartment or ask

24   if his girlfriend was home, but I heard male voices.

25   Q.   They were talking loudly?

TR

Janet Smith - Cross - Guastella

1    A.   No, just having normal conversation.

2    Q.   Did you hear music playing?

3    A.   I can't remember.

4    Q.   Do you recall speaking to a detective in connection

5    with this case?

6    A.   Yes.

7    Q.   Do you recall telling the detective that you heard

8    people fighting inside the apartment?

9    A.   Yeah, that's what I said.  I said it sounds like

10   fighting, like people tossing things around.

11   Q.   I thought you said on direct that there was screaming

12   or yelling?

13   A.   No.  I didn't hear yelling.  I heard, I assume it was

14   fighting because the way the things were moved around in the

15   apartment throwing things around.

16   Q.   So you were afraid to knock on the door?

17   A.   No, it wasn't the time that I heard the fighting

18   that's the reason I didn't knock on the door.

19   Q.   I apologize when you left you heard talking?

20   A.   Yes.

21   Q.   You didn't want to knock because you thought it was

22   men in the apartment?

23   A.   Yes.

24   Q.   You went down to your friend's apartment?

25   A.   Yes.

TR

000645

175

Janet Smith - Cross - Guastella

1      Q.    You walked down the three flights?

2      A.    Yes.

3      Q.    And then when you got there your friend was in the

4  apartment?

5      A.    She's not my friend.  Actually she lives on the fourth

6  floor.  My intention was going to my aunt's apartment, but I

7  missed the apartment and rang her doorbell next door to my aunt.

8  So she got out of the apartment.  I said, I'm sorry.  She said

9  what happened.  I said I'm looking for a lighter.  They said

10  I'll borrow you one.  I said okay.

11      Q.    How long has your aunt been living in the building?

12      A.    For many years.

13      Q.    You missed her apartment, you missed her apartment

14  door?

15      A.    Yes just next door to each other.

16      Q.    They're far apart, the doors aren't next to each

17  other.  They're a little bit -- there's space between?

18      A.    Yes.

19      Q.    Each door is labeled with the apartment on it?

20      A.    Yes.

21      Q.    Yes?

22      A.    Yes.

23      Q.    You borrowed the lighter.  Can you describe the

24  lighter that you borrowed?

25      A.    Not sure.  It's cigarette lighter, not a stove.

TR

Janet Smith - Cross - Guastella

1      Q.   Not the long one, it's a cigarette lighter that's the
2   lighter you were going to light the pilot with?

3      A.   Yes.

4      Q.   When you got back into your apartment you said you put
5   the food on the stove?

6      A.   The rice.  I light the stove, put the rice on.

7      Q.   Getting back to when you left the apartment on the
8   fourth floor you took the stairwell back up?

9      A.   Yes.

10     Q.   As you were going back to your apartment that's when
11  you started hearing the fighting and the furniture banging all
12  around?

13     A.   No.

14     Q.   When did you hear that?

15     A.   When I came back out to return the lighter.

16     Q.   Okay.  You cooked your food.  How long did it take you
17  to cook your food?

18     A.   Actually I didn't cook the food.  I light the stove.
19  After I light the stove, I washed the rice, put the rice on, and
20  walked back out to return her lighter.

21     Q.   How long were you in the apartment?

22     A.   Three or four minutes the most.

23     Q.   Then you went back down to return the lighter?

24     A.   Yeah.

25     Q.   Then you came back up taking the stairwell?

TR

Janet Smith - Cross - Guastella

1      A.   Yes.

2      Q.   That's when you hear the fighting?

3      A.   No -- yes.  When I came back out to return the lighter

4  is when I heard the fighting.

5      Q.   I apologize.  That's when you hear the arguing and

6  yelling and fighting?

7      A.   They didn't yell, the men.  I hear furniture toss

8  around.  I wasn't hearing loud talking.  I was hearing furniture

9  being moved around.

10     Q.   Two people fighting?

11     A.   I don't know if there were two people.  I don't know

12 who was in the apartment.

13     Q.   It was much louder when you first heard them inside

14 the apartment, right?

15     A.   When I first heard they was talking.

16     Q.   They were talking.

17          You walked normal pace to the stairwell, correct?

18     A.   During what time?

19     Q.   When you went to return the lighter?

20     A.   At that time I wasn't walking, I was running.

21     Q.   So at what point did you start running?

22     A.   When I heard the first shot.

23     Q.   Where were you exactly when you heard the first shot?

24     A.   Somewhere here.

25     Q.   So there's a third apartment right where you're

Janet Smith - Cross - Guastella

1  pointing?

2      A.   Right here.

3      Q.   That's when you start running?

4      A.   That's where I heard the shot that's when I started

5  running.

6      Q.   You didn't look back you just ran, you're scared?

7      A.   I started running.  When I got there, I heard someone

8  at the door open, so once this opened then I turned around to

9  see who was coming out.

10     Q.   How fast were you running?

11     A.   I don't know.  I was running.  I don't know how fast,

12  but I know I wasn't walking.

13     Q.   You were scared?

14     A.   Yes.

15     Q.   You ran?

16     A.   Yes.

17     Q.   You're saying at some point you hear the gunshot and

18  you stopped in your tracks?

19     A.   No, I was walking from here.  When I got here I heard

20  the gunshot.  When I heard the gunshot that's when I started

21  running.  When I got to this point I heard this door open, so

22  when this door opened I have turned I'm still running, but I

23  turn to look and see, that is he when I saw my neighbor coming

24  out.

25     Q.   How long do you think it took you to run between the

TR

1    first shot and second shot?

2       A.   I don't know the first shot and second shot depending

3    on the distance because after I heard the first shot from here I

4    -- this door opened.  I was already here.  When he fell to the

5    floor I was already at the exit door, so when I opened the door,

6    put my foot down on first, second stair I heard the second shot.

7    I was not in the hallway at that time.

8       Q.   Then I'm confused.  You hear the first shot and you

9    start running?

10      A.   Yes.

11      Q.   Your intention was to go to the elevator or the

12   stairwell?

13      A.   My intention I don't know, whichever way come first.

14   The stairway was first.

15      Q.   As you're running you're scared to death?

16      A.   Yes.

17      Q.   You're saying that you hear a door open?

18      A.   Yes.

19      Q.   That means you turn around?

20      A.   Yeah.

21      Q.   Were you still running as you turned around?

22      A.   I was turned, you know like this moving back.

23      Q.   By then you're almost at the stairwell, correct?

24      A.   I heard the door open when I was here.

25      Q.   Right almost by the door to the stairs?

Janet Smith - Cross - Guastella

1    A.    The door to the stairs is all the way here.

2    Q.    Okay.  You're right.  Okay.  So you turned around, but

3  you're not looking back, you're still running forward?

4    A.    I turned around and I saw the door open, but I'm

5  running.  As I'm turning because the hallway is small, I'm

6  running and looking, you know, turning to see.

7    Q.    The door to the elevator is always closed, right that

8  door doesn't stay open right?

9    A.    Yeah.

10   Q.    In other words is it closed, that door to go to the

11 elevator always remains closed?

12   A.    But I didn't take the elevator.

13   Q.    I understand that, but the door is also by the

14 stairwell, correct?

15   A.    No, it's a distance away from the stairs.  The

16 elevator is somewhere here the exit.

17   Q.    You're running right?

18   A.    Yes.

19   Q.    You want to make sure you don't bang into the door,

20 you're looking forward?

21   A.    The door is on the side.  It's not ahead of me.

22   Q.    The doorway to the elevator is ahead of you?

23   A.    Ahead of me.  But I wasn't taking the elevator.  The

24 direction I came from was the direction that I went back to the

25 stairs.

Janet Smith - Cross - Guastella

 1       Q.   I thought you were going to take whichever one you got
 2   there?
 3       A.   The stairs was the first place next to me.
 4       Q.   You're concentrating on running off that floor?
 5       A.   Yes.
 6       Q.   You're saying as you ran, you turned around and you
 7   looked back because you heard the door open?
 8       A.   Yes.
 9       Q.   Were you screaming or yelling?
10       A.   No.
11       Q.   How long would you say that you looked at that door?
12       A.   Well, a few seconds when I saw him come up and tumble.
13       Q.   Did you stop and look at him?
14       A.   No, I was --
15       Q.   You were running?
16       A.   Yeah.
17       Q.   You went into the stairwell?
18       A.   Yeah.
19       Q.   Then so you have to open that door there's a little
20   platform and then the stairs going down?
21       A.   Yes.
22       Q.   So you were still running at that point, right?
23       A.   Yes.
24       Q.   You're saying that -- it's your testimony at what
25   point do you hear the door close?

Janet Smith – Cross – Guastella

1      A.    Which door?

2      Q.    The 7 L?

3      A.    7 L?

4      Q.    Right.

5      A.    I didn't say I hear the door close.  I closed the exit

6   door behind me.  As I put my foot down first and second stairs

7   the door closed.  When my neighbor got out of the apartment the

8   door immediately closed behind him.

9      Q.    Did you see that?

10     A.    Yes, I saw it because I see the door shut.  The door

11  it shut right behind you.

12     Q.    As you're running you're seeing this?

13     A.    Yes.

14     Q.    At some point you're in the stairwell, it's a steel

15  door in the stairwell?

16     A.    It's a regular door.

17     Q.    Not a wood door?

18     A.    It's a wood door.

19     Q.    Okay.  Back in 2011 your testimony is that it was a

20  wood door?

21     A.    I think it's a wood door that's what the apartment

22  have not a steel door.

23     Q.    Not a steel door?

24     A.    No.

25     Q.    You've been there eight years?

TR

1      A.   Yes.

2      Q.   The door closes behind you?

3      A.   Yes.

4      Q.   And you almost two steps down, at that point you hear

5  the door open again?

6      A.   No, I heard a shot.

7      Q.   You heard a shot?

8      A.   Yes.

9      Q.   As the person is falling down you say you hear him

10 scream, Oh my God?

11     A.   He said Oh God help me.  He had his hands like this,

12 Oh God help me.

13     Q.   His hand was like what?

14     A.   I don't know.  Seems like he was holding on to his

15 stomach.  I'm not sure.  He said Oh God help me.  Oh my God help

16 me.

17     Q.   You saw this as you were running to the stairwell?

18     A.   Yes.

19     Q.   Do you recall telling the detective when you were in

20 the stairwell you heard the door open again?

21     A.   I can't recall saying that.

22     Q.   So it's not until you're in the stairwell that you

23 claim you hear a second shot?

24     A.   Yes.

25     Q.   You ran down to the fourth floor, right?

TR

Janet Smith - Redirect - Cilia

1    A.    Yeah.

2    Q.    Nobody was behind you running?

3    A.    Didn't hear nobody behind me.

4    Q.    You didn't see anybody coming out of the apartment?

5    A.    No.

6          MS. GUASTELLA:  Nothing further, Judge.

7  REDIRECT EXAMINATION

8  BY MS. CILIA:

9    Q.    Ms. Smith, if you can estimate the time that it took

10 between the first gunshot that you heard and the second gunshot

11 you heard, if you can?

12   A.    I'm not too sure from here to here like a minute or

13 two.  I'm not too sure how long.  Depends how long is the

14 hallway, and I'm running.  I'm not too sure.  If I can estimate

15 the minute or the two not too sure.

16   Q.    Okay.  The person who fell down, you saw fall into the

17 ground clutching himself and saying Oh, my God help me, did you

18 know who that was?

19   A.    Yes.

20   Q.    And who was that?

21   A.    It was David.

22   Q.    Thank you.

23          THE COURT:  Anything else?

24          MS. GUASTELLA:  No.

25          THE COURT:  Ms. Smith, you're excused.  You're

 1          free to step out.

 2                    Next witness please.

 3                    MS. CILIA:  Can we approach?

 4                    THE COURT:  Sure.

 5                    (Off the record discussion held at the Bench.)

 6                    Next witness.

 7                    MS. CILIA:  Detective Jeffrey Anderson.

 8   DETECTIVE JEFFREY ANDERSON, 759, 120 Detective Squad, the

 9   witness herein, having been first duly sworn, was examined and

10   testified as follows:

11   DIRECT EXAMINATION

12   BY MS. CILIA:

13        Q.   Approximately how long have you been with the NYPD?

14        A.   Approximately seven years.

15        Q.   Can you tell the jury with your service experience?

16        A.   I started my career at the 70 Precinct Flatbush,

17   Brooklyn.  There I did foot patrol for seven months.

18             I was transferred to the 120 Precinct that's where I

19   did patrol, housing unit, and anticrime unit, currently in the

20   detective's squad.

21        Q.   I want to draw your attention to December 8, 2011,

22   what was your command at that time?

23        A.   The 120 Precinct housing unit.

24        Q.   Were you working that day?

25        A.   Yes.


                              TR

1    Q.    What hours were you working on that particular day?

2    A.    7:05 in the morning to 3:40 in the afternoon.

3    Q.    At approximately 11:50 that morning, did you receive a

4    radio run?

5    A.    Yes.

6    Q.    What was that radio run referring to?

7    A.    A male shot at 195 Steuben Street.

8    Q.    Did you proceed to this location?

9    A.    Yes.

10   Q.    Where were you when you received this radio run

11   approximately?

12   A.    I was on the roadway heading towards the Verrazano

13   Bridge.

14   Q.    Can you explain to the jurors the route that you

15   traveled to proceed to Steuben Street?

16   A.    I drove over the Verrazano Bridge towards Narrows Road

17   North heading towards the location of the crime.

18   Q.    Did you reach Steuben Street?

19   A.    No.

20   Q.    Why not?

21   A.    I engaged an individual that looked suspicious on the

22   roadway on Narrows Road North.

23   Q.    I want to show you what's been premarked People's

24   exhibit 169 A, B, and C for identification.

25         Starting with 169 A. for identification, do you

Det. Anderson - Direct - Cilia

1    recognize this?

2         A.   Yes.

3         Q.   What is it?

4         A.   This is a map overview of the location of the crime

5    and the location where I stopped the individual.

6         Q.   Moving on to People's 169 B. for identification what

7    is that?

8         A.   This is a general area of where I stopped the

9    individual.

10        Q.   Then moving on to 169 C., do you recognize that?

11        A.   Yes.

12        Q.   What is that?

13        A.   It's the area where the weapon was recovered.

14        Q.   Is 169 C. a larger picture encompassed within 169 B?

15        A.   Yes.

16        Q.   What angle are these maps from?

17        A.   These are aerial photos.

18        Q.   Are you familiar with this particular area?

19        A.   Yes.

20        Q.   Is this a fair and accurate representation of the

21   aerial views of this area?

22        A.   Yes.

23        Q.   I'd ask that these be moved into evidence as People's

24   exhibit 169 A, B, and C?

25             MS. GUASTELLA:   No objection.

TR

Det. Anderson - Direct - Cilia

1           THE COURT:  Okay.  Are these premarked?

2           MS. CILIA:  Yes.

3           THE COURT:  All right.  They're in evidence.

4           (So marked. )

5      Q.   Taking a look now at People's 169 A. in evidence,

6  we're going to display that on the board here.  Can you explain

7  to the jurors what this area is?

8      A.   195 Steuben Street is where the crime occurred.

9  Pierce Street that wooded area is where the weapon was found,

10 and the overpass of Mosel Avenue in that wooded area where I

11 stopped the individual.

12     Q.   Are there arrows on 169 A?

13     A.   Yes.

14     Q.   Looking now at the arrow on the top, can you tell us

15 what that is?

16     A.   The crime location.

17     Q.   And then you said that there was another arrow that

18 indicates Mosel Avenue and Pierce Street?

19     A.   Yes.

20     Q.   Now, can you explain to the jurors where you stopped

21 this individual that you saw?

22     A.   I stopped the individual on the overpass of Mosel

23 Avenue, the wooded area.

24     Q.   On the paper in front of you that's marked 169 A, can

25 you mark with a marker where you stopped this individual?

Det. Anderson - Direct - Cilia

1      A.   Yes.

2      Q.   We're going to turn that marker up to you?

3      A.   You said X?

4      Q.   Yes.  Can you show that to the jurors?

5      A.   Sure.

6      Q.   Can you point to it also for the jurors?  Okay.

7 That's going to be approximately in this area here, is that

8 correct?

9      A.   Yes.

10     Q.   I'd like you to also indicate on People's exhibit 169

11 B. the same location if you can see it on there, where you

12 stopped this individual.

13        Can you describe this location where you were driving?

14     A.   Sure it's Narrows Road North.  It's a desolate

15 location with no sidewalks.  It's a wooded area.

16     Q.   Now you were driving on a road, is that correct?

17     A.   Yes.

18     Q.   Were there any sidewalks on that road?

19     A.   No.

20     Q.   Now besides this one individual that you saw, did you

21 see any other pedestrian traffic?

22     A.   No.

23     Q.   The individual that you saw on the service road on

24 December 8, 2011, do you see this person in court?

25     A.   Yes.

000660

Det. Anderson - Direct - Cilia

1    Q.    Can you please point to this person and indicate an

2    article of clothing?

3    A.    Sure.

4            MS. CILIA:  Indicating the defendant.

5            THE COURT:  You saw him point.  I didn't hear

6    anything.  You asked him --

7            THE WITNESS:  Right here.  In the gray suit.

8            THE COURT:  Indicating the defendant.

9            MS. GUASTELLA:  It's a gray suit?

10           THE COURT:  I'm not real good at this.  Do it

11   again please, Detective.

12           THE WITNESS:  The individual right here.

13           THE COURT:  At the table?

14           THE WITNESS:  Yes with the glasses on.

15           THE COURT:  Indicating the defendant.

16   Q.    Now, Detective, are you familiar with the area between

17   Steuben Street and where you stopped the defendant?

18   A.    Yes.

19   Q.    From where you saw the defendant about how close is

20   195 Steuben Street?

21   A.    It's approximately three blocks.

22   Q.    Is this a walkable distance?

23   A.    Yes.

24   Q.    And is there, in fact, a walking path that you can

25   take between 195 Steuben Street, and where you stopped the

000661                                                                        191

                        Det. Anderson - Direct - Cilia

1    defendant?

2         A.   Yes.

3         Q.   Now, I want to go back to when you first observed the

4    defendant, you were traveling in which direction?

5         A.   I was traveling over the Verrazano Bridge on Narrows

6    Road North towards 195 Steuben Street.

7         Q.   When you were -- when you saw the defendant, can you

8    mark with an area the direction that you were traveling on the

9    exhibit in front of you?

10        A.   169 B.

11        Q.   Actually 169 A and B, if you can.

12             Detective, which way was the defendant walking in

13   relation to you.  Was he walking in the same direction or

14   opposite?

15        A.   He was walking the opposite direction.

16        Q.   Can you tell the jury what you observed when you first

17   saw the defendant?

18        A.   When I first saw the defendant he looked at me

19   nervously.  It was a male black, dark color clothing with a

20   Yankee cap on.

21             He made eye contact with me and started walking a

22   little faster away from me.

23        Q.   So let's go back for a second you said that he looked

24   nervous to you?

25        A.   Yes.

                                     TR

Det. Anderson - Direct - Cilia

1        Q.    What makes you say that he looked nervous?

2        A.    He made eye contact with me, locked eyes.  He looked

3   very sweaty, and he started walking faster away from me while I

4   was driving.

5        Q.    When you say that he looked very sweaty, are you

6   talking about his face?

7        A.    Yes.

8        Q.    This was December of 2011?

9        A.    Yes.

10       Q.    What were the weather conditions like that day?

11       A.    It was a cool day, very cool.

12       Q.    You also mentioned something about the way that he was

13   walking when you made eye contact?

14       A.    Yes.  He started walking faster away from me after he

15   made eye contact with me.

16       Q.    Did you notice anything about the defendant's shoes?

17       A.    Yes.

18       Q.    What did you notice about that?

19       A.    I noticed they were muddy.

20       Q.    Was there mud in the area?

21       A.    Yes.

22       Q.    Where was this mud?

23       A.    This mud was in the wooded area below the overpass on

24   Pierce Street and Mosel Avenue.

25       Q.    You're saying that you stopped the defendant, I'm

TR

Det. Anderson - Direct - Cilia

1    pointing at the screen, it's at Mosel and Narrows Road?

2        A.    Yes.

3        Q.    In that vicinity?

4        A.    Yes that vicinity above the overpass.

5        Q.    Then right above that there's, it appears to be a

6    wooded path on either side of the street?

7        A.    Yes.

8        Q.    Is that where you're talking about where the mud was?

9        A.    Yes.

10       Q.    There was also mud on the defendant's shoes?

11       A.    Yes.

12       Q.    Now you mentioned a little bit about what the

13   defendant was wearing.  Let's go through that for a second.

14             Can you tell us when you stopped the defendant, did

15   you have occasion to see his clothing?

16       A.    Yes.

17       Q.    Tell us what he was wearing?

18       A.    He had a Navy Yankee cap on.  He had a dark jacket on,

19   black jacket, and black jeans.

20       Q.    Now, the cap that he was wearing was that like a

21   baseball cap?

22       A.    Baseball cap, Yankee cap.

23       Q.    Now when you stopped this defendant did you step out

24   of your car?

25       A.    Yes.

Det. Anderson - Cross - Guastella

1        Q.    Was the defendant standing upright?

2        A.    Yes.

3        Q.    Can you approximate how tall the defendant was at that

4    time?

5        A.    I would say approximately 6' 5".

6        Q.    And can you also describe the defendant's demeanor

7    during your encounter?

8        A.    He was very nervous sweating, hands in his pocket.

9        Q.    Now, Detective, approximately how long after you

10   received the initial call to respond to Steuben Street did you

11   stop the defendant?

12       A.    Approximately five minutes.

13       Q.    Besides stopping this defendant did you provide any

14   other assistance in regard to this case?

15       A.    No.

16       Q.    Thank you, Detective.

17   CROSS EXAMINATION

18   BY MS. GUASTELLA:

19       Q.    Detective, congratulations are in order.  You just

20   became a detective?

21       A.    Yes.

22       Q.    After your arrest in this case?

23       A.    No.

24       Q.    About how long after?

25       A.    I became a detective October 2013.

TR

Det. Anderson - Cross - Guastella

1      Q.    You were coming back from a training class in Brooklyn

2   on this day?

3      A.    No.

4      Q.    Where were you coming from?

5      A.    I was coming back from the outdoor gun range.

6      Q.    You were with a partner?

7      A.    Yes.

8      Q.    Coming over the Verrazano Bridge?

9      A.    Yes.

10     Q.    At that point -- at some point you get a radio run

11   male, someone shot at 195 Steuben?

12     A.    Yes.

13     Q.    You go lights and sirens, right?

14     A.    Yes.

15     Q.    You're trying to get to Steuben Street as fast as

16   possible?

17     A.    Yes.

18     Q.    It's your testimony that you're passing the individual

19   walking along the service road on the street, and you guys made

20   eye contact, is that your testimony?

21     A.    Yes.

22     Q.    You had no description of any perpetrator, correct?

23     A.    No.

24     Q.    He didn't know if he was a black male, right?

25     A.    No.

1    Q.   You didn't know if he was a white male.

2    A.   No.

3    Q.   You didn't know if it was female?

4    A.   No.

5    Q.   Lights and sirens as you're driving passed him and he

6    looked nervous and you stopped him.

7    A.   Yes.

8    Q.   Can you tell me what color shirt he has on?

9    A.   Blue.

10   Q.   Did somebody tell you to say blue?

11   A.   No.

12   Q.   Can you tell me what color shirt I'm wearing?

13   A.   A gray shirt.

14   Q.   Thank you.  Nothing further, Judge.

15            THE COURT:  Anything else?

16            MS. CILIA:  Nothing further.

17            THE COURT:  You're free to step out.

18            MS. CILIA:  People are calling Officer Anthony

19       Jacobs.

20   POLICE OFFICER ANTHONY JACOBS, 8853, ESU K-9 Unit, the witness

21   herein, having been first duly sworn, was examined and testified

22   as follows:

23   DIRECT EXAMINATION

24   BY MS. CILIA:

25   Q.   How long have you been with the NYPD?

PO Jacobs - Direct - Cilia

1    A.   Almost 20 years -- 19 years.

2    Q.   You are currently working in the K-9 Unit?

3    A.   Yes.

4    Q.   How long have you been working there?

5    A.   A little more than seven years.

6    Q.   How did you get involved with that unit?

7    A.   I applied for it.

8    Q.   That's a job that you wanted to take?

9    A.   Yes.

10   Q.   Can you explain to the jurors what the K-9 Unit does?

11   A.   We do patrol work, which is apprehension work,

12   tracking and evidence searches.

13   Q.   Can you briefly describe what those different things

14   are that you just mentioned?

15   A.   Patrol is apprehensions where find perpetrator's stuff

16   like that, tracking for missing people, and evidence article

17   searches.

18   Q.   Now, when you're assigned to the K-9 Unit, are you

19   assigned a partner?

20   A.   Yes.

21   Q.   When you're in the K-9 Unit who would your partner be?

22   A.   My K-9, Storm.

23   Q.   You mentioned that you are assigned to a particular

24   K-9?

25   A.   Yes.

PO Jacobs - Direct - Cilia

1    Q.   That's Storm?

2    A.   Yes.

3    Q.   Is that the original partner that you had when you

4    came to the unit?

5    A.   Yes.

6    Q.   Is that still your partner today?

7    A.   Yes, it is.

8    Q.   What kind of dog is Storm?

9    A.   German Shepard.

10   Q.   Does he have any specialized training?

11   A.   Yes, he does.

12   Q.   Explain?

13   A.   Patrol tracking and evidence.

14   Q.   Is Storm certified in any way?

15   A.   Yes, he is.

16   Q.   Can you explain that?

17   A.   We take a test every three years for the state.

18   Q.   This test is it, you said every three years?

19   A.   Yes.

20   Q.   Has Storm ever failed a certification?

21   A.   No.

22   Q.   Was Storm certified as of December 8, 2011?

23   A.   Yes.

24   Q.   Still certified today?

25   A.   Yes, he is.

PO Jacobs - Direct - Cilia

1     Q.   I want to direct your attention to December 8 of 2011,

2    were you working that day?

3     A.   Yes, I was.

4     Q.   What hours were you scheduled to work?

5     A.   1400 by 2235.

6     Q.   That's the afternoon?

7     A.   Yes, it is.

8     Q.   Starting at?

9     A.   2 o'clock.

10    Q.   Okay.  That afternoon were you and your partner Storm

11   called to a job?

12    A.   Yes, I was.

13    Q.   What was that job?

14    A.   Evidence search.

15    Q.   Was there a particular location?

16    A.   May I refer to my memo book?

17         THE COURT:  Yes.

18    A.   195 Steuben Street.

19    Q.   Did you respond to this location?

20    A.   Yes, I did.

21    Q.   That's here in Staten Island?

22    A.   Yes, it is.

23    Q.   About what time did you arrive?

24    A.   Approximately 1528, 3:28 p.m.

25    Q.   Did you meet with any members of the NYPD when you

TR

PO Jacobs - Direct - Cilia

1   arrived?

2       A.   I did, yes.

3       Q.   When you arrived at Steuben Street were you directed

4   to another location?

5       A.   Yes, I was.

6       Q.   Where was that?

7       A.   Corner of Mosel and Pierce.

8       Q.   Again that's here in Staten Island?

9       A.   Yes, it is.

10      Q.   Why that particular location?

11      A.   That's where somebody was arrested possible evidence

12  may be.

13      Q.   Did you respond to this location?

14      A.   Yes.

15      Q.   About what time did you arrive?

16      A.   Approximately 1645, 3:45 p.m.

17      Q.   I want to show you what's already in evidence as

18  People's Exhibit 169 B and C.

19           Starting with 169 B., do you recognize that?

20      A.   Yes.

21      Q.   That's also on our screen here.  What can you tell us

22  about this particular picture?

23      A.   This is the location where I deployed my canine.

24      Q.   Where specifically did you deploy your canine?

25      A.   Clearing area on both sides of the sound barrier next

TR

1  to the highway.

2      Q.   Can you circle around the exhibit in front of you?

3           Can you show that to the jury, can you point to it

4  also.

5           So we're talking about, on the screen here, we're

6  talking about these wooded areas over here?

7      A.   The topside.

8      Q.   This over here?

9      A.   Yes.

10     Q.   This is where you deployed your canine?

11     A.   Correct.

12     Q.   Now let's move on to 169 C., again from that what can

13 you tell us about that particular area?

14     A.   This is the same where I deployed my canine, both

15 sides of the sound barrier.

16     Q.   What else can you tell us about that particular

17 picture?

18     A.   My canine alerted us on a bag hidden on leaves.

19     Q.   Can you describe the area around Pierce and Mosel and

20 that you and your partner were searching?

21     A.   Wooded area it was full, so there where is leaves on

22 the ground.

23     Q.   Prior to searching did you know what specifically you

24 and your partner were looking for?

25     A.   No.

PO Jacobs - Direct - Cilia

1      Q.   Did you have a description of any particular type of

2   property?

3      A.   No.

4      Q.   Can you explain to the jurors how you and your partner

5   conducted the search of this particular area?

6      A.   I deploy my dog.  I give him a command to go look for

7   something with human scent on it, and he goes out and alerts

8   either by scratching or digging.

9      Q.   Do you accompany Storm on these searches or does he go

10  on his own?

11     A.   A company him.

12     Q.   Is he on leash or off leash?

13     A.   Depends on the circumstances.  At this time he was off

14  leash.

15     Q.   This type of search, an evidence search, what is Storm

16  trained for?

17     A.   Anything with human scent on it.

18     Q.   You mentioned that Storm indicated that he had located

19  something?

20     A.   Yes.

21     Q.   How did he make this indication?

22     A.   Digging and scratching.

23     Q.   Where was he digging and scratching?

24     A.   In a pile of leaves.

25     Q.   Looking at People's exhibit 169 C. in front of you,

PO Jacobs - Direct - Cilia

1    can you please circle where Storm is digging and scratching?

2            Can you show that to the jurors.

3            So you're indicating approximately and pointing now to

4    what's on screen?

5       A.   More behind the houses.

6       Q.   Back behind here?

7       A.   Yes.

8       Q.   So in this vicinity over here?

9       A.   Yes.

10      Q.   Now, where did you go when Storm made this indication?

11      A.   I went to my canine.

12      Q.   When you got there, what did you see?

13      A.   Pile of leaves with something under it.

14      Q.   Now, I would like to show you what's in evidence.   I'm

15   going to hand them up now, People's exhibit 100 and 105.

16           And we're going to start with People's exhibit number

17   100.

18           Starting with the exhibit in front of you People's

19   exhibit number 100, can you explain what's depicted in this

20   photo?

21      A.   It's just a bag and then a pathway where the bag was

22   located.

23      Q.   Is this the particular bag that Storm located on

24   December 8th of 2011?

25      A.   Yes, it is.

PO Jacobs - Direct - Cilia

1       Q.   Now when you first saw this bag was it -- you said
2   something was covering it?

3       A.   Yes, there was leaves on top of it.

4       Q.   Now this photo it appears to be dark out, is that
5   right?

6       A.   Yes.

7       Q.   When you and Storm found this duffel bag what were the
8   lighting conditions?

9       A.   It was daylight.

10      Q.   Now I'd like to go on to People's exhibit number 105.
11  Do you recognize this?

12      A.   Yes, I do.

13      Q.   What is that?

14      A.   That's the bag.

15      Q.   Now, when you and Storm first found this black and
16  gray duffel back was it open or closed?

17      A.   Closed.

18      Q.   Was it opened in your presence?

19      A.   Yes, it was.

20      Q.   Can you explain that?

21      A.   I notified Detective Guariano of the bag and he opened
22  it.

23      Q.   Was Detective Guariano also at the scene?

24      A.   Yes, he was.

25      Q.   After Storm and you located the bag you called

PO Jacobs - Direct - Cilia

1   Detective Guariano over?

2       A.   Yes.

3       Q.   So he was the one who opened the bag?

4       A.   Yes.

5       Q.   And did you ever see the contents of this bag?

6       A.   Yes.

7       Q.   To what extent did you see it?

8       A.   I saw a firearm inside and also a towel I think was in

9   there.

10      Q.   Was anything removed from the bag?

11      A.   No.

12      Q.   In your presence?

13      A.   Not in my presence.

14      Q.   So Detective Guariano opened the bag and you both

15  looked inside?

16      A.   Yes.

17      Q.   After recovering this bag did there come a time that

18  you left the black and gray duffle bag?

19      A.   Yes.

20      Q.   At that point had the bag been removed physically?

21      A.   No.

22      Q.   Was it safeguarded by a member of the NYPD?

23      A.   Yes.

24      Q.   Over besides what we've discussed here today, did you

25  have any other involvement with this homicide investigation?

PO Jacobs - Direct - Cilia

1    A.    No.

2    Q.    Thank you.

3              (At this time, Maurizia Selleck relieves Tammy

4    Rodriguez as the court reporter.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

People - P.O. Jacobs - Cross

1          MS. GUASTELLA:  May I, your Honor?

2          THE COURT:  Okay.

3     CROSS-EXAMINATION

4     MS. GUASTELLA:

5          Q.   Officer, are all the K9 made up of the K9 dog and

6     partner?

7          A.   Yes.

8          Q.   Except the K9.

9          A.   Correct.

10         Q.   And all the K9 training is at the range?

11         A.   Correct.

12         Q.   And you go through the training with the dog?

13         A.   Correct.

14         Q.   In fact, when you certify, it's pretty intense to get

15    recertified, correct?

16         A.   Not intense.

17         Q.   Do you take -- Well, when you first get the dog, you

18    go through about 300 hours of training?

19         A.   Correct.

20         Q.   And you take the training through the Municipal Police

21    Training Council, correct?

22         A.   Correct.

23         Q.   And that's over 300 hours of training?

24         A.   A little more than that; 360 for just patrolling.

25         Q.   And there is a lot of different areas that you and the

MMS

People - P.O. Jacobs - Cross

1      K9 have to do before you guys would become a team, correct?

2          A.    Correct.

3          Q.    And the K9 has to pass all the different aspects of

4      the program, right?

5          A.    Correct.

6          Q.    And in addition to what you indicated, obedience,

7      right?

8          A.    Correct.

9          Q.    Agility?

10         A.    Correct.

11         Q.    Building searches?

12         A.    Correct.

13         Q.    Area searches?

14         A.    Correct.

15         Q.    And the dog has to be able to actually want to go do

16     those things, correct?

17         A.    Correct.

18         Q.    Otherwise he is unable to be part of a team, correct?

19         A.    Correct.

20         Q.    And part of the things that the dog -- to become part

21     of the team to be trained is not just the unit scents, but it's

22     also classic credit cards?

23         A.    I'm sorry?

24         Q.    Plastic credit cards?

25         A.    What's that?

People - P.O. Jacobs - Cross

1    Q.   Credit card.

2    A.   I don't understand the question.

3    Q.   Could you tell us when the -- The part of the training

4    where the dog is taught to recover different items, can you

5    describe that?

6    A.   We heat up an article, somebody shows the dog an

7    article, it could be anything, and we hide it and the dog finds

8    it.

9    Q.   Okay.  And the dog has recovered many things, such as

10   matchbook covers?

11   A.   Everything.

12   Q.   Bullets?

13   A.   Anything, correct.

14              MS. GUASTELLA:  Thank you, Judge.  I have nothing

15       further.

16              THE COURT:  Do you take the dog home with you

17       after your tour?

18              THE WITNESS:  Yes, sir.

19              THE COURT:  You do?

20              THE WITNESS:  Yes, sir.

21              THE COURT:  I was just wondering.

22              MR. REEVES:  We wanted to bring the dog in.  We

23       didn't know if you wanted to.

24              THE COURT:  Any redirect?

25              MS. CILIA:  No.

People - P.O. Jacobs - Cross

1          THE COURT:  Thank you, Officer.  You're excused,
2    you're free to step out.
3          (Witness excused.)
4          THE COURT:  Next witness?
5          (Whereupon, a discussion is held at the bench off
6    the record.)
7          THE COURT:  We are going to take a short break,
8    members of the jury, while we get the next witness into the
9    courthouse.  So, I'll try to keep it to ten minutes.
10   You're free to step out.  Don't discuss the case.  Thanks
11   for your attention.
12         (Whereupon, the jury exits the courtroom.)
13         THE COURT:  Okay.  The jury has left.
14         Det. Patterson, what is he?
15         MS. CILIA:  He's the case detective.
16         THE COURT:  He's going to be a while?
17         MS. CILIA:  We'd like a few minutes with him to
18   show him the video that's now in evidence.
19         THE COURT:  What's a few minutes?  Which video?
20   The Ferry?
21         MS. CILIA:  Yes.
22         THE COURT:  All right.  Well, do it as quickly as
23   you can, I told the jury ten minutes.  I don't think that's
24   going to work.  Keep in mind we have to break at five to
25   one.

MMS

People - Vitale - Direct/Reeves

1          We'll second call the case, and do what you can

2     as quickly as you can.  Thanks.

3          (Whereupon, a brief recess is taken.)

4          THE COURT CLERK:  The judge said tell the jury

5     come back at 2 o'clock.

6          (Whereupon, a luncheon recess is taken.)

7          THE COURT CLERK:  Case on trial continues: Armand

8     Skrine, 454/2011.

9          THE COURT OFFICER:  Your Honor, ready for the

10    jury?

11         THE COURT:  Yes.

12         (Whereupon, the jury enters the courtroom.)

13         THE COURT CLERK:  Do both sides stipulate the

14    presence of a complete jury panel, properly seated?

15         People?

16         MR. REEVES:  Yes.

17         THE COURT CLERK:  Defense?

18         MS. GUASTELLA:  So stipulated.

19         THE COURT:  Next witness, please.

20         MR. REEVES:  People call James Vitale.

21    J A M E S   V I T A L E, having been called as a witness on

22    behalf of the People, having been duly sworn by the clerk

23    of the court, was examined and testified as follows:

24         THE COURT CLERK:  State your name.

25         THE WITNESS:  James Vitale.

People - Vitale - Direct/Reeves

1          THE COURT CLERK:  And the county of residence.

2          THE WITNESS:  The county of residence, Staten

3     Island.

4          THE COURT CLERK:  Thank you.

5          THE COURT:  Members of the jury, Mr. Vitale's

6     name was not read to you from that witness list when you

7     were selected.  Do any of you know him?

8          (No response.)

9          THE COURT:  Nobody does.  Good.

10         Proceed, please.

11         MR. REEVES:  Thank you, your Honor.

12    DIRECT EXAMINATION

13    BY MR. REEVES:

14    Q.   Good afternoon, Mr. Vitale.  How are you?

15    A.   Good.  Yourself?

16    Q.   I'm good, thank you.

17         Would you start off telling the jury who you work for.

18    A.   New York City Department of Transportation.  I'm the

19    director -- assistant director of security.

20    Q.   And as assistant director of security, what kind of

21    things are you responsible for doing?

22    A.   Safety of the passengers and the workers at the Staten

23    Island Ferry.

24    Q.   Now, do you work at Staten Island or in Manhattan?

25    A.   I work in Manhattan, sir.

MMS

000683

213

People - Vitale - Direct/Reeves

1    Q.    And as part of your duties and responsibilities as

2    assistant director of security, do you also oversee the

3    security camera system in the Whitehall station?

4    A.    Yes, sir.

5    Q.    Can you tell us, approximately how many cameras does

6    Whitehall have?

7    A.    I believe we're up to 143 now.

8    Q.    143?

9    A.    Yes, sir.

10   Q.    And do those cameras record the images?

11   A.    Yes.

12   Q.    Now, what I'd like to do is to fast-forward to

13   December 9th of 2011.  Do you recall getting, as a member of

14   the Department of Transportation, a request from the New York

15   City Police Department to download some video footage from

16   December 8, 2011, between 9 o'clock to 10 o'clock in the

17   morning?

18   A.    Yes, sir.

19   Q.    And was that done?

20   A.    Yes, it was.

21   Q.    What I'd like to do is hand up to you what's been

22   premarked as People's 170.

23         Mr. Vitale, do you recognize People's 170 for

24   Identification?

25   A.    Yes, I do.

MMS

People - Vitale - Direct/Reeves

1        Q.    What do you recognize that to be?

2        A.    That is the CD that we provided to the Police

3    Department.

4        Q.    Now, did you have a chance prior to coming to court

5    today to view the contents of that disk in my office at

6    130 Stuyvesant?

7        A.    Yes, sir.

8        Q.    And after you got done looking at it in my office, did

9    you put your initials and date on that disk?

10       A.    Yes, I did, to verify it, sir, it was mine.

11       Q.    The contents that are downloaded on that disk, do they

12   fairly and accurately reflect what was recorded on four of the

13   143 cameras on December 8, 2011?

14       A.    Yes, sir.

15              MR. REEVES:   Your Honor, I offer in evidence

16         People's 170.

17              MS. GUASTELLA:   No objection.

18              THE COURT:   All right, 170 is in evidence.

19              (Whereupon, People's Exhibit 170 is received in

20         evidence.)

21              MR. REEVES:   With the Court's permission, if I

22         can have the disk.

23       Q.    Mr. Vitale, I'm going to show you the four different

24   camera angles and I'm going to ask you some questions about

25   them, if I could.

People - Vitale - Direct/Reeves

1      A.   Okay.

2      Q.   Mr. Vitale, can you tell us what angle is being played

3   now?

4      A.   Okay, you're looking at the entrance to the terminal

5   to the escalators that head to the waiting room.

6      Q.   And it's got a date and a time stamp on it.  Is that

7   date and time stamp accurate, to the best of your knowledge?

8      A.   Yes, it is.

9      Q.   Mr. Vitale, I'm going to switch to the one that's

10  labeled Waiting Room.  Can you tell me what angle we're looking

11  at in this?

12     A.   That's just after you get off the escalators and

13  you're entering the people counters into the waiting area.

14     Q.   Now, those people counters, are they magnetometers as

15  well?

16     A.   No.

17     Q.   So, once you leave the escalator, you'd walk through

18  the people counters and then you'd be in the general waiting

19  room?

20     A.   Yes, sir.

21     Q.   Now I'm going to show you the camera from what's

22  marked as Loading Doors.  Can you explain to us what we're

23  looking at?

24     A.   You're looking at slip number 1, the rear shot of

25  loading doors which head to the boat that was pulling into that

MMS

People - Vitale - Direct/Reeves

1  slip at that time.

2      Q.   Now, do the boats leave on a schedule?

3      A.   Yes, sir.

4      Q.   So, if the date stamp is December 8, 2011, at 9:11 in

5  the morning, what time would the next ferry be scheduled to

6  leave on a Thursday?

7      A.   9:15.

8      Q.   Finally I'm going to show you the fourth image, which

9  is marked Ferry Terminal.  And if you can tell me, Mr. Vitale,

10  what we're looking at here.

11     A.   Okay.  You're looking at the front side of the loading

12  doors now from the slip headed to the boat.

13     Q.   And, again, this would be for the 9:15 in the morning

14  Ferry, correct?

15     A.   That's correct.

16     Q.   Mr. Vitale, other than providing the camera footage

17  from those four cameras to the Police Department on December 9,

18  2011, did you have any other involvement in this case?

19     A.   Negative.

20     Q.   Thank you, sir.

21         MR. REEVES:  I have no further questions, your

22     Honor.

23             (Pause in the proceedings.)

24         MS. GUASTELLA:  Oh, I'm so sorry.  I have no

25     questions.

MMS

People - Vitale - Direct/Reeves

1          THE COURT:  Oh.

2          MS. GUASTELLA:  I apologize.

3          THE COURT:  I thought you were working on

4     something.

5          MS. GUASTELLA:  No.  I apologize.

6          THE COURT:  Mr. Vitale, you're excused, you're

7     free to step out.

8          THE WITNESS:  Thank you, sir.

9          (Witness excused.)

10          THE COURT:  Next witness, please.

11          MS. CILIA:  The People call Det. Edward

12     Patterson.

13          THE COURT OFFICER:  Your Honor ready for the

14     witness?

15          THE COURT:  Yes.

16   D E T.   E D W A R D   T.   P A T T E R S O N, bearing shield

17     number 6786, assigned to the 121 Precinct Detective Squad,

18     having been called as a witness on behalf of the People,

19     having been duly sworn by the clerk of the court, was

20     examined and testified as follows:

21          THE COURT CLERK:  State your name, shield number,

22     and command for the record, please.

23          THE WITNESS:  Certainly.  Detective Edward T.

24     Patterson, shield number 6786, of the 121 Detective Squad.

25          MS. CILIA:  May I inquire?

People - Det. Patterson - Direct/Cilia

1              THE COURT:  Yes.

2     DIRECT EXAMINATION

3     BY MS. CILIA:

4        Q.   Detective, approximately how long have you been with

5     the NYPD?

6        A.   22 years and 2 months.

7        Q.   And can you please tell the jury where you've worked

8     throughout your career with the NYPD.

9        A.   Certainly, ma'am.

10            I was assigned as a police officer in the 67 Precinct

11    in Brooklyn, the 30 Precinct in Manhattan, the Citywide Street

12    Crime Unit.  I was promoted to detective and assigned to the 40

13    Precinct Robbery Apprehension Module in the Bronx, the 40

14    Precinct Detective Squad, the 41 Precinct Detective Squad, the

15    Bronx Special Victims Squad, briefly at the Chief of

16    Detective's Office on Detective Borough Staten Island, the 122

17    Detective Squad, the 120 Detective Squad, and now currently the

18    121 Detective Squad.

19       Q.   Detective, can you tell the jury what it means to be a

20    case detective?

21       A.   Yes, ma'am.

22            When you are the case detective, you are the

23    individual investigator tasked with marshaling all of the

24    investigatory steps: the interviews, the searches, the

25    canvasses, the evidence; all things of that nature.

000689                                                                            219

People - Det. Patterson - Direct/Cilia

1        Q.   Now, specific to a homicide investigation, what types

2   of responsibilities does a case detective hold?

3        A.   Pursuant to a homicide investigation, the case

4   investigator -- the case detective from the get-go will be

5   responding to the scene.  He'll document the notification of

6   the incident, whether it's from the desk officer, central

7   radio, units in the field.  He will respond to the location.

8   If the victim remains on the scene, he will examine the victim.

9   If the victim is removed to the hospital, he or other

10  detectives will be delegated to go to the hospital, check on

11  condition, confer with physicians.  He will confer with various

12  members of supervision regarding the investigative steps that

13  they want done.  He will generally ascertain which detectives

14  are performing which tasks: canvasses, obtaining of evidence,

15  processing of crime scene, searches for evidence; things of

16  that nature.

17       Q.   Now, Detective, you just mentioned that more than one

18  officer are tasked with different responsibilities; is that

19  correct?

20       A.   Yes, ma'am.  In the case of a homicide investigation,

21  it's what we refer to as an all-hands event.  All detectives

22  working in this borough particularly, all of the detectives

23  working that day will respond to the location and assist in the

24  investigation.

25       Q.   As the case detective, is it the case detective who is

People - Det. Patterson - Direct/Cilia

1    responsible for the overseeing of these tasks?

2        A.    That is correct.

3        Q.    On December 8th of 2011, were you assigned to

4    investigate a homicide that occurred in Staten Island?

5        A.    Yes, ma'am, I was.

6        Q.    And what day of the week was that?

7        A.    That was the Thursday.

8        Q.    And what were the weather conditions?

9        A.    It was clear.  The sky was clear.  It was cool for a

10   December day; not cold, but cool.

11       Q.    What was your role in that investigation?

12       A.    I was assigned as the case investigator, the case

13   detective.

14       Q.    Did you learn the name of the deceased victim in this

15   case?

16       A.    I did, ma'am.

17       Q.    Who was that?

18       A.    David Williams.

19       Q.    As part of this investigation, did you visit the crime

20   scene?

21       A.    I did, ma'am.

22       Q.    Where was that?

23       A.    195 Steuben Street.

24       Q.    And when did you visit?

25       A.    I visited immediately when the report of the incident

MMS

People - Det. Patterson - Direct/Cilia

1    had been broadcast over central radio.

2        Q.   Tell us what you observed when you got there.

3        A.   Yes, ma'am.

4            The victim, David Williams, was lying prone, facedown,

5    on the hallway floor.  The door to the apartment was open.

6    There was skull fragments and brain matter a good distance down

7    the hallway, and there was a tremendous amount of blood around

8    the victim.

9        Q.   You mentioned that the door was open?

10       A.   Yes, ma'am.  The apartment door was open.  The

11   apartment appeared to have -- it appeared that a struggle had

12   occurred inside the apartment.

13       Q.   What makes you say that?

14       A.   There were -- Items were turned over: chairs, tables,

15   things of that nature.

16       Q.   Now, can you tell the jury what was done to

17   investigate this particular homicide and also what the results

18   were of those tools?

19       A.   Yes, ma'am, I can.

20           The crime scene was examined by myself and then

21   processed by detectives from the Crime Scene Unit.  Forensic

22   evidence was obtained and sent to the laboratory for analysis.

23   A canvass of the building was conducted.  By that I mean every

24   door in the apartment building itself was knocked on.  The

25   route of -- What we believe the route of egress of the

People - Det. Patterson - Direct/Cilia

1    perpetrator we canvassed along that route between the location

2    and where the perpetrator was apprehended knocking on doors to

3    see if anyone had witnessed the perpetrator leaving the scene

4    or to ascertain if there was any video surveillance footage

5    available.

6        Q.   Was there any video surveillance available?

7        A.   There was not, ma'am.

8        Q.   You mentioned the collection of some forensic

9    evidence.  And you said that some things were sent to the lab?

10       A.   That is correct.

11       Q.   Including what?

12       A.   A assault rifle, AK-47 type; shell casings; articles

13   of clothing; a large bag.

14       Q.   Do you know whether anything was sent to the latent

15   print section of the lab?

16       A.   I do, ma'am.  A latent print was recovered in the

17   7th floor hallway area.

18       Q.   And was this fingerprint investigated?

19       A.   It was.

20       Q.   Who did it belong to?

21       A.   An individual by the name of Samuel Nelson.

22       Q.   Was Samuel Nelson ever a suspect in this

23   investigation?

24       A.   He was not, ma'am.

25       Q.   Why not?

People - Det. Patterson - Direct/Cilia

1     A.   Because he resides within the building.

2     Q.   Do you have a description of this individual?

3     A.   I do.  Samuel Nelson is a male black, 5'7" tall,

4   approximately 170 pounds.

5     Q.   During the course of your investigation, Detective,

6   did you review any Ferry video from the morning of December 8th

7   of 2011?

8     A.   I did, ma'am.

9     Q.   Why did you do that?

10    A.   I did that because we believe that was how the

11  perpetrator arrived at the crime scene.

12    Q.   I'd like to show you what are already in evidence as

13  People's Exhibits Number 168 and 170 and just ask you,

14  Detective, whether you recognize these.

15    A.   They are marked as the disks of the ferry video

16  surveillance footage obtained that day.

17    Q.   And have you had an opportunity to watch those videos?

18    A.   I have had, yes, ma'am.

19    Q.   And I'd now like to show you what's been premarked

20  People's Exhibits Number 171-A through G.

21         Detective, taking a look at these, do you recognize

22  them?

23    A.   I do, ma'am.

24    Q.   What are they?

25    A.   They are photographs -- They are still images taken

People - Det. Patterson - Direct/Cilia

1  from the video that I viewed of both sides of the ferry

2  terminal.

3      Q.   Okay.  So, they're exact stills from the videos that

4  you watched?

5      A.   They appear to be, yes, ma'am.

6      Q.   Have they been altered in any way?

7      A.   They do not appear to be, no.

8          MS. CILIA:  I would ask that these be moved into

9      evidence as People's Exhibits Number 171-A through G.

10         MS. GUASTELLA:  No objection.

11         THE COURT:  That was A through what?

12         MS. CILIA:  G.

13         THE COURT:  G?  I just didn't hear you.

14         MS. CILIA:  Yes.

15         THE COURT:  A through G, all right, they're in

16     evidence.

17         (Whereupon, People's Exhibits 171-A through G are

18     received in evidence.)

19         THE COURT OFFICER:  So marked, your Honor.

20     Q.   Detective, before we start looking at those still

21  photos, did you -- when you watched the video from the morning

22  of December 8th of 2011, did you watch it on one side of the

23  ferry or both sides of the ferry?

24     A.   Both sides, ma'am.

25     Q.   And did you notice anything of interest to you?

People - Det. Patterson - Direct/Cilia

1    A.    I did.

2    Q.    And what was that?

3    A.    An individual appears in the images, a tall fellow

4  wearing a dark jacket, gray hooded sweatshirt, carrying a large

5  gray and black bag.

6    Q.    Now, I'd like to start with 171-A which we are also

7  going to put on the board here, and I'd also like to also just

8  give a marker to the detective.

9          Detective, is there anything of interest to you in

10 People's 171-A?

11   A.    Yes, ma'am.  The individual between the metal

12 barricade entrance and the column wearing the dark colored

13 jacket, gray hooded sweatshirt, and carrying the gray and black

14 bag.

15   Q.    I'd ask you to circle it on your paper version of

16 that, and then I am going to point towards that image and ask

17 you, is that the individual that is of interest to you?

18   A.    It is, in fact, ma'am.

19   Q.    And why specifically that -- what interests you about

20 that particular individual?

21   A.    The individual pictured is wearing the clothing that

22 the defendant was apprehended with.

23   Q.    Now, let's move onto 171-B.  I am going to ask you the

24 same question:  Does anything interest you in this particular

25 still photo?

MMS

People - Det. Patterson - Direct/Cilia

1    A.   Yes, ma'am.  There is an individual facing away from

2    the camera, toward the door, underneath the E in the word

3    Terminal, wearing a dark colored jacket, a lighter gray hooded

4    sweatshirt, and carrying a gray and black bag.

5    Q.   I ask you to circle it on your exhibit and then I am

6    going to -- I'm pointing now towards the individual on the

7    left-hand side of the screen.  Is that the individual that is

8    of interest to you?

9    A.   It is.

10   Q.   Okay.  Again, if you could just tell us why.

11   A.   Yes, ma'am.  Again, he's wearing the clothing that the

12   defendant was apprehended with.

13   Q.   Is he carrying anything?

14   A.   He is carrying a large bag.

15   Q.   Now, the first two photos that we've just looked at,

16   can you tell us what side of the ferry that's from?

17   A.   I can, ma'am.  That is the Manhattan side of the ferry

18   terminal.

19   Q.   Okay.  And now we're going to move on to 171-C.

20   A.   Yes, ma'am.

21   Q.   Where does this photo -- Where does this still come

22   from?

23   A.   That's the ramp between the ferry terminal and the

24   bus -- bus area where the -- How would you describe it?  The

25   place where the buses pick people up at the top of the ramp.

People - Det. Patterson - Direct/Cilia

1    Q.    Okay, so the Staten Island side, outside the building,
2    in the bus area?
3    A.    That is correct.  Heading toward the bus area.
4    Q.    And does anything interest you in this particular
5    still?
6    A.    Yes, ma'am.  The same individual wearing the dark
7    colored clothing and carrying the large bag is present on the
8    mid right side of the photograph.
9    Q.    Moving on now to 171-D, same question:  What, if
10   anything, interests you in this still?
11   A.    The same individual, ma'am, appears further up the
12   ramp, walking toward the bus area; again, you could see the
13   large bag and the dark clothing.
14   Q.    Can you describe what the bag looks like?
15   A.    It appears to be a large hockey-type bag, a large
16   duffle, with a shoulder strap.
17   Q.    And you mentioned a gray sweatshirt; is that correct?
18   A.    I did, ma'am.
19   Q.    How is that being worn in this photo?
20   A.    It's being worn with the hood up and apparently a
21   baseball cap underneath.
22   Q.    So you also see a baseball cap?  Is that another
23   still?
24   A.    Yes, ma'am.  In 171-C the brim of a baseball cap is
25   clearly visible.

000698                                                                                    228

People - Det. Patterson - Direct/Cilia

1      Q.   Okay.  And we have that up now.  What color is that

2   brim?

3      A.   It appears black, ma'am.

4      Q.   We'll move on now to 171-E.  And, what, if anything,

5   interests you in this still?

6      A.   The same individual appears in the middle row next to

7   the railing, again, with the dark colored clothing, the lighter

8   sweatshirt, and the very large bag.

9      Q.   And where does this still depict?

10      A.   It's immediately before the bus ramp where the buses

11   embark -- the buses embark passengers after them leaving the

12   terminal and walking up the ramp.

13      Q.   Can you describe the duffel bag that you see in this

14   photo -- in this still, rather?

15      A.   Yes, ma'am.  It appears to be gray and black in color,

16   it has a large shoulder strap, and it appears that there's some

17   object within in giving it shape.

18      Q.   Let's move on now to 171-F.  If you can just describe

19   that scene for us.

20      A.   Yes, ma'am.  Again, it's the individual in dark

21   clothing with the lighter sweatshirt.  The gray of the bag is

22   clearly visible, as is the shoulder strap, and it seems that

23   it's on the person's right-hand side.

24      Q.   And is this in the same general vicinity as the last

25   still that we just looked at?

1      A.   It's a few paces beyond where he was, yes, ma'am.  He

2  appears to have adjusted the bag from behind him to his right

3  side.

4      Q.   And let's now move on to 171-G.

5      A.   Yes, ma'am.

6      Q.   What, if anything, interests you in this -- First of

7  all, tell us where this is.

8      A.   That is the bus pickup area, ramp, if you will.  The

9  same individual from the other photos appears on the far left,

10  again, with the bag, the lighter colored gray sweatshirt, and

11  the dark jacket.

12      Q.   And I'm just going to ask you -- I'm pointing now

13  toward the left-hand lower section of the screen.  Is that the

14  individual who interests you?

15      A.   That is, in fact, yes, ma'am.

16      Q.   Okay.  Now, you mentioned that a gray sweatshirt was

17  of interest to you.

18      A.   Yes, ma'am.

19      Q.   I'd like to show you what's in evidence as People's

20  Exhibit 109.  I'll also turn up at this time People's

21  Exhibit 124.

22           Looking first at People's Exhibit 109.  I wanted to

23  ask you whether you recognize this.

24      A.   I do.

25      Q.   What is it?

MMS

People - Det. Patterson - Direct/Cilia

1      A.   It's the large gray and black duffel bag that was
2    recovered.
3      Q.   Is that People's 124 or People's 109?
4      A.   Oh, I'm sorry, I misheard the numbers.  You were --
5    Yes, I apologize.  109 is a light-gray-colored hooded
6    sweatshirt.
7      Q.   And where was that recovered from?
8      A.   That was recovered with the bag, ma'am.
9      Q.   Okay.  And now moving on to People's 124.  I want to
10   ask you if you recognize this.
11     A.   I do.
12     Q.   What is it?
13     A.   It's a large gray and black duffel bag with a shoulder
14   strap.
15     Q.   What, if anything, can you tell us about these two
16   items in relation to the items that we were just talking about
17   on the stills?
18     A.   They appear to be the same items that are carried by
19   the individual in the still photo images taken from the Ferry
20   video from both sides.
21     Q.   Detective, approximately how many members of the NYPD
22   were deployed to help investigate David's death?
23     A.   Inclusive of supervision, ma'am, approximately 30
24   individuals.
25     Q.   And did you arrest anyone in connection with this

MMS

People - Det. Patterson - Direct/Cilia

1    homicide investigation?

2        A.   I did, in fact.

3        Q.   And who is that?

4        A.   I arrested Armand Skrine.

5        Q.   And do you see this person in court today?

6        A.   Yes, ma'am, I do.

7        Q.   Can you please point to this individual and indicate

8    an article of clothing?

9        A.   Yes, ma'am.

10           He's the gentleman, the African American gentleman,

11   seated at the defense table, wearing the olive-colored

12   pinstripe-ish suit with a blue shirt and a yellow-and-blue

13   striped tie.

14           MS. CILIA:  Indicating the defendant, your Honor.

15           THE COURT:  Very well.

16       Q.   Detective, where -- at approximately what time did you

17   arrest this defendant?

18       A.   Approximately -- I have to refresh my recollection for

19   the exact time, but approximately 0600 hours on the 9th of

20   December.

21       Q.   And during the time of the arrest, did you have an

22   opportunity to view the defendant's demeanor?

23       A.   I did.

24       Q.   And what was his demeanor?

25       A.   He was stoic.  He was emotionless.

People - Det. Patterson - Direct/Cilia

1    Q.   Now, Detective, can you explain to the jury what

2    pedigree information is?

3    A.   I can.

4         Pedigree information is that information which

5    describes an individual, consisting normally of name, date of

6    birth, address, height, weight, hair color, eye color; all the

7    things you would find on identification for the driver's

8    license.

9    Q.   And is this -- Is pedigree information something that

10   you would obtain during arrest processing?

11   A.   Yes, ma'am.

12   Q.   Did you receive -- Did you obtain pedigree information

13   with reference to this defendant?

14   A.   I did.

15   Q.   And where was the defendant living at the time of his

16   arrest?

17        THE COURT:  Did you receive pedigree from the

18   defendant?

19        THE WITNESS:  I don't recall, your Honor.

20        MS. GUASTELLA:  Can we approach at sidebar?

21        THE COURT:  Yes.

22        (Whereupon, a discussion is held at the sidebar

23   off the record.)

24        THE COURT:  We've had a sidebar conference.  I

25   think the DA is going to ask another question.

People - Det. Patterson - Direct/Cilia

1    Q.   Detective, did you have an opportunity to observe the

2    defendant while he was standing up?

3    A.   I did.

4    Q.   About how tall would you estimate he is?

5    A.   I would say he's about 6'7" tall.

6    Q.   How tall are you?

7    A.   I'm 6'4" tall, ma'am.

8    Q.   And could you just give an approximation between your

9    height and the defendant's height?

10   A.   The defendant was looking down at me.  He's taller

11   than I am.  When I say 6'7", it's an approximation based upon

12   my height.

13   Q.   And can you approximate the defendant's weight?

14   A.   Weight is a difficult thing to approximate, ma'am.  I

15   would say approximately 260, 240, 260.

16             MS. CILIA:  Thank you, Detective.

17             THE WITNESS:  You're welcome, ma'am.

18             MS. GUASTELLA:  Judge, I have no questions.

19             THE COURT:  Okay, Detective, you're excused,

20        you're free to step out.

21             THE WITNESS:  Thank you, Judge.

22             Thank you.

23             (Witness excused.)

24             THE COURT:  Next witness, please.

25             MR. REEVES:  Your Honor, that's all we have for

Proceedings

1    today.

2              THE COURT:  Oh, okay.  Step up for a moment,

3    please.

4              MR. REEVES:  Sure.

5              (Whereupon, a discussion is held at the bench off

6    the record.)

7              THE COURT:  That's as far as we can go today,

8    members of the jury.  The lawyers tell me we're right on

9    schedule.

10             What I'm going to make it, again, for tomorrow is

11   10 a.m., so I can handle the rest of my calendar and

12   hopefully we'll get started at 10:00.  You probably noticed

13   when I say 9:30, we get started at 10:15; when I say 10:00,

14   we get started at 10:45.  There is so many things involved

15   in getting a case up and running that sometimes it slows us

16   down.  But we'll do our best to minimize that, so I'll say

17   10 a.m.

18             Thank you very much.  Have a good evening.

19   Remember the rules:  Don't discuss the case, and so on.

20   Leave your notebooks, we'll lock them up.

21             (Whereupon, the jury exits the courtroom.)

22             THE COURT:  Okay, the jury has left.  We had a

23   bench conference.  The DA laid out what they anticipated

24   bringing out tomorrow.  I guess there's no need for me to

25   delve into that further.

Proceedings

1          I understand Dr. deRoux is your last witness.

2          MS. CILIA:  Yes.

3          THE COURT:  And you anticipate he'll be here

4    Friday.  He's only available Fridays?

5          MR. REEVES:  He was available today and I

6    foolishly didn't schedule him.  He's not available

7    Thursdays, and he will be here Friday.

8          THE COURT:  All right, I guess what --

9          MS. GUASTELLA:  I do have a witness.  I don't

10   know if he is going to be available Friday, but certainly

11   Monday morning.

12         THE COURT:  Okay.  Is it too soon for me to ask

13   you what kind of case you're putting on?

14         MS. GUASTELLA:  Yes.

15         THE COURT:  Okay.  Well, let's talk about

16   scheduling later tomorrow afternoon when we see where we

17   are with the DA's case.  Well, we'll talk about it then.  I

18   mean --

19         (Whereupon, a discussion is held off the record.)

20         MS. GUASTELLA:  Judge, do you want -- I'll try to

21   see if I can get my witness for the afternoon on Friday.

22         THE COURT:  Okay.

23         MS. GUASTELLA:  But then I believe there is going

24   to be a big gap in the morning.  Or should we just leave it

25   for Monday morning fresh?

Proceedings

1          THE COURT:  I mean, I don't even know for certain

2     the DA is going to get to Dr. deRoux first thing Friday.

3     It depends on what happens tomorrow.  There's several

4     technical witnesses.  Why don't we discuss it tomorrow,

5     we'll know better then.  If you can line your witness up

6     for Friday, that will probably work.

7          MS. GUASTELLA:  I know I spoke to him this

8     morning and he had said Monday.  I'll certainly mention

9     Friday in case we can do the afternoon.

10          THE COURT:  See what you can do.  I think we're

11     coming in a little ahead of schedule, so I'm not cracking

12     the whip at this point.

13          MS. GUASTELLA:  I think we are.

14          THE COURT:  Okay.  Very good.  I'll see you

15     tomorrow at 10:00.

16               (Defendant remanded.)

17               (Whereupon, court stands in recess and this

18     matter is adjourned to March 6, 2014, at 10 a.m.)

19  *     *     *     *     *     *     *     *     *     *

20          I hereby certify that the foregoing is a true and
accurate transcript of the above proceedings to the best of my
knowledge, skill, and ability.

21

22               _____
                 TAMMY RODRIGUEZ
23               Senior Court Reporter

24

25               _____
                 MAURIZIA M. SELLECK
                 Senior Court Reporter

MMS

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND - CRIMINAL TERM - PART 5
---------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK   : INDICTMENT NO.
                                        454/2011

          -against-                   :


ARMAND SKRINE,                        :

                                        JURY TRIAL
                      Defendant.  : (Continued)
---------------------------------------X
**(Jaclyn Nicole Hunt)**    18 Richmond Terrace
**(Patricia Zippo)**        Staten Island, New York
**(Det. Clontz)**           March 6, 2014
**(Irene Wong)**


B E F O R E:

    HONORABLE STEPHEN J. ROONEY, Justice.




A P P E A R A N C E S:

    DANIEL DONOVAN, ESQ.
    District Attorney - Richmond County
        130 Stuyvesant Place
        Staten Island, N.Y. 10301
    BY:  KYLE REEVES, ESQ.,
         JENNIFER CILIA, ESQ.,
         Assistant District Attorneys

    MARIA GUASTELLA, ESQ.
    Attorney for the Defendant
        88 New Dorp Plaza
        Staten Island, N.Y. 10306




                            MAURIZIA M. SELLECK,
                            TAMMY RODRIGUEZ,
                            SENIOR COURT REPORTERS

Proceedings

1              THE COURT CLERK:  Come to order.  Case on trial

2      continues, Indictment 454/2011: Armand Skrine.

3              Appearances.

4              MS. CILIA:  Jennifer Cilia and Kyle Reeves.

5              MS. GUASTELLA:  Maria Guastella on behalf of

6      Mr. Skrine.

7              Good morning, your Honor.

8              THE COURT:  Good morning.

9              MS. GUASTELLA:  I have a couple of things before

10     we get started.  If you want us to approach now.

11             THE COURT:  Whatever you want.  Your client is on

12     the way up, if you want to wait.  If you want to approach,

13     whatever you like.

14             MS. GUASTELLA:  I could approach now.

15             THE COURT:  Pardon?

16             MS. GUASTELLA:  I could approach now.

17             THE COURT:  Okay.

18             (Whereupon, a discussion is held at the bench off

19     the record.)

20             (Defendant present.)

21             THE COURT:  We can bring the jury in, sir.

22             THE COURT OFFICER:  Yes.

23             (Pause in the proceedings.)

24             THE COURT OFFICER:  Your Honor ready for the

25     jury?

People - Hunt - Direct/Cilia

1          THE COURT:  Yes.

2          THE COURT OFFICER:  Jury entering.

3          (Whereupon, the jury enters the courtroom.)

4          THE COURT CLERK:  Do both sides stipulate to a

5     complete jury panel, properly seated?

6          People?

7          MS. CILIA:  Yes.

8          THE COURT CLERK:  Defense?

9          MS. GUASTELLA:  So stipulated.

10          THE COURT:  Good morning.  Welcome back.

11     Next witness, please.

12          MS. CILIA:  People call Jaclyn Nicole Hunt.

13  J A C L Y N    N I C O L E    H U N T, having been called as a

14     witness on behalf of the People, having been duly sworn by

15     the clerk of the court, was examined and testified as

16     follows:

17          THE COURT CLERK:  State your name and your county

18     of residence.

19          THE WITNESS:  Jaclyn Nicole Hunt, 141 -- Richmond

20     County, Staten Island, New York.

21          MS. CILIA:  May I inquire?

22          THE COURT:  Yes.

23  DIRECT EXAMINATION

24  BY MS. CILIA:

25     Q.   Ms. Hunt, your name is Jaclyn Nicole?

People - Hunt - Direct/Cilia

1    A.    Jaclyn Nicole, yes.

2    Q.    And what do you go by?

3    A.    Nicole.

4    Q.    Ms. Hunt, could you tell the jury what you do for a

5    living?

6    A.    Um, I'm a preschool teacher -- assistant preschool

7    teacher at Silver Lake Head Start, and I'm also in nursing

8    school, and I'm a mother.

9    Q.    I want to talk to you about December 8th of 2011, but

10   first I want to ask you some background questions.

11         On December 8th, who were you living with at that

12   time?

13   A.    David Williams and my daughter, Denae Williams.

14   Q.    What was your relationship with David?

15   A.    I was his fiancée.

16   Q.    And when did the two of you first meet?

17   A.    When I was 17.

18   Q.    How long were you two together, approximately, in

19   2011?

20   A.    About 13 years.

21   Q.    You mentioned you had a daughter.  Is that also

22   David's daughter?

23   A.    Yes.

24   Q.    Where were you living back in 2011?

25   A.    195 Steuben Street, Apartment 7L.

People - Hunt - Direct/Cilia

1    Q.   About how long had you been living in that apartment

2    for?

3    A.   About seven and a half years.

4    Q.   And that's the whole time you were living with David?

5    A.   Yes.

6    Q.   What was David doing for a living back in 2011?

7    A.   He worked for Access-A-Ride.

8    Q.   Did he also take care of your daughter?

9    A.   Yes.  He was the person who dropped her off and picked

10   her up from school.

11   Q.   And in December of 2011, how old was David?

12   A.   He was 30 -- He was a week away from his 31st

13   birthday.

14   Q.   About how tall was David?

15   A.   About 5'11".

16   Q.   And what was his body type like?

17   A.   He was very thin, skinny.

18   Q.   I'd like to show you what's been premarked People's

19   Exhibit 172 for Identification.

20        Can you tell us if you recognize what's in this

21   picture?

22   A.   Yes.

23   Q.   Can you tell us what it is?

24   A.   It's a picture of David, myself, and my sister; we

25   were on vacation.

MMS

People - Hunt - Direct/Cilia

1      Q.   And the picture of David -- There are three people in

2    the picture?

3      A.   Yes.

4      Q.   Where is David in that picture?

5      A.   He's in the picture; he would be on the right of the

6    picture.

7      Q.   And is that the way that David looked in 2011?

8      A.   Yes.

9      Q.   That's a fair and accurate representation of him?

10     A.   Yes.

11          MS. CILIA:  I'd like to move this into evidence

12     as --

13          MS. GUASTELLA:  No objection.

14          MS. CILIA:  -- 172.

15          THE COURT:  You say there is no objection.

16          All right.  Without objection, it's marked in.

17          What's the number.

18          MS. CILIA:  172.

19          (Whereupon, People's Exhibit 172 is received in

20     evidence.)

21          THE COURT OFFICER:  So marked, your Honor.

22     Q.   At this time I'd like you to take a look around the

23   courtroom and tell us whether or not you recognize anyone.

24     A.   Yes.

25     Q.   Who do you recognize?

People - Hunt - Direct/Cilia

1     A.    That person over there.

2     Q.    Do you know the name of that person?

3     A.    Um, I knew him as 2-5, but his name is Armand Skrine.

4     Q.    And can you please point to that individual and

5 indicate an article of clothing that he's wearing?

6     A.    He's wearing a blue shirt and a striped tie.

7            MS. CILIA:  Indicating the defendant, your Honor.

8            THE COURT:  Very well.

9     Q.    Now, do you know the defendant?

10    A.    Yes.

11    Q.    Okay.  How do you know him?

12    A.    He's David's college roommate.

13    Q.    And this was a former college roommate?

14    A.    Former college roommate.

15    Q.    Now, you mentioned 2-5.  What does that mean?

16    A.    That was the nickname that -- I'm assuming that they

17 gave him in college.  He played basketball, he was on the

18 basketball team, and that's what Dave and his other friends

19 called him.

20    Q.    About how long have you known the defendant for?

21    A.    Um, for about the same time I've known Dave.  I was

22 introduced to him through David, so, about 13 years.

23    Q.    About how tall would you say he is?

24    A.    He's over 6'5"; probably about 6'9".

25    Q.    And how did you two first meet one another?

People - Hunt - Direct/Cilia

1    A.   I was introduced to him by David.  He had, um, come to

2  the house on different occasions and, um, before me and David

3  lived together, I had met him.  Like, he'd come to David's

4  house before, he's come to different family functions, he's

5  come to visit David before.

6    Q.   And you mentioned that the defendant and David went to

7  school together?

8    A.   Yes.

9    Q.   What school was that?

10   A.   Teikyo Post.

11   Q.   Where is that located?

12   A.   In Connecticut.

13   Q.   And, so, you're saying that even though they were no

14  longer together in school, the defendant and David kept in

15  touch?

16   A.   Yes.

17   Q.   And you mentioned the defendant visited Staten Island.

18  Is that right?

19   A.   Mm-hmm, yes.

20   Q.   Did he ever live in Staten Island?

21   A.   No.

22   Q.   Where was he living?

23   A.   Queens or Long Island.

24   Q.   And when the defendant and David would get together,

25  where would that happen?

000715                                                                    245

People - Hunt - Direct/Cilia

1     A.   Um, sometimes at, um, our house.  Other times they

2   had, you know, went out, you know, went out to, I guess, bars

3   or, you know, shopping.  Just hanging out together without me,

4   I wasn't with them.

5     Q.   And when the defendant came to Staten Island, would he

6   come and visit the apartment that you shared with David?

7     A.   Yes.

8     Q.   About how often would that happen?

9     A.   Um, sporadically throughout the years, every, um, few

10  months or so.

11    Q.   And would you and Denae, your daughter, would you be

12  home at that time?

13    A.   There were times when we were home, yes.

14    Q.   Now, how did David's height compare with the

15  defendant's height?

16    A.   David was much shorter than him.

17    Q.   And how did David's body type compare to the

18  defendant's body type?

19    A.   He was a lot thinner than him.

20    Q.   David was a lot thinner than the defendant?

21    A.   Yes.

22    Q.   Now, did the defendant ever bring anything with him

23  when he visited?

24    A.   The last time that, um, I saw him, he had a bag with

25  him.

People - Hunt - Direct/Cilia

1    Q.    About when was that?

2    A.    It was, um, the -- It was after Thanksgiving.  It was

3    a Friday or Saturday after Thanksgiving.

4    Q.    You said he brought a bag with him?

5    A.    He had a bag with him, yes.

6    Q.    I'd like to show you what's already in evidence as

7    People's Exhibit Number 124.  We're going to put that on the

8    screen as well.

9          Do you recognize that bag?

10   A.    Yes.

11   Q.    What is it?

12   A.    Um, it's the bag that, um, he had with him the last

13   time he came to our house.

14   Q.    The defendant had that bag?

15   A.    Yes.

16   Q.    About how big is that bag?

17   A.    (Indicating.)

18         MS. CILIA:  Okay.  Indicating with her hands,

19   your Honor, all the way stretched out.

20   Q.    Is that right?

21   A.    Yes.

22   Q.    Okay.  And did you notice anything about that bag when

23   the defendant brought it in?

24   A.    Yes.  When he, um -- When he came into the apartment

25   and put the bag down, it made a loud sound.  It was heavy.

MMS

People - Hunt - Direct/Cilia

1    Q.   Now I want to talk to you about December 8th of 2011.
2    That was a weekday?

3    A.   Yes, I was at work.  Yes.

4    Q.   Can you just tell us how that day started for you?

5    A.   I got up in the morning around 6:30, 7:00.  I got
6    myself ready for work, um.  Woke my daughter up, got her ready.
7    David got ready, um, warmed up the car, went downstairs.  He
8    dropped me off to work and he dropped my daughter off to
9    school.

10   Q.   Was that the normal routine that you and David would
11   follow?

12   A.   Yes.

13   Q.   So, he was the person who would drive you to work,
14   drive Denae to school, pick her up?

15   A.   Yes.

16   Q.   And when you got to work, can you tell us what, if
17   anything, happened at work?

18   A.   Yes.  Um, I was at work in the morning.  Um, I
19   normally, you know, get the children from the bus, greet them
20   as they walk in and get breakfast, and then the children sit
21   down, they have breakfast.  When they're done with breakfast,
22   they go to the bathroom, they play.

23        While I was in the classroom, my director had came
24   downstairs and, um, came into the room.  She looked upset, and,
25   um, she told me that I needed to go home.  She didn't say why

People - Hunt - Direct/Cilia

1    at first; she just said that I needed to go home.  And, so, I

2    was asking her, you know, Something okay, Something happen?

3    And she just said David's name and she just said, You need to

4    go home.  And, um, the girl that I work with, she drove me to

5    my house.  I don't live far from my job, so.

6           When I got to the front of the building, there was a

7    lot of different police cars, large units; I saw an ambulance

8    driving away.  There was a fire truck, I believe, which is

9    different.  Cars, different people.  A lot of people outside of

10   the building in front of the building.

11          When I got out of the car, I was looking around,

12   looking into -- for David, looking for our car, because I

13   thought that he got into a car accident.  I started looking

14   around for him, which I didn't see him.  Um, I saw people from

15   our building that I knew, some of our neighbors.

16          And then, um, I tried to go into my building and I was

17   stopped by police officers.  And one of the police officers

18   that I spoke to was Det. Patterson who he asked me some

19   questions.  He asked me David's name, my name, how I knew

20   David, the apartment that we lived in.  And then, um, I started

21   to get upset with Det. Patterson, because he was asking me a

22   lot of questions, but he wasn't telling me where David was or

23   what happened.  And then, um, he told me that I had to wait and

24   he came back after a while.  And he told me that he was sorry

25   for my loss.

People - Hunt - Direct/Cilia

1            THE COURT:  Next question, please.

2      Q.   Now, Ms. Hunt, I want to talk to you about David's

3  body for a second, okay.  Was there a time that came the next

4  day when you saw -- when you went somewhere and you saw David's

5  body?

6      A.   The next day I had to go to the City morgue.

7      Q.   Okay.  When you went to that morgue, did you recognize

8  someone?

9      A.   Yes.

10     Q.   Who did you recognize?

11     A.   David.

12     Q.   What I'm going to do now is I want to show you some

13  photographs of your apartment, okay?  So, I'm going to turn

14  those up to you now and we're going to go through them one by

15  one.  These are all in evidence at this point.

16            MS. GUASTELLA:  Judge, can we approach?

17            THE COURT:  Yes.

18            MS. GUASTELLA:  Sidebar.

19            (Whereupon, a discussion is held at the side bar

20      off the record.)

21     Q.   Now, on the back of each one of those pictures there's

22  a number, okay, and the first number is People's Exhibit Number

23  44.  We are going to put that up on the screen also.

24            What I want to ask you is, when you left the apartment

25  on December 8th of 2011, what was the condition of your

People - Hunt - Direct/Cilia

1   apartment?

2       A.   Um, it wasn't like this.  I didn't leave it like this.

3   Everything was together.  It wasn't disheveled as it looks in

4   this picture.

5       Q.   Okay.  So, tell us in People's Exhibit Number 44 what

6   wasn't like this when you left in the morning.

7       A.   My daughter's easel was in the corner, which you can't

8   see in the picture, behind the wall.  Um, the drum set was

9   against the wall and it was together.  Um, in this picture

10  there's a speaker that's pushed away from the wall that was

11  against the wall.  The green and pink toy that's on the floor

12  under the sofa was behind the sofa against the wall.  And all

13  of these different things that are on the floor, paper

14  scattered on the floor, they were on top of the shelf.

15      Q.   We're going to move on now to People's Exhibit 47,

16  and, again, if you can just look at that photo and tell us

17  what's out of order there.

18      A.   Again, my daughter's easel, the speaker, the papers,

19  the drum set.  One of my boots is by the door; it wasn't there,

20  I didn't leave it like that.

21      Q.   People's Exhibit Number 50, what can you tell us about

22  this picture?

23      A.   Um, the sofa is pushed away from the wall and the

24  other section of the sofa is pushed away.  I had everything

25  together.  The sofa was pushed against the wall and this other

MMS

People - Hunt - Direct/Cilia

1   piece was pushed against the piece that was against the wall,

2   so it made a circle.

3       Q.   So, normally the sofa is all one --

4       A.   Yes, one piece.

5       Q.   -- one piece?

6       A.   Yeah, together.

7       Q.   Let's move on now to People's Exhibit Number 52.  Is

8   that another example of how the sofa was not together there?

9       A.   Yes.

10      Q.   Anything else in that photo that looks different than

11  when you left in the morning?

12      A.   Yes.  The hood on the fish tank is pushed into the

13  fish tank.  It's inside.  It wasn't on top of the fish tank.

14  There's some of my daughter's artwork that was on the wall

15  that's down.  And the same thing, the sofa is pushed apart.

16      Q.   Let's move on to People's Exhibit 52, and,

17  specifically, let's talk about the fish tank for a minute.

18  What, if anything, can you tell us about that?

19      A.   The hood is pushed inside the fish tank, and there's

20  also the scoop for the fish to clean the fish tank, it's inside

21  the fish tank.

22      Q.   How about People's Exhibit Number 53?

23      A.   Again, the sofa is, um, pushed away from the rest of

24  the sofa.  There's some stuff that's scattered on the floor.

25      Q.   And People's Exhibit 54.

MMS

People - Hunt - Direct/Cilia

1    A.    Um, this whole area wasn't like this when I left home.

2    Some of the artwork was hanging on the wall.  Um, these toys

3    that are on the floor were stacked up.  Some of them were

4    inside this bin and the bin wasn't turned over; it wasn't up

5    against the wall.

6    Q.    The next picture, People's 56.

7    A.    This is pretty much how I left it.

8    Q.    This looks like it was not disturbed.  Is that right?

9    A.    Yeah.

10   Q.    Okay.  And how about People's Exhibit Number 64, does

11   that look like it was not disturbed?

12   A.    No, here it doesn't look like it was disturbed.

13   Q.    And how about People's Exhibit Number 60.  Is that how

14   you left it in the morning?

15   A.    Yes.

16   Q.    And how about People's Exhibit Number 48, does that

17   also look the way that it did in the morning?

18   A.    Yes.

19   Q.    Now, we're going to move on to the next set of

20   pictures that you have there.  We're going to start with

21   People's Exhibit Number 107, and I want to ask you if you

22   recognize the coat depicted in this photo.

23   A.    No.

24   Q.    Was this either your coat or David's coat?

25   A.    No.

People - Hunt - Direct/Cilia

1      Q.   This coat wasn't in your apartment?

2      A.   No.

3      Q.   I am going to ask you the same question.  People's

4    Exhibit 121, do you recognize that?

5      A.   No.

6      Q.   That was not David's or yours?

7      A.   No.

8      Q.   How about People's Exhibit Number 115?

9      A.   No.

10     Q.   Okay.  Did you or David ever wear a full face mask?

11     A.   No.

12     Q.   How about People's Exhibit 109, was that yours or

13   David's sweatshirt?

14     A.   No.

15     Q.   Have you ever seen that sweatshirt before?

16     A.   No.

17     Q.   People's 111, is that your towel?

18     A.   No.

19     Q.   Okay.  How about People's Exhibit 112, do you

20   recognize that towel?

21     A.   No.

22     Q.   113, do you recognize that sweatshirt?

23     A.   No.

24     Q.   How about People's Exhibit Number 116, do you

25   recognize that?

000724

254

People - Hunt - Direct/Cilia

1    A.   No.

2    Q.   Did David ever -- Did you or David ever keep

3    counterfeit money in the house?

4    A.   No.

5    Q.   People's Exhibit 117, does that shovel look familiar

6    to you?

7    A.   No.

8    Q.   People's Exhibit 120, how about that rope, did you or

9    David have that rope in the house?

10   A.   No.

11   Q.   People's 121, does this look familiar to you -- 122?

12   A.   It's 122.  No.

13   Q.   That's neither yours nor David's?

14   A.   No.

15   Q.   People's 123, do you recognize those gloves?

16   A.   No.

17   Q.   In 2011 did you and David keep latex gloves in your

18   apartment?

19   A.   No.

20   Q.   There's one more thing that I'd like show you.

21          MS. CILIA:  If you can show that to the witness,

22   please.

23   Q.   I want you to look at People's Number 165.  I want to

24   ask you, have you ever seen this weapon before?

25   A.   No.

People - Hunt - Direct/Cross

1      Q.   To your knowledge, was that weapon ever in your

2    one-bedroom apartment?

3      A.   No.

4      Q.   And your daughter was in that apartment as well,

5    right?

6      A.   Yes.

7      Q.   Would there have been any hiding places where that gun

8    would have been able to be kept?

9      A.   No, no.

10          MS. CILIA:  Thank you very much.

11   CROSS-EXAMINATION

12   BY MS. GUASTELLA:

13     Q.   Ms. Hunt, do you need a minute?

14     A.   (Indicating.)

15     Q.   Do you need a break?

16     A.   Yes.

17          THE COURT:  I didn't hear.  What happened?

18          MS. GUASTELLA:  She needs a break.

19          THE COURT:  You need a break?

20          THE WITNESS:  Yes.

21          THE COURT:  Why don't we take five minutes,

22   members of the jury, and we will do cross-examination.  Why

23   don't you step out.  Thank you for your patience and

24   attention.

25          (Whereupon, the jury exits the courtroom.)

MMS

People - Hunt - Cross

1               THE COURT:  Okay, the jury is out.  We'll take a

2    short break.

3               Ms. Hunt, please don't discuss this case with

4    anyone during this short break.  Thank you.

5               (Witness excused.)

6               (Whereupon, a brief recess is taken.)

7               MR. REEVES:  Your Honor, before the jury comes

8    in, one of our civilian witnesses is here and they have

9    child care issues.  So, what we were hoping is, after

10   Ms. Hunt finishes, if Ms. Cilia can just have five minutes

11   with the witness and then we'll put her on, and then we'll

12   call the criminalist and then the ballistics.

13              THE COURT:  So, we're going to take another

14   break?

15              MR. REEVES:  I apologize.

16              THE COURT:  She's here now?

17              MR. REEVES:  She's outside.

18              THE COURT:  Why don't you do it now, so we don't

19   have to take another break.

20              MR. REEVES:  Okay.

21              THE COURT:  Hold up the jury.

22              MR. REEVES:  It shouldn't take more than five

23   minutes.

24              THE COURT:  Okay, let me know when you're ready.

25              MR. REEVES:  Thank you.

People - Hunt - Cross

1              (Whereupon, a brief recess is taken.)

2              THE COURT:  Are we all set?

3              MR. REEVES:  We are, your Honor.

4              As the jurors line up, we're not going to be

5      calling Ms. Fields.  She has very little recollection of

6      the incident and, as a result, we will be calling -- After

7      Ms. Hunt we will be calling Patricia Zippo and Det. Clontz,

8      and that should get us to the lunch hour.  And after lunch

9      we'll have the DNA person.

10             THE COURT:  All right.

11             (Whereupon, the jury enters the courtroom.)

12             THE COURT CLERK:  Do both sides stipulate to a

13     complete jury panel, properly seated?

14             People?

15             MS. CILIA:  Yes.

16             THE COURT CLERK:  Defense?

17             MS. GUASTELLA:  So stipulated.

18             THE COURT:  Ms. Hunt, would you resume the

19     witness stand, please.

20             (Whereupon, the witness resumes the stand.)

21             THE COURT CLERK:  I just remind you you're still

22     under oath.

23             THE WITNESS:  Yes.

24             MS. GUASTELLA:  May I?

25             THE COURT:  Okay.

```
 1    CROSS-EXAMINATION (Continued)

 2    BY MS. GUASTELLA:

 3        Q.   Ms. Hunt, you live at 195 Steuben Place, right?

 4        A.   I lived there.

 5        Q.   You lived there for seven years?

 6        A.   About seven years, seven and a half.

 7        Q.   And did you ever have an occasion to take the stairs

 8    down to the first floor?

 9        A.   Yes.

10        Q.   Or to another apartment?

11        A.   Yes.

12        Q.   And can you describe the door to the stairwell?  The

13    material that it's made of, is it steel?

14        A.   Um, I'm not sure what it's made of.

15        Q.   Is it a heavy door?

16        A.   Um, not heavy enough for you to push open to get down

17    the stairs.  You can push it open.

18        Q.   Right, there is a bar that you can just push against

19    it?

20        A.   It's not a bar.  It's a doorknob.

21        Q.   Was it a doorknob in 2011?

22        A.   I believe so.

23        Q.   Now, you lived there for about seven, seven and a half

24    years.

25        A.   (Indicating.)
```

MMS

People - Hunt - Cross

1       Q.   You got to know the residents of the building, right?

2       A.   (Indicating.)

3       Q.   Were you friendly with certain people?

4       A.   They were my neighbors.

5       Q.   Now, you said you knew Armand as 2-5 and you're saying

6    that's his college basketball number?

7       A.   I'm assuming, yeah.

8       Q.   Was it his law school basketball number?

9       A.   I don't know.

10      Q.   And about how many times did Armand come to your

11   apartment?

12      A.   Um, there were a few times.

13      Q.   And approximately how many times were you there when

14   he came to the apartment?

15      A.   A few times I was there.

16      Q.   And he often showered when he got there, right?

17      A.   No.

18      Q.   He never showered in your apartment?

19      A.   He did the day that he came in November, but it wasn't

20   every time.  Occasionally he would shower.

21      Q.   So, he came -- was it the day after Thanksgiving?

22      A.   Yeah, a day or two after Thanksgiving.

23      Q.   And he had his bag with him, right?

24      A.   Yes.

25      Q.   And he put the bag down?

1    A.   Yes.

2    Q.   And it made a noise?

3    A.   Yes.

4    Q.   And that bag had little pegs on the bottom of it,

5  right?

6    A.   I don't know.

7    Q.   You sure the bag wasn't blue?

8    A.   It was a dark-colored bag.

9    Q.   Dark-colored, okay.

10        Now, you said he knew David from college, right?

11   A.   Yes.

12   Q.   And David never finished college, correct?

13   A.   Correct.

14   Q.   In fact, he was asked to leave after one semester,

15 right?

16        MS. CILIA:  Objection, Judge.

17        THE COURT:  Objection sustained.

18   Q.   David was actually unemployed on 12/8, 2011, right?

19   A.   He was still working for Access-A-Ride, but the way

20 Access-A-Ride works is they call you and they say, okay, we

21 have these routes; can you take this, can you take that?  It

22 was hard for him to take certain routes because he had to drop

23 my daughter off to school and pick her up.

24   Q.   Ms. Hunt, you spoke to Det. Patterson, right?

25   A.   Yes.

MMS

People - Hunt - Cross

1      Q.    And you told him that he was unemployed and he quit

2    his job, right?

3      A.    No.

4      Q.    You didn't tell him that?

5      A.    No.

6      Q.    You remember speaking to him on 12/8?

7      A.    Yes.

8      Q.    And it's your testimony you never told him that?

9      A.    No, I don't remember telling him that he quit his job.

10     Q.    All right, thank you.

11           So, David basically didn't work, right?  You were the

12   sole supporter of the household?

13     A.    He was a full-time father.  Like I said, he was the

14   person who dropped me and my daughter off --

15     Q.    Ms. Hunt, I asked you a question.

16     A.    And I'm answering you.

17     Q.    Your daughter is at school?

18     A.    Yes.

19     Q.    Do you know what David did all day long while your

20   daughter was in school and you were at work?

21     A.    He looked for employment if he wasn't -- He was

22   looking for a job that would benefit our schedule.

23     Q.    He dropped you off at work every morning?

24     A.    Yes.

25     Q.    In his Lexus?

People - Hunt - Cross

1    A.   In our car, yes.

2    Q.   And he purchased that car, right?

3    A.   No.

4    Q.   Who purchased the car?

5    A.   I did.

6    Q.   It's your testimony you bought that car --

7         MS. CILIA:  Objection, Judge.  What is the

8    relevance?

9         THE COURT:  The witness already answered, "I

10   did."

11        Next question.

12   Q.   Did you also buy the Mercedes that you had before the

13   Lexus?

14        MS. CILIA:  Objection.

15        THE COURT:  Sustained.

16   Q.   You also told Det. Patterson that David did not do

17   drugs, right?

18   A.   (Indicating.)

19   Q.   And you also told him he never smoked marijuana

20   either, right?

21   A.   Yes.

22   Q.   Now, Samuel Nelson, he lives in apartment 7-O, right?

23   A.   He lived on the 7th floor, yes.

24   Q.   And did you know him well?

25   A.   No.

People - Hunt - Cross

1    Q.   But he was friends with David, right?

2    A.   He was our neighbor.  He wasn't someone that he hung

3    out with or went places with or -- He lived on the same floor

4    as us.

5    Q.   He didn't work, right?

6    A.   Who.

7    Q.   Samuel.

8    A.   I don't know what he did.

9    Q.   Well, you were at work while David was home, right?

10   A.   Yes.

11   Q.   So you don't know if he hung out with Samuel every

12   day, right?

13            MS. CILIA:  Objection.

14   A.   I would know if they told me, but --

15   Q.   If he told you.

16            And you know from living on his floor that Samuel had

17   numerous contacts with the police, right?

18            MS. CILIA:  Objection.

19            THE COURT:  Sustained.

20   A.   No.

21   Q.   Let's talk about Lonney Walker.  You know Lonney

22   Walker, right?

23   A.   I know who he is.

24            MS. CILIA:  Objection.

25            THE COURT:  That much is all right.  Let's see

People - Hunt - Cross

1      where we're going.

2      Q.  He's friends with David?

3      A.  When you say "friend," what do you mean by "friend"?

4      You need to clarify that.

5      Q.  Over the apartment a few times?

6      A.  He's been to our apartment before, yes.

7      Q.  And he's about 6'6" tall, right?

8      A.  No.

9      Q.  He's not?

10     A.  Not that tall.

11     Q.  He's not as tall as Armand?

12     A.  No.  I know he's tall.

13     Q.  Taller than David?

14     A.  Yes.

15     Q.  Is he taller than Armand?

16     A.  No.

17     Q.  How much shorter is he than Armand?

18     A.  A little shorter.

19     Q.  A little bit.  An inch?

20     A.  I don't know.

21     Q.  Okay.  And he's also about 220 pounds, right?

22     A.  He's a big guy.

23     Q.  And you've actually -- He used to date somebody in

24     your family, correct?

25     A.  In my family, yeah.

MMS

People - Hunt - Cross

1    Q.   So you know he's been arrested numerous times and went

2    to prison for drugs, right?

3                MS. CILIA:  Objection.

4                THE COURT:  Objection sustained.

5    Q.   Ms. Hunt, you and David had a violent relationship,

6    right?

7    A.   No.

8    Q.   No?  In fact, a few years ago you stabbed him in

9    self-defense, didn't you?

10               MS. CILIA:  Objection.

11               MR. REEVES:  Judge, may we approach?

12               THE COURT:  The objection is sustained.

13               Yeah, you can approach.

14               (Whereupon, a discussion is held at the bench off

15       the record.)

16               (Whereupon, Maurizia Selleck is replaced by Tammy

17       Rodriguez as the official court reporter.)

18               (Continued on next page.)

19

20

21

22

23

24

25

 1              MS. GUASTELLA:  I have nothing further for this

 2       witness.

 3              THE COURT:  Any redirect?

 4              MS. CILIA:  No, thank you.

 5              THE COURT:  You're free to step out.

 6              Next witness please.

 7              MS. CILIA:  Patricia Zippo.

 8    PATRICIA ZIPPO, the witness herein, having been first duly

 9    sworn, was examined and testified as follows:

10    DIRECT EXAMINATION

11    BY MS. CILIA:

12       Q.   Can you tell us where you work?

13       A.   I'm employed by the New York City Police Department

14    police laboratory.

15       Q.   About how long have you been working for the New York

16    City Police Department lab?

17       A.   I've been with the laboratory for 29 years.

18       Q.   What is your title there?

19       A.   I'm criminalist.

20       Q.   Can you explain what that means?

21       A.   That is my civil service title, but I'm a forensic

22    examiner to the documents unit of the police laboratory.

23       Q.   What are your specific duties with respect to the

24    questioned documents section of the laboratory?

25       A.   I analyze various types of documents for authenticity,

1   alteration, literation, and also primarily handwriting analysis.

2       Q.   Approximately how many cases have you been assigned to

3   by the lab?

4       A.   I don't know the exact number, but I've worked on

5   hundreds of cases.

6       Q.   Approximately how many documents have you examined?

7       A.   That would entail thousands of documents.

8       Q.   Can you tell us what your educational background is?

9       A.   I have a bachelor in science degree in forensics and

10  associates in science degree in chemistry.

11      Q.   Did you undergo any training, NYPD laboratory training

12  to questioned documents?

13      A.   Two-year training program with the New York City

14  Police Department.  There was also outside training with the US

15  postal inspection service with the secret service and also the

16  FBI.

17      Q.   Have you participated in proficiency training?

18      A.   Yes.  We have quality assurance unit at the laboratory

19  and we're given proficiency tests at least one per year.

20      Q.   Have you passed all those examinations?

21      A.   Yes, I have.

22      Q.   Have you testified before in any courts or grand

23  juries in New York?

24      A.   Yes, I have.

25      Q.   Where was that?

P. Zippo - Direct - Cilia

1      A.   For questioned documents I've testified in Kings

2   County and also Queens County.

3      Q.   Approximately how many times in total?

4      A.   For questioned documents approximately four times.

5      Q.   Each of those cases have you been deemed an expert?

6      A.   Yes, I have.

7      Q.   Have you ever been denied qualification as an expert?

8      A.   No.

9           MS. CILIA:  Your Honor, I would ask to deem this

10   witness an expert in the area of questioned documents.

11          MS. GUASTELLA:  No objection.

12          THE COURT:  The witness is recognized as an

13   expert in questioned documents.

14          MS. CILIA:  Yes.

15      Q.   Ms. Zippo, I'd like to show you what is already in

16   evidence as People's exhibit 167, do you recognize this?

17      A.   Yes, I do recognize it.

18      Q.   You can open it up.

19           Can you tell us what it is?

20      A.   Well, this is a security envelope that contains the

21   evidence in which I analyzed for this case.

22      Q.   When you say that you analyzed this evidence, did you

23   examine all the exhibits?

24      A.   Yes.  Inside this case, yes, I did.

25      Q.   Now, this case involves counterfeit bills.  Can you

P. Zippo - Direct - Cilia

1   explain what a counterfeit bill is?

2       A.   Well, it's a bill that does not contain any of the

3   security features in our US currency.

4       Q.   Can you explain the security features that are found

5   in genuine United States currency?

6       A.   Well, just in general there are different types of

7   security features.  There is security thread, there's

8   microprinting, and there are water marks in US currency.

9       Q.   Can you -- what was the purpose of your examination,

10  and can you tell us what it consisted of?

11      A.   The purpose was to determine if any of these bills

12  were not genuine and I did, in fact, examine all the bills in

13  this particular case.

14      Q.   Can you tell us how you examined those bills?

15      A.   By visually examining them and also using a magnifier,

16  examining them of course for the serial numbers that are present

17  on the bills, looking for the microprinting, security threads,

18  and the different security features that were found on US

19  currency.

20      Q.   As a result of your examination have you reached an

21  opinion?

22      A.   Yes, I did.

23      Q.   Can you explain that?

24      A.   It was my opinion that all of the bills in this

25  particular case, there were 64 in total, were not genuine.

1  Q. Can you tell us why?

2  A. Because they were missing the security features

3 present in US currency.

4  Q. Do you have a demonstrative aid that you compared to

5 demonstrate your findings?

6  A. Yes.

7  Q. Would this aid help explain your testimony?

8  A. Yes.

9  Q. Is this aid true and accurate.  I'm going to show you

10 what's been premarked People's exhibit 173 for identification

11 taking a look at that, Ms. Zippo, is this aid a true and

12 accurate representation of the demonstrative aid that you

13 created?

14  A. Yes.

15    MS. CILIA:  I'd like to move this into evidence

16  as People's exhibit 173?

17    MS. GUASTELLA:  No objection.

18    THE COURT:  This is 173 in evidence.

19  Q. We'll display it in the board as well as have it in

20 front of you.

21    THE COURT OFFICER:  So marked.

22    (At this time, People's Exhibit 173 was marked

23  and received in evidence.)

24  Q. Could you please explain this chart to the jury and

25 state your opinion at the end?

TR

P. Zippo - Cross - Guastella

1      A.    Sure for this particular case I just chose two
2    security features on the left side of this document where it
3    says, genuine.

4           On the bottom there's a vertical security thread from
5    the $5 US currency bill.  It is hard to see, but you can also
6    visualize, like I did in this particular case, using ultraviolet
7    light.

8           On the bottom is the microprinting that has USA
9    printed from the $5 bill.

10          On the right side was one of the bills in this
11   particular case, which was marked Q-16 where those areas are
12   pointing there's vertical security thread present in that bill.

13          Also down below the microprinting was not present
14   indicating that it was not genuine.

15     Q.    Based upon a review of all of these documents can you
16   give us your opinion one more time?

17     A.    Yes Q-16 there were 64 bills in total and they were
18   all not genuine.

19               MS. CILIA:   Thank you, Ms. Zippo.

20   CROSS-EXAMINATION

21   BY MS. GUASTELLA:

22     Q.    Did you trace or investigate the origin of these
23   counterfeit bills?

24     A.    No.

25               MS. GUASTELLA:   Nothing further.

TR

Det. James Clontz - Direct - Reeves

1          THE COURT:  Anything else?

2          MS. CILIA:  No, your Honor.

3          THE COURT:  You're excused.  You're free to step

4     out.

5          (At this time, the witness is excused.)

6          MR. REEVES:  People call Detective James Clontz.

7  DETECTIVE JAMES CLONTZ, 1656, Forensic Investigation Division of

8  the New York City Police Department, the witness herein, having

9  been first duly sworn, was examined and testified as follows:

10 DIRECT EXAMINATION

11 BY MR. REEVES:

12     Q.   Good afternoon, Detective, how are you doing today?

13     A.   Fine, sir.  Thank you.

14     Q.   What I would like to do is ask you a little bit about

15 your police career, if I could starting with how long you've

16 been with the New York City Police Department?

17     A.   I've been with the department for about 14 and a half

18 years.

19     Q.   And how many years have you held the rank of

20 detective?

21     A.   I would say about six years.

22     Q.   How long have you been with the Forensic Investigation

23 Division?

24     A.   Since 2006.

25     Q.   Where in that unit do you specifically work?

Det. James Clontz - Direct - Reeves

1       A.   Firearm analysis section of the police laboratory.

2       Q.   Can you tell us a little bit about what the firearms

3   analysis or ballistics section of the police department is

4   responsible for doing?

5       A.   We examine firearms that are submitted to the

6   laboratory for examination and we also examine any kind of

7   ballistics evidence that's been taken into custody to try to

8   determine a common origin.

9       Q.   Detective Clontz, do you have any specialized training

10  that allows you to work in that unit?

11      A.   I do.

12      Q.   Explain to the ladies and gentlemen of the jury what

13  that training is?

14      A.   Sure.  I completed a two and a half year NYPD training

15  program in the identification and testing of firearms for

16  operability and the identification of ballistic experts.

17          It's based on the AFTE training program, Association

18  of Firearms and Toolmark Examiners.

19          This is an international organization made up of over

20  1100 members from over 40 different countries.  They're

21  responsible for -- they develop standards for the field of

22  firearm and tool mark examination.  They exchange information

23  within the field, and they also further the research in the

24  field of firearm and tool mark identification.

25          During my training I received and I presented formal

Det. James Clontz - Direct - Reeves

1    and informal lectures and presentations.

2           I've completed numerous training exercises and

3    practical assignments dealing with things with pistols, rifles,

4    shotguns, semiautomatic and full automatic weapons, antique

5    firearms, all respective cycles of fire.  Also the development

6    of modern ammunition.

7           I also examined hundreds of pieces of ballistic

8    evidence in order to try to determine any common origin for any

9    tool marks that I observe on these items.

10          During my training I was also able to attend several

11   armourer courses.  They're given by various firearm

12   manufacturers.

13          I've attended armourer schools given by Beretta,

14   Glock, Remington, Six Hour, Smith and Wesson, and Springfield

15   Armory.

16          During this training I was taught how to completely

17   disassemble and reassemble various firearms made by these

18   manufactures.

19          Also academically I'm currently working towards my

20   bachelor degree.

21   Q.     During the course of your degree with the firearms

22   analysis section have you been trained in how to test weapons

23   for operability?

24   A.     Yes.

25   Q.     Could you explain to the jury what it means to test a

Det. James Clontz - Direct - Reeves

1  weapon for operability?

2       A.    When a firearm is submitted for analysis --

3  operability basically means if it works.  I'll determine the

4  make and caliber of the particular firearm in question.  I'll do

5  -- make some visual observations on it to determine if there is

6  anything physically wrong with the firearm.

7            During the examination I'll introduce live ammunition

8  to the firearm to see if it actually works as it was designed to

9  do.

10           If it does work, if it does fire a cartridge it is

11 deemed operable.

12      Q.    Detective Clontz, during the course of your career

13 with firearm analysis, how many times have you tested weapons

14 for operability?

15      A.    Tested weapons?

16      Q.    Yes.

17      A.    I don't have an exact number.  I'm well over 2,000

18 firearms tested to date.

19      Q.    I would like to talk to you about a different section

20 of the lab where they use comparison microscopes.

21           Can you tell us a little bit about that?

22      A.    Sure.  It's part of the firearms analysis section

23 called microscopy unit.  There we test individual pieces of

24 ballistic evidence.  There can be fired bullets, bullet

25 fragments, or shell casings.

 1       When an item is discharged in the firearm, the firearm

 2  will leave certain markings on this evidence.  The microscopy

 3  unit will use a microscope to examine two pieces of evidence

 4  side by side in an attempt to determine a common origin for all

 5  these marks.

 6       If there is enough agreement of these markings to

 7  determine if they're from a common source, they will be deemed

 8  that they were fired from the same firearm.

 9       Q.   Have you been trained to use the comparison microscope

10  in the lab?

11       A.   Yes.

12       Q.   Now, is the lab itself, the firearms analysis section

13  of the New York City Police Department lab, is it accredited or

14  certified by an outside agency?

15       A.   Yes.

16       Q.   What agency is responsible for accrediting the lab?

17       A.   Accredited by it's called ASCLD, stands for the

18  America Society of Crime Laboratory Directors Laboratory

19  Accreditation Board.

20       Currently my laboratory, we hold the highest level of

21  accreditation, the international level.

22       Q.   Now, in addition to the lab itself being accredited

23  are the people who work in the lab also required to take

24  proficiency and competency exams?

25       A.   Yes.

1      Q.   Have you yourself taken both proficiency and
2   competency exams?

3      A.   Yes.

4      Q.   What areas have you taken those exams?

5      A.   Prior to doing any case work, upon completion of your
6   training you have to take a competency test to show that you're
7   competent enough to do case work.

8           I completed competency test successfully in both
9   firearms operability.  And microscopy proficiency testing is
10  required every year in every discipline that you do case work.

11          I have also completed successfully firearms
12  operability, proficiency test, and microscopy proficiency tests.

13     Q.   Is there any way for you to quantify or give a number
14  for the pieces of evidence that you've examined with the
15  comparison microscope in the lab?

16     A.   No, I can't.  It's because as of this point it
17  literally would be thousands of individual pieces of fired
18  bullets or fragments or casings.

19          Many, many I examined during training and many more
20  I've examined during case work.

21     Q.   Have you testified in court before?

22     A.   I have, sir.

23     Q.   Approximately how many times have you testified?

24     A.   I've testified 35 previous times.

25     Q.   What areas of expertise have you been qualified those

Det. James Clontz - Direct - Reeves

1   35 times?

2       A.   Both firearms operability and microscopy.

3       Q.   Can you give us an idea of the jurisdictions?

4       A.   I've testified in the family court of the Bronx and
5   Queens, but I've also testified in the Supreme Court in all five
6   counties of New York City.

7       Q.   Has any court denied you the qualification as an
8   expert in the field of operability or microscopy?

9       A.   No, sir.

10              MR. REEVES:  I offer Detective Clontz as an
11       expert in the field of ballistics.

12              MS. GUASTELLA:  No objection.

13              THE COURT:  Without objection he's recognized as
14       an expert in ballistics.

15      Q.   Before we talk about some specific work that you did
16   in this case, what I would like to do is ask you some questions
17   about firearms in general.

18              I'd start you off with an assault rifle.  Explain to
19   the ladies and gentlemen of the jury what makes a weapon an
20   assault rifle?

21      A.   There are certain characteristics that are needed to
22   be in place for a rifle to be deemed an assault rifle or have
23   assault rifle characteristics.  For example, the minimum would
24   be, it would be a semiautomatic rifle with a detachable
25   magazine.  With those two in place, one other characteristic

Det. James Clontz - Direct - Reeves

1    would be, would have a pistol grip that protrudes conspicuously

2    from beneath the frame, the receiver of the firearm.

3          It could have a mounting portion called a bayonet lug

4    where an external knife or bayonet could be attached to the

5    front end of it.

6          You can have a collapsible or folding stock.  There's

7    one other characteristic it comes equipped with a grenade

8    launcher.

9          I think those characteristics would deem a

10   semiautomatic rifle with detachable magazine would deem it an

11   assault weapon.

12   Q.    Can you explain to the jury when a layperson uses the

13   word AK-47, are you familiar with what an AK-47 is?

14   A.    Yes.

15   Q.    Explain to the jury.

16   A.    An AK-47 loosely translated means automatic

17   Kalashnikov model 47.  It was a semiautomatic rifle, which can

18   be converted to a full automatic.  Developed in 1947 by at the

19   time a Russian commander he developed an assault rifle that tank

20   crews can use and store in their tanks.

21         It has a unique design.  It's arguably one of the most

22   poplar and widely owned assault rifles in the world .

23         The two basic ones, assault rifles in the world are

24   our military M-16 type, it's rifle counterpart would be the

25   AK-47 assault rifle.

Det. James Clontz - Direct - Reeves

1    Q.   Would it be a fair statement to say AK-47 and other

2    models based on the AK-47 weapon was designed to be used in war?

3    A.   It was developed as a military weapon and many of the

4    world's armies use that weapon as a standard rifle.

5    Q.   Detective, I would like you to describe or explain to

6    the jury what a cartridge is, the way you would use the word in

7    the lab?

8    A.   A cartridge is sometimes confused with the term

9    bullet.  A cartridge is actually one unit of ammunition

10   sometimes called a round it has four parts.

11        The main part is a casing.  It holds inside a

12   propellant, which is gunpowder.  Bottom end of it there's a

13   little cup, ignition source called a primer what sits on the

14   top, the projectile or the bullet.

15   Q.   Now, I'm going to hand up to you what's been received

16   in evidence as People's 165.

17        Do you recognize People's 165 in evidence, the two

18   bags handed up to you?

19   A.   Yes, I do recognize it.

20   Q.   Now, can you tell us where you recognize those two

21   bags from?

22   A.   This is the packaging that I created upon completion

23   of my firearms examination.  One has packing material or the

24   packing container and various components and cartridges that I

25   received.

TR

Det. James Clontz - Direct - Reeves

1       The second, the larger one is a particular rifle and

2   packaging that I tested back in December of 2011.

3       Q.   Before we talk about that weapon, what I would like to

4   do is show you a series of photographs.

5       The first two photographs I'm going to show you are

6   126 and 127 in evidence.  I want to ask you a couple of

7   questions about that picture or those two pictures.

8       Before we get to the pictures, can you tell us the

9   semiautomatic assault rifle, how you would load that particular

10  weapon and what happens when you pull the trigger?

11      A.   This rifle that I had tested gets loaded with an

12  external box magazine.  All that magazine is it's an ammunition

13  holding devise it's outer housing that has a spring on the

14  inside and a follower on top of the spring.

15      The idea is when you load a cartridge into the top it

16  compresses the spring.  When you let go the spring pushes the

17  cartridge up, but the top of the magazine holds everything in

18  place.  Once a loaded magazine is inserted into a semiautomatic

19  rifle like this one it gets loaded in on the side there's a bolt

20  handle that's pulled to the rear.

21      Once it's let go the bolt slides forward.  It will

22  strip off the top most cartridge from the magazine and load it

23  up and into the firing chamber.  With this particular model when

24  the bolt goes forward it locks into place.

25      This rifle works semi-automatically in that one pull

TR

1  of the trigger it will discharge one cartridge fire the

2  cartridge, the bullet will travel down the barrel, and out of

3  the rifle.

4          Some of the energy produced will cause the bolt to

5  slide backwards extracting and ejecting the spent cartridge from

6  the chamber and out the ejection port.  That's one full cycle of

7  fire.  It will load, feed, extract, and eject the cartridge.

8      Q.   Now, when a shell casing is ejected from this

9  particular weapon where does it go?

10     A.   The ejection port is typically on the right hand side

11 of the rifle.  It's meant to be ejected up and out typically

12 away from the rifle with enough force so there's not a chance

13 for misfeed where the cartridge casing gets stuck and are not

14 allowing another cartridge to be loaded properly.

15     Q.   The two photographs that I've shown you, People's 126

16 and 127, can you see the ejection port on the rifle?

17     A.   No, I can't.

18     Q.   In the two photographs what's covering the ejection

19 port?

20     A.   Well, one photograph is of the left hand side, the

21 other photo has like a piece of like plastic.  In this

22 particular photo there's a piece of cardboard inserted into the

23 ejection port.

24     Q.   What's the purpose of the cardboard inserted in the

25 ejection port?

TR

1    A.   I usually see cardboard or some other material

2    inserted in that area it's so -- that indicates that someone had

3    checked the weapon, cleared the weapon, indicating that there's

4    no live rounds in the chamber.

5    Q.   When you received the weapon was the tape and the

6    plastic bag that are in the picture 126 and 127 in evidence

7    taped to the weapon?

8    A.   No.   I received them in the box with the rifle, but

9    not attached to the rifle.

10   Q.   When you received the weapon to be tested, did it come

11   with a magazine and live ammunition?

12   A.   It did.

13   Q.   But the ammunition had been removed from the weapon?

14   A.   Correct, sir.

15   Q.   Now, if one were to fire the weapon with that plastic

16   bag taped over the ejection port, what would you expect happen

17   to the discharged shell casing?

18   A.   Well, if it was covering the ejection port it would

19   actually catch the casing because the bag would cover the area

20   where the spent casing is designed to come out of the rifle.

21   Q.   Now how hot are the shell casings when they're

22   discharged from the ejection port?

23   A.   When any kind of cartridge is discharged it creates

24   tremendous amount of pressure and tremendous amount of heat, so

25   a discharge casing would be hot.

1       Q.   Now, I've got two three more photos.  I'm going to

2   show you, People's 128, 130 and 131.

3            I'd like you to take a look at People's 128.  There's

4   a blue ruler there in that picture, correct?

5       A.   Yes.

6       Q.   On the blue ruler there's an RS number.  Can you tell

7   me what number it is?

8       A.   RS 26.

9       Q.   Now, looking in that photograph, do you see any

10  ammunition in that particular magazine?

11      A.   I could make out what appears to be the copper jacket

12  of a cartridge at the top most portion of this magazine.

13      Q.   With the Court's permission what I'm going to ask you

14  to do with this red marker, if you could, just circle the copper

15  jacket protruding from that magazine.

16           I have the same question for you in the next two

17  photos People's 130 and 131.

18           In People's 130 and 131 there's a different number on

19  the blue scale than is in the photo?

20      A.   Yes.

21      Q.   That's RS 27?

22      A.   Yes, it is.

23      Q.   In either of those two pictures can you tell me, do

24  you see what appears to be a copper jacketed bullet protruding

25  from the magazine?

TR

1    A.   Yes, in both of those there's a copper jacketing

2    protruding from the top most portion of the magazine.

3         Q.   With the Court's permission if you can circle those on

4    People's 130 and 131 where you see the ammunition.

5         If you would be kind enough to hold it to the jury.

6    A.   This was 128 and this is 130.

7         Q.   Those are two different magazines?

8    A.   Yes, sir.

9         Q.   You can put all those pictures aside.

10        What I would like to do is focus on the weapon itself.

11        In December of 2011, did you receive this weapon for

12   operability testing?

13   A.   Yes.

14        Q.   If you could, and with the Court's permission, what I

15   would like you to do is to take the weapon only out of the large

16   sealed plastic bag?

17                  THE COURT:   Fine.

18   A.   This rifle is unloaded and safe to handle.

19        Q.   Thank you.

20        What I would like you to do is just explain to the

21   jury what features on this particular weapon would characterize

22   it as an assault rifle?

23   A.   Well, it's a semiautomatic rifle.  It has an ability

24   to accept an external box magazine, which would fit in here.  It

25   has a pistol grip that protrudes from beneath the frame.

TR

1          It could be argued that this position here is just a

2    means to hold the cleaning rod in someplace, but typically the

3    bayonet can be mounted to the forward portion of this.

4          It's also -- this design is made after the AK-47

5    Kalashnikov rifle made by a Romanian company, however it's based

6    on that design.

7    Q.    What makes it a semi-automatic as opposed to fully

8    automatic?

9    A.    On some models of the AK-47 type of rifle this select

10   or switch can move back and forth from safe to semi-automatic to

11   full automatic.  Semiautomatic is the ability to discharge one

12   cartridge at a time with each pull of the trigger.

13         Full automatic will discharge as many cartridges that

14   are available on the magazine when the trigger is depressed.

15         The only way to stop full automatic fire would be to

16   either take your finger out of the trigger, run out of

17   ammunition, or have a malfunction like a jam where the cartridge

18   can no longer be loaded properly and fired.

19   Q.    Now, Detective, you described how -- you can put that

20   down.

21         You described how you would load ammunition into the

22   magazine.  When you received the weapon in December of 2011 you

23   indicated that there was a detachable box magazine with it.  Is

24   it in front of you?

25   A.    Yes, it is.

TR

1    Q.   If you could, I don't want you to take it out of the
2    bag, but if you could hold the bag so that the jury can see the
3    magazine.

4    A.   This devise?

5    Q.   Did it have ammunition in that magazine when you
6    received it in December of 2011?

7    A.   When I received it, it had no ammunition in the
8    magazine itself.

9    Q.   Was the magazine empty?

10   A.   Yes.

11   Q.   Ammunition was in the box with the magazine and the
12   rifle, correct?

13   A.   Yes, I received live ammunition with the magazine.

14   Q.   How many rounds did you receive?

15   A.   I received.

16        Your Honor, may I refer to my inventory notes.

17             THE COURT:   Yes.

18   A.   I'm looking at a copy of my inventory notes that I
19   created.   When I receive a case I'll check the invoice and the
20   items that I received and itemized each thing on inventory to
21   make sure I'm receiving everything that I'm supposed to receive.

22        With this particular case I received 19 live
23   cartridges.

24   Q.   What is the maximum capacity of the magazine that came
25   with this rifle?

1      A.    This magazine that is sealed in this bag had a

2  capacity of 27.62 by 39 millimeter caliber cartridges.

3      Q.    The magazine has a capacity of 20.  What's the maximum

4  amount of ammunition that can be loaded into this rifle?

5      A.    This particular rifle and many other firearms in

6  general can accept a fully loaded magazine.  It's called a

7  chamber round, putting one in the chamber.  One could cycle the

8  bolt to load one live round into the chamber.  The magazine can

9  then be removed and topped off with another round loaded into

10  the chamber.

11          So with a fully loaded 20 cartridge magazine plus one

12  in the chamber would be 21.

13      Q.    You received it with 19 life rounds, correct?

14      A.    Yes, I did.

15      Q.    How many times would one have to pull the trigger in

16  this weapon to discharge two bullets?

17      A.    To discharge two cartridges?

18      Q.    Yes.

19      A.    Two.

20      Q.    Now, when you got the weapon did you have an

21  opportunity to check for evidence of discharge?

22      A.    I did.

23      Q.    Would you explain to the ladies and gentlemen what

24  evidence of discharge is?

25      A.    During my operability examination the first thing I'll

Det. James Clontz - Direct - Reeves

1    do is check the rifle, the firearm to see if it's unloaded and
2    make sure it's unloaded and safe to handle.

3          I was the last person to touch this prior to packaging
4    it, so I'm fairly competent that it was unloaded, but it was out
5    of my possession for just over two years. Now I do what's
6    called a safety check to insure that it was unloaded.

7          During my examination I'm going to look to see if
8    there's any kind of broken or missing parts to the rifle. I'll
9    also look down the barrel looking for any kind of obstruction
10   and look in the chamber area to see if there's any kind of
11   defect or material in there.

12         While doing so I noticed what's called evidence of
13   discharge. When a cartridge is fired the gun powder starts to
14   burn. When it does it creates like a soot or gunpowder residue,
15   a soot that will cover the firing chamber of the area. That's
16   what I noticed, the evidence of discharge.

17   Q.    When you got this weapon in December of 2011 did you
18   see evidence of discharge?

19   A.    Yes, I did.

20   Q.    Can you show us just holding up the weapon where the
21   ejection port is?

22   A.    Sure. When I examined this rifle I did clean it. I
23   was using the gloves, now they're inside out. It would defeat
24   the purpose of me putting it back on again.

25         The ejection, this is the bolt that slides forward,

TR

1    the magazine sits here.  When it gets loaded this bolt will

2    cycle forward.  When it fires, the bolt will slide back and this

3    area here, that's the ejection port, the spent casing will be

4    pulled out of the chamber and discharge up and out of the rifle.

5        Q.    Once the trigger is pulled?

6        A.    Correct.  The energy produced during the discharge on

7    the cartridge, with this particular model the cartridge will be

8    fired in here to seal for the most part seal area.

9            The gases produced will push the bullet at very high

10   speed down the barrel, and out of the firearm of the rifle.

11   This particular model like other types of rifles has a gas tube

12   here.  What happens is some of the gases will be vented upwards

13   back through this gas tube.  There's a pivot on that, that

14   pushes this back again to aid in the extraction and ejection of

15   the spent cartridge casing.  That energy will cycle the bolt

16   back again.  It will load the next cartridge to prepare it to

17   fire again.

18       Q.    In December of 2011 did you check this weapon for

19   operability?

20       A.    Yes, I did.

21       Q.    Can you tell us what you did and what the result was?

22       A.    Following my initial check, my function check, I was

23   able to determine that the firearm was most likely going to

24   operate as designed.

25            I then proceeded to take some test fire cartridges,

TR

1    live cartridges to our bullet recovery system room.

2          This room has a stainless steel tank that holds about

3    800 gallons of water with a fire port on one end.  It's designed

4    to accommodate pistols and rifles and various firearms.

5          One would fire into the firing port.  The projectile,

6    the bullet, hits the water.  The water dissipates the energy and

7    the bullet will sink down to the bottom so I can recover them.

8          I did five test fires with this rifle and the

9    cartridges, and the rifle worked as I thought it would.  It

10   operated as it was designed.

11   Q.    You tested ammunition from the ballistics supply, did

12   you test ammunition that came with the rifle?

13   A.    I did.

14   Q.    What were the results of the rounds that came with the

15   rifle, were they also operable?

16   A.    Of the three cartridges that I tested that came with

17   the rifle those three were operable as well.

18   Q.    Now, after you test fire the weapon what do you do

19   with the shell casings and bullets that you test fire?

20   A.    Before firing the cartridges I'll mark the bullet

21   portion and the cartridge casing portion of each cartridge.  I

22   recovered the bullets, matched them up with the casings because

23   of the markings.

24         One cartridge I packaged here fired states two other

25   cartridges from the case plus the two other cartridges from our

TR

1    supply.  I packaged and I test fired them.

2        Q.   I'm going to hand you what's been premarked 174 for

3    identification.

4            I would like you to hand this to the detective.

5            Do you recognize that envelope that I've just handed

6    up to you?

7        A.   Yes, I do.

8        Q.   What do you recognize that to be?

9        A.   This is a test fire envelope that I created.  This is

10   my handwriting on the front.  Also my -- the abbreviation F. E.

11   for Firearm Examination, my initials, and the date December 9,

12   2011.

13           This was a tamper resistant seal that has my initials

14   and date that I created this.

15           This is a test fire envelope that I created to put my

16   test fire samples into.

17       Q.   With the Court's permission unseal that and tell me if

18   you recognize the contents of that envelope.

19       A.   These are the casings that I created.  The gray ones

20   are case ammunition that came with the case, and the brass color

21   ones are from the supply.  These projectiles, I'm looking at the

22   lab number and my initials on here, these are the bullets that I

23   could put back with each casing that's when there was a whole

24   cartridge that I marked.

25       Q.   Now, the contents of the envelope that's been marked

                                   TR

Det. James Clontz - Direct - Reeves

1   as People's 174 for identification, is it in the same or

2   substantially the same condition as when you tested it on

3   December 9, 2011?

4       A.   Well, there are two additional stickers and initials

5   on the back here.  One set of initials was from another

6   microscopist who sealed this on December 10th of 2011 with this

7   sticker and her initials.  The third sticker, third set of

8   initials are my initials that I added to this on February 12th

9   of this year.

10      Q.   Other than the additional writing on the envelope is

11  the envelope and the contents in the same or substantially the

12  same condition from December of 2011?

13      A.   Yes.

14              MR. REEVES:  I offer 174 in evidence at this

15          time.

16              MS. GUASTELLA:  No objection.

17              THE COURT:  The test fires, did I understand you

18          to say that they're from the test that you made from

19          ballistic supplies as well as from three rounds received

20          with the weapon?

21              THE WITNESS:  Yes.  I received -- I tested three

22          cartridges that came with the rifle, one I packaged with the

23          remainder of the live ammunition and the magazine, the two

24          others that came with the case I kept along with our supply

25          of ammunition.

1           THE COURT:  So this is exhibit 174 in evidence.

2           (At this time, People's exhibit 174 was marked

3     and received in evidence.)

4     Q.    What's the purpose for keeping the test firearms in

5     that yellow envelope?

6     A.    We'll produce test fires for firearms that we receive.

7     They get entered into what's called IBAS, Integrated Ballistic

8     Identification System.

9           It's a computerized database of cartridge case images.

10    The idea is that these casings are from a known source.  I

11    tested the firearm, I produce these test fires.  I could say

12    that these came from this rifle.

13          The images are loaded into the IBAS database, so if

14    there's another crime scene somewhere or any other scene where

15    casings are recovered, those casings will be entered into the

16    IBAS system as well and the IBAS system does it's own internal

17    checking to see if there's a possible match.

18          If there is a possible match we pull the evidence from

19    the unknown crime scene to the known test fires and compare them

20    to see if there's a possible match.

21    Q.    Detective, do you know someone or did you know someone

22    by the name of Detective Beverly Des Vignes?

23    A.    Yes.

24    Q.    Who is Detective Des Vignes?

25    A.    Beverly she was a microscopist in my unit.

Det. James Clontz - Direct - Reeves

1    Q.    In December 10, 2011 did she examine the test fired

2  rounds compared against some evidence that was sent to the lab

3  from the scene of the shooting?

4    A.    Yes.

5    Q.    Is Detective Des Vignes still with the New York City

6  Police Department?

7    A.    She is retired.

8    Q.    Do you know approximately when she retired?

9    A.    I believe it was 2012 or early 2013.

10   Q.    In February of 2014 were you assigned to the

11  microscopy section of the lab?

12   A.    Yes.

13   Q.    Did you receive a request from the Richmond County

14  district attorney's office to reexamine some evidence that

15  Detective Des Vignes examined because she had retired?

16   A.    Yes, I did.

17              MR. REEVES:  Your Honor, I'm going to go to a

18         different area now.

19              THE COURT:  We'll break for lunch.  Members of

20         the jury we'll resume at 2 p.m. with further direct

21         examination of the detective.

22              Don't discuss the case.  Have a good lunch.  See

23         you at 2:00.

24              (Whereupon a luncheon recess was taken.)

25


                              TR

People - Det. Clontz - Direct/Reeves

1              (A F T E R N O O N   S E S S I O N)

2              THE COURT CLERK:  Case on trial continues,

3     Armand Skrine, Indictment 454/2011.

4              (Defendant present.)

5              THE COURT OFFICER:  Your Honor, ready for the

6     jury?

7              THE COURT:  Yes.

8              THE COURT OFFICER:  Jury entering.

9              (Whereupon, the jury enters the courtroom.)

10             THE COURT CLERK:  Do both sides stipulate to a

11    complete jury panel, properly seated?

12             People?

13             MS. CILIA:  Yes.

14             THE COURT CLERK:  Defense?

15             MS. GUASTELLA:  So stipulated.

16             THE COURT:  Detective, would you resume the

17    witness stand, please.

18             (Whereupon, the witness resumes the stand.)

19             THE COURT CLERK:  Detective, I just remind you

20    you're still under oath.  You can be seated.

21             THE WITNESS:  Thank you.

22             THE COURT:  This is continued direct examination.

23             MR. REEVES:  Thank you, your Honor.

24    DIRECT EXAMINATION (Continued)

25    BY MR. REEVES:

People - Det. Clontz - Direct/Reeves

1    Q.    Detective, I think we were about to start to talk

2    about the microscopic work you did.  Before we do that, I have

3    just a couple of more questions about the rifle that's behind

4    you.

5          In general, do all weapons get what's known as a

6    serial number stamped on them?

7    A.    Um, I believe after 1964 they were required to have a

8    serial number stamped on them.

9    Q.    And when you received this weapon December 9, 2011,

10   did it have a serial number that you could see?

11   A.    Not that I was able to find, no.

12   Q.    And why is that?

13   A.    The location where the serial number would have been

14   I -- We have a firearms reference collection at the laboratory.

15   Sometimes if I can't identify a part, or a part is missing, or

16   in this case a serial number, I could take one of our reference

17   firearms, determine where something should be, and compare it

18   to what I have.  In this particular case, I couldn't find the

19   serial number where it would have been.

20   Q.    Was it defaced?

21   A.    I determined that it was defaced.

22   Q.    And what does deface mean?

23   A.    Defacement of a firearm is an attempt to hide its

24   origin.  A serial number is meant to be -- it could be tracked

25   backwards to -- back to actually the time it was manufactured

People - Det. Clontz - Direct/Reeves

1   and to any owners along the way.  Without their serial number

2   there really is no way of determining a firearm's history.

3       Q.    Now, if a weapon is defaced and it comes into the

4   New York City Police Department's possession, does the Police

5   Department affix to it a lead seal?

6       A.    Typically, yes.

7       Q.    And what is the purpose of a lead seal?

8       A.    A lead seal is a -- It's a piece of lead that has a

9   wire attached to it with a six-digit number.  When that lead

10  seal is attached to a firearm or some other piece of evidence

11  that needs some sort of identification, that number is recorded

12  on the invoice, or on any associated paperwork, and you could

13  basically identify that particular evidence item, or in this

14  case this rifle, by that lead seal number instead of a serial

15  number.

16      Q.    And was that done in this case?  Did this weapon have

17  a lead seal when it came to you in December, 2011?

18      A.    I don't believe so.  I believe I affixed one at the

19  lab.

20      Q.    Detective, I want to talk to you a little bit about

21  ammunition if I could.

22            Before we talked about the four component parts of a

23  cartridge.  What I'd like to do is talk to you a little bit

24  about how those parts work in a weapon.

25            I'd like to start off by asking you, when you use the

MMS

People - Det. Clontz - Direct/Reeves

1    word "caliber" in the lab, what does that mean?

2        A.    Caliber is a way to identify a class of firearm.

3    Also, caliber, as it relates to ammunition, is the diameter of

4    the base of a bullet.  That would determine a bullet's caliber.

5        Q.    Now, how would you determine the caliber of a shell

6    casing?

7        A.    Typically on the bottom side of the shell casing, on

8    the head stamp area, it would be stamped in by the

9    manufacturer.

10       Q.    And can you explain to the jury, what caliber is the

11   assault rifle that's behind you?

12       A.    This caliber rifle, it's typical of this type of

13   weapon, it's classified as a 7.62 mm x 39 mm caliber rifle.

14       Q.    And would you explain to the jury what those numbers

15   mean.

16       A.    7.62 mm identifies the base diameter of the bullet.

17   It roughly equates to .308 inches.  The 39 mm is the actual

18   length of the shell casing itself without the bullet.  So, 7.62

19   is the bullet diameter by 39 is the shell length.

20       Q.    Thank you, Detective.

21            Now, when a bullet passes through the barrel of a

22   rifle, are there any marks left on the bullet that are

23   significant to your work when you're looking at the evidence

24   through the comparison microscope?

25       A.    Well, during the manufacturing of any kind of firearm,

MMS

People - Det. Clontz - Direct/Reeves

1   the barrel of, either, a rifle, pistol, or any other kind of
2   firearm just starts out as a rod of steel.  There's a drill
3   that is passed through to start a hole.  That hole is then
4   widened to get to the final caliber size.  But that barrel is
5   smooth, it's a smooth board.  A cutter is inserted.  The cutter
6   has a predetermined number of blades at a certain angle.  When
7   this cutter is pushed through, it starts to turn, and, as it
8   turns, it cuts into the inside of the barrel, creating what's
9   called rifling.  It will create a series of high points, which
10  are lands, and low points, which are grooves.

11          The idea behind that is that when a cartridge is
12  discharged, the bullet is pushed into the barrel under this
13  tremendous force and the bullet itself engages at rifling and
14  the bullet starts to spin.  As it travels down the barrel, it
15  starts to accelerate, the powder continues to burn, creating
16  pressure.  The bullet accelerates, starts to spin, and when it
17  leaves the barrel, it leaves it spinning.  The idea behind
18  that, it's -- I always associate that with any good NFL
19  quarterback throwing a football.  The football in a nice tight
20  spiral will give the football speed, distance, and accuracy.
21  Without good rifling, the bullet kind of goes like lately the
22  way I throw a football, kind of wobbles a little bit, not much
23  speed, not very accurate at all.

24          Those marks made by those cutters change with every
25  barrel as they're used.  Those marks are transferred onto the

People - Det. Clontz - Direct/Reeves

1    bullet, so the high point in a barrel would leave a low point
2    on a bullet, and the low point in a barrel would leave a high
3    point on a bullet.

4           Those are the markings that I could use to identify if
5    two bullets were fired from the same weapon and if some unknown
6    bullets, if they were fired from a known bull -- you know,
7    bullets from a known source.

8    Q.   And, Detective, I have the same question for you
9    related to a shell casing.  When a shell casing is ejected from
10   a semiautomatic weapon, are there any marks left on the shell
11   casing that would be significant to your work on the comparison
12   microscope?

13   A.   Yes, there are.

14          When the shell casing sits in the chamber, when the
15   firing pin ignites -- strikes the primer, ignites the powder,
16   there is a tremendous amount of pressure that builds.  That
17   pressure would force the bullet down the barrel, but also that
18   same pressure will take the casing and slam it against what's
19   called the breech face.  That breech face is steel; it's made
20   by different tools under different applications.  And those
21   marks will be transferred to the shell casing itself.  When it
22   hits, those marks will be more impressed.

23          Also, when the casing is extracted and ejected, the
24   extractor, it's a little hook that will pull back on the
25   cartridge casing, that's made by different tools, that can

People - Det. Clontz - Direct/Reeves

1    leave some marking.  Also, as a case is ejected out of the
2    ejection port, sometimes it might hit the topmost portion of
3    one side of the ejection port leaving scrape marks there.  That
4    top portion of the ejection port, that's metal made by another
5    process of the gun manufacturer, and that can leave identifying
6    marks as well.

7        Q.    Thank you, Detective.

8              What I'd like you to do is, you should have People's
9    164, a white envelope, in front of you.  Do you recognize that
10   envelope?

11       A.    Yes, I do.

12       Q.    What do you recognize it to be?

13       A.    This is an evidence envelope and, going by the
14   signatures and the initials, was produced by retired
15   Det. Des Vignes on December 10, 2011.

16       Q.    Now, I think we talked before lunch that after
17   Det. Des Vignes retired in February of this year, you were
18   assigned to reexamine the evidence, correct?

19       A.    Yes.

20       Q.    Did you mark that envelope in any way?

21       A.    I did.

22       Q.    And you recognize your handwriting?

23       A.    I do.

24       Q.    Now, that was unsealed here in court a couple of days
25   ago.  I'd like you to just open it again and look at the

People - Det. Clontz - Direct/Reeves

1   contents, and we're going to talk about the contents of it in a
2   few minutes.

3        Det. Clontz, can you tell me, are there any deformed
4   bullets in that white envelope that's been received in evidence
5   as 164?

6        A.   Yes.   Inside the envelope there are two smaller
7   plastic bags each containing one deformed bullet each.

8        Q.   And can you explain to the ladies and gentlemen of the
9   jury, when you and I use the term "deformed bullet," what are
10  we talking about?

11       A.   Deformed in this sense means that it's not perfectly
12  round anymore; it's been bent out of shape; it's not in good
13  condition.   Theoretically, any bullet that comes out of a
14  barrel is deformed, because it's got these land and groove
15  impressions on it, but for the -- for firearms identification,
16  that's not a deformed bullet.   It's a standard bullet with
17  markings on it.   These, however, are, like I said, the bay has
18  been flattened on both of them so that it's no longer round.

19       Q.   And, Det. Clontz, are you able to determine the
20  caliber of those two bullets?

21       A.   Using a caliber for -- to measure the base of the
22  bullet, you couldn't.   They're so flattened that the actual
23  caliber could not be measured.   However, there are certain
24  other characteristics of these that are typical of a particular
25  specific type of ammunition.

MMS

People - Det. Clontz - Direct/Reeves

1      Q.   And, Det. Clontz, do you have an opinion to a

2   reasonable degree of scientific certainty what type of bullets

3   these two are?

4      A.   By the general shape and their weight and the kind of

5   markings that are on here, these are typical of a 7.62 mm x

6   39 mm caliber class of bullet.

7      Q.   Now, Detective, can you tell the jury what a copper

8   jacketed bullet is?

9      A.   Well, in older times bullets were made out of lead,

10   and what would happen is is that when they would fire and they

11   would travel down the barrel, little bits of lead would be left

12   inside the barrel.  During, you know, like colonial times, a

13   barrel that was -- that could fit, say, I don't know, a

14   .40-caliber or .4-inch diameter bore, after it got fired

15   several, several times, that diameter could start shrinking

16   down where a smaller caliber bullet would have to go in.  The

17   idea about putting a harder metal around the lead, in this case

18   a copper jacket, is to prevent that.  The copper jacket, or the

19   copper covering, will cover the lead so that there is less lead

20   fouling in the barrel.

21      Q.   Thank you, Detective.

22           In addition to the shape of those two bullets, were

23   you able to weigh them?

24      A.   Yes.

25      Q.   And what did you find the weight of those two bullets

People - Det. Clontz - Direct/Reeves

1   to be?

2       A.   Well, they were initially weighed in.  I reconfirmed

3   them when I did them.  One bullet weighed 111.3 grains and the

4   other bullet weighs 118.2 grains.

5       Q.   Is that generally consistent with a 7.62 x 39 mm?

6       A.   There is -- It is -- There is a little bit of loss in

7   them, but they're consistent with that caliber class.

8       Q.   Now, Det. Clontz, did you have a chance to take those

9   two bullets from the scene of this homicide and compare them

10  to the rounds that you test-fired to the rifle that's behind

11  you?

12      A.   I did.

13      Q.   And can you explain to the jury what you did and what

14  your results were.

15      A.   We use a comparison microscope.  Essentially, it's

16  two compound microscopes connected by an optical bridge.

17  That optical bridge consists of prisms and mirrors.  What it

18  does, it allows me to mount one piece of evidence on the

19  left-hand stage and another piece of evidence on the right-hand

20  stage, and when I look through the eyepieces, I could see both

21  of them at the same time.  I could put them together, separate

22  them by a optical line -- it's called a line of demarcation --

23  and I could then do comparisons back and forth between them.

24           I knew that I shot these test-fires.  I personally did

25  them, I personally marked them.  I started my examination of

People - Det. Clontz - Direct/Reeves

1   the bullets with comparing my test-fires to each other.  That

2   allowed me to get kind of in my mind like a baseline of where

3   different marks should be, give me an idea of how deformed --

4   how that's going to affect my further examination.

5        After I was able to examine my test-fired bullets, I

6   then took one of the evidence bullets and tried to make a

7   comparison to find the similarities of the markings and to see

8   if I could determine if they came from the common source, which

9   in this case would be this rifle.  I also did the same with the

10  second bullet.

11       Q.   And what were the results?

12       A.   I came up with an inconclusive result.

13            Inconclusive in this instance means that the bullets

14  are of the same caliber class, so they have the same class

15  characteristics.  However, I didn't find enough repeated marks

16  or impressions that would give me a fair degree of certainty to

17  conclusively say that, okay, yes, these evidence bullets came

18  from this rifle.

19            Inconclusive in this case means that, though it's the

20  same type of bullet, it may or may not have been fired from

21  this rifle.

22       Q.   How did your opinion in February of 2014 compare to

23  the former detective's opinion?

24       A.   Det. Des Vignes also had an inconclusive result with

25  these.

1    Q.    Now, if you could, I would just like you to put the

2    bullets away and I want to talk to you a little bit about the

3    shell casings from the scene.  Can you put the bullet -- just

4    put them back in the envelope.

5           First of all, if you can show the ladies and gentlemen

6    of the jury the two shell casings that were recovered.

7    A.    Sure.  They are both marked and they're in this little

8    Ziploc bag.

9    Q.    Are you able to determine the caliber of the shell

10   casings that were recovered?

11   A.    Yes.

12   Q.    And how did you do that?

13   A.    On the head stamp it's stamped by the manufacturer.  I

14   don't know if you could tell.  This brass-colored part, that's

15   the primer, and the area surrounding it is a head stamp area,

16   and that's where the manufacturer stamped the company's name

17   and also the caliber.

18   Q.    And can you tell us who the manufacturer of the two

19   spent shell casings were to the jury.

20   A.    Sure.  These are -- It's hard to see through here.

21   These have markings on it.  It's made by a Russian

22   manufacturer.  They have these two kind of like squiggly lines

23   one on top of each other.  That is typical of the manufacturer

24   that's called Silver Bear.

25   Q.    Now, can you take a look at the live cartridges that

People - Det. Clontz - Direct/Reeves

1    were received with the magazine with the rifle and tell me if

2    you can tell who the manufacturer of the remaining live rounds

3    in that bag was.

4        A.    It's going to be hard to determine here.

5              THE WITNESS:  Your Honor, if I may look at my

6        inventory notes again.

7              THE COURT:  Okay.

8              THE WITNESS:  Thank you.

9        A.    These are the same inventory notes that I looked at

10   earlier today.

11             On my inventory notes, I had listed that all the

12   ammunition that I received was also made by Silver Bear.

13       Q.    Thank you, Det. Clontz.

14             Let's talk, if we could, about the microscopic work

15   that you did with the shell casings.

16             Can you explain to the jury what you did with the two

17   shell casings from the scene and the test-fired shell casings

18   from when you fired the rifle back in December of 2011.

19       A.    Of course.

20             I did a similar type of examination.  I took the shell

21   casings that I produced when I test-fired the rifle.  I had

22   four of them and I compared them to each other.  Again, I was

23   trying to determine any similar markings.  I wanted to be able

24   to rotate each one properly so that I could take my markings,

25   any markings that I did see, and line them up properly.  It's

1    almost looking at say you wanted to examine two clock faces.

2    You know, you would put them down and you'd probably orientate

3    12 o'clock just forward or up and down so that you could be

4    able to do a fair comparison side by side.  That's what I did

5    with my test-fires, I looked to see if I could orientate them

6    in such a way where I could identify certain features, certain

7    firing pin markings, or markings on the breech face.

8         Once I was able to get a baseline in my mind, I took

9    one of the two evidence casings and I put it up on the

10   microscope and I looked to see if I could see any similar

11   markings.  When I was able to, I rotated it just right, to a

12   point where I was looking at my known casing from the test-fire

13   I produced with the unknown casing under my microscope, and I

14   was able to put the pieces together to make what basically

15   looked like one whole casing, even though I was looking at two

16   separate pieces.  I did the same thing for the second casing as

17   well, and I was able to do that.

18        Q.   And, Detective, to a reasonable degree of scientific

19   certainty, what's your opinion about which weapon fired the two

20   discharged shell casings recovered during the course of this

21   investigation?

22        A.   Well, when examining cartridge casings, there's two

23   tools acting on here: one is the firing pin, which strikes the

24   primer; and also the breech face, which affects the rest of the

25   casing.  In my examination I was able to determine that the

People - Det. Clontz - Direct/Reeves

1   markings made by the firing pin of my known test-fires to my

2   unknown evidence casings were made by the same tool or the same

3   firearm.  And, also, the breech face markings on my test-fires

4   were made by the same tool that produced the breech face

5   markings on the evidence casings.

6       Q.   And how did your opinion compare to Det. Des Vignes

7   when she compared it back in December of 2011?

8       A.   Det. Des Vignes was able to identify one of the

9   evidence casings as a positive match to the test-fires by

10  firing pin and the second casing by firing pin and breech face.

11  I was able to determine that both casings, evidence casings,

12  matched my test-fires by, both, firing pin and breech face

13  marking.

14      Q.   Which weapon discharged these two shell casings?

15      A.   It was the same weapon that produced these test-fires,

16  which is the same rifle that I had test-fired back in December

17  of 2011.

18      Q.   That's the weapon that's in evidence as People's 165?

19      A.   Yes.

20      Q.   The Romanian-made AK-47?

21      A.   Yes, sir.  Actually, it's a -- the actual model is a

22  WASR-10, but it's an AK-47 design, yes.

23               MR. REEVES:  Det. Clontz, I have no further

24          questions for you.  Thank you, sir.

25               Thank you, your Honor.

MMS

People - Det. Clontz - Cross

1  CROSS-EXAMINATION

2  BY MS. GUASTELLA:

3      Q.   Good afternoon, Detective.  I just want to take you
4  through the timeline a little bit.

5           So, you received the weapon into evidence, right?  And
6  you -- Do you swab it and print it first and then do your
7  tests, or do you test it and then do you swab it and print it?

8      A.   I don't do swabbing or any kind of other testing.  We
9  receive what's called a request for laboratory analysis, on
10  their end will indicate the type of testing that's required.
11  When I received this rifle at the time I did my examination, I
12  was requested to do operability examination.

13      Q.   So, you didn't actually do the swabbing in this case?

14      A.   I did not, no, ma'am.

15      Q.   Do you know who in the lab did the swabbing of the
16  gun?

17           MR. REEVES:  Objection, your Honor.  Assumes
18      facts not in evidence.

19           THE COURT:  Overruled.

20           You can answer it if you know.

21      A.   I don't know.

22      Q.   And, so, it's your testimony you didn't print the gun
23  as well?

24      A.   That's correct.

25      Q.   And do you know who printed the gun in this case?

MMS

People - Det. Clontz - Cross

1           MR. REEVES:  Same objection, your Honor.

2           THE COURT:  Overruled.  I'll let the witness

3      answer it, if he knows.

4      A.   I don't know the answer to that.

5      Q.   And do you also do gun powder examinations on weapons?

6      A.   No, ma'am, I don't.

7      Q.   Do you know who conducted the gun powder test in this

8      case?

9           MR. REEVES:  Objection.

10          THE COURT:  I guess the question is, Do you know

11     if one was?

12     Q.   Do you know if one was conducted?

13     A.   That I don't know.

14     Q.   Do you know a Gina Columbo (phonetic)?

15     A.   I know of the name.  I think she might be a

16     criminalist at the laboratory.

17     Q.   Thank you.

18          Now, the Romanian WASR-10, in your expertise, you

19     wouldn't say it's the top-of-the-line AK-47, right?  It's

20     actually one of the bottom weapons, down with Chinese?

21     A.   It's -- It's -- The design works.  But is it

22     top-of-the-line?  It's made by the Romanian State Arms

23     Factories, and they are -- that's what they make.

24     Q.   It has a lot of problems, right?

25     A.   As compared to -- I'm kind of partial to US-made

MMS

People - Det. Clontz - Cross

1    rifles.  I would say it would be, yes, a lower.

2        Q.   So, it's got a lot of problems, right?

3        A.   It functions -- Actually, the AK-47 design is a --

4    it's a lot more robust than an American counterpart, the M-16

5    rifle.  It's kind of bulkier, kind of heavier, but it's a

6    design that basically can withstand a lot of dirt and just

7    maltreatment and it is still going to work.  That's why a lot

8    of parts are kind of oversized.

9        Q.   But the parts that are manufactured are cheap, right;

10   they're not the top-of-the-line parts?

11       A.   The metal is a stamped metal.

12       Q.   And the parts are all interchangeable, right, in the

13   AK-47?

14       A.   They are designed that way, yes.

15       Q.   In this particular model, WASR-10, there is a lot of

16   problems with trigger slap, right?

17                THE COURT:  With what?

18                MS. GUASTELLA:  Trigger slap.

19       Q.   Right?

20       A.   It used to be.  I had read an article about that, but

21   I believe in the later models that they were able to identify

22   that problem and correct that.

23       Q.   And trigger slap is, basically, after you pull the

24   trigger, sometimes, as the trigger is trying to reset, it

25   catches the finger, right, it hurts?

MMS

People - Det. Clontz - Cross

1    A.    It's a trigger mechanism defect at the time, yes.

2    Q.    Did you do a trigger pull test in this particular

3    case?

4    A.    I don't believe one was requested.

5    Q.    But in your expertise -- and I know you have a lot of

6    it -- the AK-47s, particularly this type of a model, has a

7    light trigger pull, correct?

8    A.    There was nothing abnormally light about it.  A

9    trigger pull --

10         May I explain really?

11   Q.    Yes.

12   A.    It's the amount of pressure required on the trigger to

13   cause the firearm to release the sear.  A sear is just a metal

14   component that would hold the firing pin back.  Once that

15   trigger is tripped by -- when the sear is tripped by the

16   trigger, the firing pin can go forward and discharge the

17   cartridge.

18         Trigger pull comes in various weights.  When I

19   test-fired this weapon, the five times that I test-fired it, I

20   didn't notice anything abnormal about it, but, then again, I've

21   tested many, many firearms, and there was nothing unique about

22   this particular trigger pull.

23   Q.    Much different than pulling the trigger on a revolver,

24   correct?

25   A.    Yes, comparatively, yes.

People - Det. Clontz - Redirect/Reeves

1    Q.   Now, you did do some work to raise the serial number,
2    correct, on this weapon?

3    A.   I'm not trained in serial number restoration.

4    Q.   You're not the one that raised the serial number?

5    A.   That's correct.

6              THE COURT:  Was a serial number raised?

7              THE WITNESS:  I didn't see a report in the case
8    folder.  I can't say either way if it was done or not done.

9    Q.   Who is Antonio Colon (phonetic)?

10   A.   Antonio Colon, he's a retired New York City detective,
11   worked in my unit, Firearms Analysis section, as our serial
12   number restoration person.  He retired, and the Bureau of
13   Alcohol, Tobacco and Firearms hired him to do serial number
14   restoration in my lab.  So, he retired and, basically, walked
15   out and came back in.

16   Q.   So, as far as you know, he was working in 2011?

17   A.   Yes, he was working.

18             MS. GUASTELLA:  Judge, I have nothing further.

19             THE COURT:  Any redirect?

20             MR. REEVES:  Yes, I do.

21   REDIRECT EXAMINATION

22   BY MR. REEVES:

23   Q.   Det. Clontz, you indicated that you fired this weapon
24   five times, correct?

25   A.   Yes.

People - Det. Clontz - Redirect/Reeves

1    Q.   Did you hurt your finger when you fired the weapon
2    five times?

3    A.   No, I didn't.

4    Q.   And you were asked about design defects.  Do you have
5    an opinion, to a reasonable degree of scientific certainty, if
6    you shot this rifle at a human being's head, would it kill the
7    person?

8    A.   It's -- The -- The bullet coming out can, yes, do
9    something like that, yes.

10   Q.   And when you shot the weapon, it worked?

11   A.   It did.

12              MR. REEVES:   Thank you.

13              No further questions, your Honor.

14              THE COURT:   Any recross?

15              MS. GUASTELLA:   No.

16              THE COURT:   All right, Detective, you're excused.

17   You're free to step out.

18              THE WITNESS:   Thank you, sir.

19              (Witness excused.)

20              THE COURT:   Next witness, please.

21              MR. REEVES:   People call Ms. Irene Wong.

22              THE COURT OFFICER:   Your Honor, are you ready for

23   the witness?

24              THE COURT:   Yes.

25              THE COURT OFFICER:   Witness entering.

MMS

People - Wong - Direct/Reeves

1    I R E N E    W O N G, having been called as a witness on behalf

2        of the People, having been duly sworn by the clerk of the

3        court, was examined and testified as follows:

4                    THE COURT CLERK:  State your name for the record.

5                    THE WITNESS:  Irene Wong, W-O-N-G.

6                    THE COURT CLERK:  And your employer.

7                    THE WITNESS:  I'm employed with the Office of the

8        Chief Medical Examiner Forensic Biology Department.

9                    MR. REEVES:  May I inquire, your Honor?

10                   THE COURT:  Yes.

11                   MR. REEVES:  Thank you.

12   DIRECT EXAMINATION

13   BY MR. REEVES:

14       Q.    Good afternoon, Ms. Wong.  How are you?

15       A.    I'm good.  And you?

16       Q.    I'm good.  Thank you.

17             Would you start off by telling the ladies and

18   gentlemen of the jury how long you've worked at the Office of

19   Chief Medical Examiner's Forensic Biology Unit?

20       A.    I've worked there since 2001.

21       Q.    And can you explain to the jury what your current

22   title is?

23       A.    My current title is a Criminalist Level IV.

24       Q.    And in the lab, what is a Criminalist Level IV

25   responsible for?

People - Wong - Direct/Reeves

1    A.   I supervise Criminalists Levels II and Criminalists

2  Level III on their casework, which means that I do a technical

3  review on their work to make sure that everything is correct.

4  I triage evidence when it comes in, so when the evidence comes

5  in, somebody has to determine what testing needs to be done on

6  which items.  I also write my own reports and testify in court

7  when necessary.

8    Q.   And what is the OCME's Forensic Biology Unit

9  responsible for doing?

10    A.   We're responsible for identifying any biological

11  fluids that might be on a piece of evidence, as well as

12  performing DNA testing on any of those evidence.

13    Q.   And, Ms. Wong, could you explain to the ladies and

14  gentlemen of the jury a little bit about your educational

15  background that allows you to work as a Criminalist IV in the

16  OCME's Forensic Biology Lab?

17    A.   I have a Bachelor's of Science in Medical Laboratory

18  Science from Northeastern University in Boston.

19    Q.   Now, in addition to your educational background, when

20  you started working at the OCME in 2001, did you receive any

21  training from them that allowed you to do the job you do?

22    A.   Yes.

23       I started as a Criminalist Level I.  With a

24  Criminalist Level I we had six months of in-house training on

25  any of the bench work that we needed to do.  And then I was

1  promoted to a Criminalist Level II, which is a DNA analyst; and

2  for that, I also had six months of training for that title.

3  And then I was promoted to a Criminalist Level III, and there

4  was approximately one to two month of training before I was

5  able to do the Criminalist Level III tasks and duties.  And

6  then, for a Criminalist Level IV, there was also about a one to

7  two month of training before I was able to do those duties.

8      Q.   And what did the training entail?  What kind of things

9  were you taught or trained to do?

10     A.   So, different levels have different responsibilities

11  and duties.  So, as a Criminalist Level I and II, we did most

12  of the bench work.  So, any of the DNA testing that needed to

13  be done or the evidence examination, that was the type of

14  things that we learned -- were trained on how to do.

15          So, part of training is basically a three-step

16  process.  We would watch somebody that was already competent --

17  that could already do the task, and then they would watch us as

18  we performed the same task, and then we would do a competency

19  test.  Basically, a competency test is something that our

20  in-house training group creates, and then we would perform the

21  test ourselves, and then we would give our results to the

22  training group and they would check our results to make sure it

23  matches with what the known result is.  And after we take that

24  test, we're deemed competent on that procedure.

25     Q.   And, Ms. Wong, how did you do on your competency

1   exams?  Pass or fail?

2        A.    I passed all of my competency tests.

3        Q.    Do you also have to take, as part of the requirement

4   of working in the lab, what are known as proficiency exams?

5        A.    Yes.  Proficiency exams are, basically, exams that we

6   take twice a year.  Remember how I was talking about the

7   competency test where it's given in-house?  A proficiency test

8   is actually from an agency outside -- it's from a company

9   outside.  They send us, quote-unquote, evidence from a case,

10  and then -- where they know the results for, so they make up

11  mock evidence.  We would perform our testing and do our duties

12  like we normally would on a case file, and we would obtain

13  results, and then we would send our results to this outside

14  agency.  They would check with their records what their known

15  results are and then send our quality assurance team the

16  results to see whether we were correct or not.

17       Q.    How often would you take the proficiency exams?

18       A.    I take it twice a year.

19       Q.    Can you tell us how you've done on all the proficiency

20  exams you've taken since 2001?

21       A.    I've passed all my proficiency exams.

22       Q.    Now, Ms. Wong, in addition to giving competency and

23  proficiency exams to the individual people who work in the lab,

24  is the lab itself checked by an outside agency?

25       A.    Yes.

1    Q.   Would you explain to the ladies and gentlemen of the
2    jury how the lab is audited and how often that happens.

3    A.   So, we are audited by a company called ASCLD/LAB,
4    which is the American Society of Crime Laboratory Directors
5    Laboratory Accreditation Board and New York State.  What that
6    means is they come in and they inspect and audit our laboratory
7    either twice a year and then we do an internal audit once a
8    year, every other year.  And it ensures that what we're saying
9    we're doing and all our results are accurate and we're
10   following our standard protocols.

11   Q.   And how did the lab fare in the most recent audit
12   that's going on now, correct?

13   A.   It's actually going to start on Monday.

14   Q.   Prior to this year's audit, how has the lab fared?

15   A.   We've passed all our audits.

16   Q.   Would it be a fair statement to say that the DNA lab
17   at the Office of Chief Medical Examiner is part of as the
18   world's best?  I know it's a loaded question, but.

19   A.   Yes.

20   Q.   Okay.  As part of the Office of Chief Medical
21   Examiner's Forensic Biology Unit, have you had an opportunity
22   to perform any DNA techniques to develop profiles of DNA?

23   A.   Yes.

24   Q.   And can you explain to the jury if there is any way to
25   quantify it?  How many times have you personally done that

People - Wong - Direct/Reeves

1    during the course of your career?

2        A.    It's in the thousands.

3        Q.    Now, we'll talk about what that means in a minute, but

4    have you also had a chance to come to court to testify about

5    your findings or other people's findings from the Office of

6    Chief Medical Examiner's Forensic Biology Lab related to DNA

7    profiles?

8        A.    Yes.

9        Q.    How many times have you come to court to testify?

10       A.    Approximately 26 times; 17 times in trial and 9 times

11   in Grand Jury.

12       Q.    And can you tell us what courts or jurisdictions

13   you've testified in before today?

14       A.    In the five boroughs of the City.

15       Q.    And when you testify, are you deemed to be an expert

16   in the field of DNA analysis?

17       A.    Yes.

18       Q.    And have you ever been denied the qualification of an

19   expert in the field of DNA analysis?

20       A.    No.

21             MR. REEVES:  Your Honor, I'd offer Ms. Wong as an

22       expert in the field of DNA analysis.

23             MS. GUASTELLA:  No objection.

24             THE COURT:  All right.  The witness is recognized

25       as an expert in DNA analysis; is that correct?

MMS

People - Wong - Direct/Reeves

1          MR. REEVES:  Yes, it is.

2          THE COURT:  Okay.

3     Q.   Ms. Wong, before we start talking about work that was

4    actually done on evidence in this case, I'd like you to just

5    briefly tell the jury what DNA is and how you can use it

6    forensically.

7     A.   So, DNA is hereditary material that is passed down

8    from your mother and your father.  It is the same throughout

9    your body.  So, if I were to test DNA from, let's say, the root

10   of your hair versus your skin cells versus your blood, it would

11   be the exact same DNA profile that we would obtain.

12         So, it is the same throughout your lifetime.  So, the

13   DNA that you were born with is the same as the DNA when you

14   die.  And you are the only one with this DNA with the exception

15   of an identical twin.

16         What DNA is is it tells you the person you are.  So,

17   it tells you that you have five fingers, two arms, two legs,

18   black hair, blue eyes; stuff like that.

19    Q.   Now, when I use the word "forensically," can you

20   explain to the ladies and gentlemen of the jury what we're

21   talking about?

22    A.   So, we use DNA to try to connect a person, place, or

23   thing to another person, place, or thing.  So, if we were to

24   examine crime scene evidence, evidence collected from a crime

25   scene, and see whether we can find biological material: semen,

1    blood, or saliva on the material, and then we would cut a piece

2    of it and do DNA testing to see whether we can connect it to a

3    person.

4        Q.   Now, can you explain to the ladies and gentlemen of

5    the jury how you generate a DNA profile from either a known or

6    an unknown sample of biological material?

7        A.   So, a known biological material is, basically, just

8    something that we know where it's coming from.  So, if I were

9    to take something like a cotton swab and swab the inside of my

10   cheek cells, I know that that DNA is from me.

11           So, if I were to do DNA testing on it, what I would do

12   is I would cut the DNA swab, or the cotton swab, maybe like a

13   third of the cotton swab, and then I would do what is called a

14   DNA extraction.  And, basically, what that is is I would remove

15   the DNA from the swab by putting that in a lot of chemicals

16   into a tube, and the next step would be to quantify, which is

17   basically to figure out how much DNA is in that tube.  The next

18   step after that is amplification, which just means that we're

19   going to make thousands and thousands of copies of the DNA that

20   we're looking at.  So, think of it like a copy machine, we're

21   just making thousands and thousands of copies.

22           The step after that would be to put that DNA, the

23   thousands and thousands of copies, into an instrument for STR,

24   or short tandem repeat, and what that does is it's going to

25   come out with a DNA profile.

People - Wong - Direct/Reeves

1       What a DNA profile is is, for DNA testing, we look at
2   15 different locations on your DNA, plus a gender gene, and
3   that's going to tell you the male or female.  So, those 15
4   different locations we see a series of numbers, and that is
5   basically what the DNA profile is.  And when we examine
6   evidence, or a known sample, this is what would come out and
7   this is what we're comparing.

8       Q.    Now, is the method used to generate a profile from an
9   unknown source the same or different as it is for a known
10  source?  Do you use the same equipment, the same techniques?

11      A.    It's the same technique, yes.

12      Q.    Now, what I'd like to do is hand up to you what's been
13  premarked as People's 175A and B, and I'm going to ask you some
14  questions.

15      In 2011 and 2012, did the Office of Chief Medical
16  Examiner receive, both, known and unknown samples relating to a
17  homicide of David Williams on December 8, 2011, here in Staten
18  Island, New York?

19              THE WITNESS:  Your Honor, may I please refer to
20      my notes?

21              THE COURT:  Yes.

22      A.    Can you please repeat that date?

23      Q.    Certainly.

24      The homicide of David Williams occurred on December 8,
25  2011, and my question was, in December of 2011 through 2012,

MMS

People - Wong - Direct/Reeves

1    did the Office of Chief Medical Examiner receive, both, known

2    and unknown samples that were requested to be analyzed for DNA?

3        A.    Yes.

4        Q.    What I've handed up to you is People's 175A and B for

5    identification.   Each time a known sample comes in from a

6    suspect in a case, is it assigned a unique and specific number

7    by the Office of Chief Medical Examiner?

8        A.    Yes.

9        Q.    And, in this case, did the Office of Chief Medical

10   Examiner receive a known sample from a person by the name of

11   Armand Skrine?

12       A.    Yes.

13       Q.    And was it assigned a specific and unique number?

14       A.    Yes.

15       Q.    And what was that number?

16       A.    FB for Forensic Biology, 11 for 2011, -S1608.

17       Q.    Now, I've handed up a binder to you that's been

18   labeled People's 175A.   Do you recognize that?

19       A.    Yes.

20       Q.    And what do you recognize that to be?

21       A.    This is a certified copy of a file concerning the

22   evidence FB11-S1608.

23       Q.    And is it a complete and accurate copy that's been

24   certified?

25       A.    Yes.

People - Wong - Direct/Reeves

1      Q.   Now, in the course of business of the Office of Chief

2   Medical Examiner's Forensic Biology Unit, are you required to

3   keep files on all work you do on a specific case?

4      A.   Yes.

5      Q.   And was that done with FB11-S1608?

6      A.   Yes.

7      Q.   And what I handed up to you is 175A for

8   identification.  Is it true and accurate copy of the business

9   records that you are required to keep?

10      A.   Yes.

11            MR. REEVES:  Your Honor, I offer People's 175A at

12     this time.

13            MS. GUASTELLA:  No objection.

14            THE COURT:  I beg your pardon?

15            MS. GUASTELLA:  No objection.

16            THE COURT:  All right, 175A is marked in

17     evidence.

18            (Whereupon, People's Exhibit 175A is received in

19     evidence.)

20            THE COURT OFFICER:  So marked.

21      Q.   Ms. Wong, what I'd like to do is to talk to you about

22   the second folder, 175B for identification, and I'd ask you if

23   you recognize that.

24      A.   Yes.

25      Q.   What do you recognize that to be?

People - Wong - Direct/Reeves

1      A.    It's a certified copy of the file FB11-06979.

2      Q.    Is it a fair and accurate copy of the entire file or

3   the evidence that was submitted under that particular number?

4      A.    Yes.

5      Q.    And the same questions:  You are required when you get

6   unknown evidence, you are required to assign it a specific and

7   unique number and maintain a file on that evidence that you've

8   analyzed?

9      A.    Yes.

10              MR. REEVES:  Your Honor, I offer People's 175B in

11         evidence.

12              MS. GUASTELLA:  Can I take a look at 175B?

13              THE COURT:  Sure.

14              (Handing.)

15              MS. GUASTELLA:  No objection.

16              THE COURT:  I beg your pardon?

17              MS. GUASTELLA:  No objection.

18              THE COURT:  This is 175B now in evidence.

19              (Whereupon, People's Exhibit 175B is received in

20         evidence.)

21              THE COURT:  What is 175B what is submitted as and

22         unknown sample?

23              MR. REEVES:  Yes.

24              THE COURT:  All right.

25      Q.    Ms. Wong, what I'd like to do is to talk to you about

People - Wong - Direct/Reeves

1    175B first.

2         Now, you explained the different steps that

3    technicians or criminalists in the lab will take to generate a

4    profile from an unknown sample.  In this particular case, what

5    was submitted for examination?

6         A.   There are items taken from David Williams: blood

7    sample, scalp hair, left fingernails, right fingernails, and

8    swab of a bite mark.

9         There were also swab RS6 from the west wall of the 7th

10   floor hallway of 195 Steuben Street, S/O stairwell doorway 7B.

11   There was also a brown long coat labeled RS7 from the duffel

12   bag RS23.  There was a black mask from inside the left outside

13   pocket of the brown long coat.  There was also black mask RS12

14   from the duffel bag RS23; black sock RS13 from the duffel bag

15   RS23; black gloves with a yellow trim labeled RS18; black

16   leather jacket RS28; black long sleeved shirt RS33; black

17   duffel bag RS23 from the N/O footpath north side of retainer

18   wall Pierce Street.

19        There were also items taken from Armand Skrine:  A

20   gray hoodie zip-up sweatshirt labeled RS8; pink bath towel,

21   RS9; a pink hand towel, RS10; black hoodie sweatshirt pullover,

22   RS11; a black right ankle sneaker boot, RS29; left ankle

23   sneaker boot, RS29A; blue jeans, RS30; black shorts with white

24   trim, RS31; a gray T-shirt, RS32; a black spade with yellow

25   handle RS14; black umbrella, RS15; black umbrella, RS16; white

People - Wong - Direct/Reeves

1   rope, RS17; a gray CD player, RS19; CD-ROM, RS19A; black

2   headphones, RS20; white glove, RS21; white glove, RS22; a swab

3   22.1 handle of blade; swab 23.1 handle of umbrella; swab 24.1

4   handle of umbrella; swab 26.1 buttons of CD player; swab 27.1,

5   rim of CD; swab 28.1, edges of headphone; swab 29.1, wristband

6   of latex glove; swab 30.1, wristband of latex glove; clear

7   plastic bottle, RS24; clear glass bottle containing fluid, 24A;

8   swab 21.1, rigid portion of cap of Gatorade bottle; swab 21.2,

9   swab of -- side of Gatorade bottle; swab 1.1, from grip of

10  rifle; swab 1.2 from strap buckle of rifle; swab 1.3 from lever

11  of rifle; cutting 1.4 from edge of duct tape on rifle; swab 2.1

12  from head stamp of cartridge; swab 3.1 from base and loading

13  area of magazine; swab 4.1.1 from head -- head stamps of

14  cartridge; swab 4.2.1 from head stamps of cartridge; swab 9.1

15  loader area of firearm magazine; swab 9.2, edges of firearm

16  magazine; swab 20.1, head stamps of cartridge; swab 20.2, head

17  stamps of cartridge; and that was the last one.

18      Q.    Now, out of all the evidence that was submitted, can

19  you tell us what was analyzed by the Office of Chief Medical

20  Examiner for DNA?

21      A.    We looked at the items taken from David Williams, the

22  blood sample.  And we also looked at the brown coat, RS7; the

23  black mask from inside the left outside pocket of the long --

24  brown long coat; the black mask, RS12; the black glove with

25  yellow trim, RS18; the black leather jacket, RS28; the gray

People - Wong - Direct/Reeves

1   hoodie zip-up sweatshirt, RS8; the black hoodie sweatshirt
2   pullover, RS11; the black right ankle sneaker boot, RS29; the
3   black left ankle sneaker boot, RS29A; and the blue jeans, RS30.

4       Q.   Now, from those items, were you able or was the lab
5   able to generate any DNA profiles?

6       A.   Yes.

7       Q.   And from what items were DNA profiles generated?

8       A.   A male profile that we labeled Male Donor A was
9   generated from black mask 1B swabbing and a black mask 2 inside
10  scrapings.

11      Q.   Now, Ms. Wong, as part of the examination process,
12  were color photos taken of several of the items that were
13  examined?

14      A.   Yes.

15      Q.   I am going to hand up to you what's been premarked as
16  People's 176A through E for identification and ask you if you
17  recognize these color photos.

18           Ms. Wong, before we talk about the photos, there are
19  black-and-white copies of that -- of those five photos in the
20  folder that's been received in evidence as 175B, correct?

21      A.   Yes.

22      Q.   Is the only difference between the ones that have been
23  received in evidence and the ones I've handed up as 176A
24  through E for identification the fact that the ones I've just
25  handed to you are in color?

MMS

People - Wong - Direct/Reeves

1    A.    Yes.

2            MR. REEVES:   Your Honor, I'd offer People's 176A

3    through E.

4            MS. GUASTELLA:   I just have a quick question.

5            Ms. Wong, in those photos, the copies of the

6    mask, it looks like there is a gray mark or so around the

7    items.   Is that something that was added to the article?

8            THE WITNESS:   No.   That was when the analyst

9    performed the testing on the item, they took a picture of

10   it and then they circled the picture to demonstrate where

11   they did the testing.

12           MS. GUASTELLA:   So that's something added by the

13   lab, the actual markings on the -- Okay.   Nothing further.

14           THE WITNESS:   Correct.

15           THE COURT:   Any objection?

16           MS. GUASTELLA:   No.

17           THE COURT:   All right, this is 176A through E.

18   Is that right?

19           MR. REEVES:   That's correct.

20           THE COURT:   In evidence.

21           (Whereupon, People's Exhibits 176A through E are

22   received in evidence.)

23           THE COURT OFFICER:   So marked, your Honor.

24   Q.    Ms. Wong, I posted 176A.   Could you tell the ladies

25   and gentlemen of the jury what they're looking at in this

MMS

People - Wong - Direct/Reeves

1  picture?

2      A.    So, this is a picture that was taken during the

3  examination of the long brown coat with black and gray lining.

4      Q.    Now, the top picture is the coat right side out, and

5  the bottom picture is the coat inside out, correct?

6      A.    The top picture is from the outside front, and the

7  bottom picture is the inside rear.

8      Q.    Thank you.

9          Ms. Guastella asked you, the defense attorney asked

10  you questions about the white lines.  Could you explain those

11  to the ladies and gentlemen of the jury.  What are those?

12      A.    So, for the testing on these items, we swabbed the

13  certain areas to determine who might have had contact or who

14  was wearing the jacket.  So, in instances where, let's say a

15  jacket or a shirt, we would look in areas where they would rub

16  against the skin, so that's where your skin cells would most

17  likely be.  So, the areas that you see circled on the bottom

18  picture, which is around the neck or the chest area, and the

19  two cuffs, the left and the right arm, those were the areas

20  that were swabbed for DNA testing.

21      Q.    And to your knowledge, was any DNA recovered from

22  those areas on the brown coat?

23      A.    There was not enough DNA for -- to do testing.

24      Q.    Thank you.

25          I want to draw your attention to the next photo, which

MMS

People - Wong - Direct/Reeves

1    is 176B.  Just tell the ladies and gentlemen what they're

2    looking at in 176B.

3        A.    This was the black mask found on -- found from the

4    outside pocket of the brown coat.

5        Q.    And in this photo, the white lines, can you explain to

6    the ladies and gentlemen what the white lines represent?

7        A.    So, this was exactly the same as the jacket where the

8    analyst that did the testing swabbed that middle portion of the

9    mask to try to obtain DNA.

10       Q.    Now, was the lab successful in generating DNA profile

11   from that item that was swabbed by the technician?

12       A.    Yes.

13       Q.    What I'd like to do is to show you 176C and just ask

14   you some questions about that.

15             Can you tell us what 176C is?

16       A.    That is a picture of the black mask, RS12.

17       Q.    That's a different mask than the one we just displayed

18   as 176B, correct?

19       A.    That's correct.

20       Q.    Was any examination done on this particular item?

21       A.    Yes.

22       Q.    And can you explain what the white lines on this item

23   represent?

24       A.    So, the white lines are the same as from the other

25   items.  Basically, that was the area that the analyst swabbed

MMS

People - Wong - Direct/Reeves

1    or scraped to try to obtain some DNA.

2        Q.   And the same question for 176D.  What's that a picture

3    of?

4        A.   So, 176C was from the outside of the mask.  176D is

5    the inside of the mask.

6        Q.   And was a DNA profile developed from any of the

7    swabbing taken from the second mask?

8        A.   Yes.

9        Q.   Finally, the last picture in this series, 176E, can

10   you explain to the ladies and gentlemen of the jury what this

11   is a picture of?

12       A.   This is the picture of the black glove with the yellow

13   trim, RS18.

14       Q.   And the white lines on the photo represent what?

15       A.   And that was the area that the analyst scraped in

16   order to try to obtain some DNA.

17       Q.   And was a DNA profile generated from those scrapings

18   from the black glove with the yellow stripe?

19       A.   No.

20       Q.   Now, Ms. Wong, what I'd like to do is to talk to you

21   about the second file, 175A.

22            During the course of the investigation, did the Office

23   of Chief Medical Examiner's Forensic Biology Unit receive a

24   known sample of Armand Skrine?

25       A.   Yes.

People - Wong - Direct/Reeves

1    Q.    I'm going to hand up to you what's been premarked as

2    177A through C, and if you could, when the court officer gives

3    you those pieces of paper, just tell the jury what they are.

4        A.    They are, basically, a summary of the DNA results

5    obtained from this case.

6    Q.    And do those three pieces of paper fairly and

7    accurately reflect the result of the DNA analysis of the known

8    sample of Armand Skrine and the unknown samples recovered from

9    the two masks that are contained in the bench notes received in

10   evidence as 175A and B?

11       A.    Yes.

12   Q.    Ms. Wong, would those three pieces of paper be helpful

13   to you in explaining to the jury the results of your testing in

14   this case?

15       A.    Yes.

16            MR. REEVES:   Your Honor, I'd offer People's 177A

17       through C at this time.

18            THE COURT:   Can we have a brief sidebar, please,

19       just for a moment.

20            (Whereupon, a discussion is held at the side bar

21       off the record.)

22            (Whereupon, Tammy Rodriguez replaces Maurizia

23       Selleck as the official court reporter.)

24            (Continued on next page.)

25

MMS

1    Q.    Ms. Wong, if you take 175 A., note relating to the

2    buccal swab from the defendant, does it indicate where the swab

3    was taken?

4    A.    According to the request for laboratory examination

5    report provided by the New York City Police Department it states

6    it's from I/O, mouth/cheek of suspect Armand Skrine.

7    Q.    Does it indicate the person who took the actual buccal

8    swabbing from the defendant?

9    A.    It says -- on the same form it says the evidence

10   collector was Robin S-T-E-N-E-C-K.

11   Q.    Detective Steneck?

12   A.    That would be correct.

13   Q.    Detective Steneck prepared a voucher for those buccal

14   swabs?

15   A.    Yes.

16   Q.    That voucher was submitted to the OCME for analysis?

17   A.    Yes.

18   Q.    Ms. Wong, what I would like to do is redirect your

19   attention to 177 A. through C, the last question I asked you, I

20   believe, would those three pieces of paper help you explain to

21   the ladies and gentlemen of the jury what a DNA profile looks

22   like?

23   A.    Yes.

24            MR. REEVES:  Your Honor, I would offer People's

25   177 A. through C. in evidence at this time?

TR

                              Wong - Direct - Reeves

1              MS. GUASTELLA:  No objection.

2              THE COURT:  All right.  177 A. through C. in

3        evidence.

4              (At this time People's Exhibit 177 A through C

5        were marked and received in evidence.)

6              THE COURT OFFICER:  So marked, your Honor.

7    Q.   Now, Ms. Wong, I would like you to take a look at 177

8    A. and I've posted for the ladies and gentlemen of the jury.

9              Tell them what they're looking at?

10   A.   So before when I was talking about the 15 different

11   locations that we're looking at on the DNA this is what it would

12   look like.

13             So on the left hand column you see on the top it says

14   loci that basically means the location of the DNA we're looking

15   at.  So the first row after Loci says D3S1358 that's the first

16   location the name of the first location.

17             VWA is the second and FGA is the third etc., etc..

18             On the second column on the right hand side on the top

19   it says Armand Skrine and underneath that you see a bunch of

20   numbers that is what a DNA profile looks like.

21             So before when I had said that the DNA comes from your

22   mother and your father, so if you look at location D3S1358 you

23   see two numbers a 15 and 17, so the mother or the father could

24   have donated a 15 and the other person would have donated the 17

25   so that goes the same for all of the different locations that

Wong - Direct - Reeves

1    you see there.

2            Now, at the last location on that last row you see

3    something the location called amelogenin that is the gender

4    gene.  So basically it's going to tell you if it's a male or

5    female.  A female would be XX and a male would be XY.

6    Q.    Thank you.  So what's posted is 177 A. would be the 15

7    loci DNA profile of Armand Skrine, correct?

8    A.    Correct.

9    Q.    Now, what I would like you to do is just explain to

10   the ladies and gentlemen of the jury you said that you guys exam

11   the glove, but you weren't able to generate a DNA profile from

12   the glove.

13           Can you explain to the ladies and gentlemen why the

14   absence of DNA from an item like a glove?

15   A.    So for the glove we scraped inside area where we would

16   think there would be a lot of DNA.  Unfortunately there was not

17   enough DNA to continue with our testing.

18           Remember before I said some of the steps to do DNA

19   testing, the first thing would be to draw the DNA out of the

20   item.

21           The second one would be to quantify it, to figure out

22   how much DNA is there.  At that stage we were not able to get

23   the minimum amount of DNA obtained in order to continue testing

24   to obtain a DNA profile.

25   Q.    Can you tell us where in the human body can we get DNA

 1  from?

 2      A.   You can get it from practically anywhere in the body.

 3      Q.   Now, you did have a chance to test the two masks.  I'd

 4  like to ask you did you have an opportunity if you take a look

 5  at 177 B., did you have an opportunity to generate a DNA profile

 6  from the unknown scrapings from the mask that was called mask 1?

 7      A.   Yes.

 8                THE COURT:  What's mask 1?

 9                MR. REEVES:  Can you tell the Court which one it

10      was the one in the pocket, or the one in the duffel bag?

11      A.   Mask 1 B was from the inside -- left outside pocket of

12  the brown long coat.

13      Q.   So just to differentiate between the two the lab

14  called that mask 1?

15                THE COURT:  I think the witness said 1 B., is

16      that right?

17                THE WITNESS:  Correct.

18      Q.   Now, were you able to generate a profile, a DNA

19  profile from mask 1 B?

20      A.   Yes.

21      Q.   What I posted on 177 B., how does that compare to the

22  known DNA profile of Armand Skrine?

23      A.   As you can see from the chart Armand Skrine's profile,

24  DNA profile is on the second column.  We're going to compare the

25  numbers between the second column and the DNA profile obtained

TR

1    from the mask 1B. and the numbers are the same.

2        Q.    Finally, if I can draw your attention to 177 C., that

3    was designated mask 2 inside scrapings?

4        A.    Correct.

5        Q.    And can you tell us were you able to generate DNA

6    profile from that item?

7        A.    Yes.

8        Q.    Can you explain the findings to the ladies and

9    gentlemen of the jury?

10       A.    So if you're looking at the DNA profile for mask 2 is

11   on the last column on the right.  So the numbers are exactly the

12   same as before with the exception of location FGA as well as for

13   four other locations.

14             What this generally means is there wasn't enough DNA

15   to obtain a full DNA profile.

16       Q.    Now the profile from the two unknown samples from the

17   two masks was that a single source of DNA or a mixture of DNA?

18       A.    There were single source.

19       Q.    Can you explain what that means?

20       A.    So for evidence that we tried to do DNA testing on we

21   were able to obtain either single source, which means only one

22   person donated to that sample or a mixture, which means that

23   more than one person was found on that sample.

24       Q.    Now, Ms. Wong, once you generate a DNA profile on the

25   15 loci of somebody's DNA, is there any way to tell how rare or

TR

000812

342

Wong - Direct - Reeves

1    how common that is in the general population?

2        A.    Yes.

3        Q.    What's that called?

4        A.    We use our population statistics in order to figure

5    out how rare the profile is.

6        Q.    Are you familiar with random match probability?

7        A.    Yes.

8        Q.    Does that play to help calculate how rare or how

9    common some profiles can be?

10       A.    That's the formula that we use in order to figure out

11   our calculations.

12       Q.    Can you explain to the ladies and gentlemen how random

13   match probability works?

14       A.    So basically all those numbers from the DNA chart that

15   you see over there we calculate how frequent we see that number

16   in the general population.

17            Once we see how frequent that is we multiply all of

18   those numbers and all of those frequencies in order to figure

19   out the -- how often we'll see it in the population.

20            So think of it like a lottery system.  If 1 comes out

21   of the lottery it's 1 in 52 chances because there's 52 numbers.

22   The next time that you draw from it that's another 1 in 52

23   chances and etc., etc. until we have 15 different locations and

24   we have two DNA alleles or those numbers are called alleles

25   different variations of DNA.

1    So it's 15 locations times 2 per location.  It's the

2  frequency of each of those DNA that we're comparing to come up

3  with those numbers.

4    Q.   Could you calculate the random match probability for

5  either of the two unknown samples in relationship to Armand

6  Skrine?

7    A.   Yes.

8    Q.   What did you come up with?

9    A.   The DNA profile is expected to be found in one in

10  greater than 6.8 trillion people.

11    Q.   Can you give the jury an idea how that compares to the

12  current population?

13    A.   So the current population of earth is about 6.8

14  billion to 7 billion, so we would expect to see this profile

15  once in approximately a hundred planet earths.

16    Q.   The last question that I have for you to a reasonable

17  degree of scientific certainty, can you tell me who the donor of

18  the two unknown samples from the two masks are?

19    A.   Armand Skrine is the donor to those two mask samples.

20    Q.   Thank you.  No further questions.

21         MR. REEVES:  Thank you, your Honor.

22  CROSS-EXAMINATION

23  BY MS. GUASTELLA:

24    Q.   You can't tell the last time the donor wore those two

25  masks?

                                TR

Wong - Direct - Reeves

1    A.    No.  We can't tell the timeframe of when the DNA was

2    deposited on the item.

3    Q.    Could have been a year ago, correct?

4    A.    That's possible.

5                MS. GUASTELLA:  Thank you.

6                THE COURT:  Anything else?

7                MR. REEVES:  No.  Thank you, your Honor.

8                THE COURT:  Ms. Wong, thank you you're excused.

9    You're free to step out.

10               I understand that we're done for the day.

11               MR. REEVES:  That is correct.

12               THE COURT:  We'll resume tomorrow at 10 a.m.

13               MR. REEVES:  Yes.

14               THE COURT:  Okay.  We'll resume tomorrow at

15   10:00, members of the jury, have a good evening.

16               Abide by the rules.  Don't discuss the case.

17   Leave your notebooks.

18               (At this time the jury is excused from the

19   courtroom. )

20               I guess we're talking about Dr. DeRoux that's it

21   for you.

22               MR. REEVES:  Yes.

23               THE COURT:  We had a side-bar regarding the

24   source of the known DNA sample from Mr. Skrine.

25               We discussed the fact that it was taken by a

Wong - Direct - Reeves

1    detective in the precinct and apparently it was Detective

2    Steneck.  Defense counsel suggested maybe the DA could ask

3    that question in an effort to reveal the source and he did.

4              So are we done with that issue?

5              MS. GUASTELLA:  What would have happened is I

6    would have objected, you would have had them call the

7    witness in.  The witness would have said the swab, she would

8    have come back and wasted everybody's time.  Because of that

9    I was satisfied with the way it came out.

10             I have an issue.  There was may be I was mistaken

11   to assume the People would have testified to the lab report

12   that there was no residue consistent with discharge of

13   firearm with the glove that was recovered.

14             THE COURT:  I didn't hear you.  No discharge?

15             MS. GUASTELLA:  There's a report that I have that

16   was taken from the criminal section of NYPD, that laboratory

17   results -- that there was no residue consistent with a

18   discharge of a firearm from the glove.

19             THE COURT:  The glove that was recovered in the

20   duffel bag?

21             MS. GUASTELLA:  Yes.

22             THE COURT:  All right.  What do you want me to

23   do?

24             MS. GUASTELLA:  I ask that the People make this

25   person available.

1           THE COURT:  You can do that or stipulate.  I

2    don't know if that's a big issue.  I'm not litigating, so I

3    don't have your prospective.

4           A stipulation might be the easiest way to do it,

5    but I'll leave it up to you.

6           You're talking about somebody from the lab?

7           MS. GUASTELLA:  Jean Columbo.

8           MR. REEVES:  I haven't spoken to Ms. Columbo.  We

9    had no intention of calling her.  She was not on the witness

10   list, or the names of witnesses to be mentioned.

11          I'll check to see if she's available.  Counsel

12   can always obtain her.  I'll make it easier.

13          THE COURT:  You can expedite it if she's

14   available, and not retired or on vacation.

15          You could subpoena her, or as I suggested may be

16   you can reach a stipulation.  I don't know how important it

17   is.  That's not my call.  Do what you can.

18          MS. GUASTELLA:  Are there any other documents

19   that the People have that indicate other tests that were

20   done with gunshot residue tests any other items?

21          MS. CILIA:  Not to our knowledge, no.  I believe

22   that by the time they would have been able to do that too

23   much time had gone by and therefore they didn't do it.

24          THE COURT:  If they finish up with Dr. DeRoux

25   tomorrow, which I said 10 a.m. that means we'll start at

1      10:30, which means we'll probably be done with the ME by

2      11:30, what are we going to do with the rest of the day.

3      Ms. Guastella?

4                  MS. GUASTELLA:  I indicated this morning my

5      witness is available Monday morning.

6                  THE COURT:  If you have any other witnesses then

7      I would ask you to consider utilizing them tomorrow.

8                  I hate to send the jury home at 11:30 in the

9      morning.

10                 MS. GUASTELLA:  We may have Ms. Columbo as a

11     witness.

12                 THE COURT:  Are you putting your client on the

13     stand?

14                 MS. GUASTELLA:  We're still discussing it, Judge.

15     I'm hoping to know by tomorrow afternoon.

16                 THE COURT:  Well, maybe tomorrow by noon.  I'm

17     not trying to put you in a corner, but we're going to have a

18     whole day tomorrow if your client is going to testify --

19                 MS. GUASTELLA:  I'm going to put him on after his

20     father testifies.

21                 THE COURT:  Well get his father in tomorrow.

22                 MS. GUASTELLA:  I can't.  He has three jobs he

23     couldn't take off tomorrow.

24                 THE COURT:  It seems to me this is very

25     important.

Wong - Direct - Reeves

1    MS. GUASTELLA:  I initially told him Wednesday.

2    I thought we would finish later on in the week.

3    MR. REEVES:  I am going to ask for an offer of

4    proof as to the father -- it doesn't seem to me that there's

5    anything relevant.

6    THE COURT:  That sounds like a good idea.  We had

7    a brief bench conference earlier.  Ms. Guastella said he was

8    background.  I asked if he was a character witness and she

9    said no.

10   Background is a little obscure.  I know you're

11   reluctant to disclose your defense if you have a formal one

12   or maybe you're relying on proof beyond a reasonable doubt

13   I'm not sure, but can you give us an offer of proof.

14   MS. GUASTELLA:  He'll testify as to background

15   that means he knows his son went to college, went to law

16   school, whether he graduated or not, where he was living on

17   December 7, 2011, what his situations were.

18   MR. REEVES:  None of that is relevant.

19   THE COURT:  At this point I don't think it is.

20   MS. GUASTELLA:  Of coarse it is.  People are

21   going to a allege that he took the ferry and bus over to

22   Staten Island.  What if he was living in New Jersey.

23   THE COURT:  They haven't alleged or proven

24   specifically where he lives.  I think Ms. Hunt testified

25   that she thought he lived in Queens.

Wong - Direct - Reeves

1      MR. REEVES:  That would be an alibi.  We have no

2   alibi notice.

3      THE COURT:  Are you talking about alibi?

4      MS. GUASTELLA:  I'm not.

5      MR. REEVES:  Where he lives is irrelevant.

6      MS. GUASTELLA:  Of course, it is.  They're going

7   to say he came over from Queens on the ferry, the ferry to

8   the train, to the bus, and came to Staten Island to execute

9   David Williams.  Perhaps he was living in New Jersey at the

10  time.

11     THE COURT:  Mr. Skrine will testify he was living

12  where?

13     MS. GUASTELLA:  I'm not saying that's where he

14  was living.  The father will provide information as to where

15  Mr. Skrine was living at the time that the People say, in

16  the general time People say he committed this crime.

17     MR. REEVES:  That's irrelevant.

18     MS. GUASTELLA:  No.  It's not it would disprove

19  that he was on the ferry and train.

20     THE COURT:  Where?

21     MS. GUASTELLA:  I don't know, Judge.  I'll speak

22  to the father a little bit more.

23     THE COURT:  Talk to me tomorrow.  It seems to me

24  if you wanted to call your client's father to say where he

25  was living at the time in question I would probably permit

Wong - Direct - Reeves

1    that.  Arguably that is relevant given the ferry video.

2    Beyond that, I'm not sure that you can ask about your

3    client's background and so on.

4              I mean I think that the DA is right when he says

5    that's not relevant.  I think where he was living, if the

6    father could say that probably is, given the People's proof.

7    Beyond that I'm not sure.

8              You can always call him as a character witness,

9    but I don't think that's what you want to do although you

10   could.

11             In terms of bringing out your client's background

12   and so on, I don't know that I can permit him to do that.

13             MS. GUASTELLA:  I'm assuming if he was a

14   character witness possibly at this time I'm going to ask for

15   a motion in limine as to that if the father or Mr. Skrine

16   was to testify as to character would that be opening up the

17   door to the uncharged crime.

18             THE COURT:  Which uncharged crime?

19             MS. GUASTELLA:  The one in Queens.

20             THE COURT:  I didn't know what that is.  We're

21   talking about that?

22             MS. GUASTELLA:  The incident in Queens the People

23   tried to get it through Sandoval.

24             THE COURT:  Some kind of controlled substance.

25             MR. REEVES:  It was an assault.

Wong - Direct - Reeves

1    MS. GUASTELLA:  It was not charged.  Mr. Skrine

2    was not arrested.  Upon information and believe that

3    complainant in that case is not going to proceed and never

4    did want to proceed and, in fact, the detectives couldn't

5    get him to come in.

6            THE COURT:  If you put your client's peacefulness

7    the character trait in evidence -- you can read Richardson's

8    as well as I, that might open the door with regard to cross

9    examination regarding prior acts of violence, but I don't

10   want to give you a ruling because I haven't heard anything

11   specific.  You can read Richardson's as well as I.

12           If you did make him a character witness, I don't

13   think that would be out of the realm of possibility, you

14   might be able to go into that or I'll talk to you tomorrow.

15   Think about it.  You can't get the father in tomorrow.

16           MS. GUASTELLA:  No.  I can't get the father in

17   tomorrow, no.

18           THE COURT:  Well, think about it.  If your client

19   is going to testify what's wrong with tomorrow?

20           MS. GUASTELLA:  I'm not going to put him on

21   tomorrow.  I'm going to spend time with him on Riker's

22   Island this weekend, and prepare him for his defense.  I'm

23   not going to put him on tomorrow afternoon.

24           THE COURT:  Do you anticipate any other witnesses

25   perhaps your client and possibly his father?

Wong - Direct - Reeves

1        MS. GUASTELLA:  No.

2        THE COURT:  Okay.  I'll see you at 10:00.  We'll

3    talk again and we'll work out scheduling.

4        MS. GUASTELLA:  The only issues unresolved are

5    they going to make her available, or do I have to subpoena

6    her?

7        THE COURT:  I heard Mr. Reeves say that he was

8    going to look into it.

9        If you can it's 4 o'clock, Mr. Reeves, perhaps

10   you can make a phone call expedite this or if you can reach

11   a stipulation great, if not, I'll sign a subpoena.

12       I don't know if it's an important issue, but I'm

13   not necessarily the best gauge of that, so I'll certainly

14   sign a subpoena for the technician of the lab if she's still

15   there and available.  All right.  Thank you.

16       Certified to be true and accurate.

17

18   _____

19   Maurizia M. Selleck, Court Reporter

20

21   _____

22   Tammy Rodriguez, Court Reporter

23

24

25


                              TR

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND - CRIMINAL TERM - PART 5
-----------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK    : INDICTMENT NO.
                                         454/2011

            -against-                  :


ARMAND SKRINE,                         :

                                         JURY TRIAL
                          Defendant.   : (Continued)
-----------------------------------------X
**(Dr. deRoux)**              18 Richmond Terrace
                              Staten Island, New York
                              March 7, 2014


B E F O R E:

    HONORABLE STEPHEN J. ROONEY, Justice.



A P P E A R A N C E S:

    DANIEL DONOVAN, ESQ.
    District Attorney - Richmond County
        130 Stuyvesant Place
        Staten Island, N.Y. 10301
    BY:  KYLE REEVES, ESQ.,
        JENNIFER CILIA, ESQ.,
        Assistant District Attorneys

    MARIA GUASTELLA, ESQ.
    Attorney for the Defendant
        88 New Dorp Plaza
        Staten Island, N.Y. 10306




                          MAURIZIA M. SELLECK
                          SENIOR COURT REPORTER


MMS

Proceedings

1          THE COURT CLERK:  Case on trial continues,

2     calendar number 2: Armand Skrine.

3          THE COURT:  Ready?

4          MS. GUASTELLA:  Yes.

5          MS. CILIA:  Yes.

6          THE COURT:  I saw Dr. deRoux.  We can line up the

7     jury.

8          THE COURT OFFICER:  Your Honor ready for the

9     jury?

10          THE COURT:  Yes.

11          THE COURT OFFICER:  Jury entering.

12          (Whereupon, the jury enters the courtroom.)

13          THE COURT CLERK:  Do both sides stipulate to a

14     complete jury panel, properly seated?

15          People?

16          MS. CILIA:  Yes.

17          THE COURT CLERK:  Defense?

18          MS. GUASTELLA:  So stipulated.

19          THE COURT:  Good morning.  Welcome back.

20          Next witness, please.

21          MR. REEVES:  People call Dr. Stephen deRoux.

22     D R.   S T E P H E N   d e R O U X, having been called as a

23     witness on behalf of the People, having been duly sworn by

24     the clerk of the court, was examined and testified as

25     follows:

People - Dr. deRoux - Direct/Reeves

1            THE COURT CLERK:  State your name and affiliation

2        for the record, please.

3            THE WITNESS:  Stephen deRoux, Office of Chief

4        Medical Examiner, New York City.

5            MR. REEVES:  May I inquire, your Honor?

6            THE COURT:  Yes.

7            MR. REEVES:  Thank you.

8    DIRECT EXAMINATION

9    BY MR. REEVES:

10       Q.   Good morning, Dr. deRoux.  How are you?

11       A.   I'm good, thank you.

12       Q.   Would you start off by telling the ladies and

13   gentlemen of the jury how long you've been with the Office of

14   Chief Medical Examiner.

15       A.   More than 21 years.

16       Q.   And, Dr. deRoux, what position do you hold with the

17   Office of Chief Medical Examiner now?

18       A.   I'm currently Deputy Chief Medical Examiner in charge

19   of Staten Island, or Richmond County.

20       Q.   And would you explain to the jury a little bit about

21   your educational background.

22       A.   I went to medical school at University of the West

23   Indies, that's in Kingston, Jamaica.  Following graduation from

24   medical school, I worked for the Jamaican government in

25   multiple medical specialties for about three and a half years.

People - Dr. deRoux - Direct/Reeves

1    I then moved to United States and did three years of training

2    in general surgery.  That was followed by three years of

3    training in anatomical pathology which was followed by one year

4    of training in forensic pathology.

5         Q.   And, Doctor, would you explain to the ladies and

6    gentlemen what anatomical pathology and forensic pathology are.

7         A.   Anatomic pathology is primarily a hospital-based

8    laboratory specialty where we diagnose disease primarily using

9    a microscope.  Forensic pathology is a specialized branch of

10   anatomic pathology where we investigate the cause of death and

11   manner of death in people who die under violent, unexplained,

12   or suspicious circumstances.  This is primarily done by field

13   investigation and conducting autopsy.

14        Q.   And, Dr. deRoux, are you licensed to practice medicine

15   here in New York?

16        A.   Yes.

17        Q.   Can you tell us a little bit about the duties and

18   responsibilities of a medical examiner here in Staten Island?

19        A.   The main function of medical examiner, like I said, is

20   to determine the cause of death and manner of death in these

21   people who die under violent, unexplained, or suspicious

22   circumstances.

23        Q.   Dr. deRoux, what is an autopsy?

24        A.   An autopsy is where you examine the body of a deceased

25   person.  We generally start by doing an external examination of

MMS

People - Dr. deRoux - Direct/Reeves

1    the body, looking for diseases and injuries.  We measure height

2    and weight of the body.  This is then followed by multiple

3    incisions in the body where we remove all the internal organs

4    and dissect them, again, primarily looking for disease

5    processes and injuries.

6         Q.   Doctor, during the course of your medical career, can

7    you tell the jury the number of autopsies that you've

8    personally performed?

9         A.   I've done more than 4,000.

10        Q.   And can you tell us the number of autopsies that you

11   observed other doctors in your presence perform?

12        A.   Several thousand.

13        Q.   Doctor, have you testified in court before today?

14        A.   I didn't hear the question, sorry.

15        Q.   Have you testified in a court of law before today?

16        A.   Yes.

17        Q.   Approximately how many times have you testified?

18        A.   More than 350 times.

19        Q.   And, Dr. deRoux, in 350 times you've testified in

20   court, have you been qualified as an expert in the field of

21   forensic pathology?

22        A.   Yes.

23        Q.   Has any court denied you title of expert in that

24   field?

25        A.   No.

MMS

People - Dr. deRoux - Direct/Reeves

1      MR. REEVES:  Your Honor, I would offer Dr. deRoux

2    as an expert in the field of Forensic Pathology.

3      MS. GUASTELLA:  No objection.

4      THE COURT:  All right, the doctor is recognized

5    as an expert in Forensic Pathology.

6    Q.   Dr. deRoux, before we talk about the specific case,

7    I'd like you to tell the jury what the following terms mean the

8    way you would use them as a forensic pathologist?

9      Would you explain to the jury what the manner and

10   cause of death is.

11   A.   The cause of death is a disease or injury or a

12   combination of those which lead to the final cause of death.

13   So, it's whatever starts a lethal sequence of events in someone

14   dying.  And manner of death explains how the cause arose.  And

15   for purposes of death certification, on a death certificate we

16   are allowed certain choices.  We are allowed to put either

17   natural, homicide, suicide, accident, or undetermined.

18   Q.   Dr. deRoux, would you explain to the ladies and

19   gentlemen what an abrasion, a laceration, and blunt force

20   trauma is?

21   A.   Blunt force trauma is caused by any sort of blunt

22   instrument that either impacts a body or the body impacts

23   itself.  A laceration is a wound caused by blunt trauma where

24   the skin will split open.  And an abrasion is where you have an

25   outer layer of skin rubbed off by some sort of blunt trauma.

People - Dr. deRoux - Direct/Reeves

1    Q.   And, Dr. deRoux, I'd like to focus your attention on

2    an autopsy that was performed on December 9, 2011, on a person

3    identified as David Williams.  Each time an autopsy is done in

4    the City of New York, is it given a unique and specific number?

5    A.   Yes.

6    Q.   And is a report written and filed with the Office of

7    Chief Medical Examiner related to the findings of the autopsy?

8    A.   Yes.

9    Q.   What was the number assigned the autopsy of David

10   Williams?

11   A.   R111292.

12   Q.   And, Doctor, what I am going to do is hand up to you

13   what's been premarked as People's 178 for identification, and

14   I'd ask you to take a look at that.  And just tell the ladies

15   and gentlemen of the jury if you recognize that document.

16   A.   Yes.

17   Q.   Dr. deRoux, what is that?

18   A.   This is a copy of the files for David Williams,

19   including my final autopsy report.

20   Q.   And do those documents fairly and accurately cover all

21   the documents that were prepared during the course of autopsy

22   relating to the investigation into the death of David Williams?

23   A.   Yes.

24   Q.   Now, does the autopsy report that's included in that

25   set of documents also bear your signature?

People - Dr. deRoux - Direct/Reeves

1    A.    Yes.

2    Q.    And when did you sign off on the autopsy report?  Do

3    you recall the date?

4    A.    December 14, 2011.

5              MR. REEVES:  Your Honor, I would offer People's

6         178 in evidence at this time.

7              MS. GUASTELLA:  No objection.

8              THE COURT:  Okay, 178 is marked in evidence.

9              (Whereupon, People's Exhibit 178 is received in

10        evidence.)

11             THE COURT OFFICER:  So marked, your Honor.

12   Q.    Doctor, who performed the autopsy on the body of

13   David Williams?

14   A.    I did.

15   Q.    During the course of autopsy, did you or any member of

16   the Office of Chief Medical Examiner take photographs of the

17   wounds on David Williams --

18   A.    Yes.

19   Q.    -- either before or during the autopsy?

20   A.    Yes.

21   Q.    I am going to hand up to you what have been premarked

22   as People's 179A through M, as in Mary, for identification.

23             Dr. deRoux, if you can take a look at those photos.

24   Do you recognize those as photos that were taken during autopsy

25   of Mr. Williams on December 9, 2011?

People - Dr. deRoux - Direct/Reeves

1    A.    Yes.

2    Q.    Do those photographs accurately show the wounds that

3    you observed on Mr. Williams at the time of autopsy?

4    A.    Yes.

5              MR. REEVES:  I'd offer them in evidence as

6    People's 179A through M, your Honor.

7              MS. GUASTELLA:  Doctor, the injuries that are

8    reflected in the photos are also in your report, correct?

9              THE WITNESS:  Yes.

10             MS. GUASTELLA:  Judge, I'm going to object.

11             THE COURT:  May I see them, please.

12             (Handing.)

13             THE COURT:  All right.  I've reviewed the photos.

14   I think the foundation is sufficient, so I'll mark them

15   into evidence 179A through M.

16             (Whereupon, People's Exhibits 179A through M are

17   received in evidence.)

18             THE COURT OFFICER:  So marked, your Honor.

19   Q.    Doctor, before we talk about the injuries to

20   Mr. Williams, at autopsy did you have an opportunity to measure

21   the height and weight of Mr. Williams at the time of his death?

22   A.    Yes.

23   Q.    What was his height?

24   A.    He was 70 inches, or 5-foot-10, and 138 pounds.

25   Q.    I'm sorry, how much did he weigh?

MMS

People - Dr. deRoux - Direct/Reeves

1        A.    138 pounds.

2        Q.    Thank you.

3              Was Mr. Williams clothed or unclothed when he was

4     received at the morgue?

5        A.    He was wearing clothing.

6        Q.    Was there any evidence of medical intervention when he

7     was received at the morgue?

8        A.    No.

9        Q.    Prior to or during the time of autopsy, did a

10    medical/legal investigator furnish you with any evidence from

11    the scene relating to Mr. Williams' death?

12       A.    Yes.

13       Q.    What was furnished?

14       A.    The medical/legal investigator provide the report of

15    what he saw when he went to the scene.

16       Q.    Did he also physically bring you anything that was

17    recovered from the scene relating to Mr. Williams' body?

18       A.    Aside from sending the body itself, he recovered some

19    fragments of skull at the scene which he put in a bag and sent

20    along with the body.

21       Q.    I am going to show you People's 179A and just ask you

22    what that is.

23       A.    Those are multiple fragments of skull.

24       Q.    Those were received from the medical/legal

25    investigator from your office?

People - Dr. deRoux - Direct/Reeves

1    A.   Yes.

2    Q.   Now, what I'd like to do is ask you, did you see any

3  injuries on Mr. Williams at the time of autopsy?

4    A.   Yes.

5    Q.   And can you tell us or describe for us where those

6  injuries were.

7    A.   He had an entry gunshot wound of the left side of the

8  head, behind the left ear, and he had an exit wound at the top

9  of his head, going from his eyebrow area to the top of his

10  head, which was a big gaping wound with brain visible.

11          He had a second gunshot wound that went through his

12  right arm.  It then exited the right arm and entered the right

13  side of the chest.  It went through his chest, going through

14  the right lung, the heart, the left lung, and exiting the left

15  side of the chest, and then went through his left arm and

16  exited the left arm.

17    Q.   Dr. deRoux, I want to talk to you about the injuries

18  to Mr. Williams' head.  I'm going to show you 179B.  Can you

19  show us on that photograph where the entry wound was?

20    A.   How do I show it?

21    Q.   I'm sorry?

22    A.   How do I show it?  Using this?

23    Q.   Yes.  You have the same photo in front of you.

24    A.   This is the same photograph.  And just behind the left

25  ear, in the back of the head, there is an entry gunshot wound.

People - Dr. deRoux - Direct/Reeves

1    Q.    Where is the exit wound?

2    A.    The exit wound is at the top of the head.  It extended

3    from the right eyebrow to the top of the head.

4    Q.    I am going to show you 179C.  What is that a

5    photograph of?

6    A.    That's a close-up of the entry gunshot wound on the

7    left side of the head.

8    Q.    Doctor, are you familiar with the term "stippling"?

9    A.    Yes.

10    Q.    Just explain to the ladies and gentlemen what

11    stippling is.

12    A.    Whenever a firearm is discharged, there are a number

13    of things that go on in the barrel of the gun.  You are going

14    to have a projectile, or bullet.  Shell casings contain gun

15    powder.  When the weapon is fired, the gun powder catches on

16    fire.  Now, most of the gun powder will catch on fire and burn

17    completely, forming soot.  Some of the gun powder never ever

18    catches on fire.  So, the gun powder that never ever catches on

19    fire still goes down the muzzle of the gun and exits the muzzle

20    of the gun and goes through the air.  When those unburnt

21    fragments of gun powder strikes the skin, it leaves a

22    characteristic pattern of abrasions, which we call stippling.

23    Q.    Now, Dr. deRoux, does the presence of stippling or the

24    absence of stippling assist you as a medical examiner in

25    determining the distance the muzzle of the gun was from the

MMS

People - Dr. deRoux - Direct/Reeves

1  victim at the time a shot was fired?

2      A.    It can, yes.

3      Q.    Now, did you see any stippling around the wound that's

4  on the screen now?

5      A.    No.

6      Q.    Does that give you any indication as to how close or

7  how far the muzzle of the weapon would have been from

8  Mr. Williams at the time that shot was inflicted?

9      A.    It would depend on the test-firing of that weapon.

10  Since it was a high-powered weapon, I'm not sure how far the

11  unburnt gun powder would travel from a high-powered weapon.

12      Q.    And, Dr. deRoux, can you describe for us the path that

13  the bullet from this particular shot traveled through

14  Mr. Williams' head?

15      A.    It went from left to right, back to front, and

16  upwards.

17      Q.    Now, when you use those directions, what position do

18  you assume the body to be in?

19      A.    We describe these directions based on the body in the

20  anatomical position.  The anatomical position is a body

21  standing erect, head facing forward, arms at the side, palms

22  facing forward.

23      Q.    And, Dr. deRoux, do you have an opinion to a

24  reasonable degree of medical certainty what impact this wound

25  would have had on Mr. Williams' immediate ability to function?

People - Dr. deRoux - Direct/Reeves

1    A.    That would cause immediate death, instantaneous death.

2    Q.    Dr. deRoux, I'm going to talk to you about the second

3    gunshot wound to the arms and the chest, and to do that I'm

4    going to show you the next photo, which is People's 179D.

5         Before we talk about the gunshot wound, however, I'd

6    like to talk to you about a wound on the upper right shoulder

7    of Mr. Williams that is visible in this picture.  Can you tell

8    us what that is?

9    A.    Those are three abrasions.

10   Q.    And do you have any opinion as to how recent those

11   abrasions were?

12   A.    Those are all fresh abrasions.  They happened around

13   the time of death.

14   Q.    Would you explain to the jury why that's your opinion.

15   A.    Because there is no evidence of it healing.  There is

16   no evidence of scab formation or anything like that.  That's a

17   fresh wound.

18   Q.    Now, Doctor, in this particular photo, which is 179D,

19   is the gunshot wound to the right arm visible?

20   A.    Yes.

21   Q.    Can you use a picture you have in front of you to show

22   the ladies and gentlemen of the jury where the right arm

23   entrance wound is.

24   A.    (Indicating.)

25   Q.    Thank you, Dr. deRoux.

People - Dr. deRoux - Direct/Reeves

1          MR. REEVES:  Could I hand up a marker to the

2      doctor and ask him to mark that "ENT" for entrance.

3              (Handing.)

4      Q.   And that's on People's 179D.

5      A.   (Indicating.)

6      Q.   Doctor, can you explain to the ladies and gentlemen,

7      how do you, as a medical examiner, tell the difference between

8      an entrance gunshot wound and an exit gunshot wound?

9      A.   There are several things that we use, but as a general

10     rule, entry wound is smaller than the exit wound.  As a general

11     rule, entry wound tends to be fairly neat and round and also

12     tends to have what we call an abrasion margin around it.

13     Whereas, a general rule, the exit wound tends to be larger,

14     more irregular, and do not have an abrasion margin.

15     Q.   And, Doctor, put up 179E.  Can you take a look at that

16     and tell us what it is.

17     A.   That's just a close-up of the entry gunshot wound of

18     the right arm.

19     Q.   Thank you.

20          Now, can you describe for us the path that this bullet

21     took through Mr. Williams' body?

22     A.   It went from right to left without any significant

23     vertical or horizontal deviation.

24     Q.   I'm going to show you 178 -- I'm sorry -- 179F.

25     What's that a picture of?

People - Dr. deRoux - Direct/Reeves

1   A.   That shows the entry gunshot wound to the right arm,
2   and also the reentry of the right chest.

3   Q.   What damage was done to Mr. Williams' right arm as a
4   result of this gunshot wound?

5   A.   Nothing significant, just went through the muscles.
6   There were no bone injuries and no significant vascular
7   injuries.

8   Q.   Doctor, when the bullet entered the chest cavity on
9   the right side of Mr. Williams, what was struck in his chest
10  cavity by this particular bullet?

11  A.   It went through his right lung, his heart, and his
12  left lung.

13  Q.   Now, I am going to show you the next photo, which is
14  179G.  What does that show?

15  A.   I'm not quite sure.  I can't really orient it.

16  Q.   Okay.  I am going to skip to 179H.  Does that now
17  orient you?

18  A.   Yes.

19  Q.   What are we looking at in 179H?

20  A.   You are looking at the exit wound from the right arm.

21  Q.   And 179I, what does that show you?

22  A.   That shows the exit wound from the left chest and the
23  reentry into the left arm.

24  Q.   And if you can tell me what 179J is.

25  A.   That's just a close-up of the exit wound from the left

000839

369

People - Dr. deRoux - Direct/Reeves

1    chest.

2        Q.    Now, you had indicated the organs that were struck by

3    this bullet.  Can you tell us what happened or what damage was

4    done to Mr. Williams' heart as a result of this gunshot wound?

5        A.    There was extensive damage of the entire heart.  It

6    involved all four ventricles, the septum between the

7    ventricles, and the -- what we call the papillary muscles,

8    which hold the valves in place.

9        Q.    I am going to show you 179K.  Does that picture show

10   the damage to Mr. Williams' heart by this gunshot wound?

11       A.    It does, yes.

12       Q.    And 179L, does that also show the extensive damage to

13   Mr. Williams' heart?

14       A.    Yes.

15       Q.    Doctor, do you have an opinion to a reasonable degree

16   of medical certainty what impact that gunshot wound would have

17   had on Mr. Williams' immediate ability to function?

18       A.    Well, once that heart was struck, that heart will not

19   be pumping blood anymore.  He would only have maybe 10 or

20   15 seconds worth of oxygen in his brain to keep him conscious.

21   After that 10 or 15 seconds, he's going to go unconscious and

22   become unresponsive, and if he was erect, he would fall to the

23   ground.

24       Q.    And, Doctor, during the course of preparing the

25   autopsy report, you used the term pulpified to describe the

MMS

1   damage to Mr. Williams' heart.  Would you mind explaining to

2   the jury what pulpified means as the way you used it.

3       A.    Pulpified means it was extensively damaged, like pulp

4   from paper or something like that, with extensive damage,

5   almost like the heart had been ground up in something.

6       Q.    Dr. deRoux, you and I have been talking about the

7   gunshot wound to the head and the gunshot wound to the arms and

8   chest.  Do you have any opinion whatsoever on which wound was

9   inflicted first?

10      A.    No.

11      Q.    And can you explain to the jury why that is?

12      A.    There is no way of me sequencing the gunshot wounds.

13  I have no idea which one came first or second.

14      Q.    Now, the last photo that I have up on the screen is

15  179M, as in Mary.  Would you explain to the ladies and

16  gentlemen of the jury what that is.

17      A.    On the upper right you can see the abrasions that

18  we've discussed before.  Where you see that L-shaped cursor,

19  that's a scale to measure things.  And what you're seeing

20  inside that L-shaped area is what to me appeared to be a bite

21  mark, which was subsequently confirmed by our forensic dentist.

22      Q.    And, when you examined Mr. Williams' body on

23  December 9, 2011, could you tell whether or not this what

24  appeared to be a bite mark was fresh or an old wound?

25      A.    It was a fresh wound.

1    Q.    And can you explain why that's your opinion?

2    A.    Because, again, you could actually see the impression.

3    Over time the impression would disappear.  The skin itself is

4    not broken, so over time that impression would disappear.

5    That's something fresh.

6    Q.    And, Dr. deRoux, do you have any opinion to a

7    reasonable degree of medical certainty the position of

8    Mr. Williams' upper arms at the time the gunshot wound to the

9    arms and chest was inflicted?

10   A.    The arms were to his side because the entry and exit

11   wounds of the arm line up quite nicely with the entry and exit

12   wounds of the chest, and then the wound to the left arm also

13   matches up with exit from the left chest, so his arms were by

14   his side.

15   Q.    Doctor, can you explain to the ladies and gentlemen of

16   the jury what toxicology is the way it was used in your lab?

17   A.    When we do an autopsy, we take liquid and solid organ

18   tissues for measuring chemical substances, drugs, both legal

19   and illegal, and we -- the lab will generate a report of the

20   presence or absence of any of these substance, whether they be

21   prescribed or illicit substance.

22   Q.    And, Dr. deRoux, during the autopsy of Mr. Williams,

23   other than the injuries that you and I have talked about, did

24   you see any other injuries that were relevant to the report

25   that you prepared?

People - Dr. deRoux - Direct/Reeves

1    A.    He had some abrasions and a contusion of his head; he
2    also had a abrasion of his chest, which we've seen before; and
3    he had an abrasion of his leg.

4    Q.    And did those injuries appear to be recent?

5    A.    They were all recent, yes.

6    Q.    Now, what was sent to the toxicology lab from
7    Mr. Williams' body, and what was tested, and what were the
8    results?

9    A.    I sent bile, blood, brain, gastric contents, liver,
10    urine, and vitreous humor.

11    Q.    And could you tell us what results came back from the
12    toxicology lab?

13    A.    In, both, blood and urine, they detected cotinine and
14    cannabinoids.

15    Q.    What is cotinine?

16    A.    Cotinine is a breakdown product of tobacco or
17    metabolites.

18    Q.    And cannabinoids are what?

19    A.    Same as marijuana.

20    Q.    Can you tell us to a reasonable degree of medical
21    certainty what effect either of those two substances had on the
22    cause of death of David Williams?

23    A.    They had nothing to do with the cause of death.

24    Q.    And, Doctor, that's my last question for you:  To a
25    reasonable degree of medical certainty, what did you certify

People - Dr. deRoux - Direct/Reeves

1  the cause of death to David Williams to be?

2      A.   Gunshot wounds of head and chest with injuries of

3  brain, heart and liver -- sorry -- lungs.  My mistake.

4              MR. REEVES:  Thank you, Dr. deRoux.  No further

5      questions for you.

6              Thank you, your Honor.

7              MS. GUASTELLA:  Judge, I have no questions.

8              THE COURT:  Pardon?

9              MS. GUASTELLA:  No questions.

10             THE COURT:  Okay.  Thanks, Doctor.

11             THE WITNESS:  You're welcome.

12             THE COURT:  You're excused.

13             (Witness excused.)

14             THE COURT:  Can you step up a moment, Counsel.

15             (Whereupon, a discussion is held at the bench off

16     the record.)

17             THE COURT:  That's as far as we can go today,

18     members of the jury.  I'm sorry to let you go so early on a

19     Friday, but that's the best that I can do.

20             We're going to resume at 10 a.m. on Monday.  We

21     are actually ahead of schedule according to the lawyers, so

22     I don't want you to be concerned that we're losing this

23     afternoon.  So, I'll let you go.  Have a good weekend.

24     Remember the rules:  Don't discuss the case, and so on.

25     And we'll see you 10 a.m., Monday.  Thanks, again.

Proceedings

1    (Whereupon, the jury exits the courtroom.)

2    THE COURT: Okay, the jury has left. I just

3    wanted to ask a question about the second ski mask. I'm

4    calling it the second, I don't know which is the first.

5    Which ski mask have I been looking at pictures of during

6    this trial?

7    MR. REEVES: The pictures that you've been

8    looking at during the trial have been the ski mask that was

9    found in the duffel bag itself. The second ski mask was

10   found in the pocket of the brown coat found in the duffel

11   bag.

12   THE COURT: Who found it, the one in the coat?

13   MR. REEVES: The one in the coat, the testimony

14   was that the Office of Chief Medical Examiner found it in

15   the pocket of the coat when they processed the coat.

16   THE COURT: I know the coat was in the duffel bag

17   according to the Crime Scene Unit. There is no testimony

18   she looked into the pockets or took anything out, did she?

19   MR. REEVES: No.

20   THE COURT: So, the coat is vouchered and sent

21   out to the lab where that mask is taken from the pocket and

22   tested?

23   MR. REEVES: Correct.

24   THE COURT: Okay. I was just wondering. I

25   haven't reviewed the transcript. I will over the weekend.

MMS

Proceedings

1      So, your plan is to call possibly your client's

2  father and possibly your client?

3          MS. GUASTELLA:  Correct.

4          THE COURT:  What I would suggest -- I don't know

5  how the day is going to go Monday.  If the testimony is not

6  too extended, then I think I'd like to have a charge

7  conference and maybe you could sum up.  I don't know if

8  I'll get a charge in by an appropriate time.  I don't like

9  to charge after 3:30.  It doesn't really make a lot of

10  sense.  So, keep that in mind.  I mean, it is possible that

11  I'll be asking you to sum up Monday.

12          MS. GUASTELLA:  I'll be ready.

13          THE COURT:  It really depends on how long the

14  defense case is.  Anything else?

15          MS. GUASTELLA:  No.

16          MR. REEVES:  I don't think so.

17          THE COURT:  Okay.  Thank you very much.  I'll see

18  you Monday at 10:00.

19              (Defendant remanded.)

20              (Whereupon, court stands in recess and this

21  matter is adjourned to March 10, 2014, at 10 a.m.)

22  *   *   *   *   *   *   *   *   *   *   *
        I hereby certify that the foregoing is a true and
23  accurate transcript of the above proceedings to the best of my
    knowledge, skill, and ability.
24
                                 MAURIZIA M. SELLECK
25                               Senior Court Reporter

MMS

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND - CRIMINAL TERM - PART 5
----------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK   : INDICTMENT NO.
                                        454/2011

              -against-                :

ARMAND SKRINE,                         :

                                       JURY TRIAL
                         Defendant.  : (Cont'd)
----------------------------------------X
                         18 Richmond Terrace
                         Staten Island, New York
                         March 10, 2014

B E F O R E:

    HONORABLE STEPHEN J. ROONEY, Justice.



A P P E A R A N C E S:

    DANIEL DONOVAN, ESQ.
    District Attorney - Richmond County
         130 Stuyvesant Place
         Staten Island, N.Y. 10301
    BY:  KYLE REEVES, ESQ.,
         JENNIFER CILIA, ESQ.,
         Assistant District Attorneys

    MARIA GUASTELLA, ESQ.
    Attorney for the Defendant
         88 New Dorp Plaza
         Staten Island, N.Y. 10306



                         MAURIZIA M. SELLECK
                         SENIOR COURT REPORTER

                              MMS

Proceedings

1          THE COURT CLERK:  Case on trial continues,

2     calendar number 3, Indictment 454/2011, Armand Skrine, from

3     the back.

4               Appearances, counsel.

5               MR. REEVES:  On behalf of the People, Kyle Reeves

6     and Jennifer Cilia.

7               Good morning, your Honor.

8               MS. GUASTELLA:  Maria Guastella for Mr. Skrine.

9               Good morning, your Honor.

10              THE COURT:  Good morning.

11              Do you want to step up a moment while we're

12    waiting for the defendant.

13              (Whereupon, a discussion is held at the bench off

14    the record.)

15              (Defendant present.)

16              THE COURT:  Why don't we get on the record.

17    Mr. Skrine is present.

18              People, I understand that that's your case in

19    chief.

20              MR. REEVES:  Yes, your Honor.

21              THE COURT:  Ms. Guastella, what is your

22    intention?

23              MS. GUASTELLA:  Resting at this point.

24              THE COURT:  So you are resting.

25              MS. GUASTELLA:  Yes.

Proceedings

1           THE COURT:  You mind if I just ask your client.

2           Mr. Skrine, I'm sure you've discussed it with

3    your lawyer, you have a right to testify, of course.  She

4    says you're resting, so I gather you've decided you are not

5    going to testify; is that correct?

6           THE DEFENDANT:  Yes.

7           THE COURT:  Have you had enough time to discuss

8    this with your lawyer?

9           THE DEFENDANT:  Yes.

10          THE COURT:  Okay.  So, the defense is resting,

11   the People are resting, right?

12          MR. REEVES:  Yes.

13          THE COURT:  So, both sides are resting.  We have

14   a jury, but we're going to have a charge conference.  If

15   you're ready we can do that now.

16          MS. GUASTELLA:  Yes, Judge.

17          THE COURT:  Okay.  Incidentally, we discussed at

18   the bench, if you are resting, I don't think there is

19   enough in the record for me to give a justification charge.

20   I guess you agree.

21          MS. GUASTELLA:  I do.  I wasn't planning on

22   asking for that.

23          THE COURT:  I just wanted to make sure.  Let me

24   ask a couple of preliminary questions:

25          Was there any testimony in this case regarding

Proceedings

1    witness preparation?  I have a charge on that, but I don't

2    recall any questions regarding --

3                    MS. GUASTELLA:  I don't recall any.

4                    THE COURT:  Do you recall any?

5                    MR. REEVES:  No.

6                    THE COURT:  Okay.  We had four experts, correct?

7                    MR. REEVES:  Correct.

8                    THE COURT:  Are there any exhibits that are

9    marked for ID but not in evidence?  I can think of one.

10                    MR. REEVES:  Yes.

11                    THE COURT:  There was a magazine marked subject

12    to connection.

13                    MR. REEVES:  Correct.

14                    THE COURT:  Okay.  Anything else?

15                    MR. REEVES:  There was some photographs.

16                    THE COURT CLERK:  A lot of pictures.

17                    THE COURT:  Photos that are not in evidence,

18    marked for ID but not in evidence?

19                    THE COURT CLERK:  Yes.

20                    THE COURT:  I'll tell the jury as part of my

21    standard charge they may consider testimony regarding

22    exhibits that are not in evidence, but they can't have the

23    exhibits themselves.

24                    I have a charge on photographs.  I also have a

25    charge on gruesome photographs.  I don't know that that's

Proceedings

1    required here.  What do you think, Ms. Guastella?

2              MS. GUASTELLA:  I'm sorry, I didn't hear.  What

3    type of photographs?

4              THE COURT:  I give a general charge on

5    photographs, I also have a specific charge on what's

6    referred to as gruesome photographs.  I don't know if

7    that's required here or not.  What do you think?

8              MS. GUASTELLA:  No, Judge.

9              THE COURT:  Okay.  Were there any maps or

10   diagrams placed in evidence?

11             MR. REEVES:  Yes, there were, your Honor.

12             THE COURT:  Which was that?

13             MR. REEVES:  People's 161, 162, and 163.

14             THE COURT:  Oh, right, 161, 162, and 163, is that

15   right?

16             MR. REEVES:  Correct.

17             THE COURT:  Okay.  Those were my preliminary

18   questions.

19             Now, in terms of what I'm charging here, I'm

20   assuming the People are asking for a circumstantial

21   evidence charge.

22             MR. REEVES:  Yes, your Honor.

23             THE COURT:  Any objection?

24             MS. GUASTELLA:  No.

25             THE COURT:  Okay, I'll give that.

MMS

Proceedings

1          There was talk during voir dire -- I don't know

2   if it was Ms. Cilia or Mr. Reeves or both -- I think to the

3   effect that the Court would charge the jury on motive.

4          Are you asking for a motive charge?

5          MR. REEVES:  Yes, your Honor.

6          THE COURT:  Any objection?

7          MS. GUASTELLA:  No.

8          THE COURT:  That's a standard charge from CJI.

9   I'll give it if you want it, and you do.

10          MR. REEVES:  Yes.

11          THE COURT:  So, that's circumstantial evidence

12   and motive.  And I think that's it preliminarily.

13          Let's get to the substantive charges.

14          Count 1 is Murder in the Second Degree.  People

15   are requesting it?

16          MR. REEVES:  Yes.

17          THE COURT:  Any objection?

18          MS. GUASTELLA:  No.

19          THE COURT:  Okay.  I'll charge Count 1, Murder in

20   the Second Degree.

21          In terms of the weapons charges, I'd like to

22   streamline these submissions if I can.  Let me just throw

23   out a thought:  What I'm thinking of submitting but I'm not

24   wedded to this, and I'll certainly hear argument, what I'm

25   thinking of submitting are Counts 3 and 4, not submitting

MMS

Proceedings

 1    Count 2, not submitting Count 5.  I don't know how you feel

 2    about that.  There's arguably consecutive sentencing

 3    possible here.  I'm not saying I would do that if there

 4    were a conviction of any sort, but Counts 2 and 3 are

 5    concurrent counts, Counts 4 and 5 are concurrent counts.  I

 6    believe Count 5 might be a lesser included of Count 3; I'm

 7    not a hundred percent sure.  My inclination is to give

 8    Counts 3 and 4.

 9              What do you think?

10              MR. REEVES:  Can I have one moment?

11              THE COURT:  Okay.

12              MR. REEVES:  Your Honor, I would just ask for

13    Count 3, Criminal Possession of a Weapon in the Second

14    Degree, not home or place of business.

15              THE COURT:  And that's it for weapons counts?

16              MR. REEVES:  And Count, I believe, 5 -- I'm

17    sorry.  Count 4, which is the -- One second, your Honor.

18              Just Count 3, your Honor, Criminal Possession of

19    a Weapon in the Second Degree.

20              THE COURT:  So, in terms of weapon counts, you're

21    only requesting Count 3?

22              MR. REEVES:  That's correct.

23              THE COURT:  That's all right with me.

24              Ms. Guastella, what do you think?

25              MS. GUASTELLA:  That's fine.

Proceedings

1        THE COURT:  Okay.  So, I'm submitting Counts 1

2    and 3.  I won't submit Counts 2, 4 and 5.

3        That brings us to Count 6.  Are you requesting

4    that, a forged instrument?

5        MR. REEVES:  Yes, your Honor.

6        THE COURT:  All right.  Any objection?

7        MS. GUASTELLA:  No.

8        THE COURT:  Okay.  So, I'll submit Count 6.

9    Count 7 was dismissed at the outset of the case.  So, three

10    counts: Counts 1, 3, and 6.

11        Any other requests from either side?

12        MS. CILIA:  Your Honor, under the firearms

13    section, it says that pistol or revolver is a definition of

14    a firearm, but there is a specialized definition that

15    includes assault weapons.  We would ask for that.

16        THE COURT:  Right, I think I have to do that.  A

17    firearm means a pistol or revolver, or, in this case, an

18    assault weapon.  That's at Penal Law section 265.00(22).

19    What I had planned on charging was the statute prior to the

20    amendment in July of 2013, since this is a 2011 charge.

21    So, it would be 265.00(22) prior to the July, 2013,

22    amendment.

23        Let me just read it into the record:

24        "Assault weapon" means (a) a semiautomatic rifle

25    that has an ability to accept a detachable magazine and has

Proceedings

1    at least two of the following characteristics: (1) a

2    folding or telescoping stock; (2) a pistol grip that

3    protrudes conspicuously beneath the action of the weapon;

4    (3) a bayonet mount; (4) a flash suppressor or threaded

5    barrel designed to accommodate a flash suppressor; (5) a

6    grenade launcher.

7              That's the way the statute reads.  As I recall,

8    having reviewed the ballistics expert's testimony, he

9    testified as to a pistol grip protruding conspicuously

10   beneath the action and a bayonet mount.  I don't think he

11   testified as to the other three items.  Did he?

12             MR. REEVES:  He did.  He testified about a

13   detachable box magazine as well.

14             THE COURT:  Okay.  Well, yeah, that's part of the

15   original definition.  In terms of the following

16   characteristics, they list five, I think he only testified

17   as to two of them.  I'm not sure.  What do you think?

18             Do you follow me?  He did testify this is a

19   semiautomatic rifle with the ability to accept a detachable

20   magazine.  Then the statute talks about at least two of the

21   following five characteristics: a folding or telescoping

22   stock.  Did he testify to that?  He testified that can be a

23   characteristic of an assault weapon.  I don't know if he --

24             MR. REEVES:  I believe he testified about the

25   pistol grip and the bayonet mount.

1          THE COURT:  That's what I recall.

2          Shall I just list those two, or shall I list them

3     all and let the jury make their findings?  I can read the

4     statute in full, it doesn't matter to me, or I can edit it.

5          I mean, what I could say, for example, is an

6     assault weapon means a semiautomatic rifle that has an

7     ability to accept a detachable magazine and has the

8     following two characteristics: a pistol grip that protrudes

9     conspicuously beneath the action of the weapon and a

10    bayonet mount.

11         MR. REEVES:  I also believe he testified that it

12    was also based on the AK-47 design which I believe is part

13    of the statute.

14         THE COURT:  You know, that is, but the statute is

15    a little more complex and I don't know if he met all of

16    those hurdles.

17         Hang on a second.  He said it was pattern on the

18    AK-47 design.

19         MR. REEVES:  Correct.

20         THE COURT:  He said it was made in Romania.

21         MR. REEVES:  Correct.

22         THE COURT:  I don't believe he said it was an

23    AK-47.  I believe he said it was pattern on an AK-47

24    design.  You could check the minutes if you want.  I have

25    them, but I think you do too.

Proceedings

1    MS. GUASTELLA: He did talk about that it was a

2    Romanian AK-47.

3    THE COURT: I don't know if he said it was a

4    Romanian AK-47 or if it was Romanian-manufactured and based

5    on the AK-47 design. I don't know if that's significant or

6    not, I have no idea. Which is why I didn't intend to get

7    into that part of the assault weapon definition, if you

8    follow me.

9    MS. GUASTELLA: I don't think it necessarily

10   matters.

11   THE COURT: What?

12   MS. GUASTELLA: I don't think it necessarily

13   matters.

14   THE COURT: Why don't I give the assault weapon

15   definition under 265.00(22)(a). Is that acceptable or not?

16   MR. REEVES: Yes.

17   MS. GUASTELLA: That's fine.

18   THE COURT: Okay. I think that's all I have.

19   Anybody think of anything else you might want me to charge?

20   I mean, I'll charge the usual.

21   MS. GUASTELLA: In your circumstantial charge are

22   you going to discuss moral certainty as to the evidence?

23   THE COURT: I don't usually do that. That was

24   the law years ago. It's no longer part of the pattern

25   instruction, although I think the language is equivalent.

Proceedings

1      The charge I have been giving for some time now is the

2      pattern instruction.  I'll hand it out if you want to take

3      a look at it.

4              Why don't you give this to Ms. Guastella, and you

5      can hand it over to the DA when you finish.  I can print

6      out two more copies if you want me to.

7              (Handing.)

8              MS. GUASTELLA:  I could give this to Mr. Kyle.  I

9      have one.

10             THE COURT:  Oh, you do?

11             MS. GUASTELLA:  Yeah.

12             MR. REEVES:  Does the Court need this back?

13             THE COURT:  Yes, it's my only copy.  I'll give

14     you a copy.

15             MR. REEVES:  No, I have a copy.

16             THE COURT:  Is that charge okay with both sides?

17             MR. REEVES:  Yes.

18             THE COURT:  Defense?

19             MS. GUASTELLA:  One moment, Judge.

20             (Pause.)

21             MS. GUASTELLA:  It's fine.

22             THE COURT:  Okay.  Anything else anybody wants?

23             MS. GUASTELLA:  Do you want me to reserve my

24     trial order of dismissal to right before we sum up, or?

25             THE COURT:  You can make it now if you want.  You

Proceedings

1    probably do not want to make it in front of the jury,

2    although you can if you want.

3              MS. GUASTELLA:  That's why I was asking if you

4    want me to reserve it or do it now.

5              THE COURT:  You can do it whenever you want.

6              MS. GUASTELLA:  Judge, at this time the defense

7    moves to dismiss the indictment on the grounds that the

8    prosecution hasn't proved a legally sufficient case.

9    Specifically, the People have not proven Count 1, Murder in

10   the Second Degree, and People have not presented legally

11   sufficient evidence to establish that Mr. Skrine committed

12   Murder in the Second Degree.  As well, they did not present

13   legally sufficient evidence to charge -- to establish that

14   Mr. Skrine committed Count 3, Criminal Possession of a

15   Weapon in the Second Degree.  And, as well, they did not

16   present legally sufficient evidence to establish that

17   Mr. Skrine committed Count 6, Criminal Possession of a

18   Forged Instrument in the First Degree.

19              THE COURT:  People?

20              MR. REEVES:  Your Honor, the People would rest on

21   the record and ask the Court to deny the motion in its

22   entirety.

23              THE COURT:  I think a legally sufficient case was

24   presented considering the circumstantial evidence charge,

25   so I'll -- as to all three of those counts, so I'll deny

MMS

Proceedings

1    the motion.

2    Well, the jury is here. Do you want to take a

3    few minutes and get your summations together, or are you

4    ready to go now? I don't know how you feel about it. I'm

5    in no rush if you want 15, 20 minutes, half hour.

6    MS. GUASTELLA: I'm ready, Judge.

7    MR. REEVES: The only thing we need to do is to

8    bring all the evidence across the street, so if we can have

9    15 minutes, that would be sufficient.

10   THE COURT: That's fine. We'll take 20 minutes.

11   If you need more, I'll give it to you.

12   Why don't we tell the jury -- Don't tell them

13   anything specific. Just tell them it's going to be about

14   another 20 minutes or so if they want to get some coffee.

15   THE COURT OFFICER: Okay.

16   (Whereupon, a brief recess is taken.)

17   (Whereupon, Court Exhibit 1 is marked.)

18   THE COURT CLERK: Come to order. Case on trial

19   continues, Armand Skrine.

20   (Defendant present.)

21   THE COURT: All right. Everybody is present. I

22   neglected to ask during our charge conference,

23   Ms. Guastella, if you want me to charge the jury they may

24   draw no inference unfavorable to your client because he

25   didn't testify. I can only give that if you want me to.

MMS

Proceedings

1            MS. GUASTELLA:  It's not necessary, Judge.

2            THE COURT:  Are you saying you don't want me to

3      give it?

4            MS. GUASTELLA:  Right.

5            THE COURT:  Okay, I won't, if you don't want me

6      to.

7            The verdict sheet was handed up.  Both sides

8      initialed it I see.  It is approved in form?

9            MR. REEVES:  Yes.

10            MS. GUASTELLA:  Yes.

11            THE COURT:  What videos do we have in evidence

12      here?  We have two from the Ferry.

13            MS. CILIA:  Yes.

14            THE COURT:  If the jury wants to see those, how

15      are we going to do it?  I don't think you can get this big

16      screen in the jury room; we've tried that before.  Can we

17      send a laptop in?

18            MS. CILIA:  Yes.

19            THE COURT:  Is that all right if they ask for it?

20            MS. GUASTELLA:  Your Honor, I just had a brief

21      discussion with my client about that charge that was just

22      discussed, and, on second thought, we would like to have it

23      in.

24            THE COURT:  You're talking about if the defendant

25      does not testify, the jury may draw no unfavorable

Proceedings

1        inference?

2                    MS. GUASTELLA:  Yes.

3                    THE COURT:  Do you want that?

4                    MS. GUASTELLA:  Yes.

5                    THE COURT:  Okay, I'll give it.

6                    What about this laptop issue, if the jury

7        requests to see those videos, can we send it in with the

8        laptop?

9                    MS. GUASTELLA:  What else is going to be on that

10       laptop?

11                   THE COURT:  Hopefully nothing.

12                   MS. GUASTELLA:  Right.

13                   THE COURT:  In the past the DA has provided I

14       think what they call a clean laptop.  There is no internet

15       access in the jury room.

16                   MS. GUASTELLA:  As long as it's clean, I have no

17       objection.

18                   MR. REEVES:  It will be.

19                   THE COURT:  Okay.  Is that all right with you?

20                   MR. REEVES:  That's fine.

21                   THE COURT:  I mean, I can tell them, if they want

22       to see it on the big screen, we'll bring them back in the

23       courtroom, but if they want to see it on the laptop, we'll

24       send it in.

25                   MS. GUASTELLA:  Okay, that's fine.

Proceedings

1        THE COURT:  In terms of ballistics evidence, if

2    they want to see the rifle or ballistics evidence, I think

3    what I'll tell them is we'll send it in with them, but with

4    an officer; we are not going to leave it in there.  And

5    when they're examining it, the officer will take it out,

6    and I'll tell them not to deliberate while the officer is

7    in there.

8        MS. GUASTELLA:  That's fine.

9        THE COURT:  Okay.  Now, we've got this computer

10    screen here.  You see where it's set up.  Is that all right

11    with you, the positioning, or not?

12        MS. GUASTELLA:  Well, I'm actually feeling a

13    little claustrophobic.

14        THE COURT:  Well, my point is your client can't

15    see it, right, and you can't either?

16        MS. GUASTELLA:  Right.

17        THE COURT:  If it's all right with you.  I can't

18    touch it.

19        MS. GUASTELLA:  Can we put it back to where it

20    was?

21        THE COURT:  The defendant can't see it from where

22    it is and he ought to be able to see it.  Can we move it

23    out to where you had it during the trial?

24        MS. GUASTELLA:  I don't see why it has to be

25    right here.

Proceedings

1          THE COURT:  I don't care where it is.  I can see

2     it, but I'm concerned that the defense table cannot see it.

3          MR. REEVES:  I don't think there is any

4     obligation for the defendant to see it at this point.

5          THE COURT:  If you don't want to move it, then I

6     won't let you use it.

7          MR. REEVES:  I guess I don't have a choice.

8     That's fine.

9          THE COURT:  Okay.  Why don't we do this:  We'll

10     have the defense summation and then we'll take a break and

11     you can move this thing.  And maybe I want to see what

12     you're going to have on this.  I haven't seen it.

13               Have you, Ms. Guastella?

14          MS. GUASTELLA:  No.

15          THE COURT:  I think we ought to view it after the

16     defense summation.

17               Do you want to step up a moment?

18               (Whereupon, a discussion is held at the bench off

19     the record.)

20          THE COURT:  Is there anything else for the

21     record?

22               Just for the record, we're going to raise the

23     laptop so the defense table can see it.

24          MR. REEVES:  Correct.

25          THE COURT:  So we won't bother to move the big

MMS

Proceedings

1    screen.  They'll be able to see it on the laptop.

2              If there's nothing else, we'll bring the jury in.

3    I guess there's nothing else.  Line them up.

4              THE COURT OFFICER:  Your Honor, are you ready for

5    the jury?

6              THE COURT:  Yes.

7              THE COURT OFFICER:  Jury entering.

8              (Whereupon, the jury enters the courtroom.)

9              THE COURT CLERK:  Do both sides stipulate to the

10   presence of a complete jury panel properly seated?

11             People?

12             MS. CILIA:  Yes.

13             THE COURT CLERK:  Defense?

14             MS. GUASTELLA:  So stipulated.

15             THE COURT:  Good morning.  Welcome back.

16             People?

17             MR. REEVES:  Ladies and gentlemen, the People's

18   case was completed with Dr. deRoux's testimony.

19             Your Honor, the People rest.

20             THE COURT:  Defense?

21             MS. GUASTELLA:  Your Honor, at this time the

22   people -- the defense rests.

23             THE COURT:  All right, members of the jury, both

24   sides have rested, so that concludes the introduction of

25   evidence in the case.  You'll now hear the summations of

MMS

1    the lawyers, and after that I'll instruct you on the law,

2    and then you'll begin deliberations.

3              Under our law, defense counsel must sum up first

4    and the prosecutor must follow.  The lawyers may not speak

5    to you after that.  Summations provide each lawyer an

6    opportunity to review the evidence and submit for your

7    consideration the facts, inferences, and conclusions that

8    they contend may properly be drawn from the evidence.

9              If you find that a lawyer has accurately

10   summarized and analyzed the evidence, and if you find that

11   the inferences and conclusions the lawyer asks you to draw

12   from that evidence are reasonable, logical, and consistent

13   with the evidence, then you may adopt those inferences and

14   conclusions.

15             Please bear in mind the following points:

16             First, you are the finders of fact, and that's

17   for you and you alone to determine the facts from the

18   evidence that you find to be truthful and accurate.  And,

19   so, whatever the lawyers say and however they say it, you

20   should remember that what the lawyers say is simply

21   argument submitted for your consideration.

22             Second, remember the lawyers are not witnesses in

23   this case, and, so, if a lawyer asserts as facts something

24   that is not based on the evidence, you must disregard it.

25   Nothing the lawyers say at any time is evidence, and, so,

MMS

Proceedings

1    nothing they say in their summations is evidence.  You've

2    heard the evidence and you must decide the case on the

3    evidence as you find it and on the law as I will explain

4    it.

5           Third, during summations one lawyer's

6    recollection of the evidence may in good faith differ from

7    the recollection of the other lawyer's or from your own

8    recollection.  The lawyers will undoubtedly differ with

9    each other on the conclusions to be drawn from the

10   evidence.  It's your own recollection and understanding and

11   evaluation of the evidence, however, that controls

12   regardless of what the lawyers have said or will say about

13   the evidence.  You and you alone are the judges of the

14   facts in this case, and if during your deliberations you

15   need to have your recollection of the testimony refreshed,

16   you may have all or any portion of the testimony read back

17   to you.

18          Fourth, remember, under our law I'm responsible

19   for explaining the law, not the lawyers.  If you think

20   there is any difference between what the lawyers may say or

21   what I say the law is, your sworn duties as jurors is to

22   follow my instructions on the law.

23          And, finally, if during the summations I sustain

24   an objection to a comment of a lawyer, that comment will be

25   stricken from the record and you must disregard it as if it

MMS

Summations - Defense

1      were never said.  If I overrule an objection, the comment

2      will stand.  Whether I sustain or overrule an objection, or

3      on my own indicate that a comment must be disregarded, my

4      ruling indicates only that the comment does or does not

5      violate one of the rules of law set down for lawyers to

6      follow during the summation.  It's not an attempt to

7      indicate that I have an opinion on what is said or of the

8      facts of the case or of whether this defendant is guilty or

9      not guilty.

10             Remember, once again, under our law, you and you

11     alone judge what facts, if any, are proven and whether the

12     defendant is guilty or not guilty, not I and not the

13     lawyers.

14             So, we'll turn to summations now, and I'll

15     recognize Ms. Guastella.

16             MS. GUASTELLA:  Thank you, your Honor.

17             Not guilty.  Not guilty is the only possible

18     verdict in this case.  They couldn't even prove to you the

19     theory of their own theory that they presented to you in

20     opening.  They couldn't even prove that.

21             So, what did they prove in this case?  They

22     certainly didn't prove that Armand committed any crimes

23     beyond a reasonable doubt.  Again, they couldn't even prove

24     their own theory, and we'll go through that in a little

25     bit.

MMS

1           The judge is going to talk about circumstantial

2      evidence in his charge to you and I'm going to ask that you

3      pay close attention to it.  It's a long charge.  Please

4      listen to it carefully.  It's going to discuss inferences.

5           Prosecution is going to get up, they are going to

6      make an inference, they are going to tell you an inference.

7      They are going to tell you that just because a mask that

8      had DNA on it that belonged to Armand, just because it was

9      in a bag with the murder weapon, he must be guilty, you

10     have to convict.  Ladies and gentlemen, the inferences must

11     be proven beyond a reasonable doubt.

12           Now, I mentioned they didn't even prove their

13     theory of their case, and I'll tell you why.  In opening,

14     she told you that this person came to Staten Island, that

15     person being Armand.  He comes to Staten Island with a

16     duffel bag; the murder weapon is in the duffel bag.  Takes

17     the Ferry, gets off the Ferry; takes the bus, gets off

18     at -- walks -- I don't know however he got to 195 Steuben,

19     that was never testified to.  Gets there, enters the

20     building with the mask, goes up to the apartment, and

21     shoots David for absolutely no reason, but it was his

22     friend.

23           She tells you that he shot through the arm, out

24     the other arm, hits the heart, and then while he's down on

25     the ground the shooter shoots him in the back of the head.

MMS

1    She couldn't even prove that during this trial.  She

2    couldn't even prove to you the manner he was shot in.

3    Dr. deRoux testified that he didn't know which shot came

4    first, but she told you it was the one through the arm.

5    Dr. DeRoux also told you that he wasn't shot while he was

6    on the ground, he was standing.  She couldn't even prove to

7    you the theory of her own case.

8         What else didn't they prove?  They never proved

9    or showed any evidence that Armand was the person on the

10   Ferry.  They never proved that he was the one that had that

11   gray and black duffel bag.  They didn't prove that he

12   entered 195 Steuben Street.

13        Jean testified a tall man enters the building

14   with a mask, with a bag.  And we will get to that in a

15   minute, but there is no proof that the mask that that

16   person was wearing entering Steuben Street was the mask

17   that was recovered from the duffel bag that contained his

18   DNA on it.  They never proved that.  In fact, they never

19   even proved to you the person that entered the building

20   with the mask was the shooter.

21        What else didn't they prove to you?  They didn't

22   prove that Armand committed any crimes on December 8th.

23        So, what did the prosecution show in this case?

24   Well, I'll submit they put on a good show: brought the

25   video screen in, shows you hundreds of pictures, some

MMS

Summations - Defense

1    unnecessary, duplicates, misfires, close-ups.  Showed you

2    videos.  I'm sure in summation they are going to do some

3    type of a presentation, that's why the screen is here.  And

4    all for what?  They dragged this trial on -- out as long as

5    they could and for what?

6              MR. REEVES:  Objection, your Honor.

7              THE COURT:  Well, I'll sustain the objection to

8    dragging the trial out.

9              Go ahead.

10             MS. GUASTELLA:  People did this to put on this

11   show to show you or to try to hide that there is no

12   evidence in this case that Armand committed any crimes on

13   December 8, 2011.

14             They are going to get up, and I assume Mr. Kyle

15   will get up, and he is going to tell you that he proved his

16   theory of the case because a mask containing DNA that may

17   have belonged to Armand was in the bag.  What is that proof

18   of?  It's proof of nothing.  The mask was in the bag.  And,

19   by the way, it's a ski mask.  We keep saying mask.  It was

20   a ski mask, it was in the duffel bag.  So what, what does

21   that prove?  That's not evidence that it's in the bag.

22   They never proved that that bag belonged to Armand.

23             They never showed you or gave you any evidence

24   that that person entering the building with the mask was

25   wearing the same mask that was recovered later.  It's a ski

MMS

Summations - Defense

1  mask.  It can be purchased anywhere.  Nothing unique about

2  it.  It's not a Halloween disguise.  It's a mask that you

3  buy in the cold, to repel cold weather.

4  What else haven't they proved?  They haven't

5  proven how long that ski mask was in that duffel bag.  They

6  haven't proved the last time somebody wore that ski mask.

7  You heard Ms. Wong testify that DNA could have been on the

8  mask for over a year.  So we don't know how long that was

9  in there, we don't know the last time someone wore that

10  mask.

11  They haven't even proven to you whose clothes

12  were in the duffel bag.  Now, during the trial they made a

13  big deal about getting the measurements of the clothing

14  out, so I'm assuming they are going to come and they are

15  going to say the 48L jacket and the 4X sweatshirt belongs

16  to Armand.  But you know what, it could have also belonged

17  to Lonney Walker.  We know he's 6'6" and over 220 pounds.

18  And in Ms. Hunt's own words, she said he was a big guy.

19  Those could have been his clothes.  We know he's been in

20  the apartment.

21  MS. CILIA:  Objection, Judge.

22  THE COURT:  Overruled.

23  MS. GUASTELLA:  We know he's been in the

24  apartment.  We know Armand has been in the apartment.

25  Armand has showered there before.  We don't know exactly

MMS

1    how many times, but more than one.  Could have left

2    anything behind.

3        Simply put, the People did not prove their case.

4    They did not prove each and every element of every crime

5    charged beyond a reasonable doubt, and because of that you

6    need to return a verdict of not guilty.

7        Now, I'm going to go through the trial a little

8    bit.  You sat here, it was a long trial.  I don't want to

9    revisit everything.  If I don't mention something it's not

10   because I don't think it's important.  Maybe when preparing

11   my summation I might have left it out or I missed it.  You

12   all sat here with Armand and myself.  You heard it all.

13   You probably remember something that I forgot to mention.

14   So, please, don't think I don't think it's important.

15       So, I'd like to start with Det. Anderson.  He sat

16   there and he basically told us all he stopped him for no

17   reason, and the reason we know he had no reason to stop him

18   is because he told you he had no description of a

19   perpetrator.  He didn't know if it was a male black, a male

20   white, a female.  Had no idea who he was looking for.  But

21   he wants you to believe that racing to the crime scene,

22   lights and siren, he happens to make eye contact with him

23   and he appeared nervous and that's why he stopped him.

24   That's ridiculous.  You cannot believe that's the reason

25   why he was stopped.  He had no reason to stop him

1    whatsoever.  He couldn't even tell you what color shirt I

2    had on.

3           Now, he tells you when Armand is apprehended, he

4    had black jeans on and a black jacket.  He never mentions a

5    gray hoodie or a great sweatshirt jacket, never.  And

6    that's important, because when Det. Patterson testified, he

7    viewed the videotape, as we all did, and he testified that

8    the person on the Ferry, this person of interest, was

9    wearing a gray hoodie.  Det. Anderson never says he was

10   wearing a gray hoodie, and that would have been something

11   that was important.  Or at least say a sweatshirt; he

12   doesn't even say that.

13          So, when he's asked why this person was of

14   interest, Det. Patterson responds, the person was a person

15   of interest because he was wearing the clothes that Armand

16   was wearing when he was apprehended.  Where -- There was no

17   evidence of that.  We don't know who the person of interest

18   is that was on the Ferry.  We don't know if those clothes

19   that that person was wearing were his clothes.  There is no

20   evidence of that.  Is he a person of interest because he's

21   wearing black jeans, a black jacket, and he's carrying a

22   duffel bag and he's on the Ferry?  There are many people

23   that would have fit that description, including Lonney

24   Walker: tall, black man.  So, because of that, makes him a

25   person of interest?  That's ludicrous.

Summations - Defense

1      So, they make a big deal about the fact that he

2      got on the Ferry in Manhattan, this person of interest,

3      gets off in Staten Island, and then walks up the bus ramp.

4      Where does he go from there?  There is no evidence to show

5      where this person of interest goes.  And just as a side

6      note, recall -- I believe it was the Manhattan side -- when

7      he's coming onto -- this person of interest is coming onto

8      the Ferry on the Manhattan side.  He walks past uniformed

9      officers, K9 teams.  I believe the K9 team was passing him

10     coming down the ramp.  You can take a look at it.  But they

11     want you to believe that this person of interest is

12     carrying around a duffel bag with an AK-47 in it, pass the

13     police officers, pass K9 teams that are trained in

14     terrorism, and this person of interest calmly walks past

15     them.  It just doesn't make any sense.

16     And I love the fact when Det. Patterson said he

17     said that he could tell looking at that duffel bag there

18     was an object in it.  They are going to argue that that

19     object was the AK-47.  Of course there was an object in the

20     bag.  There was numerous objects in the bag.  That's why he

21     is carrying a duffel bag, otherwise he wouldn't need to

22     carry it if there were no objects in it.  That made no

23     sense.

24     So, what happens to this person of interest?

25     People are going to argue to you that he shows up at

MMS

1    195 Steuben Street.  And we know that he shows up at

2    195 Steuben Street because Jean testifies that a small

3    man -- I'm sorry, a small man -- uniquely tall man enters

4    the building wearing a mask and a duffel bag.  If you

5    remember what he said when Ms. Cilia asked him or tried to

6    get him to say that that bag was four feet wide, do you

7    remember what he said?  No, it wasn't that big, it was only

8    16 inches wide.  He is a maintenance man.  I submit to you

9    that a maintenance man is going to know the difference

10   between 16 inches and 4 feet wide.

11          So, who was that person walking into 195 Steuben

12   Street?  We don't know.  They certainly didn't prove who

13   that person was.  It could have been Lonney Walker walking

14   in.  He would have had to hide his face because everybody

15   would know him walking into the building.

16          Again, they didn't show, they didn't prove, they

17   didn't provide any evidence that that person walking into

18   195 Steuben Street, that mask was the same mask that's

19   recovered hours and hours later with some DNA on it that

20   belonged to Armand.  They didn't do that.  They didn't

21   prove that.  So, now we have a bag that's described as

22   black and gray on the Ferry, in the lobby of 195 Steuben

23   Street, at 16 inches wide.

24          And then Ms. Hunt testifies as well at this

25   trial, and Ms. Cilia showed her -- I believe it was

## Summations - Defense

1    Ms. Cilia -- The prosecution showed her a photo of the bag,

2    and she says, yep, that's the bag that Armand was carrying

3    on November 26th when he came to our apartment.  But on

4    cross, when I asked her, You sure his bag wasn't blue, she

5    doesn't reply, No, it was gray and black.  She's like, It

6    was dark.  It was a dark bag.  So now we have three bags:

7    We have the black and gray from the Ferry, we have the one

8    at Steuben Street that's 16 inches, and then we have

9    Armand's blue bag.  Three different bags.

10          Now, they are also going to argue that when he

11   comes to the apartment, he must have been carrying the

12   AK-47 with him, because when he drops the bag down on the

13   ground it makes a loud noise.  I asked her, could the

14   little metal pegs on bottom of the bag create that loud

15   noise?  She said she didn't see them.  Doesn't mean they

16   weren't there.  And I think it's ridiculous to assume that

17   there was a weapon in that bag because it made a loud

18   noise.  I submit it could have been the metal pegs on the

19   bottom of the bag.  And she testifies that he took a shower

20   that day as well.

21          Now, why else hasn't the People even proven their

22   theory that they told you about in their opening?

23          The crime scene.  She told you, or they told you

24   that David was shot in the hallway, okay.  Now, recall

25   Det. Aguilo, he testifies that he's the first police

Summations - Defense

1    officer to arrive.  Him and his partner run up the stairs,

2    run up seven flights.  They get there, the deceased is

3    laying on the ground and there is a lot of blood.  And he

4    thinks there's a child in the apartment, so he runs into

5    the apartment, rightfully so, looking for this child,

6    having to step over things, moving things around looking

7    for this child.  And I submit to you -- I'm sorry.  When he

8    comes, enters that apartment, he tells you that he finds a

9    shell casing inside the apartment, a bullet and a shell

10   casing inside of the apartment.  And I submit that when he

11   was leaving the apartment, he or his partner accidentally

12   kicked the shell casing outside, which is where --

13              MR. REEVES:  Objection, your Honor.  There is no

14   evidence to that at all.

15              THE COURT:  I didn't hear any evidence regarding

16   that.

17              I'll caution the jury not to speculate.

18              You're free to sum up based on the evidence.

19              MS. GUASTELLA:  Have his testimony read back.  He

20   testifies that when he enters the apartment, he sees a

21   shell casing behind the door, on the inside of the

22   apartment.

23              MR. REEVES:  Objection.  That's not the evidence.

24              THE COURT:  The jury's recollection will control.

25   As I said before, the lawyers may differ in their

Summations - Defense

1    recollection, but it's your recollection that controls.  If

2    you need anything read back, you need only ask.

3         Go ahead.

4         MS. GUASTELLA:  Det. Steneck tells you that she

5    recovers the shell casing outside.  Have that testimony

6    read back, because it's in there.

7         Now, let's talk about her.  Very experienced.

8    She's securing the crime scene.  Very, very careful.  Works

9    hours.  I think she said she worked until about 11 o'clock

10   collecting all the evidence.  She collected a lot of stuff,

11   swabbed a lot of stuff to send things to the lab for a

12   fingerprint, for gun powder residue, for DNA testing, all

13   that stuff.  She is very careful in collecting everything.

14   She's very thorough.  She doesn't want to miss anything.

15   She told you she didn't want to miss anything, and, in

16   fact, she didn't miss the print, the handprint on the

17   hallway, right near where the deceased body was laying.

18   And she explains to you, she doesn't say that the handprint

19   on the wall, the palm print on the wall was there and then

20   there was blood splatter and that's maybe how it got there.

21   No.  What does she tell you?  She explains to you that

22   someone put their hand in blood --

23        MR. REEVES:  Objection.

24        MS. CILIA:  Objection.

25        THE COURT:  I don't recall that testimony.

Summations - Defense

1    Again, the jury's recollection controls.

2         MS. GUASTELLA:  Please have that read back.  She

3    explained that somebody put their hand and then touched the

4    wall.

5         MR. REEVES:  Objection.  That's not the

6    testimony, your Honor.

7         THE COURT:  I don't recall specifically.  Again,

8    the jury's recollection will control.

9         MS. GUASTELLA:  The print is taken, the print is

10   analyzed, and it comes back to Samuel Nelson.  And we know

11   that Samuel Nelson lives in the building, he lives in 7-O,

12   right near there; and we know that he knows David, they've

13   been on the same floor for years.  In fact, perhaps he hung

14   out with them during the daytime when Ms. Hunt was at work.

15        MR. REEVES:  Objection.

16        THE COURT:  Sustained as to that.  That's

17   speculative.

18        MS. GUASTELLA:  We know he was at the crime

19   scene, his print was on the wall.  And what does the

20   detective do?  He rules out Samuel Nelson as a suspect, and

21   the prosecution asked him why.  I ruled him out because he

22   resides in the building.  That's ridiculous.  He ruled him

23   out because he resides in the building.  Not concerned that

24   there is a palm print right on the wall right outside where

25   Mr. -- where the deceased was laying?  But he's ruled out

MMS

Summations - Defense

1  because he lives in the building.  There is no evidence

2  that he called 911.  People didn't show you that either.

3  But he's ruled out because he's a resident of the building.

4  Some investigation.

5       What else was done in this case besides ruling

6  him out?

7       Ms. Zippo testifies, and she goes on and on and

8  on about her qualifications and the fact that she knows the

9  money is counterfeit and the money that was found in the

10 sock in the duffel bag was counterfeit.  I asked her, Did

11 you investigate the origins of the money?  And she said,

12 No.  Why not trace the money, find out who owned the money

13 or who began this counterfeit ring?  It's never even looked

14 into.

15      What else?  Det. Clontz, yeah.  He testifies that

16 he runs some tests and that a partial serial number is

17 lifted from the AK-47, a partial serial number.  There is

18 no evidence that that --

19      MS. CILIA:  Objection, Judge.  That's not the

20 evidence.

21      THE COURT:  The DA says it's not the testimony.

22      MS. GUASTELLA:  I apologize.  He testifies that

23 criminalist Clontz lifted up the partial serial number, and

24 now Det. Clontz now works for the ATF lifting serial

25 numbers.  There is no evidence that that serial number was

Summations - Defense

1     traced to anybody.  There was no evidence they even tried

2     to trace it to anybody to find out who the last registered

3     owner of this weapon was.  He did nothing.  What did they

4     do?

5          There's capability of all these things that they

6     could have done: DNA on all the stuff that was taken,

7     fingerprints, gun powder residue.  None of that.

8          Ms. Wong.  She talks about the whole laundry list

9     of things that she receives to test: the rifle, the

10    bullets, the magazine -- they're all swabbed -- the duffel

11    bag, the duct tape on the duffel bag, all the clothing, and

12    the mask.  And then she talks about finding a second mask

13    in a pocket.  And out of all those things, she selects a

14    few items, a few items to test to try to develop a profile.

15    And out of the few items, out of this long laundry list

16    that she tests, she retrieves a profile and she testifies

17    that it matches Armand's profile.  But what's interesting

18    is, where did the second mask come from?  Because you know

19    the Det. Steneck was very thorough.  Where did it come

20    from?  Ms. Wong said that it was found in the pocket of the

21    jacket.  That doesn't make sense.  Det. Steneck would have

22    found it if it was in the pocket.  She is going to go

23    through the pockets to see if there is any kind of piece of

24    identification that would have identified the clothing.

25          MR. REEVES:  Objection, your Honor.

MMS

Summations - Defense

1      THE COURT:  I don't know if -- Well, I don't want

2   to comment on the evidence.  The record is what it is and

3   both sides are free to argue from it.  I'll say no more.

4      Go ahead.

5      MS. GUASTELLA:  The other thing that's

6   interesting is that she testifies that she scrapes the

7   inside of the second mask, the inside.  Now the inside is

8   where the person would put the ski mask on, it would

9   touch -- the eyes would touch it, the nose would touch it,

10  the mouth would touch it, but, yet, when she scrapes the

11  inside, she says there's not enough DNA recovered to

12  develop a profile but there is enough on the outside.  That

13  just doesn't make any sense to me.

14      And the other thing is, at first I thought I

15  misheard something, but the Property Clerk testified that

16  they recovered -- Sgt. Trzcinsky I believe his name was

17  testified that he retrieved or he recovered or he received,

18  I apologize, a pair of blue jeans.  I thought maybe I

19  misheard it.  And then I heard Ms. Wong say the same thing.

20  Out of the long laundry list of items, one of the items is

21  a pair of blue jeans.  Where did these blue jeans come

22  from?  Whose blue jeans were they?  They weren't even

23  tested.  We heard that Armand was wearing black jeans.  The

24  person of interest was wearing black jeans.  Where did the

25  blue jeans come from?  It's just something to keep in the

1    back of your mind.

2        The biggest thing is the bite mark.  Dr. deRoux

3    tells you it's a fresh bite mark.  David was struggling

4    with someone in the apartment.  Whoever shot him bit him on

5    his back.  No tests are done.  You heard it was swabbed.

6    It was received by the ME's office, but nothing was done

7    with it.  No DNA testing on it, no dental impressions on

8    it.  That was the killer.  Whoever belonged to that bite

9    mark was the killer and they did nothing to test the bite

10   mark.  That makes no sense to me.  But because some DNA

11   that belonged to Armand was found on a mask inside of a

12   bag, because of that he must be guilty?  You can't believe

13   that.  You can't trust that when they get up here --

14        MR. REEVES:  Objection, your Honor.

15        THE COURT:  I'll sustain the objection to the

16   word "trust."  You can rephrase that.

17        MS. GUASTELLA:  Well, they are going to get up in

18   a few minutes after I sit down -- And I want to say that

19   once I sit down, I can't come back up and say anything

20   else.  This is it, my final opportunity to speak to you.

21   So, please, when they go through their summation and their

22   power point and all of this stuff they're going to show you

23   all over again, and arguments they are going to make,

24   please reflect upon what I'm telling you and ask yourself,

25   what would Ms. Guastella say in rebuttal to what they're

Summations - Defense

1    saying in their summation?  Because I can't get back up

2    here and tell you what I would have said.  So, please think

3    about what I would say based on what I'm telling you now.

4         What do we know in this case?  At the end of the

5    case, at the end of the day, what we know is that David

6    didn't work --

7         MR. REEVES:  Objection, your Honor.

8         MS. GUASTELLA:  He was unemployed on December 8th

9    of 2011.

10        THE COURT:  I don't recall.  I remember his

11   fiancée testified that he was doing something.  I'll let

12   the jury's recollection control in that regard.

13        MS. GUASTELLA:  Judge, withdrawn.  We know that

14   he did do -- he did go to college and he met Armand in

15   college, but he never finished college.

16        MR. REEVES:  Objection.

17        MS. CILIA:  Objection.

18        MR. REEVES:  You can't besmirch the victim's

19   character, your Honor.

20        THE COURT:  I'll sustain the argument to whether

21   he finished or not.  There was a question during trial in

22   that regard and I sustained the objection as I recall, but

23   you can certainly sum up on the record that he went to

24   college, I gather, with your client.

25        MS. GUASTELLA:  Ms. Hunt testifies that her --

## Summations - Defense

1    that David kept in touch with Armand after he graduated

2    college and after law school, and that's why she called him

3    2-5, because she knew him from when he played basketball on

4    those teams.

5         We know that Armand was in the apartment numerous

6    occasions and, in fact, has taken showers there before.

7         But, most importantly, what do we know for sure?

8    Because the detective told you -- everyone told you here

9    that the handprint on the wall belonged to Samuel Nelson

10   but he was ruled out because he lived on the same floor.

11   That's what we know.  Samuel Nelson's hand was in David's

12   blood.

13        Thank you.

14        THE COURT:  Okay.  At this point we are going to

15   take a short break, then we'll hear from the district

16   attorney.  So, I'll let you step out.

17        Don't discuss the case yet.  The rules still

18   apply.

19        Thank you.

20        (Whereupon, the jury exits the courtroom.)

21        THE COURT:  Okay, the jury has left.  Shall we

22   run through this -- You don't have to give me a whole

23   summation.  I just want to see what you got on the screen.

24   They are going to arrange the laptop so the defense can see

25   it.

Proceedings

1    MR. REEVES:  I am going to hand up a copy of the

2    power point to Court and to counsel.

3         (Handing.)

4         MR. REEVES:  Those are all the slides that will

5    be used during the course of the summation.  All the slides

6    are photos that have been received in evidence.

7         THE COURT:  What I'm looking at is what you are

8    going to have on the screen?

9         MR. REEVES:  Correct.

10        In addition to the slides that are in evidence,

11   we've put texts that mirrors the Court's charge which,

12   according to People versus Baker, Court of Appeals case

13   that precedes People versus Santiago, Court of Appeals

14   noted with approval that People are allowed to display the

15   appropriate law provided that the People do two things:

16   One, they are accurate in the presentation of the law, and,

17   two, that they acknowledge the Court is always the source

18   of the law.

19        THE COURT:  What's the cite on Baker?

20        MR. REEVES:  I believe it's 14 NY3d.  I don't

21   remember the page.  It's People versus Baker.  It's within

22   the last two years.  But there's also a Second Department

23   case called Tiro, T-I-R-O, where the Second Department

24   noted with approval the People's use of power point in

25   summation.  And I should point out to the Court --

MMS

Proceedings

1        THE COURT: I can't read this, because you keep

2    talking to me. Go ahead.

3        MR. REEVES: I'm sorry.

4        THE COURT: That's all right. Finish up. I

5    don't have a problem with the concept of a power point

6    presentation. There's nothing wrong with that. I just

7    like to go through them before so I know what I am going to

8    be looking at.

9        MR. REEVES: Sure. What I did want to point out

10   to the Court is that Ms. Cilia will be using the power

11   point which includes the photos and other evidence that

12   have been received in evidence as well as excerpts from the

13   transcript.

14       THE COURT: These photos are all in evidence that

15   I'm looking at?

16       MR. REEVES: Correct.

17       THE COURT: Did Det. Patterson give a height for

18   the defendant?

19       MS. CILIA: He did.

20       THE COURT: He said 6'7"?

21       MS. CILIA: He did.

22       MS. GUASTELLA: He said based on -- from his own

23   height.

24       THE COURT: I'm just trying to remember if he

25   used the term 6'7".

MMS

Proceedings

1      MS. CILIA:  I got that the from the transcript.

2      THE COURT:  And the same with the weight?

3      MS. CILIA:  As well as the weight, yes.

4      THE COURT:  On page 35 you have two pictures of a

5   person walking up the ramp.  Underneath the photo you have,

6   "This is the defendant."

7      MS. GUASTELLA:  There is no proof that that's the

8   defendant.

9      MR. REEVES:  That's our argument.

10      THE COURT:  You can certainly make the argument,

11   but I'd like that taken out of the power point.  You can do

12   that easily, right?

13      MR. REEVES:  Yes.

14      THE COURT:  You can certainly ask the jury to

15   make that inference, but I think printing it like that

16   might be misleading, so take that out.

17      MR. REEVES:  That's been done.

18      THE COURT:  Thank you.

19      MS. GUASTELLA:  Judge, I have a problem with the

20   photos on page 36.  It looks like they overlaid photos of a

21   person with clothing at the Ferry terminal.  There is no

22   proof that those are the same clothes.

23      MR. REEVES:  That's our argument, we're asking

24   the jury to draw logical and reasonable inferences from the

25   evidence.

Proceedings

1          THE COURT:  As long as everything I'm looking at

2    is in evidence, there is no problem with juxtaposing or

3    making an argument.  It's an inference you're asking the

4    jury to draw.

5          MS. GUASTELLA:  Judge, I have an objection to the

6    rest where they put the charges and the element of the

7    charges.  I believe that's the Court's job, not the

8    prosecution's job.

9          THE COURT:  I'm going to go read this Baker case

10   in a minute and see what they say.  I am going to go read

11   Baker and Tiro if I can find them.

12          Let me just make one observation before I do

13   that.  Throughout this power point presentation, you have,

14   What is the credible evidence?  What is the credible

15   evidence?  And then you list it.  You got to take

16   "credible" out.  The reason is you're vouchering, and

17   that's improper.  I can't let you argue you should believe

18   this, you should believe that.  You can make objective

19   arguments in terms of what the jury should find and you can

20   ask them to draw inferences, but I wouldn't let you argue

21   verbally, This is credible, That's not credible, This is

22   credible.  You got to make objective arguments, so take out

23   the word "credible."  You can leave, What is the evidence,

24   if you want.  That's throughout.

25          I am going to go read a couple of cases.

MMS

Proceedings

1           Second call.

2                (Whereupon, a brief recess is taken.)

3                (Defendant present.)

4           THE COURT CLERK:  Case on trial continues,

5      Armand Skrine, Indictment 454/2011.

6           THE COURT:  Well, I reviewed Santiago, which

7      Mr. Reeves alluded to.  I've also reviewed Baker and Tiro.

8      I don't think the defendant -- rather, the People's power

9      point presentation necessarily runs or follows those cases.

10          In Baker, as Mr. Reeves said, the law was

11     referred to, but the Court of Appeals indicated that it

12     could make certain things clearer to the jury.  Moreover,

13     the Court made it clear that the jury had to take the law

14     from them.  I've already done that in pre-summation

15     instructions.  And I'd expect the People, when referring to

16     the law, to make it clear that they get the law from the

17     Court, which I think Mr. Reeves already said you'd do.

18     Right?

19          MS. CILIA:  Right.

20          MR. REEVES:  Yes.

21          THE COURT:  Do you have any other objections,

22     specific objections?

23          MS. GUASTELLA:  No.  Did they take "credible"

24     out?

25          THE COURT:  Yes.  It's gone?

Proceedings

1          MR. REEVES:  Yes.

2          THE COURT:  Take a look at page 41, do you have

3     any objection to anything on page 41?

4          MS. GUASTELLA:  The first line, How to determine

5     if someone is intentionally doing something on purpose, I

6     have a problem with that.  I can't really read this.

7     Judge, the defendant's conduct, that's for the jury to

8     decide if that was the defendant's conduct.

9          THE COURT:  That's true, but as I've said in the

10    pre-summation instructions, and as I often say during

11    summations when I get objections, both sides are free to

12    ask a jury to draw reasonable, logical inferences from the

13    evidence.  The jury can accept them or reject them.

14         MS. GUASTELLA:  Judge, just to be clear, have you

15    instructed for them to take out the charges and the

16    elements?

17         THE COURT:  No.

18         MS. GUASTELLA:  That's staying in?

19         THE COURT:  Having read Baker I don't think there

20    is any problem with it, as long as the DA makes it clear

21    that they're not charging on the law.  There's nothing

22    wrong, I don't think, with referring to their burden of

23    proof in terms of the elements and saying here's how we

24    argue we've proved these elements.  I've made it clear to

25    the jury they have to take the law from me.  Part of the

MMS

1    pre-summation instruction was, If you think there is any

2    difference between what the lawyers may have said and what

3    I say the law is, your sworn duties as jurors is to follow

4    my instructions on the law.

5        MS. GUASTELLA:  Judge, I have a problem with

6    page 41, last two slides, where he says "defendant's

7    conduct," because that's assuming to the jury that that was

8    already proven in the trial and it wasn't.

9        THE COURT:  I take it to mean they're asking the

10   jury to draw inferences from the evidence that is in front

11   of them.  But I do think, I mean -- I'm just thinking out

12   loud here.  I think that on page 41 the first box is fine.

13   The second box I think is fine, except for items 10 and 11.

14   I don't know where that comes from.  It seems to me that's

15   pure speculation.  The rest of it I think is arguably

16   asking the jury to draw inferences on the evidence based on

17   the evidence in front of them.  And then the final --

18       MS. GUASTELLA:  I disagree.  I don't see how you

19   interpret that to mean that it draws an inference.  It says

20   the intent is defendant's conduct.  It's not saying draw an

21   inference.  It's basically telling the jury this is what

22   the defendant's conduct was.

23       THE COURT:  Well, maybe we ought to rework it,

24   put "inference" in there somewhere.

25       MR. REEVES:  I don't understand why.  This is our

## Proceedings

1   argument to the jury: that the defendant is the shooter,

2   look at his conduct to determine his intent before, during,

3   and after. And all the things that we have displayed are

4   either in evidence or can be reasonably inferred from the

5   evidence.

6            THE COURT: I don't necessarily disagree with you

7   except for 10 and 11 in the middle box and 2 in the lower

8   box. I don't know where those items come from. I don't

9   know that that's inferences. It seems to me it's pure

10  speculation.

11           MR. REEVES: I think if you take Dr. deRoux's

12  testimony and the pictures that are in evidence, it's clear

13  that the weapon was aimed at his chest.

14           MS. GUASTELLA: The gun was strapped to the body

15  part.

16           THE COURT: 10 and 11 in the middle box, I don't

17  know where they come from. I think they should come out.

18  I don't think I'd let you make that argument verbally.

19  It's speculation. The rest of it I think is arguably a

20  legitimate inference you're asking the jury to draw. And

21  then the bottom box, number 2, "Aimed murder weapon at

22  David's chest as David attempted to run out of his

23  apartment."

24           MR. REEVES: I think that's a reasonable

25  inference from the evidence when you have Det. Steneck

MMS

## Proceedings

1    saying there is a deformed bullet inside the apartment,

2    there is a bullet impact mark on the inside door frame, and

3    the shell casing's recovered from the duffel bag

4    afterwards. Coupled with Dr. deRoux's testimony, I think

5    that's a logical inference.

6         THE COURT: "Aimed murder weapon at David's

7    chest," fine, I think you can make that argument. But as

8    he attempted to run out of the apartment, I don't think

9    there is any base.

10        MS. GUASTELLA: Dr. deRoux's testimony is that it

11   goes in through his right arm --

12        THE COURT: Yes.

13        MS. GUASTELLA: -- not through his chest.

14        THE COURT: And through the chest.

15        MS. GUASTELLA: So, the gun was not aimed at his

16   chest. It went in through the side.

17        MR. REEVES: If the Court wants me to take out

18   the "as David attempted to run out" part.

19        THE COURT: Why don't you change to, Aimed murder

20   weapon at David. Ms. Guastella is arguing that the

21   entrance wound was to the left arm as I recall. The bullet

22   then traveled through the torso and did the damage the

23   doctor testified to, but I don't know where it was aimed

24   other than at the defendant -- other than at the deceased.

25   I would change number 2 in the bottom box to aimed murder

MMS

Proceedings

1    weapon at David.

2               MR. REEVES:  Fine.

3               MS. GUASTELLA:  And fired through David's heart.

4               THE COURT:  Well, the bullet went through the

5    heart.

6               MS. GUASTELLA:  It wasn't fired at the heart, it

7    went through the arm.

8               MR. REEVES:  It doesn't say that.  It says into.

9               THE COURT:  I don't think that's necessarily

10   misleading.  The jury heard the doctor's testimony.  I

11   don't think that's necessarily misleading.

12              MS. GUASTELLA:  And 5 and 6, Aimed the murder

13   weapon at David's head and fired directly to David's head.

14   That's not what Dr. DeRoux testified to.

15              THE COURT:  The doctor said it was a wound to the

16   back of the head that came through the forehead.  The

17   neighbor testified that when the deceased came out of the

18   apartment, after she heard the first shot, he fell on his

19   face; she then left in the stairway and heard the second

20   shot.  So, I think this is a fair comment on that evidence.

21   It's asking the jury to draw an inference as to the second

22   shot, and I don't think it's necessarily misleading.  Of

23   course, it's up to the jury what inferences and conclusions

24   to draw.

25              So, 10 and 11 in the middle box should come out,

MMS

Proceedings

1    and we're going to alter 2 to aimed murder weapon at David.

2            MR. REEVES:  That's fine.

3            THE COURT:  Apart from that, I think we're

4    talking about inferences that are not unreasonable.  I'm

5    not saying the jury has to draw them, I'm simply saying I

6    think it's a fair argument.  We've taken out the word

7    "credible;" and there was that other issue: This is the

8    defendant in the Ferry pictures.  Apart from that, I don't

9    have any specific problems, as long as you make it clear

10   when you talk about the law that the jury must take the law

11   from the Court.

12           It's ten to one.  We're not going to get a DA

13   summation in before lunchtime, so is it all right if I

14   simply tell the jury to come back at two?

15           MS. GUASTELLA:  That's fine.

16           THE COURT:  Do I have to bring them back in the

17   courtroom for that?

18           MS. GUASTELLA:  No.

19           THE COURT:  We're just going to tell them to come

20   back at two for the next summation.

21               (Whereupon, a luncheon recess is taken.)

22           THE COURT CLERK:  Case on trial continues:

23   Armand Skrine, Indictment 454/2011.

24               (Defendant present.)

25           THE COURT:  The defendant is present.  So, if

MMS

Summation - People/Cilia

1      there's nothing further, we'll bring the jury in.

2                Are you going to arrange that so the defense

3      table can see it?

4                MR. REEVES:  (Indicating.)

5                MS. CILIA:  It's going to be like that.

6                THE COURT OFFICER:  Your Honor ready for the

7      jury?

8                THE COURT:  Yes.

9                THE COURT OFFICER:  Jury entering.

10               (Whereupon, the jury enters the courtroom.)

11               THE COURT CLERK:  Do both sides stipulate the

12     presence of a complete jury panel, properly seated?

13               People?

14               MS. CILIA:  Yes.

15               THE COURT CLERK:  Defense?

16               MS. GUASTELLA:  So stipulated.

17               THE COURT:  Good afternoon, welcome back.

18               Ms. Cilia.

19               MS. CILIA:  No one knew when they boarded the

20     9:15 ferry on December 8th of 2011, that with a murderer's

21     intention in his heart and assault rifle strapped to his

22     chest, death in the form of defendant was boarding along

23     with them, and that death in the form of defendant would

24     travel by ferry, by bus, by foot, by elevator, until he

25     reached the destination that would be his final: David

1   Williams' doorstep.

2           When David met death that morning, he didn't

3   recognize him.  Instead, all that David saw was his friend,

4   his old former college roommate paying him a visit; and

5   cloaked in that friendship David welcomed death into his

6   apartment with open arms.

7           But once outside of view from everyone in the

8   world but his intended victim, death revealed himself, and

9   although David tried valiantly to run from him, death in

10  the form of defendant prevailed aiming his assault rifle

11  and pulling the trigger into David's heart and into David's

12  head.

13          Death tried to hide his identity that bloody day.

14  He was cloaked in a face mask to the outside world, he was

15  cloaked in his friendship to David, but death is concealed

16  no longer.  Death sits before you today in his suit and

17  tie, his face is revealed --

18          THE COURT:  I'm going to sustain the objection as

19  to death sits before you today in suit and tie.  Rephrase

20  that.

21          MS. CILIA:  The defendant is the man who killed

22  David Williams on December 8th.

23          The issue for you to be decided is as follows:

24  Did the defendant kill David Williams on purpose on

25  December 8th of 2011?  The answer is yes.

MMS

Summation - People/Cilia

1          Your role as a juror:  To evaluate the witnesses,

2     to evaluate the evidence, to be the finders of fact.  Your

3     role as jurors is not to speculate as Ms. Guastella asked

4     you to do, speculate about what if, what if this, what if

5     that, what if there is somebody else in Staten Island who's

6     a tall man.  You have to evaluate the evidence in front of

7     you and nothing else.

8          Determine for yourself what evidence is

9     believable to reach a verdict.  The Court is going to tell

10    you some factors to use and, of course, it's the Court who

11    gives you the law, but, also, don't leave your common sense

12    at the door.

13         Ask yourselves, the ability to observe, did the

14    witnesses in this case see the incident?  Ask yourself if

15    Jean Loiseau, as he was entering through that building, had

16    an opportunity to see the masked man who was so much taller

17    than him when Jean Loiseau is 6-foot-4.  Ask yourself, did

18    Janet Smith, as she was walking out of her apartment, have

19    an opportunity to see and to hear David get shot, David

20    step out of his apartment, David fall to the floor.

21         Did the People's witnesses recall the event

22    accurately?  Do you think -- Does anyone here think that

23    Janet Smith is ever going to forget what happened to her

24    neighbor on December 8th, that she is the last person on

25    earth to see David alive, to say his very last words?  Is

Summation - People/Cilia

1    that something that she's going to forget?

2              Corroboration:  Is the testimony supported by

3    physical evidence?  And what are some examples of that?

4    Jean Loiseau talked about a black face mask, he talked

5    about a dark long jacket; and then you saw a black face

6    mask in the defendant's bag, you saw a dark jacket, you saw

7    the murder weapon.  So, ask yourself, is the witness's

8    testimony corroborated by the physical evidence?

9              You heard Janet Smith talk about two shots that

10   she heard.  And what did Det. Steneck recover?  Two

11   deformed bullets matching the two shots that David

12   struck -- I'm sorry -- that defendant struck David with on

13   December 8th of 2011.

14             Is the testimony supported by other testimony?  I

15   don't know how many people took the stand and said in one

16   way or the other that the defendant is an incredibly tall

17   person, that the man in the mask on December 8th of 2008

18   (sic) was an unbelievably tall man.  Jean Loiseau, he's

19   6-foot-4, he was towering over me.  Nicole told you, I've

20   had many opportunities to see the defendant, he's somewhere

21   between 6-foot-5 and 6-foot-9.  Det. Patterson is 6-foot-4,

22   and what did he tell you?  I think this guy is about

23   6-foot-7.

24             Did what the People's witnesses say have the ring

25   of truth?  Did it all make sense, common sense?  Did the

MMS

Summation - People/Cilia

1    People's evidence make sense?  And the answer, of course,

2    is yes.

3          The defendant shot David Williams on purpose on

4    December 8th of 2011.  So, let's talk a little bit about

5    the testimony, the evidence in this case.

6          You heard from Jean Loiseau.  You heard that he's

7    a maintenance worker at 195 Steuben Street, as well as the

8    apartment building across the street.  You heard that on

9    December 8th, that morning, he was working in the other

10   building at 204.  When he was working on tiles, he had to

11   go back to his shop, so he entered into 195 Steuben Street.

12   And he did that because he needed to get into his workroom.

13         Nobody was in the lobby at that time.  He told

14   you that the lobby is open, anybody can get in.  As he

15   walks back out, what does he see?  He sees a masked man who

16   he's observing because it's the middle of the day, it's

17   strange.  He's inside, he sees a masked man.  This man is

18   much taller than him and he's carrying a gray and black

19   duffel bag.  This man was well over 6-foot-4, he was

20   wearing a long dark coat, his hands had gloves on them.

21   And, again, he was wearing that full face mask that only

22   showed his eyes, and, again, carrying the gray and black

23   duffel bag.

24         And what do we find out?  That in the defendant's

25   bag that was left by him in the woods, there is a glove

MMS

Summation - People/Cilia

1      inside.   There is a dark long jacket inside of that duffel

2      bag which has the defendant's DNA in that duffel bag as

3      well as the murder weapon.

4              MS. GUASTELLA:   Objection to in the duffel bag.

5              THE COURT:   Well, I guess that's technically

6      accurate.

7              I think you are referring to the ski masks or the

8      masks, whatever?

9              MS. CILIA:   Yes.

10             THE COURT:   I think the jury understands that.

11             MS. CILIA:   And when I asked Jean on the stand

12     how does that compare, he said, in sum and substance,

13     that's the same kind of jacket.

14             Same question when we asked him about the duffel

15     bag.   His response was, That looks like the same kind of

16     duffel bag.

17             And, finally, when we showed him the mask, his

18     same response, It looks like the same kind of mask to me.

19             All of those items found in the defendant's

20     duffel bag with the murder weapon.

21             You heard from Janet Smith, Janet Smith being the

22     next-door neighbor to David and to Nicole, right next door.

23     They lived next to door to each other for years.  And she

24     told you, she is a nurse, she works in the afternoons; she

25     was home that morning.  She talked to you about the fact

MMS

1    that she was cleaning her apartment, that she noticed that

2    her stove wasn't working because she had been cleaning it,

3    so she goes initially to David's apartment because he's her

4    neighbor, but she hears the male voices inside.  She

5    doesn't think anything of it.  She just thinks, I'm going

6    to go downstairs, I'm going to ask somebody else because I

7    don't want to bother him.  She comes back up shortly

8    thereafter.  She lights her stove after borrowing the

9    lighter from her neighbor.

10          As she comes back out, what does she hear?  No

11   longer just voices.  Now she hears papers being moved, she

12   hears furniture being thrown around.  At this point she

13   testifies to you that she's at this red circle up here.

14   This is People's Exhibit 161.  I'm sorry, she's at this

15   middle circle.  She turned around, she wonders what's going

16   on, so she begins to start walking back toward David's

17   apartment where she hears this commotion coming from.  And

18   that's the point at which she hears shot number one.  And

19   where does shot number one come from?  It comes from inside

20   of David's apartment.  That, of course, scares Janet Smith,

21   of course.  She then begins running down the hallway, runs

22   down, until she hears the door open.  And what does Janet

23   Smith think?  She turns around because she wants to make

24   sure that the person, whoever is shot, she wants to see

25   who's behind her, so she turns around, and instead of

## Summation - People/Cilia

1    seeing the shooter, she sees the victim.  She sees her

2    neighbor who she's known for the past five, seven years,

3    clutching his chest, opening the door.  He's the only one

4    there who's opening the door.  His hand is extended out to

5    her, his other hand is at his chest, and he says, the last

6    words of his life:  Oh, my God, help me, help me.

7            She sees David fall to the floor, his head in the

8    ground, as she runs out into the stairs to the only place

9    that she knows that somebody is definitely home, her

10   4th-floor neighbor, where she's just borrowed the lighter

11   from.  She runs down those stairs as fast as she can.  She

12   enters into that apartment and she tells that neighbor,

13   Call 911.  And right as she's entering into that -- into

14   the stairwell, what does she hear?  A second shot.  And

15   this shot is so much louder than the first.  Why?  Because

16   we're no longer within David's apartment.  The defendant at

17   this point has stepped outside as David is laying face down

18   on the floor and then he shoots a second time into David's

19   head just to make sure.  Just to make sure that that first

20   shot that hit him in the heart killed him, he's going to

21   shoot him a second time in the head.

22           You heard from Nicole Hunt.  Nicole and David

23   have been together for the past 13 years.  They have a

24   child together.  They've lived together.  She told you not

25   only about her relationship with David, but she told you

MMS

Summation - People/Cilia

1      about the relationship between the defendant and David:

2      that David and the defendant met in college; that they were

3      actually roommates in college in Connecticut; that even

4      after their school days were over, that the defendant and

5      David still kept in touch with one another to the point

6      where the defendant would actually visit David, with Nicole

7      there, with the baby there, in their apartment on Steuben

8      Street, many times.

9              She's able to tell you the defendant's physical

10     description.  And what was it?  She said he had to be at

11     least 6-foot-5, maybe up to 6-foot-9.  He had a much larger

12     build than David.  And she talked about David's physical

13     description.  Who would know David's physical description

14     better than Nicole?  She said he's about 5-foot-11, she

15     said he has a very skinny build, and we know from

16     Dr. deRoux that that's correct, because Dr. deRoux measured

17     him, David, when he did the autopsy, and he weighed him.

18     David was 5-foot-10, in fact; he was 135 pounds.  And what

19     does this tell us?  That Nicole can observe things very

20     well.  What she sees is what is, in fact, happening.

21             And she talks about the last day of David's life,

22     December 8, 2011.  She and David, they get up at the normal

23     time, early; they get ready for work and for school.  They

24     get the baby ready.  Everybody gets into the car because

25     David is going to drive Nicole to school -- I'm sorry,

1    Nicole to work and Denae to school, and that's what he

2    does.  And it's not until later in the morning that Nicole

3    gets that phone call that she is never going to forget.

4         And, again, remember that ability to observe?

5    Nicole had many opportunities to see the defendant, and she

6    also had an opportunity to see the defendant's bag.  And

7    she told you when she took that stand, I recognize that

8    bag, that is the defendant's bag.  I saw him carry it a

9    little after Thanksgiving, in November of 2011.  He brought

10   that bag to my apartment.

11        And what else does she tell you about the bag?

12   When he dropped it on the floor, it make a clunking noise,

13   because the defendant always had that gun with him.

14        She talked to you about the apartment.  This is

15   not the way that Nicole left the apartment on December 8th,

16   with baby's toys knocked over, the drum set knocked over.

17   Clearly something has happened here.  Poor David was trying

18   to run for his life out of the apartment as the defendant

19   chased him with an assault rifle.

20        The sectional here, it used to be all put

21   together.  There are papers on the floor.  None of that was

22   like that when Nicole left.  That's the defendant's doing

23   as he was running after David in his final moments in life.

24        Even if you take a look at the fish tank in this

25   picture.  David was trying so hard to get out and the

1    defendant was running after him so quickly that there is a

2    cup inside of the fish tank.  There are different items

3    inside of that fish tank, all which shows the struggle that

4    ensued within.

5            You also heard from law enforcement, not just

6    civilian witnesses.

7            You heard from Det. Jeffrey Anderson.

8    Det. Anderson is the one who stopped the defendant.  Let's

9    just talk about that for a minute.  We know that Janet has

10   her neighbor call the police as soon as this happened.  She

11   sees David die.  No time has elapsed at this time.  And

12   between 5 and 10 minutes after that phone call the

13   defendant is stopped less than three blocks away in a

14   wooded area that has a direct path to 195 Steuben Street.

15           And where is he stopped?  He's stopped on a

16   service road; a service road with no sidewalk, with no

17   pedestrian traffic anywhere.  It's just the defendant

18   walking on the side of the service road.

19           And what does he have?  He's got mud on his

20   shoes, indicating that he just came from that wooded path.

21   He's acting nervous.  He's sweating profusely.  The officer

22   actually says, I could see him sweating, which makes a lot

23   of sense why the defendant's DNA would later be found on

24   the mask, because he's sweating into the mask.

25           And, again, he's wearing the dark baseball hat,

Summation - People/Cilia

1    and we're going to talk about that later when we look at

2    some of the stills from the video.

3            195 Steuben Street where David lay dying. Mosel

4    Avenue, which you can see leads all the way to the service

5    road where the defendant is stopped. Pierce Street, where

6    the defendant's duffel bag that he just discarded was

7    recovered with the murder weapon. And here is a close-up.

8            Det. Anderson, as he hears this, he goes the

9    fastest route that he knows to get to 195 Steuben Street

10   because he's heard this come over the radio. So, he takes

11   the service road and he sees the defendant coming from a

12   wooded area. Who comes from a wooded area? So, he stops

13   the defendant who is acting nervously, who's sweating, who

14   has mud on his shoes.

15           And this is what the defendant looked like when

16   he was arrested, minus the baseball cap. You'll see he's

17   not wearing a gray sweatshirt. He's wearing a black jacket

18   and a black shirt, because he's changed his clothes from

19   what he was wearing on the Ferry. He knew what he was

20   going to do; he implemented that plan.

21           You can still see, if you look carefully, on the

22   bottom of his shoes the mud from that path that he just

23   took.

24           You heard from Officer Anthony Jacobs from K-9.

25   He talked to you about Storm, his partner. He and Storm

1     came to Staten Island for one purpose, to look for physical

2     evidence.  He didn't know what that evidence was going to

3     be.  And he's deployed to an area where he ends up

4     recovering the defendant's duffel bag.  That duffel bag

5     with the defendant's mask with his DNA inside with the

6     murder weapon inside, that's what Storm found.  And Storm

7     was looking for human scents, and that's exactly what he

8     found.

9          So, let's look at this again:  Where David's body

10    was found; where Officer Anderson stopped the defendant,

11    approximately 5 to 10 minutes after this horrendous murder

12    happened; and where Storm was deployed.

13         Let's take a close-up.  Right here, right at

14    where that wall is, that's approximately where the duffel

15    bag was found.  The defendant walked down, he dumped the

16    bag, and then he walked out to the service road, trying to

17    get a bus to get back to where he was coming from.

18         So, here is the bag, the retaining wall on one

19    side and the duffel bag.  But Officer Jacobs told you, this

20    isn't quite the way that it looked when he and Storm found

21    the duffel bag.  No, the defendant had actually tried to

22    cover it up with leaves and the duffel bag was closed,

23    because he didn't want anybody to find his -- the murder

24    weapon.

25         When Officer Jacobs got there, the duffel bag was

Summation - People/Cilia

1    closed, but it was opened by Det. Guariano in his presence.

2    And what's inside? You could see the murder weapon, right

3    there, same murder weapon in the bag. It was tested by

4    ballistics. We know it's the murder weapon.

5              And what's right on top? That dark jacket that

6    the defendant was wearing. It's on top of the bag because

7    it's the last thing that he took off before he closed up

8    that duffel bag. Also back there, the gray sweatshirt that

9    he wasn't wearing when he was stopped by the police,

10   because he didn't want to be wearing the same clothes. He

11   had planned for that.

12             Det. Robin Steneck took the stand from crime

13   scene. She documented everything in this case. She

14   documented the crime scene, she documented the ballistic

15   evidence, she documented the defendant's abandoned duffel

16   bag, as well as documenting the defendant himself, what he

17   looked like. She documented the outside of 195 Steuben

18   Street where David was murdered, what it looked like when

19   she got there; David's body laying face down; the blood

20   trail; the blood spatter that happened when the defendant

21   took that assault rifle and pointed it at the victim's

22   head. She even told you about the brain matter that she

23   found from David almost 80 feet away from his body.

24             Let's take a look just for a minute at the way

25   that David was dressed the day that he was murdered: No

MMS

Summation - People/Cilia

1    shoes on; he wasn't expecting anyone.  No pants on; he is

2    just wearing shorts.  It's December; he wasn't looking to

3    go outside.  He was looking for visitors.  This was

4    unannounced.

5            And then the deformed bullets:  This one being

6    outside the apartment, so that would be the second shot to

7    David.  We have it in evidence.  We have the shell casing

8    also from outside of 195.  It's going to go along with the

9    second bullet to David's head.  She documented the door

10   which shows that there was no forced entry, because David

11   knew the defendant.  And she documented the apartment,

12   which we've seen some photos of already.

13           And then that second -- what she called the

14   second but it was actually the first shot, we have that one

15   as well, this deformed bullet.  That's the bullet that went

16   through David's heart.

17           She also documented the bullet impact marks.  The

18   first one, as we know, Janet Smith told us that she heard

19   the first shot from within the apartment, as David was

20   running out.  And we know that also from the ballistic

21   evidence, because there is a bullet impact mark right

22   there.  After it went through David and went through his

23   heart and went through the other side of his body, it hit

24   that door.

25           Then we have the second bullet impact mark, and

MMS

Summation - People/Cilia

1  that's right in front of 7N.  That bullet struck the door

2  after it struck David in the head.

3        And she documented, again, the duffel bag, the

4  contents of the duffel bag.  What did defendant bring with

5  him when he went to murder David Williams?  He brought his

6  long coat, okay, because he needed one thing to wear when

7  he murdered David, another thing to wear when he was

8  running away.  And if you'll note, that's a 46XL, which

9  would fit somebody the size and stature of the defendant.

10       Here is the gray hoodie, the gray hoodie that he

11  wasn't wearing when he was stopped, but that he was wearing

12  when he was on the Ferry, that Det. Patterson took interest

13  in when he was watching the Ferry video.  That's a 3XL,

14  again, because the defendant is a very extremely large man.

15       Towels.  The face mask.  He needed that face mask

16  because he didn't want anybody to know who he was when he

17  entered that building, because he knew he was going to kill

18  David Williams.

19       Counterfeit money because he wanted to make sure

20  that he would have something to get away -- money to get

21  away with.  And what was interesting about the counterfeit

22  money?  You could tell it was counterfeit because all the

23  serial numbers matched.  You heard from an expert who

24  explained to you that all the serial numbers are not

25  supposed to match when it comes to United States currency.

1          A glove.  Because the defendant wanted to make

2     sure that he didn't leave any fingerprints or any DNA on

3     that gun.  And not just one set of gloves, but a second

4     latex gloves, because he wanted to make extra sure that he

5     wasn't going to have any DNA anywhere near that gun.

6          And, of course, the music.  What he got pumped up

7     with before executing David Williams.  And just take a look

8     at that for a second.  This is the CD that was found in the

9     defendant's bag.  And what does it say on that CD?  It

10    says, Massacre; and now just think about what happened to

11    David Williams that day.

12         And the murder weapon fully loaded, two

13    magazines, bullet in the chamber.  That was inside of that

14    bag, too, and that's why he put the leaves over that,

15    because he was hoping nobody would find that.  And along

16    with that magazine, one shell casing.  And that shell

17    casing becomes very important later on when we talk about

18    ballistics, because we learn that that shell casing matches

19    the shell casing that was left at the scene.  They both

20    came from the same firearm, the murder weapon, which is in

21    evidence.

22         That's the shell casing from inside of the bag.

23    That's the shell casing from inside of David's apartment.

24              And, again, a second magazine.

25              We talked about the fact that Det. Steneck, she

1       also documented what the defendant looked like, what he was

2       wearing, okay.  He was wearing that black jacket, dark

3       jeans, black shoes, black T-shirt.  And there they are, the

4       black jacket, the black shoes, the black jeans.  And look

5       at those sizes, this is what's on the defendant: 4XL, US

6       13, W38.  That's what the defendant is wearing at the time

7       of his arrest.

8              And she documented the defendant, no injuries to

9       the defendant, none whatsoever.  Looks like on his hand he

10      has some old injury on his finger, nothing from that day.

11      Nothing whatsoever.

12             You heard from Officer Vincent Aguilo.  Officer

13      Aguilo was the first officer to respond to David's death

14      scene.  There were officers who were outside first, but

15      Officer Aguilo and his partners were the ones who went in

16      before anyone else.  He was also the first officer to enter

17      David's apartment, because, again, as you heard, he was

18      looking to see whether or not there were any small children

19      inside.  And he told you that the way the Det. Steneck had

20      taken the photographs and documented that, that's exactly

21      the way that David Williams was laying when he entered that

22      hallway.  And he told you that the way that Det. Steneck

23      documented that apartment was exactly the way that it was

24      when he entered that apartment.

25             And you heard from Det. Patterson.  He's the case

Summation - People/Cilia

1    detective in this.  He's the one who's responsible for the

2    entire investigation.  He oversaw it.  He talked to you

3    about canvasses, you canvass for people, he and his team.

4    He canvassed for video.  And he talked to you about

5    suspects, okay.  He said that there was a print that was

6    removed from the scene, okay, and that came back to a man

7    named Samuel Nelson.  And why was that person not a

8    suspect?  He's 5-foot-7, okay, a foot under the defendant,

9    okay, a foot under what the witnesses said that the masked

10   man was wearing.  He lives in the building.  He's on the

11   7th floor, okay.  You heard Nicole say that he lives in

12   apartment 7-O.  You heard Officer Aguilo say that when he

13   got there, he saw a man who looked like he was calling 911,

14   okay.  Samuel Nelson was never a suspect in this case.

15   Samuel Nelson wasn't stopped 10 -- I'm sorry, 5 to

16   10 minutes away, three blocks away.  Samuel Nelson's bag

17   wasn't found with his DNA and the murder weapon inside.

18           And Det. Patterson also talked about the

19   defendant's physical description because he had some time

20   to observe it.  He said that the defendant was

21   approximately 6-foot-7 and between 240 and 260 pounds.

22           You heard from Det. James Clontz from the

23   ballistics lab, an expert in ballistics.  He talked to you

24   about the assault rifle that was found in the defendant's

25   bag which was, in fact, the murder weapon.  He told you

MMS

1    that it was a semiautomatic rifle which is different than

2    an automatic rifle. So, it's one trigger pull per bullet.

3    So when the defendant pulled the trigger, he did it not

4    just once, but he did it twice. It had the ability to

5    accept external magazines. It had a pistol grip which

6    protrudes from beneath the frame. And it was designed

7    based on an AK-47 model. Okay. That's what makes it,

8    Det. Clontz told you, an assault weapon under the law.

9           He told you that it was defaced, meaning that

10   where there is supposed to be a serial number, which is

11   what allows us to track weapons, that there was no serial

12   number.

13          And he told you that the magazine was loaded. He

14   told you that this particular magazine has the capacity to

15   hold 21 bullets. And how many were in there? 19. Where

16   are the other two? We have them right here, the two that

17   went through David Williams.

18          He told you that the weapon is operable, he

19   tested it himself; and he also told you that the weapon was

20   discharged.

21          He talked to you about the deformed bullets.

22   Now, the deformed bullets and the assault rifle have the

23   exact same caliber. He told you they are deformed. He

24   can't tell you whether or not they're -- they came from

25   that particular rifle, because they're deformed, they went

MMS

Summation - People/Cilia

1    through a body and then hit different objects, but he can

2    tell you that they are the same caliber.  But he could tell

3    you about the shell casings, the shell casings that we have

4    in evidence as well.  One shell casing coming from the bag,

5    the other shell casing coming from David's death scene.

6    And these two shell casings matched.  And they match a

7    weapon, and it's the weapon that we have in evidence, it's

8    the murder weapon.

9            And what else does Det. Clontz tell us?  He told

10   us the significance of this garbage bag wrapped around the

11   murder weapon.  Why is there a garbage bag over this

12   weapon?  Well, he told you that this would contain the

13   shell casings, okay.  So, unlike a revolver, their actual

14   shell casings come out of each bullet as it comes out.  And

15   these -- And that garbage bag right there would hold those

16   shell casings in place, but because shell casings are hot,

17   the garbage bag had a little hole.  The defendant's plan

18   didn't work out exactly the way that he wanted.  Although

19   he didn't want to leave any forensic evidence at the scene,

20   he did.

21           You heard from Irene Wong who came from the DNA

22   lab.  She is a DNA expert.  She talked to you about the

23   masks in this case that were found contained within the

24   duffel bag that had the murder weapon inside.  She talked

25   to you about two masks.  Mask number one she told you the

1    source of the DNA, the defendant.  There is a second mask;

2    the source of the DNA on that mask, the defendant.

3             Now, this first mask was actually contained

4    within that dark jacket that Jean Loiseau saw the defendant

5    wearing, okay.  That was in the pocket.  And there is the

6    jacket that it came from, right inside the pocket.  So,

7    Det. Steneck didn't even document the fact that there was

8    this mask because she documented the jacket itself, but not

9    the mask inside.  But of course she did document this mask.

10   This is the same mask that Jean saw the defendant wearing

11   on December 8th.

12            So, here we go with mask number one; this is the

13   smaller of the two masks.  I'm not a DNA expert, okay, but

14   I can read the numbers.  And you can see that in each one

15   they match, okay, that the defendant's DNA is the source of

16   that mask.

17            And there is the mask, the second mask.  We're

18   going to get to that now.  Again, mask number 2 you can see

19   right here, and, more importantly, the expert told you that

20   the source of the DNA on both of these masks is the

21   defendant.

22            You also heard from Patricia Zippo.  She was a

23   questioned document expert.  She talked to you about the

24   bills that were found in the defendant's duffel bag, and

25   she's the one that told you they were counterfeit.  She's

MMS

1    the expert in this.  And, so, she was able to explain that

2    there are a bunch of security features that are on regular

3    money that were missing from this money, okay.  That's what

4    makes it non-genuine.

5         You heard from Dr. Stephen deRoux.  He's the one

6    who conducted David's autopsy.  He talked to you about the

7    injuries that David had on his body on December 8th of

8    2011.  And what was of particular note was he told us that

9    the bullet wound that went through David's heart would have

10   given him 10 to 15 seconds of breathing air, okay, 10 to

11   15 seconds where he would still be able to do something.

12   And he did.  He ran out of the apartment, he gasped, he

13   said his last words.

14        Now, that's in stark contrast to the bullet wound

15   to David's head.  Dr. de Roux told you once that bullet

16   impacted David's head, that would be it, death would be

17   instantaneous.  So, we know that shot number one is the one

18   that went through David's side, through his heart, and into

19   the other side.

20        Here is the entrance wound.  David's running out

21   of his apartment, okay.  On the right-hand side is where

22   the bullet enters the body.  And here is the exit wound,

23   right on the other side.  It goes right through him.

24        This is what the defendant did to David's heart.

25   Dr. deRoux said it was pulpified, 10 to 15 seconds left

1    after the defendant shot David in the heart.

2         Second shot:  David is lying on the ground, face

3    down, and what does the defendant do?  He shoots him right

4    in the back of the head just to make sure.

5         So, let's talk about the physical evidence in

6    this case.  We've talked a little bit about it already.

7         We've talked about the discharged shell casings.

8    The casing found in David's bag matched the casing found at

9    the scene of the crime.

10        We talked about the deformed bullets.  And those

11   deformed bullets were found one inside of the apartment,

12   which goes along with Janet's testimony, okay, that she

13   heard one shot from within the apartment, and then a second

14   deformed bullet outside, which goes along with her

15   testimony that she heard a second louder shot.

16        And then we have some more evidence, and that's

17   the surveillance videotape.  So, let's go through that now.

18   9:10 a.m., Whitehall side.  Right there is the defendant,

19   already strapped with the duffel bag which contains the

20   murder weapon, with the dark hat on, the baseball cap that

21   Officer -- I'm sorry -- Detective Anderson saw him wearing

22   when he was stopped, and the gray hoodie sweatshirt that

23   was found in the duffel bag.

24        There he is again, left-hand side of the screen,

25   another shot of the defendant.

Summation - People/Cilia

1      Fast-forward about 35 minutes later.  Here is the

2   defendant on the Staten Island side of the Ferry entering

3   into the bus terminal; walking toward the bus terminal.

4   Here is a shot of the back of the bag.  You can see that

5   it's weighed down.  We all know what it was weighed down

6   with.  It was so heavy that the defendant had to readjust

7   the bag.

8      The images that we just showed you are the

9   defendant.  Let's talk about how we know that.

10      Here he is:  Same duffel bag that's found in the

11   woods; same jacket that the defendant was wearing at the

12   time of his arrest; and same gray hoodie that was found

13   within that duffel bag.

14      Here is another shot of him:  Same dark jeans

15   that defendant is wearing; same shoes that the defendant

16   was wearing at the time of his arrest; and, again, the same

17   jacket.

18      Det. Steneck took a picture of the defendant from

19   the back when he was arrested.  Same stature, same posture,

20   same bag.

21      So, let's talk about the charges.  This is

22   something that the judge is going to charge you on the law,

23   but we are just going to go over a few things now.

24      He's being charged with Murder in the Second

25   Degree, Criminal Possession of a Weapon in the Second

MMS

1    Degree, and Criminal Possession of a Forged Instrument in

2    the First Degree.  Those are the names of the charges.

3         You are going to hear from the judge about

4    "knowingly," that "knowingly" means aware of conduct; that

5    to "possess" means to have physical possession or dominion

6    or control over property; and "firearm," he is going to

7    tell you, includes an assault weapon, which is what we have

8    in evidence.

9         He is going to tell you that an assault weapon is

10   a semiautomatic rifle that has the ability to accept a

11   detachable magazine and it has at least two of the

12   following characteristics, which include a pistol grip that

13   protrudes conspicuously beneath the action of the weapon,

14   and a folding or telescoping stock, flash suppressor, and

15   grenade launcher.

16        You heard from Det. Clontz that this is, in fact,

17   the assault rifle; it had at least two of those

18   characteristics.

19        Loaded, has ammunition and capable of firing.

20        And, also, that this did not take place in the

21   defendant's home or place of business, and, obviously, we

22   have proven that.

23        We know that it's loaded because it had not one

24   but two separate magazines both of which are loaded.

25   Remember, the only two bullets that are missing are the two

MMS

Summation - People/Cilia

1    that killed David Williams.

2    So, now we are going to apply the law to the

3    evidence.  The defendant carries the assault weapon to

4    Staten Island in his duffel bag.  The defendant holds the

5    weapon in his hands as he shoots into David's heart and

6    into David's head.  And then the defendant discards the

7    murder weapon in the woods as he attempts to flee the

8    scene.  And that's how we know that he possessed it.

9    Again, apply the law to the evidence.

10    This is a semiautomatic rifle; it has the ability

11    to accept external magazines.  It has a pistol grip that

12    protrudes from beneath the frame.  It's designed based on

13    an AK-47 model.  So, we know that it's a assault rifle.

14    What has the evidence proven?  That on

15    December 8, 2011, in Staten Island, the defendant possessed

16    an assault rifle, and that he did so knowingly; that

17    firearm was loaded and operable; and the gun was not in his

18    home or place of business.

19    So, now moving along to Criminal Possession of a

20    Forged Instrument in the First Degree, again, the judge is

21    going to be the one who tells you the law, but I expect him

22    to say that with knowledge that it is forged and with

23    intent to defraud, deceive, or injure another, he possesses

24    a forged instrument which is or purports to be an issue of

25    money, this money, okay, the counterfeit money.

MMS

Summation - People/Cilia

1           Again, you have to act knowingly and

2    intentionally.  How do we know that he acted knowingly?

3    The defendant discarded the counterfeit money along with

4    the murder weapon when he tried to flee the scene, and we

5    know that he acted intentionally because the defendant's

6    bag was filled with items meant to provide assistance to

7    him when he was on the run, and that included the

8    counterfeit money.

9           So, the evidence in this case has proven that on

10   December 8th of 2011, in Staten Island, the defendant

11   possessed a forged instrument purporting to be an issue of

12   money; he did so knowingly and he did so with the intent to

13   defraud, deceive or injure another.

14          And then we have Murder in the Second Degree:

15   With intent to cause death, the defendant caused the death

16   of another person.

17          The judge is going to tell you that "intent"

18   means conscious objective or purpose.  And how do we

19   determine that?  How do we know that the defendant acted

20   intentionally?  We've got to look at what the defendant

21   did, his conduct before he murdered David Williams, while

22   he murdered David Williams, and then after the crime.

23          So, what did he do before?  He placed duct tape

24   around the weapon, okay, because he didn't want to have his

25   prints, DNA, on there.  He put the garbage bag on the

MMS

Summation - People/Cilia

1    weapon to make sure that the shell casings would stay in

2    place and none would stay on the scene.  He loaded the

3    weapon with a detachable magazine fully loaded.  Then he

4    placed that loaded weapon into a duffel bag.  And then,

5    just to make sure, he added an additional loaded magazine

6    into the duffel bag as well.  He carried the assault weapon

7    which was hidden in the duffel bag through the Whitehall

8    Ferry terminal.  We saw him on video doing that.  And then

9    he carried that assault weapon hidden in the duffel bag

10   onto the Ferry.  Then he carried the assault weapon still

11   hidden in the duffel bag through the terminal.  And then

12   continuing his route, he went to David's apartment building

13   with that duffel bag containing the murder weapon.

14          He placed a face mask on to conceal his identity,

15   because he knew that he was going to kill David.  He placed

16   gloves on himself to keep from leaving fingerprints.  He

17   removed the face mask from his face when he knocked on

18   David's door, because he didn't want David to know that he

19   was about to kill him.

20          What did the defendant do during the shooting?

21   We know there was no forced entry, so as his friend the

22   defendant entered that apartment.  He aimed the assault

23   rifle at David, and he fired into David's heart.

24          Then the defendant, after David ran out, fell on

25   the ground, he opened the apartment door, he walked to

1    David's body, and David's body was laying face down on the

2    floor, and he aimed the murder weapon at David's head.

3    Then he fired directly into David's head.

4         What was the defendant's conduct like after the

5    shooting?  Well, he quickly left the apartment.  He didn't

6    want to get caught.  He took the gloves, the long coat that

7    he was wearing, the mask that he was wearing, the murder

8    weapon, the ammunition, he put it all back into the duffel

9    bag; he changed his clothes, because he didn't want to be

10   wearing the same clothes as the clothes he had just been

11   killing David with; and then he discarded the duffel bag

12   into that wooded area.  He put leaves over the duffel bag

13   to make sure to hide the bag from view, and he walked

14   toward public transportation.  When he was stopped by

15   police, he was sweating profusely.

16        The result of the defendant's conduct:  A gunshot

17   wound to his heart, a gunshot wound to his head, the result

18   being David Williams' death.  The defendant shot David on

19   purpose.  When you apply the law, that's what you get.

20        The defendant intended to kill David.  How do we

21   know that?  The weapon that was used: fully-loaded assault

22   rifle.  Also, the location of where he was shot:   Shot

23   number one, as the defendant -- as David attempted to run

24   out of the apartment; shot number two, David is on the

25   ground.

MMS

Summation - People/Cilia

1       The defendant was in close proximity to David.

2   There were two shots that he fired.  Remember because as a

3   semiautomatic you have to shoot each time.

4       The number of times that David was struck: twice,

5   because he was aiming at David.

6       The area:  He shoots David in the heart and in

7   the head.  And, again, the result, David Williams' death.

8       The evidence has proven in this case that on

9   December 8th of 2011, right here in Staten Island, that the

10  defendant caused the death of David Williams, that the

11  defendant intended to kill -- to cause the death of David

12  Williams.

13      Now, at the beginning of this case, during jury

14  selection, during the openings, we told you that at the end

15  of this case, after we had proved beyond all reasonable

16  doubt the defendant's guilt, that we were going to come

17  back to you and we were going to ask you to do one thing,

18  and that's what I'm going to ask you to do now, and that's

19  follow the law.  Follow the law, convict the man who was

20  responsible for these crimes, vote guilty on all counts

21  against the defendant.

22      Thank you.

23      THE COURT:  It's about 3:30.  My charge on the

24  law is going to take about an hour.  It's really too late

25  in the day for me to charge, so we're going to break now.

Proceedings

1    We are going to resume -- Can I make it 9:30? It's been

2    10:00 for the last few days. Is 9:30 all right with

3    everybody? I'll make it 10:00 if you want.

4               THE JURORS: Ten o'clock.

5               THE COURT: Would you prefer 10:00?

6               THE JUROR: Ten.

7               THE COURT: Okay, we'll make it 10 a.m., and I'll

8    give you the law then.

9               The rules still apply: Don't discuss the case,

10   and so on. Thank you for your attention, and have a good

11   afternoon.

12              THE JUROR: Leave the notebooks?

13              THE COURT: Yes. We'll lock them up, we'll give

14   them back to you tomorrow.

15              (Whereupon, the jury exits the courtroom.)

16              THE COURT: Okay. 10 a.m.

17              (Defendant remanded.)

18              (Whereupon, court stands in recess and this

19   matter is adjourned to March 11, 2014, at 10 a.m.)

20   *    *    *    *    *    *    *    *    *    *    *
        I hereby certify that the foregoing is a true and
21   accurate transcript of the above proceedings to the best of my
     knowledge, skill, and ability.
22

23

24                           _____
                             MAURIZIA M. SELLECK
25                           Senior Court Reporter

MMS

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND - CRIMINAL TERM - PART 5
---------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK   : INDICTMENT NO.
                                        454/2011

            -against-                 :


ARMAND SKRINE,                        : JURY TRIAL
                                        (Cont'd)

                      Defendant.  :
---------------------------------------X
                      18 Richmond Terrace
                      Staten Island, New York
                      March 11, 2014

B E F O R E:

    HONORABLE STEPHEN J. ROONEY, Justice.



A P P E A R A N C E S:

    DANIEL DONOVAN, ESQ.
    District Attorney - Richmond County
        130 Stuyvesant Place
        Staten Island, N.Y. 10301
    BY: KYLE REEVES, ESQ.,
        JENNIFER CILIA, ESQ.,
        Assistant District Attorneys

    MARIA GUASTELLA, ESQ.
    Attorney for the Defendant
        88 New Dorp Plaza
        Staten Island, N.Y. 10306




                      MAURIZIA M. SELLECK
                      SENIOR COURT REPORTER



                      MMS

Proceedings

1          THE COURT CLERK:  Case on trial continues,

2     calendar number 1, Indictment 454/2011: Armand Skrine.

3          Appearances, counsel.

4          MS. CILIA:  Jennifer Cilia and Kyle Reeves for

5     the People.

6          MS. GUASTELLA:  Maria Guastella on behalf of

7     Mr. Skrine.

8          Good morning again, your Honor.

9          THE COURT:  Good morning.

10         (Defendant present.)

11         THE COURT:  Okay, the defendant is present.

12         As to Count 6, in reviewing the law yesterday

13    afternoon, I came across several cases that indicate to me

14    Count 6 is probably not proven.  People against Bailey at

15    13 N.Y.3d 67.  I'll cite another case, People against

16    Batson, Second Department case from last year, reported at

17    103 A.D.3d 910.  These cases stand for the proposition that

18    in terms of Criminal Possession of a Forged Instrument in

19    the First Degree, it must be proven that the defendant in

20    question knew, was aware, that the bills at issue were

21    counterfeit, and also it must be proven beyond a reasonable

22    doubt, of course, that the defendant intended to defraud,

23    deceive, or injure another.  I don't think we have either

24    of those things specifically proven here.  We've got

25    possession in a circumstantial sense proven, but I don't

MMS

Proceedings

1          think there is any proof of knowledge or intent.

2                    So, my feeling is I should have granted

3          Ms. Guastella's motion yesterday with regard to Count 6

4          anyway.

5                    Anyone want to be heard?

6                    MS. GUASTELLA:  Judge, obviously, I have no

7          objection to the count being dismissed.  However, I think

8          the jury should have a curative instruction asking them to

9          disregard any testimony during the trial and during

10         Ms. Cilia's summation as to counterfeit money.

11                   THE COURT:  I'm not submitting a number of counts

12         based on the charge conference.  What I generally say as

13         part of my pattern instruction is for reasons which need

14         not concern them, certain counts are not going to be

15         submitted and they are not to draw any inference.

16                   MS. GUASTELLA:  But the People in their power

17         point gave that charge.

18                   THE COURT:  You want me to leave it?

19                   MS. GUASTELLA:  No.

20                   THE COURT:  I'll take it out.  I'll hear the DA.

21         But if I start to get into specific as you call it curative

22         instructions with regard to Count 6, then wouldn't I have

23         to do it with regard to counts 2 and 4 and 5?

24                   MS. GUASTELLA:  Had the People not addressed that

25         exact count in their power point and broken it down element

Proceedings

1    by element --

2              THE COURT:  What do you want me to say?

3              MS. GUASTELLA:  That the People should disregard

4    any testimony surrounding the counterfeit money as well as

5    their summation and the power point.

6              THE COURT:  Hear what I generally say:  For

7    reasons that need not and must not concern you, the Court

8    will not submit the other counts to the indictment for your

9    consideration.  That simply means you will not consider

10   those particular counts in your final deliberations.  Bear

11   in mind you are not to speculate upon the fact that they've

12   been removed from your final deliberations.  You are to

13   draw no inference whatsoever from the fact that those

14   particular counts have been excluded from your final

15   deliberations.

16             Isn't that sufficient?

17             MS. GUASTELLA:  Judge, can you read it one more

18   time?  I apologize.

19             THE COURT:  For reasons that need not and must

20   not concern you, the Court will not submit the other counts

21   of the indictment for your consideration.  That simply

22   means you will not consider those particular counts in your

23   final deliberations.  Bear in mind you are not to speculate

24   upon the fact that I've removed those particular counts of

25   the indictment from your final deliberations.  You are to

MMS

## Proceedings

1    draw no inference whatsoever from the fact that those

2    particular counts have been excluded from your final

3    deliberations.

4            MS. GUASTELLA:  Judge, I guess that's fine, but

5    just note my objection as to the curative instruction for

6    the record.

7            THE COURT:  I guess that's fine but note my

8    objection?

9            MS. GUASTELLA:  Because if the People didn't put

10   it in their power point and actually expand on the charge

11   and put the elements out in front of them and compare what

12   they think they have proven to each element, then I

13   probably wouldn't have asked for a curative instruction.

14           THE COURT:  I can't see how a counterfeit charge

15   has any bearing on the other two counts.  I mean, it's a

16   separate and distinct charge which I'm not submitting.  I

17   think this is sufficient.

18           What do you think, People?  I mean --

19           MR. REEVES:  I think we're disadvantaged

20   because Ms. Cilia argued to the jury the proof of the

21   defendant's guilt of this count, but I have no objection

22   if the Court reads the instruction.  I'm not quite sure

23   what a curative instruction would be for.  There was no bad

24   faith and we argued the evidence, so there is nothing to be

25   cured.

000934

464

Proceedings

1         THE COURT: There is no question I should have

2  granted the motion yesterday in my view and you would have

3  known before you summed up. I don't see any prejudice on

4  this counterfeit argument with regard to the other two

5  counts. I mean, of course I have my own unique

6  perspective, you have yours.

7         MR. REEVES: Correct.

8         THE COURT: If you both want me to say something

9  specific about Count 6, if you both want me to, then tell

10  me what you want me to say.

11         MR. REEVES: I want you to say what you just read

12  to both parties. I think that minimizes the prejudice to

13  the People and it explains to the jury why they're only

14  getting the two counts.

15         THE COURT: I think that instruction is

16  sufficient. It's time-tested and I just don't see the

17  prejudice.

18         I do agree, I should have dismissed it before you

19  summed up, but I didn't review these cases until after when

20  I began to wonder about the elements.

21         Okay. So, if there is no further discussion,

22  I'll grant the defense motion to dismiss Count 6. So, that

23  means I'm submitting two counts.

24         Let me hand out another verdict sheet, and if you

25  approve it in form, just say so and please initial in the

Proceedings

1    lower corner somewhere.

2            (Handing.)

3            THE COURT:  Is the verdict sheet approved in form

4    by both sides?

5            MS. GUASTELLA:  Yes.

6            MR. REEVES:  Yes.

7            THE COURT:  Okay.  So, I guess we can bring the

8    panel in and I'll give them an instruction.

9            (Whereupon, Court's Exhibit 2 is received in

10   evidence.)

11           THE COURT:  You know, if you want me to, I can

12   say this in their final instructions:  Specifically with

13   regard to the counterfeit charge, disregard --

14           MR. REEVES:  No, I'm not asking for that.

15           THE COURT:  She is.

16           MS. GUASTELLA:  On the count that it was brought

17   out the way it was in the power point, I'd ask for that

18   you.

19           MR. REEVES:  It doesn't matter whether it's in

20   the power point or not.  It's a count in the indictment the

21   Court didn't dismiss.  We had a charge conference; the

22   Court agreed to submit it; we argued it.  I don't know why

23   the People should be penalized for --

24           THE COURT:  I don't know how I'm penalizing

25   anyone.

MMS

Proceedings

1    MR. REEVES: If you are drawing attention to it.

2    THE COURT: Then here's what I will do. I'll

3    say: For reasons that need not and must not concern you, I

4    will not submit the other counts of the indictment for your

5    consideration, specifically counts 2, 4, 5 and 6, and I'll

6    name them. And I'll leave it at that. I think that should

7    be quite clear.

8    MR. REEVES: Your Honor, they -- you haven't read

9    the indictment to them, so I don't know why we're drawing

10   attention to it.

11   THE COURT: Did anybody refer to the other counts

12   at any point?

13   MR. REEVES: No.

14   THE COURT: No?

15   MR. REEVES: No. This unduly draws the jury's

16   attention to counts that aren't being submitted, and it's

17   going to lead to speculation.

18   THE COURT: On the other hand, there was, as

19   Ms. Guastella points out, summation with regard to the

20   counterfeit charge because I didn't grant the motion to

21   dismiss. So, what I will say is: For reasons that need

22   not concern you I won't submit the other counts of the

23   indictment, including the Criminal Possession of a Forged

24   Instrument in the First Degree count. That simply means

25   you won't consider those counts. I don't think that harms

MMS

Jury Charge

1        anybody.  And I believe it addresses Ms. Guastella's

2        concern.

3                    THE COURT OFFICER:  Your Honor, ready for the

4        jury?

5                    THE COURT:  Yes.

6                    THE COURT OFFICER:  Jury entering.

7                    (Whereupon, the jury enters the courtroom.)

8                    THE COURT CLERK:  Do both sides stipulate a

9        complete jury panel, properly seated?

10                   People?

11                   MS. CILIA:  Yes.

12                   THE COURT CLERK:  Defense?

13                   MS. GUASTELLA:  So stipulated.

14                   THE COURT:  Good morning.  Welcome back.

15                   The proof -- Withdrawn.  Following summations of

16       the lawyers, it now becomes my duty to instruct you as to

17       the law applicable to this case.  I want to remind you

18       that, in making their summations, the lawyers reviewed the

19       evidence that you've already seen during the trial and

20       suggested to you certain inferences or conclusions which

21       they, in their opinions, believe may be properly drawn from

22       the evidence.

23                   If you found that a particular attorney's

24       analysis of the evidence was correct, that the evidence as

25       summed up and analyzed by that attorney is accurate, and if

MMS

1    you find that the inferences and conclusions which you were

2    asked to draw from the evidence are logical and sensible,

3    then you are at liberty to adopt such inferences or

4    conclusions either in whole or in part.

5         On the other hand, if you believe that either

6    counsel's analysis of the facts or of the inferences or

7    conclusions which you were asked to draw therefrom are

8    illogical or not warranted by the evidence, then you may

9    disregard the same, either in whole or in part, in drawing

10   your own conclusions from the evidence which you believe to

11   be truthful.

12        Bear in mind nothing the lawyers said in their

13   summation is evidence in the case.  Indeed, nothing that I

14   will say in my final instructions on the law will be

15   evidence in the case.  You've heard the evidence, and you

16   alone are the sole and exclusive judges of the facts in the

17   case.

18        I want to commend the attorneys for the able

19   manner in which they've carried out their responsibilities

20   as advocates, and I want to thank the jury for its patience

21   and attention.  It's now of utmost importance that the

22   final words in this case be given to you and be considered

23   by you in a calm and a quiet atmosphere.

24        Trial by jury in criminal cases forms the very

25   basis and is the heart of the true administration of

Jury Charge

1    justice in our country, our state, and our community. It

2    should not be a game of wits, nor of histrionics.  It's

3    intended as a procedure by which we quietly, rationally,

4    and objectively attempt to ascertain the truth.  You as

5    jurors and I representing the Court have a great

6    responsibility in determining that a just result is

7    reached, both, on the law and on the facts.  And we've now

8    arrived at that phase of the trial where you will be

9    instructed on the law and then retire for final

10   deliberations.

11        I'll divide my instructions into two parts:

12   first, a general statement of the law applicable to all

13   jury trials in criminal cases, and then a statement of the

14   law which is particularly applicable to the crimes charged

15   in this indictment.

16        As I said during summations, the district

17   attorney and defense counsel, respectively, have commented

18   on the evidence and have suggested to you certain

19   inferences and conclusions you might reasonably and

20   logically draw from the evidence.  Once again, their

21   summations are not evidence.  However, if the arguments of

22   counsel strike you as reasonable and logical and supported

23   by the evidence, you may, if you so conclude, adopt them.

24   On the other hand, if you find such arguments to be

25   unreasonable or illogical or unsupported by the evidence,

1   you may reject them.  In the last analysis, it's the

2   function of the jury to draw its own inferences or

3   conclusions from the evidence as you recollect the evidence

4   and as you find such evidence credible and believable.  You

5   are the sole and exclusive judges of the facts.  It's the

6   duty of the jury to decide each and every issue of fact

7   which has arisen during trial.  No one, not the lawyers and

8   not I, may presume to tell you how the issues of fact

9   should be decided.  I repeat, you and you alone are the

10  sole and exclusive judges of the facts.

11          In resolving each and every issue of fact, you

12  must do so solely on evidence in the case and on that

13  evidence alone.  You may not consider or speculate on

14  matters not in evidence or matters outside the case.  The

15  evidence in this case includes the testimony of the

16  witnesses and the exhibits that were received in evidence.

17  Any testimony which was stricken from the record or to

18  which an objection was sustained must be disregarded by

19  you.  Exhibits that were received in evidence are available

20  upon your request for your inspection and consideration.

21  Exhibits that were just seen during the trial or marked for

22  identification but not received in evidence are not

23  evidence and, thus, are not available for your inspection

24  and consideration.  But testimony based on exhibits that

25  were not received in evidence may be considered by you.

MMS

1  It's just that the exhibit itself is not available for your

2  inspection and consideration.

3  If you want to see the videos that were

4  introduced in evidence from the Ferry terminals, you can

5  request that. It's up to you. If you do, we'll send it in

6  or send them in with a laptop so you can play it in the

7  jury room. If you want to see it on that big screen, we

8  can't get that into the jury room. If you need that, we'll

9  bring you back into the courtroom and play it for you here

10  in the courtroom.

11  Also, if you want to see any of the ballistics

12  evidence, including the rifle that's in evidence, you can

13  request that and we'll send it in, but we'll send it in

14  with a court officer, and the court officer will remain in

15  the jury room while you examine those items, if you want

16  to. It's up to you. Do not deliberate while the court

17  officer is in the room. Wait until he leaves. When he

18  leaves, he'll take the ballistics evidence with him.

19  Apart from that, you can request any of the other

20  exhibits in evidence and, as I said, we will send them in

21  to you for your inspection.

22  As I've said, you are the sole and exclusive

23  judges of the facts. On the other hand, I'm the sole and

24  exclusive judge of the law in the case. These are separate

25  and distinct responsibilities of equal importance.

MMS

Jury Charge

1           As the judge of the law, it's been my function to

2     regulate the course of the trial and to determine what

3     evidence under our law was admissible.  My rulings in each

4     instance were solely based on the law.

5           My other function is to instruct you on the law

6     specifically applicable to this case.  My instructions to

7     you on the law must be accepted by you, whether you agree

8     with them or not.  If you have any idea of your own of what

9     the law is or what you think it should be, it's now your

10    duty under your oath to cast aside your own ideas of the

11    law and to accept the law exactly as I give it to you.

12          You must not infer from any of my rulings or

13    anything I may have said during this trial that I hold any

14    personal views for or against this defendant.  Furthermore,

15    you are not under any circumstance to draw any inference or

16    conclusion from an unanswered question, nor may you

17    consider any testimony which was stricken from the record.

18          Please remember, all of us, the court, counsel,

19    jury, people and defendant, are bound by the laws of our

20    state exactly as these laws provide.  Each attorney is an

21    officer of the court, holding the highest duties to that

22    attorney's client.  An attorney's function is to represent

23    a client to the best of that attorney's ability.  If, in

24    the interests of advocacy, the attorneys have done or said

25    anything which you deem to be objectionable, you must not

Jury Charge

1  let such feeling interfere with your primary duty here to

2  judge the facts impartially and to be fair to, both, the

3  people and the defendant.  As I believe I've said before,

4  arguments of counsel made during the course of trial are

5  not evidence and must not be considered by you as such.

6        During the course of the trial, the lawyers and I

7  have had various conferences, sometimes up here at the

8  bench, sometimes off to the side.  We try to keep our

9  voices down during these conferences.  Hopefully you didn't

10  overhear us, but I'll instruct you now, if you did overhear

11  any parts of these conferences, you must disregard what you

12  heard.  The conferences do not constitute evidence, and

13  anything you may have heard in that regard must play no

14  role in your deliberations.

15        During the trial I've ruled on various motions

16  and objections.  These rulings are solely based on the law,

17  and these rulings should not be considered by you as giving

18  any indication or creating any inference that the Court has

19  any opinion as to the issues or the facts which, as I've

20  said several times now, are exclusively for your

21  determination.

22        Now, there are certain fundamental legal

23  principles that are applicable in the criminal cases in

24  general.  These are safeguards mandated by our Constitution

25  with which the law surrounds every defendant in a criminal

MMS

Jury Charge

1     trial.  These basic principles of law apply to every

2     criminal case conducted in the courts of New York State

3     regardless of the nature or seriousness of the crime or

4     crimes charged.  I made reference to these principles in my

5     preliminary instructions at the beginning of the trial.

6     Because of their importance I'll repeat and amplify my

7     instructions as to each of them.

8             Before discussing these Constitutional

9     safeguards, however, let me emphasize, as I have before,

10    that an indictment is simply an accusation required by the

11    law solely for the purpose of informing a defendant of the

12    offenses with which he is charged.  It's simply a paper

13    writing.  It's not evidence of anything.  The allegations

14    set forth in the indictment are allegations only, they're

15    not evidence; and, as I say, the indictment is merely a

16    device required by law to inform a defendant of the charges

17    against him and to bring such charges to trial.

18            So, I'll turn now to the fundamental principles

19    of our law that apply in all criminal trials: the

20    presumption of innocence, the burden of proof, and the

21    requirement of proof beyond a reasonable doubt.

22            As to the presumption of innocence:  Throughout

23    these proceedings the defendant is presumed to be innocent.

24    As a result, you must find the defendant not guilty unless

25    on the evidence presented at this trial you conclude that

MMS

1     the People have proven the defendant guilty beyond a
2     reasonable doubt.

3              As to the burden of proof:  The defendant is not
4     required to prove that he is not guilty.  In fact, the
5     defendant is not required to prove or disprove anything.
6     To the contrary, the People have the burden of proving the
7     defendant guilty beyond a reasonable doubt.  That means
8     before you can find the defendant guilty of a crime, the
9     People must prove beyond a reasonable doubt every element
10    of the crime, including that the defendant is the person
11    who committed that crime.  This burden of proof never
12    shifts from the People to the defendant.  If the People
13    fail to satisfy their burden of proof, you must find the
14    defendant not guilty.  If the People satisfy their burden
15    of proof, you must find the defendant guilty.

16             Now, as to the standard of proof required for a
17    conviction in every criminal case, that standard, of
18    course, being proof of guilt beyond a reasonable doubt:
19    What does our law mean when it requires proof of guilt
20    beyond a reasonable doubt?  The law uses the term proof
21    beyond a reasonable doubt to tell you how convincing the
22    evidence of guilt must be to permit a verdict of guilty.
23    The law recognizes that, in dealing with human affairs,
24    there are very few things in this world that we know with
25    absolute certainty.  Therefore, the law does not require

Jury Charge

1    the People to prove a defendant guilty beyond all possible

2    doubt.  On the other hand, it's not sufficient to prove

3    that a defendant is probably guilty.  In a criminal case,

4    the proof of guilt must be stronger than that.  It must be

5    beyond a reasonable doubt.

6          A reasonable doubt is an honest doubt of the

7    defendant's guilt for which a reason exists based upon the

8    nature and quality of the evidence.  It's an actual doubt.

9    It's not an imaginary doubt.  It's a doubt that a

10   reasonable person acting in a matter of this importance

11   would be likely to entertain because of the evidence that

12   was presented or because of the lack of convincing

13   evidence.

14         Proof of guilt beyond a reasonable doubt is proof

15   that leaves you so firmly convinced of the defendant's

16   guilt that you have no reasonable doubt of the existence of

17   any element of the crime or of the defendant's identity as

18   the person who committed the crime.

19         In determining whether or not the People have

20   proven the defendant's guilt beyond a reasonable doubt, you

21   should be guided solely by a full and fair evaluation of

22   the evidence.  After carefully evaluating the evidence,

23   each of you must decide whether or not that evidence

24   convinces you beyond a reasonable doubt of the defendant's

25   guilt.

MMS

Jury Charge

1          Whatever your verdict may be, it may not rest

2     based upon baseless speculation, nor may be influenced in

3     any way by bias, prejudice, sympathy, or by a desire to

4     bring an end to your deliberations or to avoid an

5     unpleasant duty.

6          If you are not convinced beyond a reasonable

7     doubt that the defendant is guilty of a charged crime, you

8     must find the defendant not guilty of that crime.  If you

9     are convinced beyond a reasonable doubt that the defendant

10    is guilty of a charged crime, you must find the defendant

11    guilty of that crime.

12          The last fundamental principle I'll discuss with

13    you before moving on has to do with your duty not to

14    consider the subject of punishment.

15          Our law provides that in determining your

16    verdict, you may not consider or speculate concerning

17    matters relating to sentence or punishment.  You must not

18    discuss such matters, nor should your deliberations in any

19    way be influenced by such matters.  If you render a verdict

20    of guilty, I'm required to impose sentence in accordance

21    with the law.  The jury has no function relating to

22    sentence or punishment and such matters are wholly

23    immaterial to your deliberations.

24          So, that concludes my discussion of the

25    fundamental principles and the Constitutional safeguards

Jury Charge

1    applicable to all criminal cases.

2              Let me move on now and discuss with you the issue

3    of credibility of witnesses.

4              As judges of the facts, you alone determine the

5    truthfulness and accuracy of the testimony of each witness.

6    You must decide whether a witness told the truth and was

7    accurate, or, instead, testified falsely or was mistaken.

8    You must also decide what importance to give to the

9    testimony you do accept as truthful and accurate.  It's the

10   quality of the testimony that is controlling, not the

11   number of witnesses who testified.

12             If you find that any witness has intentionally

13   testified falsely as to any material fact, you may

14   disregard that witness's entire testimony, or you may

15   disregard so much of it as you find was untruthful and

16   accept so much of it as you find to have been truthfully

17   and accurately given.

18             There is no particular formula for evaluating the

19   truthfulness and accuracy of another person's statements or

20   testimony.  You bring to this process all of your varied

21   experiences.  In life you frequently decide the

22   truthfulness and accuracy of statements made to you by

23   other people.  The same factors used to make those

24   decisions should be used in this case when evaluating the

25   testimony.

MMS

1            Some of the factors you may wish to consider in

2     evaluating the testimony of a witness are as follows:

3            Did the witness have an opportunity to see or

4     hear the events about which he or she testified?

5            Did the witness have the ability to recall those

6     events accurately?

7            Was the testimony of the witness plausible and

8     likely to be true, or was it implausible and not likely to

9     be true?

10           Was the testimony of the witness consistent or

11    inconsistent with other testimony or evidence in the case?

12           Did the manner in which the witness testified

13    reflect upon the truthfulness of that witness's testimony?

14           To what extent, if any, did the witness's

15    background, training, education, or experience affect the

16    believability of that witness's testimony?

17           Did the witness have a bias, hostility, or some

18    other attitude that affected the truthfulness of the

19    witness's testimony?

20           You may consider whether a witness had or did not

21    have a motive to lie.  If a witness had a motive to lie,

22    you may consider whether and to what extent, if any, that

23    motive affected the truthfulness of that witness's

24    testimony.  If a witness did not have a motive to lie, you

25    may consider that as well in evaluating the witness's

Jury Charge

1    truthfulness.

2          You may consider whether a witness has any

3    interest in the outcome of the case or, instead, whether

4    the witness has no such interest.  You are not required to

5    reject the testimony of an interested witness or to accept

6    the testimony of a witness who has no interest in the

7    outcome of the case.  You may, however, consider whether

8    any interest in the outcome or the lack of such interest

9    affected the truthfulness of the witness's testimony.

10          You may consider whether a witness made

11   statements at this trial that are inconsistent with each

12   other.  You may also consider whether a witness made

13   previous statements that are inconsistent with his or her

14   testimony at trial.

15          You may consider whether a witness testified to a

16   fact here at trial that the witness omitted to state at a

17   prior time when it would have been reasonable and logical

18   for the witness to have stated the fact.  In determining

19   whether it would have been reasonable and logical for the

20   witness to have stated an omitted fact, you may consider

21   whether the witness's intention was called to the matter

22   and whether the witness was specifically asked about it.

23          If a witness has made such inconsistent

24   statements or omissions, you may consider whether and to

25   what extent they affect the truthfulness or accuracy of

Jury Charge

1    that witness's testimony here at trial.  The contents of a

2    prior inconsistent statement are not proof of what

3    happened.  You may use evidence of a prior inconsistent

4    statement only to evaluate the truthfulness or accuracy of

5    the witness's testimony here at trial.

6          You may consider whether a witness's testimony is

7    consistent with the testimony of other witnesses or with

8    other evidence in the case.  If there were inconsistencies

9    by or among witnesses, you may consider whether they were

10    significant inconsistencies relating to important facts or

11    instead with the kind of minor inconsistencies that one

12    might expect from multiple witnesses to the same event.

13          In this case you've heard the testimony of police

14    officers.  The testimony of a witness should not be

15    believed solely and simply because the witness is a police

16    officer.  At the same time, a witness's testimony should

17    not be disbelieved solely and simply because the witness is

18    a police officer.  You must evaluate a police officer's

19    testimony in the same way you would evaluate the testimony

20    of any other witness.

21          The defendant did not testify in this case, and I

22    charge you that the fact that he did not testify is not a

23    factor from which any inference unfavorable to the

24    defendant may be drawn.

25          You will recall that certain witnesses testified

Jury Charge

1    after being qualified as experts in their respective

2    fields.  Patricia Zippo testified as an expert in the field

3    of questioned documents; Det. James Clontz testified as an

4    expert in the field of ballistics; Irene Wong testified as

5    an expert in DNA analysis; and Dr. Stephen deRoux testified

6    as an expert in forensic pathology.

7         Ordinarily a witness is called to testify about

8    facts and is not permitted to give an opinion.  Where,

9    however, scientific, medical, technical, or other

10   specialized knowledge will help the jury understand the

11   evidence or determine a fact in issue, a witness with

12   expertise in a specialized field may render opinions about

13   such matters.  You should evaluate the testimony of any

14   such witness just as you would the testimony of any other

15   witness.  You may accept or reject such testimony in whole

16   or in part, just as you may with respect to the testimony

17   of any other witness.

18        In deciding whether or not to accept such

19   testimony, you should consider the following: the

20   qualifications and believability of the witness; the facts

21   and other circumstances upon which the witness's opinion

22   was based; the accuracy or inaccuracy of any assumed or

23   hypothetical fact upon which an opinion was based; the

24   reasons given for the witness's opinion; and whether the

25   witness's opinion is consistent or inconsistent with other

1    evidence in the case.

2         In sum, the testimony and opinions of expert

3    witnesses are subject to the same rules and tests

4    concerning reliability as is the testimony of any other

5    witness.

6         During the trial we marked in evidence a number

7    of exhibits.  The exhibits together with the testimony

8    constitute the evidence.  I'll remind you, any exhibits

9    marked solely for identification but not received in

10   evidence cannot and must not be considered by you during

11   your deliberations.  Should you wish to examine any or for

12   that matter all of the exhibits, you may request the same

13   in a note to the Court.

14        Among the exhibits received in evidence were

15   photographs.  These photographs purport to depict various

16   locations or objects or persons relevant to the issues in

17   the case.  Those photographs were received in evidence to

18   assist you in making your evaluation of the testimony

19   relating to the location, scenes, objects, or persons

20   depicted therein.  You're the sole judges of the accuracy

21   of these photographs and you're the sole judges of the

22   weight, if any, to be given to such photographs.

23        Also, amongst the exhibits marked into evidence

24   were DNA records from the Office of the Chief Medical

25   Examiner and an autopsy report and file admitted during

MMS

## Jury Charge

1    Dr. deRoux's testimony.  You may consider these records

2    together with all the other proof in the case in

3    determining the issues presented to you for your final

4    determination.

5         Counselors, there was no stipulation in this

6    case, was there?

7         MR. REEVES:  No.

8         THE COURT:  Okay.  That's part one.

9         Let me move on to part two wherein I will define

10   the counts being submitted to you, give you the elements of

11   those counts.  But before I do that, I want to address two

12   issues, the first has to do with what we call

13   circumstantial evidence.

14        There are two types of evidence, namely, direct

15   evidence and circumstantial evidence.  In this case the

16   People contend that there is circumstantial evidence of the

17   defendant's guilt.  Let me explain what constitutes direct

18   and circumstantial evidence and how they differ.

19        Direct evidence is evidence of a fact based on a

20   witness's personal knowledge or observation of that fact.

21   A person's guilt of a charged crime may be proven by direct

22   evidence if, standing alone, that evidence satisfies the

23   jury beyond a reasonable doubt of the person's guilt of

24   that crime.

25        Circumstantial evidence is direct evidence of a

1    fact from which a person may reasonably infer the existence

2    or nonexistence of another fact.  A person's guilt of a

3    charged crime may be proven by circumstantial evidence if

4    that evidence, while not directly establishing guilt, gives

5    rise to an inference of guilt beyond a reasonable doubt.

6            Let me give you an example of the difference

7    between direct evidence and circumstantial evidence.

8    Suppose that in a trial one of the parties is trying to

9    prove that it was raining on a certain morning.  A witness

10   testifies that on that morning she walked to the subway

11   and, as she walks, she saw rain falling, she felt it

12   striking her face and she heard it splashing on the

13   sidewalk.  That testimony of the witness's perceptions

14   would be direct evidence that it rained on that morning.

15           Suppose, on the other hand, the witness testified

16   that it was clear as she walked to the subway, that she

17   went into the subway and got on the train, and that while

18   she was on the train, she saw passengers come in at one

19   station after another carrying wet umbrellas and wearing

20   wet clothes and raincoats.  That testimony constitutes

21   direct evidence of what the witness observed, and because

22   an inference that it was raining in the area would flow

23   naturally, reasonably, and logically from that direct

24   evidence, the witness's testimony would constitute

25   circumstantial evidence that it was raining in the area.

1             The law draws no distinction between

2    circumstantial evidence and direct evidence in terms of

3    weight or importance. Either type of evidence may be

4    enough to establish guilt beyond a reasonable doubt

5    depending on the facts of the case as the jury finds them

6    to be.

7             Because circumstantial evidence requires the

8    drawing of inferences, I'll explain the process involved in

9    analyzing that evidence and what you must do before you

10    return a verdict of guilty based solely on circumstantial

11    evidence.

12             Initially, you must decide on the basis of all

13    the evidence what facts, if any, have been proven. Any

14    facts upon which an inference of guilt can be drawn must be

15    proven beyond a reasonable doubt. After you have

16    determined what facts, if any, have been proven beyond a

17    reasonable doubt, then you may decide what inferences, if

18    any, can be drawn from those facts. Before you may draw an

19    inference of guilt, however, that inference must be the

20    only one that can fairly and reasonably be drawn from the

21    facts. It must be consistent with the proven facts and it

22    must flow naturally, reasonably, and logically from them.

23    Again, it must appear that the inference of guilt is the

24    only one that can fairly and reasonably be drawn from the

25    facts and that the evidence excludes beyond a reasonable

MMS

1    doubt every reasonable hypothesis of innocence.

2           If there is a reasonable hypothesis from the

3    proven facts consistent with the defendant's innocence,

4    then you must find the defendant not guilty.  If the only

5    reasonable inference you find is that the defendant is

6    guilty of a charged crime and that inference is established

7    beyond a reasonable doubt, then you must find the defendant

8    guilty of that crime.

9           So, that's the law on circumstantial evidence.

10          Let me at this point give you a charge on the law

11   with respect to what we call motive.  Let me explain motive

12   and, in particular, the difference between motive and

13   intent.

14          Intent means conscious objective or purpose.

15   And, so, a person commits a criminal act with intent when

16   that person's conscious intent or purpose is to engage in

17   the act which the law forbids or to bring about an unlawful

18   result.  Motive is the reason why a person chooses to

19   engage in criminal conduct.  If intent is an element of a

20   charged crime, that element must be proven by the People

21   beyond a reasonable doubt.

22          In this case intent is an element of Murder in

23   the Second Degree.  I'll explain that charge to you

24   shortly.

25          Motive, however, is not an element of the crimes

MMS

1    charged, therefore the People are not required to prove a

2    motive for the commission of a charged crime.

3    Nevertheless, evidence of a motive or evidence of lack of a

4    motive may be considered by the jury.  For example, if you

5    find from the evidence that the defendant had a motive to

6    commit the crime charged, that's a circumstance you may

7    wish to consider as tending to support a finding of guilt.

8    On the other hand, if the proof establishes that the

9    defendant had no motive to commit the crime charged, that's

10   a circumstance you may wish to consider as tending to

11   establish that the defendant is not guilty of a charged

12   crime.

13            So, that's the law on motive.

14            Let me now get to the specific counts of the

15   indictment I'm submitting to you.  I'm submitting two

16   counts for your consideration.  Count 1 is called Murder in

17   the Second Degree, and I'll define that for you now.

18            Under our law, a person is guilty of Murder in

19   the Second Degree when, with intent to cause the death of

20   another person, he causes the death of such person.  The

21   term intent used in this definition has its own meaning

22   under the law, and I'll define that for you now.  Intent

23   means conscious objective or purpose.  Thus, a person acts

24   with intent to cause the death of another when that

25   person's conscious objective or purpose is to cause a death

Jury Charge

1    of another.

2            In order for you to find the defendant guilty of

3    this crime, this is Murder in the Second Degree, submitted

4    to you under Count 1 of the indictment, the People are

5    required to prove from all the evidence in the case beyond

6    a reasonable doubt both of the following two elements:

7    element number one, that on or about December 8, 2011, in

8    Richmond County, the defendant caused the death of David

9    Williams, and element number two, that the defendant did so

10   with the intent to cause the death of David Williams.

11           If you find that the People have proven beyond a

12   reasonable doubt both of those elements, you must find the

13   defendant guilty of the crime of Murder in the Second

14   Degree as charged in Count 1.

15           On the other hand, if you find that the People

16   have not proven beyond a reasonable doubt either one or

17   both of those elements, you must find the defendant not

18   guilty of the crime of Murder in the Second Degree as

19   charged in Count 1.

20           The other count I'm submitting to you is called

21   Criminal Possession of a Weapon in the Second Degree.  This

22   is submitted to you under Count 3 of the indictment.  Let

23   me define that count for you.

24           Under our law, a person is guilty of Criminal

25   Possession of a Weapon in the Second Degree when that

1     person knowingly possesses any loaded firearm.  Such

2     possession shall not constitute a violation of this law if

3     such possession takes place in such person's home or place

4     of business.

5               In connection with this law, let me define for

6     you the following terms: firearm, loaded firearm, possess,

7     and knowingly.

8               A firearm means any assault weapon.  Further, a

9     firearm -- Withdrawn.  A firearm means any assault weapon.

10              What I'll do at this point is define for you the

11    term assault weapon.  Assault weapon means a semiautomatic

12    rifle that has an ability to accept a detachable magazine

13    and has at least two of the following characteristics: 1, a

14    folding or telescopic stock; 2, a pistol grip that

15    protrudes conspicuously beneath the action of the weapon;

16    3, a bayonet mount; 4, a flash suppressor or a threaded

17    barrel to accommodate a flash suppressor; or 5, a grenade

18    launcher.  That's the definition of assault weapon.  And,

19    again, a firearm means any assault weapon.

20              Now, under our law, a firearm must be operable,

21    that is, the firearm must be capable of discharging

22    ammunition.

23              A loaded firearm means any firearm loaded with

24    ammunition which may be used to discharge such firearm, or

25    any firearm which is possessed by one who, at the same

Jury Charge

1    time, possesses a quantity of ammunition which may be used

2    to discharge such firearm.

3          .          Possess means to have physical possession or

4    otherwise to exercise dominion or control over tangible

5    property.  A person knowingly possesses a firearm when that

6    person is aware that he is in possession of a firearm.

7          So, that's the definition of the crime charged

8    Criminal Possession of a Weapon in the Second Degree and

9    the definition of the internal terms contained within that

10   law.

11         Let me give you the elements now.  In order for

12   you to find the defendant guilty of this crime, this is

13   Count 3, Criminal Possession of a Weapon in the Second

14   Degree, the People are required to prove from all the

15   evidence in the case, beyond a reasonable doubt, each of

16   the following four elements: element number one, that on or

17   about December 8, 2011, in Richmond County, the defendant

18   possessed a firearm; element two, that the defendant did so

19   knowingly; element three, that the firearm was loaded and

20   operable; and element four, that the defendant possessed

21   such firearm in a place that was not the defendant's home

22   or place of business.

23         Therefore, if you find that the People have

24   proven beyond a reasonable doubt each of those elements,

25   you must find the defendant guilty of the crime of Criminal

Jury Charge

1    Possession of a Weapon in the Second Degree as charged in

2    Count 3.

3            On the other hand, if you find that the People

4    have not proven beyond a reasonable doubt any one or more

5    of those elements, you must find the defendant not guilty

6    of the crime of Criminal Possession of a Weapon in the

7    Second Degree as charged in Count 3.

8            That concludes my review of the laws and rules

9    you apply in reaching your final verdict as to each of the

10   counts submitted to you.  For reasons that need not and

11   must not concern you, the Court is not submitting various

12   other counts of the indictment to you for your

13   consideration, including a count of Criminal Possession of

14   a Forged Instrument in the First Degree.  That was the

15   count related to alleged counterfeit money.

16           This simply means -- when I say "this," I mean

17   the fact that I am not submitting other counts to you --

18   This simply means you will not consider those particular

19   counts in your final deliberations.  Please bear in mind

20   you are not to speculate upon the fact that I have removed

21   these particular counts of the indictment from your final

22   deliberations.  You are to draw no inference whatsoever

23   from the fact that these particular counts have been

24   excluded from your final deliberations.

25           Your final verdict as to each of the counts that

MMS

1   are being submitted to you must be based upon the laws and

2   rules as given to you by the Court and which you must now

3   apply to the facts as you find the facts to exist in this

4   case.

5               To assist you during your final deliberations

6   we've prepared a written list called a verdict sheet.  The

7   verdict sheet contains the specific counts being submitted

8   to you for your final determination, and the verdict sheet

9   also lists the options or choices that you may make after

10  careful consideration of all the evidence in accordance

11  with the Court's instructions.  Further, the verdict sheet

12  provides a column for your Foreperson to record your

13  verdict as to each of the separate offense -- submitted

14  separate offenses submitted to you for your final

15  determination.  Your verdict will be either guilty or not

16  guilty, and you will render a verdict separately and

17  specifically as to each of the counts being submitted to

18  you.

19              A court officer will bring a copy of the verdict

20  sheet to the jury room when you retire for deliberations.

21  If at any time during your deliberations you have any

22  questions concerning your use of the verdict sheet or any

23  questions concerning your review of the offenses listed

24  thereon, please feel free to send us a note in writing and

25  we will respond to your inquiry.

MMS

Jury Charge

1    In the course of your deliberations, if your

2    recollection of any part of the testimony should fail, or

3    if you find yourselves in doubt concerning my legal

4    instructions, it's your privilege, if you so desire, to

5    return to the courtroom for the purpose of having such

6    testimony or instructions read to you.  Your Foreperson

7    should write out your request and sign the same.  Simply

8    give the note to the court officer who will be stationed

9    outside the jury room.  He or she will bring it to us, and

10   as soon as we can -- we're prepared to answer your

11   requests, we'll bring you in and do that.  We'll do this as

12   promptly as possible.

13   If you request testimony and if there is a delay

14   between your sending us the note and our bringing you in to

15   respond, it doesn't mean we're ignoring you.  It means

16   we're searching the record to find what it is you want.

17   Sometimes that takes a little bit of time.  So, if there is

18   any delay, that's what's going on.

19   To conduct your deliberations in an orderly

20   fashion you must have the Foreperson.  Of course, this

21   person's vote is entitled to no greater weight than that of

22   any other jurors.  Under our law, the juror whose name was

23   first drawn and called must be designated the Foreperson,

24   so Juror Number 1 will act as your Foreperson and record

25   your verdict.

MMS

1          Let me remind you of the note-taking

2     instructions.  I believe I observed a few of you taking

3     notes.  Any notes you've taken are only an aid to your

4     memory and must not take precedence over your independent

5     recollection.  Those of you who did not take notes must

6     rely on your independent recollection and must not be

7     influenced by any notes another juror may have taken.  Any

8     notes you've taken are only for your own personal use in

9     refreshing your recollection.  A juror's notes are not a

10    substitute for the recorded transcript of the testimony or

11    for any exhibit received in evidence.

12          If there is a discrepancy between a juror's

13    recollection and his or her notes regarding the evidence,

14    you should ask to have the relevant testimony read back or

15    the exhibit produced in the jury room.

16          Additionally, a juror's notes are not a

17    substitute for the detailed explanation I have given you of

18    the principles of law that govern this case.  If there is a

19    discrepancy between a juror's recollection in his or her

20    notes regarding those principles, you should ask me to

21    explain those principles again.

22          A juror may only refer to his or her notes during

23    the proceedings and during deliberations.  Any notes you

24    have taken are confidential and shall not be available for

25    examination or review by any party or any other person.

Jury Charge

1       After the jury has rendered its verdict, we will collect

2       any notes and destroy them.

3               Your verdict on each of the counts you are

4       considering, whether guilty or not guilty, must be

5       unanimous; that is, each and every juror must agree to it.

6       To reach a unanimous verdict you must deliberate with the

7       other jurors.  That means you should discuss the evidence

8       and consult with each other, listen to each other, give

9       each other's views careful consideration, and reason

10      together when considering the evidence together.  When you

11      deliberate, you should do so with a view toward reaching an

12      agreement if that can be done without surrendering

13      individual judgment.

14              Each of you must decide the case for yourself but

15      only after a fair and impartial consideration of the

16      evidence with the other jurors.  You should not surrender

17      an honest view of the evidence simply because you want the

18      trial to end or you are outvoted.  At the same time, you

19      should not hesitate to reexamine your views and change your

20      mind if you become convinced that your position was not

21      correct.

22              As I said, in order to reach a verdict all twelve

23      members of the jury must agree.  Your verdict must be

24      unanimous, and whenever all of your members are in

25      agreement on a verdict, you may report the same to the

Jury Charge

1    Court.

2                At this point I am going to step to the side with

3    the lawyers for a short discussion.  I'll be right back.

4    Don't discuss the case yet, please.  Thanks for your

5    attention.

6                (Whereupon, the following takes place at sidebar,

7    out of the hearing of the jury:)

8                THE COURT:  We are at sidebar in the courtroom.

9                Exceptions or requests?

10               MR. REEVES:  No exceptions, no requests.

11               MS. GUASTELLA:  No.

12               THE COURT:  What do you want me to do with the

13   alternates?  I believe I'll keep them around.

14               MS. GUASTELLA:  For a little bit.

15               THE COURT:  We can talk about them later.

16               Can I have your consent, if you want to give it,

17   to send any exhibits they request -- exhibits that are in

18   evidence -- into them without your being here to approve

19   it?

20               MS. CILIA:  Yes.

21               MS. GUASTELLA:  That's fine.

22               THE COURT:  Okay.  I assume you'll all be nearby

23   anyway.

24               Anything else?

25               MS. GUASTELLA:  No.

MMS

Jury Charge

1      MS. CILIA:  No.

2      (Whereupon, proceedings resume in open court.)

3      THE COURT:  All right.  That concludes my

4  instructions.  I'll submit the case to you for your final

5  determination.

6      As I have stated before, our law and your oath

7  require that you render a fair and impartial verdict and

8  that you do so without fear, favor, or sympathy, so we ask

9  that you take this case and, in fulfillment of your oath

10  and in accordance with the Court's instructions, render a

11  true and impartial verdict.

12      Thank you very much for your attention.  You're

13  free to step out now and go to the jury room.  Take your

14  notebooks with you if you want.

15      I'm going to ask our alternate jurors to remain

16  with us for a moment.

17      (Whereupon, the primary jury exits the

18  courtroom.)

19      THE COURT:  The 12 jurors have left.

20      Gentlemen, we'd like to keep you around for a

21  while.  The reason is we can substitute an alternate juror

22  into deliberations even after they've started.  So, we'd

23  like to keep you around in case that's necessary.  We're

24  going to send you to another room in the building; I'm sure

25  you'll be comfortable.  Leave your notebooks, don't take

Jury Charge

1      them with you.  And let me instruct you, don't discuss the

2      case with anyone, don't let anyone discuss it with you.

3      And this is also very important:  Please don't form any

4      opinion.  If you're substituted into deliberations, it's

5      important you go in with an open mind.

6              So, thank you very much for your patience and

7      attention and we'll see you a little later.  The officers

8      will show you to another room in the building.

9              (Whereupon, the two alternate jurors exit the

10     courtroom.)

11              THE COURT:  Okay.  The alternates have left.

12              It's 11:30.  I don't know if and when we're going

13     to get a note, but I just want to advise you, I have to

14     break for lunch, I have to send the jury out for lunch with

15     special instructions, and I have to do that no later than

16     five to one.  So, if you don't hear from us before, would

17     you make sure you're here in the courtroom by, let's say, a

18     quarter to one.

19              MS. GUASTELLA:  Yes.

20              MS. CILIA:  Yes.

21              THE COURT:  Good.  Thank you.

22              (Whereupon, the case is set aside, awaiting the

23     verdict of the jury.)

24              THE COURT CLERK:  Court Exhibits 3 through 7,

25     jury notes.

Proceedings

1    (Whereupon, Court's Exhibits 3, 4, 5, 6, and 7

2    are received in evidence.)

3    THE COURT CLERK: First note, Number 3, is review

4    Ferry terminal videos. Number 4, testimony about Samuel

5    Nelson prints. Number 5 is testimony about defendant's

6    clothing, money, et cetera. Number 6, testimony from

7    detective who apprehended the defendant. Number 7, DNA

8    testimony and evidence.

9    (Defendant present.)

10   THE COURT CLERK: Case on trial continues.

11   THE COURT: We're making copies of the jury notes

12   so we can give it to both sides, so that will just take a

13   minute.

14   Have you all seen the notes?

15   MS. CILIA: We just got them.

16   THE COURT: You didn't see them before?

17   THE COURT CLERK: I showed them to you.

18   THE COURT: The clerk says he showed them to you.

19   I just want to get it on the record.

20   MR. REEVES: We saw the notes.

21   THE COURT: He just gave you a copy.

22   Defense has seen them, too.

23   MS. GUASTELLA: Yes, we saw the original notes.

24   THE COURT: The clerk has marked them 3, 4, 5, 6,

25   and 7.

MMS

Proceedings

1            Court Exhibit 3, review Ferry terminal videos.

2       We've sent them in based on our sidebar conference after

3       the charge.  You consented to that.

4            Court Exhibit 4, testimony about Samuel/Nelson

5       prints.

6            What is that, the print on the wall in the

7       hallway?

8                 MS. GUASTELLA:  Yes.

9                 THE COURT:  Who's the witness?

10                MS. GUASTELLA:  It was Det. Steneck.

11                MR. REEVES:  It would be Det. Patterson.

12                THE COURT:  I beg your pardon?

13                MR. REEVES:  It would be Det. Patterson, because

14      Det. Steneck didn't testify about Samuel Nelson.

15                MS. GUASTELLA:  She testified that -- how the

16      prints got on the wall -- how the prints could have gotten

17      on the wall, and that print went back to Samuel Nelson, and

18      that's what I said in my opening.

19                THE COURT:  Did Steneck testify about prints on

20      the wall?

21                MS. GUASTELLA:  Yes.

22                MR. REEVES:  She testified about a single print

23      from the wall, but did not attribute it to anyone.

24                THE COURT:  And then who's the next guy who

25      testified about Samuel Nelson?

MMS

Proceedings

1      MR. REEVES:  Ms. Cilia asked Det. Patterson about

2    the identity of the print on the wall.

3      THE COURT:  And he put it to Mr. Nelson?

4      MR. REEVES:  Yes.

5      THE COURT:  I think we give them both.  Take the

6    passes out of Steneck, take the passes out of whoever the

7    other detective was.  I mean, it's not very long, right?

8      MS. GUASTELLA:  No.

9      THE COURT:  Why don't you see if you can agree on

10    what passes we are going to read, but let me move on before

11    you tackle that.

12      Court Exhibit 4 -- No.  Court Exhibit 5,

13    testimony about defendant's clothing, money, et cetera.

14      How many witnesses are we talking about here?  I

15    mean, that's spread all over the place.

16      MS. GUASTELLA:  Can you get them to clarify the

17    note?

18      THE COURT:  I could ask them to clarify it.  Are

19    you talking about clothing in the duffel bag, clothing

20    defendant was wearing?  Are you talking about both?  Shall

21    I do that?

22      MR. REEVES:  Just read them Det. Steneck's

23    testimony and Det. Anderson's testimony.

24      THE COURT:  Are they the only two that dealt with

25    this?

MMS

Proceedings

1    MS. GUASTELLA: Judge, it's too vague.

2    Defendant's clothing, money, et cetera. I think we need to

3    ask them exactly what they mean by the note.

4    THE COURT: We have two sets of clothing as I

5    understand the testimony: one, the defendant, what he was

6    wearing; two, clothing recovered from a duffel bag. I'll

7    ask them for clarification.

8    Court Exhibit 6 is pretty straightforward:

9    Testimony from detective who apprehended defendant.

10    Who was that?

11    MS. CILIA: Det. Anderson.

12    THE COURT: Det. Anderson. So, we'll have the

13    reporter read Det. Anderson's testimony. Agreed?

14    MS. GUASTELLA: Yes.

15    THE COURT: How long is that, does anyone know?

16    MS. GUASTELLA: I don't remember it being long at

17    all.

18    THE COURT: I don't seem to have it. I have

19    everything else, but I don't have that.

20    MS. GUASTELLA: I can give it to you.

21    THE COURT: I don't want to look at it. I just

22    want to make sure the reporter has it.

23    We have Anderson.

24    Agreed, we'll read Det. Anderson's testimony?

25    MS. GUASTELLA: Yes.

MMS

Proceedings

1              THE COURT:  People agreed?

2              MS. CILIA:  Yes.

3              THE COURT:  And the last note is Court Exhibit 7,

4    DNA testimony and evidence.

5              So, that, I gather, would require the reading of

6    Irene Wong's testimony.

7              MS. GUASTELLA:  Right.

8              THE COURT:  And the evidence, according to my

9    notes, correct me if I'm wrong, Exhibit 175A and B,

10   Exhibit 176A through E, and Exhibit 177A through C.  Is

11   that agreed?

12             MS. CILIA:  Yes.

13             THE COURT:  Can we give the jury those exhibits?

14             MS. GUASTELLA:  That's fine.

15             THE COURT:  The People have agreed.

16             Maybe what I'll do at this point -- We sent the

17   videos in; I don't know if they're looking at them now or

18   not.  I suppose what I could do is bring the jury in, ask

19   for a clarification on that one note, and then send them to

20   lunch.  What do you think?

21             MS. GUASTELLA:  Judge, that's fine.

22             MS. CILIA:  In that clarification we would just

23   ask whether or not they would like readbacks from the

24   civilian testimony of the clothing description that those

25   people gave as well as the bag.

MMS

Proceedings

1      MS. GUASTELLA:  Well, if they are going to

2   clarify, they'll let us know.

3      THE COURT:  The note reads:  Testimony about

4   defendant's clothing, money, et cetera.  That's pretty

5   vague.  I don't know if they're talking about the clothing

6   the defendant was wearing, the clothing that was recovered

7   from a duffel bag, both.

8      MS. CILIA:  Or the clothing described by

9   witnesses.

10      THE COURT:  Well, I guess that would be

11   encompassed in this note.  I just don't know what they're

12   talking about.  If they're just talking about the duffel

13   bag, I guess we can narrow it down.  If they're talking

14   about everything, it may be broader.  It may take us time

15   to go through it.  I don't know how many witnesses touched

16   on this; a lot, several.

17      Anybody?

18      MS. CILIA:  Jean Loiseau talked about clothing,

19   Nicole talked about clothing, Det. Steneck talked about

20   clothing, Det. Anderson, Patterson.

21      THE COURT:  Okay.  Why don't we line them up.

22      THE COURT OFFICER:  Where do you want the

23   alternates, Judge?

24      THE COURT:  In the front row.

25      MS. CILIA:  Also Ms. Hunt.

Proceedings

1    MS. GUASTELLA:  Ms. Hunt described the clothing.

2    I think we need to get the clarification.  It's just too

3    much.

4    THE COURT OFFICER:  Your Honor ready for the

5    jury?

6    THE COURT:  (Indicating.)

7    THE COURT OFFICER:  Jury entering.

8    (Whereupon, the jury and alternates enter the

9    courtroom.)

10    THE COURT CLERK:  Both sides stipulate to a

11    complete jury panel, properly seated?

12    People?

13    MS. CILIA:  Yes.

14    THE COURT CLERK:  Defense?

15    MS. GUASTELLA:  So stipulated.

16    THE COURT:  Okay, we have your notes.  We've

17    marked them Court Exhibits 3 through 7.

18    Number 3, review Ferry terminal videos.  We sent

19    those in, right?

20    JUROR:  Yes.

21    THE COURT:  Okay, fine.  So you can review those

22    as you wish.

23    Number 4, Court Exhibit 4, Testimony about

24    Samuel/Nelson prints.  We're searching through the record

25    to find that, and we'll get it to you -- read back to you

MMS

Proceedings

1      as soon as we can.

2      Court Exhibit 5, Testimony about defendant's

3      clothing, money, et cetera. We're going to need a

4      clarification on that. I have to get it in a note. I

5      can't talk to you individually, I'm not allowed to. So,

6      what I'd like you to do -- I'm going to send you to lunch

7      shortly, but what I'd like you to do, if you could, is send

8      us another note telling us with a little more specificity,

9      if possible, what you want. We're not sure if you're

10     talking about clothing recovered from a duffel bag,

11     clothing that the defendant was allegedly wearing, both.

12     We're just not quite sure. This testimony could involve a

13     number of witnesses, and depending on your clarification

14     note, we will be searching the record to respond. We'll

15     respond to your notes, it might take a little time.

16     So, send us another note after lunch, if you can,

17     narrowing that down. It would help us in our search.

18     Court Exhibit 6, fairly straightforward,

19     Testimony from detective who apprehended the defendant.

20     We'll read that to you this afternoon.

21     And the final note, Number 7, DNA testimony and

22     evidence. We'll read you the DNA witness's testimony and

23     we will send you the evidence that was introduced during

24     her testimony, which was Exhibits 175 and 176 and 177.

25     So, what we'll do is, I'll give you what we call

MMS

Proceedings

1    separation instructions and then, at 2 p.m., maybe you can

2    send us a clarifying note regarding that clothing question.

3    That will put us in a better position to respond.  The rest

4    of it we will deal with early this afternoon.  And as I

5    said, we've already sent in the videos.

6         We used to bring lunch in for our jurors, but we

7    don't do that anymore.  The judiciary budget is such that

8    we can't afford it, so we send you out to lunch.  I'm

9    required by law, once deliberations start, to give you what

10   we call separation instructions.  So, let me do that now.

11        First of all, deliberations must be conducted

12   only in the jury room when all jurors are present.

13   Therefore, all deliberations must now cease and must not be

14   resumed until all of you have returned and are together

15   again in the jury room.  So, when the 12th juror shows up

16   at or about 2 p.m., please compose a clarifying note, if

17   you can, regarding that clothing issue.  And once we get

18   that, we'll bring you back in, we'll respond to the other

19   requests, and then we'll probably take a break while we

20   search the record for the clothing testimony and evidence.

21        Secondly, during this recess, do not converse,

22   either amongst yourselves or with anyone else, about

23   anything relating to this case.

24        Third, you remain under obligation not to

25   request, accept, agree to accept, or discuss with any

MMS

Proceedings

1       person the receipt or acceptance of any payment or benefit

2       in return for supplying information concerning this trial.

3               Fourth, you must promptly report directly to me

4       any incident within your knowledge involving an attempt by

5       any person improperly to influence you or any members of

6       the jury.

7               Fifth, you must not visit or view the premises or

8       place where any charged crime was allegedly committed, or

9       any other premises or place involved in the case.

10              Sixth, you must not read, view, or listen to any

11      accounts or any discussions of the case reported by

12      newspapers, television, radio, the internet, or any other

13      news media.

14              And, finally, you must not attempt to research

15      any fact, issue, or law related to this case whether by

16      discussion with others, by research in the library, on

17      computer, on the internet, or by any other means or source.

18              I'll let you go to lunch now.  We'll make it

19      2 p.m.  We'll wait for that clarifying note, if you can

20      propose one, then we'll bring you back in and address as

21      many of these notes as we can.  Then we'll probably take a

22      break while we search the record on the clothing issue.  I

23      hope that's good.

24              Have a good lunch.  We'll give them back to you

25      at 2:00.

MMS

Proceedings

1              (Whereupon, the primary jury exits the courtroom.

2              THE COURT:  The 12 jurors have left.

3              Gentlemen, you can go to lunch, too.  The same

4     rules apply to you.  Have a good lunch.  And when you

5     return to wherever they have you in the building, at 2:00,

6     we'll wait till we get the jury's note and then we'll bring

7     you back in.

8              Thanks very much.  Have a good lunch.

9              (Whereupon, the two alternates exit the

10    courtroom.)

11             THE COURT:  Okay.  The alternates have left.

12             I think notes 6 and 7 are self-explanatory.

13    We'll have the reporter read the DNA witness's testimony;

14    we'll send those exhibits in; and we'll have

15    Det. Anderson --

16             Is that the apprehending officer?

17             MS. CILIA:  Yes.

18             THE COURT:  We will have his testimony read.

19    That's pretty straightforward.

20             If you could, please see if you can get your

21    heads together on Samuel Nelson prints.  I gather from what

22    I've heard there is a passage from Det. Steneck and there

23    is a passage from some other detective.  So, if you can

24    narrow that down, you can read it to them.  Is that

25    possible?

MMS

Proceedings

1    MR. REEVES:  Det. Steneck is at page 57, line 21,

2    through 58, line 6.

3    THE COURT:  Okay, that doesn't sound too hard.

4    And the other detective?

5    MR. REEVES:  Det. Patterson.

6    MS. GUASTELLA:  I agree with the Det. Steneck's.

7    THE COURT:  Take a look at Patterson's testimony

8    and see if you can agree on that and that shouldn't be too

9    hard.

10   MS. CILIA:  We also have Det. Patterson's

11   testimony.  It's on page 222, and that's going to start on

12   line 14, and it continues to page 223, line 4.

13   MS. GUASTELLA:  That's fine, Judge.

14   THE COURT:  Okay, then we're agreed on that.  So,

15   what's left up in the air is testimony about defendant's

16   clothing, money, et cetera.  Hopefully we will get a

17   clarifying note.  That can involve some time, I guess.  I

18   mean, I think it's a theme running through the whole trial,

19   isn't it?  Probably a number of witnesses.  I don't know

20   how long it's going to take.  Why don't we wait and see

21   what the clarifying note says.

22   Okay.  I guess we'll break for lunch.  I'll see

23   you at 2:00.  Thank you.

24   (Defendant remanded.)

25   (Whereupon, a luncheon recess is taken.)

MMS

Proceedings

1    (Whereupon, Court Exhibit Number 8, is marked in

2    evidence.)

3    (Defendant present.)

4    THE COURT:  Everyone is present.  We have a note.

5    I gather it's a clarifying note.  It's marked Court

6    Exhibit 8.  I'll just read it into the record:  "Photos of

7    items found on defendant at time when he was picked up;

8    Testimony from detective who picked him up;" and, "List of

9    all items found in the duffel bag."

10   The testimony from the detective who picked him

11   up they've already requested, right?  They're going to get

12   that.  That's Det. Anderson.

13   MS. CILIA:  Yes.

14   MS. GUASTELLA:  Right.

15   THE COURT:  Photos of items found on defendant at

16   time when he was picked up.  As I recall, that's clothing.

17   MR. REEVES:  Correct.

18   THE COURT:  Do we know what photos we're talking

19   about?

20   MR. REEVES:  Ms. Cilia is getting those now.

21   People's 153 through 159 is one set.  And 132

22   through 135, 139, and 138.

23   MS. GUASTELLA:  There was also money, right, the

24   120 that was put up and tested for blood?

25   MR. REEVES:  That's People's 160.

MMS

Proceedings

1     THE COURT: So we're settled on the photos, both

2     sides?

3          MR. REEVES: Yes.

4          MS. GUASTELLA: Yes, Judge.

5          THE COURT: Second, testimony from detective who

6     picked him up. And that's going to be read to them.

7     That's Det. Anderson as I understand, correct?

8          MR. REEVES: Yes.

9          THE COURT: And, finally, list of all items found

10    in the duffel bag.

11         I don't recall any list being placed in evidence.

12    Are we talking about Steneck's testimony?

13         MS. CILIA: We have the photographs which is the

14    list of everything that was in the bag, because

15    Det. Steneck took one single photo of each item.

16         MS. GUASTELLA: Judge, they didn't ask for a

17    photo. They asked for a list. They asked for a list of

18    the items in the duffel bag. They didn't ask for photos.

19    They clearly want a list.

20         THE COURT: I don't want to create evidence.

21         MS. GUASTELLA: I'm thinking -- The list?

22         THE COURT: Seems to me what Ms. Cilia just

23    suggested is probably responsive. I don't know. There is

24    no list in evidence, but if there are photos of everything

25    she recovered, they're marked in evidence, then I suppose

MMS

Proceedings

1       that would satisfy them.

2                MS. GUASTELLA:  Let me see the items you're

3       talking about.

4                (Handing.)

5                THE COURT:  What do you think?

6                MS. GUASTELLA:  Fine, Judge.

7                THE COURT:  Pardon?

8                MS. GUASTELLA:  That's fine.

9                THE COURT:  Can I get the numbers of those

10      photos?  I want the numbers of the photos regarding the

11      items found in the duffel bag.

12               THE COURT CLERK:  105, 106, 107, 108, 109.

13               THE COURT:  108, 109?

14               THE COURT CLERK:  Yes.  110, 111, 112, 113, 114,

15      115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126,

16      128.

17               THE COURT:  128?

18               THE COURT CLERK:  Yes.  127.

19               THE COURT:  127?

20               THE COURT CLERK:  Yes.

21               THE COURT:  And 128?

22               THE COURT CLERK:  Yes.

23               Was that in the duffel bag?

24               MR. REEVES:  Yes.

25               THE COURT CLERK:  129, 130, 131, 140, 141, 142,

MMS

Proceedings

1       143, 144, 145, 146, 147, 148, 149, 150, 151, and 152.

2               105 to 152.

3               THE COURT: And the first part, the photos of

4       items found on defendant at time when he was picked up.

5       What are those numbers?

6               THE COURT OFFICER: Photo 132, 133, 134, 135,

7       138, 139, 153, 154, 155, 156, 157, 158, 159, 160.

8               THE COURT: All right. Then if it's acceptable,

9       what I'll say to the jury is, in terms of their request,

10      photos of items found on defendant at time when he was

11      picked up, we're sending those photos in to you, they are

12      exhibit numbers 132, '3, '4, '5, '8, '9, 153, '4, '5, '6,

13      '7, '8, '9 and 160. Is that all right?

14              MR. REEVES: Yes.

15              THE COURT: Both sides?

16              MS. GUASTELLA: Yes.

17              THE COURT: And then, in terms of list of all

18      items found in the duffel bag, what I think I'll say, if

19      it's all right with both sides, is there is no list in

20      evidence, however, we'll send you in photos that are in

21      evidence of items allegedly recovered from the duffel bag;

22      105 through 131, 140 through 152. Is that acceptable?

23              MS. GUASTELLA: Yes.

24              MS. CILIA: Yes.

25              THE COURT: Okay. And the second part of the

MMS

Proceedings

1    trilogy was, Testimony from the detective who picked him

2    up.  That's Anderson.  We're going to read that anyway.

3         All right.  Then, if there's nothing else, we'll

4    bring the jury in.  I guess what we'll do is go in order.

5    First, testimony about Samuel Nelson prints.

6         We're ready for that?

7         MS. CILIA:  I believe also responsive would be

8    Ms. Hunt's testimony on page 262, lines 22 to 25.

9         MS. GUASTELLA:  What is that?  In reference to

10   what?

11        MS. CILIA:  Samuel.  It says testimony about

12   Samuel/Nelson prints.

13        MS. GUASTELLA:  Prints which I don't think she

14   talked about prints.

15        MS. CILIA:  The first time I read this I thought

16   it was Samuel Nelson prints, but now I think it's testimony

17   about Samuel, slash, Nelson prints.

18        MS. GUASTELLA:  They want to hear testimony about

19   the prints.

20        THE COURT:  That's what the note says.

21        MS. GUASTELLA:  She didn't testify about his

22   prints, Ms. Hunt.

23        THE COURT:  The note says testimony about

24   Samuel/Nelson prints.  What's the slash?  Is that his name,

25   Samuel Nelson?

Proceedings

1           MS. CILIA:  His name is Samuel Nelson.

2           THE COURT:  So testimony about Samuel Nelson

3    prints.

4           MS. GUASTELLA:  Right.  Not Ms. Hunt.  Ms. Hunt

5    didn't talk about his prints.

6           THE COURT:  I don't know what we're talking

7    about.

8           MS. CILIA:  She testifies that he lives on the

9    7th floor.

10          THE COURT:  Your position?

11          MS. GUASTELLA:  What page are you talking about,

12   Jenn?

13          MS. CILIA:  Page 262.

14          MS. GUASTELLA:  Which lines?

15          MS. CILIA:  22 to 25.

16          MS. GUASTELLA:  Judge, we can do line 22:  "He

17   lives in apartment 7-O?"

18              "He lived on the 7th floor, yes."

19          And that's it.  I don't see how, "Did you know

20   him well?" -- I don't see how that has anything to do with

21   the prints.

22          MS. CILIA:  That's fine.

23          THE COURT:  Okay, the DA agrees.  So let's make

24   sure the reporter knows what she's reading.

25          MS. CILIA:  So we have Ms. Hunt and then we have

MMS

Proceedings

1    Det. Patterson, which we previously discussed, page 222,

2    lines 14 to 25, page 223, lines 1 through 4.  And then for

3    Det. Steneck's testimony we have page 57, lines 21 through

4    25, and page 58, lines 1 through 9.

5              THE COURT:  That's with regard to what note?

6              MS. CILIA:  Det. Steneck, the crime scene

7    detective.

8              THE COURT:  I know what she is.  What note are we

9    talking about, Samuel Nelson?

10             MS. CILIA:  The prints, yes.

11             THE COURT:  I think we agreed on that before we

12   broke for lunch.  Are we still in agreement?

13             MS. GUASTELLA:  I just want to be clear, because

14   now I don't know why we're doing this again.

15             Page 222, line 14 to line 25, and then page 223,

16   line 1 to line 4, right?

17             MS. CILIA:  Yes.

18             THE COURT:  All right.  Then the last two notes

19   were, Testimony of detective who apprehended defendant; we

20   know that's Anderson.  And DNA testimony in evidence; we

21   know that's Ms. Wong.  So, I think we're set.

22             Are you set?

23             THE COURT REPORTER:  Yes.

24             THE COURT:  Why don't we bring the jury in and

25   respond to their notes.

MMS

Proceedings

1        Do they still have the videos?

2        THE COURT OFFICER:  Yes.

3        THE COURT:  They're still in there?

4        THE COURT OFFICER:  Yes.

5        THE COURT:  Okay.

6        THE COURT OFFICER:  Your Honor ready for the

7   jury?

8        THE COURT:  (Indicating.)

9        THE COURT OFFICER:  Jury entering.

10       THE COURT CLERK:  Do both sides stipulate to a

11   complete jury panel, properly seated?

12       People?

13       MS. CILIA:  Yes.

14       THE COURT CLERK:  Defense?

15       MS. GUASTELLA:  So stipulated.

16       THE COURT:  Okay, welcome back.  We have your

17   clarifying note.  Thank you very much.  Let me just go

18   through these again one at a time.

19       Exhibit 3, "Review ferry terminal videos," we

20   sent them in.  I understand you still have them, so you can

21   review them at your leisure.

22       Court Exhibit 4, "Testimony about Samuel Nelson

23   prints," and we've isolated that.  I think it's three

24   witnesses, so the court reporter is going to read that for

25   you now and then we'll move on.

MMS

Proceedings

1         (Whereupon, the requested testimony is read

2    back.)

3         THE COURT:  Okay, that was Court Exhibit

4    Number 4.

5         Court Exhibit Number 5 was your initial request,

6    "Testimony about defendant's clothing, money, et cetera."

7    You sent us a clarifying note, which we've marked Court

8    Exhibit 8, and I'll just read that in the record.  We'll go

9    one at a time.  There are three requests in Court

10   Exhibit 8.

11        First of all, "Photos of items found on defendant

12   at time when he was picked up."  We have put those photos

13   together and we'll send them in to you.  They are photos --

14   or Exhibits Number 132 through 135, 138, and 139, and 153

15   through 160.  So, those are photos in response to that

16   query and we will send them in to you.

17        Next, "Testimony from detective who picked him

18   up."  That's actually the same as your request in Court

19   Exhibit Number 6, which was testimony from defendant --

20   from detective who apprehended the defendant.  That's

21   Det. Anderson, and we are going to read his testimony to

22   you shortly.

23        And, finally, in terms of Court Exhibit 8, your

24   note -- your earlier note about defendant's clothing, which

25   was Court Exhibit 5, "List of all items found in the duffel

MMS

Proceedings

1    bag."  There is no list in evidence.  However, there are

2    photos.  So, what we're going to do is send you in the

3    photos of the items found in the duffel bag.  Hopefully

4    that will be satisfactory.  If it's not, just let us know.

5    And those are photos -- or exhibits, rather, numbers 105

6    through 131, and 140 through 152.  So we will send those

7    exhibits in to you.

8              So that takes care of your amended note Court

9    Exhibit 8.

10             Court Exhibit 6, as I've already said, is,

11   "Testimony from detective who apprehended the defendant."

12   That's Det. Anderson, and the court reporter will read that

13   to you now.

14             (Whereupon, the requested testimony is read

15   back.)

16             THE COURT:  And your last note or request is

17   Court Exhibit 7, "DNA testimony and evidence."  This is the

18   testimony of Ms. Irene Wong.  During her testimony the

19   following exhibits were placed in evidence:  Exhibits 175A

20   and B, 176A through E, and 177A through C.  So, we will

21   send those exhibits in to you.

22             And the court reporter is going to read

23   Ms. Wong's testimony back to you now.

24             (Whereupon, the requested testimony is read

25   back.)

MMS

Proceedings

1          THE COURT:   Counsels, can you approach the bench

2     for a moment.

3          (Whereupon, a discussion is held at the bench off

4     the record.)

5          THE COURT:   Well, that completes the readback.

6     We will send in the exhibits I discussed a little earlier.

7     And I hope this satisfies your various inquiries.  If not,

8     send us another note.  We aim to please.

9          Thank you very much for your attention.  I'll let

10     you step out and resume deliberations.  You can take your

11     notebooks with you.

12          (Whereupon, the jury and alternates exits the

13     courtroom.)

14          THE COURT:   All right.  The jury and the

15     alternates have left.  My plan, Counselors, as we discussed

16     at the bench, is to break at about 4:10, which is about a

17     half hour from now, so please be here then.

18          MS. GUASTELLA:   Yes, Judge.

19          THE COURT:   If you are not going to stay around.

20          Thank you.

21          Shall we bring the alternates back tomorrow if

22     there is no verdict?

23          MS. CILIA:   Yes.

24          MS. GUASTELLA:   I don't think we need to keep

25     them.

Proceedings

1        THE COURT:  Pardon?

2        MS. GUASTELLA:  I'm okay with discharging them.

3        THE COURT:  I am too, but not if the DA doesn't

4    want me to.  So, I really need consent from both sides to

5    discharge them.  I don't mind bringing them back.

6        MS. GUASTELLA:  I don't think I'd consent to

7    putting an alternate in at this point anyhow.

8        THE COURT:  That's the issue, I can't discharge

9    an alternate without the consent of both sides.  If you

10   think that's a possibility.  It's always good to have them

11   around just in case.

12       MS. GUASTELLA:  I don't think it's a possibility.

13   That's what I'm saying.

14       MR. REEVES:  We'll consent to their release, your

15   Honor.

16       THE COURT:  So, both sides are consenting?

17       MS. GUASTELLA:  Yes.

18       MR. REEVES:  Yes.

19       THE COURT:  When we resume in about a half hour,

20   I'll send the jury home for the night and discharge the

21   alternates.

22       Thank you.

23       (Whereupon, court stands in recess, awaiting the

24   verdict of the jury.)

25       THE COURT:  Just for the record, the case on

MMS

Proceedings

1    trial continues. All parties are present.

2               These are the alternate jurors, Counselors.

3               Gentlemen, we have decided to release you from

4    this case. I know you've been around all day, probably

5    getting bored, so we've decided to let you go. You're

6    discharged. I want to thank you on behalf of the parties

7    for your service in this matter. Because of your service

8    you are now exempt from jury duty in the courts of New

9    York State for a number of years. I think it's six

10   years. The jury clerk can tell you more about that when

11   you check out, which I understand you have to do across

12   the street.

13              So, again, thank you very much for your service

14   and you're discharged from this matter.

15              (Whereupon, the alternate jurors exit the

16   courtroom.)

17              THE COURT: You can bring the regular jury in.

18   Shall I say 10 a.m.? I don't want to fight with them.

19   When I said 9:30 a couple of people expressed a

20   displeasure.

21              MS. GUASTELLA: Are you going to instruct them

22   once they're all there to start deliberating?

23              THE COURT: Yes.

24              THE COURT OFFICER: Your Honor ready for the

25   jury?

MMS

Proceedings

1           THE COURT: (Indicating.)

2           THE COURT OFFICER: Jury entering.

3           (Whereupon, the jury enters the courtroom.)

4           THE COURT CLERK: Do both sides stipulate the

5      presence of a complete jury panel, properly seated?

6           People?

7           MS. CILIA: Yes.

8           THE COURT CLERK: Defendant?

9           MS. GUASTELLA: So stipulated.

10          THE COURT: We're going to break for the

11     afternoon. Permit me to instruct you as I'm required to at

12     this stage, because you're in the midst of deliberations,

13     as follows:

14          First of all, deliberations must be conducted

15     only in the jury room when all jurors are present.

16     Therefore, all deliberations must now cease and must not

17     be resumed until all of you have returned and are together

18     again in the jury room. I'll make it 10 a.m. I am not

19     going to argue with you about 9:30. I will make it 10 a.m.

20     In other words, when the 12th juror appears, at or about

21     10 a.m., we will send your notebooks in and we'll send the

22     exhibits you have back in and you may resume deliberations

23     then, but not before then.

24          Secondly, during this recess, do not converse,

25     either amongst yourselves or with anyone else, about

Proceedings

1      anything related to this case.

2              Third, you remain under obligation not to

3      request, accept, agree to accept, or discuss with any

4      person the receipt or acceptance of any payment or

5      benefit in return for supplying information concerning this

6      trial.

7              Fourth, you must promptly report directly to me

8      any incident within your knowledge involving an attempt by

9      any person improperly to influence you or any members of

10     the jury.

11             Fifth, you must not visit or view the premises or

12     place where any charged crime was allegedly committed, or

13     any other premises or place involved in the case.

14             Sixth, you must not read, view, or listen to

15     any accounts or discussions of the case reported by

16     newspapers, television, radio, the internet, or any other

17     news media.

18             And, finally, you must not attempt to research

19     any fact, issue, or law related to this case whether by

20     discussion with others, by research in the library or on

21     the internet, or by any other means or source.

22             We have released our alternate jurors, so stay

23     well.  We can't do anything without all twelve of you.

24     Okay.  Have a good evening and we'll see you tomorrow.

25             (Whereupon, the jury exits the courtroom.)

MMS

Proceedings

1            THE COURT:   Okay.   Jury has left.

2            I'll see you tomorrow morning.

3            (Defendant remanded.)

4            (Whereupon, court stands in recess and this

5       matter is adjourned to March 12, 2014, at 10 a.m.)

6    *    *    *    *    *    *    *    *    *    *    *

7            I hereby certify that the foregoing is a true and
     accurate transcript of the above proceedings to the best of my
     knowledge, skill, and ability.

8

9

10                              MAURIZIA M. SELLECK
11                              Senior Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MMS

1   SUPREME COURT OF THE STATE OF NEW YORK

2   COUNTY OF RICHMOND:   CRIMINAL TERM - PART 5

3   PEOPLE OF THE STATE OF NEW YORK

4

5                        against

6

7   ARMAND SKRINE,

8                     Defendant

9   _____

10   **Indictment #434-2011**

11                   18 Richmond Terrace

12              Staten Island, New York, 10301

13                     March 12, 2014

14       B E F O R E:   HONORABLE STEPHEN ROONEY, Judge

15

16   A P P E A R A N C E S:

17

18   DANIEL DONOVAN, ESQ.
     District Attorney-Richmond County
19
     JENNIFER CILIA, ESQ.
20   KYLE REEVES, ESQ.
     Assistant District Attorney
21
     MARIA GUASTELLA, ESQ.
22   Appearing on behalf of the Defendant

23

24

25
                **Tammy Rodriguez, Senior Court Reporter**

                           TR

Proceedings

1              THE COURT:  Both sides have seen the note.  We

2     got another note.

3              This one says, "We would like to go to lunch."

4              THE CLERK:  Case on trial continues Armand

5     Skrine.

6              MS. CELIA:  Jennifer Celia and Kyle Reeves for

7     the People.

8              MS. GUASTELLA:  Maria Guastella for the

9     defendant.

10              THE COURT:  Before we bring the jury in we got

11     the first note Court exhibit 9 requested photos of the

12     outside area where the defendant was apprehended, and

13     secondly, photographs of the hallway where the deceased was

14     found.

15              The lawyers went through the photos and they

16     agreed on what photos to send in.  All in evidence.  They

17     were exhibits 169 A. through C. exhibit 3 through 10, 12

18     through 17, 21, 23, 25, 32 through 43, 72 through 76 and 82

19     through 89.

20              So those photos were all sent in to the jury in

21     response to Court exhibit 9 on agreement of the lawyers, is

22     that right?

23              MS. GUASTELLA:  Yes.

24              MS. CILIA:  Yes.

25              THE COURT:  That note is dealt with.

TR

Proceedings

1          Now we have two more notes.  The first one is

2     marked court exhibit 10, Can Judge review definition of

3     circumstantial evidence, the intent, and reasonable doubt.

4          I think that's self-explanatory.  I don't know if

5     you have any comments.  I'll review those areas with them,

6     is that agreed.

7          MS. GUASTELLA:  Yes.

8          THE COURT:  We got a note immediately after that,

9     which we haven't marked it yet.  It will be court exhibit

10    10.

11         The jury is out in the hallway.  I think I'll

12    send them out to lunch and I'll charge them on these issues

13    at 2 p.m.

14         MS. GUASTELLA:  Yes.

15         MS. CILIA:  Yes.

16         THE COURT:  We can bring the jury in.

17         (At this time the jury enters the courtroom.)

18         THE CLERK:  Both sides stipulate the presence of

19    a complete jury panel properly seated?

20         MS. CELIA:  Yes.

21         MS. GUASTELLA:  So stipulated.

22         THE COURT:  Good afternoon nice to see you again.

23    We got an earlier note requesting various photos we sent

24    them in to you.

25         Now we've gotten two more notes.  One we marked

TR

Proceedings

1    court 10, Can Judge review definition of circumstantial

2    evidence, intent, and reasonable doubt.

3             I'll of course do that.  Immediately after that

4    we got another note, which we marked number 11, We would

5    like to go to lunch.

6             I think I'll send you to lunch then.  At 2 p.m.

7    I'll charge you on those items that you requested.

8             Permit me to instruct you before I let you go to

9    lunch as follows:

10            I have to do that.  I'm required by law to give

11   you these instructions.  You know them by heart now, but I

12   must repeat them.

13            First, deliberations must be conducted in the

14   jury room when all jurors are present.  Therefore, all

15   deliberations must now cease, and must not be resumed until

16   all of you are returned and are together again in the jury

17   room.

18            In this situation when the 12th juror returns

19   from lunch, we'll bring you back here, and I'll review the

20   law with you on those areas that you requested.  After that

21   you may resume deliberations, but not before then.

22            Secondly, during this recess do not converse,

23   either among yourselves or with anyone else about anything

24   related to this case.

25            Third, you remain under obligation not to

Proceedings

1    request, accept, agree to accept, or discuss with any person

2    the receipt or acceptance of any payment or benefit in

3    return for supplying any information concerning the trial.

4           Fourth, you must promptly report directly to me

5    any incident involving an attempt by any person improperly

6    to influence you or any member of the jury.

7           Fifth, you must not visit or view the premises or

8    place where any charged crime was allegedly committed, or

9    any other premises or place involved in the case.

10          Six, you must not read, view, or listen to any

11   accounts or discussions of the case reported by newspaper,

12   television, radio, the internet or any other news media.

13          And, finally and you must not attempt to research

14   any fact, issue, or law related to this case whether by

15   discussions with others, research in the library or internet

16   or, by any other means or source.

17          Thank you very much.  We'll see you at 2 and I'll

18   read the law to you again.

19          (At this time the jury is excused from the

20   courtroom.)

21          THE COURT:  All right 2 p.m.

22          (Whereupon a luncheon recess was taken.)

23          THE CLERK:  Case on trial continues appearances,

24   counsel.

25          MS. CILIA:  Jennifer Celia and Kyle Reeves for

TR

Proceedings

1          the People.

2                     MS. GUASTELLA:  Maria Guastella for Mr. Skrine.

3                     THE COURT OFFICER:  Jury entering.

4                     (At this time the jury enters the courtroom. )

5                     THE CLERK:  Both sides stipulate to the presence

6          of a complete jury panel properly seated, People?

7                     MS. CELIA:  Yes.

8                     MS. GUASTELLA:  Yes.

9                     THE COURT:  This is court exhibit 10, Can Judge

10         review definition of circumstantial evidence, intent, and

11         reasonable doubt.  I'll go in order in the way you

12         requested.

13                    Circumstantial evidence there are two types of

14         evidence namely direct evidence and circumstantial evidence.

15                    In this case the People contend that there is

16         circumstantial evidence of the defendant's guilt.

17                    Let me explain what constitutes direct and

18         circumstantial evidence and how they are different.

19                    Direct evidence is evidence of a fact based on a

20         witness's personal knowledge or observation of that fact.

21                    A person guilt of a charged crime may be proven

22         by direct evidence if standing alone that evidence satisfies

23         the jury beyond a reasonable doubt of the person's guilt of

24         that crime.

25                    Circumstantial evidence is direct evidence of a

1    fact from which a person may reasonably infer the existence

2    or nonexistence of another fact.

3          A person's guilt of a charged crime may be proven

4    by circumstantial evidence if that evidence while not

5    directly establishing guilt gives rise to an inference of

6    guilt beyond a reasonable doubt.

7          Now, let me give you an example of the difference

8    between direct evidence and circumstantial evidence.

9    Suppose that in a trial one of the parties is trying to

10   prove that it was raining on a certain morning.  A witness

11   testifies that on that morning she walked to the subway and

12   as she walked she saw rain falling, she felt it striking her

13   face and she heard it splashing on the sidewalk.  That

14   testimony of the witness's perception would be direct

15   evidence that it rained on that morning.

16         Suppose, on the other hand, the witness testified

17   that it was clear as she walked to the subway, that she went

18   into the subway and got on the train, and that while she was

19   on the train, she saw passengers come in at one station

20   after another carrying wet umbrellas and wearing wet clothes

21   and raincoats.

22         That testimony constitutes direct evidence of

23   what the witness observed, and because an inference that it

24   was raining in the area would flow naturally, reasonably,

25   and logically from that direct evidence, the witness's

Proceedings

1    testimony would constitute circumstantial evidence that it

2    was raining in the area.

3            The law draws no distinction between

4    circumstantial evidence and direct evidence in terms of

5    weight or importance.  Either type of evidence may be enough

6    to establish guilt beyond a reasonable doubt depending on

7    the facts of the case as the jury finds them to be.

8            Because circumstantial evidence requires the

9    drawing of inferences, I'll explain the process involved in

10   analyzing that evidence and what you must do before you may

11   return a verdict of guilt based solely on circumstantial

12   evidence.

13           Initially, you must decide on the basis of all

14   the evidence what facts, if any, have been proven.  Any

15   facts upon which an inference of guilt can be drawn must be

16   proven beyond a reasonable doubt.

17           After you've determined what facts, if any, have

18   been proven beyond a reasonable doubt, then you must decide

19   what inferences, if any, can be drawn from those facts.

20           Before you may draw an inference of guilt,

21   however, that inference must be the only one that can fairly

22   and reasonably be drawn from the facts.

23           It must be consistent with the proven facts and

24   it must flow naturally, reasonably, and logically from them.

25           Again, it must appear that the inference of

TR

Proceedings

1    guilty is the only one that can fairly and reasonably be

2    drawn from the facts, and that the evidence excludes beyond

3    a reasonable doubt every reasonable hypothesis of innocence.

4         If there is a reasonable hypothesis from the

5    proven facts consistent with the defendant's innocence, then

6    you must find the defendant not guilty.

7         If the only reasonable inference you find is that

8    the defendant is guilty of a charged crime, and that

9    inference is established beyond a reasonable doubt, then you

10   must find the defendant guilty of that crime.

11        So that's the law on circumstantial evidence.

12   Now, your next request for me is to review the law on

13   intent.

14        Intent is an element of count one that's murder

15   in the second degree.

16        Intent means conscious objective or purpose.

17   Thus, a person acts with intent to cause the death of

18   another when that person's conscious objective or purpose is

19   to cause the death of another, and to put this in context

20   let me review with you the element of murder in the second

21   degree, count one.

22        In order for you to find the defendant guilty of

23   this crime the People are required to prove from all the

24   evidence in the case beyond a reasonable doubt both of the

25   following two elements:

TR

Proceedings

1        Element number one that on or about December 8,

2   2011 in Richmond County the defendant caused the death of

3   David Williams and element number two, the defendant did so

4   with the intent to cause the death of David Williams.

5        Therefore, if you find that the People have

6   proven beyond a reasonable doubt both of those elements you

7   must find the defendant guilty of the crime of murder in the

8   second degree as charged in count 1.

9        On the other hand, if you find that the people

10   have not proven beyond a reasonable doubt either one or both

11   of those elements you must find the defendant not guilty of

12   the crime of murder in the second degree as charged in count

13   one.

14        Once again intent means conscious objective or

15   purpose.  Thus a person acts with intent to cause the death

16   of another when that person's conscious objective or purpose

17   is to cause the death of another.  So that's intent.

18        Finally, let me review with you the concept of

19   proof beyond a reasonable doubt.

20        The standard of proof required by law for

21   conviction in every criminal case is called proof of guilt

22   beyond a reasonable doubt.

23        Now what does our law mean when it requires proof

24   of guilty beyond a reasonable doubt?

25        The law uses the term proof beyond a reasonable

1    doubt to tell you how convincing the evidence of guilt must

2    be to permit a verdict of guilt.

3              The law recognizes that in dealing with human

4    affairs there are very few things in this world that we know

5    with absolute certainty.  Therefore, the law does not

6    require the People to prove a defendant's guilt beyond all

7    possible doubt.

8              On the other hand it's not sufficient to prove

9    that the defendant is probably guilty in a criminal case,

10   the proof must be stronger than that, it must be beyond a

11   reasonable doubt.

12             A reasonable doubt is an honest doubt of the

13   defendant's guilt for which a reason exist based upon the

14   nature and quality of the evidence.

15             It's an actual doubt not an imaginary doubt.

16   It's a doubt that a reasonable person, acting in the manner

17   of this importance would be likely to entertain because of

18   the evidence that was presented or because of the lack of

19   convincing evidence.

20             Proof of guilt beyond a reasonable doubt is proof

21   that leaves you so firmly convinced of the defendant's guilt

22   that you have no reasonable doubt of the existence of any

23   element of the crime or of the defendant's identity as the

24   person who commented the crime.

25             In determining whether or not the People have

TR

Proceedings

1   proven the defendant's guilt beyond a reasonable doubt, you

2   should be guided solely by a full and fair evaluation of the

3   evidence.

4           After carefully evaluating the evidence each of

5   you must decide whether or not that evidence convinces you

6   beyond a reasonable doubt of the defendant's guilt.

7   Whatever your verdict maybe it must not rest upon baseless

8   speculation, nor may it be influenced in any way by bias,

9   prejudice, sympathy, or by a desire to bring an end to your

10  deliberation or to avoid an unpleasant duty.

11          If you're not convinced beyond a reasonable doubt

12  that the defendant is guilty of a charged crime you must

13  find the defendant not guilty of that crime.

14          If you are convinced beyond a reasonable doubt

15  that the defendant is guilty of a charged crime you must

16  find the defendant guilty of that crime.

17          So that's the law on reasonable doubt.  I hope

18  this satisfies your inquiry.  Send us another note if you

19  need to.  Please resume deliberations.  Thank you very much.

20          (At this time the jury is excused from the

21  courtroom.)

22          THE COURT:  The jury left.  Second call.

23          THE CLERK:  Case on trial conditions, 454 of 2011

24  Armand Skrine.

25          I'll note the presence of all parties .  It's

TR

Proceedings

1    4:25.  The officer who's assigned to the jury tells me the

2    jury would like to go home for the evening.  If there's no

3    objection.

4                MS. GUASTELLA:  No objection.

5                THE COURT:  I'll bring them in and release them.

6    Do we need a note?

7                MS. CILIA:  No.

8                THE COURT:  We can bring them in.

9                THE COURT OFFICER:  Jury entering.

10               (At this time the jury enters the courtroom.)

11               THE CLERK:  Both sides stipulate to a complete

12   jury panel properly seated?

13               MS. CILIA:  Yes.

14               MS. GUASTELLA:  Yes.

15               THE COURT:  How are we doing?

16               That's a rhetorical question.  I'm told by the

17   officer that you would like to break for the day.  That's

18   fine with us.

19               Permit me to instruct you as I've told you do

20   before.

21               First of all Deliberations must be conducted only

22   in the jury room when all jurors are present.  Therefore,

23   all deliberations must now cease and must not be resumed

24   until all of you have returned and are together again in the

25   jury room.  I'll make it 10 a.m.

TR

Proceedings

1       Again when at 12 jurors appear you may resume

2    deliberations not before then.

3       Second, do not converse either among yourselves

4    or with anyone else about anything relate today this case.

5       Third, you remain under obligation not to

6    request, accept, agree to accept or discuss with any person

7    the receipt or acceptance of any payment or benefit in

8    return for supplying information about this trial.

9       Fourth, you must promptly report directly to me

10   any incident within your knowledge involving an attempt by

11   any person improperly to influence you or any member of the

12   jury.

13      Fifth, you must not visit or view the premises or

14   place where any charged crime was allegedly committed, any

15   other premises or place involved in the case.

16      Six, you must not read, view, or listen to any

17   accounts or discussions of the case reported by newspapers,

18   television, radio, the internet, or any other news media.

19      And, finally, you must not attempt to research

20   any fact, issue, or law relate to this case whether by

21   discussion with others, by research in the library or on the

22   internet or any other means or source.

23      Thank you very much.  Have a good evening.  We'll

24   see you tomorrow morning.  Thank you.

25      (At this time, the jury is excused from the

TR

Proceedings

1    courtroom.)

2           Jury has left.  I'll see you tomorrow.

3

4           Certified to be true and accurate.

5

6

7               Tammy Rodriguez, Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND - CRIMINAL TERM - PART 5
----------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK   : INDICTMENT NO.
                                        454/2011

            -against-                 :

ARMAND SKRINE,                        :

                                       JURY TRIAL
                           Defendant. : (Continued)
----------------------------------------X
                           18 Richmond Terrace
                           Staten Island, New York
                           March 13, 2014

B E F O R E:

    HONORABLE STEPHEN J. ROONEY, Justice.

A P P E A R A N C E S:

    DANIEL DONOVAN, ESQ.
    District Attorney - Richmond County
        130 Stuyvesant Place
        Staten Island, N.Y. 10301
    BY:  KYLE REEVES, ESQ.,
        JENNIFER CILIA, ESQ.,
        Assistant District Attorneys

    MARIA GUASTELLA, ESQ.
    Attorney for the Defendant
        88 New Dorp Plaza
        Staten Island, N.Y. 10306

                           MAURIZIA M. SELLECK
                           SENIOR COURT REPORTER

                    MMS

Proceedings

1    THE COURT CLERK:  Calendar number 3, case on

2    trial continues:  Armand Skrine, 454/2011.

3    (Whereupon, Court Exhibit 12 is marked in

4    evidence.)

5    THE COURT:  You've seen the note?

6    MS. GUASTELLA:  Yes.

7    THE COURT:  Do we have that ballistics evidence?

8    MR. REEVES:  Yes.

9    THE COURT:  Okay.  We can send that in, we don't

10   need a court officer, right?  We'll just give it to them?

11   THE COURT OFFICER:  Yes.

12   THE COURT:  Exhibit 164, shell casings.

13   MR. REEVES:  It's all ballistics evidence.

14   MS. GUASTELLA:  Judge, they're asking for the

15   shell casings found at the scene.  There was only one.

16   MR. REEVES:  It's all combined.  I don't think

17   you can separate the shell casings.  It's all packaged

18   together.

19   THE COURT:  What exhibit?

20   MR. REEVES:  164.

21   THE COURT:  How many shell casings were found at

22   the scene?

23   MS. GUASTELLA:  One.

24   THE COURT:  It says one.  And one was found in

25   the duffel bag, right?

MMS

Proceedings

1        MR. REEVES: Correct.

2        THE COURT: Why don't I tell them that. We will

3    give them the shell casings, but your note says shell

4    casings found at the scene. The testimony was one found at

5    the scene, one found in the duffel bag, and we'll send it

6    in to you.

7        MS. GUASTELLA: Judge, I would just leave the

8    record even tighter than that, that only one shell casing

9    was found at the scene.

10        THE COURT: That's what I just said.

11        MS. GUASTELLA: Without the additional the other

12    one was found in the bag.

13        THE COURT: I'll say the additional part, too,

14    because they asked for shell casings, plural. I don't know

15    if they're confused.

16        MS. GUASTELLA: Okay.

17        (Defendant present.)

18        THE COURT: All right. Mr. Skrine is here.

19        Let me just read the note into the record:

20    "Janitor testimony read back. Shell casings found at

21    scene."

22        We just discussed that.

23        "Was there any testimony in regard to

24    fingerprints found in the apartment?"

25        Was there?

Proceedings

1          MS. GUASTELLA:  I don't recall.

2          MR. REEVES:  No.  The only testimony is

3     Det. Steneck's testimony about where the patent fingerprint

4     was found.

5          THE COURT:  In the hallway.

6          MR. REEVES:  In the hallway, that's correct.

7          THE COURT:  So, the answer to the question, "Was

8     there any testimony in regard to fingerprints found in the

9     apartment," is no.

10         MR. REEVES:  I would say, But there's no

11     fingerprints found in the hall -- in the apartment, your

12     Honor.

13         THE COURT:  "Was there any testimony in regard to

14     fingerprints found in the apartment?"

15         MS. GUASTELLA:  The answer is no.

16         MR. REEVES:  The answer would be no.

17         THE COURT:  Okay.  And the last one, "What were

18     the Judge's instructions about Lonney Walker?"  I'm pretty

19     sure I didn't give any.  Is that correct?

20         MS. GUASTELLA:  That's correct.

21         MR. REEVES:  That's correct.

22         THE COURT:  Okay.  We are going to let the

23     reporter go through the transcript for a bit and then we'll

24     bring the jury in.

25         MR. REEVES:  Your Honor, to answer the fourth

Proceedings

1    question, I agree there was no instructions, but how does

2    the Court propose to answer that question?

3              THE COURT:  I gave no such instructions.

4              MR. REEVES:  Okay.

5              (Pause.)

6              THE COURT:  I'm looking at my notes.  One shell

7    casing found at the scene --

8              MR. REEVES:  One found in the duffel bag.

9              THE COURT:  -- one in the duffel bag.  Two shell

10   casings in total were found in this case or recovered.

11             MR. REEVES:  Correct.

12             THE COURT:  And then --

13             MR. REEVES:  And those two shell casings are now

14   in one --

15             THE COURT:  -- bag.

16             MR. REEVES:  One bag.

17             THE COURT:  All right.

18             MS. CILIA:  Judge, can we approach briefly?

19             THE COURT:  You can stay on the record if you

20   want or approach.  I don't care.

21             (Whereupon, a discussion is held at the bench off

22   the record.)

23             THE COURT OFFICER:  Your Honor ready for the

24   jury?

25             THE COURT:  Just one second.

Proceedings

 1                  (Pause.)

 2                  THE COURT:  You can bring the jury in.

 3                  THE COURT OFFICER:  Jury entering.

 4                  (Whereupon, the jury enters the courtroom.)

 5                  THE COURT CLERK:  Do both sides stipulate the

 6      complete jury panel, properly seated?

 7                  People?

 8                  MS. CILIA:  Yes.

 9                  THE COURT CLERK:  Defense?

10                  MS. GUASTELLA:  So stipulated.

11                  THE COURT:  Good morning, welcome back.  We have

12      your note which we've marked Court Exhibit 12.  We'll go

13      question by question.

14                  First, "Janitor testimony read back."  And our

15      court reporter is ready to do that now.

16                  (Whereupon, the requested testimony is read back

17      to the jury.)

18                  THE COURT:  Okay, thank you.

19                  The second request on Court Exhibit 12, "Shell

20      casings found at scene."

21                  The testimony was that one shell casing was

22      recovered from the scene and one shell casing was recovered

23      from the duffel bag.  They've both been entered into

24      evidence as Exhibit 164, and we'll send them in to you.

25                  Next question:  "Was there any testimony in

MMS

Proceedings

1    regard to fingerprints found in the apartment?"  The answer

2    is no.

3              And, lastly, "What were the judge's instructions

4    about Lonney Walker?"  I gave instructions regarding

5    evidence and testimony and credibility of witnesses, but I

6    gave no specific instruction as to Lonney Walker.

7              So, I hope that satisfies your request.  If you

8    have any further request, feel free to send us a note.

9    Please resume deliberations.  We'll send that exhibit in to

10   you.

11             (Whereupon, the jury exits the courtroom.)

12             THE COURT:  That last answer I just want to say

13   for the record was discussed at the bench just before the

14   jury came in.  It was a little different than what we had

15   discussed on the record prior.  It was discussed in front

16   of both lawyers and I had no objection registered.

17             It's 12:15, so I got to send them to lunch in

18   35 minutes or so, so please make sure you're here so I can

19   give them the usual separation instructions.

20             THE COURT OFFICER:  Take charge?

21             THE COURT:  Yes.

22             (Defendant remanded.)

23             (Whereupon, court stands in recess awaiting the

24   verdict of the jury.)

25             (Defendant present.)

MMS

Proceedings

1          THE COURT:  Okay.  All parties are present.  We

2     have two more notes.

3          (Whereupon, Court Exhibits 13 and 14 are marked

4     in evidence.)

5          THE COURT:  Court Exhibit 13 reads, "Defense

6     attorney's questions and answers read back regarding Lonney

7     Walker."

8          Was that Ms. Hunt's testimony?

9          MS. CILIA:  It was.  It's less than one page.

10         THE COURT:  Anybody else?

11         MS. CILIA:  That's it.

12         THE COURT:  Nothing from Det. Patterson on that?

13         MS. CILIA:  No.

14         MS. GUASTELLA:  No.

15         THE COURT:  Okay.  So we agreed that's it.

16         Do you have the page?

17         MS. CILIA:  Yes.  Page 263, line 21 to 23, and

18    page 264, line 2 through 25.

19         THE COURT:  Ms. Guastella?

20         MS. GUASTELLA:  Judge, I apologize.  I was

21    downstairs when that note came in.  I didn't get a chance

22    to look through.

23         THE COURT:  Go ahead.

24         MS. GUASTELLA:  What did you say?

25         MS. CILIA:  Page 263, starting at line 21 to 23,

Proceedings

1    and then the next page, 264, line 2 to 25.

2                    MS. GUASTELLA:  What line did you say?

3                    MS. CILIA:  2 through 25.

4                    MS. GUASTELLA:  Judge, 265?  Unless she said it

5    and I missed it.

6                    Page 265, actually line 4.

7                    MS. CILIA:  That was an objection that was

8    sustained.  That doesn't get read back.

9                    THE COURT:  If I sustained an objection, then we

10   can't read it.

11                   MS. GUASTELLA:  I get that, Judge.

12                   Judge, they sent a note in right after that to go

13   to lunch.

14                   THE COURT:  The next note says, "Can we go to

15   lunch?"

16                   MS. CILIA:  Judge, this is going to take less

17   than one minute to read back.

18                   THE COURT:  Why don't we read it in and then I'll

19   give them separation instructions for lunch.  Okay?

20                   MS. CILIA:  Yes.

21                   THE COURT:  If it's that brief, then it won't

22   take long.

23                   Bring them in.

24                   THE COURT OFFICER:  Your Honor ready for the

25   jury?

MMS

Proceedings

1            THE COURT:  Yes.

2            THE COURT OFFICER:  Jury entering.

3            (Whereupon, the jury enters the courtroom.)

4            THE COURT CLERK:  Both sides stipulate to a

5    complete jury panel, properly seated?

6            People?

7            MS. CILIA:  Yes.

8            THE COURT CLERK:  Defense?

9            MS. GUASTELLA:  Yes.

10            THE COURT:  Okay, we have two notes.  The first

11    one has been marked Court Exhibit 13.  "Defense attorney's

12    questions and answers read back regarding Lonney Walker."

13    I believe this is from Ms. Hunt's testimony, and the court

14    reporter will read it to you now.

15            (Whereupon, the requested testimony is read

16    back.)

17            THE COURT:  Okay.  Your next note is marked Court

18    Exhibit 14, "Can we go to lunch?"  Yes, you can.  And, as

19    you know, I have to read you what we call separation

20    instructions, and then I'll let you go to lunch.

21            First of all, deliberations must be conducted

22    only in the jury room when all jurors are present.

23    Therefore, all deliberations must now cease and must not be

24    resumed until all of you have returned and are together

25    again in the jury room.

MMS

1          Second, during this recess, do not converse,

2     either amongst yourselves or with anyone else, about

3     anything related to this case.

4          Third, you remain under obligation not to

5     request, accept, agree to accept, or discuss with any

6     person the receipt or acceptance of any payment or benefit

7     in return for supplying information concerning the trial.

8          Fourth, you must promptly report directly to me

9     any incident within your knowledge involving an attempt by

10    any person improperly to influence you or any members of

11    the jury.

12          Fifth, you must not visit or view the premises or

13    place where the charged crime was allegedly committed, or

14    any other premises or place involved in the case.

15          Sixth, you must not read, view, or listen to any

16    accounts or discussions of the case reported by newspapers,

17    television, radio, the internet, or any other news media.

18          And, finally, you must not attempt to research

19    any fact, issue, or law related to this case whether by

20    discussion with others, by research in the library, or on

21    internet, or by any other means or source.

22          Thank you very much.  Have a good lunch, and

23    we'll see you later.

24          (Whereupon, the jury exits the courtroom.)

25          THE COURT:  All right.  The jury has left.  We'll

Proceedings

1    break for lunch.

2                    (Defendant remanded.)

3                    (Whereupon, a luncheon recess is taken.)

4                    (Whereupon, court stands in recess awaiting the

5    verdict of the jury.)

6                    (Whereupon, Court Exhibit 15 is marked in

7    evidence.)

8                    (Defendant present.)

9                    THE CLERK:  Case on trial continues:  Armand

10   Skrine, Indictment 454/2011.  Appearances remain the same.

11                   THE COURT:  I have a note, Court Exhibit 15, "Can

12   we break for the day?"

13                   What do you think?

14                   MS. CILIA:  We feel that their day ends at 4:30

15   and they should probably be reminded that their day ends at

16   4:30.  They've been asking to go to lunch earlier and

17   earlier every day, now they're asking to leave for the day

18   earlier and earlier.  So, this might be a good time --

19                   THE COURT:  Defense, what do you think?

20                   MS. GUASTELLA:  Judge, I don't think it's been an

21   easy case for them.  You can obviously tell from their

22   faces when they came in last night they were frustrated and

23   upset.  If they want to go home, I think we should let them

24   go home.

25                   THE COURT:  You think I should ask -- I mean, I'm

MMS

Proceedings

1    perfectly willing to ask -- whether they've reached a

2    partial verdict?

3              MS. GUASTELLA:  Judge, they haven't indicated

4    that they have.

5              THE COURT:  No, they haven't.

6              MS. GUASTELLA:  They haven't indicated they're

7    deadlocked.  They've been sending in notes.  I think if

8    they had a partial verdict, I think they'd say something.

9              THE COURT:  Maybe.  I don't think there is any

10   rule that prohibits me from inquiring.  I just wondered how

11   both sides felt about me inquiring.  I don't have a

12   particular feeling.

13             You prefer I leave it alone?

14             MS. GUASTELLA:  (Indicating.)

15             THE COURT:  If both sides would, then I'll do

16   that.

17             Then now the question is shall I let them go or

18   not.  It's 3:33, I guess.  I think if they want to go home,

19   I'll let them go home.  I haven't gotten a deadlock note,

20   so I don't believe there is need to talk about Allen at

21   this point.

22             So, I'll send them home, tell them to come back

23   at 10:00 and then resume deliberations.

24             All right.  You can line them up if they're in

25   there.

MMS

Proceedings

 1              THE COURT OFFICER:  Your Honor ready for the

 2      jury?

 3              Jury entering.

 4              (Whereupon, the jury enters the courtroom.)

 5              THE COURT CLERK:  Do both sides stipulate to a

 6      complete jury panel, properly seated?

 7              People?

 8              MS. CILIA:  Yes.

 9              THE COURT CLERK:  Defense?

10              MS. GUASTELLA:  Yes.

11              THE COURT:  Okay, we have your note, Court

12      Exhibit 15, "Can we break for the day?"  Sure, you can.  I

13      guess I'll make it 10 a.m. tomorrow.  Is that all right

14      with everyone?

15              Okay, 10 a.m. tomorrow.

16              And bear with me:

17              First, deliberations must be conducted only in

18      the jury room when all jurors are present.  Therefore, all

19      deliberations must now cease and must not be resumed until

20      all of you have returned and are together again in the jury

21      room.  So, in other words, when the 12th juror appears at

22      or about 10 a.m., you may resume deliberations, but not

23      before then.

24              Secondly, during this recess, do not converse

25      either amongst yourselves or with anyone else about

MMS

1     anything related to this case.

2            Third, you remain under obligation not to

3     request, accept, agree to accept, or discuss with any

4     person the receipt or acceptance of any payment or benefit

5     in return for supplying any information concerning the

6     trial.

7            Fourth, you must promptly report directly to me

8     any incident within your knowledge involving an attempt by

9     any person improperly to influence you or any members of

10     the jury.

11            Fifth, you must not visit or view the premises or

12     place where the charged crime was allegedly committed, or

13     any other premises or place involved in the case.

14            Sixth, you must not read, view, or listen to any

15     accounts or discussions of the case reported by newspapers,

16     television, radio, the internet, or any other news media.

17            And, finally, you must not attempt to research

18     any fact, issue, or law related to this case whether by

19     discussion with others, by research in the library or on

20     the internet, or by any other means or source.

21            Thank you very much for your efforts today.  Have

22     a good evening.  We'll see you tomorrow.

23            (Whereupon, the jury exits the courtroom.)

24            THE COURT:  Okay.  The jury has left.  I'll see

25     you tomorrow.

Proceedings

1          (Defendant remanded.)

2          (Whereupon, court stands in recess and this

3      matter is adjourned to March 14, 2014, at 10 a.m.)

4    *      *      *      *      *      *      *      *      *      *      *
         I hereby certify that the foregoing is a true and
5    accurate transcript of the above proceedings to the best of my
     knowledge, skill, and ability.

6

7

8                              MAURIZIA M. SELLECK
9                              Senior Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MMS

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND - CRIMINAL TERM - PART 5
----------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK    : INDICTMENT NO.
                                         454/2011

            -against-                  :


ARMAND SKRINE,                         :

                                         JURY TRIAL
                      Defendant.  : (Cont'd)
----------------------------------------X
                      18 Richmond Terrace
                      Staten Island, New York
                      March 14, 2014

B E F O R E:

    HONORABLE STEPHEN J. ROONEY, Justice.



A P P E A R A N C E S:

    DANIEL DONOVAN, ESQ.
    District Attorney - Richmond County
        130 Stuyvesant Place
        Staten Island, N.Y. 10301
    BY: KYLE REEVES, ESQ.,
        JENNIFER CILIA, ESQ.,
        Assistant District Attorneys

    MARIA GUASTELLA, ESQ.
    Attorney for the Defendant
        88 New Dorp Plaza
        Staten Island, N.Y. 10306




                      MAURIZIA M. SELLECK
                      SENIOR COURT REPORTER

                      MMS

Proceedings

1                THE COURT CLERK:   Case on trial continues,

2       calendar number 4:   Armand Skrine, Indictment 454/2011.

3                     Appearances, Counsel.

4                MS. CILIA:   Jennifer Cilia and Kyle Reeves for

5       the People.

6                MS. GUASTELLA:   Maria Guastella on behalf of

7       Mr. Skrine.

8                     Good morning, your Honor.

9                THE COURT:   Good morning.

10               THE COURT CLERK:   First one is Court Exhibit

11      Number 16 and the second one will be 17.

12                    (Whereupon, Court's Exhibits 16 and 17 are

13      received in evidence.)

14                    (Defendant present.)

15               THE COURT:   All parties are present.   We have two

16      notes marked, respectively, Exhibit 16 and 17.

17               Sixteen says, "Can we get a magnifying glass?"

18      Any objection?

19               MS. GUASTELLA:   I have an objection, Judge.   I

20      don't think it's appropriate for the jury to have a

21      magnifying glass.   It's akin to when you instruct them

22      not to go to the crime scene and do their own independent

23      investigation.   Here it appears that with a magnifying

24      glass they're trying to conduct their own investigation.

25               THE COURT:   People?

MMS

Proceedings

1    MR. REEVES: I would disagree with counsel. If

2    they want a magnifying glass to look at the exhibits, we

3    can provide it to them.

4    THE COURT: I don't see anything wrong with a

5    magnifying glass. I've sent them in before. I don't think

6    it's equivalent to conducting an experiment.

7    Actually, I have a case, People against Moody,

8    195 A.D.2d, page 1016. I'll read the pertinent language:

9    "Nor did the Court err in granting the jury's request,

10   during deliberations, for a magnifying glass. As the Court

11   correctly observed, use of a magnifying glass was for the

12   purpose of enhancing the clarity of the photographs,

13   similar to the use of reading glasses."

14   So, I will send in a magnifying glass. We have

15   one.

16   We have another note; the reporter hasn't dealt

17   with it yet. So, what I propose to do is send the

18   magnifying glass and tell the jury we'll bring them in in

19   response to their second note as soon as we can. That's

20   number 17, and it reads as follows: "Part of neighbor's

21   testimony when she said she heard voices in David's

22   apartment prior to borrowing the lighter."

23   So, I guess we'll search for testimony and pull

24   that out and then bring them in and read to it. Maybe you

25   can agree to what passages are involved and then tell the

MMS

Proceedings

1    reporter.

2         So, we'll send the magnifier in and tell them

3    we'll get them in response to their second note, and I

4    guess we'll second call this while you go through the

5    record.

6         MS. CILIA:  It will just take another minute,

7    Judge.

8         THE COURT:  Well, if you think you can do it

9    quickly, but the reporter has to be in on this.

10        Let's second call the case so the reporter can

11   get her copy in and you can work with her on this response.

12        (Pause in the proceedings.)

13        (Defendant present.)

14        THE COURT CLERK:  Case on trial continues,

15   Indictment 454/2011.

16        THE COURT:  All parties are present.

17        Have we agreed, Counsels, on the readback?

18        MS. GUASTELLA:  Judge, I just want to confer with

19   my client, but I believe so.

20        THE COURT:  Okay.

21        MS. GUASTELLA:  Judge, no objection.  We did

22   agree.

23        THE COURT:  So we've agreed.

24        Maurizia, are you ready?

25        THE COURT REPORTER:  Yes.

Proceedings

1      MS. CILIA:  Do you want us to put on the record

2  what the pages are?

3      THE COURT:  I don't care.  If you've agreed,

4  that's good enough for me.

5      MS. CILIA:  We will make a brief record.

6      This is regarding Janet Smith's testimony:  It

7  starts on page 166, the lines are 19 through 25.  Next is

8  page 167, the lines are 1 through 11.  The next is page

9  173, the lines are 22 through 25.  Next is page 174, line

10  1, and lines 19 through 23.

11      THE COURT:  Okay.  You can bring them in.

12      THE COURT OFFICER:  Your Honor ready for the

13  jury?

14      THE COURT:  (Indicating.)

15      THE COURT OFFICER:  Jury entering.

16      (Whereupon, the jury enters the courtroom.)

17      THE COURT CLERK:  Do both sides stipulate the

18  presence of a complete jury panel, properly seated?

19      People?

20      MS. CILIA:  Yes.

21      THE COURT CLERK:  Defense?

22      MS. GUASTELLA:  So stipulated.

23      THE COURT:  Good morning.  We've got the two

24  notes this morning.  The first was Court Exhibit 16 in

25  request for a magnifying glass, which we sent in, once we

MMS

Proceedings

1    found one.

2            The next is Court Exhibit 17, and it reads as

3    follows:  It's a jury note.  "Part of neighbor's testimony

4    where she said she heard voices in David's apartment prior

5    to borrowing the lighter."  So, we've pulled that testimony

6    out from the record and the court reporter will read it to

7    you now.

8            (Whereupon, the requested testimony is read

9    back.)

10           THE COURT:  I hope that's helpful.  Thank you

11   very much.  Please resume deliberations.

12           (Whereupon, the jury exits the courtroom.)

13           THE COURT:  Okay.  The jury has left.  We'll

14   second call this.  I have another case.  Keep in mind,

15   Counsels, as you know, I've got to send them to lunch in

16   about an hour, so make sure you're here.

17           (Defendant remanded.)

18           (Court stands in recess awaiting the verdict of

19   the jury.)

20           (Whereupon, Court Exhibit Number 18 is marked in

21   evidence.)

22           (Defendant present.)

23           THE COURT:  All right.  All parties are present.

24           Court Exhibit 18, a jury note, says, "May we

25   break for lunch," so let's bring them in and I'll send them

Proceedings

1          to lunch.

2                    THE COURT OFFICER:  Your Honor ready for the

3          jury?

4                    THE COURT:  (Indicating.)

5                    THE COURT OFFICER:  Jury entering.

6                    (Whereupon, the jury enters the courtroom.)

7                    THE COURT CLERK:  Do both sides stipulate the

8          presence of a complete jury panel, properly seated?

9                    People?

10                   MS. CILIA:  Yes.

11                   THE COURT CLERK:  Defense?

12                   MS. GUASTELLA:  Yes.

13                   THE COURT:  We have your note, "May we break for

14         lunch?"  It's lunchtime anyway.  I'm sorry for the delay.

15         I was in conference with another judge in another case and

16         I got caught up with that.  Bear with me.

17                   Deliberations must be conducted only in the jury

18         room when all jurors are present.  Therefore, all

19         deliberations must now cease and must not be resumed until

20         all of you have returned and are together again and in the

21         jury room.  I'll make it 2 p.m.

22                   Secondly, during the recess do not converse,

23         either amongst yourselves or with anyone else, about

24         anything related to this case.

25                   Third, you remain under obligation not to

MMS

Proceedings

1    request, accept, agree to accept, or discuss with any

2    person the receipt or acceptance of any payment or benefit

3    in return for supplying any information concerning the

4    trial.

5         Fourth, you must promptly report directly to me

6    any incident within your knowledge involving an attempt by

7    any person to improperly influence you or any members of

8    the jury.

9         Fifth, you must not visit or view the premises or

10   place where any charged crime was allegedly committed, or

11   any other premises or place involved in the case.

12        Sixth, you must not read, view, or listen to any

13   accounts or discussions of the case reported by newspapers,

14   television, radio, the internet, or any other news media.

15        And, once again, finally, you must not attempt to

16   research any fact, issue, or media, or law related to this

17   case whether by discussion with others, by research in the

18   library or internet, or by any other means or source.

19        Thank you.  Have a good lunch.

20        (Whereupon, the jury exits the courtroom.)

21        THE COURT:  Okay.  The jury has left.  I'll see

22   you later.

23        (Defendant is remanded.)

24        (Whereupon, a luncheon recess taken.)

25        (Whereupon, court stands in recess awaiting the

MMS

Verdict

1    verdict of the jury.)

2            THE COURT CLERK:  Court Exhibit 19 so marked.

3            (Whereupon, Court Exhibit 19 is marked in

4    evidence.)

5            (Defendant present.)

6            THE COURT:  All parties are present.

7            We have Court Exhibit Number 19, a jury note,

8    reading:  "The jury has reached a verdict," so let's bring

9    the jury in and we'll take a verdict.

10           THE COURT CLERK:  Line them up.

11           THE COURT OFFICER:  Ready for the jury?

12           THE COURT:  Yes.

13           THE COURT OFFICER:  Jury entering.

14           (Whereupon, the jury is entering the courtroom.)

15           THE COURT CLERK:  Do both sides stipulate to a

16   complete jury panel, properly seated?

17           People?

18           MS. CILIA:  Yes.

19           THE COURT CLERK:  Defense?

20           MS. GUASTELLA:  Yes.

21           THE COURT:  I have your note indicating you've

22   reached a verdict, so the clerk will now take a verdict.

23           THE COURT CLERK:  Madam Foreperson, has the jury

24   reached a verdict, yes or no?

25           THE FOREPERSON:  Yes.

MMS

Verdict

1          THE COURT CLERK:  Please rise.

2          How say you to Count 1, Murder in the Second

3    Degree, guilty or not guilty?

4          THE FOREPERSON:  Guilty.

5          THE COURT CLERK:  How say you to Count 2,

6    Criminal Possession of a Weapon in the Second Degree,

7    guilty or not guilty?

8          THE FOREPERSON:  Guilty.

9          THE COURT CLERK:  The Foreperson may be seated.

10         Members of the jury, hearken unto your verdict as

11   it now stands recorded:  You, and each of you, have said

12   collectively, through your Foreperson, that you find the

13   defendant guilty of Count 1, Murder in the Second Degree,

14   and guilty of Count 2, Criminal Possession of a Weapon in

15   the Second Degree, and so say you all?

16         THE JURORS:  Yes.

17         THE COURT:  Is there a request to poll the jury?

18         MS. GUASTELLA:  Yes, Judge.

19         THE COURT:  Poll the jury, please.

20         THE COURT CLERK:  Members of the jury, each of

21   you say through your Foreperson that you find the

22   defendant, Armand Skrine, guilty of Murder in the Second

23   Degree and guilty of Criminal Possession of a Weapon in the

24   Second Degree.

25         Juror Number 1, is that your verdict?

MMS

Verdict

1              JUROR #1:  Yes.

2              THE COURT CLERK:  Juror Number 2, is that your

3      verdict?

4              JUROR #2:  Yes.

5              THE COURT CLERK:  Juror Number 3, is that your

6      verdict?

7              JUROR #3:  Yes.

8              THE COURT CLERK:  Juror Number 4, is that your

9      verdict?

10             JUROR #4:  Yes.

11             THE COURT CLERK:  Juror Number 5, is that your

12     verdict?

13             JUROR #5:  Yes.

14             THE COURT CLERK:  Juror Number 6, is that your

15     verdict?

16             JUROR #6:  Yes.

17             THE COURT CLERK:  Juror Number 7, is that your

18     verdict?

19             JUROR #7:  Yes.

20             THE COURT CLERK:  Juror Number 8, is that your

21     verdict?

22             JUROR #8:  Yes.

23             THE COURT CLERK:  Juror Number 9, is that your

24     verdict?

25             JUROR #9:  Yes.

Verdict

1      THE COURT CLERK:  Juror Number 10, is that your

2   verdict?

3           JUROR #10:  Yes.

4      THE COURT CLERK:  Juror Number 11, is that your

5   verdict?

6           JUROR #11:  Yes.

7      THE COURT CLERK:  Juror Number 12, is that your

8   verdict?

9           JUROR #12:  Yes.

10          THE COURT:  Members of the jury, I want to thank

11  you for your service in this matter.  We took you away from

12  your jobs and your lives for an extended period.  We are

13  very grateful to all of you for that sacrifice of your very

14  valuable time.  You are now discharged from this matter.

15          If you have your notebooks, leave them.  If you

16  have them in the jury room, leave them.  All the notebooks

17  will be destroyed.  I am told you will be signed off across

18  the street -- Okay, talk to the officers when you leave,

19  they will give you instructions in terms of what you do

20  from here.

21          In any event, thank you all for your service.

22  This jury is discharged.  You are free to leave.

23          THE JURORS:  Thank you.

24          (Whereupon, the jury exits the courtroom.)

25          THE COURT:  All right.  The jury has left.

Proceedings

1          I need a date for investigation and sentence.

2    Probation wants at least ten days.  Today is the 14th.  So,

3    I think we're talking about, at the earliest, March 26th,

4    27th, something of that sort.

5          Counselors, can we agree on a date?

6          MR. REEVES:  Your Honor, the 26th is not a good

7    date for either Ms. Cilia for myself.  The 27th?

8          MS. GUASTELLA:  The 27th is fine.

9          THE COURT:  The 27th is good.

10         Okay.  I'll put this on for March 27th for

11   investigation and sentence.  I'll order a presentence

12   report, and Mr. Skrine is remanded until then.

13         MS. GUASTELLA:  Judge, I'm reserving motions.

14         THE COURT:  That's fine.  If you want to file

15   motions, perhaps you can do it by the 27th.  I'll adjust

16   the schedule if that's how it works out.

17         MS. GUASTELLA:  Thank you.

18         THE COURT:  Okay, thank you.

19         (Defendant remanded.)

20         (Proceedings concluded.)

21   *    *    *    *    *    *    *    *    *    *    *
          I hereby certify that the foregoing is a true and
22   accurate transcript of the above proceedings to the best of my
     knowledge, skill, and ability.
23

24

25        MAURIZIA M. SELLECK
          Senior Court Reporter

MMS

001042

1

1   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF RICHMOND - CRIMINAL TERM - PART 5
2   -----------------------------------X Indictment No.
    THE PEOPLE OF THE STATE OF NEW YORK  : 454/11
3
                    -against-            : MURDER 2
4
    ARMAND SKRINE,                       :
5   NYSID# 08012423R          DEFENDANT.
    -----------------------------------X Sentence
6
                            18 Richmond Terrace
7                           Staten Island, New York 10301
                            July 29, 2014
8

9
    B E F O R E:
10
                    HONORABLE STEPHEN J. ROONEY
11
                            Justice
12

13

14  A P P E A R A N C E S:

15
            DANIEL M. DONOVAN, JR., ESQ.
16          District Attorney - Richmond County
            BY:  KYLE REEVES, ESQ.
17               and
            NATALIE BARROS, ESQ.
18          Assistant District Attorneys

19

20          MARK FONTE, ESQ.
            Attorney for the Defendant
21          60 Bay Street
            Staten Island, New York 10301
22
            *       *       *       *       *       *
23

24
                    KARYN S. GUTKIN
25                  SENIOR COURT REPORTER

    kg

001043

2

Sentence - Skrine

1      COURT CLERK:  On the Part 5 calendar, number

2  four, Armand Skrine, Indictment 454 of 2011.

3      THE COURT:  I received papers on a 330 motion, I

4  handed out a decision.  Did both sides receive it?

5      MR. REEVES:  Kyle Reeves, on behalf of the

6  People.

7      Yes, your Honor, I did receive it.

8      MR. FONTE:  Good morning.  Mark Fonte, on behalf

9  of the defendant.

10      I have read and reviewed the decision, and I have

11  given my client a copy thereof.

12      THE COURT:  Okay.

13      Just for the record, for the reasons stated in

14  the written decision, the motion is denied.

15      And I'm ready to proceed to sentencing, if the

16  parties are ready.

17      MR. FONTE:  I'm ready.

18      MR. REEVES:  People are ready, your Honor.

19      COURT CLERK:  Are you Armand Skrine?

20      THE DEFENDANT:  Yes.

21      COURT CLERK:  Is Mr. Fonte, standing beside you,

22  your attorney?

23      THE DEFENDANT:  Yes.

24      COURT CLERK:  Armand Skrine, you're before the

25  Court for sentencing following your conviction by verdict

kg

3

Sentence - Skrine

1    of the crimes of Murder in the Second Degree and Criminal

2    Possession of a Weapon in the Second Degree.

3            Before being sentenced, the Court will allow you,

4    your attorney and the district attorney an opportunity to

5    address the Court with respect to this matter regarding

6    sentence.

7            For the People?

8            MR. REEVES:  Your Honor, before I address the

9    Court, I previously, or Ms. Cilia had previously sent to

10   the Court in April 2014 a letter asking the Court,

11   pursuant to 380.50 of the Criminal Procedure Law, to allow

12   a member of David Williams' family to address the Court

13   about the impact this crime has had on their lives.

14           I would ask the Court to recognize

15   Miss Evelyn Porter, the mother of Mr. David Williams, and

16   allow her to address the Court before I speak.

17           THE COURT:  Okay.  The last name?

18           MR. REEVES:  Porter.

19           THE COURT:  Okay, very well.

20           MS. PORTER:  Good morning, your Honor.

21           THE COURT:  Good morning.

22           MS. PORTER:  My name is Evelyn Porter, and I am

23   the mother of David Williams.

24           I just want to say today that my son was

25   viciously murdered by Armand Skrine, who is in the

kg

4

Sentence - Skrine

1   courthouse today.  Why this heinous crime took place, I

2   have no idea.  I'm here today on behalf of my son to say,

3   although this crime has taken place and my son was

4   viciously murdered on that day, that I was not even able

5   to have an open casket for him because of this hideous

6   crime.

7        And I would say to Armand Skrine today, you

8   should be ashamed of yourself, and may that particular

9   day, that very moment that you pulled the trigger and you

10  murdered my son, I want that to burn inside of you for the

11  rest of your God given life.

12       And in addition to that, I want to also say, what

13  type of a friend were you to him, that my son opened his

14  door to you and you committed this crime to him, how dare

15  you.

16       May God forgive you today, because as far as I'm

17  concerned this is something that you should--

18       MR. FONTE:  She is supposed to address the Court,

19  not the defendant.

20       MS. PORTER:  You may have murdered his body, but

21  I can tell you this, on this very day, my son will live

22  forever and ever.

23       And when they lock you behind those doors and

24  turn that key, remember this, look around this courthouse,

25  he has friends that will remember him forever.  David will

kg

Sentence - Skrine

1    live on forever and ever, and you, Mr. Skrine, you will be

2    destined to your determination.  You are done, finished.

3    And that's all I have to say on behalf of my son.

4         You robbed him, you robbed him from being a good

5    father that he was.  You tried to disgrace his name in

6    this courthouse.  And he was a good guy, a good man, my

7    son, who you viciously murdered.  May you rot in hell.

8         That's all I have to say, your Honor.

9         THE COURT:  All right, that's the victim impact

10   statement.

11        Mr. Fonte, do you want to make a statement?

12        MR. FONTE:  Yes, Judge.  My understanding of a

13   victim impact statement is a representative of the family

14   is allowed to address the Court, not allowed to address

15   directly the defendant.  So that is my objection, to what

16   is a victim impact statement.

17        I'm not sure exactly what that rant was, but if

18   it was a victim impact statement, I certainly object to

19   it.

20        THE COURT:  Your objection is noted.

21        Do the People want to be heard?

22        MR. REEVES:  I do, your Honor.  Two things.

23        Before I speak on behalf of the People of the

24   State of New York, I do want to read into the record a

25   letter that Miss Nicole Hunt, the wife of David Williams,

kg

Sentence – Skrine

1    handed me, and I would ask this be made part of the

2    record.  This is written by Miss Hunt and addressed to the

3    Court.

4            MR. FONTE:  Judge, I'm going to object to a

5    second impact statement.

6            THE COURT:  Let me rule on your first objection.

7    I think Miss Porter's statement was a victim impact

8    statement, it was largely addressed to the Court.

9            I don't dispute the fact she did address some

10   remarks to your client.  But I think the purpose of the

11   victim impact statement is to inform the Court of the

12   impact that the crime had on the victim's family, and I

13   think that was accomplished.  So your objection is noted,

14   I overrule it.

15           In terms of what Mr. Reeves wants to read, it's a

16   letter, I don't view it as another victim impact

17   statement.  I wouldn't permit two oral victim impact

18   statements, the statute really doesn't permit it.  But I

19   do consider letters, I get them all the time on

20   sentencing.  This is a letter.  And whether I read it or

21   whether Mr. Reeves reads it into the record, I don't think

22   makes any deference.

23           So I will overrule that objection and permit

24   Mr. Reeves to read the letter.

25           MR. REEVES:  Thank you, your Honor.

kg

1    This is from Miss Nicole Hunt, the wife of
2    David Williams and the mother of David Williams' child.

3    My complete life and my daughter's life were
4    forever changed on December 8, 2011. Little did any of us
5    know that would be the last time we would see each other.
6    A seemingly normal day ended in tragedy, and I was in
7    shock for days after David passed.

8    Not only did I have to accept that David was
9    gone, I had to explain to his four year old daughter.  For
10   months my daughter had emotional outbursts and was
11   inconsolable.

12   The person that we looked to, trusted and
13   depended on was ripped from our lives.  David was an
14   honest, helpful person who did not deserve to die the way
15   he did, especially by someone he trusted as a friend and
16   welcomed into his house and around his family.  My
17   daughter was robbed of a father who was constantly by her
18   side.

19   Instead of planning birthday parties and
20   weddings, I have been planning funeral arrangements and
21   memorial services.  To be in the courtroom with
22   Armand Skrine, the defendant, knowing that I had to be in
23   the same room as him makes me sick to my stomach.

24   He deserves to pay for what he has done.  I'm
25   asking for David, and the safety of my daughter and

kg

1    myself, that Armand Skrine serve the maximum sentence for

2    his crime, a life sentence without parole, for the life he

3    so cruelly took.

4         And Miss Hunt asked me to make that part of the

5    court record, that statement.

6         THE COURT:  You know, of course, that I cannot

7    impose life without parole.

8         MR. REEVES:  I understand, your Honor.  That's

9    Miss Hunt's sentiment.

10         THE COURT:  Understood.

11         MR. REEVES:  My request is to have the Court

12    impose the maximum punishment that you can under the law,

13    that is, to run the two terms consecutive to one another.

14    Simply because the evidence adduced during this trial

15    supported the People's contention that the defendant,

16    armed with an AK 47 assault rifle, went into Mr. Williams'

17    home and shot him to death.

18         He didn't shoot Mr. Williams twice, Armand Skrine

19    shot Mr. Williams two times, in an effort to kill him both

20    times.

21         As the Court heard, the first shot essentially

22    pulpified the victim's heart.  When Mr. Williams fell in

23    the hallway of his apartment building, mortally wounded,

24    the defendant didn't walk away.  Instead, he took the

25    rifle, he aimed it at Mr. Williams' head and he executed

kg

Sentence - Skrine

1    Mr. Williams.

2         Dr. de Roux told you that either of the two shots

3    were fatal.

4         Your Honor, despite the lack of a significant

5    criminal history, there are some crimes that only have to

6    be committed once in order for a defendant to earn the

7    maximum punishment, and I think the Court, in its

8    experience and wisdom, has seen one of those cases before

9    it when this case was tried in April 2014.

10        Because of the horrific nature of the crime,

11   because of the way Armand Skrine has conducted his life to

12   this date, I would ask the Court to impose the maximum

13   sentence.

14        Thank you, your Honor.

15        THE COURT:   Thank you.

16        Mr. Fonte, would you like to be heard on

17   sentencing?

18        MR. FONTE:   I would.

19        As the Court is aware, I was not the trial

20   counsel during the trial of Armand Skrine, so my comments

21   today are a result of reviewing the trial transcript, the

22   presentence report, the 330.30 motion submitted by

23   Ms. Guastella, and People's response thereto, as well as

24   Dr. Barday's psychiatric report, which I submitted to the

25   People and the Court, that psychiatric report dated May 5,

kg

001051

1    2014 and which was at least partly the subject of my

2    supplemental 330.30 motion.

3              Judge, because of the possibility and/or

4    likelihood that this case may very well have to be retried

5    again, having to go through an appeal process, I'm not

6    going to comment on the facts of the case.

7              My client adamantly maintains his innocence, and

8    I suppose the People should be congratulated on convicting

9    the wrong person for the murder--

10             MR. REEVES:  Objection, your Honor.

11             MR. FONTE:  --of the deceased.

12             MR. REEVES:  The psychiatric report indicates

13   Mr. Skrine killed the victim, so I think this is a

14   somewhat hollow statement by counsel.

15             THE COURT:  I will hear him.  I will note that I

16   address the psychiatric report issue as part of the 330.30

17   application and decision.

18             Go ahead.

19             MR. FONTE:  Next, Judge, as Mr. Reeves pointed

20   out, your Honor has a wealth of experience on these

21   matters, on these sentences, and in reviewing the

22   background of defendants.

23             This particular defendant's background is very

24   different and stands apart from what we ordinarily see in

25   the court.

kg

Sentence - Skrine

1      Mr. Skrine, as a young man, lost his mother.

2    Despite that early loss, he began his life excelling.  He

3    went through high school, did well enough in high school

4    to attend college.  Became a college graduate.  And

5    excelled so much that he applied to and was accepted into

6    law school.

7           And I think everybody in the well of this

8    courtroom knows how difficult that is.

9           He gets into law school and begins his studies in

10   the law.  At this point in time, according to Dr. Barday,

11   he begins to suffer what began as periodic episodes of

12   depression.  That depression became more and more apparent

13   during his time in law school.

14          And apparently, he began to self medicate by

15   using alcohol, and then gradually into other controlled

16   substances.

17          But what is sad about this case-- obviously,

18   there is a loss of a life, but there is also a young man

19   who was seemingly on the road to success, he was on the

20   jet path to success, coming from a somewhat impoverished

21   background, with the loss of an intimate family member,

22   yet dispute all of that, he was able to overcome.

23          Interjecting into his path in life, became his

24   illness.  And the mental illness is what sidetracked this

25   individual.  And it's an illness that he apparently

kg

1    continues to suffer from.

2            I would note that Dr. Barday states in page 16 of

3    his report that Mr. Skrine was suffering from both a mood

4    disorder with psychotic features, as well as from

5    substance abuse and dependence.  His interpersonal

6    functioning gradually declined over time.

7            Having hit his apex in law school, Mr. Skrine was

8    never then able to pass the bar, sustain gainful

9    employment or maintain personal relationships.

10           I understand this is a defense-submitted report;

11    however, as the Court is aware, the defendant was the

12    subject of a 730 examination well before I ever got into

13    the case.  Ms. Guastella apparently asked for a 730

14    examination, and at one point he was found unfit to

15    proceed.

16           So we have at least two state psychiatrists,

17    state doctors, did an examination of the defendant and

18    found him unfit.  And I bring this to the Court's

19    attention for purposes of mitigation of sentence.

20           Certainly if the defendant committed these

21    crimes, this is not actions which would rise to the level

22    of mental disease or defect, as Ms. Guastella informed the

23    Court, but I think it can and should be taken into

24    consideration at mitigation of sentence that your Honor is

25    about to set.

kg

13
Sentence - Skrine

1    Dr. Barday further states that by the time of the

2    offense, he was no longer reflective on his life and on

3    how to improve it, but was living day to day hustling on

4    the street.

5    There is, however, evidence that disturbances in

6    his mental state persisted after his arrest, as evidenced

7    by his having been found unfit to stand trial and being

8    committed to a forensic hospital for psychiatric

9    treatment.

10    I would, therefore, respectfully ask your Honor

11    to consider these factors in mitigation of the defendant's

12    sentence.

13    THE COURT:  Thank you.

14    COURT CLERK:  Mr. Skrine?

15    THE COURT:  Mr. Skrine, would you like to say

16    anything before I impose sentence?

17    THE DEFENDANT:  Yeah.

18    Um, I am very sorry for the loss that this family

19    is dealing with.  Very sorry that I am sitting in this

20    position, talking to you in this capacity.

21    Just like you all suffered losses, I have gone

22    through a lot of pain, and a lot of trials and

23    tribulations to this point in my life.

24    There was a point where I did suffer

25    tremendously.  I wouldn't even be able to speak as

kg

14

Sentence - Skrine

1   fluently as I am today if I didn't get this kind of

2   treatment in this sad situation that I have for mental

3   sickness, such as I was suffering from.

4           I hope one day that the truth you see is fully

5   brought to you.  There were points in this trial, but I'm

6   not going to say I agreed with in the way that certain

7   people say things about me, the way that they pointed out

8   certain things to indicate that I am the guilty person in

9   this.

10          And I just felt that there were certain things

11  that they did sloppy, that should have been looked at a

12  little bit more clearly, as I'm going in the right

13  direction.  So I'm going to say I'm sorry.

14          THE COURT:  Thank you for your statement.

15          Thank you all for your statements.

16          I presided over the trial, I reviewed the

17  presentence report, of course, Dr. Barday's sentencing

18  statements, so I'm familiar with the facts and

19  circumstances.

20          The defendant was convicted after a jury trial of

21  counts one and three in the indictment, Murder in the

22  Second Degree and Criminal Possession of a Weapon in the

23  Second Degree, respectively.

24          The evidence indicated that the defendant and the

25  victim had known each other since college, and that on the

kg

001056

1    day in question the defendant went to the victim's

2    apartment with an AK 47 semiautomatic rifle and shot the

3    victim twice.

4         One shot penetrated the chest and went through

5    the lungs and the heart.  The other shot went through the

6    victim's head.

7         The evidence indicated that this was delivered

8    while the victim was lying prone on the hallway floor.

9         As the D.A. noted, the medical examiner testified

10   that each shot was fatal.

11        Probation indicates as a result of these crimes,

12   the victim's fiancee and his seven year old daughter are

13   now in counseling.

14        Probation also indicates, and the NYSID sheet

15   verifies this, that Mr. Skrine has three prior misdemeanor

16   convictions, one of which was for Criminal Possession of a

17   Weapon in the Fourth Degree.

18        I will note Mr. Fonte's argument regarding mental

19   health, and I'm certainly considering it; it was also

20   addressed in the presentence report.

21        I will note in passing, as well, that no

22   psychiatric defense was raised in this case and no

23   intoxication defense was raised.

24        These were senseless crimes, as far as I can

25   tell, and committed in a brutal manner with tragic effect.

kg

Sentence - Skrine

1    I will note that the sentence as to count three,

2    which is Criminal Possession of a Weapon in the second

3    degree, is going to involve a period of post-release

4    supervision.

5    I just want to advise Mr. Skrine that pursuant to

6    the Penal Law, a period of post-release supervision is

7    automatically included in every determinate sentence as a

8    part thereof.  The Board of Parole provides this

9    supervision and is empowered to impose this supervision

10    during the post-release period in the same manner as it

11    does for defendants on parole or conditional release.

12    A Violation of any period of supervision

13    occurring at any time during any period of post-release

14    supervision would subject the defendant to a further

15    period of imprisonment, up to the balance of the remaining

16    period of post-release supervision.

17    Accordingly, and considering all of the above,

18    the sentences are as follows:

19    As to count one, which was a conviction of Murder

20    in the Second Degree, a Class A felony, in violation of

21    Penal Law 125.25 subdivision one, the sentence is an

22    indeterminate one consisting of 25 years to Life; that is,

23    a minimum of 25 years, a maximum of life.

24    As to count three, which was a conviction for

25    Criminal Possession of a Weapon in the Second Degree, a

kg

001058

17

Sentence - Skrine

1   Class C violent felony offense, in violation of Penal Law

2   Section 265.03 subdivision three, the sentence is a

3   determinate one consisting of ten years, to include and to

4   be followed by a two and a half year period of

5   post-release supervision.

6        I will direct that these sentences run

7   concurrently with each other.

8        Mr. Fonte, if you want me to, I will make sure

9   the defendant's commit card is addressed mental health

10  treatment requested.

11       MR. FONTE:  That is my request, Judge.  Thank

12  you.

13       THE COURT:  We will make that notation on the

14  commit card.

15       Surcharges and fees are imposed, as required by

16  law.  I will direct they come from inmate funds.

17       And I would like to see that Mr. Skrine is

18  advised of his right to appeal the judgement of this

19  Court.

20       COURT CLERK:  Mr. Skrine, pursuant to the New

21  York City Administrative Code 10-601 Gun Offender

22  Registration Act, which I will provide to you, you must

23  register in writing at the time of your sentence by

24  signing the Gun Offender Registration Form, and you must

25  physically report to the NYPD gun offender monitoring unit

kg

18

Sentence - Skrine

1   within 48 hours of your release.

2           You're also advised that you have 30 days to

3   appeal, and I will give you a form for that, as well.

4           MR. FONTE:  I would like the record to reflect

5   that my client has been given written notice of appeal,

6   and I will file a notice of appeal with the Court.

7           THE COURT:  Very good.  I think that's

8   everything.

9           MR. FONTE:  Judge, let the record reflect I'm

10  handing to Mr. Skrine a written notice of appeal.

11          THE COURT:  Okay.  If there is nothing else, I

12  will let the officers take charge.

13          MR. REEVES:  Thank you, your Honor.

14          MR. FONTE:  Thank you.

15          THE COURT:  Thank you.

16  CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF THE ORIGINAL
    STENOGRAPHIC MINUTES TAKEN OF THIS PROCEEDING.

17

18                  KARYN S. GUTKIN
                    Senior Court Reporter

19

20

21

22

23

24

25

    kg