UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

ARMAND SKRINE, :

Petitioner, :

-against- :

23-cv-04575-DG

CHRIS COLLINS, Superintendent, :
Great Meadows Correctional Facility and
LETITIA JAMES, Attorney General :

Respondents. :

---------------------------------------------------------------X

# PETITIONER'S MEMORANDUM OF LAW REPLYING TO THE STATE'S OPPOSITION TO HIS PETITION FOR A WRIT OF HABEAS CORPUS

NATALIE REA (NR 2266)
THE LEGAL AID SOCIETY
CRIMINAL APPEALS BUREAU
Attorney for Petitioner
199 Water Street, 5th Floor.
New York, New York 10038
NRea@legal-aid.org
(212) 577-3403

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

PRELIMINARY STATEMENT ........ 1

SUMMARY OF THE ARGUMENT ........ 2

ARGUMENT

In Reviewing An Ineffective Assistance Of Counsel Claim, A Court Must Assess Counsel's Performance As A Whole, The Errors Combined And The Prejudicial Impact Of The Combined Errors, Not As The State Court Did Here, Contrary To Strickland, Separately And Individually, Warranting Issuance Of The Writ. Strickland v. Washington, 466 U.S. 668 (1984); 28 U.S.C. §2254(d). ........ 4

A. Strickland requires courts to look at counsel's errors together. and their combined prejudicial impact not, as the court did here, individually and separately. ........ 5

B. Respondents do not argue that the state court considered counsel's errors together or their combined prejudicial impact but claim erroneously that the errors were either not errors or not prejudicial. ........ 7

(1) Respondents are mistakenly dismissive of counsel's failure to object to the prosecutor's use and abuse of the suppressed clothing ........ 7

(2) The state court did not address counsel's fatal failure to object to the inadmissible unauthenticated "second mask" with the DNA profile and respondents' novel theory of derivative authentication is without merit. ........ 9

(3) Counsel's failure to object to the DNA testimony of Irene Wong adds to counsel's incompetence. ........ 11

C. Under the proper Strickland standard, counsel's overall performance was (1) deficient and (2) its impact prejudicial. ........ 14

(1) Combined, counsel's errors resulted in a deficient performance. ........ 14

(2) But for counsel's deficient performance, the outcome would have been different. ........ 16

CONCLUSION....................19

TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

Bullcoming v. New Mexico,
564 U.S. 647 (2011)....................12, 13

Green v. Lee,
964 F. Supp. 2d 237 (E.D.N.Y. 2013)....................6

Harrington v. Richter,
562 U.S. 86 (2011)....................6

Kimmelman v. Morrison,
477 U.S. 365 (1986)....................6

Lindstadt v. Keane,
239 F.3d 191 (2d Cir. 2001)....................16

Melendez-Diaz v. Massachusetts,
557 U.S. 305 (2009)....................12

Rosario v. Ercole,
601 F. 3d 118 (2d Cir. 2010)....................6

Strickland .v Washington,
466 U.S. 668 (1984)....................*passim*

Williams v. Illinois,
567 U.S. 50 (2012)....................13

**STATE CASES**

People v. Baldi,
54 N.Y.2d 137 (1981)....................6

People v. Brown,
13 N.Y.3 332 (1990)....................13

People v. Goldstein,
6 N.Y. 3d 119 (2004)....................12

People v. Jarvis,
113 A.D.3d 1058 (4th Dept. 2014)....................9

People v. John,
27 N.Y.3d 294 (2016)....................12, 13

People v. Julian,
41 N.Y.2d 340 (1977)48 (1979) ........ 9

People v. Price,
29 N.Y.3d 472 (2017) ........ 9

People v. Skrine,
201 A.D. 3d 744 (2d Dept. 2022) ........ 3

People v. Turner,
5 N.Y. 3d 476 (2005) ........ 12

People v. v. Tzintzelis,
35 N.Y.3d 925 (2020) ........ 12

Young v. U.S.,
63 A.3d 1033 (D.C. Court of Appeals 2013) ........ 12

**STATUTES**

28 U.S.C. § 2254 ........ 1

28 U.S.C. § 2254(d) ........ 14

28 U.S.C. § 2254 (d)(1) ........ 5

Antiterrorism and Effective Death Penalty Act ........ 5

**CONSTITUTIONAL PROVISIONS**

Sixth Amendment ........ 6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
ARMAND SKRINE, :

