UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
Armand Skrine,

                         Petitioner,                         **<u>MEMORANDUM & ORDER</u>**
                                                       23-CV-04575 (DG)

        -against-

Christopher Collins,

                         Respondent.
------------------------------------------------------------------X
DIANE GUJARATI, United States District Judge:

       By Petition filed June 20, 2023, Petitioner Armand Skrine, incarcerated at Great

Meadows Correctional Facility, commenced this action pursuant to 28 U.S.C. § 2254.  *See*

Petition ("Pet."), ECF No. 1.  Petitioner challenges his 2014 conviction in the Supreme Court of

the State of New York, County of Richmond (the "Richmond County Supreme Court") of

murder in the second degree and criminal possession of a weapon in the second degree and

asserts as the basis for the Petition that he received ineffective assistance of counsel in violation

of the Sixth Amendment.  *See generally* Pet.

       For the reasons set forth below, the Petition is DENIED.

**BACKGROUND**[1]

**I.**      **The Shooting of David Williams and Petitioner's Arrest**[2]

       On December 8, 2011, David Williams was shot to death inside the building located at

195 Steuben Street in Staten Island, New York ("195 Steuben Street").  A few minutes after the

---

[1]  Familiarity with the State Court Record ("S.R."), ECF No. 12-1, which includes, *inter alia*, the relevant state court filings, orders, and trial record, is assumed herein.

[2]  The facts set forth in this section are taken largely from the state court's decision on Petitioner's motions to suppress, discussed further below, and are set forth in substance and in summary.  *See* S.R. 1-7; *see also* S.R. 162-228.

shooting, a radio run of the shooting went out and about five minutes thereafter, law enforcement officers (who did not have a description of a suspect) saw Petitioner walking along a service road near a wooded area that was approximately a five-minute walk from 195 Steuben Street and that had a muddy path that led to 195 Steuben Street. Petitioner appeared nervous, made eye contact with one of the officers, and began to walk faster. The officers got out of their marked police vehicle and approached Petitioner, who appeared sweaty (in 40 to 45-degree weather) and fidgety and who refused the officers' request for identification. Petitioner was then handcuffed. Petitioner had no blood on him but did have mud on his sneakers. A wallet was recovered from Petitioner's person with his driver's license and counterfeit United States currency. Petitioner thereafter was brought to the police precinct, where, prior to the administration of *Miranda* warnings, Petitioner made a statement with respect to the counterfeit currency. Later the same day, another law enforcement officer, who was not aware that anyone had been arrested in connection with the shooting of Williams, discovered a black and gray duffel bag in the wooded area. Inside the bag was, *inter alia*, a semiautomatic weapon.

## II.    The State Court Proceedings

### A.    The Indictment

On December 29, 2011, Petitioner was charged in a seven-count Indictment with: (1) Murder in the Second Degree (P.L. § 125.25-1); (2) Criminal Possession of a Weapon in the Second Degree (P.L. § 265.03-1(b)); (3) Criminal Possession of a Weapon in the Second Degree (P.L. § 265.03-3); (4) Criminal Possession of a Weapon in the Third Degree (P.L. § 265.02-3); (5) Criminal Possession of a Weapon in the Third Degree (P.L. § 265.02-7); (6) Criminal Possession of a Forged Instrument in the First Degree (P.L. § 170.30); and (7) Criminal Possession of a Forged Instrument in the First Degree (P.L. § 170.30). *See People v. Skrine*,

Indictment No. 454/2011 (N.Y. Sup. Ct.).[3]

### B.    Pretrial Motions

Prior to trial, Petitioner moved to suppress certain evidence and on June 14, 2013, a *Dunaway*/*Huntley*/*Mapp*/*Wade* hearing was held before the Honorable Robert J. Collini of the Richmond County Supreme Court at which three law enforcement officers testified: Detective Daniel Guariano, who had recovered the duffel bag containing the semiautomatic weapon; Officer Jeffrey Anderson, who was one of the officers who had encountered Petitioner on the service road near the wooded area; and Detective Edward T. Patterson, who had interacted with Petitioner at the police precinct, including with respect to the administration of *Miranda* warnings and with respect to Petitioner's statement about the counterfeit currency.  *See* S.R. 162-228.  At the hearing, Petitioner's counsel, *inter alia*, cross-examined each witness, conducted *voir dire* as to particular exhibits, and objected to the admission of particular exhibits.  *See* S.R. 162-228.

On July 17, 2013, Justice Collini issued a "Decision and Order on Defendant's Motions to Suppress," granting in part and denying in part the motions to suppress.  *See* S.R. 1-7. Specifically, Justice Collini ruled that "the recovery of physical evidence from defendant's person (i.e., the counterfeit currency and identification cards) must be suppressed;" that "defendant's statement to the police at the 120th Precinct is suppressed;" that "Defendant's motion to suppress physical evidence as to the duffel bag and its contents is DENIED in all respects;" and that a photo array that had been conducted on January 6, 2012 was not unduly suggestive and "was clearly attenuated from any unlawful stop."  *See* S.R. 1-7.

---

[3]    The Court takes judicial notice of the Indictment.

### C.    The Trial

A jury trial was held from February 26, 2014 through March 14, 2014 over which the Honorable Stephen Rooney presided.  *See* S.R. 229-1041.

### 1.    Opening Statements

Following preliminary instructions to the jury, *see* S.R. 473-82, the People delivered an opening statement, *see* S.R. 483-88.  In its opening statement, the People asserted that the evidence would prove that Petitioner, who was Williams' friend and former college roommate, traveled to Williams' apartment in Staten Island on December 8, 2011 with a duffel bag containing a loaded assault rifle and shot Williams twice, killing him.  The People previewed that the jury would learn: that video from the day of the murder showed a man with a large black and gray duffel bag taking the ferry to Staten Island; that just prior to the murder, an extremely tall man wearing a dark face mask was seen walking into Williams' building at 195 Steuben Street with a large black and gray duffel bag; that less than ten minutes after the police received the call of shots fired, Petitioner was stopped just minutes away from 195 Steuben Street while walking on a service road near a wooded area, where no other people were walking; that a large black and gray duffel bag was recovered from the wooded area; and that the duffel bag contained, among other items, a defaced assault rifle identified as the murder weapon, magazines with additional ammunition, and a black face mask containing DNA belonging to Petitioner.

Petitioner's counsel chose not to present an opening statement at the start of trial, *see* S.R. 488, having explained to the court that she would like the opportunity to reserve her opening for after the People rest because she was not sure what defense she was going to be using and did not want to promise the jury something she could not deliver, *see* S.R. 471 (indicating to the court that she understood it was in the court's discretion to allow her to reserve opening).