Petitioner, :

-against- :

CHRIS COLLINS, Superintendent, :
Great Meadows Correctional Facility and
LETITIA JAMES, Attorney General :

Respondents. :

---------------------------------------------------------------X

## PRELIMINARY STATEMENT

On June 20, 2023, Armand Skrine filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. §2254, on the grounds that he was denied his constitutional right to counsel (ECF Doc#1-1 and Doc#1-2). Petitioner argued that under Strickland .v Washington, 466 U.S. 668 (1984), courts must assess counsel's errors cumulatively, not individually, and the prejudicial impact of the combined errors, not the prejudicial impact of each error separately. In this case, trial counsel made numerous errors, some more egregious than others, but the Appellate Division never considered them combined or their combined prejudicial impact. Instead, contrary to Strickland, it picked two errors, ignoring the others, and analyzed them and their impact individually and separately, rather than cumulatively.

Respondents fail to grapple with these analytical errors, which pervade the legal standard the Appellate Division utilized and applied when evaluating Mr. Skrine's ineffective assistance claim. Tellingly, they oppose the petition without claiming that

Strickland allows courts to look at errors and their impact individually rather than combined (ECF Doc#12 and 13). Instead, after a minimal presentation of the facts, respondents argue that counsel's numerous failures were not errors or not prejudicial. This reply is submitted to address respondents' meritless arguments. Because the state court's individual error analysis was contrary to Strickland, or, at the very least, an unreasonable application thereof, the writ should be granted.

## SUMMARY OF THE ARGUMENT

On December 8, 2011, around 11:00 a.m., shots were heard in the victim's apartment at 195 Steuben Street in Staten Island. Earlier that morning, in the lobby, the janitor – Jean Loiseau – had observed a person over 6'4", wearing a long black winter coat, a full-face black mask, and carrying a gym bag. A radio run was transmitted without a description and petitioner, who is tall, was arrested 10 to 15 minutes later, in the vicinity – without probable cause. Later that night, the murder weapon was found in a duffel bag in the woods near the victim's building.

At trial, the prosecution had neither eyewitnesses nor fingerprints connecting petitioner to the crime. Respondents now argue that Loiseau's description "uncannily" matched petitioner in that he described "a very tall man, covered from head to toe in ski equipment and carrying a duffel bag." However, Loiseau described a person a little over 6'4," who, on that December morning, was wearing a long dark coat and a dark full-face mask and was carrying a duffel bag. Loiseau could not see if the person was a man or a woman, white or black. When shown the grey duffel bag recovered in the woods and the full-face mask recovered from the duffel bag, Loiseau could only say that they were the

same "kind" as the one carried and worn by the person in the lobby (ECF Doc#1-2 at 20). In other words, the person in the lobby was tall and petitioner was tall.

In the absence of eyewitnesses and fingerprints or a proper description, the prosecution had to establish a connection between petitioner and the items found in the duffel bag with the crime weapon. The prosecutor did so by repeatedly comparing the extra-large clothing recovered from the duffel bag with the suppressed large clothing worn by petitioner at the time of arrest, by introducing into evidence an unauthenticated partial mask – the "second mask" – of unknown origin found by a non-testifying employee of the Office of the Medical Examiner ("OCME") that contained a full DNA profile matching petitioner, and by introducing the inadmissible DNA testimony of Irene Wong, an OCME criminologist who had neither observed, performed the testing, or looked at the raw data to reach her own independent conclusions.

All this evidence was inadmissible, and counsel never objected. Not only did she fail to object to this most critical evidence, at trial she proceeded aimlessly – making irrelevant objections to evidence the state was not introducing, choosing not to make an opening statement because she was unprepared, and giving an incoherent summation pointing the finger at a perpetrator almost a foot shorter than petitioner. After four days of deliberations and 14 substantive notes from the jury, petitioner was convicted of second-degree murder and sentenced to the maximum term of imprisonment of 25 years to life.