## 2.    The People's Case

At trial, the People called sixteen witnesses and offered a variety of other evidence, including physical and photographic evidence.[4]  Consistent with the People's opening statement, the People presented evidence that Williams was murdered inside the building at 195 Steuben Street on December 8, 2011; that Petitioner and Williams knew each other; that Petitioner was very tall; that Petitioner possessed a black and gray duffel bag; that a very tall man wearing a mask and carrying a bag was seen inside the building at 195 Steuben Street around the time of the murder; that very shortly after the murder, Petitioner was stopped while walking in close proximity to 195 Steuben Street; and that a black and gray duffel bag was recovered from the wooded area near where Petitioner was stopped, containing the murder weapon and two masks with DNA profiles matching Petitioner.[5]

Jaclyn Nicole Hunt, who lived with Williams and was his fiancée at the time of the murder, testified that Petitioner was Williams' former college roommate; that after college, Petitioner and Williams kept in touch; and that Petitioner, who did not live on Staten Island, had visited Williams' home on Staten Island on various occasions – every few months or so – and had come to various family functions.  *See* S.R. 710-11, 713-15.  Hunt also testified that

---

[4]    The witnesses were: (1) NYPD Detective Robin Steneck, *see* S.R. 489-557; (2) Jessica Diniso, *see* S.R. 571-76; (3) Jean Loiseau, *see* S.R. 577-96; (4) NYPD Officer Vincent Aguilo, *see* S.R. 597-609; (5) NYPD Sergeant John Trzcinski, *see* S.R. 611-20; (6) Michael Casiano, *see* S.R. 628-34; (7) Janet Smith, *see* S.R. 634-55; (8) NYPD Detective Jeffrey Anderson, *see* S.R. 655-66; (9) NYPD Officer Anthony Jacobs, *see* S.R. 666-80; (10) James Vitale, *see* S.R. 681-87; (11) NYPD Detective Edward Patterson, *see* S.R. 687-703; (12) Jaclyn Nicole Hunt, *see* S.R. 709-36; (13) Patricia Zippo, *see* S.R. 736-42; (14) NYPD Detective James Clontz, *see* S.R. 742-86; (15) Irene Wong, *see* S.R. 787-814; and (16) Dr. Stephen deRoux, *see* S.R. 824-43.

[5]    The Court assumes familiarity with the entirety of the trial record and summarizes the trial record below only to the extent necessary for present purposes.

Petitioner was a college basketball player and was over 6'5" – probably about 6'9". *See* S.R. 713.[6] Hunt testified that the last time she saw Petitioner, which was "after Thanksgiving," he had a bag with him; that the bag was heavy and made a loud sound when Petitioner put it down; and that the bag was the same bag that was later recovered by law enforcement. *See* S.R. 715-16.

Jean Loiseau, a maintenance worker at both 195 Steuben Street and 231 Steuben Street, testified that the lock to the entrance of the building at 195 Steuben Street was broken and that anybody could get into the building; that as of December 8, 2011, the surveillance camera in the lobby of the building at 195 Steuben Street was not working; that on the morning of December 8, 2011, he saw a man standing in the lobby of the building at 195 Stueben Street; that the man was taller than Loiseau, who was 6'4"; that the man was "covered" – he was wearing a long coat, glove, and face mask – and was carrying a sports bag, the size of which was approximately 16 inches. *See* S.R. 577-84. When shown evidence at trial of a coat, face mask, and bag, Loiseau confirmed that the coat looked like the coat he saw on the man in the lobby and that the face mask and bag were the kind he had seen on the man in the lobby. *See* S.R. 584-85.

Janet Smith, who lived on the same floor as Williams in the building at 195 Steuben Street, testified that shortly before noon on December 8, 2011, she left her apartment to borrow a lighter in order to light her stove; that she had intended to borrow a lighter from Apartment 7L – Williams' apartment – but that when she got there, she heard male voices talking in the apartment, assumed that Hunt was not home, and went to the fourth floor instead, where she borrowed a lighter from someone else; that she then went back to her apartment, lit her stove,

---

[6]  Detective Patterson testified that Petitioner was about 6'7" and weighed "approximately 260, 240, 260." *See* S.R. 703. Detective Anderson testified that Petitioner was approximately 6'5". *See* S.R. 664.

and thereafter left her apartment to return the lighter; that she "heard things being moved around shuffling" – "like furniture moving around, people fighting" and "heavy tumbling, things being thrown over" – in Williams' apartment, she turned, and "the next thing [she] heard was a bang, sounds like a shot, so [she] started running;" that she then saw the door of Williams' apartment open and saw Williams come out with his hands on his stomach and that he "walked a few doors almost to [her] door and he fell to the floor" and said: "Help me.  Oh, God help me."  *See* S.R. 634-40.  Smith further testified that when Williams fell to the floor, she was already to the staircase door, that she then "took the first and second stairs," "heard another bang, a lot of bang," ran to the apartment where she had gotten the lighter, knocked on the door, and said "call the cops my neighbor was shot."  *See* S.R. 640-41.

NYPD Detective Jeffrey Anderson testified that on December 8, 2011 at approximately 11:50 a.m., he received a radio run regarding a shooting at 195 Steuben Street; that while en route to 195 Steuben Street, he drove over the Verrazzano Bridge towards Narrows Road North and approximately five minutes after he received the radio run, he "engaged an individual that looked suspicious on the roadway on Narrows Road North;" that the area was a wooded area and "a desolate location with no sidewalks;" that he did not see any pedestrian traffic other than the suspicious-looking individual, who he identified in court as Petitioner; that the distance between 195 Steuben Street and where he encountered Petitioner is a "walkable distance" – "approximately three blocks" – and that there is "a walking path that you can take" between 195 Steuben Street and where he encountered Petitioner.  *See* S.R. 655-61.  Detective Anderson also testified that when he observed Petitioner, Petitioner was walking in the opposite direction of him, that Petitioner "looked at [him] nervously," that Petitioner was wearing dark colored clothing and had a Yankees cap on, that Petitioner made eye contact with him and started

walking a little faster away from him, that Petitioner "looked very sweaty" although it was a very cool day, that Petitioner's shoes were muddy, and that there was mud in the wooded area. *See* S.R. 661-63.

NYPD Officer Anthony Jacobs testified that on December 8, 2011, he and his K-9 partner Storm were called upon to do an evidence search at 195 Steuben Street; that when they arrived there, he was directed to go to the wooded area where Petitioner had been encountered; that when he arrived at the wooden area, at approximately 3:45 p.m., he deployed Storm and Storm alerted to a bag covered with leaves; that the bag was a black and gray duffel bag, which was closed when found and thereafter opened in Officer Jacobs' presence; that Officer Jacobs saw a firearm and a towel inside the bag; and that nothing was removed from the bag in his presence and the bag was safeguarded by a member of the NYPD. *See* S.R. 666-75.