On appeal, petitioner argued that all these errors where the evidence was far from overwhelming, amounted to ineffective assistance of counsel. The Appellate Division disagreed. The court addressed only two errors: counsel's failure to object to the DNA testimony of the criminalist, Irene Wong, and to the introduction of the suppressed

clothing. As to the former, the court found that the "alleged error" was not "so clear-cut and dispositive" at the time of the trial that "no reasonable defense counsel would have failed to assert it." As to the latter, the court held that the error was not "sufficiently egregious and prejudicial" as to compromise the defendant's right to a fair trial. People v. Skrine, 201 A.D. 3d 744, 745 (2d Dept. 2022).

Because Strickland requires that a court consider counsel's errors together and their combined prejudicial impact in assessing an ineffective assistance of counsel claim and the state court – contrary to Strickland – never did so, petitioner now asks the court to vacate the conviction and issue a writ of habeas corpus.

## ARGUMENT

In Reviewing An Ineffective Assistance Of Counsel Claim, A Court Must Assess Counsel's Performance As A Whole, The Errors Combined And The Prejudicial Impact Of The Combined Errors, Not As The State Court Did Here, Contrary To Strickland, Separately And Individually, Warranting Issuance Of The Writ. Strickland v. Washington, 466 U.S. 668 (1984); 28 U.S.C. §2254(d).

Counsel was unprepared from the very beginning and never seemed to understand the prosecution's case. She never objected to the introduction and use of the suppressed clothing worn by petitioner at the time of arrest. She never objected to a never-vouchered, never-authenticated "second mask" found inadvertently by a non-testifying OCME employee in the pocket of a vouchered coat. She never raised a confrontation clause objection to the DNA testimony of Irene Wong, an OCME employee, who impermissibly testified to the tests and conclusions of other non-testifying criminalists. Instead, at trial, counsel proceeded haphazardly, waiving an opening statement because she was not prepared, objecting to irrelevant suppressed money the state did not plan to use, and giving

an incomprehensible summation pointing at two perpetrators, one 6'6", the other 5'7". Counsel's performance with its multiple errors – big and small – was far below any reasonable professional standard. The jury struggled with the evidence. It deliberated for four days, not as respondents claim, because counsel had provided effective representation, but because the prosecution's circumstantial case was far from overwhelming. Under Strickland, the state court had to look at counsel's errors together and their combined prejudicial impact. The Appellate Division never did. It picked two errors, counsel's failure to object to the DNA testimony of Wong and to the suppressed clothing worn by petitioner at the time of arrest, dismissing the first as not "clear-cut and dispositive" and the second as insufficiently egregious and prejudicial. Such an analysis is contrary to Strickland and requires issuance of the writ.

A. Strickland requires courts to look at counsel's errors together and their combined prejudicial impact not, as the state court did here, individually, and separately.

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a petition for habeas corpus shall be granted where the state court has adjudicated the claim on the merits, but the decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, 28 U.S.C. §2254 (d)(1). Petitioner's ineffective assistance of counsel claim is squarely governed by Strickland v. Washington, 466 U.S. 668 (1984). But the state court applied a standard that was contrary to Strickland and an unreasonable application thereof, under 28 U.S.C. §2254 (d)(1)(see ECF Doc#1-2 at 51-59).

Under Strickland, counsel is constitutionally ineffective where (1) her performance was deficient in that "representation fell below an objective standard of reasonableness

under prevailing professional standards" and (2) there is a reasonable probability that absent the errors, the result would have been different, id. at 688 (see ECF Doc#1-2 at 37). Deficient performance requires a showing that counsel "made errors so serious that counsel was not functioning" as counsel under the Sixth Amendment. Strickland, 466 U.S. at 687; Harrington v. Richter, 562 U.S. 86, 104 (2011). The court must consider "counsel's overall performance throughout the case in order to determine whether 'the identified acts or omissions' overcome the presumption that counsel rendered reasonable professional assistance." Kimmelman v. Morrison, 477 U.S. 365, 386 (1986)(emphasis added). New York's traditional standard also requires courts to look at the totality of the circumstances to determine whether there was meaningful representation. People v. Baldi, 54 N.Y.2d 137, 147 (1981); see Green v. Lee, 964 F. Supp. 2d 237, 255 (E.D.N.Y. 2013). When "properly applied," the New York traditional meaningful representation standard is not contrary to Strickland. Rosario v. Ercole, 601 F. 3d 118, 12-26 (2d Cir. 2010). When improperly applied, as here, it was contrary to Strickland (ECF Doc#1-2 at 50-60).