NYPD Detective Robin Steneck, a member of the Crime Scene Unit who was assigned to process the scene at 195 Steuben Street and the scene at the wooded area, testified about her processing of certain evidence, including the duffel bag recovered from the wooded area. *See* S.R. 489-557. Detective Steneck testified that she took the duffel bag recovered from the wooded area to her truck to process the bag and that the contents of the bag included, *inter alia*, a 46 XL long brown coat, a 3XL gray hooded sweatshirt, a 3XL black hooded sweatshirt, a black mask with eye holes, a black sock containing numerous bills inside, a black spade with yellow handle, two black umbrellas, a white rope approximately nine feet long, a black glove with yellow trim, two white latex gloves, a loaded rifle with a magazine in the firearm and live cartridge in the chamber, an additional magazine, and a discharged shell casing. *See* S.R. 534-41. Detective Steneck also testified that she photographed Petitioner at the precinct and that he was wearing, *inter alia*, a 4XL black jacket, size 13 shoes, and size W38 pants. *See* S.R. 541-46.

Dr. Stephen deRoux, Deputy Chief Medical Examiner at the Office of Chief Medical Examiner ("OCME") and an expert in forensic pathology, testified about the autopsy performed on Williams and testified that the cause of death was "[g]unshot wounds of head and chest with injuries of brain, heart and . . . lungs." *See* S.R. 825-28, 842-43.

NYPD Detective Edward Patterson, the case detective on the Williams murder investigation, testified regarding the investigation, explaining that the crime scene was examined and processed; that forensic evidence – including from an assault rifle, shell casings, articles of clothing, and a bag – was collected and sent to the laboratory for analysis; that a canvass of the building was conducted; and that a latent print was recovered in the seventh floor hallway, which was determined to belong to Samuel Nelson, who lived at 195 Steuben Street, was 5'7" and approximately 170 pounds, and was not a suspect in the investigation. *See* S.R. 687-93.

As part of the investigation, surveillance footage from the Staten Island Ferry/terminals on the morning of December 8, 2011 was reviewed and, as Detective Patterson testified, the footage depicted "a tall fellow" wearing a dark jacket and a gray hooded sweatshirt with a baseball cap underneath, the brim of which appeared to be black; the footage depicted that the individual was carrying a large gray and black duffel bag with a shoulder strap, which appeared to have "some object within [it] giving it shape;" and the duffel bag appeared to be the same duffel bag recovered from the wooded area and the gray hooded sweatshirt appeared to be the same sweatshirt recovered from inside the duffel bag. *See* S.R. 693-700; *see also* S.R. 628-34, 681-87.

NYPD Sergeant John Trzcinski of the Property Clerk Division testified about the vouchering of various items relating to the investigation – including a long brown coat, a black mask with eye holes, a black sock, a black glove with yellow trim, a black waist-length jacket, a

black long-sleeve shirt, a black duffel bag with gray trim, a gray hoodie zip-up sweatshirt, a pink bath towel, a pink hand towel, a black hoodie sweatshirt pullover, black ankle sneaker boots, blue jeans, black shorts with white trim, a gray sleeveless T-shirt, a black spade with yellow handle, two black umbrellas, and a white robe – and testified that "Superstorm Sandy" flooded and destroyed the warehouse that stored the vouchered items and that the items were contaminated and/or compromised.  *See* S.R. 611-20.

NYPD Detective James Clontz of the Forensic Investigation Division, an expert in the field of ballistics, testified about the analysis he conducted and that it was his opinion to a reasonable degree of scientific certainty that the two shell casings that had been recovered were fired from the firearm that was found in the duffel bag and also testified that the firearm was defaced in that it was missing its serial number.  *See* S.R. 742-80.

Irene Wong, a "Criminalist Level IV" with the Forensic Biology Department of OCME and an expert in the field of DNA analysis, testified that OCME received for analysis biological material from, *inter alia*, Petitioner, items taken from Williams (blood, scalp hair, fingernails, and swab of a bite mark), a swab from a wall of the seventh floor hallway of the building at 195 Steuben Street, and items from the duffel bag recovered in the wooded area, including the long brown coat and the black mask and also including another black mask from inside the left outside pocket of the coat; testified that of the items submitted, OCME was able to generate a DNA profile for each of the two black masks; testified that as to each mask, only one person donated to the sample; and testified to a reasonable degree of scientific certainty that Petitioner was the donor of the samples from the two masks.  *See* S.R. 787-813.[7]  Wong explained that as a

---

[7]  With respect to one of the masks, Wong testified that OCME was not able to obtain a full profile.  *See* S.R. 811.

Criminalist Level IV, she supervised Criminalists Level II and Criminalists Level III on their casework, which meant that she "do[es] a technical review on their work to make sure that everything is correct," and that she "triage[s] evidence when it comes in."  *See* S.R. 787-88.

During the People's case, Petitioner's counsel cross-examined various of the People's witnesses and lodged objections to testimony and other evidence offered by the People.  Through her cross-examination, Petitioner's counsel, *inter alia*, suggested flaws in the People's narrative and suggested potential alternative narratives.

For example, Petitioner's counsel cross-examined Loiseau, the maintenance worker who had testified about his observations at 195 Steuben Street on the morning of the murder, eliciting that even after Loiseau looked at the individual in the lobby of the building, the individual stayed and waited for the elevator, *see* S.R. 591-92 – from which a jury could draw the inference that the individual was not on his way to commit murder given that he did not appear to be concerned that he had been observed.  Through her cross-examination of Loiseau, Petitioner's counsel also established that in addition to having an unlocked front door, the building had an unlocked back door, *see* S.R. 591 – from which a jury could draw the inference that someone had managed to enter the building undetected through the back – and Petitioner's counsel suggested that Loiseau's ability to recall the events of the morning and the timing of those events was flawed, *see* S.R. 588-90.

Petitioner's counsel also cross-examined Smith, the neighbor who had testified to hearing sounds in Williams' apartment and to seeing Williams in the hallway after having been shot. Through cross-examination of Smith, Petitioner's counsel elicited testimony from which a jury could have concluded that Smith's ability to perceive the events at issue properly, her memory, and/or her credibility were faulty – including eliciting that Smith claimed to have mistakenly

gone to the wrong apartment on the fourth floor to borrow the lighter and that Smith was "scared to death" at the time of relevant events. *See* S.R. 642-54.

On cross-examination of Hunt, who had testified about having heard a sound when Petitioner put his bag down on a visit preceding the murder, Petitioner's counsel elicited that Hunt did not know if the bag had pegs on the bottom. *See* S.R. 730. Petitioner's counsel also suggested on cross-examination that the bag could have been blue, not black and gray, which undercut Hunt's testimony on direct examination that the bag she saw in November was the bag recovered in connection with the investigation. *See* S.R. 730 (when asked on cross-examination if she was sure that the bag wasn't blue, Hunt responding that "[i]t was a dark-colored bag"). Petitioner's counsel also elicited testimony from Hunt about Samuel Nelson and about Lonney Walker, including eliciting that Walker was tall – indeed only "[a] little shorter" than Petitioner – was "a big guy," had been to Williams' apartment, and had dated someone in Hunt's family. *See* S.R. 732-34.