In this case, the court never considered counsel's performance as a whole. It never looked at counsel's errors, both large and small, together or their combined prejudice. It picked two errors – counsel's failure to object to the DNA testimony of the OCME chemist and to the prosecutor's use and abuse of the suppressed clothing – considering each separately and individually. The court's analysis was contrary to Strickland.

B. Respondents do not argue that the state court considered counsel's errors together or their combined prejudicial impact but claim erroneously that the errors were either not errors or not prejudicial.

Respondents, like the Appellate Division, address counsel's errors individually and dismisses them as either not error or not prejudicial. According to respondents, the prosecutor's use of the suppressed clothing evidence was not prejudicial because an officer testified to petitioner's appearance at the time of arrest (ECF Doc#14 at 29-31). In addition, the "second mask" discovered by the non-testifying OCME employee was not inadmissible but admissible under a novel theory of derivative authentication. Under that novel theory, because the "second mask" was found in the pocket of an authenticated coat, the "second mask" was derivatively authenticated (ECF Doc#14 at 13-19). Moreover, counsel's failure to raise a confrontation clause objection to Wong's DNA testimony was not prejudicial because she testified to DNA found on two masks and was not error because there is no clearly established Supreme Court precedent regarding the Confrontation Clause aspects of expert DNA testimony (ECF Doc#14 at 19-29). Finally, according to respondents, counsel's other choices including the waiver of an opening, the objection to irrelevant suppressed bills, and incoherent summation, were simply choices (ECF Doc#14 at 8-11). These arguments have no merit.

(1) Respondents are mistakenly dismissive of counsel's failure to object to the prosecutor's use and abuse of the suppressed clothing.

Counsel's failure to object to the suppressed clothing was one of the two errors the Appellate Division chose to address, finding it insufficiently egregious and prejudicial. According to respondents, the error was not prejudicial because an officer described petitioner at the time of arrest (ECF Doc#14 at 29-32). The use and abuse of the suppressed

clothing by the prosecutor at trial and the related notes from the jury during deliberations strongly suggests otherwise.

Somewhat tellingly, respondents do not mention petitioner's suppressed large size clothing at the time of arrest in the Declaration in Opposition (See ECF Doc #12 1-2 at 1-14). However, at trial the prosecutor used the clothing evidence over and over again (See ECF Doc#1-2 at 17-24; 34). Detective Robin Streneck testified at length and in extreme detail about the size extra-large clothing from the duffel bag found in the woods and the suppressed size extra-large clothing recovered from petitioner. From the duffel bag, Detective Streneck recovered, marked, numbered, and photographed among other items, a long black coat, size 46XL, a gray hooded zip sweatshirt, size 3XL, a black hooded sweatshirt, size 3XL (See ECF Doc#1-2 at 17-18). At the precinct, she recovered, marked, numbered, and photographed petitioner's clothing including a short black jacket, size 4XL; size 13 shoes, size W38 jeans, size XXL gray sleeveless T-shirt, and a black long-sleeve shirt size 6XL (See ECF Doc#1-2 at 18-19). The prosecutor asked Irene Wong of the OCME and the property clerk to list all the clothing, suppressed and not (see ECF Doc#1-2 at 16, 21-22). In summation, the State compared the size of the suppressed clothing with the size of the clothing recovered from the duffel bag.

The prosecutor used the suppressed evidence over and over again for its prejudicial impact and it worked. During deliberations, the jury asked about "defendant's clothing, money et cetera [sic]." Seeking clarification, the court asked the jury, "[w]e're not sure if you're talking about clothing recovered from the duffel bag, clothing that the defendant was allegedly wearing, both" (see ECF Doc#1-2 at 27-28)(emphasis added). Not only had

the "defendant's clothing" been suppressed but the clothing from the duffel bag was not defendant's clothing. That was actually the critical question the jury had to decide.

Counsel's failure to object to any of this was egregious, People v. Jarvis, 113 A.D.3d 1058 (4th Dept. 2014)(failure to object to suppressed evidence amounted to deficient performance)(see ECF Doc#1-2 at 42-43), and when combined with the other errors, amounted to deficient performance under Strickland.