In addition, Petitioner's counsel elicited testimony during her cross-examination of certain law enforcement witnesses from which a jury could draw the inference that the investigation was sloppy and/or otherwise flawed. For example, Petitioner's counsel elicited from NYPD Officer Aguilo, who had participated in the investigation, that when he went into Williams' apartment, he went in "with urgency," "had to step around things and move around things to go look into the different rooms," and was not wearing protective covering on his shoes, and elicited that when Officer Aguilo got to the apartment, the door was not fully closed. *See* S.R. 608-09. Petitioner's counsel also cross-examined Detective Anderson in a manner that appears to have been aimed at challenging his credibility with respect to his testimony that when he was driving and Petitioner was walking, the two made eye contact and that Petitioner looked

nervous.  *See* S.R. 664-66.  In addition, Petitioner's counsel cross-examined Detective Clontz –

the ballistics expert who on direct examination had testified that it was his opinion to a

reasonable degree of scientific certainty that the two shell casings that had been recovered were

fired from the firearm that was found in the duffel bag – and elicited that he neither swabbed nor

fingerprinted the firearm and did not know if a gun powder test had been done on the firearm.

*See* S.R. 781-82.  And Petitioner's counsel cross-examined Wong – who on direct examination

had testified that OCME had concluded that DNA from Petitioner was recovered from the two

masks recovered during the investigation – eliciting that Wong could not tell the last time the

donor wore the two masks and that it could have been a year earlier.  *See* S.R. 813-14.

Petitioner's counsel also cross-examined Michael Casiano – a security inspector with the

Department of Transportation who was responsible for security cameras in the Staten Island

Ferry terminal and on the ferry boats themselves, *see* S.R. 628-29 – eliciting testimony that more

than six police officers work each shift and that two are usually assigned to the boats, *see* S.R.

633, from which testimony a jury could draw the inference that someone would not be likely to

bring a firearm onto the ferry.

### 3.    The Charge Conference and the Motion to Dismiss

After the People rested, Petitioner rested without presenting a defense case.  *See* S.R.

864.  The record reflects, however, that although Petitioner did not present a case, Petitioner's

counsel prepared for a potential defense case and gave considered thought to the decision about

whether to present such a case.  *See, e.g.*, S.R. 816-22 (referencing potential witnesses and also

referencing plans to spend time with Petitioner on Rikers Island over the weekend to prepare

him).

After the parties rested, the court held a charge conference, at which Petitioner's counsel

was actively engaged.  *See* S.R. 848-57.

Following the charge conference, Petitioner's counsel moved to dismiss the Indictment "on the grounds that the prosecution hasn't proved a legally sufficient case."  *See* S.R. 857-58. Petitioner's counsel argued:

> [T]he People have not proven Count 1, Murder in the Second Degree, and People have not presented legally sufficient evidence to establish that Mr. Skrine committed Murder in the Second Degree.  As well, they did not present legally sufficient evidence to charge -- to establish that Mr. Skrine committed Count 3, Criminal Possession of a Weapon in the Second Degree.  And, as well, they did not present legally sufficient evidence to establish that Mr. Skrine committed Count 6, Criminal Possession of a Forged Instrument in the First Degree.

*See* S.R. 858.  The People opposed the motion, resting on the record.  *See* S.R. 858.

Justice Rooney denied the motion in its entirety, stating that he "[thought] a legally sufficient case was presented considering the circumstantial evidence charge."  *See* S.R. 858-59. The case then proceeded to closing arguments.

### 4.    Closing Arguments and Further Decision on the Motion to Dismiss

Petitioner's counsel delivered a closing argument.  At the outset, Petitioner's counsel argued that "[n]ot guilty is the only possible verdict in this case," that the People "certainly didn't prove that Armand committed any crimes beyond a reasonable doubt," and that the People "couldn't even prove their own theory."  *See* S.R. 867.

Petitioner's counsel went on to argue that the People had not proven the manner in which Williams was shot, had not proven that Petitioner was the person on the ferry, had not proven that Petitioner had entered the building at 195 Steuben Street on the day of the murder, had not proven that the person who entered the building with the mask was the shooter, had not proven that the mask that the person was wearing was the mask later recovered, had not proven how long it had been since anyone had worn the mask in the duffel bag, had not proven that the bag

belonged to Petitioner, and had not proven whose clothes were in the bag.  *See* S.R. 869-71.
Petitioner's counsel – relying on testimony she had elicited from Hunt on cross-examination –
argued that the clothing could have belonged to Lonney Walker.  *See* S.R. 871.  And Petitioner's
counsel argued that Lonney Walker "would have had to hide his face because everybody would
know him walking into the building."  *See* S.R. 875.

Petitioner's counsel also focused the jury on the credibility of Detective Anderson,
arguing to the jury that the testimony that when "racing to the crime scene . . . he happens to
make eye contact with [Petitioner] and he appeared nervous and that's why he stopped him" was
"ridiculous."  *See* S.R. 872.

Relying on testimony she had elicited on cross-examination of security inspector Casiano
about police presence at the ferry, Petitioner's counsel also argued that "[i]t just doesn't make
any sense" that one would calmly walk past uniformed police officers and K-9 teams carrying a
duffel bag with an AK-47 in it.  *See* S.R. 874.

Petitioner's counsel referenced the testimony of Loiseau that the bag he saw on the
individual he saw in the lobby of the building at 195 Steuben Street was only 16 inches.  *See* S.R.
875.  And she referenced the testimony she had elicited from Hunt on cross-examination that cast
doubt on the color of the bag Hunt had seen in November.  *See* S.R. 876.

In addressing the testimony of Wong, Petitioner's counsel raised a question about where
the second mask had come from.  *See* S.R. 881.

Petitioner's counsel also pointed out to the jury that there was evidence about the
recovery of blue jeans but that there was testimony that Petitioner had been wearing black jeans.
*See* S.R. 882.

And, Petitioner's counsel pointed out to the jury that the People's theory seemed to be

that Petitioner had shot *his friend* "for absolutely no reason."  *See* S.R. 868.

Following Petitioner's closing argument – and outside the presence of the jury – Petitioner's counsel objected to certain demonstratives that the People intended to use during closing argument.  *See* S.R. 888-96.  After resolution of the objections, the People delivered a closing argument in which the evidence – much of which was circumstantial – was marshaled. *See* S.R. 897-927.

Following closing arguments, Justice Rooney reversed in part his prior ruling on Petitioner's motion to dismiss and dismissed Count Six, stating that "[t]here is no question I should have granted the motion" as to Count Six and "should have dismissed it before [the parties] summed up."  *See* S.R. 930-37.

Justice Rooney thereafter gave his jury instructions.  *See* S.R. 937-68.  Two counts of the Indictment were submitted to the jury: Count One (Murder in the Second Degree) and Count Three (Criminal Possession of a Weapon in the Second Degree).  *See* S.R. 851-53, 930-68.