(2) The state court did not address counsel's fatal failure to object to the inadmissible unauthenticated "second mask" with the DNA profile and respondents' novel theory of derivative authentication is without merit.

Counsel's failure to object to the introduction of the inadmissible "second mask" with a full DNA profile was one of her most egregious errors because all lawyers are expected to know basic authentication rules for the introduction of physical evidence (see ECF Doc#1-2 at 37-41). The "second mask" was the partial face mask discovered by a non-testifying OCME employee, long after all the other items recovered from the duffel bag had been marked, numbered, photographed, and vouchered by Detective Streneck (ECF Doc#1-2 at 22-23).[1] It was not admissible but counsel apparently did not know and did not object.

In New York, authentication requirements are set forth in People v. Price, 29 N.Y.3d 472 (2017) and People v. Julian, 41 N.Y.2d 340 (1977) (ECF Doc#1-2 at 38-41; ECF Doc#14 at 6). In essence, non-fungible items that possess unique characteristics do not require evidence of a proper chain of custody because they can be identified by a

---

1 The trial court named this partial face mask the "second mask" and petitioner has followed the trial court's naming choice (ECF Doc#1-2 at 24). Respondents, however, refer to the "second mask" as the mask "marked '1B' by OCME and unmarked by Streneck" or "mask 1B" and adds to the confusion by referring to the full-face mask recovered from the duffel bag, marked RS12, vouchered, and photographed by Streneck as "Mask 2" (ECF Doc#14 at 14-15).

witness. In contrast, fungible items require the prosecution to establish a proper chain of custody to ensure that the item is unchanged and is what it purports to be.

This "second mask" was a partial face mask and a non-fungible item that required identification to be authenticated. No one identified it and respondents do not claim otherwise (ECF Doc#1-2 at 39; ECF Doc#14 at 15). Respondents treat the "second mask" as a fungible item and concedes that there was a "gap" in the chain of custody. Respondents ask the court to excuse the "gap" under a novel theory of derivative authentication. Under that theory, because the never-vouchered, never-authenticated "second mask" was recovered from the pocket of an authenticated coat, it must be considered authenticated. According to respondents, the authenticated coat provides the reasonable assurances of the "identity and unchanged condition" of the "second mask" (ECF Doc#14 at 16). The coat provides no reasonable assurances of anything. Under respondents' theory, everything found in the duffel bag would be tacitly authenticated because the duffel bag was authenticated. That is simply absurd. There is no derivative authentication in New York.

In this case, if the "second mask" is considered a fungible item, there was a fatal gap in the chain of custody rendering it inadmissible. Indeed, the non-testifying OCME employee, with the initial DTR, who discovered the "second mask" recognized the problem. He had no idea where it came from. According to notes in the OCME case file, DTR described this unusual discovery as an "administrative deficiency" and "evidence discrepancy quantity more," adding that the "mask will be packed in evidence bag with item 1A." (["Also in the pocket of item#1 [the coat] was another black mask"])(ECF Doc#14 at 22). There was no evidence showing how or when the "second mask" got there or who put it there. It appeared at the OCME long after Detective Streneck recovered,

marked, and vouchered all the items from the duffel bag and from petitioner at the precinct. It was not, as respondents claim, found "packaged" in the pocket of the coat (ECF Doc#14 at 13). DTR packaged the "second mask" after finding it.

Respondents, recognizing the precarity of this novel derivative authentication theory, argue that even if counsel erred in not objecting to this "second mask," it does not matter because there were two masks with petitioner's DNA. While there were two masks, one was admissible, one was not and only the inadmissible mask had a full DNA profile. Counsel's failure to object to the introduction of this "second mask" and its DNA profile was therefore egregious when considered alone. Combined with counsel's other errors, her performance clearly fell "below an objective standard of reasonableness under prevailing professional standards." The Appellate Division conveniently ignored this critical error.

(3) Counsel's failure to object to the DNA testimony of Irene Wong adds to counsel's incompetence.