### 5.    Jury Deliberations and Verdict

Jury deliberations began on March 11, 2014.  *See* S.R. 969.  On March 14, 2014, the jury returned its verdict, finding Petitioner guilty of Count One (Murder in the Second Degree) and Count Three (Criminal Possession of a Weapon in the Second Degree).  *See* S.R. 1029, 1037-40.[8]

During the multi-day deliberations, there were numerous jury notes.  *See* S.R. 969-1037. Notably, the jury asked to review a variety of evidence, including: testimony of Detective Anderson, testimony of Loiseau, testimony about Petitioner's clothing, testimony about Samuel

---

[8]   Count Three of the Indictment was referred to by the jury as Count Two, *see* S.R. 1038, likely because only two counts were submitted to the jury.

Nelson's prints, ferry terminal videos, DNA testimony and evidence, ballistic evidence, photographs of items found on Petitioner, photographs of the outside area where Petitioner was apprehended, and photographs of the hallway where Williams was found.  The jury also asked for a list of all items found in the duffel bag and asked whether there was testimony regarding fingerprints found in the apartment.  In addition, the jury asked for readback of Petitioner's counsel's questions regarding Lonney Walker and answers thereto and asked for the portion of Smith's testimony about hearing voices in Williams' apartment prior to borrowing the lighter. The jury also asked that the judge review the definition of circumstantial evidence, intent, and reasonable doubt and asked: "What were the Judge's instructions about Lonney Walker?"[9]

Petitioner's counsel participated in the process of determining appropriate responses to the jury's notes and advocated for certain responses to the jury's inquiries.  *See* S.R. 969-1037.

### D.    Sentencing

After trial and prior to sentencing, Petitioner obtained new counsel.  *See* S.R. 1050-51.

At sentencing, which took place on July 29, 2014, Justice Rooney, noting that he had presided over the trial, stated, *inter alia*:

> The evidence indicated that the defendant and the victim had known each other since college, and that on the day in question the defendant went to the victim's apartment with an AK 47 semiautomatic rifle and shot the victim twice.
>
> One shot penetrated the chest and went through the lungs and the heart.  The other shot went through the victim's head.
>
> The evidence indicated that this was delivered while the victim was lying prone on the hallway floor.
>
> As the D.A. noted, the medical examiner testified that each shot was fatal.
>
> . . .

---

[9]  The parties agreed that the judge had not given any instructions about Lonney Walker.  *See* S.R. 1016.

These were senseless crimes, as far as I can tell, and committed in a brutal manner with tragic effect.

*See* S.R. 1055-56.

Justice Rooney thereafter imposed (1) an indeterminate sentence of 25 years to life on Count One and (2) a determinate sentence of 10 years, to include and to be followed by a two-and-one-half-year period of post-release supervision on Count Three and directed that the sentences run concurrently with each other. *See* S.R. 1057-59.[10]

### E.    Petitioner's State Court Appeal

Petitioner appealed the judgment of conviction to the Supreme Court of the State of New York, Appellate Division, Second Judicial Department (the "Appellate Division"). *See* Pet. at 2 (ECF-generated pagination); S.R. 8-79, 127-49. On appeal, Petitioner argued that the judgment must be reversed and a new trial ordered and that should the court not reverse and order a new trial, the sentence should be reduced. *See* S.R. 74.

More specifically, Petitioner argued two points: (1) "Where the People's case was based entirely on the inadmissible hearsay testimony of an OCME analyst who did not construct the DNA profile; an inadmissible, never-authenticated mask with the only full DNA profile; and the improper, repeated use of Appellant's suppressed clothing, counsel's failure to object to any of this inadmissible evidence deprived Appellant of the effective assistance of counsel, mandating reversal" and (2) "Given Appellant's difficult background, history of mental illness, insignificant criminal record, and expressed remorse, the maximum sentence of 25 years to life was excessive and should be reduced." *See* S.R. 8-79.

---

[10] Prior to sentencing, Petitioner's trial counsel filed a "330.30 motion," which was denied at sentencing. *See* S.R. 1043, 1050-51. Petitioner's trial counsel also asked for a "730 examination" and Petitioner "at one point . . . was found unfit to proceed." *See* S.R. 1053.

In arguing that his counsel was ineffective, Petitioner argued that counsel's performance "fell far below reasonable objective standard" because counsel "did not object to the People's critical but inadmissible evidence," namely, Wong's testimony, one of the masks, and Petitioner's clothing; that counsel's "indecision evinced a lack of preparation;" that counsel "gave no opening and an incoherent summation;" and that the jury deliberated for four days and, "but for counsel's incompetence, the outcome would have been different." *See* S.R. 49-69; *see also* S.R. 128-44.

In opposition to Petitioner's appeal, the People argued that Petitioner's representation at trial "was thoroughly effective," that Petitioner "was appropriately sentenced to 25 years to life," and that the judgment should be affirmed in all respects. *See generally* S.R. 80-124.

In arguing that Petitioner's counsel rendered effective assistance, the People argued, *inter alia*, that Petitioner "received the benefit of thorough and impassioned representation, by an attorney well versed in the intricacies of New York criminal procedure;" that the "attorney was faced with significant evidence of her client's guilt;" that Petitioner's "ties to the scene, and to the apparent killer, were virtually innumerable;" that "apart from the general notion that the evidence of the killer's identity would be challenged – and that Williams's regular access to the apartment would be helpful – an effective defense theory would largely be contingent on the outcome of cross-examination: on whatever discrepancies, weaknesses, and doubts emerged from prodding at witness testimony;" that counsel's "initial desire to defer her opening until she heard the People's case . . . was understandable;" that counsel's performance evinced "coherent tactics and overall competence;" and that "[t]he theme of [counsel's] summation was the overwhelming circumstantiality of the People's case" – as counsel pointed out, the People's case relied on inferences about the manner in which the victim was shot, inferences about the identity

of the ferry rider and the man standing in the lobby, inferences that one commonly available mask is the same as another, inferences that one commonly available duffel bag is the same as another, and the inference that a gun was used by the same person whose DNA was recovered from a neighboring mask. *See* S.R. 80-119. In their brief on appeal, the People pointed to effective cross-examination by Petitioner's counsel and argued that counsel's "vigorous closing argument arrived amid – and in some ways was *made possible by* – other displays of alertness and fluency in the relevant facts and law" and that "[f]or her work, counsel can reasonably be credited with the jury's considerable deliberation over an extremely strong circumstantial case." *See* S.R. 98-108. The People also argued that "counsel's treatment of the DNA evidence and her client's clothing were *not error*, let alone the sort of error that would sufficiently prejudice her client and sufficiently taint her overall performance to amount to an ineffective-assistance reversal." *See* S.R. 108-19 (discussing, *inter alia*, Confrontation Clause and pre-trial suppression ruling).