Counsel's failure to object to Wong's DNA testimony is one of the two errors, the Appellate Division picked out of the list of counsel's myriad additional errors in rejecting petitioner's ineffective assistance of counsel claim. Considering the error individually not in combination with others, as required by Strickland, the court rejected petitioner's ineffective assistance of counsel claim because this error was not "clear-cut and dispositive" "at the time." Of course, it did not have to be. The error had to be such that combined with counsel's other errors, it rendered counsel's performance below reasonable professional standard, and it did.

There is no question that after People v. John, 27 N.Y.3d 294 (2016), decided two years after petitioner's trial, counsel's failure to object to the DNA testimony would have

been reversible error. In John, the Court of Appeals, applied Bullcoming v. New Mexico, 564 U.S. 647 (2011), and held that the proper DNA expert to testify about a DNA match at trial was the "analyst who witnessed, performed or supervised the generation of the defendant's DNA profile or who used his or her independent analysis on the raw data." 27 N.Y.3d at 306. Wong did none of those things. She was a technical reviewer, but she did not observe the testing or draw an independent conclusion. She just reviewed the existing paper file created by her colleagues with the initials DMW, SNP, KLB, BMA, and FR who performed the tests and reviewed the raw data ((ECF Doc#1-2 at 43-45).

While John had not been decided at the time of petitioner's trial, lawyers in New York and elsewhere were successfully challenging the testimony of analysts who, like Wong, had not actually performed or even observed the DNA testing ((ECF Doc#1-2 at 44, citing People v. Morrison, 90 A.D.3d 1554 (4th Dept. 2011); see Young v. U.S., 63 A.3d 1033 (D.C. Court of Appeals 2013)). Lawyers were expected to object to similar testimony ((ECF Doc#1-2 at 45, citing People v. Austin, 30 N.Y.3d 98 (2017); People v. v. Tzintzelis, 35 N.Y.3d 925 (2020)).[2] At the time of trial, under Bullcoming, 564 U.S. 647 (2011); Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009); and People v. Goldstein, 6 N.Y. 3d 119 (2004), Wong's testimony was within the core class of testimony implicating the Confrontation Clause. Had counsel been competent and prepared, she would have objected. Her failure to do so is yet another error contributing to her overall incompetence.

---

[2] The New York Court of Appeals has adopted a "clear-cut and dispositive" standard for assessing counsel's performance where otherwise effective counsel committed a single significant error. See People v. Turner, 5 N.Y. 3d 476, 480 (2005). It has never done so, as here, where counsel's performance is riddled with multiple serious errors reflecting her total lack of preparation.

Respondents argue that the Appellate Division's rejection of the claim was "not contrary to, or an unreasonable application" of Strickland for several reasons (ECF Doc #14 at 17-27). First, even though at the time lawyers routinely raised confrontation clause objections to the DNA testimony of experts in Wong's position, respondents argue that counsel would have had "no basis" to object because at the time, People v. Brown, 13 N.Y.3 332 (1990), was controlling (ECF Doc#14 at 24). Actually, Brown was not controlling. Brown involved a "cold hit." Mr. Brown was not a suspect when the DNA testing was conducted; petitioner was. Further, in Brown, unlike here, the testifying DNA expert had reached her own conclusions from the raw data. People v. John, 27 N.Y.3d 294, 310 (2016). Irene Wong just reviewed what others did and what others concluded.

Second, respondents mistakenly argue that Bullcoming would not support a confrontation clause objection to Wong's DNA testimony (ECF Doc#14 at 25). According to respondents, Wong was not merely "a conduit" for the conclusion of others that violated the Confrontation Clause in Bullcoming (ECF Doc#14 at 22). In fact, Wong was merely a conduit. She never observed or supervised the testing of the DNA material. She did not review the raw data on the computer or the editing of the DNA material (ECF Doc#1-2 at 42-43).

Finally, conflating different standards, respondents argue that the Appellate Division's decision on this error was not contrary to Strickland because the plurality opinion in Williams v. Illinois, 567 U.S. 50 (2012), addressing the confrontation clause aspects of DNA testimony did not provide a clearly established Supreme Court precedent to assess petitioner's claim (ECF Doc#14 at 20-25). The argument could be relevant if petitioner were seeking a writ of habeas corpus based on a confrontation clause violation

requiring a clearly established Supreme Court precedent on the confrontation clause aspects of DNA testimony under 28 U.S.C. §2254(d) (see ECF Doc#14 at 20-25). But petitioner is raising an ineffective assistance of counsel claim governed by the well-established Supreme Court precedent set in Strickland. The failure to object to Wong's DNA testimony was yet another aspect of counsel's overall incompetent performance.