By Decision & Order dated January 12, 2022, the Appellate Division affirmed the July 29, 2014 judgment of the Richmond County Supreme Court convicting Petitioner of murder in the second degree and criminal possession of a weapon in the second degree. *See* S.R. 148-49. More specifically, the Appellate Division noted its "responsibility to conduct an independent review of the weight of the evidence" and stated that upon reviewing the record, the Appellate Division was "satisfied that the verdicts of guilt were not against the weight of the evidence." *See* S.R. 148. The Appellate Division further stated that:

> The evidence, the law, and the circumstances of this case, viewed in the totality and as of the time of the representation, reveal that counsel provided the defendant with meaningful representation. Contrary to the defendant's contention, counsel was not ineffective for failing to assert a Confrontation Clause challenge to the testimony of a criminalist employed by the Office of the Chief Medical Examiner of the City of New York. The alleged error involves an issue

which was not so clear-cut and dispositive at the time of the defendant's trial that no reasonable defense counsel would have failed to assert it.  In addition, counsel's failure to object to improper testimony and evidence regarding the clothing worn by the defendant at time of his arrest was not sufficiently egregious and prejudicial as to compromise the defendant's right to a fair trial.

*See* S.R. 148-49 (alterations accepted) (quotations and citations omitted) (citing and quoting various New York state cases).

By letter dated January 18, 2022, Petitioner sought leave to appeal the Appellate Division's January 12, 2022 decision to the New York Court of Appeals (the "Court of Appeals").  *See* S.R. 150.  In a letter dated February 10, 2022, Petitioner argued that the Appellate Division had departed from well-established standards and had applied a much stricter standard and that leave should be granted for the Court of Appeals to address the Appellate Division's "erroneous strict new standard and reiterate the proper standard to assess the performance of counsel in an ineffective assistance of counsel claim."  *See* S.R. 151-56.

By letter dated March 9, 2022, the People responded to Petitioner's application for leave to appeal from the January 12, 2022 decision of the Appellate Division.  *See* S.R. 157-59 (arguing, *inter alia*, that "there was significant evidence connecting defendant to the crime to the scene, and to the apparent killer;" that "[a]t the time of defendant's trial, the governing case was *People v. Brown*, 13 N.Y.3d 332 (2009), which held that a DNA report was not testimony because it consisted of merely machine-generated graphs, charts and numerical data, and the relevant technicians would not have been able to offer any testimony other than how they performed certain procedures;" that "[i]t is impossible to retroactively require defense counsel to anticipate the more precise rules articulated by the Court of Appeals two years later in *People v. John*, 27 N.Y.3d 294 (2016);" that "the court's and the parties' handling of the DNA evidence was entirely compliant with the rules that were yet to be established by *John*;" that "counsel was

not deficient by refraining from objecting on confrontation clause grounds;" that "[t]his case presents no leave worthy issue;" and that "not granting leave will neither make a mockery of standards set by *People v. Baldi*, 54 N.Y.2d 137 (1981), nor *Strickland v. Washington*, 466 U.S. 668 (1984)" (quotations omitted)).

By Order dated March 24, 2022, the Court of Appeals denied Petitioner's application for leave to appeal. *See* S.R. 161.

### III.   The Petition

On June 20, 2023, Petitioner filed the instant Petition. *See generally* Pet. In his Memorandum of Law in support of the Petition, Petitioner argues that Petitioner's counsel's "combined failure to object to the inadmissible and only evidence connecting Petitioner to the crime and lack of preparation throughout the trial, where the admissible evidence was far from overwhelming and the jury deliberated for four days, deprived Mr. Skrine of his constitutional right to the effective assistance of counsel." *See* Petitioner's Memorandum of Law in Support of Petition for Writ of Habeas Corpus ("Pet. Br.") at 27-52, ECF No. 1-2. Petitioner – reiterating arguments made in connection with his appeal in state court – argues that counsel's performance was deficient because counsel "fail[ed] to object to the inadmissible 'second mask,'" "failed to object to the inadmissible suppressed clothing," "failed to object to the inadmissible DNA testimony," and throughout the trial, "was unprepared and, at times, almost absent" and Petitioner argues that counsel's deficient performance prejudiced Petitioner. *See* Pet. Br. at 28-42. Petitioner argues that "[t]he state court's failure to assess counsel's errors and their prejudicial [impact] in combination was (1) contrary to *Strickland*, and (2) an unreasonable application thereof and based on an unreasonable determination of the facts under 28 U.S.C §2254(d)(1)(2)." *See* Pet. Br. at 42-52. Petitioner requests that the Petition be granted, that

Petitioner's convictions be vacated, and that, unless Petitioner is retried within 60 days, the charges be dismissed and Petitioner be released. *See* Pet. Br. at 52.

On December 19, 2023, Respondent filed an opposition to the Petition. *See generally* Memorandum of Law in Opposition to Petition ("Resp. Br."), ECF No. 14. Respondent argues that "[t]he state court's rejection of Petitioner's ineffective assistance of trial counsel claim was not contrary to, or an unreasonable application of, clearly established Supreme Court law." *See* Resp. Br. at 2-30. And Respondent notes that Petitioner "faces a double burden" – he "must meet not only the narrow standard of review under AEDPA but also the two-prong test of *Strickland v. Washington*, 466 U.S. 668 (1984)." *See* Resp. Br. at 3. Respondent argues that Petitioner has not met his burden. *See generally* Resp. Br.

Respondent argues, *inter alia*, that counsel's performance evinced overall competence, *see* Resp. Br. at 8-11 (discussing various aspects of counsel's performance at trial); that Petitioner's claim that counsel was ineffective for failing to object to the admissibility of the second mask "misses an important aspect of how the mask was handled and stored" and, in any event, failure to object did not prejudice Petitioner, *see* Resp. Br. at 11-17; that the admission of Wong's testimony "was unquestionably proper under prevailing prece[dent] of the New York Court of Appeals at the time of the trial" and, in any event, Petitioner cannot demonstrate prejudice, *see* Resp. Br. at 17-26 (discussing, *inter alia*, *People v. Brown*, 13 N.Y.3d 332 (2009) and *People v. John*, 27 N.Y.3d 294 (2016)); and that Petitioner's claim that counsel was ineffective for failing to object to testimony and evidence regarding the clothing worn by Petitioner at the time of his arrest can be disposed of on the ground of lack of sufficient prejudice, *see* Resp. Br. at 27-29.

On February 27, 2024, Petitioner filed his reply to Respondent's opposition. *See* Reply

Memorandum of Law ("Reply"), ECF No. 20.  Petitioner argues that "[i]n reviewing an ineffective assistance of counsel claim, a court must assess counsel's performance as a whole, the errors combined and the prejudicial impact of the combined errors, not as the state court did here, contrary to *Strickland*, separately and individually, warranting issuance of the writ" and asserts that Respondent does not argue that the state court considered counsel's errors together or their combined prejudicial impact, that Respondent claims erroneously that counsel's alleged errors were either not errors or not prejudicial, and that under the proper *Strickland* standard, counsel's overall performance was deficient and its impact prejudicial.  *See generally* Reply.

## FEDERAL REVIEW OF STATE CONVICTIONS

To determine whether a petitioner is entitled to a writ of habeas corpus, a district court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*See* 28 U.S.C. § 2254(d).