C. Under the proper Strickland standard, counsel's overall performance was (1) deficient and (2) its impact prejudicial.

Under Strickland v. Washington, 466 U.S. 668, 688 (1984), counsel is ineffective where her performance was deficient in that "representation fell below an objective standard of reasonableness under prevailing professional standards and there is a reasonable probability that, absent her unprofessional performance, the result would have been different. In making these determinations, Strickland requires courts to consider counsel's acts or omissions combined and their combined impact. 466 U.S. at 690. Under that standard, petitioner was denied the effective assistance of counsel.

(1) Combined, counsel's errors resulted in a deficient performance.

Counsel's performance fell far below any reasonable professional standard. Counsel did not just fail to object to the critical inadmissible evidence connecting petitioner to the crime – the suppressed clothing, the inadmissible "second mask" and Wong's DNA testimony – she was unprepared throughout. She chose not to make an opening statement, not as a matter of strategy, but because she was not ready. She never objected to the prosecutor's use of the critical suppressed extra-large clothing worn by petitioner but made and withdrew objections to a $100 bill and a $20 bill found in petitioner's pocket that had

been suppressed and that the prosecution did not intend to use.[3] Counsel did not object to the inadmissible and unauthenticated "second mask" but cross-examined Irene Wong about meaningless grey lines on the "second mask" where the DNA sample had been taken. Toward the end of trial, counsel read the DD5s provided by the police and noted that no gun powder residue had been recovered from the glove found in the duffel bag. She asked to know who had performed the test but then, without explanation, withdrew the request (ECF Doc#1-2 at 24). The only explanation for counsel's actions was ignorance, lack of preparation and incompetence. She just said what went through her head with no thought whatsoever. She was not providing representation; she was playing a lawyer.

True, counsel asked a handful of meaningful questions during her cross-examination of Jane Hunt, the victim's partner (ECF Doc.#1-2 at 14). Counsel asked if Hunt knew Lonney Walker and she did. He was tall, just a little shorter than petitioner, weighed 220 pounds, and had been to their apartment. With a few questions, counsel pointed the finger at Lonney Walker as the perpetrator. In summation, however, she completely undermined that moment by pointing the finger at another person, another neighbor, Samuel Nelson, who was 5'7" or almost a foot shorter than the suspect seen by the janitor. Misstating the record, she told the jury that Samuel Nelson had been "ruled out because he lived on the same floor." She said, "that's what we know. Samuel Nelson's hand was in David's blood. Thank You." In fact, Samuel Nelson's prints were not in the victim's blood on the wall, and he had not been ruled out because he lived on the same floor. He had been ruled out because he was a foot shorter than the suspect seen by the janitor.

---

[3] DA suggests the theory was robbery. The first-time counsel objected to the bills., the prosecutor told the court that it would not be using them (((ECF Doc#1-2 at 20)

Respondents noticeably strain to find examples of counsel's competence. Respondents assert that counsel's summation had a theme, i.e., the "circumstantiality of the People's case" (ECF Doc#14 at 8). She challenged the credibility of Detective Anderson who arrested petitioner, as well as the credibility of the witnesses' description of the duffel bag and mentioned that the "second mask" had gone unmentioned. Respondents overlook the irrelevance of Anderson's testimony and the inadmissibility of the "second mask" that should never have been discussed in summation. Respondents also commend counsel for objecting to a power point presented by the prosecutor in summation, but the power point was innocuous, further evidencing counsel's scattered and purposeless approach. Considering counsel's errors together, as required by Strickland, her overall performance was utterly deficient. Contrary to Strickland, the state court looked at two errors individually and separately. It never looked at those two "errors in the aggregate" or combined with all the others in the context of the entire representation. Lindstadt v. Keane, 239 F.3d 191, 204 (2d Cir. 2001) (Strickland requires courts to consider counsel's "errors in the aggregate" when determining whether "they fell outside the wide range of professionally competent assistance.") (alterations and quotations omitted).