"A state court decision is 'contrary to' clearly established federal law 'if the state court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law' or the state court 'decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.'"  *See Englert v. Lowerre*, 115 F.4th 69, 80 (2d Cir. 2024) (alterations

accepted) (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)), *cert. denied sub nom.*

*Englert v. Bishop*, 145 S.Ct. 2826 (2025); *see also Rosario v. Ercole*, 601 F.3d 118, 123 (2d Cir.

2010). "A state court decision involves an 'unreasonable application' of clearly established

federal law 'if the state court identifies the correct governing legal principle from the Supreme

Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'"

*Englert*, 115 F.4th at 80 (alteration accepted) (quoting *Williams*, 529 U.S. at 413). Under

AEDPA, "clearly established Federal law" refers "only to the holdings of the Supreme Court

extant at the time of the relevant state court decision." *Id.* at 81 (quotations omitted); *see also*

*Williams*, 529 U.S. at 412.

AEDPA's standard is "intentionally difficult to meet." *See Woods v. Donald*, 575 U.S.

312, 316 (2015) (quotation omitted). As the United States Court of Appeals for the Second

Circuit has stated:

> This highly deferential standard of review is difficult to meet in that it demands
> that state-court decisions be given the benefit of the doubt. Thus, under AEDPA,
> the determinative question is not whether a federal court believes the state court's
> determination was incorrect but whether that determination was unreasonable – a
> substantially higher threshold. In other words, to obtain § 2254 relief, a petitioner
> must show that the state court's ruling on the claim being presented in federal
> court was so lacking in justification that there was an error well understood and
> comprehended in existing law beyond any possibility for fairminded
> disagreement. Thus, the existence of reasonable arguments on both sides is all the
> state needs to prevail in an AEDPA case.

*See Englert*, 115 F.4th at 80-81 (alterations accepted) (quotations and citations omitted); *see also*

*Dunn v. Reeves*, 594 U.S. 731, 739-40 (2021) (in context of ineffective assistance of counsel,

noting, *inter alia*, that a federal court may grant habeas relief only if a state court violated clearly

established Federal law, as determined by the Supreme Court of the United States; that "[t]his

wide latitude means that federal courts can correct only extreme malfunctions in the state

criminal justice system;" that "in reviewing the work of their peers, federal judges must begin

with the presumption that state courts know and follow the law;" and that "a federal court may grant relief only if *every* fairminded jurist would agree that *every* reasonable lawyer would have made a different decision" (alterations accepted) (quotations omitted)); *Harrington v. Richter*, 562 U.S. 86, 101-03 (2011) (noting, *inter alia*, that "[f]or purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law;" that "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself;" that 28 U.S.C. § 2254(d) "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the United States Supreme Court's] precedents" and "[i]t goes no further;" and that "habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal" (quotations omitted)); *Chambers v. Lilly*, 735 F. Supp. 3d 196, 239 (E.D.N.Y. 2024) (noting that "[t]he requirements set forth by AEDPA are strictly construed and, by design, erect a substantial barrier to federal habeas relief").[11]

## DISCUSSION

For the reasons set forth below, the Petition is DENIED.

---

[11] Respondent does not argue that Petitioner did not exhaust his state court remedies or that the Petition is untimely and neither party argues that the state court decision was not adjudicated on the merits. *See generally* Pet. Br.; Resp. Br.; Reply; *see also Richter*, 562 U.S. at 98-99 (2011) (noting that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary," that "determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning," and that "as [the United States Supreme Court] has observed, a state court need not cite or even be aware of [the Supreme Court's] cases under § 2254(d)"); *Chambers*, 735 F. Supp. 3d at 240-41.

## I.    Applicable Law

The "clearly established" federal law applicable to Petitioner's ineffective assistance of counsel claim is the two-part test articulated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984).  *See Englert*, 115 F.4th at 81; *see also Lindstadt v. Keane*, 239 F.3d 191, 198 (2d Cir. 2001) (noting that "[i]n a petition for habeas relief alleging ineffective counsel, the question as to whether the matter is governed by existing Supreme Court precedent is easily answered because the merits of such claims are squarely governed by the Supreme Court's holding in *Strickland v. Washington*" (alterations accepted) (quotation omitted)).

The two-part test articulated by the Supreme Court in *Strickland* "requires a defendant challenging conviction based on ineffective assistance of counsel to show both that (1) counsel's performance was objectively deficient, and that (2) petitioner was actually prejudiced as a result."  *See Englert*, 115 F.4th at 81 (quotations omitted); *see generally Strickland v. Washington*, 466 U.S. 668 (1984).[12]  As the Supreme Court has stated:

> To establish deficient performance, a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness.  A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance.  The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the counsel

---

[12]  The Second Circuit has noted:

> The *Strickland* Court . . . declared . . . that there is no reason for a court to address both components of the inquiry if the defendant makes an insufficient showing on one.  In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant.  As the Supreme Court admonished, the object of an ineffectiveness claim is not to grade counsel's performance.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

*See Garner v. Lee*, 908 F.3d 845, 861 (2d Cir. 2018) (alterations accepted) (quotations and citations omitted).

guaranteed the defendant by the Sixth Amendment.

With respect to prejudice, a challenger must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*See Richter*, 562 U.S. at 104 (quotations and citations omitted); *see also Englert*, 115 F.4th at 81 (noting that "[a]t the first step of *Strickland* analysis, courts strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment;" that "[t]o overcome this presumption, a petitioner bears a heavy burden" because "the question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom;" that "[t]o establish prejudice at *Strickland's* second step, a petitioner must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different;" and that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome, which requires a substantial, not just conceivable, likelihood of a different result" (alterations accepted) (quotations and citations omitted)); *Garner*, 908 F.3d at 861-62 (noting that with respect to prejudice, the "question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is *possible* a reasonable doubt might have been established if counsel acted differently; instead, the likelihood of a different result must be substantial, not just conceivable;" that "[t]he prejudice analysis should also be made objectively, without regard for the idiosyncrasies of the particular decisionmaker;" that "[t]he prejudice inquiry is therefore ineluctably tied to the strength of the prosecution's evidence;" that a "verdict or conclusion with ample record support is less likely to

28

have been affected by the errors of counsel than a verdict or conclusion only weakly supported by the record;" and that "even serious errors by counsel do not warrant granting habeas relief where the conviction is supported by overwhelming evidence of guilt" (alterations accepted) (quotations omitted)).  The Supreme Court has explained that when analyzing counsel's performance, strategic decisions are entitled to a strong presumption of reasonableness, that the burden of rebutting this presumption "rests squarely on the defendant," and that "even if there is reason to think that counsel's conduct was far from exemplary, a court still may not grant relief if the record does not reveal that counsel took an approach that no competent lawyer would have chosen."  *See Dunn*, 594 U.S. at 739 (alteration accepted) (quotations omitted); *see also Richter*, 562 U.S. at 105 (noting, *inter alia*, that "[u]nlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge").