(2) But for counsel's deficient performance, the outcome would have been different.

The jury deliberated for 4 days and sent 14 substantive notes. At the end of the third day, the jurors looked tired, and the court wondered whether it should ask them if they had reached a partial verdict. Counsel's deficient performance clearly impacted the outcome because the evidence was far from overwhelming.

There were no eyewitnesses or fingerprints connecting petitioner to the crime. The identification evidence consisted of grainy videos from the ferry terminal and the testimony

of the janitor who, on a December morning, saw a tall person wearing a somewhat generic winter full-face mask and a long winter coat and carrying a generic gym bag.

The murder weapon was found in a duffel bag in the woods and the prosecution had to connect petitioner to the weapon. Most, if not all, the connecting evidence was inadmissible. Had counsel objected to the inadmissible evidence, there would have been no "second mask," no full DNA profile, and most probably no DNA evidence at all. But all that evidence was introduced, and the jury focused on the inadmissible evidence when deliberating. On the first day of deliberations, it asked to review it all. It asked for "Defendant's clothing, money etc.," the description of petitioner by the arresting officer, Wong's DNA testimony. The court's answers aggravated the prejudice. In considering the request for "defendant's clothing," the court asked the jury if it meant "the clothing recovered from the duffel bag, clothing that the defendant was allegedly wearing, both" (ECF Doc#1-2 at 27-28). In other words, at the time when the jury was most open to suggestions, the court told the jury that the clothes in the bag belonged to petitioner, as if that fact had been established. It had not. It was the critical question the jury had to decide. Counsel did not object to any of this. After the jury asked for the "DNA testimony and evidence" (ECF Doc#1-2 at 27), the entire testimony of Irene Wong was read back. That testimony included the only full DNA profile found on the inadmissible "second mask," should never have been before the jury, let alone read back.

Not only did counsel not object to the inadmissible evidence, but she focused on irrelevant details and, in doing so, indirectly strengthened the inadmissible evidence. By focusing on the irrelevant suppressed $100 and $20 bills, counsel appeared to be trying to

divert the jury's attention.[4] By cross-examining Irene Wong about a grey marks on the inadmissible "second mask," counsel indirectly focused the jury's attention on the DNA evidence from the inadmissible "second mask." At one point, counsel noticed that no gun powder residue had been recovered from a glove found in the duffel bag and asked to know who had performed the test but then, with no explanation withdrew the request (ECF Doc#1-2 at 24). It all looked like theater rather than legal representation.

In summation, counsel's addition of Samuel Nelson, a foot shorter than the suspect, as a potential suspect completely undermined the few meaningful questions she asked about Lonney Walker. These questions established that the victim had a friend called Lonny Walker who was a little shorter than petitioner and visited them occasionally (ECF Doc#1-2 at 14). In summation, however, she pointed the finger at Samuel Nelson, the 5'7" neighbor. She argued, incorrectly, that his handprints had been found in the blood on the hall by the victim's apartment. She also told the jury that Samuel Nelson had been eliminated as a suspect because he was a neighbor. In fact, he had been eliminated because he was 5'7" and his prints were not in the blood found on the wall (ECF Doc#1-2 at 26). Her summation made no sense and the jury noticed. On the first day, the jury asked for the testimony related to Samuel Nelson, the 5'7" neighbor. On the second day, the jury asked for the testimony related to Lonney Walker, the 6'6" friend. The jury was confused.

The combined prejudice of counsel's errors – big and small – was obvious. The Appellate Division never considered counsel's errors together or their combined impact. That analysis is contrary to Strickland and warrants issuance of the writ.

---

[4] Respondents mistakenly suggests that the theory was robbery. The first-time counsel objected to the bills., the prosecutor told the court that it would not be using them ((ECF Doc#1-2 at 20).

## CONCLUSION

For The Reasons Stated Above And The Initial Memorandum, The Petition Should Be Granted, Petitioner's Convictions Vacated And, Unless He Is Re-Tried Within 60 Days, The Charges Dismissed And Petitioner Released.

Respectfully submitted,

Natalie Rea (NR 2266)

NATALIE REA (NR 2266)
Attorney for Defendant-Petitioner

February 27, 2024