"Surmounting *Strickland*'s high bar is never an easy task."  *Richter*, 562 U.S. at 105 (quotation omitted).  And "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult."  *Id.*  As the Supreme Court has explained: "The standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so."  *See id.* (quotations and citations omitted); *see also Englert*, 115 F.4th at 81-82.  As the Supreme Court also has explained: "Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)."  *See Richter*, 562 U.S. at 105.  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable," rather "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*

29

## II.     The Petition Is Denied

As set forth above, the relevant inquiry here is whether Petitioner has demonstrated that the adjudication of his ineffective assistance of counsel claim in state court resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or that was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d).

Upon consideration of the record and applying the appropriate standard of review – taking care not to "equat[e] unreasonableness under *Strickland* with unreasonableness under § 2254(d)," *see Richter*, 562 U.S. at 105 – the Court concludes that Petitioner has not demonstrated that he is entitled to the relief sought and the Petition therefore must be denied.

Petitioner asserts that the state court "never considered counsel's errors or their prejudicial impact in combination," argues that the "combined prejudicial impact of counsel's error[s] might well have raised a doubt in the mind of the jury," argues that "if not contrary to *Strickland*, [the state court's decision] is an 'objectively unreasonable' application of *Strickland*," and argues that the state court's decision was "based on an unreasonable determination of the facts." *See* Pet. Br. at 43-51.[13]  Petitioner's assertion and arguments are unavailing here.

As an initial matter, the Court notes that Petitioner has failed to identify any determination of *fact* made by the Appellate Division, *see generally* Pet. Br.; Reply, and on the record before the Court, the Court cannot conclude that the Appellate Division's decision was

---

[13] Petitioner acknowledges that "[s]eparately, each error may not have amounted to deficient performance," but argues that "together they do."  *See* Pet. Br. at 47.

"based on an unreasonable determination of the facts," *see* 28 U.S.C. § 2254(d)(2).

In addition, Petitioner's assertion that the Appellate Division "considered counsel's errors and omissions separately and their prejudicial impact separately," *see* Pet. Br. at 43, is belied by the text of the Appellate Division's decision. *See* S.R. 148-49. In its decision, the Appellate Division indicated that it viewed the evidence, the law, and the circumstances of the case "in the totality." *See* S.R. 148. The Appellate Division's subsequent reference to specific errors alleged by Petitioner, *see* S.R. 148-49, does not indicate that the Appellate Division considered only those alleged errors, let alone considered them only individually rather than collectively. The Court will not assume that the Appellate Division did not do as it says it did – *i.e.*, view the evidence, the law, and the circumstances of the case *in the totality*.

The record before the Court does not reflect that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." The record does not reflect that the state court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law or that the state court decided the case differently than the Supreme Court has on a set of materially indistinguishable facts.[14] Nor does the record reflect that the state court unreasonably applied the legal principles of *Strickland* to the facts of Petitioner's case. The record before the Court does not reflect that the Appellate Division's decision on Petitioner's claim of ineffective assistance "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *See*

---

[14] The Second Circuit has recognized that New York's "meaningful representation" standard is not contrary to the *Strickland* standard. *See Rosario*, 601 F.3d at 124 (citing, *inter alia*, *People v. Baldi*, 54 N.Y.2d 137, 147 (1981)); *see also Gross v. Graham*, 802 F. App'x 16, 19 (2d Cir. 2020).

*Englert*, 115 F.4th at 80 (quoting *Richter*, 562 U.S. at 103).  In light of the state court record and

the strong presumption "that counsel rendered adequate assistance and made all significant

decisions in the exercise of reasonable professional judgment," *see Englert*, 115 F.4th at 81

(quotations omitted), the Court cannot conclude that "there is no possibility fairminded jurists

could disagree that the state court's decision conflicts with" *Strickland*, *see Richter*, 562 U.S. at

102.

Petitioner's bald assertions that Petitioner's counsel "had no understanding of the

prosecution's case" and "was so ineffective that [Petitioner] essentially went to trial

unrepresented," *see* Pet. Br. at 2, 47, are belied by the record.  Here, Petitioner's counsel, *inter*

*alia*: made a strategic decision not to give an opening statement at the outset of trial so as not to

promise the jury something that she might not be able to deliver; went on to cross-examine

numerous witnesses, eliciting testimony that undercut certain of the People's evidence and the

credibility and/or reliability of certain testimony and laid the foundation for a closing argument

that highlighted weaknesses in the People's case, suggested that the perpetrator could have been,

*inter alia*, Lonney Walker, and suggested that the People's theory of the case made no sense;

successfully argued for dismissal of Count Six prior to submission of the case to the jury;

actively participated in discussions regarding jury instructions and regarding formulation of

appropriate responses to jury notes; and undertook certain preparation for a possible defense

case.[15]  And, although, as Petitioner highlights, Petitioner's counsel did not lodge objections to

the admission of the second mask, certain of Petitioner's clothing, and Wong's testimony, the

_____

[15]  Petitioner argues without record support that counsel "chose not to make an opening
statement, not as a matter of strategy, but because she was not ready."  *See* Reply at 14.

Petitioner also argues that counsel had a "myopic focus" on the bills recovered from Petitioner
at the time of arrest, *see* Pet. Br. at 39, a characterization that is not supported by the record.

Court cannot conclude that the lack of objection demonstrates that the Appellate Division's decision was contrary to, or involved an unreasonable application of, *Strickland*.[16]

The Petition, ECF No. 1, is denied.

## CONCLUSION

For the reasons set forth above, the Petition, ECF No. 1, is DENIED.

The Court will not issue a certificate of appealability as Petitioner has not "made a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). Petitioner, however, has a right to seek a certificate of appealability from the United States Court of Appeals for the Second Circuit. *See* 28 U.S.C. § 2253(c).

The Clerk of Court is directed to enter judgment and close this case.

SO ORDERED.

> /s/ Diane Gujarati
> DIANE GUJARATI
> United States District Judge

Dated:    September 29, 2025
        Brooklyn, New York

---

[16] The Court notes with respect to the issue of the clothing that it is not entirely clear from the record that the clothing worn by Petitioner was in fact intended to be covered by the pretrial ruling suppressing certain evidence and the record reflects that at the time of trial, there may have been some confusion as to the scope of the ruling. The ruling stated that "the recovery of physical evidence from defendant's person (i.e., the counterfeit currency and identification cards) must be suppressed." *See* S.R. 5. On appeal, Petitioner argued that the state court "made the common error of using '*i.e.*' instead of '*e.g.*' to list examples" and asserted that the ruling included suppression of all of Petitioner's clothing, *see* S.R. 141-42, and Respondent argued that "[i]nasmuch as the court used the abbreviation '*i.e.*' rather than '*e.g.*,' the currency and cards are fairly understood to make up an exhaustive list of the 'physical evidence from defendant's person' the court was referring to" and that "[c]ounsel cannot be faulted [for] failing to read more into the order than was there," *see* S.R. 117-18. Any ambiguity in how the ruling was intended and/or perceived is not material to the Court's decision herein.